JINA L. CHOI (N.Y. Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
STEVEN D. BUCHHOLZ (Cal. Bar No. 202638)
  buchholzs@sec.gov
ANDREW J. HEFTY (Cal. Bar No. 220450)
  heftya@sec.gov
SUSAN F. LaMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
THOMAS J. EME (Ill. Bar No. 6224870)
  emet@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC, | |
| Defendants, and | |
| CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

**SUMMARY OF THE ACTION**

1.      From in or around 2010 through the present, Thomas Henderson, his Oakland, California-based company, San Francisco Regional Center, LLC ("SFRC"), and other companies under Henderson's control have fraudulently raised at least $107 million in securities issued to approximately 215 investors by SFRC-related companies.

2.      Henderson used his companies to entice predominantly Chinese foreign nationals to make investments of $500,000 each, purportedly to fund one of seven business projects.  Henderson and SFRC pitch the investments as a means to participate in the Employment–Based Immigration Fifth Preference program ("EB-5 Program"), which is administered by the United States Citizenship and Immigration Services ("USCIS") and provides a means for foreign nationals to qualify for United States permanent residency if they make a qualified investment of $500,000 or more in a specified project that is determined to have created or preserved at least 10 jobs for United States workers.

3.      Henderson, through SFRC, has sponsored a total of seven business projects under the EB-5 program ("EB-5 Projects"), including a skilled nursing facility, three calls centers, a warehousing/third-party logistics business, a retail grocery and restaurant business, and a dairy processing business.  Investors in each EB-5 Project paid $500,000 for an interest in a limited partnership.  To solicit EB-5 Program investors, Henderson used marketing materials, including private placement memoranda and business plans, which represent that each investor's $500,000 "capital contribution" would be used by the limited partnership to start and operate, or make loans to, a specific, job-creating business.

4.      Rather than using each investor's $500,000 capital contribution solely for the project for which it was solicited, Henderson has used at least $9.6 million from SFRC accounts with commingled funds, including investor funds, to benefit himself through his non-EB-5 business ventures and other means.  For example, Henderson used $346,000 of investor funds to purchase his $1.4 million personal residence in Oakland, California.  He used approximately $3.8 million from commingled SFRC accounts with investor funds to build out and operate two restaurants in Oakland, California that are not related to any of EB-5 Project businesses, and in which he had an ownership

interest.  He used another $5.1 million from SFRC accounts commingled with investor funds to fund three more non-EB-5 business ventures that benefited him.  And he caused SFRC to pay $394,000 from its commingled accounts to himself or for services or goods for his benefit.

5.      In addition to their $500,000 capital contributions, investors are required to pay a "syndication fee," ranging from $40,000 to $60,000.  Henderson and his companies provided investors with marketing materials stating that the syndication fees will be used to pay expenses related to the offering, including paying finder's fees to overseas agents who solicit investors for the projects; the materials further state that investors' entire capital contributions thus remain available for job-creating investments.  Despite these assurances, Henderson diverted at least $7.5 million from investor capital contributions to pay overseas marketing agents.

6.      Finally, Henderson has engaged in an elaborate shell game of using funds raised for one EB-5 Project to fund other EB-5 Projects, contrary to representations made to investors who were told their investment would be used for a specific EB-5 Project.  Henderson's actions have jeopardized both the investors' prospects for an economic return, as well as their ability to obtain permanent residency through the EB-5 Program.

7.      Based on the above, the Defendants have violated and will continue to violate the federal securities laws.  In order to protect current investors and the public, and to halt Defendants' fraud, the Commission seeks an order enjoining the Defendants from further violations of the anti-fraud provisions of the federal securities laws, and providing other equitable and related relief including the appointment of a receiver.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Defendants, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

11.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, practices, transactions, and courses of business that form the basis for the violations alleged in this Complaint occurred in Alameda County, California.

12.     Under Civil Local Rule 3-2(d), this case should be assigned to the San Francisco or Oakland Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in Alameda County, where SFRC's principal place of business is located.

## DEFENDANTS

13.     **Thomas M. Henderson** ("Henderson"), age 68, is a resident of Oakland, California. At all relevant times, Henderson controlled the other Defendants and Relief Defendants by virtue of his management authority over them and, for some, through his ownership interest in them, as described more fully below.

14.     **San Francisco Regional Center, LLC ("SFRC")** is a California limited liability company formed on or around September 14, 2010, with its principal place of business in Oakland, California.  Henderson is the Chief Executive Officer and President of SFRC.  According to Henderson, he has a 67 percent ownership interest in SFRC.  Through at least December 2016, Henderson controlled the operations of SFRC.  SFRC is the General Partner of Defendants NA3PL, L.P., West Oakland Plaza, L.P., and California Gold Medal, L.P., in addition to holding ownership interests in other Defendants and Relief Defendants, as described below.  In November 2011, USCIS designated SFRC a "Regional Center," which permitted SFRC to sponsor commercial enterprises in which investors invest through the EB-5 Program.  At least nine bank accounts were opened in SFRC's name, from approximately October 2010 to December 2014.  Henderson was the sole signatory on all those accounts.

15.     **Immedia, LLC ("Immedia")** is a California limited liability company formed on or around September 14, 2010, with its principal place of business in Oakland, California.  Immedia is

owned by SFRC and Henderson.  According to Henderson, Immedia does not conduct any business operations of its own, except for opening bank accounts for conducting aspects of SFRC's business since approximately November 2015.  At least two bank accounts were opened in Immedia's name, both in November 2015.  Henderson was the sole signatory on these two accounts.  At Henderson's direction, funds from investors for at least some of the EB-5 Projects were transferred into and out of these accounts.

