# EXHIBIT 1

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                          )

                                           )   File No. SF-04031-A

SAN FRANCISCO REGIONAL CENTER, LLC )

WITNESS:  Thomas M. Henderson

PAGES:    1 through 199

PLACE:    Securities and Exchange Commission

          44 Montgomery Street, Suite 2800

          San Francisco, California

DATE:     Thursday, June 2, 2016

     The above entitled matter came on for hearing,
pursuant to notice, at 9:15 a.m.

Diversified Reporting Services, Inc.

(202) 467 9200

Page 2

```
 1   APPEARANCES:

 2

 3   On behalf of the Securities and Exchange Commission:

 4        THOMAS EME, ESQ.

 5        STEVEN BUCHHOLZ, ESQ.

 6        Securities and Exchange Commission

 7        Division of Enforcement

 8        44 Montgomery Street, Suite 2800

 9        San Francisco, California  94104

10        (415) 705-2320

11

12   On behalf of the Witness:

13        CHARLES RICE, ESQ.

14        Shartsis Friese, LLP

15        One Maritime Plaza

16        Eighteenth Floor

17        San Francisco, CA 94111-3598

18        (415) 773-7229

19

20        LEEDS DISSTON, ESQ.

21        Casalina and Disston

22        409 13th Street

23        Oakland, CA  94612

24        (510) 835-8110

25
```

Page 3

1                          C O N T E N T S

2

3    WITNESS:                                          EXAMINATION

4    Thomas M. Henderson                                        6

5

6    EXHIBITS:        DESCRIPTION                       IDENTIFIED

7    1                SEC Form 1662                              5

8    2                Subpoena                                   6

9    3                Background Questionnaire                   7

10   4                Form 924-A                                54

11   5                Tesh, LLC, Balance due

12                    to/from 12/31/2015                        63

13   6                Community Bank of the Bay

14                    SFRC's Records                            69

15   7                East West Bank SFRC's Records             73

16   8                East West Bank SFRC's

17                    Account January 2013                      96

18   9                Withdrawal/transfer slip East

19                    West Bank 10/7/14                        105

20   10               SFRC, LLC, Balance Sheet

21                    4/1/16                                   154

22   11               Bates SEC-SFRC-E-0002280                 168

23   12               Subpoena to SFRC                         188

24

25

Page 4

```
1                    P R O C E E D I N G S
2           MR. EME:  We're on the record at about
3   9:15 a.m. on June 2nd, 2016.
4           Mr. Henderson, please raise your right hand.
5   Whereupon,
6               THOMAS M. HENDERSON
7   was called as a witness and, having been first duly
8   sworn, was examined and testified as follows:
9           MR. EME:  You may lower your hand.  Please,
10  state your full name and spell it for the record?
11          THE WITNESS:  Thomas Michael Henderson,
12  T-h-o-m-a-s, M-i-c-h-a-e-l, H-e-n-d-e-r-s-o-n.
13          MR. EME:  I am Mr. Eme and with me is Mr.
14  Buchholz.  We are both officers of the Commission for the
15  purposes of this proceeding.
16          This is an investigation by the United States
17  Securities and Exchange Commission in the matter of San
18  Francisco Regional Center, LLC, File No. SF-40301, to
19  determine whether there have been violations of certain
20  provisions of the Federal Securities Laws.  However, the
21  facts developed in this investigation might constitute
22  violations of other federal or state civil or criminal
23  laws.
24          Before we opened the record, you were provided
25  with a copy of the Formal Order of Investigation in this
```

Page 9

```
 1      Q    Who owns SFRC?

 2      A    Thomas Henderson, Matthew Henderson, Michael

 3 Henderson.

 4      Q    And what percentage does each person own?

 5      A    One-third each.

 6      Q    Okay.  Has that ownership structure always been

 7 the same or was it different in the past?

 8      A    It's always been the same, but as of December

 9 31st, 2014, Michael Henderson is no longer involved in

10 SFRC.

11      Q    You mean he's no longer involved in managing

12 it?

13      A    He never managed it.

14      Q    Okay.  What involvement did he give up?

15      A    He gave up his interest in SFRC.

16      Q    Okay.

17      A    Back to me.

18      Q    Okay.  So, as of December 31st, 2014, Michael

19 stopped being a part owner?

20      A    Yes.

21      Q    Gave up all his ownership interest to you?

22      A    Yes.

23      Q    Okay.  So, today, do you and Matthew own half

24 of it each?

25      A    I own two-thirds, Matthew owns one-third.
```

Page 37

```
 1      A    No.
 2      Q    Does he have any role in overseeing what Hemei
 3  and Ubik and the other overseas representatives are
 4  doing?
 5      A    On a limited scale, yes.
 6      Q    Okay.  Briefly, describe to me what he does?
 7      A    He is involved, primarily, out of our Oakland
 8  office, in the management of a number of the ventures
 9  that we have, is his primary responsibility.  He does
10  travel overseas.  He doesn't speak Mandarin, so the
11  meetings with investors are primarily in Mandarin, with
12  Peter Hu and the staff there.
13          BY MR. BUCHHOLZ:
14      Q    In terms of his marketing role, does he provide
15  information to Mr. Hu and Ms. Jin, and the other folks
16  nationally?
17      A    Yes.  That's his primary responsibility is to
18  keep them in the loop as to what our businesses are doing
19  here in the U.S., so that that can be passed on to our
20  investors to give them a comfort level that we are
21  creating the jobs.  So, there's day-to-day, week-to-week
22  information that's shared overseas, primarily.
23          BY MR. EME:
24      Q    Do you have an understanding of how Mr. Hu and
25  Ms. Jin have gone about recruiting investors for the
```

