Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
Sumy Kim (SBN 290082)
skim@peretzlaw.com
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, CA 94111
Telephone:  415.732.3777
Facsimile:  415.732.3791

Attorneys for Defendants COMPREHENSIVE CARE OF OAKLAND, L.P.
And COMPREHENSIVE CARE OF CALIFORNIA, LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC.<br><br>                      Defendants.<br><br>CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; CENTRAL CALIFORNIA FARMS, LLC; BERKELEY HEALTH CARE DYNAMICS, LLC; and JL GATEWAY, LLC.<br><br>                      Relief Defendants. | Civil Case No. 3:17-cv-00223-RS<br><br>**DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP'S AND COMPREHENSIVE CARE OF CALIFORNIA, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER**<br><br>**Date:**  March 2, 2017<br>**Time:** 1:30 p.m.<br>**Courtroom:** 3 - 17th Floor<br><br>**Judge:** Hon. Richard Seeborg |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 3

    A.      The Business Plan to Purchase and Operate a Nursing Home and the Formation of
CCOO and CCOC ..................................................................................................... 3

    B.      Henderson Had Exclusive Control and Responsibilities over CCOO's EB-5 Investors
and the Investment Funds........................................................................................... 4

    C.      Ma Purchased Bay Area Health Care Center, Remodeled It and Re-open It as a New
Nursing Home ............................................................................................................ 6

    D.      Ma's Efforts in Opening a Subacute Care Unit and Converting BAHCC into a Subacute
Facility........................................................................................................................ 7

    E.      Defendants' Success is a Poster Child as to the Intent of the EB-5 Program................... 8

    F.      Ma Recently Discovered the Henderson's Fraudulent Conduct and Immediately Took
Actions to Address Them ........................................................................................... 8

    G.      The Current Status of the EB-5 Program Investors of CCOO ......................................... 10

    H.      The Continued Successful Operation of Defendants is Vital to Protect the Interest of
CCOO's EB-5 Investors ........................................................................................... 11

III.    LEGAL ARGUMENT ............................................................................................. 12

    A.      The Court Should Not Appoint a Receivership over CCOO and CCOC............................ 12

        1.      The SEC Fails to Show Fraud or Wrongdoing by Defendants ..................................... 12

        2.      The SEC Fails to Show Mismanagement or any Imminent Danger to the CCOO
Business..................................................................................................................... 14

        3.      Defendants and the Limited Partners Will Be Irreparably Harmed If a Receivership is
placed over Defendants ............................................................................................. 15

        4.      In Balance, the Current Receivership in the Young Case Sufficiently Protects the
Limited Partners ........................................................................................................ 18

    B.      The Young Case Should Not Be Stayed........................................................................ 19

        1.      The Enjoining of the Young Case Receivership and Staying the State Case Does Not
Protect All of the Investors....................................................................................... 19

        2.      The Wencke I and II Case Is Not Applicable Here......................................................... 20

        3.      The SEC Has Not Made Showing to Grant an Injunction Enjoining the Receiver and
the Young Case .......................................................................................................... 20

C.    There are No Facts to Warrant a Preliminary Injunction against Defendants .................. 21

IV.    CONCLUSION ............................................................................................................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.* 999 F.2d 314 (8th Cir. 1993) ........................... 11

*Fid. Bank v. Key Hotels of Brewton*, LLC, No. 15- 0031-WS-M, 2015 U.S. Dist. LEXIS 48055
   (S.D. Ala. Apr. 13, 2015) ....................................................... 15

*In re Cedant Corp. Securities Litigation,* 109 F.Supp.2d 225 (D.N.J. 2000) ..................................... 13

*In re Cylink Securities Litigation,* 178 F.Supp.2d 1077 (N.D. Cal. 2001) ...................................... 13

*Limbright v. Hofmeister,* No. 5:09-cv-107-KSF, 2012 U.S. Dist. LEXIS 163360 (E.D. Ky. Nov.
   15, 2012) ............................................................... 14

*Negrete v, Allianz Life Ins. Co. of North America,* 523 F.3d 1091 (9th Cir. 2008) ........................ 20

*New York Life Ins. Co. v. Watt West Inv. Corp.,* 755 F.Supp. 287 (E.D. Cal. 1991) .................... 12

*PNC Bank, N.A. v. Presbyterian Ret. Corp.,* No. 14- 0461-WS-C, 2014 U.S. Dist. LEXIS 159724
   (S.D. Ala. Nov. 13, 2014) ....................................................... 15

*Securities and Exchange Commission v. Goble*, No. 11-12059, 2012 WL 1918819 (11th Cir.
   2012) ................................................................. 21

*Securities and Exchange Commission v. United Fin. Grp. Inc.,* 474 F.2d 354, 358 (9th Cir.
   1973.) ................................................................ 12

*Securities and Exchange Commission v. United Fin. Grp.. Inc.,* 474 F.2d 354, 358 (9th Cir.
   1973.) ................................................................ 21

*Securities and Exchange Commission v. Bonastia,* 614 F.2d 908 (3rd Cir. 1980) ........................ 20

*Securities and Exchange Commission v. Keller Corporation*, 323 F.2d 397 (7th Cir. 1963)......... 14

*Securities and Exchange Commission v. Wencke,* 577 F.2d 619 (9th Cir. 1978) .......................... 19

*Securities and Exchange Commission v. Wencke,* 622 F.2d 1363 (9th Cir. 1980) ........................ 20

*View Crest Garden Apartments, Inc. v. U.S.,* 281 F.2d 844 (9th Cir. 1960).................................. 12

**Statutes**

15 U.S.C. s 77t(b) .................................................................. 20

15 U.S.C. ss 78u .................................................................... 20

42 U.S. Code §1395 ................................................................. 15

California Corporations Code § 15904.08 ................................................. 18

**Other Authorities**

12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus  ....................................... 2, 11, 12

13 James Wm. Moore, *et al.*, Moore's Federal Practice ................................................................ 12

I.    **INTRODUCTION**

Defendant COMPREHENSIVE CARE OF OAKLAND, LP ("CCOO") and its general partner Defendant COMPREHENSIVE CARE OF CALIFORNIA, LLC ("CCOC") (collectively, "Defendants") were the first participants in an EB-5 Immigrant Investor Program of Defendants THOMAS HENDERSON ("Henderson") and SAN FRANCISCO REGIONAL CENTER, LLC ("SFRC") (collectively, the "Henderson Defendants").  After 8 years of hard work, Defendants became a EB-5 program success story, responsible for creating dozens of full-time and long serving jobs, advancing the goals of their immigrant investors, and becoming a profitable business.

It all begun in 2009 when Henderson scouted Shirley Ma ("Ma") and proposed a partnership where he would help her find EB-5 investors so that she could develop a business plan to purchase a nursing home and grow it to become a subacute nursing facility.  Based on their respective skill set and experience, the parties decided that Henderson would handle all aspects of the EB-5 program and manage the funds obtained from the overseas investors.  Ma, in turn, agreed to be responsible for the acquisition, operation, development and day-to-day management of the nursing facility.

In 2010-2011 Henderson recruited foreign investors for CCOO (the "Limited Partners") to execute Ma's business plan and received EB-5 funds from these Limited Partners.  Ma, on her part, located and acquired a failing nursing facility on the brink of losing its license and begun with the long and complex process to grow and upgrade the facility.  By 2013, the nursing home was completely renovated and converted to be certified as a sub-acute care facility earning the highest rating available for a skilled nursing in California.  Presently, Defendants employ 160 full-time employees and generated $13.5 million in revenue as of 2016.