16.     **Comprehensive Care of California, LLC** is a California limited liability company formed on or around September 10, 2010, with its principal place of business in Oakland, California. It is the general partner of, and controls, Defendant Comprehensive Care of Oakland, L.P.  SFRC is currently a manager of Comprehensive Care of California, LLC and was its 50 percent owner from its formation through at least July 2016.

17.     **Comprehensive Care of Oakland, L.P.** is a California limited partnership, formed on or around September 14, 2010, with its principal place of business in Oakland, California.  It issued securities to investors in the form of limited partnership interests, first as part of a stand-alone EB-5 enterprise and, later, a Project sponsored by SFRC, soliciting the investments through private placement memoranda and business plans which represented that it would use investor capital contributions to capitalize, own and operate a skilled nursing facility.

18.     **CallSocket, LLC** is a California limited liability company, formed on or around July 5, 2011, with its principal place of business in Oakland, California.  It is the general partner of, and controls, Defendant CallSocket, L.P.  SFRC is a managing member and at least 47.5 percent owner of CallSocket, LLC.  CallSocket, LLC is currently under the control of a receiver appointed in or about March 2016 in *Young v. Henderson*, *et al.*, Case No. RG15778891, Superior Court of California, Alameda County (filed July 22, 2015) ("*Young v. Henderson*").

19.     **CallSocket, L.P.** is a California limited partnership, formed on or around September 1, 2011, with its principal place of business in Oakland, California.  It issued securities in the form of limited partnership interests to investors as part of an EB-5 Project sponsored by SFRC, soliciting the investments through a private placement memorandum and business plan which represented that it

1  would use investor capital contributions to start and operate a call center business.  CallSocket, L.P.

2  is currently under the control of the receiver appointed in *Young v. Henderson*.

3       20.  **CallSocket II, LLC** is a California limited liability company, formed on or around

4  June 14, 2012, with its principal place of business in Oakland, California.  It is the general partner of,

5  and controls, Defendant CallSocket II, L.P.  SFRC is a managing member and at least 50 percent

6  owner of CallSocket II, LLC.  CallSocket II, LLC is currently under the control of the receiver

7  appointed in *Young v. Henderson*.

8       21.  **CallSocket II, L.P.** is a California limited partnership, formed on or around June 14,

9  2012, with its principal place of business in Oakland, California.  It issued securities in the form of

10  limited partnership interests to investors as part of an EB-5 Project sponsored by SFRC, soliciting the

11  investments through a private placement memorandum and business plan which represented that it

12  would use investor capital contributions to start and operate a second call center business.  CallSocket

13  II, L.P. is currently under the control of the receiver appointed in *Young v. Henderson*.

14       22.  **CallSocket III, LLC** is a California limited liability company, formed on or around

15  February 25, 2014, with its principal place of business in Oakland, California.  It is the general

16  partner of, and controls, Defendant CallSocket III, L.P.  SFRC is a managing member and at least 50

17  percent owner of CallSocket III, LLC.  CallSocket III, LLC is currently under the control of the

18  receiver appointed in *Young v. Henderson*.

19       23.  **CallSocket III, L.P.** is a California limited partnership, formed on or around January

20  3, 2013, with its principal place of business in Oakland, California.  It issued securities in the form of

21  limited partnership interests to investors as part of an EB-5 Project sponsored by SFRC, soliciting the

22  investments through a private placement memorandum and business plan which represented that it

23  would use investor capital contributions to start and operate a third call center business.  CallSocket

24  III, L.P. is currently under the control of the receiver appointed in *Young v. Henderson*.

25       24.  **North America 3PL, LLC** is a California limited liability company, formed on or

26  around July 22, 2010, with its principal place of business in Oakland, California.  A so-called job-

27  creating entity, it purportedly would borrow money from Defendant NA3PL, L.P., and use it to fund

28  the development, construction, and initial operating expenses of a warehouse/third-party logistics

1  facility.  Henderson is a member and 40 percent owner of North America 3PL, LLC, and from its

2  formation through at least March 2016 he was one of its managers.

3      25.  **NA3PL, L.P.** is a California limited partnership, formed on or around February 25,

4  2014, with its principal place of business in Oakland, California.  It issued securities to investors as

5  part of an EB-5 Project sponsored by SFRC, soliciting the investments through a private placement

6  memorandum and business plan which represented that it would loan investor capital contributions to

7  Defendant North America 3PL, LLC, which would use the loaned funds for the development,

8  construction, and initial operating expenses of a warehouse/third-party logistics facility.

9      26.  **West Oakland Plaza, L.P.** is a California limited partnership, formed on or around

10 January 16, 2015, with its principal place of business in Oakland, California.  It issued securities to

11 investors as part of an EB-5 Project sponsored by SFRC, soliciting the investments through a private

12 placement memorandum and business plan which represented that it would loan investor capital

13 contributions to non-party West End Market, LLC, which would use the loaned funds for the

14 development, construction, and initial operating expenses of a food service and grocery business.

15     27.  **California Gold Medal, L.P.** is a California limited partnership, formed on or around

16 March 4, 2015, with its principal place of business in Oakland, California.  It issued securities to

17 investors as part of an EB-5 Project sponsored by SFRC, soliciting the investments through a private

18 placement memorandum and business plan which represented that it would loan investor capital

19 contributions to non-party Crystal Golden, LLC, which would use the loaned funds for the

20 development, construction, and initial operating expenses of a production and worldwide distribution

21 facility for dairy products.