Page 38

1   limited partnerships, do they use personal relationships,
2   do they use advertising, other general solicitation, do
3   you have an understanding of how they do it?
4        A    Initially, they have all of the documentation,
5   the business plan, we have videos, there's a PowerPoint
6   presentation that they have overseas.
7        Q    And SFRC provides that to them, correct?
8        A    Yes.  And they translate these documents or
9   business plans, or economic impact reports, into Chinese
10  for the investors.  Ninety-nine percent of them don't
11  speak a word of English, they're the 40, 50, 60 year
12  olds -- investors.  Most of the marketing, initially, was
13  word of mouth.  And as the social media has developed,
14  rapidly, in China over the number of years, there's more
15  and more that is online.  The primary investors that are
16  interested in our projects are previous investors that
17  introduce their friends or acquaintances, based on the
18  success that we've had to date with our investors getting
19  their green cards.
20            MR. RICE:  I guess one thing you didn't mention
21  in all this was the Private Placement Memorandum, which
22  you have.  So, I just don't want that to be seen as his
23  answer excluded that in any way.
24            MR. EME:  Okay.
25            THE WITNESS:  Yeah, there's a Private Placement

Page 39

1  Memorandum, there's a Syndication Agreement, there's a
2  Limited Partnership Agreement, there's an Economic Impact
3  Report, where we have an independent economist through
4  the RIMS II program, that determines how many indirect
5  jobs, based on the direct jobs and the revenues.
6          MR. EME:  Okay.
7          THE WITNESS:  So, all of that documentation
8  is supplied to the overseas offices that disseminate it
9  to the various investors that are interested in
10 investing.
11         MR. EME:  Okay.  Thank you.
12         BY MR. EME:
13    Q    Hemei, is it sometimes called Shanghai Hemei?
14    A    Yes.
15         MR. EME:  Why don't we go ahead and take our
16 first break now.
17         MR. RICE:  Okay.
18         MR. EME:  We'll go off the record at five after
19 10:00 a.m.
20         (Off the record at 10:05 a.m.)
21         MR. EME:  We're back on the record at about
22 10:15 a.m.
23         BY MR. EME:
24    Q    So, I'd like to talk a little bit about the LPs
25 and the job creating entities.

Page 42

1   other individual by the name of Glenn, G-l-e-n-n, Millar,
2   M-i-l-l-a-r.
3       Q    What does he do?
4       A    He's with the California Milk Advisory Board.
5   He's also with the Foster Farms Crystal Creamery Dairy
6   operation.
7       Q    And is he ultimately overseen by you and
8   Matthew?
9       A    Is he over us?
10      Q    Yes, right, Mr. Millar -- are you over him, are
11  you and Matthew over him?
12      A    I'm over everybody.
13      Q    Okay.  Over everybody, all right.  Now, money
14  that belongs to either California Gold Medal LP or
15  Crystal Golden, who has the authority to move that, to
16  transfer to pay it out?
17      A    I do.
18      Q    Is it just you?
19      A    Yes.
20      Q    Next, let's talk about CallSocket Limited
21  Partnership.  Does it have a manager over day-to-day Call
22  Center operations?
23           MR. RICE:  And just to be clear, there's three
24  of them, so --
25           MR. EME:  Yeah.

Page 43

1          MR. RICE:  -- one, we always call it CallSocket

2   I, even though its title is technically just CallSocket

3   LP.  So, I'm assuming you're talking about CallSocket I

4   now?

5          MR. EME:  I am, yeah, yeah.

6          BY MR. EME:

7      Q    So, there's CallSocket Limited Partnership,

8   CallSocket Roman numeral II Limited Partnership,

9   CallSocket Roman III Limited Partnership, correct?

10     A    Yes.

11     Q    Okay.  And then each of them has a general

12  partner, correct?

13     A    Yes.

14     Q    Okay.  So, CallSocket I -- we'll call it, even

15  though the I is not really in the name -- CallSocket I,

16  does it have a manager over the day-to-day operations?

17     A    Yes.

18         MR. RICE:  You're talking about the limited

19  partnership now, rather than the LLC?

20         MR. EME:  Yeah, yeah.  I'm talking about the

21  business itself, the actual Call Center business.

22         BY MR. EME:

23     Q    My understanding is that there is a Call Center

24  business in operation -- at least there was recently --

25  and people worked there.  I assume that there's some

Page 44

1  manager of that shop and I'm trying to find out who that

2  person is currently?

3      A      That person's name is Sabrina, S-a-b-r-i-n-a,

4  Shepard, S-h-e-p-a-r-d.

5      Q      Okay.  And everyone answers to you, so she

6  answers to you, right?

7      A      Yes.

8      Q      Okay.  And does she have authority to move

9  money belonging to CallSocket I?

10     A      No.

11     Q      Only you?

12     A      Only me.

13            BY MR. BUCHHOLZ:

14     Q      Is there a differentiation between CallSocket

15  LP, CallSocket LLC and CallSocket Holding Company, LLC,

16  or you consider them all to be CallSocket I?

17     A      No, CallSocket LLC is the general partner of

18  CallSocket LP.  CallSocket Holding Company is an entirely

19  separate entity that is not associated with CallSocket

20  LP.

21     Q      Great, okay.  Thank you.

22            MR. RICE:  "Not associated" is a little strong,

23  isn't it?

24            THE WITNESS:  Well --

25            MR. BUCHHOLZ:  Let's just ask the question.

Page 47

```
 1              THE WITNESS:  Yeah.  It's San Francisco
 2   Regional Center.
 3              MR. EME:  Okay.
 4              BY MR. BUCHHOLZ:
 5      Q    And just getting back now to the CallSocket
 6   operating entities, so it is correct that the operating
 7   entities, the job creating entities are CallSocket LP,
 8   CallSocket II LP, CallSocket III LP?
 9      A    Yes.
10      Q    Okay.  We have the manager, Sabrina Shepard for
11   CallSocket I.  Who are the managers for CallSocket II and
12   III, if there are any?
13      A    Yeah.  The CallSocket II manager, his name is
14   B-i-j-a-y, N-i-r-a-u-l-a, Bijay Niraula.
15              MR. EME:  N-i-r-a?
16              THE WITNESS:  N-i-r -- Niraula -- N --
17              MR. RICE:  Do you want to consult your phone?
18              THE WITNESS:  Yeah.  It's only "Bijay."
19   N-i-r-a-u-l-a, yeah, Niraula.
20              BY MR. BUCHHOLZ:
21      Q    And for CallSocket III?
22      A    It's not operating, yet.
23              BY MR. EME:
24      Q    The money belonging to CallSocket II LP, does
25   anyone have authority -- has anyone had authority to move
```

Page 48

1    that money other than you?