At no time did Ma have access, visibility or authority to the EB-5 investment funds. Similarly, the Henderson Defendants had no say, interest or authority over the management or the operation of the facility.  The relationship between the parties was limited in that Ma would make request for funds and Henderson provide them to her.  By the end of 2013, Ma was informed that she had exhausted all the EB-5 funds available to CCOO, and from that point on, she funded the business through operating income and a $2 million loan taken for the business that Ma personally guaranteed.

In the fall of 2015, Defendants learned that the Henderson Defendants were in litigation with a business partner who had a similar business deal as Henderson and Ma, named Alan

Young (the "Young Case"). Through this litigation, Defendants were shocked to discover that the Henderson Defendants misappropriated approximately $4.7 million of Defendants' EB-5 investment funds. Upon this discovery, Defendants took immediate steps to secure their business. Ma bought Henderson of CCOC and she is now its sole owner. Defendant then filed a derivative Cross-Complaint against the Henderson Defendants in the Young Case to recover the investors' funds misappropriated by them. Defendants are also in the process of certifying CCOC as a regional center for CCOO in order to secure the completion of its EB-5 program for the benefit of the Limited Partners.

It was only after the Young Case has been pending for nearly two years with an appointed receiver that gathered substantial amounts of funds misappropriated by the Henderson Defendants that the SEC filed this instant case. Through the present Motion, the SEC now requests (1) the appointment of a receivership, (2) injunctive relief in enjoining the receivership in the Young Case and staying the Young Case entirely, (3) injunctive relief to enjoin Defendants from violating any federal securities laws, selling any security and destroying documents. Defendants respectfully request that each of the relief sought by the SEC be denied.

In determining whether a receiver should be appointed, courts often consider a variety of factors, such as: (1) whether the defendant engaged in fraudulent conduct, (2) whether an imminent danger of loss of property exists, and (3) harm to the plaintiff if the request for a receivership is denied in comparison to the harm to the opposing party. *Solis v. Matheson,* 563 F.3d 425, 438 (9th Cir. 2009). None of these factors apply to Defendants because (1) Defendants did not engage in fraudulent conduct but were victims of fraud, (2) there is no imminent danger or evidence of mismanagement of the business as CCOO nursing facility is profitable, growing and flourishing, (3) a receivership will cause substantial harm to the Defendants and ultimately the Limited Partners whom the SEC seeks to protect — CCOO is a the risk of losing its major contracts and its license with the State of California if a receivership is appointed over the business. As the appointment of a Receiver will fatally detriment Defendants and the Limited Partners it seeks to protect, Defendants respectfully request that Defendants be excluded from any order for a receivership.

As to the remaining injunction requests, the SEC cannot make a proper showing of *prima facie* case of previous violation and federal securities law and a reasonable likelihood the wrong will be repeated sufficient as required by law to grant an injunction. Defendants have not previously violated any federal securities law. Additionally, there is no likelihood of the wrong

being repeated because the Henderson Defendants' assets have all be placed in a receivership in the Young Case and Defendants. Therefore, both injunctive reliefs requested by the SEC must be denied.

As to the request to enjoin the Young Case receiver and stay the case, this request must be denied because the SEC failed to provide any applicable legal authority to allow for such an order. Furthermore, such a stay would only harm all the parties involved, including the EB-5 investors who require a swift resolution while their visa applications are pending.

Finally, although Defendants have no intention of violating any laws, selling any security nor destroying any documents, SEC has not made a showing of any fact to warrant such an injunction against Defendants. Despite this fact, Defendants would not be opposed to stipulating to such an order from the Court.

Based on further arguments presented herein, Defendants respectfully request the Court to deny the SEC's Motion as to the Defendants.

## II. FACTUAL BACKGROUND

### A. The Business Plan to Purchase and Operate a Nursing Home and the Formation of CCOO and CCOC

In the fall of 2009, Henderson approached Ma and told her that he had an idea with a potential to access a large number of investors who were interested in the EB-5 Immigrant Investor Program, but that he did not have a business plan that would meet the job creation criteria under that program. [Declaration of Shirley Ma in Support of Opposition to Motion for a Receivership ("Ma Decl.) at ¶4.] Ma had no knowledge or relationship to Henderson before she was introduced to him during that fall. [*Id.* at ¶5.] At that time, Ma had no knowledge nor experience with an EB-5 Immigrant Investor Program time, but she had over 25 year of experience in the nursing home industry and had been employed as the administrator of a large nursing facility in Alameda for 21 years. [*Id.* at ¶6.] During her successful career in nursing homes, Ma acquired the skills, knowledge and expertise to develop and operate a unit for patients in need of subacute care that was part of the nursing home facility she operated in Alameda. [*Id.* at ¶7.]

Ma was interested in advancing her career in the nursing homes and become an owner of a facility so she agreed to develop a business plan whereby she will use the EB-5 immigrant investor program to purchase an existing nursing home facility in the East Bay and use her skills to upgrade the facility, grow the business and create jobs. [*Id.* at ¶8.] In particular, Ma realized

that the EB-5 Immigrant Investor Program fit well with her plans — she was interested in forming a new subacute care unit in the nursing home that would be purchased, which in turn would create many new jobs because the operation of such a unit is very labor intensive.  [*Id.* at ¶9.]

The parties then agreed to be equal partners in the business with the understanding that each one of them would have a different set of responsibilities based on their skill-set and expertise.  [*Id.* at ¶10.]  The parties agreed that Ma would operate, develop, grow and manage the day-to-day operations of the nursing facility, while Henderson would handle the corporate formation, deal with the attorneys and federal government about the EB-5 Immigrant Investor Program, prepare and sign the offering materials that would be provided to the investors, and manage the funds obtained from the overseas investors.  [*Id.* at ¶11.]

On September 10, 2010, Henderson formed CCOC as a limited liability company, and each party — Ma and Henderson — was to be provided 50% ownership of CCOC.  [*Id.* at ¶12.] Ma took her 50% membership interest in CCOC in her own name, but Henderson insisted that his ownership interest in CCOC be placed under a separate entity rather than in his name personally, which he would end up calling SFRC.  [*Id*. at ¶13.]

Henderson then informed Ma that he would form a partnership between CCOC and the foreign EB-5 investors called CCOO.  [*Id.* at ¶14.]  Henderson explained that CCOC would be named as the general partner of CCOO and that the EB-5 program investors would be considered limited partners in CCOO.  [*Id.*]  By September 14, 2010, Henderson formed SFRC and CCOO. [*Id.* at ¶15.]  On October 1, 2010, SFRC and Ma entered into an Operating Agreement to operate CCOC.  [*Id.* at ¶16.; A copy of the Operating Agreement is attached to the Ma Decl. at ¶17 as Exhibit "1".]

**B.    Henderson Had Exclusive Control and Responsibilities over CCOO's EB-5 Investors and the Investment Funds**

Upon information and belief, CCOO was Henderson's first business that used the EB-5 Immigrant Investor Program.   [*Id.* at ¶17.]   In discussions that took place during the time Henderson and Ma formed their relationship and put together their business plan, Henderson informed Ma that he would try to solicit twenty (20) EB-5 investors for the nursing home business.  [*Id.* at ¶18.]  Henderson also advised Ma that each investor will provide $500,000 in funds for the business, but that there would be various fees and expenses payable to SFRC, such as marketing and operating expenses to identify and solicit the investors as well as agency fees to

the individuals who would find them.  [*Id.* at ¶19.]   As such, Ma had no knowledge as to how much of the $500,000 would ultimately be paid to Defendants.