22                              **<u>RELIEF DEFENDANTS</u>**

23     28.  The following entities are named as Relief Defendants in this action for the purpose of

24 assuring complete relief.  Each received investor money or property that was obtained in violation of

25 the federal securities laws.  The Relief Defendants have no legitimate claim to such money or

26 property or the fruits derived therefrom.

27     29.  **CallSocket Holding Company, LLC** is a California limited liability company formed

28 on or around November 4, 2011, with its principal place of business in Oakland, California.  From

1   approximately December 2011 to December 2016, it held title to real property known as the Oakland
2   Tribune Tower, located at 409 13th Street in Oakland, California.  Approximately $1.3 million of
3   capital contributions from Comprehensive Care of Oakland, L.P. were used for the purchase of the
4   property.  SFRC is a member and 80 percent owner of CallSocket Holding Company LLC.  SFRC
5   was also the sole manager of CallSocket Holding Company LLC until in or about March 2016 when
6   it was placed into the receivership created in *Young v. Henderson*.  The receiver currently controls the
7   entity and the proceeds from the sale of the Tribune Tower property.

8       30.     **CallSocket III Holding Company, LLC,** is a California limited liability company
9   formed on or around March 11, 2013, with its principal place of business in Oakland, California.
10  From June 2013 to March 2016, it held title to real property known as the I. Magnin Building, located
11  at 2001 Broadway, Oakland, California.  Approximately $2.4 million in capital contributions from
12  CallSocket, L.P. and CallSocket II, L.P. were used towards the purchase of the property in June 2013.
13  SFRC is a member, approximately 99 percent owner, and until placed into the state-court
14  receivership in *Young v. Henderson*, was the sole manager of CallSocket III Holding Company, LLC.
15  The I. Magnin Building was sold in or about March 2016 and the state court receiver holds the
16  remaining proceeds from the sale.

17      31.     **Berkeley Healthcare Dynamics, LLC,** is a California limited liability company,
18  formed in or around October 2012, with its principal place of business in Oakland, California.
19  Henderson has either a direct or indirect ownership interest in Berkeley Healthcare Dynamics, LLC.
20  Berkeley Healthcare Dynamics, LLC holds legal title to real property located at 1700 20th Street in
21  Oakland, California.  Approximately $2.5 million from CallSocket, L.P., including at least $1.95
22  million of CallSocket, L.P. investors' capital contributions, was used to purchase the property.  In
23  March 2016, the property, but not Berkeley Healthcare Dynamics, LLC, was placed under the control
24  of the receiver appointed in *Young v. Henderson*.

25      32.     **JL Gateway, LLC** is a California limited liability company, formed on or around
26  June 26, 2014, with its principal place of business in Oakland, California.  It holds legal title to real
27  property located at 800-900 Market Street in Oakland, California.  Approximately $150,000 of

28

investors' funds from CallSocket III, L.P. and NA3PL, L.P. was used towards the purchase of the property. SFRC is a managing member and 75 percent owner of JL Gateway, LLC.

33. **Central California Farms, LLC,** is a California limited liability company, formed in or around January 16, 2015, with a business addresses listed with the California Secretary of State in Oakland, California. It holds legal title to real property located at 417 and 615 North Burnett Road, Tipton, California, and approximately $2.48 million of investors' capital contributions from Defendant California Gold Medal, L.P. was used to purchase this property. SFRC is a member, 50 percent owner, and sole manager of Central California Farms, LLC.

## FACTUAL ALLEGATIONS

### I.  Henderson and SFRC Have Raised More Than $115 Million from Investors

34. From September 2010 through at least October 2016, Henderson has been soliciting investments in seven EB-5 Projects. In total, Henderson and SFRC have raised approximately $115 million, comprised of approximately $107 million in "capital contributions" and $8.9 million in so-called "syndication fees," from approximately 215 EB-5 Program investors.

35. Investors in each of the seven EB-5 Projects have been solicited with a Business Plan and a Private Placement Memorandum ("PPM"), both of which were approved by Henderson. Each PPM identifies a limited partnership, designed to fund a particular EB-5 Project, as the issuer of the securities purchased by investors.

36. For each EB-5 Project investment, the PPM and Limited Partnership Agreement state that in exchange for the "capital contribution" of $500,000, an investor will receive an interest in the limited partnership and a share of net profits generated by the EB-5 Project. Based on the businesses formed using the entirety of the investors' capital contributions and the jobs to be generated from creating these businesses, the investors are expected to file petitions with USCIS seeking residency in the United States under the EB-5 Program.

37. Investors also pay an additional "syndication fee" of $40,000, $50,000, or $60,000 (depending on the particular EB-5 Project). The syndication fees are to be paid to the general partner of the EB-5 Project and are supposed to be the means for paying the offering expenses, including so-called "finders' fees" and legal fees. The separate fee is described in the offering materials as a

1   means to ensure that the entirety of the investor's $500,000 capital contribution remains free for job-
2   creating investments.

3       38.     Henderson reviewed the Business Plans and the PPMs for each offering in each EB-5
4   Project.  He had final authority to approve these documents; and he did approve them for distribution
5   to prospective investors.  Henderson approved the Business Plans and PPMs for SFRC, the general
6   partners, and the limited partnerships for each of the EB-5 Projects.  As directed by Henderson or
7   SFRC staff, overseas marketing agents deliver the Business Plans and PPMs to prospective investors
8   in the EB-5 Projects before they invest.

9       39.     All of the Defendants have engaged in a scheme to solicit funds from foreign investors
10  and to misappropriate those funds for Henderson's personal benefit.  And each of the Defendants
11  engaged in manipulative or deceptive acts in furtherance of this scheme.  Henderson, SFRC, the other
12  general partners, and the limited partnerships solicited funds by creating the false appearance that
13  each EB-5 Project was a distinct business that complied with USCIS requirements and provided
14  investors with both the possibility of a return on their investment and a means to obtain U.S.
15  residency under the EB-5 Program.