2         A    No.

3              MR. RICE:  And again, we've got an asterisk

4    there for the receiver.

5              MR. EME:  Yes, right.

6              MR. RICE:  Okay.

7              MR. EME:  Yeah, aside from the receiver.

8              MR. RICE:  That's the one person who did not --

9              MR. DISSTON:  Or the Judge --

10             MR. EME:  Yeah, or the Judge, yeah.  My

11   questions are pre-receivership, if I didn't make that

12   clear, but that is what I'm talking about.

13             BY MR. BUCHHOLZ:

14        Q    Other than the receiver, for any of the GPs or

15   LPs, or operating entity LLCs, does anyone other than you

16   have authority to move money among entities?

17        A    No.

18        Q    Has that always been the case?

19        A    Yes.

20             MR. RICE:  And "receiver" includes the Court,

21   because there have been situations where the Court had

22   ordered those.

23             MR. BUCHHOLZ:  Right, yes.

24             BY MR. EME:

25        Q    Comprehensive Care of Oakland, LP, that runs a

Page 66

```
 1      A     There's a loan agreement.
 2      Q     Who signed the loan agreement?
 3      A     I did.
 4      Q     Does it have a payment schedule?
 5      A     I believe so.
 6      Q     Is the loan secured by collateral?
 7      A     No.
 8      Q     Is there a set payoff date?
 9      A     I don't recall.
10      Q     You've been involved with a restaurant called
11   "Tribune Tavern"?
12      A     Yes.
13      Q     And what is the nature of your involvement,
14   owner, manager, both?
15            MR. RICE:  Are you talking about him,
16   personally, or through any entity?
17            BY MR. EME:
18      Q     What's your personal involvement with Tribune
19   Tavern, what have you done with respect to that?
20      A     Personally, I'm not a partner or owner, or
21   manager of the Tribune Tavern.
22      Q     Okay.  Who is the owner of Tribune Tavern?
23      A     The partner, I believe, is the CallSocket
24   Holding Company, a partner in the Tavern.
25      Q     Why is CallSocket a partner in a restaurant?
```

Page 67

1    A    Because CallSocket Holding Company owns the
2  building that the restaurant is -- where the restaurant
3  is located.
4    Q    Does the restaurant conduct Call Center
5  operations?
6    A    No.
7    Q    Has it ever conducted Call Center operations?
8    A    No.
9    Q    Does a CallSocket entity have a written down
10 ownership stake in the restaurant?
11   A    Yes.
12   Q    It's put in writing, how much of the restaurant
13 the CallSocket entity owns?
14   A    Seventy-five percent, I believe.
15   Q    When was that put in writing?
16   A    I don't recall the exact date. I believe when
17 the restaurant opened.
18   Q    And can you tell me which CallSocket entity
19 owns 75 percent of the Tribune Tavern?
20   A    CallSocket Holding Company.
21   Q    Why is it the owner of the restaurant, that
22 particular CallSocket entity?
23   A    Because CallSocket Holding Company owns the
24 property -- LLC.
25   Q    So, you believe it's CallSocket Holding

Page 68

1    Company, LLC, that owns part of Tribune Tavern, correct?

2        A    I'm not 100 percent sure.  I'd have to go back

3    and look at the documents, it's been a number of years.

4        Q    And the restaurant Lungomare, are you involved

5    with that one, have you ever been involved with that one?

6        A    I was involved in that one several years ago.

7        Q    And what was your involvement and how did it

8    stop?

9        A    There was a partnership with another gentleman

10   that was operating the restaurant, and we agreed to

11   disagree as to how the money was transacted from the

12   revenues in the operation.  This project originally was

13   going to be an EB-5 project.

14       Q    Did it ever become an EB-5 project?

15       A    No.

16       Q    That's Lungomare, you said, was originally

17   going to be an EB-5 project?

18       A    Yes.

19       Q    But it never did become one, correct?

20       A    Correct.

21       Q    Was Tribune Tavern going to be an EB-5 project?

22       A    That was the initial plan, that we were going

23   to open up 10 restaurants under the San Francisco

24   Restaurant Group, LLC.

25       Q    Did Tribune Tavern ever become an EB-5 project?

Page 69

```
 1      A    No.

 2      Q    And was there a CallSocket entity that owned

 3  part of Lungomare, at one point?

 4      A    No.

 5      Q    Did SFRC own a part of Lungomare, or did you?

 6      A    I believe San Francisco Regional Center was the

 7  owner, partner.

 8      Q    And is Tribune Tavern located in the Tribune

 9  Tower in Oakland?

10      A    Yes.

11      Q    And does CallSocket Holding Company, LLC, own

12  the Tribune Tower in Oakland?

13      A    Yes.

14           MR. EME:  Would you mark this, please.

15                     (SEC Exhibit No. 6 was marked for

16                     identification.)

17           MR. EME:  I'm now handing you what's just been

18  marked Exhibit 6.

19           For the record, Mr. Buchholz has left.  He may

20  return later.

21           So, I'll describe --

22           MR. RICE:  Yeah, I mean this is, you know,

23  obviously, many, many pages.  Do you want him to go

24  through this individually or do you want to do this in

25  some sort of lump way?
```

Page 70

1          MR. EME:  I'm going to do it in closer to a
2     lump way.
3          MR. RICE:  Okay.
4          MR. EME:  And I'm not going to -- I think
5     you'll be comfortable with the way I'm doing it.
6          MR. RICE:  Okay.
7          MR. EME:  If not, let me know.
8          MR. RICE:  If you do that, maybe you could
9     characterize what it is, rather than asking him, because
10    he hasn't reviewed it completely.
11         MR. EME:  Okay.  I'm going to describe it for
12    the record now.
13         MR. RICE:  Yeah.
14         MR. EME:  Yeah, but that's where I'm going,
15    yes.
16         So, this is a series of checks written on
17    SFRC's account at Community Bank of the Bay.  The Bates
18    numbers all start with SEC-CBOTB-E and then they're not
19    in sequence, because these came from a larger set of
20    documents.  But these are bank records from Community
21    Bank of the Bay, all on SFRC's account.  And they appear
22    to represent money to cover expenses of either Tribune
23    Tavern or Lungomare.
24         MR. RICE:  And I'll just note for the record
25    there are, you know, a number of different payees here.