As agreed by the parties, Henderson was fully responsible to bringing and managing the EB-5 investors' monies, and for that purpose he along with the Henderson Defendants opened and maintained bank accounts for those investment funds.  [*Id.* at ¶20.]  Throughout the entire time the Henderson Defendants managed the EB-5 investors' monies for CCOO, neither Ma nor any other person at Defendants except for Henderson had signatory authority, access or visibility of the funds that were provided by the EB-5 investors of CCOO.  [*Id.* at ¶21.]  In particular, Ma never had access to the bank accounts in which EB-5 investors' monies for CCOO were deposited, she had never seen any bank statements for those accounts, and up until the end of 2016 she had never seen any accounting records for those monies.[1]  [*Id.* at ¶22.]

As the parties hoped for, through 2010 and 2011, Henderson indeed recruited twenty (20) EB-5 investors for CCOO and he had informed Ma about recruiting those investors.  [*Id.* at ¶24.] Upon securing the investment, each of these investors signed a Limited Partnership Agreement for CCOO (the "Partnership Agreement") where CCOC was named as the "General Partner" of CCOO and the individual investors were designated as "Limited Partners".  [*Id.* at ¶25; A redacted copy of the Partnership Agreement is attached to Ma Decl. at ¶25 as Exhibit "2".]

As for the infusion of funds to the business, at the very beginning, Ma used her own funds to operate the business because CCOO was the first EB-5 Immigrant Investor Program used by Henderson and the investors' money was not yet available.  [*Id.* at ¶26.]  Later, from November 2011 through most of 2013, Henderson would provide funds to the Defendants to operate the business that was in a growing mode and frequently needed an infusion of funds.  [*Id.* at ¶27.]

At the end of 2013, Defendants sought additional investment funds from Henderson given the rising costs of operations, recent construction and the large investment necessary for establishing a subacute-care unit at the facility.  [*Id.* at ¶28.]  However, for the first time, Henderson told Ma that all of the EB-5 investment monies for CCOO were already given to CCOO and that he can no longer provide Defendants with any additional funds.  [*Id.* at ¶29.]  Ma took Henderson as his word and since she had no access to the investments funds, the bank accounts or the accounting for those monies, she no longer asked for funds to operate the business.  [*Id.* at ¶30.]

---

[1] Until very recently, Henderson was also the only person that had a relationship and the communications with the EB-5 investors of CCOO.  [*Id.* at ¶23.]

DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP AND COMPREHENSIVE CARE OF CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER

- 5 -

Because Henderson represented to Ma that there are no investors' funds for CCOO, in January 29, 2014, CCOO took a $2,000,000 loan that Ma **personally guaranteed** in order to continue with growing the business and maintaining its operations.  [*Id.* at ¶31; a true and correct copy of the relevant pages of the loan agreement is attached to Ma Decl. at ¶31 as Exhibit "3".]

### C.   Ma Purchased Bay Area Health Care Center, Remodeled It and Re-open It as a New Nursing Home

While Henderson was exclusively responsible for the investment side of the nursing home business, Ma was the one fully responsible for operation and development of the actual business. [*Id.* at ¶32.]   In that regard, Henderson Defendants, and particularly Henderson, were never provided access nor signatory powers to Defendants financials or bank accounts and were never involved in the management or day-to-day operations of the facility.  [*Id.* at ¶33.]

1.   In or around early 2010, Ma took the first steps to bring the business plan into fruition by locating a nursing home formerly named Oakland Springs Care Center, renamed by Ma to Bay Area Health Care Center ("BAHCC"), in Oakland, California.  [*Id.* at ¶34.]  At the time, BAHCC was a failing nursing home located in a dilapidated facility and was on the brink of losing its Skilled Nursing Facility ("SNF") license issued by the Department of Health and Human Services of the State of California ("DHHS").  BAHCC was then rated 1-Star out of the 5-Star ranking of the Quality Rating System of the Centers of Medicare & Medicaid Services of DHHS.  [*Id.* at ¶35.]  In order to purchase the facility, Ma had to go through a very rigorous application process with DHHS in order to ensure that the new potential licensee is equipped to run such a facility. [*Id.* at ¶36.]  Based on Ma's impeccable record, her over twenty-five years of experience in the healthcare industry, her experience in the industry and her twenty-one (21) year record as an administrator of large health care facility in Alameda, CA, the DHHS approved the application for change of ownership to CCOO as a licensee based on the declaration that Ma would be the operator.  [*Id.* at ¶37.]

Due to the poor state of the facility, starting November 2011, Ma proceeded to make extensive renovations to the interior, including but not limited to, fixtures and equipment.  [*Id.* at ¶38.]  The remodel included the purchase of high quality hospital beds to replace outdated hand-cranked beds, new centralized heating and cooling systems were installed, the electrical and mechanical systems were replaced and upgraded to be in compliance building codes and to be in compliance with the requirements for subacute units.  Insulation of the ventilator alarm system were installed and new equipment was purchased to accommodate subacute care necessities.  [*Id.*]

The entire renovation of the facility was expensive, took nearly two years to complete and cost approximately $1.7 million.  [*Id.*]

Additionally, upon starting the operation of BAHCC, Ma discovered that many of the patients at the BAHCC facility were improperly placed there as it pertained to the level of care the patients needed.  [*Id.* at ¶39.]  As such, through Ma's directive, Defendants evaluated each patient, transferred some of them to the appropriate facility so they could receive the appropriate type of care, retained the properly placed patients and admitted new patients to fill the new vacancies.  [*Id.*]  Needless to say, the Henderson Defendants had no involvement in any aspect of the upgrades made to the BAHCC facility at that time. [*Id.* at ¶40.]

   D.   **Ma's Efforts in Opening a Subacute Care Unit and Converting BAHCC into a Subacute Facility**

In November 2011, Ma also began implementing her plan to convert the BAHCC facility to a certified subacute care facility.  [*Id.* at ¶41.]  The certification into DHHS' subacute program would allow BAHCC to service more medically fragile patients and patients who require special services, such as inhalation therapy, tracheotomy care, intravenous tube feeding, and complex wound management care.  [*Id.*]  Ma's plan for this conversion was based on the fact that there was no subacute care facility in Oakland and the higher level of care would provide greater potential of revenue for Defendants.  [*Id.*]  Ultimately, the establishment of a certified subacute care unit at BAHCC was a two year process because of the need to follow through rigorous DHHS requirements.  Through Ma's efforts in obtaining quality staff, BAHCC became certified as a sub-acute care facility in November 2013.  [*Id.*]

During the successful conversion process, Defendants built a professional and capable team at BAHCC that has now reached 160-full time employees.  [*Id.* at ¶42.]  The positions created by Defendants are long-term employment positions that are not expected to disappear once the EB-5 Immigrant Investor Program at BAHCC achieves its goals.  [*Id..*]  Further, most of these full-time positions provide a career path for the employees to advance in the healthcare industry.  [*Id.*]

BAHCC is currently the only subacute care facility in Oakland, and there continues be a large demand for licensed subacute beds.  [*Id.* at ¶43.]  In addition, the quality of BAHCC as a subacute care facility is now well known in the industry as acute hospitals presently have the confidence to refer their high acuity patients for placements at that facility.  [*Id.* at ¶44.]