16      40.     Henderson and SFRC used bank accounts in the names of SFRC and Immedia and
17  numerous, multi-step transactions to commingle funds for the EB-5 Projects, masking the true
18  sources of the funds and creating a common fund to pay expenses and finders' fees, buy property, and
19  enrich Henderson.  In particular, from 2010 through 2016, Henderson controlled numerous bank
20  accounts in the name of SFRC into which he deposited and transferred out investor funds raised for
21  each of the EB-5 Projects.  From late 2015 through the present, Henderson additionally opened at
22  least two bank accounts in the name of Immedia, into which he has deposited and transferred out
23  investor funds raised for certain of the EB-5 Projects.

24      41.     Indeed, Henderson frequently commingled capital contributions from investors in the
25  separate EB-5 Projects by transferring them into SFRC or Immedia bank accounts and then
26  redirecting the funds in the commingled accounts to whatever use he determined, frequently without
27  regard to the EB-5 Project (or other source) from which the money had been obtained.

28

COMPLAINT                                    9

**II.      Henderson Used at Least $9.6 Million from SFRC Accounts with Commingled Investor Funds to Benefit Himself**

42.      Contrary to the Business Plans and PPMs, Henderson did not use the entirety of the investors' capital contributions to start and operate, or to lend money for such purposes to, the distinct businesses associated with the EB-5 Projects.  Instead, Henderson has used at least $9.6 million from SFRC accounts commingled with investor funds to benefit himself through non-EB-5 business ventures and other means.

43.      For example, in November 2014, he used approximately $346,000 of funds from investors in the CallSocket III EB-5 Project L.P., towards the purchase of his $1.4 million personal residence in Oakland, California.  And from December 2011 through November 2015, Henderson caused SFRC to pay $394,000 from its commingled accounts to himself or for services or goods for his benefit.

44.      Henderson took additional investor funds for himself.  For example, Henderson used approximately $3.8 million from commingled SFRC accounts with investor funds to build out and operate two restaurants in Oakland, California.  Henderson had an indirect ownership interest in both restaurants, as well as a right to net profits, through his ownership interest in SFRC.  Neither restaurant is related to any of the EB-5 Project businesses, and the offering materials provided to EB-5 investors by Henderson and other Defendants did not disclose that that their funds would be used for these restaurants.

45.      Similarly, at Henderson's direction, from January 2013 to December 2013 a net of approximately $257,000 was paid to or on behalf of Starr Brand, LLC from an SFRC account.  Starr Brand, LLC is an entity in which Henderson held an indirect ownership interest through SFRC.  According to Henderson, Starr Brand, LLC never conducted any business.  The offering materials provided to EB-5 investors by Henderson and other defendants failed to disclose that that their funds would be paid to or on behalf of Starr Brand, LLC.

46.      Henderson misused additional investor money on other non-EB-5 business ventures that personally benefited him.  For example, in November 2012, Henderson, making transfers through SFRC, used approximately $2.5 million from investors in CallSocket I to purchase a

warehouse in Oakland, California.  He placed title in non-party Berkeley Healthcare Dynamics, L.P., an entity in which he has an indirect ownership interest.  Over the period November 2012 through January 2014, Henderson transferred an additional approximately $2.2 million from SFRC bank accounts with commingled investor funds to this same non-party.  In February 2014, Henderson then formed the limited partnership NA3PL, L.P. for a new warehouse EB-5 Project, which received its first investor funds in May 2014.  That EB-5 Project is located at the warehouse property and, for at least some period of time, paid rent to the current title holder, Relief Defendant Berkeley Healthcare Dynamics, LLC, another entity in which Henderson has either a direct or indirect ownership interest.

47.     Similarly, in around December 2014, Henderson commingled funds from NA3PL, L.P. and CallSocket III and used $150,000 of the commingled funds toward the purchase of a shopping complex located at 800-900 Market Street in Oakland, California.  Henderson placed title in Relief Defendant JL Gateway, LLC, which is owned 75 percent by SFRC, an entity owned in part by Henderson.  The PPMs and business plans for NA3PL, L.P. and CallSocket III did not disclose that investors' funds for those Projects would be used to purchase this property.  Instead, the Business Plan for the West Oakland Plaza EB-5 Project states that that Project would develop a grocery store/restaurant, and commercial kitchen at the 800-900 Market Street location.  But the limited partnership for that Project was not even formed until January 2015 – a month after the purchase of the property – and the first investor funds for that Project were not received until November 2015.  Furthermore, from at least May 2016 to November 2016, West Oakland Plaza made rent payments to JL Gateway, LLC, an entity in which Henderson has an indirect ownership interest through SFRC.  Thus, Henderson used investor funds from two EB-5 Projects towards the purchase of property that would come to be used by a third EB-5 Project that pays rent to an entity in which Henderson has an indirect ownership interest – and Henderson also gave himself an ownership interest in the underlying property itself.

48.     Finally, Henderson converted assets that were purchased with EB-5 investor funds to his own purposes.  For instance, Henderson allowed one of the restaurants in which he had an indirect ownership interest to operate without paying rent for a period from the Oakland Tribune Tower building, which had been purchased in part with capital contributions from investors in

Comprehensive Care of Oakland, L.P.  Indeed, Henderson permitted other entities with which he is associated – including a law firm that has provided him services – to use space in the Tribune Tower while paying no rent or below-market rent.

49. Henderson was able to thus divert investor money, and EB-5 Project related funds to his own purposes given his control over the various entities' bank accounts, as well as his control over the entities generally.