Page 71

1          MR. EME:  Right.

2          MR. RICE:  And you know, Tom can't verify that,

3    unless you ask him to go through that.  But I'll accept

4    your characterization for the moment.

5          MR. EME:  Yeah.  Well, let's go through a few

6    of them.  Again, I'm not trying to get him to --

7          MR. RICE:  I mean maybe --

8          MR. EME:  -- give some definitive testimony on

9    every page in this exhibit.

10         MR. RICE:  Yeah, okay.

11         MR. EME:  That's clear.

12         BY MR. EME:

13    Q    But as you look through this, do you generally

14    recognize these to be checks written on SFRC's account at

15    Community Bank of the Bay, signed by you?

16    A    Yes.

17    Q    Okay.  And the first page, there's a check to

18    Broadway Restaurant Entertainment Group for $5,000.00, in

19    June of 2012.  Would that have been for an expense of one

20    of the two restaurants?

21    A    Yes.

22    Q    The next page, the second page, is a check to

23    Five Terraces, No. 5 Terraces, for $20,000.00, in

24    September 2012.  Would that have been for an expense of

25    one of the two restaurants?

Page 72

```
 1      A    I believe so, yes.

 2      Q    I see a check in here -- if you go back a few

 3   more pages to East Bay Restaurant Supply, it's

 4   $30,000.00?

 5      A    Yes.

 6      Q    In November of 2012.  Would that have been for

 7   expenses for one of the restaurants?

 8      A    Yes.

 9      Q    The next page is a check to Black Creek

10   Builders, December 2012, roughly $11,000.00.  And in the

11   "For" line it says: "Lungomare," do you see that?

12      A    Yes.

13      Q    So, would that have been for the Lungomare

14   Restaurant?

15      A    Yes.

16      Q    The next check is RB Builders, Inc.?

17      A    Yes.

18      Q    Two hundred sixty-two thousand dollars,

19   roughly, December 2012.  In the "For" line it says

20   "Tribune Tavern."  Would that have been for the Tribune

21   Tavern?

22      A    Yes.

23           MR. RICE:  I'm sorry, what was the last one you

24   said?

25           MR. EME:  RB Builders, Inc.,
```

Page 73

```
 1            MR. RICE:  Okay, thanks.
 2            MR. BUCHHOLZ:  Or R3.
 3            MR. EME:  Oh, it could be R3, yes.
 4            THE WITNESS:  R3.
 5            MR. EME:  Thank you.  I think it is R3, yes.
 6       Okay. I think we can be finished with that one.
 7       Now, I have another exhibit, similar --
 8                      (SEC Exhibit No. 7 was marked for
 9                       identification.)
10            MR. EME:  Now I hand you what's just been
11       marked Exhibit 7.
12            Mr. Buchholz has returned, for the record.
13            This is a similar collection of checks, but
14       from an East West Bank account, it's SFRC's account at
15       East West Bank.  And I've put these together, because
16       they appear to be checks paying expenses associated with
17       one of the two restaurants.
18            BY MR. EME:
19       Q    And as you look through these, do you generally
20       recognize them to be checks on SFRC's account at East
21       West Bank, that you signed, Mr. Henderson?
22       A    Yes.
23       Q    Would checks to Five Terraces be for restaurant
24       expenses?
25       A    Yes.
```

Page 74

1     Q    Checks to Broadway Restaurant Entertainment

2    Group, would those be for restaurant expenses?

3    A    Yes.

4    Q    It's abbreviated "ENT," but I think that's

5    "Entertainment."  The last page is to -- take a look at

6    the one on the last page of this exhibit -- it says:

7    "This is There Restaurant Group"?

8    A    Yes.

9    Q    Is that a restaurant expense?

10    A    Yes.

11    MR. RICE:  Is that one of the same restaurants

12    or a different restaurant?

13    THE WITNESS:  The same.

14    BY MR. EME:

15    Q    It's either Lungomare or Tribune Tavern?

16    A    It's the Tribune Tavern.

17    Q    Okay.  And for the record it's "This is There,"

18    T-h-e-r-e, "Restaurant Group."

19    So, by my calculation the checks total,

20    roughly, $3.3 million coming out of SFRC's bank accounts

21    and going to the restaurants, Tribune Tavern and

22    Lungomare.  Where did SFRC get the money?

23    A    I don't recall where all of this money came

24    from, out of what accounts through San Francisco Regional

25    Center.

Page 75

1    Q    Do you have any recollection, at all, of where

2   the $3.3 million came from?

3    A    No.  I'd have to go back through the

4   accounting.

5    Q    Was any of it taken from capital investments by

6   investors in the EB-5 limited partnerships?

7    A    I don't believe so.

8    Q    Why do you say you don't believe so?

9    A    Because I'm not sure 100 percent as to where

10   the funds came from.  That's something that Marvin Tate

11   has, the accountant.

12        BY MR. BUCHHOLZ:

13    Q    What other sources of funds did SFRC have,

14   other than the EB-5 LPs?

15    A    No other source of funds, except through

16   management fees and potential revenues from the various

17   businesses.

18    Q    Okay.  So, is it fair to say then that the

19   source of the funds would have to either by from the EB-5

20   LPs or from revenues or management fees associated with

21   those?

22    A    Yes.

23        BY MR. EME:

24    Q    Has it been your practice to have capital

25   investments by EB-5 investors transferred into SFRC bank

Page 76

1   accounts?