Consequently, the number of subacute patients at BAHCC have grown to now constitute 37 out of the 79 patients in BAHCC today. [*Id.* at ¶45.]

**E.      Defendants' Success is a Poster Child as to the Intent of the EB-5 Program**

Ultimately, BAHCC, which was on the brink of collapse 6 years ago, has now been revived into a thriving business that made $13,678,778 in revenue in 2016. [*Id.* at ¶46.] From a once 1-Star institution, it is now rated a 5-Star facility with DHHS and with projections of continued growth in staff and revenue with plans to continue expanding the facility's subacute bed capacity. [*Id.* at ¶46.] The restructuring of BAHCC created not only a high-quality care facility, but improved the neighborhood, created jobs, and created new opportunity for skilled nurses.[2] [*Id.*] This was all made possible through the EB-5 Immigrant Investor Program, which provided Defendants the opportunity to receive funding to implement a well throughout business plan that could not have succeeded without someone of Ma's experience driving it. [*Id.*]

**F.      Ma Recently Discovered the Henderson's Fraudulent Conduct and Immediately Took Actions to Address Them**

At the end of 2011, Henderson informed Ma that he was purchasing the Tribune Building in Oakland. [*Id.* at ¶48.] When Ma asked if the purchase of the Tribune Building was an EB-5 project, Henderson claimed it was **a personal investment** which he was purchasing through a private lender. [*Id.*]

In or around end of 2014 or early 2015, Ma was informed by a Henderson Defendants agent that Henderson recruited four (4) additional investors designated for CCOO's EB-5 Immigrant Investor Program, increasing the total number of CCOO's investors to twenty four (24). [*Id.* at ¶49.] Henderson **did not** inform Ma of this addition, but rather told agents of the Henderson Defendants to keep this as a secret from Ma. [*Id.*] Defendants never saw the money provided by these 4 new investors and to date have no idea when and how Henderson Defendants received those funds. [*Id.*]

In the fall of 2015, Henderson informed Ma that he was in litigation with another EB-5 program business partner, Alan Young. [*Id.* at ¶50.] However, Henderson reassured Ma that it would have no effect on Defendants even though Ma became increasingly concerned about

---

[2] For instance, BAHCC is now paving a new road in the industry as it is in the process of implementing a new service to provide dialysis treatment for the subacute patients. [*Id.* at ¶47.] This will be the first of its kind in Northern California; and it will serve to provide care for patients who would otherwise be required to remain in acute hospital, save cost for Medicare and MediCal and create higher paying job in the skilled nursing arena. [*Id.*]

Henderson's conduct.  [*Id.*]  Despite Henderson's representations, in May 2016, Defendants were named as defendants in the Young Case.  [*Id.* at ¶51.]  Ma only found out about this development from Henderson later because Henderson was still listed as the agent of service of process for the Defendants.  [*Id.*]  Upon notifying Ma, Henderson again reassured her that Defendants had nothing to do with the allegations and Mr. Young was only naming every business Henderson had ever been linked to in order to further harass and embarrass him.  [*Id.* at ¶52.]  Finally, Henderson told Ma that he would be covering all legal representation of Defendants in this case, and that she had nothing to worry about.  [*Id.* at ¶53.]

Through the litigation of the Young Case, around July 22, 2016, Ma was surprised to learn that deposit of $1,840,000 was used for the purchase of the Tribune Building originated from CCOO's foreign investment funds and that the legal title of the Tribune Building was taken under another entity controlled by Henderson Defendants.  [*Id.* at ¶54.]  Ma immediately confronted Henderson on the matter, and was told by him that there was a promissory note for CCOO on the funds used and Defendants would be paid back in full.  [*Id.*]  Up until that time, Ma was never informed of that promissory note and have not seen it to date.  [*Id.*]  Ma does not believe that this promissory note ever existed.  [*Id.*]

The revelation about the large investment in the Tribune Building caused Ma to completely lose her trust in Henderson and the Henderson Defendants and by September 2016, Ma purchased Henderson's share at CCOC (which was formally owned by SFRC) in order to shield and protect Defendants from the Henderson Defendants' malfeasance and fraudulent conduct.  [*Id.* at ¶55.]   Ma is thus the sole member and owner of CCOC.  [*Id.*]

At that point, Defendants began to suspect that the fraudulent conduct by the Henderson Defendants did not extend to the purchase of the Tribune Building, and began to independently and forensically research into Defendants' bookkeeping and accounting to discover any misconduct or misappropriation of monies by tracing the total investment capital Defendants received from the Henderson Defendants since its inception.  [*Id.* at ¶56.]

In early November 2016, Defendants discovered **for the first time** that the Henderson Defendants converted additional investors' funds they had been holding in trust for CCOO beyond the purchase of the Tribune Building.  [*Id.* at ¶57.]  Defendants further realized that the Henderson Defendants had spent substantial amounts of CCOO's EB-5 investment money for the purpose of funding other business ventures and/or purchasing real estate.  [*Id.*]  Upon this discovery, Defendants immediately sought separate litigation counsel than the one provided to

them by Henderson and filed a Cross-Complaint against Henderson Defendants.[3]  [*Id.* at ¶58.]   At this time, Ma believes $4.7 million of Defendants' EB-5 investment funds were misappropriated by Henderson Defendants, aligned with SEC's allegations.  [*Id.* at ¶59.]

Defendants also hired outside immigration counsel who specialized in the EB-5 Immigrant Investor Program in an effort to protect the interested of all the limited partners of CCOO. [Declaration of Jason Wolf ("Wolf Decl.") at ¶¶4 and 6.]  As part of this effort, Defendants are currently seeking a new regional center designated by USCIS to replace SFRC's role in their EB-5 business plan in the case that the United States Immigration and Naturalization Services ("USCIS") terminates SFRC as an EB-5 regional center.  [*Id.* at ¶12; Ma Decl. at ¶60.]

### G.     The Current Status of the EB-5 Program Investors of CCOO

The EB-5 Immigrant Investor Program is administered by the USCIS and requires each applicant to invest at least $500,000 and to create jobs for at least 10 U.S. workers.  [Wolf Decl. at ¶7.]  When applying under the EB-5 Immigrant Investor Program, the foreign investor must initially show that he or she is willing and able to meet the investment and job creation requirements of the EB-5 Immigrant Investor Program.  [*Id.*]  Upon initial approval, the USCIS grants the foreign investor and family (spouse and minor unmarried children) Conditional Permanent Residence ("CPR status").  [*Id.*]  Two years after receiving CPR Status, the foreign investor must show he or she in fact did meet the investment and job creation requirements of the EB-5 Immigrant Investor Program [*Id.*]  Upon satisfaction of these requirements, the USCIS will grant the foreign investor Lawful Permanent Residence ("LPR Status") and the immigration process is completed.  [*Id.*]  If a person holding CPR Status does not satisfy the requirements for LPR Status, the USCIS will terminate CPR Status and institute removal proceedings, to deport the foreign investor from the United States.  [*Id.*]

However, if an EB-5 investment is placed in affiliation with an EB-5 Regional Center, such as SFRC, the creation of at least 10 jobs per investor may be evidenced with an Economic Impact Report ("EIR") showing the calculation of *both direct and indirect jobs*.  [*Id.* at ¶¶9-11.] Based on Defendants' affiliation with a regional center, SFRC has provided an EIR to the USCIS

---

[3] On January 18, 2017, Defendants filed a Cross-Complaint against the Henderson Defendants in the Young Case for fraud, breach of fiduciary duties and other claims.  [a true and correct copy of the Cross-Complaint is attached to the Request for Judicial Notice ("RJN") as Exhibit "A".]  This action was brought as a derivative suit on behalf of CCOO's investors.  [*Id.*]  As early as on November 29, 2016, Defendants attempted to file the Cross-Complaint in an Ex parte Application but their request was denied at that time, mandating that they file a motion for leave to file the Cross-Complaint.  [Declaration of Yosef Peretz ("Peretz Decl") at ¶4.]  Immediately after this Motion for Leave was granted, Defendants proceeded to file the Cross-Complaint.  [*Id.*]

showing the calculation of both direct and indirect jobs due to Defendants, and estimates that a total of more than 240 jobs will be created by Defendants, when Defendants directly employs 185 full-time workers.  [*Id.* at ¶13.]