50. Henderson knew, or was reckless in not knowing, that the use of investor money for these non-EB-5 business ventures, his personal residence, to pay himself, and for services and goods for his benefit, was contrary to the way in which he represented to investors he would use their money.

### III.   Henderson Misused $7.5 Million in Capital Contributions to Pay Finder's Fees

51. Contrary to representations to investors, Henderson has used their capital contributions to pay overseas marketing agents or "finders" who marketed the EB-5 Projects to investors.

52. As described above, the PPMs for the EB-5 Projects describe the additional "syndication fee" as the means for paying offering expenses, specifying that the general partners expect to use the syndication fees to pay for, among other things, "finder's fees." The PPMs also state that the purpose of assessing a separate syndication fee to cover such expenses is "to assure that" the $500,000 each investor paid was a "capital contribution and available to the Partnership for job-creating investments."

53. Contrary to these representations, from approximately November 2011 through June 2016, Henderson directed transfers totaling approximately $16.6 million from bank accounts of SFRC, Immedia, CallSocket, L.P., West Oakland Plaza, L.P., and California Gold Medal, L.P. for payments of finder's fees to overseas agents who marketed the EB-5 Project investments. Syndication fees paid by investors across all seven EB-5 Projects totaled approximately $8.9 million, and were insufficient to cover the more than $16 million in finder's fees payments.  Henderson thus used at least $7.5 million in investor capital contributions to make payments to overseas marketing agents, contrary to the PPMs.

54.     Henderson and Defendants SFRC; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; Immedia, LLC; North America 3PL, LLC, and Comprehensive Care of California, LLC knew, or were reckless in not knowing, that investors' capital contributions were being used to pay finders' fees contrary to the representations to investors.

**IV.     The Seven EB-5 Projects Are Not Maintained As Distinct Businesses**

55.     Henderson has also used his discretion over the funds he commingled through the SFRC and Immedia bank accounts, and his control over each of the entities, to routinely use funds solicited for one project to fund other EB-5 Projects, contrary to representations in the PPMs and Business Plans provided to investors.  Henderson's frequent transfers of funds from the EB-5 Projects into and out of the SFRC and Immedia bank accounts served, as well, to obscure that Henderson transferred millions of dollars of investors' funds from SFRC and Immedia to (1) pay overseas marketing agents, (2) fund his non-EB-5 business ventures; (3) use funds solicited for one EB-5 Project to fund other EB-5 Projects; and (4) to pay or otherwise benefit himself.

56.     Henderson's use of funds solicited for one EB-5 Project to fund other EB-5 Projects or business entities was contrary to the representations in the PPMs and Business Plans provided to investors, and has seriously jeopardized both the investors' prospects for an economic return, as well as their ability to obtain permanent residence through the EB-5 Program.

57.     Henderson and Defendants SFRC; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; Immedia, LLC; North America 3PL, LLC, and Comprehensive Care of California, LLC knew, or were reckless in not knowing, that using funds solicited for one Project to fund other EB-5 Projects was contrary to their representations to investors.

**A.  Comprehensive Care of Oakland Skilled Nursing Facility EB-5 Project**

58.     The first EB-5 Project established by Henderson was Comprehensive Care of Oakland, L.P. ("CCOO"), formed in September 2010.  Initially, from approximately March 2011

through mid-November 2011, 16 investors invested a total of approximately $8 million in capital contributions in CCOO, before SFRC was designated as a Regional Center by USCIS.

59.     After SFRC was designated a Regional Center in November 2011, eight additional investors invested a total of approximately $4 million in capital contributions in CCOO through December 2013.  In addition, certain CCOO investors paid syndication fees, some in the amount of $40,000, and others in the amount of $60,000; according to accounting and bank records received by the Commission, the total amount of syndication fees collected for the Project was approximately $440,000. CCOO directly or indirectly received capital contributions from investors in this EB-5 Project.  Syndication fees were payable to the general partner, Comprehensive Care of California, LLC.

60.     Investors in CCOO were told that their capital contributions would be committed to use by CCOO in its nursing business.  The Business Plan CCOO investors were provided represents that investor money will be used by CCOO to capitalize, own and operate a subacute care skilled nursing facility in Oakland, California.

61.     The PPMs provided to investors, both before and after SFRC was designated a Regional Center sponsor, further state that the separation of the syndication fees from the capital contribution is "intended to assure that the entire Unit Price of $500,000 is capital contribution and available to the Partnership for job-creating investments."  Henderson approved the content and distribution of the Business Plan and PPM in both his individual capacity, and, through his authority, for SFRC, Comprehensive Care of California, LLC, and CCOO.  Henderson, SFRC, Comprehensive Care of California, LLC, and CCOO thus made the representations in the Business Plans and PPMs.

62.     Despite these representations, from March 31, 2011 to June 17, 2016, Henderson caused to be transferred a net of approximately $4.7 million from CCOO to SFRC and Immedia that was not returned to the account for CCOO.

63.     Henderson used approximately $1.3 million in capital contributions from CCOO investors towards the purchase of a building known as the Tribune Tower, located at 409 13th Street in Oakland, California in or around December 2011.  Though this significant sum raised from CCOO investors was used toward the $8 million purchase price, the Tribune Tower was titled in the name of

Relief Defendant CallSocket Holding Company, LLC; The PPM and Business Plan for CCOO did not disclose that investor funds would be used to purchase this property.

64.     Henderson, SFRC, Comprehensive Care of California, LLC, and CCOO knew, or were reckless in not knowing, that they were using investor money contrary to the ways in which they represented to investors they would.