2       A    Yes.

3       Q    When you were writing these checks, did you

4   know whose money you were spending, if it was the

5   investors'

6   money or SFRC's money?

7       A    No.

8       Q    Did you care?

9       A    Well, I always care.

10          BY MR. BUCHHOLZ:

11      Q    Did you take any steps to try to determine

12  exactly which source of funds you were using?

13      A    No.

14      Q    And Mr. Tate didn't have an understanding

15  either, to your knowledge, of exactly which source of

16  funds were being used?

17      A    I'm not sure.

18      Q    Do you believe he did?

19      A    I don't know.

20      Q    Did you ever ask him to do anything to confirm

21  or track exactly what source of funds were being used for

22  what?

23      A    We did the "due to/due from," yes.

24      Q    Okay.  But that was mostly after the fact,

25  though, is that correct?  You would record a "due to/due

Page 83

1    going to be an EB-5 project.

2            BY MR. BUCHHOLZ:

3        Q    **Were the restaurants ever described in any**

4    **materials that were filed with the USCIS?**

5        A    No.

6        Q    **Did you have any drafts of such descriptions or**

7    **conversations with anyone about preparing descriptions of**

8    **the restaurants to submit to USCIS?**

9        A    We had -- yes -- we had an entire business plan

10   that we put together for USCIS.

11       Q    **Who else was involved in that?**

12       A    Jennifer Bronson, she wrote the business plan.

13       Q    **Why did you not end up submitting it?**

14       A    Because I had a problem with the partner from

15   an accounting standpoint of the proceeds to the

16   restaurants.  And once we separated, I don't believe I

17   wrote another check to the restaurant, from San Francisco

18   Regional Center.

19       Q    **Is that Mr. Pastena?**

20       A    Yes.

21       Q    **And you never took any steps later to describe**

22   **any monies that were used for restaurant ventures to**

23   **USCIS or in a USCIS filing?**

24       A    No.  We never submitted the EB-5 project to

25   USCIS.  I'd had enough with these two restaurants.

Page 84

```
1        Q      Right.  And with regard to any of the other
2   entities that were actually covered in USCIS balance, you
3   didn't ever disclose to USCIS that monies had been used
4   in connection with restaurant ventures, is that correct?
5        A      Correct.
6        Q      Okay.
7               BY MR. EME:
8        Q      Does Tribune Tavern rent space in Tribune
9   Tower?
10       A      Yes.
11       Q      Has it ever paid rent on that space?
12       A      Yes.
13       Q      When?
14       A      This year.
15       Q      2016?
16       A      Yes.
17       Q      Did it pay rent before that?
18       A      No.
19       Q      And how long has it been occupying that space?
20       A      Approximately three years.
21       Q      Is that from the opening date?  I want to go
22   back to even, you know, maybe the restaurant wasn't open,
23   but Tribune Tavern was still renting?
24       A      I'm not sure when the actual construction
25   renovation started.
```

Page 85

1      Q    Okay.  But through the opening -- from the
2  opening day through 2013, it pays no rent, correct?
3      A    Yes.  Because it wasn't making any money.
4           MR. RICE:  Do you know when it went into
5  operation?
6           THE WITNESS:  I believe it was April 2013 -- I
7  think.
8           BY MR. EME:
9      Q    Have you, personally, dined at Tribune Tavern,
10 frequently, since it opened?
11     A    Yes.
12     Q    About how often have you dined there?
13     A    I have lunch there maybe four days a week, and
14 I have dinner there maybe once a week.
15     Q    And have you paid for those meals?
16     A    No.
17     Q    Do you ever eat there when you're doing
18 business entertaining?
19     A    Yes.
20     Q    And do you pay on those occasions for yourself
21 or your guest?
22     A    No.
23     Q    The four lunches and one dinner a week, is that
24 personal or does that include the business?
25           MR. RICE:  I'm sorry, what does that mean?

Page 86

1          MR. EME:  He said earlier that he's eaten there

2    roughly -- he east there -- his practice is that he eats

3    lunch there four days a week and dinner one day a week.

4          BY MR. EME:

5     Q     Correct?

6     A     Approximately, yes.

7     Q     Right.  And were you thinking of you were there

8    personally eating or were you including the business

9    entertaining?

10    A     Both.

11    Q     Do you know -- can you give me an approximation

12   of the five meals a week, how many are just you,

13   personal, and how many are business?

14    A     I'd say one is business, four is personal.

15    Q     Is there anyone else who has been regularly

16   eating for free at Tribune Tavern?

17    A     My son, Matt Henderson, Aileen Yen.  I'm not

18   sure -- there are other people from our office that eats

19   there, but I'm not sure if the meal is comp'd or not.

20    Q     Okay.  Are Matt and Aileen allowed to go there

21   and eat for free, is that the practice?

22    A     Yes.

23    Q     And do you know how often they've been eating

24   there, since it opened?

25    A     Matt, probably lunch four times a week, with

Page 88

1      A     I don't recall if I have or not.

2      Q     Okay.

3            BY MR. EME:

4      Q     I think we've covered this already, but I just

5  want to make sure we're clear.  Have you always been the

6  one who has controlled bank accounts of SFRC, the limited

7  partnerships, their general partners and any separate job

8  creating entities?

9      A     Yes, except for North America 3PL, LLC, both

10 Kevin Shimamoto and Clement Chin are on that bank

11 account.

12           MR. DISSTON:  How about CCOO?

13           THE WITNESS:  Oh, yes, and CCOO, Shirley Ma

14 handles that, all of those monies through that nursing

15 home operation.

16           MR. EME:  Okay.

17           BY MR. EME:

18     Q     Would that be accounts in the name of the LP

19 and the GP?

20     A     It's Comprehensive Care of Oakland, LP, I

21 believe she handles all of those funds.

22     Q     And does she do it alone or do you have

23 authority, also?

24     A     She does it alone.

25     Q     Okay.  Have you ever had authority over the

Page 89

1   CCOO, LP, account?

2      A    I have, from when the monies were originally

3   invested into the project.  I did have control over those

4   accounts, yes.  But the day-to-day operation for CCOO

5   banking is handled 100 percent by Shirley Ma.