At this time, Defendants are informed and believe all of the twenty-four (24) Limited Partners are physically located in the United States and have all either begun or completed the immigration process.  [*Id.* at ¶¶5, 14.]  Eleven (11) of these twenty-four (24) Limited Partners have already received their permanent green cards.  [*Id.* at ¶15.]  Nine (9) of these Limited Partners' have completed their two-year conditional residency period and their applications for permanent green cards are currently pending at this time.  [*Id.* at ¶16(a).]  The four (4) remaining Limited Partners, who joined the EB-5 program with Defendants in late 2014, have not yet filed their applications for permanent green cards as they still completing their two-year conditional permanent residency period.  [*Id.* at ¶16(b).]  Defendants are informed and believe the earliest the last of this group of Limited Partners can file their application is October 2018.  [*Id.*]

**H.  The Continued Successful Operation of Defendants is Vital to Protect the Interest of CCOO's EB-5 Investors**

Although the three groups of CCOO's Limited Partners are in unique situations from each other, the continued success of Defendants is vital to the interest of each of the twenty-four (24) Limited Partners.  [*Id.* at ¶16(b).]  First, the highest priority for the eleven (11) Limited Partners who have completed the immigration process is likely to secure the return of as much of their investment and ultimately seek a buy out their ownership share of Defendants. [*Id.* at ¶16(b).] The Court should take note that recently 9 out of these 11 Limited Partners requested to be bought out from CCOO.   [Ma Decl. ¶61.]

The remaining thirteen (13) Limited Partners have even *a greater stake* in the continued successful operation of Defendants as their immigration status and their investment depends on it. For instance, in order for their applications for permanent visas to be approved, the remaining thirteen (13) Limited Partners will require Defendants to reach 185 full time employees.  [Wolf Decl. at ¶¶17-19.]   Fortunately, under Ma's management of BAHCC and based on the maintenance of job growth and increase in census numbers, Defendants are currently scheduled to reach 185 full-time employees by June 2018, and Defendants are projected to continue to experiencing increases to their revenue and value as a business.  [Ma Decl. at ¶62; Wolf Decl. at ¶18.]

//

DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP AND COMPREHENSIVE CARE OF CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER

- 11 -

1

2

### III.   LEGAL ARGUMENT

####    A.    The Court Should Not Appoint a Receivership over CCOO and CCOC

Under federal law, appointing a "receiver is an extraordinary equitable remedy," which should be applied with caution. *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.* 999 F.2d 314, 316 (8th Cir. 1993); see also 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus ("Wright, Miller & Marcus") §2983, at 24 (2d ed. 1997). There is "no precise formula for determining when a receiver may be appointed." *Aviation Supply Corp., supra,* 999 F.2d at 316. Rather, federal courts consider a variety of factors in making this determination, including, but not limited to, for example: (1) "whether [the party] seeking the appointment has a valid claim"; (2) "whether there is fraudulent conduct or the probability of fraudulent conduct," by the defendant; (3) whether the property is in imminent danger of "being lost, concealed, injured, diminished in value, or squandered"; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property"; and, (7) "whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership." 13 James Wm. Moore, *et al.*, Moore's Federal Practice ("Moore's"), § 66.04[2][b] (3d ed. 2008); *New York Life Ins. Co. v. Watt West Inv. Corp.*, 755 F.Supp. 287, 292 (E.D. Cal. 1991) citing 12 Wright, Miller & Marcus § 2983. *See also View Crest Garden Apartments, Inc. v. U.S.,* 281 F.2d 844, 847 (9th Cir. 1960).

While the Court has broad discretionary and equitable powers order a receiver, the Court's priority is to protect the innocent Limited Partners from further harm. Defendants believe such an appointment would cause substantial harm to the Limited Partners in direct contrast to the SEC's intent while preserving the *status quo* of Defendants' operations is more likely to protect the Limited Partners' interest in both getting a financial return of their cash investment and successfully complete the immigration process through the EB-5 Immigrant Investor Program.

####    1.    The SEC Fails to Show Fraud or Wrongdoing by Defendants

The SEC' Motion should be denied as it pertains to Defendants because the SEC has made no showing as to any existence of "fraud and mismanagement" by Defendants. *SEC v. United Fin. Grp. Inc.,* 474 F.2d 354, 358 (9th Cir. 1973.) Nor could it, as Defendants themselves never mismanaged or fraudulently used any of the funds transferred to them by Henderson. [Ma Decl. at ¶63.] Rather, **Defendants were victims of Henderson Defendants' scheme to**

DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP AND COMPREHENSIVE CARE OF CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER

- 12 -

**misappropriate the EB-5 investment monies**.  For instance, Defendants never had access to or authority over any of the EB-5 funds held in trust by Henderson Defendants nor the bank accounts where it was kept.  [Ma Decl. at ¶64.]  Second, all EB-5 monies received by Defendants were used to further their business plan they provided to the USCIS.  [Ma Decl. at ¶65.]  Finally, Defendants did not know of or authorize the misappropriation of funds by Henderson.  [Ma Decl. at ¶66.]  As such, the fraudulent conduct alleged by the SEC was never committed nor authorized by Defendants in their capacity.

To this, SEC's sole argument is that Henderson's wrongful conduct should be imputed on Defendants on the basis of *respondeat superior* and vicarious liability because Henderson was a general partner and controlled the limited partnerships.  [Motion at pp. 24-25.]  This argument fails for two reasons: First, Henderson never had any control over Defendants.  Second, this an oversimplification of the law as they applied to the situation at hand.  Of note is that the cases cited by the SEC merely restate the general principle of vicarious liability and *respondeat superior* for corporations without analyzing the application of both theories over Defendants. This is because both theories do not apply here.

As for control over Defendants, Henderson Defendants never had any control of, access to or authority over the operation and management of BAHCC.  [Ma Decl. at ¶67.]  In that regard, Henderson Defendants were never provided access nor signatory powers to Defendants financials or bank accounts.  [*Id*.]  This separation of control was mutual as Ma or Defendants lack any control over the Henderson Defendants and CCOO's Limited Partners' monies.  [Ma Decl. at ¶33.]  Furthermore, Henderson was removed as a partner of Defendants in September 2016, and therefore he retains no control over Defendants at the present time.  [Ma Decl. at ¶68.] Therefore, SEC fails to show any facts that support control of the Henderson Defendants of Defendants.