**B.  The Three CallSocket Call Center EB-5 Projects**

65.     After SFRC was designated a regional center in 2011, Henderson embarked on three "call center" EB-5 Projects.  The first, CallSocket, L.P. ("CallSocket I"), raised approximately $18 million in capital contributions from approximately 36 investors, plus syndication fees totaling approximately $1.8 million, from April 2012 to June 2013.

66.     Similarly, the second call center, CallSocket II, L.P. ("CallSocket II") raised a total of $15.5 million in capital contributions from 31 investors, plus syndication fees totaling approximately $1.5 million, from November 2012 to June 2014.  Finally, the third, CallSocket III, L.P. ("CallSocket III") raised approximately $19.5 million in capital contributions plus a total of approximately $1.6 million in syndication fees from 39 investors, from November 2013 to January 2016.

67.     CallSocket I, CallSocket II, and CallSocket III directly or indirectly received capital contributions from investors in this EB-5 Project.  The Syndication fees were payable to the general partners, CallSocket, LLC, CallSocket II, LLC, and CallSocket III, LLC.

68.     The Business Plans and PPMs for each of the three CallSocket EB-5 Projects represent that the investors' capital contributions will be committed to establishing and operating the respective call center business.  For example, the PPMs for each of the three Projects state that "the Partnership intends to invest all of each investor's capital contribution of $500,000 in CallSocket, LP [and for II and III, CallSocket II, LP and CallSocket III, LP] that should protect the principal amount of investment as much as reasonably possible."  The PPMs further provide that the Syndication Fee is to be used to pay offering expenses, including a "finder's fee," which is "intended to assure that the entire Unit Price of $500,000 is capital contribution and available to the Partnership for job-creating investments."  The Business Plans for each of the three Projects elaborate on the particular call center business, describing, for example, their planned locations in different buildings, and specifying each

of the three Project's startup expenses by categories such as Design and Engineering, Equipment and Furnishings, Startup Expenses, and Labor and Payroll Expenses.  Henderson approved the content and distribution of the Business Plan and PPM for each CallSocket EB-5 Project in both his individual capacity and, through his authority, for SFRC, the general partners (CallSocket, LLC, CallSocket II, LLC, and CallSocket III, LLC), and the limited partnerships (CallSocket, L.P., Callsocket II, L.P., CallSocket III, L.P.).  Henderson, SFRC, and the CallSocket general partners and limited partnerships thus made the representations in the respective Business Plans and PPMs for each CallSocket EB-5 Project.

69.    Despite these assurances, Henderson commingled the funds raised for each of the CallSocket EB-5 Projects and then disbursed those funds as he saw fit.

70.    For instance, as indicated above, in around November 2012, Henderson arranged for the purchase of a warehouse property located at 1700 20th Street in Oakland, California for $8.25 million.  Part of the purchase money for the property included approximately $2.5 million Henderson transferred from CallSocket I funds, including approximately $1.95 million in investor capital contributions.   However, the property was titled in the name of an unrelated business, non-party Berkeley Healthcare Dynamics, L.P.  The warehousing EB-5 Project is located on the property and for at least some period of time paid rent to the current title holder, Relief Defendant Berkeley Healthcare Dynamics, LLC.

71.    Similarly, in or around October 2012, Henderson used approximately $797,000 in capital contributions from CallSocket I investors towards the purchase of another property called the Community Bank Building, located at 1750 Broadway in Oakland, California.  However, title was given to CallSocket II.

72.    Again, in or around December 2012, Henderson used approximately $453,000 in capital contributions from CallSocket I investors to purchase a property known as the Dufwin Towers, located at 519 17th Street in Oakland, California.  The property was also titled in the name of CallSocket II.

73.    Moreover, in approximately June 2013, Henderson used approximately $2.4 million in capital contributions obtained from investors in CallSocket I and CallSocket II to purchase the I.

Magnin Building, located at 2001 Broadway in Oakland, California, which was titled in the name of Relief Defendant CallSocket III Holding Company, LLC.  The I. Magnin Building was sold in or about March 2016 for net proceeds of approximately $9.8 million.

74.    Ultimately, Henderson directed funds away from certain CallSocket Projects. Thus, at Henderson's direction, from November 13, 2012 to March 24, 2016, a net of approximately $14.8 million was transferred from CallSocket II to SFRC and Immedia that was not returned to the account for CallSocket II.  Similarly, also at Henderson's direction, from March 31, 2013 to March 31, 2016, a net of approximately $19 million, including approximately $16.5 million in capital contributions, was transferred from CallSocket III to SFRC and Immedia that was not returned to the account for CallSocket III.  Indeed, CallSocket III has not operated a call center.

75.    Henderson, SFRC, the general partners (CallSocket, LLC, CallSocket II, LLC, and CallSocket III, LLC), and the limited partnerships (CallSocket, L.P., CallSocket II, L.P., CallSocket III, L.P.) knew, or were reckless in not knowing, that they were using investor money contrary to the ways in which they represented to investors that they would.

**C.  NA3PL, L.P. Warehousing/Third-Party Logistics Project**

76.    The fifth EB-5 Project Henderson established and SFRC sponsored, NA3PL, L.P., raised approximately $20 million in capital contributions and approximately $2 million in syndication fees, from approximately 40 investors from May 2014 to March 2016.  NA3PL, L.P. and its general partner, SFRC, directly or indirectly received capital contributions from investors in this EB-5 Project.