6      Q    Okay.  And the NA3PL, LLC, you said Kevin and

7   Clement are on the account.  Is that on the account with

8   you or just them?

9           MR. DISSTON:  Just to clarify the confusing

10  names of some of these entities, I think the LLC that is

11  the job creating entity in NA3PL, LP project, is North

12  America 3PL, LLC, not NA3PL, LLC.  Although, I think that

13  entity exists, I don't think that it has any function.

14          MR. EME:  Okay.  Yes, I am aware of that

15  distinction between the two and I'll try to be more

16  careful about it.

17          BY MR. EME:

18      Q    So, Kevin and Clement are on an account of

19  North America 3PL, LLC, is that correct?

20      A    Yes.

21      Q    Okay.  And do you have authority over that

22  account?

23      A    Yes.

24      Q    With them?

25      A    Yes.

Page 138

```
 1          MR. RICE:  Okay.
 2          BY MR. EME:
 3      Q   So, that's the CallSockets, they're all in the
 4  same business, right?
 5      A   Well, they're in the same business, but they're
 6  all different companies, separate companies.
 7          BY MR. BUCHHOLZ:
 8      Q   Right.  And you don't remember any specific
 9  disclosure or communication with USCIS about using funds
10  from CCOO to make a real estate related loan to an entity
11  in a different business?
12      A   I don't recall if we did or how we stated it to
13  USCIS.  The -- I'm not sure how it was accounted for to
14  USCIS, but all the funds were accounted for.
15          BY MR. EME:
16      Q   1700 20th Street in Oakland, California, who
17  owns that property?
18      A   That's Berkeley Healthcare Dynamics, LLC.
19      Q   And does North America 3PL, LLC, rent that
20  building or part of that building from Berkeley Health
21  Dynamics?
22      A   Yes.
23      Q   So, it's the job creating entity that rents the
24  space from Berkeley Health Dynamics, LLC, correct?
25      A   Yes.
```

Page 146

1    shared that information with the investors, but I don't

2    know, because I'm not there.

3         Q    Right.  I just want to make sure that we're

4    clear here.  Are you referring to something not in the

5    documents or are you referring just to the documents?

6         A    The documents say I have sole discretion to buy

7    properties, make loans, make investments.

8         Q    Right.  And --

9         A    When that happened, I would tell our overseas

10   offices, this is the transaction we did.  Whether they

11   shared it with the investors or not, I don't know.

12        Q    Okay.  And what you understood to be

13   communicated to the investors was what was in the

14   documents, but on your discretion?

15        A    Yes.

16        Q    That's what you asked to have translated into

17   Chinese and communicated to the investors?

18        A    Yes.

19        Q    Okay.  Who owns Berkeley Healthcare Dynamics?

20        A    There are four partners.

21        Q    Who are they?

22        A    Kevin Shimamoto, Clement Chin, Jennifer

23   Bronson, and myself.

24        Q    Yourself, personally?

25        A    Yes.

Page 147

```
1        Q      Are they equal 25 percent stakes?
2        A      No.  Clement and Kevin, 25 percent each.
3   Jennifer, 10.  And 40 percent I own, personally.
4               BY MR. EME:
5        Q      Let me just jump in -- there's an LP and an
6   LLC, so which one were you thinking of?
7        A      There was --
8        Q      I think there's both?
9        A      There are.
10              MR. RICE:  That's pretty complicated, too.
11              THE WITNESS:  There is both, yes.
12              MR. EME:  Okay.
13              THE WITNESS:  And the LP was originally the
14   owner of the property and when we refinanced the BHD
15   property, we had to set up a single purposes entity,
16   otherwise the bank would not refinance the property, and
17   that's when SFRC was no longer the partner in it and it
18   was the four of us, personally.
19              BY MR. EME:
20       Q      Are the partners in Berkeley Health Dynamics,
21   LP --
22       A      LLC.
23       Q      Okay. -- the owner of the property?
24       A      Yes.
25              BY MR. BUCHHOLZ:
```

Page 149

1    Francisco Regional Center, the entity, to be the partner

2    in the warehouse operation for the refinancing of the

3    property.

4         Q    Okay.  Right.  But the LLC took over ownership

5    of the property, correct?

6         A    BHD, LLC, yes, took over ownership.

7         Q    Okay.  And you got a 40 percent ownership stake

8    in BHD, LLC, correct?

9         A    Correct.

10        Q    And you didn't pay any compensation for that 40

11   percent stake, is that correct?

12        A    Correct.

13             MR. DISSTON:  Well, are you talking about

14   compensation in the form of a cash payment or

15   compensation in the form of a note?

16             BY MR. BUCHHOLZ:

17        Q    In the form of capital.  Did you pay any money?

18        A    No.  I signed a guarantee to the bank on the

19   mortgage, personally.  But I didn't have to prior to

20   that, because it was San Francisco Regional Center.  So,

21   there's a note due.

22        Q    Okay.

23             BY MR. EME:

24        Q    What is Immedia, LLC, I-m-m-e-d-i-a, LLC?

25        A    Immedia is a bank account doing business as San

Page 150

1   Francisco Regional Center.

2       Q   **Did you open that account?**

3       A   Yes.

4       Q   **And why did you open it?**

5           MR. RICE:  I'm sorry -- is Immedia a d/b/a of

6   SFRC? Is that what you're saying?  The way you said it

7   was the opposite.

8           THE WITNESS:  Well, Immedia is doing business

9   as SFRC.

10          MR. RICE:  I'm confused, I'm not sure what that

11  means.

12          MR. EME:  He also said it's a bank account

13  doing business as SFRC.

14          BY MR. EME:

15      Q   **So, does Immedia have any substance of its own?**

16      A   No.

17          MR. RICE:  Is it a fictitious business name of

18  SFRC?

19          THE WITNESS:  It's a separate -- it's an LLC on

20  its own.