Second, the principles of vicarious liability and *respondeat superior* do not apply here.  In the one case cited in the SEC's moving papers, the court actually provides that one can only impute liability to the corporation "when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation…" *In re Cylink Securities Litigation,* 178 F.Supp.2d 1077, 1088 (N.D. Cal. 2001) quoting *In re Cedant Corp. Securities Litigation,* 109 F.Supp.2d 225, 233 (D.N.J. 2000).  Here, Henderson's theft and misappropriation of Defendants' EB-5 funds was neither in the course of his contract with Defendants nor for the benefit of Defendants.  For instance, Section 4.5 of CCOC's operating agreement required Henderson to act

---
DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP AND COMPREHENSIVE CARE OF CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER

- 13 -

in good faith and in a manner in the best interest of Defendants.  [Ma Decl. at ¶16 as Exhibit "1".]  Similarly, Section X (A) and (G) to CCOO's LP Agreement also required Henderson to "receive, invest and expend Capital Contributions…in furtherance of the Partnership's business" in good faith and in the best interest of the Partnership and its Partners.  [Ma Decl. at ¶25 as Exhibit "2".]  In direct breach of these provisions, Henderson did not act in the course of his duties and stole the money to benefit himself.

Defendants' position is aligned with the "controlling person" provision in Section 20(a) of the 1934 Securities Exchange Act, which provides that "[e]very person who, directly or indirectly, controls persons liable under any section of the 1934 Act shall likewise be liable unless the controlling person acted in good faith and did not directly or indirectly induce" the violation.  Again, Defendants never had control over the Henderson Defendants nor the monies they stole, so no theory of liability should be asserted against Defendants.  Rather, as provided extensively above, Defendants were victims of the same fraud, and took all possible steps to recover the damage caused to Defendants and the Limited Partners by the Henderson Defendants.  As examples, Defendants have filed a Cross-Complaint the against Henderson Defendants in the Young Case, obtained new litigation counsel, retained new immigration counsel, and actively seek to designate a new regional center instead of SFRC.  [Ma Decl. at ¶¶58, 60; Wolf Decl at ¶6.]

## 2.     The SEC Fails to Show Mismanagement or any Imminent Danger to the CCOO Business

The Seventh Circuit stated *in Securities and Exchange Commission v. Keller Corporation*, 323 F.2d 397, 403 (7th Cir. 1963) that:

> The prima facie showing of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court. It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.

While this is the law, there has been **no showing** by the SEC as to ***any facts*** implicating Defendants of any kind of mismanagement because this is not the case with Defendants.  Despite the fraudulent conduct by the Henderson Defendants, Defendants are the poster child of the EB-5 Immigrant Investor Program.  Through EB-5 investment funds, Ma was provided an opportunity to purchase a run-down facility on the brink of closure, implement a business plan, and turn the

facility to a flourishing business that has create new jobs for the residents in the Bay Area. Outside of the stain of the two pending cases, Defendants are well managed, on a path to meeting its job commitments to the Limited Partners and hope to provide a return on their investments to them.

### 3.   Defendants and the Limited Partners Will Be Irreparably Harmed If a Receivership is placed over Defendants

Most importantly, the appointment of a receivership over Defendants will not actually "rectify [Henderson] Defendants fraud" of the Limited Partners' investment as alleged by the SEC, but rather place them further at risk due to the irreparable harm it may cause.  [Motion at p. 28.]  As such, the Court must deny the SEC's request for a receivership as to Defendants.  *See Limbright v. Hofmeister*, No. 5:09-cv-107-KSF, 2012 U.S. Dist. LEXIS 163360 at *10-11 (E.D. Ky. Nov. 15, 2012) (denying motion to appoint receiver because of risk of mismanagement of specialized business and the cost to bring the receiver "up to speed").  Sitting in equity, the Court has the discretion to avoid these risks, especially where they do not enhance existing protections. See *Fid. Bank v. Key Hotels of Brewton*, LLC, No. 15- 0031-WS-M, 2015 U.S. Dist. LEXIS 48055 at *12-13 (S.D. Ala. Apr. 13, 2015) (denying motion to appoint receiver over hotel in the midst of renovations and franchise and financing negotiations because "appointing a receiver now could be catastrophic" since it would "almost certainly undermine (and perhaps even negate) [defendant's] attempts to restore the Hotel and to make [plaintiff] whole," and a forced sale would not benefit investors).  The courts are further instructed to not take the extraordinary step of appointing a receiver in situations where a receiver would "accomplish more harm than good." *PNC Bank, N.A. v. Presbyterian Ret. Corp.*, No. 14- 0461-WS-C, 2014 U.S. Dist. LEXIS 159724 at *38-39 n.24 (S.D. Ala. Nov. 13, 2014) (denying motion to appoint receiver absent evidence of mismanagement, or that the defendant could not pay routine operating costs, and given the high cost of managing the property under receivership and the risk that a receiver would "alienat[e], distract[], or discourag[e] employees").

### i.   A Receivership Will Put at Risk Defendants' Operating License with DHHS

Federal law requires every SNF to be licensed to operate.  42 U.S. Code §1395i-3(d)(2). In California, the licensing of BAHCC relies heavily on the identification of the operator of the facility.  [Ma Decl. at ¶37.]  As provided above, the licensing of Defendants was predicated on Ma's experience in the industry.  As such, the transfer of Defendants to a receivership to someone

1   without any experience in skilled nursing care runs a risk of losing BAHCC's license.  For

2   instance, the SEC seeks to appoint the Young Case's appointed receiver, Susan L. Uecker, as the

3   receiver.  While Defendants do not dispute that Ms. Uecker is a well-respected receiver and

4   completely suitable to serve as a receiver in this case, it would not be appropriate to place her as a

5   receiver over BAHCC, which required special skills and a specific license for operations.  The

6   closest resemblance to Defendants in Ms. Uekcer's previous receiverships, is the case of

7   *Paracelsus v. Doctors Hospital of Oakland*; however, Ms. Uekcer's receivership was limited to

8   the collection of accounts receivable for the hospital.  [Exhibit 50 to the Declaration of Thomas

9   Eme]  Despite Ms. Uekcer's competence as a receiver to a wide range of businesses, Ms. Uecker

    simply does not have the experience, license or knowledge necessary to operate a subacute unit in

    a nursing facility.  [*Id.*]

10                  ii.      ***The Appointment of a Receivership May Terminate Defendants'***

11                          ***Contracts with Their Major Providers***

12          Defendants currently are in contract with Kaiser, MediCal and MediCare to service its

13   members who need skilled nursing facility services.  [Ma Decl. at ¶69.]  Specifically as to Kaiser,

14   sixty percent (60%) of Defendants' current patients are Kaiser members and these patients

    generated $3,008,140 of Defendants' revenue in 2016. [*Id.*]

15          Article 4.2.2.9 of Defendants' contract with Kaiser specifically provides that **the**

16   **assignment of a receivership would terminate the contract**.  [A true and correct copy of the

17   relevant pages of the Agreement is attached to Ma Decl. at ¶70 as Exhibit "4".]  As subacute

18   patients from Kaiser make up nearly half of the Defendants' current patients, this would clearly

19   cause a great detriment to Defendants, those Limited Partners seeking a return on their

20   investments *and* those Limited Partners who still have not obtained a permanent visa as

21   Defendants would not be able to maintain the number of full-time staff should the Kaiser contact

    be terminated.