77.    The Business Plan and PPM for the NA3PL, L.P. project represent that capital contributions from its investors will be loaned to North America 3PL, LLC to fund the development and operations of a warehousing/third-party logistics business.  For example, the Business Plan states that NA3PL, L.P. "will raise $20M [million] of equity from up to 40 EB-5 investors and loan the $20M to NA3PL, LLC (the Job Creating Entity)" which "will use the funds to support its development and operations of a warehousing/third-party logistics business that supports importers and exporters moving goods through the Port of Oakland."  The PPM provided to investors for NA3PL, L.P. assures that the separate syndication fee will be used to pay offering expenses, and this

is "intended to assure that $500,000 of each Subscription Price is capital contribution and available to the Partnership for job-creating investments."  Henderson approved the content and distribution of the Business Plan and PPM in both his individual capacity, and, through his authority, for SFRC and NA3PL, L.P.  Thus, Henderson, SFRC, and NA3PL, L.P. made the representations in the Business Plan and PPM.

78.     Contrary to these claims, Henderson diverted funds raised for NA3PL, L.P., away from this EB-5 Project.  Thus, at Henderson's direction, from March 31, 2014 to March 31, 2016, a net of approximately $17.4 million was transferred from NA3PL, L.P. and North America 3PL, LLC, including a net of at least $15.3 million in capital contributions, to SFRC and Immedia that was not returned to the accounts for NA3PL, L.P. or North America 3PL, LLC.

79.     As he did with respect to the other EB-5 Projects, Henderson also diverted funds sourced from NA3PL, L.P. to purchase property for an unrelated business venture.  As indicated above, in around December 2014, Henderson commingled funds sourced from NA3PL, L.P. and CallSocket III and used $150,000 of the commingled funds toward the purchase of a shopping complex located at 800-900 Market Street in Oakland, California.  The property is titled in the name of Relief Defendant JL Gateway, LLC, and the Business Plan for the West Oakland Plaza EB-5 Project states that that Project would develop a grocery store/restaurant, and commercial kitchen on the property.

80.     Henderson, SFRC, and NA3PL, L.P. knew, or were reckless in not knowing, that they were using investor money contrary to the ways in which they represented to investors they would.

**D.     West Oakland Plaza Retail Center Project**

81.     The sixth EB-5 Project Henderson established and SFRC sponsored, West Oakland Plaza, L.P. ("West Oakland Plaza"), raised a total of approximately $2 million in capital contributions and approximately $210,000 in syndication fees from four investors, from November 2015 to September 2016.  West Oakland Plaza and Immedia, doing business as SFRC, directly or indirectly received capital contributions from investors in this EB-5 Project.

82.     The Business Plan and PPM for West Oakland Plaza represent that capital contributions from its investors will be loaned to non-party West End Market, LLC ("West End

Market"), for use in a retail center business.  For example, the Business Plan states that West Oakland Plaza will "raise $10 million (USD) of equity from 20 EB-5 investors and loan the money to West End Market, LLC" the "job creating entity," which "will use the funds to support development and operations of a grocery store/restaurant and related commercial kitchen in an existing shopping complex."  And the PPM states that the separate syndication fee is "intended to assure that the entire Unit Price of $500,000 is capital contribution and available to the Partnership for job-creating investments."  Henderson approved the content and distribution of the Business Plan and PPM in both his individual capacity, and, through his authority, for SFRC and West Oakland Plaza.  Thus, Henderson, SFRC, and West Oakland Plaza made the representations in the Business Plan and PPM.

83.     Despite these assurances, Henderson also diverted money from this EB-5 Project to other purposes.  For example, from approximately April 2016 to August 2016, Henderson caused West Oakland Plaza to pay approximately $786,000 of funds from its investors to North America 3PL, LLC.

84.     Furthermore, contrary to its Business Plan, West Oakland Plaza has not loaned funds to West End Market.

85.     Henderson, SFRC, and West Oakland Plaza knew, or were reckless in not knowing, that they were using investor money contrary to the ways in which they represented to investors they would.

**E.   California Gold Medal Dairy Processing Project**

86.     The seventh EB-5 Project Henderson established and SFRC sponsored, California Gold Medal, L.P. ("California Gold Medal"), has, as of November 2016, raised approximately $21.5 million in capital contributions and approximately $1.1 million in syndication fees from 43 investors from August 2015 to November 2016.  California Gold Medal and its general partner, SFRC, directly or indirectly received capital contributions from investors in this EB-5 Project.

87.     The Business Plan and PPM for California Gold Medal state that capital contributions from its investors will be loaned to non-party Crystal Golden, LLC ("Crystal Golden"), for use in a dairy processing business.  For example, the Business Plan states that California Gold Medal will "raise $50 million from 100 EB-5 investors and loan these funds to Crystal Golden, LLC (the Job

Creating Entity)," which will "use the funds to support its development and operations of a dairy processing company that will source California milk and process it into UHT dairy products specifically for the export market."  And its PPM states that the syndication fee is to be used to pay offering expenses in order "to assure that the entire Unit Price of $500,000 is capital contribution and available to the Partnership for job-creating investments."  Henderson approved the content and distribution of the Business Plan and PPM in both his individual capacity, and, through his authority, for SFRC and California Gold Medal.  Thus, Henderson, SFRC, and California Gold Medal made the representations in the Business Plan and the PPM.

88.     Despite these assurances, in around November 2015, Henderson used approximately $2.48 million in capital contributions from California Gold Medal investors toward the purchase of property in Tipton, California, on which there was an existing dairy processing facility, which was titled in the name of Relief Defendant Central California Farms, LLC ("Central California Farms").  Henderson holds an indirect ownership interest in Central California Farms through SFRC.  Central California Farms is not identified in the PPM or Business Plan as the "Job Creating Entity."  Henderson failed to adhere to the representations in the Business Plan and PPM, which told investors that their capital contributions would be *loaned* to Crystal Golden, LLC to buy the property.