21          MR. RICE:  Immedia is?

22          THE WITNESS:  Immedia is.

23          MR. RICE:  Okay.

24          MR. EME:  You can find it on the California

25  Secretary of State website.

Page 151

1        BY MR. EME:

2        Q      So, it exists as a separate entity, Immedia

3    does, right?

4        A      Yes.

5        Q      But it also has a bank account in its name

6    d/b/a SFRC, right?

7        A      D/b/a SFRC, yes.

8        Q      Okay.  Has Immedia conducted any other

9    operations other than that bank account?

10       A      None.

11       Q      Okay.  So, why does that bank account exist,

12   what's the purpose of it?

13       A      We set up that bank account because I'm in

14   another lawsuit litigation with partners in the shopping

15   center, and the San Francisco Regional Center account,

16   the previous one, was frozen.  And we set up this SFRC

17   account to continue the business operations.

18       Q      When you say "we," does that mean you?

19       A      Me, yes.

20       Q      So, for all intents and purposes, is that

21   account an account of SFRC?

22       A      Yes.  That is the SFRC account.

23       Q      Okay.  Is that the only bank account, right

24   now, that SFRC has?

25       A      Yes.

Page 152

1        Q     CallSocket III, LP, has it conducted any

2   operations?

3              MR. EME:  Mr. Buchholz is stepping out, for the

4   record.

5              THE WITNESS:  From the Call Center, not at this

6   time.

7              MR. EME:  Right.

8              BY MR. EME:

9        Q     It bought and sold the I. Magnin Building at

10  2001 Broadway in Oakland, California, right, or passed

11  through a holding company?

12       A     CallSocket III Holding Company sold the I.

13  Magnin Building and those monies were deposited in

14  CallSocket III Holding, LLC, account, and were

15  transferred to CallSocket III, LP, account.

16       Q     Okay.

17       A     To the investors' account.

18       Q     Okay.

19              MR. RICE:  This is all pre-receivership?

20              THE WITNESS:  This is pre-receivership.

21              MR. RICE:  Okay.

22              BY MR. EME:

23       Q     And so aside from that activity, CallSocket

24  III, LP, hasn't conducted any operations?

25       A     Not yet.

Page 160

```
 1              MR. EME:  Okay.
 2              BY MR. EME:
 3      Q    So, City Brand Media, LLC, does SFRC have an
 4   ownership stake, even if it's indirect, in City Brand
 5   Media, LLC?
 6      A    Yes.
 7      Q    All right.  Bay Area Trading, LLC, what kind of
 8   a company is that?
 9      A    Bay Area Trading is a wholesale company that is
10   owned by North America 3PL.  Bay Area Trading buys
11   seafood as a wholesaler and supplies the seafood to the
12   Tavern Restaurant, that's the only business that it does.
13      Q    And does -- is it the NA3PL, LP that owns --
14      A    North America 3PL, LLC.
15      Q    Is it the sole owner of Bay Area Trading, LLC?
16      A    Yes.
17      Q    Okay.  And SFRC has an indirect ownership stake
18   in Bay Area Trading, LLC, correct?
19      A    Yes.
20      Q    JL Gateway, LLC, what kind of company is that?
21      A    JL Gateway, LLC, is the owner of the shopping
22   center.
23      Q    The piece of property?
24      A    A piece, yes, the property.
25              MR. RICE:  Which shopping center?
```

Page 161

1              THE WITNESS:  The Jack London Gateway, JL
2    Gateway Shopping Center.
3              BY MR. EME:
4        Q    Is that part of the West Oakland Plaza project?
5        A    Yes.
6        Q    Does JL Gateway, LLC, own the property in trust
7    for West Oakland Plaza, LP?
8        A    No.
9        Q    Do you have or does SFRC have any ownership
10   stake in JL Gateway, LLC, direct or indirect?
11       A    Yes, indirect.
12       Q    And where did JL Gateway, LLC, get the money to
13   buy the shopping center?
14       A    It's a loan from Thorofare Lenders that
15   financed the shopping center.
16       Q    And so Thorofare is a third party lender, not
17   part of the SFRC family, if you will?
18       A    It's an independent lender that we have no
19   association with.
20       Q    Okay.  And did JL Gateway use any other fund,
21   besides what it borrowed from Thorofare?
22       A    Not that I recall.
23       Q    True Agility, you already talked about what
24   that is.  Does SFRC have any direct or indirect ownership
25   stake in True Agility?

Page 164

1    about -- actually, more than two.  Magic Ear --
2            MR. RICE:  We'll hold you to that promise.
3            BY MR. EME:
4      Q    -- LLC, we talked about what that is.  Sorry if
5    I'm repeating this, but does SFRC have any direct or
6    indirect ownership interest in that one?
7      A    Indirect.
8      Q    Creative Dynamics, same question, does SFRC
9    have any direct or indirect ownership interest in that?
10     A    None.
11     Q    How about you, personally?
12     A    No.
13     Q    If you turn the page you'll see Starr Brand,
14   LLC, that's Starr with two "R"s, what is that?
15     A    That was an EB-5 investment that never
16   happened.
17     Q    You mean it was going to be something that EB-5
18   investors could put their money into?
19     A    Yes.
20     Q    Did it ever conduct any business?
21     A    No.
22     Q    It's listed as an asset, money that's due from
23   Starr Brand to SFRC on this exhibit.  Do you know why
24   that is, why would Starr Brand have money due to SFRC?
25     A    Money was loaned to Starr Brand, LLC.

Page 177

1    the investor will get their green cards or get their
2    money back.  That's the deal I signed with USCIS, with
3    their rules and regulations, when they appointed me a
4    Regional Center. So, that's the risk that the investors
5    take, that I'm making the right decision on their behalf
6    to create the jobs, so that they get their green cards.
7          The Call Center business is a hard business,
8    I'm competing with India and the Philippines at a dollar
9    an hour, or two dollars, or whatever it is.  So, you have
10   to be creative here and hopefully our own businesses,
11   that we have a relationship with, generate the revenues
12   and the jobs, and has value going back to the investors,
13   long-term.
14        Q    I want to go back to the written disclosures to
15   investors and talk about that, briefly.  So, has the
16   practice been that a Private Placement Memorandum, or
17   PPM, has been prepared for each of the limited
18   partnerships?
19        A    Yes.
20        Q    And then has the PPM been distributed to people
21   who are prospective investors, before they invest?
22        A    Yes.
23        Q    Okay.  Likewise, has a business plan be created
24   for each of the limited partnerships?
25        A    Yes.