22          Similarly, a receivership on Defendants is likely to be considered a change of "managing

23   control" as it pertains to Defendants' contract with MediCare.  [Ma Decl. at ¶71.]  Therefore, the

24   appointment of a receivership creates a risk of termination of this contract as well.  [A true and

25   correct copy of the relevant pages of the Medicare application is attached to Ma Decl. at ¶71 as

26   Exhibit "5".]  MediCare patients generated $2,051,413 in revenue for Defendants in 2016.  [*Id.*]

27   As such, the loss of Defendants contract with MediCare would also devastate Defendants'

28

financials and staffing and in turn may put the Limited Partners investment and immigration status at peril.

Finally, a receivership also puts at risk Defendants' contract with MediCal. [Ma Decl. at ¶72.]   In the agreement between the parties, provision 36 provides that the contract is not assignable.  [A true and correct copy of the relevant pages of the MediCal Agreement is attached to Ma Decl. at ¶72 as Exhibit "6".]  Furthermore, provision 25(c) provides that the contract may be temporarily suspended if Defendants are under investigation for fraud.  [*Id.*]  Although Defendants have committed no wrongdoing, an appointment of a receivership may trigger MediCal's suspension of the contract because of the application of the above provisions.  At this time, MediCal patients made of $5,713,611 of 2016's revenue for Defendants.  [*Id.*]  Defendants cannot sustain as a business or keep it employment of its staff should any of the contracts be suspended or terminated due to the receivership.  [*Id.*]

### iii.      *Receivership Will Constitute a Default on Defendants' Loans*

The terms of a loan taken by Defendants on January 29, 2014 for $2,000,000 provides that the appointment of a receiver would constitute as an event of default and that the lender may declare the entire balance immediately due.  [A true and correct copy of the relevant pages of the Agreement is attached to Ma Decl. at ¶31 as Exhibit "3".]  Defendants do not have the present funds to repay all of the loan at this time.  [*Id.* at ¶73.]  A default of that loan is likely to cause a financial crisis that will risk the Limited Partners' investment in the business.  [*Id.*]

In addition to the above, a receivership is likely to make it more difficult for Defendants to obtain lines of credit from banks and vendors.

### iv.      *Defendants May Risk Losing its Participation Subacute Program Entirely*

The criteria and standards provided by DHHS require the following for a Sub-Acute facility to operate: (1) it must be licensed, (2) certified as a long-term care Medicare and Medi-Cal provider, (3) employ professional staff with the ability to provide care to subacute patients either by experience or demonstrated competence.

Currently, Defendants are licensed as a Freestanding and Skilled Nursing Facility.  Ma is the operator for Defendants due to her impeccable track record in the industry for over twenty-five (25) years. [Ma Decl. at ¶37.] Ma has also been responsible for the certification of Defendants as long-term care Medicare and Medi-Cal providers.  [*Id.* at ¶74.] The changes of

DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP AND COMPREHENSIVE CARE OF CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER

- 17 -

1   management to Defendants may affect all these factors and may risk decertification of Defendants

2   as a subacute facility.

3        As previously mentioned, Defendants are the only subacute facility in Oakland, the only

4   subacute facility that takes MediCal in the East Bay and 37 of Defendants' 72 patients are

5   subacute patients. [*Id.* at ¶45.]   The loss of this certification would be devastating to not only

    Defendants and the Limited Partners, but to the patients as well.

6        In addition, the decertification of Defendants subacute status will require Defendants to

7   downsize its staff causing risk to many of the Limited Partners' immigration status and CCOO's

8   ability to meet the 185 full-time employees by mid-next year.   [*Id.* at ¶62.]   Finally, Ma is

9   currently in the process of converting Defendants to be able to provide dialysis treatment for the

10  subacute patients.   [*Id.* at ¶47.]   This would not be possible under a receivership and will

    definitely not happen if Defendants become decertified.

11       Because SEC's motion for an appointment of a receiver creates unnecessary risks to

12  Defendants' business, patients and Limited Partners while accomplishing nothing, Defendants

13  respectfully requests that the SEC's Motion for Receivership as it pertains to Defendants be

14  denied.

              **4.     In Balance, the Current Receivership in the Young Case Sufficiently**
15                     **Protects the Limited Partners**

16       The sole argument of the SEC as to appointing a receivership over Defendants' business is

17  that the Limited Partners may not be sufficiently protected under the receivership of the Young

18  Case because the receiver therein has no explicit obligation to Defendants or the Limited Partners.

19  [Motion at p. 30.]   This also is a misunderstanding of Defendants' standing in the Young Case.

20  First, again, there is no showing of fraud, mismanagement or risk of loss of assets by Defendants

    to warrant a receivership over Defendants in this instant case.

21       Second, CCOO's money from the Limited Partners were kept in SFRC accounts managed

22  by Henderson, and they are all under a receivership in the Young Case.   As the Henderson

23  Defendants were the culprit to the fraudulent conduct, a receivership is already in place to protect

24  the Limited Partners from further abuse of those investment funds.

25       Third, the receivership in the Young Case is sufficient to protect the interests of the

26  Limited Partners because the Order Confirming Appointment of Receiver in the Young Case is a

27  neutral one, with a fiduciary duty to all the parties in the action.   [A copy of the Order is attached

    to the RJN as Exhibit "C".]   Specifically, para. 13 of said order provides:

28

---

1

2

3

Monies coming into possession of the Receiver pursuant to her operation of the business thereto, and not expended for any of the purposes herein authorized, shall be held by said Receiver, subject to such orders as this Court may hereinafter issue as to their disposition, and shall be held by the Receiver in interest bearing accounts."

4

5

6

7

As such, the distribution of receivership assets will be subject to the order of the Court upon the disposition of the Young Case, and not upon the whims of the receiver as the SEC implies.  As Defendants filed a Cross-Complaint in the Young Case, they have preserved their rights over the receivership assets.  Notably, Defendants already participated in the mediation between all interested parties in the Young Case on January 25, 2017.  [Peretz Decl. at ¶5.]

8

9

10

11

12

13

14

Finally, Defendants have a fiduciary duty to the Limited Partners and intend to vigorously litigate the Cross-Complaint in the Young Case to recover as much of CCOO's assets as possible. As the sole member and manager of CCOC, which is the General Manger of CCOO, both California Corporations Code § 15904.08 and the LP Agreement place on Ma the duties to act in the best interest of the Limited Partners and Defendants.  [Ma Decl. at ¶75; *See also* Section X(G) to CCOO's LP Agreement, Ma Decl. at ¶25 as Exhibit "2".]  Ma has all the intentions to live up to her statutory and contractual obligations toward the Limited Partners.  [Ma Decl. at ¶76]  As such, the receivership in the Young Case is sufficient to protect the Limited Partners.

15

**B.      The Young Case Should Not Be Stayed**

16

17

18

19

Within the SEC's request for a receivership, the SEC also seeks an order to enjoin the Young Case receivership and stay the Young Case based on the argument that it is necessary to protect all of the investors that were defrauded and a unified receivership would promote the primary purpose of equity receiverships.  [Motion at pp. 29-31.]  However, this would be entirely inappropriate for several reasons.