89.     Furthermore, Henderson has used another approximately $1.8 million of California Gold Medal investor's funds to directly pay for expenses and services.  Even if these expenses were used for the California Gold Medal EB-5 Project – and they may not have been – direct payment of such expenses from investor funds is contrary to the representations to investors that their capital contributions would be loaned to an entity that would start and run the dairy processing business.

90.     Henderson also diverted funds raised for California Gold Medal away from this EB-5 Project.  Thus, at Henderson's direction, from April 15, 2015 to November 30, 2016, a net of approximately $1.4 million was transferred from California Gold Medal to SFRC and Immedia that was not returned to the account for California Gold Medal.

91.     Henderson, SFRC, and California Gold Medal, knew, or were reckless in not knowing, that they were using investor money contrary to the ways in which they represented to investors they would.

**FIRST CLAIM FOR RELIEF**

**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c))**

**(Securities Fraud)**

92.     The Commission realleges and incorporates by reference paragraphs 1 through 91.

93.     Defendants San Francisco Regional Center, LLC; Thomas M. Henderson; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; and Comprehensive Care of California, LLC; by engaging in the conduct set forth above, with scienter, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, in connection with the purchase or sale of securities, (1) employed devices, schemes, or artifices to defraud, and (2) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

94.     By reason of the foregoing, these Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) & (c)].

95.     By engaging in the conduct above, Defendants Immedia, LLC and North America 3PL, LLC knowingly or recklessly provided substantial assistance to one or more of the other Defendants in their violations of Section 10(b) of the Exchange Act  [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(a) & (c)].

**SECOND CLAIM FOR RELIEF**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b))**

**(Securities Fraud)**

96.     The Commission realleges and incorporates by reference paragraphs 1 through 91.

97.     Defendants San Francisco Regional Center, LLC; Thomas M. Henderson; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; and Comprehensive Care of California, LLC; by engaging in the conduct set

forth above, with scienter, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, in connection with the purchase or sale of securities, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

98.     By reason of the foregoing, these Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

99.     By engaging in the conduct above, Defendants San Francisco Regional Center, LLC; Thomas M. Henderson; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; and Comprehensive Care of California, LLC; each knowingly or recklessly provided substantial assistance to one or more of Defendants California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; and West Oakland Plaza, L.P. in their violations of Section 10(b) of the Exchange Act  [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF

### (Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act)

### (Securities Fraud)

100.     The Commission realleges and incorporates by reference paragraphs 1 through 91.

101.     Defendants San Francisco Regional Center, LLC; Thomas M. Henderson; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; and Comprehensive Care of California, LLC, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (1) with scienter, employed devices, schemes, or artifices to defraud; and (2) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

102.     By reason of the foregoing, these Defendants violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) & (3)].

103.     By engaging in the conduct above, Defendants Immedia, LLC and North America 3PL, LLC knowingly or recklessly provided substantial assistance to one or more of the other Defendants in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) & (3)].

**FOURTH CLAIM FOR RELIEF**

**(Violations of Section 17(a)(2) of the Securities Act)**

**(Securities Fraud)**

104.     The Commission realleges and incorporates by reference paragraphs 1 through 91.

105.     Defendants San Francisco Regional Center, LLC; Thomas M. Henderson; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; and Comprehensive Care of California, LLC, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

106.     By reason of the foregoing, these Defendants violated Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

107.     By engaging in the conduct above, Defendants San Francisco Regional Center, LLC; Thomas M. Henderson; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; and Comprehensive Care of California, LLC each knowingly or recklessly provided substantial assistance to one or more of Defendants California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; and West Oakland Plaza, L.P. in their violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**FIFTH CLAIM FOR RELIEF**

1

**(Relief Defendants)**

2    108.    The Commission realleges and incorporates by reference paragraphs 1 through 91.

3    109.    The Relief Defendants, CallSocket Holding Company, LLC; CallSocket III Holding

4  Company, LLC; Berkeley Healthcare Dynamics, LLC; JL Gateway, LLC; and Central California

5  Farms, LLC, each received investor money or property, which was obtained in violation of the

6  federal securities laws.

7    110.    The Relief Defendants have no legitimate claim to such money or property or the

8  fruits derived therefrom.

9                                    **<u>PRAYER FOR RELIEF</u>**

10                 WHEREFORE, the Commission respectfully requests that the Court:

11                                                I.

12         Enter an order enjoining all Defendants preliminarily and permanently from directly or

13  indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the

14  Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

15                                                II.

16         Enter an order enjoining all Defendants preliminarily and permanently from directly or

17  indirectly participating in the issuance, offer, or sale of any security of any entity controlled by, or

18  under joint control with, any of them.

19                                                III.

20         Enter an order appointing a temporary receiver over all entity Defendants and Relief

21  Defendants (but not over individual Defendant Thomas M. Henderson).

22                                                III.

23         Enter an order prohibiting the movement, alteration, and destruction of books and records to

24  protect the books and records showing the location of assets and the disposition of investors' monies

25  and protect all remaining documents necessary for full discovery in this matter.

26                                                IV.

27         Enter an order requiring Defendants and Relief Defendants to disgorge their ill-gotten gains

28  according to proof, plus prejudgment interest thereon.

## V.

Enter an order requiring Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.


Dated: January 17, 2017                    Respectfully submitted,


                                          s/  Andrew J. Hefty
                                          Andrew J. Hefty
                                          Susan F. LaMarca
                                          Thomas Eme
                                          Attorneys for Plaintiff
                                          SECURITIES AND EXCHANGE COMMISSION