Page 178

1      Q      And distributed to prospective investors?

2      A      Yes.

3      Q      For the PPMs, who drafted them, who reviewed

4   them, and who ultimately approved them, can you tell me

5   that?

6           MR. RICE:  That's a lot of questions at once.

7   So, feel free to tease those out.

8           MR. EME:  Yes.

9           THE WITNESS:  Leeds Disston, my attorney,

10   generated the legal documents, the PPM, Limited

11   Partnership Agreement, Operating Agreement.  The Business

12   Plan we create in-house, ourselves.

13           BY MR. EME:

14      Q      So, let's just talk about the PPM separately --

15   and thank you for all that.  The way I look at it,

16   someone writes it -- this could be over-simplification --

17   but somebody writes it, other people review it and then

18   somebody else says, yes, that's approved.  So, the PPMs,

19   who has been the primary drafter of the PPMs?

20      A      Leeds Disston.

21      Q      Okay.  And then when he has a draft ready to

22   go, do you review it, does someone else review it, before

23   it actually is distributed?

24      A      I review it.  Jennifer Bronson reviews it.

25   Matt Henderson reviews it.  And China reviews it.

Page 179

1      Q      Okay.

2             MR. RICE:   When you say China, what do you

3      mean?

4             THE WITNESS:   China offices, our representative

5      offices in Shanghai, they review it.

6             BY MR. EME:

7      Q      Is that Peter?

8      A      Peter Hu.

9      Q      And is it just Peter or Jessie was the other

10     person?

11     A      Well, primarily Peter Hu is the individual.

12     Q      Okay.   Peter is in mainland China or in Hong

13     Kong?

14     A      Mainland China.

15     Q      Okay.   So, after all that review is done, is

16     there somebody who has the final authority to say I

17     approve this, this can be distributed to investors?

18     A      That would be me.

19     Q      Okay.   And the Business Plans, Jennifer

20     Bronson, she's the primary drafter of them, is that

21     right?

22     A      Yes.

23     Q      And do they go through a review process, before

24     they're distributed?

25     A      Months and months of review.

Page 180

```
 1        Q     Okay.  And who are the reviewers?
 2        A     Myself, Matt Henderson, Peter Hu, as well as
 3   staff in Shanghai.  We also have individuals that are
 4   partnering up with us in the venture, that are driving
 5   the business plan, also, based on their background and
 6   expertise.
 7        Q     Okay.  And then when that review process is
 8   finished, are you the one who had ultimate authority to
 9   say we're going with this?
10        A     Yes.
11        Q     Okay.  And these practices that you described
12   to me, have they been essentially the same for the past
13   five years?
14        A     Yes.
15             MR. RICE:  And if I could just clarify, when
16   Jennifer drafts the Business Plan, where is she getting
17   the information from?
18             THE WITNESS:  She's getting the information
19   from the marketplace, as well as from the potential
20   partner that is involved in the operations, that normally
21   ends up being the manager of the --
22             MR. RICE:  So, Shirley Ma for CCOO?
23             THE WITNESS:  Shirley Ma for CCOO, with her
24   expertise, 21 years expertise in the healthcare nursing
25   home industry.  So, there's a lot of documentation that
```

Page 181

```
 1    comes from, and data, that comes from the partners that
 2    are already established in the industry.
 3              BY MR. EME:
 4         Q    And do the -- or have the investors signed
 5    limited partnerships to become investors?
 6         A    Yes.
 7         Q    And Mr. Disston, has he been the primary
 8    drafter of those?
 9         A    Yes.
10         Q    And have they gone through a review and
11    approval process, as well?
12         A    Yes.
13         Q    And is it different from the PPM one or what's
14    the review and approval process?
15         A    Well, it's the same, everybody has a chance to
16    review it and then we all agree that it's unanimous,
17    we're ready to go with it, ready to run with it.
18         Q    But you have the ultimate authority, though, to
19    approve the Limited Partnership Agreement?
20         A    Yes.
21         Q    All the limited partnerships were formed in
22    California, right?
23         A    Yes.
24         Q    And do the investors or have the investors
25    executed subscription agreements to become investors?
```

```
                                                    Page 198

 1                  PROOFREADER'S CERTIFICATE

 2

 3  In the Matter of:    SAN FRANCISCO REGIONAL CENTER, LLC

 4  Witness:             Thomas M. Henderson

 5  File Number:         SF-04031-A

 6  Date:                Thursday, June 2, 2016

 7  Location:            San Francisco, California

 8

 9           This is to certify that I, Donna S. Raya,

10  (the undersigned), do hereby swear and affirm that the

11  attached proceedings before the U.S. Securities and

12  Exchange Commission were held according to the record and

13  that this is the original, complete, true and accurate

14  transcript that has been compared to the reporting or

15  recording accomplished at the hearing.

16

17  _____        _____6/10/16_____

18  (Proofreader's Name)          (Date)

19

20

21

22

23

24

25
```

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2    REPORTER'S CERTIFICATE

3

4         I, Robert Ohlson, reporter, hereby verify that the

5    foregoing transcript of _197_ pages is a complete, true and

6    accurate transcript of the testimony indicated, held on

7    _6.2/16_ , at _San Francisco_

8    _California_ , in the matter of: _San Francisco_

9    _Regional Center_ . I further certify that this

10   proceeding was recorded by me and that the foregoing

11   transcript was prepared by Maryann Loverro under my

12   direction.

13

14

15   Date: _6/10/16_

16   Official Reporter: _Robert Ol_

17   Diversified Reporting Services, Inc.

18

19

20

21        Diversified Reporting Services, Inc.

22   Phone: (202) 467-9200 Fax: (202) 296-9220

23

24

25