20

21

**1.      The Enjoining of the Young Case Receivership and Staying the State Case Does Not Protect All of the Investors**

22

23

24

25

26

27

The stay of the Young Case would not "protect all of the investors" as alleged by the SEC [Motion at p. 30.]  Despite some overlap as to the material facts and some of the parties, the Young Case and the SEC's case are clearly different in its causes of action and parties.  [A copy of the Second Amended Complaint by Alan Young is attached to the RJN as Exhibit "C".]  For example, SEC's case is alleged against a select few entities associated with Henderson Defendants, while the Young Case involves all known Henderson Entities.  [*Id.*]  The Young Case was also first filed, has been pending since July 22, 2015, is in an advanced stage of

28

DEFENDANTS COMPREHENSIVE CARE OF OAKLAND, LP AND COMPREHENSIVE CARE OF CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER

- 19 -

discovery and is set for trial for September this year.  [Peretz Decl. at ¶6.]  The Young Case involves two cross-complaints, including the one filed by Defendants as a derivative suit for the Limited Partners.  [*Id.*]

The stay of the Young Case will clearly harm Defendants and its Limited Partners as its claims against Henderson Defendants are not part of the SEC case and it ultimately halts any recovery indefinitely.  As Defendants and its Limited Partners would be best served with the timely adjudication of the Young Case, Defendants respectfully requests that the Court deny the SEC's request for stay.

### 2.        The Wencke I and II Case Is Not Applicable Here

While the SEC cites the *Wencke I* case to argue that the federal court *may* enjoin a state receiver, the facts in *Wencke I* are not analogous to this case.  [Motion at p. 32.]  Although the Court in *Wencke I* held that the federal court had jurisdiction to enjoin the state court, the SEC failed to provide the distinguishing facts of the case.  *Securities and Exchange Commission v. Wencke,* 577 F.2d 619, 623 (9th Cir. 1978) ("*Wencke I*").  The Court in *Wencke I* found it necessary to appoint a federal receiver and enjoin the state receiver because the state receiver was the wrongdoer himself.  *Id.* at 621.  Therein, Wencke was the state receiver of the asset at issue, and was using his status as "a protective cloak for *Wencke* to throw over his continued looting".  *Id.* at 622.  Clearly, this is not the case here.  All of Henderson Defendants' assets ascertainable that was attributed to his misappropriation of the EB-5 investments are in a court-appointed neutral receivership in the Young Case.

In that same regard, the stay of the state case by the federal court in *Wencke II* must be analyzed with the facts.  The Court held that the "state proceeding was simply another device to cover *Wencke's* fraud and the federal receiver was necessary to prevent further violations of federal securities laws and protect public investors".  *Securities and Exchange Commission v. Wencke,* 622 F.2d 1363, 1368 ("*Wencke II*").  Here, that is clearly not the case.  The Young Case is legitimate civil action, which has been pending for nearly two (2) years, and is currently set for trial by the fall of this year.

Therefore, *Wencke I and II* cannot be appropriately applied here.

### 3.        The SEC Has Not Made Showing to Grant an Injunction Enjoining the Receiver and the Young Case

The SEC has not made sufficient showing to grant an injunction to enjoin the Young Case receiver and stay the case.  In considering the stay of a state case, the Court in *Wencke II* reasoned

that a stay of the state court action is appropriate: "(W)henever it appears to the Commission that any person is engaged or is about to engage in acts or practices" which violate the securities laws. See 15 U.S.C. s 77t(b) (Securities Act of 1933); 15 U.S.C. ss 78u(d) & (e) (Securities Exchange Act of 1934). *Wencke II* at p. 1368-1369. This is aligned with the congressional intent of 15 U.S.C. §78u, which provides authority for the SEC to seek injunctions. Specifically, case law has previously interpreted 15 U.S.C. §78u as a deterrence to stop the violator from committing future infractions. *Securities and Exchange Commission v. Bonastia,* 614 F.2d 908, 912 (3rd Cir. 1980).

Here, the SEC has made no showing that Defendants or any of the parties to the Young Case are engaged or about to be engage in acts or practices that violate the securities laws. As such, SEC has not made sufficient showing to grant any injunction at this time.

Finally, case law provides that a stay of a state action should be invoked when federal injunctive relief is necessary to prevent state court from so interfering with federal court's consideration or disposition of case as to seriously impair federal court's flexibility and authority to decide that case. *Negrete v, Allianz Life Ins. Co. of North America,* 523 F.3d 1091, 1101-1102 (9th Cir. 2008). The Court is to construe doubts about the permissibility of an injunction "in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy", and "the mere fact that a state court may reach a conclusion that differs from what a federal court would prefer does not change the result." *Id.*

The SEC has made no showing that the continued litigation of the Young Case would interfere with the federal's court's consideration or disposition of case as to *seriously impair* the federal court's flexibility and authority to decide this case. As such, the request should be denied.

**C.      There are No Facts to Warrant a Preliminary Injunction against Defendants**

As provided by SEC's moving papers, only "upon proper showing" of *prima facie* case of previous violation and federal securities law *and* a reasonable likelihood the wrong will be repeated can the Court grant injunctive relief. [Motion at p. 21.]

Here, SEC has not made a showing of either of these elements as it pertains to Defendants; and therefore, should be denied. First, as provided above, the SEC has made no showing as to any existence of "fraud and mismanagement" by Defendants. *SEC v. United Fin. Grp.. Inc.,* 474 F.2d 354, 358 (9th Cir. 1973.) Second, there is no risk that the wrong will be repeated by Defendants. Henderson Defendants, who were the wrongdoers, has never had control or access to Defendants' operation or management of the facility. [Ma Decl. at ¶¶21-22.] Most importantly,

Henderson was never provided any signatory authority over Defendants accounts, and Henderson sold his interest in CCOC to Ma on September 2016.  [*Id.* at ¶33.]

As to the specific relief requested, the SEC's request that Defendants be enjoined from violating federal securities laws is superfluous, improper and in violation of FRCP 65(d)(1).  *See SEC v. Goble*, No. 11-12059, 2012 WL 1918819 (11th Cir. May 29, 2012).   Despite this, Defendants have not and have no intention to violating any federal securities laws.  [*Id.* at ¶77.] Defendants also do not intend to participate in the issuance, offer, or sale of any security of any entity controlled by, or under joint control with, any of them. [*Id.* at ¶78.]  Finally, Defendants will not be destroying any documents.  [*Id.* at ¶79.]  Notably, Defendants already provided a non-spoliation letter to the SEC upon their request, despite it being Defendants' policy to shred all patient files within seven (7) years.  [A copy of the letter and excerpts of the policy is attached to Peretz Decl. at ¶7 as Exhibit "A".]

## IV.   CONCLUSION

As provided above, it is clear that the interest of the Limited Partners includes not only the value of their investment, but also (and perhaps more importantly) the status of their EB-5 visa applications.  Accordingly, in contrast to the typical receivers appointed in SEC matters who are tasked solely with preserving assets of the receivership, a receiver appointed in this action should work to promote both financial and non-financial goals.   However, the imposition of a receivership on Defendants will be only be at an enormous and unnecessary cost to Defendants, cause irreparable harm to Defendants' business and result in the exact opposite intent of the SEC in protecting its Limited Partners.

Similarly, the SEC's motions for preliminary injunctions are not warranted.  In particular, the request to enjoin the Young Case receiver and stay the action and will only serve to further harm Defendants and its' limited partners, delaying recovery for an indefinite period of time.

Based on the arguments presented above, Defendants respectfully request the Court to deny the SEC's Motion in its entirety.

Dated: February 9, 2017                                   PERETZ & ASSOCIATES


                                                                  By: */s/Yosef Peretz*
                                                                       Yosef Peretz
                                                                        Sumy Kim
                                                                  Attorneys for Defendants
                                                                  COMPREHENSIVE CARE OF
                                                                  OAKLAND, L.P. and COMPREHENSIVE
                                                                  CARE OF CALIFORNIA, LLC