1  Yosef Peretz (SBN 209288)
   yperetz@peretzlaw.com
2  Sumy Kim (SBN 290082)
   skim@peretzlaw.com
3  PERETZ & ASSOCIATES
   22 Battery Street, Suite 200
4  San Francisco, CA 94111
   Telephone:  415.732.3777
5  Facsimile:  415.732.3791

6  Attorneys for Defendants COMPREHENSIVE CARE OF OAKLAND, L.P.
   And COMPREHENSIVE CARE OF CALIFORNIA, LLC
7

8                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
                       **SAN FRANCISCO DIVISION**
9

| | |
|---|---|
| 10  SECURITIES AND EXCHANGE COMMISSION, | Civil Case No. 3:17-cv-00223-RS |
| 11 | |
| 12                    Plaintiff, | **DECLARATION OF SHIRLEY MA IN SUPPORT OF DEFENDANTS COMPREHENSIVE CARE OF** |
| 13  vs. | **OAKLAND, LP AND COMPREHENSIVE CARE OF** |
| 14  SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS HENDERSON; | **CALIFORNIA, LLC OPPOSITION TO PLAINTIFF'S MOTION FOR** |
| 15  CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, | **PRELIMINARY INJUNCTION AND FOR APPOINTMENT OF RECEIVER** |
| 16  L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF | |
| 17  OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; | **Date:**  March 2, 2017 |
| 18  CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; | **Time:** 1:30 p.m. |
| 19  COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; | **Courtroom.:** 3 - 17th Floor |
| 20  and NORTH AMERICA 3PL, LLC. | |
| 21                    Defendants. | |
| 22  CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING | |
| 23  COMPANY, LLC; CENTRAL CALIFORNIA FARMS, LLC; | |
| 24  BERKELEY HEALTH CARE DYNAMICS, LLC; and JL GATEWAY, | |
| 25  LLC. | |
| 26 | |
| 27                    Relief Defendants. | |

28

I, Shirley Ma, declare:

1. I am the sole member of Defendants COMPREHENSIVE CARE OF CALIFORNIA, LLC ("CCOC"), who is a party in this action. CCOC is the general partner to Defendants COMPREHENSIVE CARE OF OAKLAND, LP ("CCOO") (collectively, "Defendants"), who is a party in this action.

2. If called as witness in this matter I would and could competently testify.

3. This declaration is submitted in support of Defendants' Opposition to Plaintiff SECURITIES AND EXCHANGE COMMISSION ("SEC")'s Motion for Preliminary Injunction and Appointment of Receiver.

4. In the fall of 2009, Defendant THOMAS HENDERSON ("Henderson") approached me and told me that he had an idea with a potential to access a large number of investors who were interested in the EB-5 Immigrant Investor Program. However, he did not have a business plan that would meet the job creation criteria under that program.

5. I had no knowledge or relationship to Henderson before I was introduced to him during that fall of 2009.

6. I also had no knowledge nor experience with an EB-5 Immigrant Investor Program at that time, but I had over 25 year of experience in the nursing home industry and had been employed as the administrator of a large nursing facility in Alameda for 21 years.

7. I believe through my successful career in nursing homes I acquired the skills, knowledge and expertise to develop and operate a unit for patients in need of subacute care that was part of the nursing home facility I was operating in Alameda.

8. I was interested in advancing my career in the nursing homes and it was my dream job to own my own facility. As such, I agreed to develop a business plan whereby I agreed to use the EB-5 immigrant investor program to purchase an existing nursing home facility in the East Bay and use my skills to upgrade the facility, grow the business and create jobs.

9. In fact, I realized that EB-5 Immigrant Investor Program fit well with my plans as I wanted to form a new subacute care unit in a pre-existing nursing home, which in turn, I believed would create many new jobs because the operation of such a unit is very labor intensive.

10. After hearing Henderson's proposal and thinking through my business plan, I agreed to be equal partners in the business with the understanding that each one of us would have a different set of responsibilities based on our skill-set and expertise.

11.     We agreed that I would operate, develop, grow and manage the day-to-day operations of the nursing facility, while Henderson would handle the corporate formation, deal with the attorneys and federal government about the EB-5 Immigrant Investor Program, prepare and sign the offering materials that would be provided to the investors, and manage the funds obtained from the overseas investors.

12.     On September 10, 2010, Henderson formed CCOC as a limited liability company, and Henderson and I was to each be provided 50% ownership of CCOC.

13.     I took my 50% membership interest in CCOC in my own name, but Henderson insisted that his ownership interest in CCOC be placed under a separate entity rather than in his name personally, which he would end up calling SFRC.

14.     Henderson then informed me that he would form a partnership between CCOC and the foreign EB-5 investors called CCOO.  Henderson explained to me that CCOC would be named as the general partner of CCOO and that the EB-5 program investors would be considered limited partners in CCOO.

15.     By September 14, 2010, Henderson formed SFRC and CCOO.

16.     On October 1, 2010, SFRC and I entered into an Operating Agreement to operate CCOC. A true and correct copy of the Operating Agreement is attached hereto as Exhibit "1".

17.     I believe CCOO was Henderson's first business that used the EB-5 Immigrant Investor Program.

18.     Early on at the onset of the partnership, Henderson informed me that he would try to solicit twenty (20) EB-5 investors for the nursing home business.

19.     Henderson also advised me that each investor will provide $500,000 in funds for the business, but that there would be various fees and expenses payable to SFRC, such as marketing and operating expenses to identify and solicit the investors as well as agency fees to the individuals who would find them.  However, it was never clarified to me as to how much of the $500,000 would ultimately be provided to the business.

20.     As agreed by the parties, Henderson was fully responsible to bringing and managing the EB-5 investors' monies, and for that purpose he along with the Henderson Defendants opened and maintained bank accounts for those investment funds.

21.     Throughout the entire time the Henderson Defendants managed the EB-5 investors' monies for CCOO, neither me nor any other person at CCOO or CCOC except for Henderson had

signatory authority, access or visibility of the funds that were provided by the EB-5 investors of CCOO.

22.     I never had access to the bank accounts in which EB-5 investors' monies for CCOO were deposited, I had never even seen any bank statements for those accounts, and up until the end of 2016 I had never seen any accounting records for those monies

23.     Until very recently, it is my belief that Henderson was also the only person that had a relationship and the communications with the EB-5 investors of CCOO.

24.     Through 2010 and 2011, Henderson indeed recruited twenty (20) EB-5 investors for CCOO and informed me about recruiting those investors.

25.     Upon securing the investment, each of these investors signed a Limited Partnership Agreement for CCOO (the "Partnership Agreement") where CCOC was named as the "General Partner" of CCOO and the individual investors were designated as "Limited Partners".  A copy of an example of a Partnership Agreement is attached hereto as Exhibit "2".

26.     Initially, I had to use my own funds to operate the nursing facility because CCOO was the first EB-5 Immigrant Investor Program used by Henderson and the investors' money was not yet available.

27.     Later, from November 2011 through most of 2013, Henderson would provide funds to me to operate the business which was in constant state of growth and frequently needed an infusion of funds.

28.     At the end of 2013, I requested additional investment funds from Henderson given the rising costs of operations, recent construction and the large investment necessary for establishing a subacute-care unit at the facility.

29.     However, for the first time, Henderson told me that all of the EB-5 investment monies for CCOO were already given to CCOO and that he can no longer provide Defendants with any additional funds.

30.     I took Henderson as his word and since I had no access to the investments funds, the bank accounts or the accounting for those monies, I no longer asked for funds to operate the business.

31.     Because Henderson represented to me that there are no investors' funds for CCOO, in January 29, 2014, CCOO took a $2,000,000 loan that I personally guaranteed in order to continue with growing the business and maintaining its operations.  A true and correct copy of the relevant pages of the loan agreement is attached hereto as Exhibit "3".

32.     While Henderson was exclusively responsible for the investment side of the nursing home business, I was the one fully responsible for operation and development of the actual business.

33.     Henderson Defendants, and particularly Henderson, were never provided access nor signatory powers to Defendants financials or bank accounts and were never involved in the management or day-to-day operations of the facility.

34.     In or around early 2010, I took the first steps to bring the business plan into fruition by locating a nursing home formerly named Oakland Springs Care Center, which was renamed to Bay Area Health Care Center located in Oakland, California ("BAHCC").  The facility was in the process of decertification.

35.     BAHCC was a failing nursing home located in a dilapidated facility and was on the brink of losing its Skilled Nursing Facility ("SNF") license issued by the Department of Health and Human Services of the State of California ("DHHS").  BAHCC was then rated 1-Star out of the 5-Star ranking of the Quality Rating System of the Centers of Medicare & Medicaid Services of DHHS.

36.     In order to purchase the facility, I had to go through a very rigorous application process with DHHS in order to ensure that the new potential licensee is equipped to run such a facility.

37.     Based on my impeccable record of over twenty-five years of experience in the healthcare industry and my twenty-one (21) year record as an administrator of large health care facility in Alameda, CA, the DHHS approved the application for change of ownership to CCOO as a licensee based on the declaration that I would be the operator.

38.     Due to the poor state of the facility, starting November 2011, I proceeded to make extensive renovations to the interior, including but not limited to, fixtures and equipment.  The remodel included the purchase of high quality hospital beds to replace outdated hand-cranked beds, new centralized heating and cooling systems were installed, the electrical and mechanical systems were replaced and upgraded to be in compliance building codes and to be in compliance with the requirements for subacute units.  Ventilation alarm system were installed and new equipment was purchased to accommodate subacute care necessities.  The entire renovation of the facility was expensive, took nearly two years to complete and cost approximately $1.7 million.

39.     Upon starting the operation of BAHCC, I also discovered that many of the patients at the BAHHC facility were improperly placed there as it pertained to the level of care the patients needed.  As such, I had the staff members evaluate each patient, transfer some of them to the

1    appropriate facility, so they could receive the appropriate type of care, retain the properly placed

2    patients and admit new patients to fill the new vacancies.

3    40.     Needless to say, the Henderson Defendants had no involvement in any aspect of the

     upgrades made to the BAHCC facility at that time.

4    41.     In November 2011, I also began implementing my plan to convert the BAHCC facility to

5    a certified subacute care facility.  The certification into DHHS' subacute program would allow

6    BAHCC to service more medically fragile patients and patients who require special services, such

7    as inhalation therapy, tracheotomy care, intravenous tube feeding, and complex wound

8    management care.  The reason for my plan to make this conversion was based on the fact that

     there was no subacute care facility in Oakland and the higher level of care would provide greater

9    potential of revenue for Defendants.  Ultimately, the establishment of a certified subacute care

10   unit at BAHCC was a two year process because of the need to follow through rigorous DHHS

11   requirements.  Through my efforts in obtaining quality staff, BAHCC became certified as a sub-

12   acute care facility in November 2013.

13   42.     During the successful conversion process, I built a professional and capable team at

14   BAHCC that has now reached 160-full time employees.  The positions I created at BAHCC are

     long-term employment positions that are not expected to disappear once the EB-5 Immigrant

15   Investor Program at BAHCC achieves its goals.  Further, most of these full-time positions provide

16   a career path for the employees to advance in the healthcare industry.

17   43.     BAHCC is currently the only subacute care facility in Oakland, and there continued be a

18   large demand for licensed subacute beds.

19   44.     In addition, the quality of BAHCC as a subacute care facility is now well known in the

20   industry as acute hospitals presently have the confidence to refer their high acuity patients for

     placements at that facility.

21   45.     Consequently, the number of subacute patients at BAHCC have grown to now constitute

22   37 out of the 79 patients in BAHCC today.

23   46.     BAHCC, which was on the brink of collapse 6 years ago, has now been revived into a

24   thriving business that made $13,678,778 in revenue in 2016.   From a once 1-Star institution, it is

25   now rated a 5-Star facility with DHHS and with projections of continued growth in staff and

26   revenue with plans to continue expanding the facility's subacute bed capacity.  The restructuring

27   of BAHCC created not only a high-quality care facility, but improved the neighborhood, created

28

jobs, and created new opportunity for skilled nurses.  This was all made possible through the EB-5 Immigrant Investor Program, which provided me the opportunity to receive funding to implement a thoughtful business plan that could not have succeeded without my experience in the industry.

47.     BAHCC is also now paving a new road in the industry as it is in the process of implementing a new service to provide dialysis treatment for the subacute patients.  This will be the first of its kind in Northern California; and it will serve to provide care for patients who would otherwise be required to remain in acute hospital, save cost for Medicare and MediCal and create higher paying job in the skilled nursing arena.

48.     At the end of 2011, Henderson informed me that he was purchasing the Tribune Building in Oakland.  When I asked if the purchase of the Tribune Building was an EB-5 project, Henderson claimed it was a personal investment which he was purchasing through a private lender.

49.     In or around end of 2014 or early 2015, I found out that Henderson Defendants recruited an additional 4 investors to my business plan, increasing CCOO's Limited Partners to 24 investors.  Henderson did not inform me of this addition.  However it is my belief that Henderson told agents of the Henderson Defendants to keep this as a secret from me.  The business never saw the money provided by these 4 new investors and to date, and I have no idea when and how Henderson Defendants received those funds.

50.     In the fall of 2015, Henderson informed me that he was in litigation with another EB-5 program business partner, Alan Young.  However, Henderson reassured me that it would have no effect on Defendants.  Despite Henderson's representations, I was becoming increasingly concerned about Henderson's conduct.

51.     Despite Henderson's representations, in May 2016, Defendants were named as defendants in the Young Case.  I only found out about this development from Henderson after the fact because Henderson was still listed as the agent of service of process for the Defendants.

52.     Once I was notified, Henderson again reassured me that Defendants had nothing to do with the allegations and Mr. Young was only naming every business Henderson had ever been linked to in order to further harass and embarrass him.

53.     Henderson also told me that he would be covering all legal representation of Defendants in this case, and that I had nothing to worry about.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

54.     During the litigation of the case and around July 22, 2016, I was surprised to learn that deposit of $1,840,000 was used for the purchase of the Tribune Building originated from Defendants' foreign investment funds and that the legal title of the Tribune Building was taken under another entity controlled by Henderson Defendants.  As such, I immediately confronted Henderson on the matter, and was told that there was a promissory note for CCOO on the funds used and Defendants would be paid back in full.  Up until that time, I was never informed of that promissory note and have not seen it to date.  I do not believe that this promissory note ever existed.

55.     The revelation about the large investment in the Tribune Tower caused me to completely lose my trust in Henderson and SFRC.  By September 2016, I purchased Henderson's share at CCOC (which was formally owned by SFRC) in order to shield and protect Defendants from what I believed to be the Henderson Defendants' malfeasance and fraudulent conduct.  Currently, I am the sole member and owner of CCOC.

56.     At that point, I began to suspect that the fraudulent conduct by the Henderson Defendants did not extend to the purchase of the Tribune Tower, and began to independently and forensically research into Defendants' bookkeeping and accounting to discover any misconduct or misappropriation of monies by tracing the total investment capital Defendants received from the Henderson Defendants since its inception.

57.     In early November 2016, I discovered for the first time that the Henderson Defendants converted additional investors' funds they had been holding in trust for CCOO beyond the purchase of the Tribune Building.  I further realized that the Henderson Defendants had spent substantial amounts of CCOO's EB-5 investment money for the purpose of funding other business ventures and/or purchasing of real estate.

58.     Upon this discovery, I immediately sought separate litigation counsel than the one provided to me by Henderson and filed a Cross-Complaint against Henderson Defendants.

59.     I believe $4.7 million of Defendants' EB-5 investment funds were misappropriated by Henderson Defendants.

60.     I am currently seeking a new regional center designated by USCIS to replace SFRC's role in their EB-5 business plan in the case that the United States Immigration and Naturalization Services ("USCIS") terminates SFRC as an EB-5 regional center.

61.     The Court should take note that recently 9 out of these 11 Limited Partners requested to be

bought out from CCOO.

62.     BAHCC is currently scheduled to reach 185 full-time employees by June 2018, and projected to continue experiencing increases to their revenue and value as a business.

63.     I have never mismanaged or fraudulently used any of the funds transferred to Defendants by Henderson.  .

64.     I never had access to or authority over any of the EB-5 funds held in trust by Henderson Defendants nor the bank accounts where it was kept.

65.     All EB-5 investment funds received from Henderson were used exclusively for BAHCC and Defendants' business plan.

66.     I did not know of or authorize the misappropriation of EB-5 investments funds by Henderson.

67.     Henderson Defendants never had any control of, access to or authority over the operation and management of BAHCC.

68.     Henderson was removed as a partner of Defendants in September 2016, and therefore he retains no control over Defendants at the present time

69.     Defendants currently are in contract with Kaiser, MediCal and Medicare to service its members who need skilled nursing facility services.  Specifically as to Kaiser, sixty percent (60%) of Defendants' current patients are Kaiser members and these patients generated $3,008,140 of Defendants' revenue in 2016.

70.     A true and correct copy of the relevant pages of the Agreement is attached hereto as Exhibit "4".

71.     A receivership on Defendants may be considered a change of "managing control" as it pertains to Defendants' contract with Medicare.  A true and correct copy of the relevant pages of the Medicare application is attached hereto as Exhibit "5".   Medicare patients generated $2,051,413 in revenue for Defendants in 2016.

72.     A receivership also puts at risk Defendants' contract with MediCal.  In the agreement between the parties, provision 36 provides that the contract is not assignable.  A true and correct copy of the relevant pages of the MediCal Agreement is attached hereto as Exhibit "6".   At this time, MediCal patients made of $5,713,611 of 2016's revenue for Defendants.  Defendants cannot sustain as a business or keep it employment of its staff should any of the contracts be suspended or terminated due to the receivership.

73.     As to the loan taken by Defendants on January 29, 2014 for $2,000,000, Defendants do not have the present funds to repay all of the loan at this time.  A default of that loan is likely to cause a financial crisis for Defendants.

74.     The certification of Defendants as long-term care Medicare and Medi-Cal providers is my responsibility, and I have made sure that Defendants remain certified.

75.     Defendants and I intend to vigorously litigate the Cross-Complaint in the Young Case to recover as much of CCOO's assets as possible.

76.     I have all the intentions to live up to my statutory and contractual obligations toward the Limited Partners.

77.     Defendants and I have not and have no intention to violating any federal securities laws.

78.     Defendants and I also do not intend to participate in the issuance, offer, or sale of any security of any entity controlled by, or under joint control with, any of them.

79.     Defendants and I will not be destroying any documents.


        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own personal knowledge and as to such matters, I am informed and believe they are true and correct.


        Executed this February 9, 2017 at Alameda, California.


_____
Shirley Ma

# EXHIBIT 1

OPERATING AGREEMENT
FOR

COMPREHENSIVE CARE OF CALIFORNIA, LLC.

A CALIFORNIA LIMITED LIABILITY COMPANY

**THIS OPERATING AGREEMENT** (the "Agreement") is entered into effective as of October 1, 2010, by SAN FRANCISCO REGIONAL CENTER, LLC. and SHIRLEY S. MA, doing business in the State of California (hereinafter sometimes collectively referred to as "Members" and "Managers").

R E C I T A L S

WHEREAS, on September 14, 2010, "COMPREHENSIVE CARE OF CALIFORNIA, LLC." (the "Company") was formed as a limited liability company by the filing of articles of Organization with the California Secretary of State; and

WHEREAS, the Members and Managers wish to adopt and approve an agreement to govern the operations of the Company and document the rights and obligations of each Member and Manager with respect to the Company;

NOW THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, the parties agree as follows:

A G R E E M E N T

ARTICLE I

ORGANIZATIONAL MATTERS

1.1   Formation and Purpose.  The Members have formed a California limited liability company by filing the Articles with the California Secretary of State and have entered into this Agreement to define the rights and liabilities of the Members. The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act or the laws of the State of California.  Unless otherwise defined herein, capitalized terms shall have the meanings set forth in Section 11.1 hereof.  To the extent permitted by the Act, this Agreement shall control the rights or obligations of any Member.

1.2   Name and Term.   The name of the Company shall be
"COMPREHENSIVE CARE OF CALIFORNIA, LLC." The business of the
Company may be conducted under that name or, upon compliance with
applicable laws, any other name that the Members and Managers
deem appropriate or advisable.   The terms of this Agreement shall
be co-terminous with the existence (including any winding up
activities) of the Company.

1.3   Office, Agent, and Addresses of Members and Manager.
The Company shall maintain an office and registered agent in
California, and may locate its principal office where the Members
and Managers may determine.   Other offices may also be
established as needed within and without California.   The
registered agent shall be as stated in the Articles or as
otherwise determined by the Members and Managers.   The addresses
of the Members and of the Managers are set forth on Exhibit "A".

## ARTICLE II

### CAPITAL CONTRIBUTIONS

2.1   Capital Contributions.   Each Member shall contribute
the amount set forth on Exhibit A as his or her initial Capital
Contribution.   No Member shall be required to make any additional
Capital Contributions.   Additional Capital Contributions may be
made upon the recommendation of the Managers with the written
approval of members holding a Majority Interest.   Members shall
have the opportunity, but not the obligation, to participate in
such additional Capital Contributions on a pro rata basis in
accordance with their Percentage Interests.   All Capital
Contributions and Percentage Interests, as set forth on Exhibit
A, shall be adjusted by the Managers on a regular basis.   For
purposes of this Agreement, the term "Capital Contribution" shall
mean the aggregate fair market value of the cash, property
(including promissory notes) contributed to the Company by
Members and services rendered (excluding, however, the value of
any services with respect to which the Member is treated solely
as an "employee" and not as the equivalent of a partner for
federal employment tax purposes).

2.2   Capital Accounts.   The Company shall establish and
maintain in accordance with the Regulation, a "Capital Account"
for each Member, which shall carry over to his transferee if
transferred in accordance with this Agreement.   No Member shall
be entitled to receive any interest on his Capital Contributions.

## ARTICLE III

### MEMBERS

3.1   Limited Liability.  Except as required under Act or this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contact, tort, or otherwise.

3.2   Admission of Additional Members.  Additional Members may be admitted to the Company on terms determined by the Managers and approved by the unanimous approval of the Members; provided, however, that "substitute members" may be admitted only in accordance with Article VI.

3.3   Withdrawals, Resignations, and Termination of Interest.  Any Member may withdraw or resign upon sixty (60) days prior written notice to the Company.  Such Member's Membership Interest shall be subject to purchase and sale as provided in Article VII.  Upon a transfer of a Member's Membership Interest in violation of this Agreement, the occurrence of a Dissolution Event as to that Member which does not result in the dissolution of the Company, or the withdrawal of a Member, the Membership Interest of a Member shall be terminated and may be purchased by the Company or remaining Members as provided for below.  Each Member acknowledges and agrees that such termination and acquisition of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

3.4   Transactions with the Company.  Unless otherwise prohibited herein, a Member may lend money to and transact other business with the Company if the Manager approves after full disclosure of the Member's involvement is made.  Each such Member shall have, in such capacity, the same rights and obligations with respect thereto as a Person who is not a Member.

Notwithstanding the foregoing, no Member shall be entitled to remuneration for acting in the Company business unless; (i) the Member renders services to the Company and the value of those services is not included as part of that Member's Capital contributions under Article II hereof (i.e., the Member is treated solely as an "employee" and not as a partner for federal employment tax purposes); or (ii) the Member acts in connection with the winding up of the Company's affairs pursuant to Article IX.

3.5   Members Are Not Agents.  Pursuant to Section 4.1 and the Articles, the management of the Company is vested in the Managers.  No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

3.6   Voting Rights.  Except as expressly provided herein and excluding Members who are the subject of a Dissolution Event and assignors of a Membership Interest, Members holding a Majority Interest shall have the right to formally approve or

disapprove matters, as specifically provided for below (hereinafter "approval" by Members), including, but not limited to, the following: (i) a decision to continue the business of the Company after the occurrence of a Dissolution Event; (ii) the transfer of a Membership Interest and admission of the assignee as a Member of the Company; (iii) a decision to compromise an obligation of a Member or return money or property paid or distributed  in violation of the Act; (iv) the election and removal of the Managers; (v) the reorganization or the dissolution of the Company; and (vi) limitation imposed on, or fees paid to, the Managers.  The unanimous consent of all Members shall be required to amend the Articles or this Agreement or to admit new Members.

3.7  Meetings of Members.  Meetings of members may be held at such date, time and place within or without California as the Managers may fix from time to time.  However, no meetings of the Members shall be required.  At any Members' meeting, the Managers shall preside at the meeting and appoint a person to act as secretary, prepare minutes of the meeting, and maintain the minute books of the Company.  Unless prohibited by the Act or the Articles, meetings of the Members may be called by the Managers, or upon written demand of a Member (or group of Members) holding more than then percent (10%) of the Percentage interests for the purpose of addressing any matters on which the Members may vote.

## ARTICLE IV

### MANAGEMENT AND CONTROL OF THE COMPANY

4.1  Management of the Company by Managers.

The business, property, and affairs of the Company shall be managed exclusively by the Managers.  Except for situations in which the approval of the Members is expressly provided for in the Articles of this Agreement, the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters, and to perform any and all the acts customary or incident to the management of the Company's business, property and affairs.

4.2  Election of Managers.

A.  Number; Term; and Qualifications.  The Company shall initially have two (2) Managers.  The number of Managers of the Company shall be fixed from time to time by Members holding a Majority Interest, provided that in no instance shall there be less than one Manager and provided further that if the number of Managers is reduced or increased, the Articles shall be amended as required by the Act.  Unless he resigns or is removed, each Manager shall hold office until a successor is elected and

qualified.  The Managers shall be elected by the affirmative vote or written consent of Members holding a Majority Interest.  A Manager need not be a Member, an individual, a resident of California, or a citizen of the United States.

B.   Resignation; Removal; Vacancies.  A Manager may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.  The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The Manager may be removed at any time, with or without cause, by the affirmative vote or written consent of Members holding a Majority Interest.  The resignation or removal of a Manager shall not effect or prejudice the Manager's rights as a Member or otherwise, and shall not constitute a withdrawal of a Member. Vacancies shall be filled by the affirmative vote or written consent of Members holding a Majority Interest.

4.3   Powers.  Subject to the terms of this Agreement, the Managers shall manage the business, property and affairs of the Company, and shall have all powers needed to do so, including without limitation, the power to exercise all of the powers described in California Corporations Code Section 17003. Notwithstanding the foregoing, a Manager shall not have the authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest; (i) the Sale, exchange or other disposition of all, substantially all the Company's assets (unless pursuant to the Company's duly authorized dissolution);  (ii) the merger of the Company with another limited liability company, limited partnership, corporation, general partnership or other person; provided, however, no Member shall be required to become personally liable (e.g., a general partner), or shall be subjected to an economic risks of loss in excess of his or her Capital Contribution, in any merger without his express written consent or unless each Member is granted dissenter's rights as described in the Act; (iii) the establishment of different classes of Members; (iv) transactions between the Company and the Manager or an affiliate of the Manager, or transactions in which the Manager has a material financial interest; (v) any act which would make it impossible to carry on the ordinary business of the Company; (vi) the confession of a judgment against the Company; or (vii) any other transaction described herein which requires the approval of the Members.

4.4   Members have no Managerial Authority. No Member shall have the power to participate in the management of the Company unless expressly authorized or required by this Agreement, the

Articles, or Acts.  Unless authorized in writing to do so by the Managers, no Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

    4.5   Performance of Duties; Liability of Manager.  A Manager shall perform his managerial duties in good faith, in a manner he reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinary prudent person in like position would use under similar circumstances.  A Manager who so performs shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Managers shall be entitled to rely on information, opinions, reports, or statements, including financial statements and the financial data, from the employees, representatives and agents of the Company, its attorneys and accountants, and the Members, unless he has knowledge that reliance is unwarranted and that reasonable inquiry may be appropriate.

    4.6   Devotion of Time; Competing Activities.  A Manager shall not be required to devote all of his time or business efforts to the affairs of the Company, and may devote whatever time, effort, and skill, as he deems appropriate for the operation of the Company.  The Managers and the Members, and their employees, representative and agents, may engage or invest in, independently or with others, any business activities of any type or description, including without limitation those that might be the same as or similar to the Company's business that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have the right in or to such other ventures or activities or to the income or proceeds derived therefrom.  A Manager shall not be obligated to present any investment opportunity to prospective economic advantage to the Company, even if the opportunity is of a the character that, if presented to the Company, could be taken by the Company.  A Manager shall have the right to hold any investment opportunity or prospective economic advantage for his own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Managers and Affiliates of a Manager may own and/or manage the business, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive all rights and claims which they may otherwise have against the Manager and his agents, employees, and affiliates as result of any such activities.

    4.7   Transactions between the Company and the Manager.  Upon full and complete disclosure to the Members, and the approval by disinterested Members holding a Majority Interest, a

Manager and/or his Affiliate may engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and the terms and conditions of such transaction, on an overall basis, are as fair and reasonable to the Company as those that are generally available to parties operating at arm's length.

4.8   Limited Liability.  No person who is a Manager or officer (or both) of the Company shall be personally liable under any judgment of a Court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer (or both) of the Company.

## ARTICLE V

### ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1   Allocations of Net Losses and Net Profit.  Net losses shall be allocated to the Members in proportion to their Percentage Interests.  Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such member's share of Company "Minimum Gain" (as defined in the Regulations) that would be realized on a foreclosure of the Company's property.  Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 5.1.  Any loss reallocated under this Section 5.1 shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article V, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article V, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article V if no reallocation of losses had occurred under this section 5.1.  Net profit shall be allocated to a Member in proportion to his Percentage Interest. The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their share of Company income and loss for income tax purposes.

5.2   Special Allocations.  Notwithstanding Section 5.1, if there is a net decrease in Company Minimum Gain during any fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and if necessary, in subsequent fiscal years) in an amount equal to the portion of

such Member's share of the net decrease in Company Minimum Gain that is allocable to the Regulations), and determined in accordance with Regulations.  Minimum Gain attributable to a Members' "Nonrecourse Debt" (as defined in the Regulations) shall also be charged back and specially allocated in accordance with the Regulations.  This Section 5.2 is intended to comply with the minimum gain chargeback requirement contained in the Regulations and shall be interpreted and applied consistently therewith. Notwithstanding Section 5.1, any "Nonrecourse Deductions" (as defined in the Regulations) for any fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.  Items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Members who bear the economic risk of loss with respect to the Members' Nonrecourse Debt to which such items are attributable as, described in the Regulations.

5.3   Qualified Income Offset.  Notwithstanding Section 5.1, if any event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 5.3 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article V so that he net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article V to the extent possible shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 5.3 if such expected adjustments, allocations, or distributions had not occurred.

5.4   Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes, and shall not effect or in any way be taken into account in computing a Member's Capital Account of share of profits, losses or other items of distributions pursuant to any provisions of this Agreement.

5.5   Allocation of Net Profits and Losses. If any Membership Interest is transferred, increased or decreased during any Fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal Year shall be

assigned pro rata to each day in the particular period of such Fiscal year to which such item is attributable (i.e., the day it is accrued or incurred) and allocated to each Member based upon his or her respective Membership Interest at the close of such day.

5.6   Distributions.   Subject to applicable law and this Agreement, a Manager may distribute "Distributable Cash" to the Members in the following order of priority; (a) to Members in proportion to their unreturned Capital Contributions until each Member's Capital Contributions are recovered; and (b) to the Members in proportion to their Percentage Interests.   All such distributions shall be made only to the Persons who are the holders of record of the Economic Interest on the actual date of distributions.   Neither the Company nor the Managers shall incur any liability for making distributions in accordance with this Section 5.6.   A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money.   No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.   Except upon a dissolution and the winding up of the Company, no member may be compelled to accept a distribution of any asset in kind.   Except for distributions made in violation of the Act or this Agreement, no Member or owner of an Economic Interest who is not a Member (hereinafter an "Economic Interest Owner") shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.   The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Members or Economic Interest Owner.

5.7   Restrictions on Distributions.   No distribution shall be made if, after giving effect to the distribution; (a) the Company would not be able to pay its debts as they become due in the usual course of business; (b) the Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that could be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of the Members, if any, upon dissolution that are superior to the rights of the Members receiving the distribution; or (c) the Act.   A Member or Manager who votes for a distribution in violation of this Agreement (or the Act) is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act.   Any member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so

liable and (ii) each Member for the amount the Members received with knowledge of facts indicating that the distribution was made in violation of this agreement or the Act.

## ARTICLE VI

### TRANSFER AND ASSIGNMENT OF INTERESTS

6.1   Transfer or Assignment of Interests.  No Member shall be entitled to transfer, assign, sell, exchange, encumber or in any way alienate all or any part of his or her Membership Interest except with the prior written consent of Members holding a Majority Interest, which consent may be given or withheld as determined by the Members in their sole discretion.  Transfers in violation of this Article VI shall only be effective to the extent set forth in Section 6.4.  Any Membership Interest (or portion thereof) transferred shall continue to be subject to the terms and provisions of this Agreement.  Furthermore, and in addition to the restrictions contained herein, no Member shall transfer, assign, sell, exchange, encumber or in any way alienate all or part of his Membership Interest: (i) without first complying with all applicable state and federal securities laws, and (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all the Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Managers.  Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the date immediately following the date upon which the requirements of this Agreement have been met.

6.2   Substitution of Members.   A transferee of a membership Interest shall have the right to become a substitute Member only if (i) the requirements of Section 6.1 are met, (ii) such Person agrees to be bound by the terms of this Agreement, and (iii) such Person pays any reasonable expenses in connection with is or her admission as a new Member.  The admission of a substitute Member shall not result in the release of a Member who assigned the Membership Interest from any liability that such Member may have to the Company.

6.3   Family and Affiliate Transfer.   The Membership Interest of any Member may be transferred, subject to compliance with Section 6.1 (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii)  to any Affiliate of the Members.  Any transferee of a Membership Interest transferred pursuant to this Section 6.3 shall take such Membership Interest subject to the transfer restrictions imposed by this Agreement.

6.4   <u>No Effect to Transfers in Violation of Agreement</u>.
Upon any transfer of a Membership Interest in violation of
this Article VI, the transferee shall have no right to vote or
participate in the management of the business, property and
affairs of the Company or to exercise any rights of a Member.
Such transferee shall only be entitled to become an Economic
Interest Owner and thereafter shall only receive the share of one
or more of the Company's Net Profits, Net Losses and
distributions of the Company's assets to which the transferor of
such Economic Interest would otherwise be entitled.
Notwithstanding the immediately preceding sentences, if, in the
determination of the Managers, a transfer in violation of this
Article VI would cause the termination of the Company under the
Code, in the sole discretion of the Managers, the transfer shall
be null and void and the purported transferee shall not become
either a member or an Economic Interest Owner.  Upon any
transfer, assignment, conveyance or sale (whether arising out of
an attempted charge upon that Member's Economic Interest by
judicial process, a foreclosure by a creditor of the Member or
otherwise) of a Member's Economic Interest which does not at the
same time transfer the balance of the rights associated with the
Membership Interest transferred by a Member (including, without
limitation, the rights of the Members to vote or participate in
the management of the business, property and affairs of the
Company), the Company shall purchase from the Member, and the
Member shall sell to the Company for a purchase price of $200,
all remaining rights and interests retained by the Member that
immediately before the transfer, assignment, conveyance or sale
were associated with the transferred Economic Interest.  Such
purchase and sale shall not, however, result in the release of
the Member from any liability to the Company as a Member.  Each
Member acknowledges and agrees that the right of the Company to
purchase such remaining rights and interests from a Member who
transfers a Membership Interest in violation of this Article VI
is not unreasonable under the circumstances existing as of the
date hereof.

6.5   <u>Right of First Refusal</u>.  Each time a Member proposes
to transfer, assign, convey, sell, encumber or in any way
alienate all or any part of his Membership Interest (or as
required by operation of law or another involuntary transfer to
do so) such Member shall first offer such Membership Interest to
the Company and the nontransferring Members in accordance with
the following provisions:

A.    Such Member shall deliver a written notice to the
Company and the other Members stating such Member's bona fide
intention to transfer such Membership Interest, the name and
address of the proposed transferee, the Membership Interest to be
transferred, and the purchase price and terms of payment for
which the Member proposes to transfer such Membership Interest.

B.   Within thirty (30) days after receipt of the notice described in Section 6.5A, each nontransferring Member shall notify the Managers in writing of his desire to purchase a portion of the Membership Interest being so transferred.  The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest, which may be so transferred.  Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his pro rata share of Membership Interest, then the other Members can successively and proportionality elect, in the same manner as described in Section 7.3 below, to purchase the entire Membership Interest.  If the notice sets forth noncash consideration, the Company and such purchasing Member each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the noncash consideration offered, as determined by the Managers.

C.   If the Company or the other Members do not elect to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the entire Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) all requirements of this Article VI are met.  If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

### ARTICLE VII

### CONSEQUENCES OF DEATH, DISSOLUTION, RETIREMENT OR BANKRUPTCY OF MEMBER

7.1   Dissolution Event.  Upon the occurrence of a Dissolution Event, the Company shall dissolve unless, within ninety (90) days of the Dissolution Event, the Members holding a Majority of the remaining Membership Interests (the "Remaining Members") consent to the continuation of the business of the Company.  Upon the withdrawal of a Member under Section 3.3, or if the Remaining Members consent to the continuation of the business of the Company, the Company and/or the Remaining Members shall purchase, and the Member whose actions or conduct resulted

in the Dissolution Event ("Former Member") shall sell, the Former Member's Membership Interest (hereinafter "Former Member's Interest) as provided in this Article VII to avoid dissolution of the Company.

7.2   Purchase Price. The purchase price for the Former Member's Interest shall be the Capital Account balance of the Former Member as adjusted pursuant to Section 202; provided, however, that if the Former Member of the Company deems the Capital Account balance to vary from the fair market value of the Former Member's Interest by more than ten percent (10%), such party be entitled to require an appraisal by providing notice of the request for an appraisal within fifteen (15) days after the determination by Remaining Members to continue the business of the Company.  In such event, the value of the Former Member's Interest shall be determined by three (3) independent appraisers, one selected by the Former Member (or representative), one selected by the Company, and one selected by the two appraisers so named.  The fair market value of the Former Member's Interest shall be the average of the two appraisals closest in amount to each other.  In the event the fair market value is determined to vary from the Capital Account balance by less than ten percent (10%), the party requesting such appraisal shall pay one-half of such expense and the Remaining Members shall pay the remaining one-half of such expense.  Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

7.3   Notice of Intent to Purchase.   The Managers shall notify the remaining Members of the purchase price of the Former Member's Interest within ten (10) days of its determination, who shall each then notify the managers in writing of his desire to purchase a portion of the Former Member's Interest within twenty (20) days of the date notice is given by the Managers.   The failure of any Remaining Member to submit a notice within the applicable twenty (20) day period shall constitute an election on the part of the Members not to purchase any of the former Member's Interest.  Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.  If any Remaining Member elects to purchase less than all of his pro rata share of the Former Member's Interest, then the Remaining Members shall be entitled to elect to purchase that portion of the Former Member's Interest which has not yet been elected for purchase as is proportionate to the Percentage Interest held by each elected Remaining member, i.e, which bears the same proportion that the Percentage Interest of the Remaining of Members bears to the aggregate of the Percentage

Interests of all of the Remaining Members electing to purchase the Former Member's Interest. This proportionate right of first refusal shall be repeated (using the ten and twenty day notice periods noted above) until the Remaining Members: (i) no longer wish to acquire any more of the Former Member's Interest or, if sooner, (ii) have elected to acquire one hundred percent of such Former Member's Interest. If the Remaining Members fail to purchase the entire interest of the Former Member, the Company shall purchase any remaining share of the Former Member's Interest.

7.4   Payment of Purchase Price. The purchase price shall be paid by the Company or the Remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the remaining Members: (i) the Company or the Remaining Members shall at the closing pay in cash the total purchase price for the Former Member's Interest; or (ii) the Company or the Remaining Members shall pay at the closing one-fifth (1/5) of the purchase price in cash and shall pay the balance of the purchase price in four equal annual principal installments, plus accrued interest, payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at the applicable federal rate as provided in the Code for the month in which the initial payment is made, and the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation to pay the balance due shall be evidenced by a promissory note, and if purchase by a Remaining Member, secured by a pledge of the interest in the Company being purchased.

7.5   Closing Purchase of Former Member's Interest. The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 a.m. at the principal office of the Company no later than thirty (30) days after the date on which the exercising of the right of first refusal noted above has been completed, except that if the closing date falls on a Saturday, Sunday, or legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member, the Company and the Remaining Member shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

**ARTICLE VIII**

**ACCOUNTING, RECORDS, REPORTING BY MEMBERS**

8.1   Books and Records. The books and records of the Company shall reflect all Company transactions and shall be kept

in accordance with the accounting methods followed for federal income tax purposes. The company shall maintain at its principal office in California all of the following: (i) a current list of the full name and last known business or residence address of each Member and Economic Interest Owner, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner; (ii) the full name and business or residence address of the Managers; (iii) a copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed; (iv) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years; (v) a copy of this Agreement and any and all amendments thereto together with executed copes of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed; (vi) copies of the financial statements of he Company, if any, for the six most recent Fiscal Years; and (vii) the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

8.2   Delivery to Members and Inspection.   Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interests of the Person as Member, Manager or Economic Interest owner, to (i) inspect and copy during normal business hours any of the Company records described in Section 8.1; and (ii) obtain from the Managers, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

8.3   Annual Statement.   A Manager shall prepare and send an annual report to each of the Members not less than 120 days after the close of each Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Managers that the financial statements were prepared without audit from the books and records of the Company. The Managers shall cause to be prepared at least annually, at the Company's expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Managers shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax information returns. The Managers, at Company expense, shall cause to be prepared and timely filed with the appropriate authorities, the income tax returns for the Company, any amendments to,

restatements of, the Articles, as well as any reports required to be filed by the Company with those entities until the Act or other then current applicable laws, rules, and regulations (including, but not limited to the statement required under California Corporation Code 17060.)

8.4 <u>Bank Accounts</u>. The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

8.5 <u>Accounting and Tax Matters</u>. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers. The Managers shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Managers, who shall serve as the "Tax Matters Partner," as defined in Code Section 6231, shall represent the Company at the Company's expense in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interest of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or cease to be a Member or Manager, as the case may be, Members holding a Majority interest may designate another to be Tax Matters Partner.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1 <u>Dissolution</u>. The Company shall be devolved, its assets shall be disposed of, and it's affairs wound up in the first to occur of the following: (i) upon the happening of any event of dissolution specified in the Articles; (ii) upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the California Corporations Code; (iii) upon the vote of the Members; (iv) upon the occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest; or (v) the sale of all or substantially all of the assets of the Company. As soon as possible following the occurrence of any of the foregoing events, the Managers, or if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

9.2   <u>Winding up</u>.  Upon the occurrence of any event
specified in Section 9.1, the Company shall continue solely for
the purpose of winding up its affairs in an orderly manner,
liquidating its assets, and satisfying the claims of its
creditors.  The Managers, or, if none, the Members, shall be
responsible for overseeing the winding up and liquidation of the
Company, shall take full account of the liabilities and assets of
the Company, shall either cause its assets to be sold or
distributed (and, if sold, as promptly as is consistent with
obtaining the fair market value thereof), and shall cause the
proceeds therefrom, to the extent sufficient therefor, to be
applied and distributed as provided in Section 9.4.  The Persons
winding up the affairs of the Company shall give written notice
of the commencement of winding up by mail to all known creditors
and claimants whose addresses appear on the records of the
Company.  The Managers or Members winding up the affairs of the
Company shall be entitled to reasonable compensation for such
services.

9.3   <u>Distribution in Kind</u>.  Any noncash asset distributed
to one or more Members shall first be valued at its fair market
value to determine the Net Profit or Net Loss that would have
resulted if such asset were sold for such value, such Net Profit
or Net Loss shall then be allocated pursuant to Article V, and
the Members' Capital Accounts shall be adjusted to reflect such
allocations.  The amount distributed and charged to the Capital
Account of each Member receiving an interest in such distribution
asset shall be the fair market value of such interest (net of any
liability secured by such asset that such Member assumes or takes
subject to).  The fair market value of such asset shall be
determined by the Managers or by the Members or, if any Member
objects, by an independent appraiser (any such appraiser must be
recognized as an expert in valuing the type of asset involved)
selected by the Managers or liquidating trustee and approved by
the Members.

9.4   <u>Order of Payment of Liabilities Upon Dissolution</u>.
After determining that all known debts and liabilities of the
Company in the process of winding up, including, without
limitation, debts and liabilities to Members who are creditors of
the Company, have been paid or adequately provided for, the
remaining assets shall be distributed to the Members in
accordance with their positive Capital Account balances, after
taking into account income and loss allocations for the Company's
taxable year during which liquidation occurs.  Such liquidating
distributions shall be made by the end of the Company's taxable
year in which the Company is liquidated, or, if later, within
ninety (90) days after the date of such liquidation.  The payment
of a debt or liability, whether the whereabouts of the creditors
is known or unknown, has been adequately provided for either of
the following means: (i) payment thereof has been assumed or
guaranteed in good faith by one or more financially responsible

person or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or the Managers to be adequate at the time of any distribution of the assets pursuant to this Section; or (ii) the amount of the debt or liability has been deposited as provided in Section 2008 of the California Corporations Code.  This Section 9.4 shall not prescribe the exclusive means of making adequate provisions for debts and liabilities.

   9.5   Compliance with Regulations.  All payments to the Members upon the winding up and dissolution of the Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of the Regulations.

   9.6   Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member except as provided in Article X.

   9.7   Certificate of Cancellation.    Any Manager or Member who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

   9.8   No action for Dissolution. Except as expressly permitted in the Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event.  The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1.  Except where the Managers have failed to liquidate the Company as required by the Article IX, each Member hereby waives and renounces his right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles of this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights of interests of the complaining Member.  Damages for breach of this Section 9.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE X

### INDEMNIFICATION AND INSURANCE

10.1 Indemnification of Agents. The Company shall indemnify any person who was or is a party or is threatened to be made a party of any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee, or agent of the Company or that being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manger, director, officer, employee or their agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being refereed to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.  The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem prudent.

10.2 Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

### ARTICLE XI

### DEFINITIONS; MISCELLANEOUS

11.1 Definitions.  When used in this Agreement, the following terms shall have the meanings set forth below.  Terms not defined in the Section 11.1 shall have the meanings set forth elsewhere in this Agreement, or, if not so defined, the meanings given to such terms under laws of the State of California.

A.   "Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 1700 et seq., as the same may be amended from time to time.
B.   "Affiliate" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member.  The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the

right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

C. "Bankruptcy" shall mean: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United State Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of Section 303(f)(1) of the United Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

D. "Code" Shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable the Regulations (as defined below).

E. "Dissolution Event" Shall mean with a respect to any Member one or more of the following: death, insanity, withdrawal, resignation, expulsion, Bankruptcy, dissolution or occurrence of any other event which terminates the continued membership of any Member unless the other Members consent to continue the business of the Company pursuant to Section 9.1.

F. "Distributable Cash" shall mean the amount of cash which the Managers deem available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Managers deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

G. "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of Members, including, without limitation, the right to vote or participate in the management, except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of the Company.

H.   "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

I. "Majority Interest" shall mean one or more Percentage Interests of members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

J.   "Member" shall mean each Person (said term to include all authorized legal representatives) who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with this Agreement or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

K.   "Net Profits and Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles, consistently applied, employed under the method of accounting used by the Company at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

L.   "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit "A" hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.  Percentage Interests shall be determined annually, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of the Members, effective as of the first day of the Company's Fiscal Year but with all distributions under this Agreement to be deemed to have occurred on such day immediately prior to determination of the Percentage Interest of a Member.

M. "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

11.2 Legends.   Each Member understands and agrees that the certificates (if any) evidencing the Membership Interest may bear the following or a substantially similar legend:

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE LAWS OF ANY STATE, AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND

REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS ALSO SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS SET FORTH HEREIN.

11.3 Headings; Interpretation.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption of burden or proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his counsel.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

11.4 Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with the Agreement or the transactions contemplated by this Agreement.  Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 11.7 of this Agreement, and that when so made shall be as if served upon him personally within California.

11.5 Severability; Exhibits.  If any provision of the Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

11.6 Additional Documents and Acts.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

11.7 Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with the Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such

notices will be given to the Members or Managers at the address specified in Exhibit "A" hereto.  Any party may, at any time by giving five (5) days' prior written notice to other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

11.8  <u>Reliance on Authority of Person Signing</u>.   If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

11.9  <u>No Interest in Company Property</u>.  No Member or Economic Interest Owner has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

11.10  <u>Attorney's Fees</u>.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without litigation, reasonable attorney's fees and expenses.

11.11  <u>Time is of the Essence; Remedies Cumulative</u>.  All dates and times in this Agreement are of the essence.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

11.12  <u>Special Power of Attorney</u>.  Each Member grants the Managers a special power of attorney irrevocably making, constituting, and appointed the Managers as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to the execution, acknowledgement, delivery and filing of promissory notes, security agreements, UCC-1 financing statements, assignments of certificates of membership interest, or other documents of transfer to be delivered pursuant this Agreement, as well as any consent to the representation of the Company by counsel.  The foregoing special power: (i) is irrevocable, (ii) is coupled with an interest, and (iii) shall survive a Member's death, incapacity, or dissolution.

11.13 <u>Binding Effect; Parties in Interest</u>.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement of any Persons other than the Members and Managers and their respective successors and assigns, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

11.14 <u>Complete Agreement; Amendments</u>.  This Agreement and the Articles constitute the complete and exclusive statements of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supercede all prior written and oral agreements or statements by and among the Members and Managers or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Managers or have any force or effect whatsoever.  To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control.  All amendments to this Agreement must be in writing and signed by all of the Members. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, all of the Members of COMPREHENSIVE CARE OF CALIFORNIA, LLC., a California limited liability company, have executed this Agreement, effective as of October 1, 2010.

SAN FRANCISCO REGIONAL
CENTER, LLC. by
Thomas M. Henderson,
Managing Member

SHIRLEY S. MA

## EXHIBIT "A"

CAPITAL CONTRIBUTION OF MEMBERS AND ADDRESS OF MEMBERS AND

MANAGER AS OF

COMPREHENSIVE CARE OF CALIFORNIA, LLC.

October 1, 2010

| Members' Names | Members' Capital Contribution | Members' Percentage Interest |
|---|---|---|
| 1.  San Francisco Regional Center, LLC. | $5,000.00 | 50% |
| 2.  Shirley S. Ma | $5,000.00 | 50% |

Managers' Names and Addresses

San Francisco Regional Center, LLC. by

1.  Thomas M. Henderson, Managing Member          418 Third Street, Suite 101, Oakland, CA 94607

2.  Shirley S. Ma          418 Third Street, Suite 101, Oakland, CA 94607

**EXHIBIT 2**

# LIMITED PARTNERSHIP AGREEMENT

## OF

# COMPREHENSIVE CARE OF OAKLAND, L.P.
## A California Limited Partnership

# TABLE OF CONTENTS

EXPLANATORY STATEMENTS.................................................................3

Article  I     Establishment of partnership.............................................4

Article  II    Defined terms..............................................................5

Article  III   Business and purpose of the partnership..........................10

Article  IV    Capital contributions; capital accounts.............................10

Article  V     Allocation of profits and losses; distributions of cash flow;

               Certain tax matters.....................................................13

Article  VI    Rights, powers and duties of the general partner.............18

Article  VII   Rights and obligations of limited partners........................24

Article  VIII  Transfer of partnership interests........................................26

Article  IX    Expenses and reimbursement...........................................30

Article  X     Dissolution of the partnership..........................................30

Article  XI    Accounting provisions......................................................33

Article  XII   Reports........................................................................34

Article  XIII  Independent activities; transactions with affiliates..........34

Article  XIV   Indemnification of the general partner and others..........35

Article  XV    Assurances...................................................................36

Article  XVI   Amendments.................................................................36

Article  XVII  Power of attorney..........................................................37

Article  XVIII Miscellaneous................................................................37

Article  XIX   Representations and warranties........................................39

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL TO THE PARTNERSHIP, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

FURTHER, THE SECURITIES REPRESENTED BY THIS AGREEMENT CANNOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO "U.S. PERSONS" (AS SUCH TERM IS DEFINED IN REGULATION S, PROMULGATED UNDER THE SECURITIES ACT) UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.

# LIMITED PARTNERSHIP
# AGREEMENT OF
## COMPREHENSIVE CARE OF OAKLAND, L.P.,
### a California limited partnership

This Limited Partnership Agreement (this "Agreement") is made to be effective as of the Effective Date (as hereafter defined in Section 1.04 hereof), by and among COMPREHENSIVE CARE OF CALIFORNIA LLC, a California limited liability company (hereafter, the "General Partner"), and each of the persons set forth in Exhibit A attached hereto under the designation "Limited Partners" (hereafter, individually, a "Limited Partner" and collectively, the "Limited Partners"). The Limited Partners and the General Partner are collectively referred to as the "Partners".

## RECITALS

WHEREAS, the Partners desire to form a California limited partnership pursuant to the California Uniform Limited Partnership Act of 2008 (hereafter, the "Partnership Act"); and

WHEREAS, the Partners further desire that the Partnership transact certain business and make certain investments, and that they all share in the risks, benefits, profits and losses of such business and investments under the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## I.   ARTICLE I ESTABLISHMENT OF PARTNERSHIP

### A.   SECTION 1.01 NAME

The name of the Partnership shall be "COMPREHENSIVE CARE OF OAKLAND, L.P." (hereafter, the "Partnership" or "CCOO").

### B.   SECTION 1.02 PRINCIPAL OFFICE AND RESIDENT AGENT OF PARTNERSHIP

The principal office, mailing address and place of business of the Partnership shall be at 418 3rd St. Suite 101, Oakland, California 94607, USA. The Partnership may have such other or additional offices as the General Partner may determine. The resident agent of the Partnership shall be Thomas M Henderson, 418 3rd St. Suite 101 Oakland, California 94607, USA, or such other agent as the General Partner may determine.

### C.   SECTION 1.03 ESTABLISHMENT OF PARTNERSHIP

The Partners agree to form a limited partnership in the name of "COMPREHENSIVE CARE OF OAKLAND, L.P." pursuant to the provisions of the Partnership Act and upon the terms and conditions set forth in this Agreement. The General Partner shall execute and cause to be filed a Certificate of Limited Partnership (hereafter, the "Certificate") in the office of the California Secretary of State and any additional documents as may be necessary or appropriate to form a limited partnership pursuant to the laws of the State of California. To the extent that the rights or obligations of any Partner under the Partnership Act are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Partnership Act, control.

### D.   SECTION 1.04 TERM

The term of the Partnership shall commence upon the filing of the Certificate in the office of the California Secretary of State (hereafter, the "Effective Date") and shall continue for a period of ten (10) years from said date, or until the Partnership is dissolved, wound up and terminated in accordance with the provisions of this Agreement; provided, however, that the Partners agree that notwithstanding any contrary provision contained in this Agreement, and to the fullest extent permitted by the Partnership Act, the term of the Partnership shall not expire until all investments of the Partnership no longer remain outstanding and distribution of the proceeds thereof have been made in accordance with this Agreement.

## II.    **ARTICLE II DEFINED TERMS**

Throughout this Agreement, all references to money or currency are in United States dollars, and the word or words listed below within quotation marks shall have the meanings which follow them:

**"1933 Securities Act"** means the Securities Act of 1933, as amended, and the rules and regulations promulgated there under.

**"Additional Partner"** means a Partner admitted to the Partnership other than as an assignee or transferee of all or a portion of a previously admitted Partner's Partnership Interest in the Partnership.

**"Additional Required Capital"** has the meaning set forth in Section 4.01(6) of this Agreement.

**"Affiliate"** means, when used with reference to a Partner, a Person who directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with, the Partner or the principals of the Partner, or any person who is related to the Partner or a principal of the Partner. The term "control" as used herein (including the terms "controlling" "controlled by" and "under common control with") means possession, direct or indirect, of the power to (i) vote 50% or more of the outstanding voting securities of a corporate Partner or such Person; or (ii) otherwise direct the management policies of a Partner or such Person by contract or otherwise.

**"Agreement"** (or "Partnership Agreement") means this Limited Partnership Agreement of the Partnership, as originally executed and as amended from time to time.

**"Annual Management Fee"** has the meaning set forth in Section 6.08(2) of this Agreement.

**"Applicable California Law"** means the laws of the State of California, now or hereafter in effect, which shall be used to construe and govern this Agreement.

**"Applicable Securities Acts"** means the 1933 Securities Act, the Securities Exchange Act of 1934, as amended, and applicable state securities laws.

**"Bankruptcy"** means with respect to any General Partner:

(i)      its filing a petition in bankruptcy or for reorganization;
(ii)     its making an assignment for the benefit of creditors;
(iii)    its consenting to the appointment of a receiver for all or a substantial part of its property;
(iv)     its being adjudicated bankrupt or insolvent;
(v)      its being the subject of a court order appointing a receiver or trustee for all

5

or a substantial part of its property without its consent; or

(vi)    its being the subject of a court order ordering the assumption of custody or sequestration of all or substantially all of its property.

"**Capital Contribution**" means the money contributed to the Partnership as capital by any Partner, as reflected in the Partnership's books and records, and shall include the initial and any additional Capital Contributions of a Partner. The initial Capital Contribution of each Limited Partner shall be Five Hundred Thousand Dollars ($500,000), as set forth in Section 4.01(1) hereof.

"**Capital Account**" means with respect to any Partner the sum of (i) the amount of money contributed by the Partner to the Partnership, (ii) the fair market value of property contributed by the Partner to the Partnership (net of liabilities secured by such contributed property that the Partnership is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to the Partner of Partnership income and gain (or item thereof), decreased by (a) the amount of money distributed to the Partner by the Partnership, (b) the fair market value of property distributed to the Partner by the Partnership (net of liabilities secured by such distributed property that such Partner is considered to assume or take subject to under Section 752 or the Code), (c) all allocations to the Partner of expenditures of the Partnership described in Section 705(a)(2)(B) of the Code, and (d) allocations of Partnership loss and deduction (or item thereof); subject to such other adjustments required by Treasury Regulation 1.704-1 (b)(4) (or any corresponding successor provision). In all events, Capital Accounts shall be maintained in accordance with the Treasury Regulations promulgated under Section 704(b) of the Code.

"**Cash Flow from Operating Profit**" means, with respect to any fiscal year of the Partnership or other period, the sum of all cash receipts of the Partnership generated by the operating income of the Partnership (including interest revenue from investments made by the Partnership, but not including Capital Contributions, loans to the Partnership and Cash from Return of Investments), less (i) the sum of all cash expenditures, including, without limitation, the repayment to the extent possible of all third party obligations, any and all payments of expenses due to the General Partner (including the Annual Management Fee), brokers, attorneys, and consultants, and the payment of debts of the Partnership (including debts to the Partners and their Affiliates). Cash Flow from Operating Profit shall apply to each individual fiscal year and shall not be cumulative.

"**Cash Flow from Return of Investments**" means the sum of all cash proceeds generated from (i) the repayment of the principal amount invested by the Partnership in any investment made by the Partnership, including any principal payments with respect to any note or other obligation received by the Partnership in connection with any investment or the sale or other disposition of the Partnership's property, and (ii) the sale, exchange, liquidation, other disposition (including, without limitation, any condemnation award or casualty loss recovery with respect thereto), or financing or refinancing of all or any portion of the Partnership's property (collectively, a "Sales or Refinancing Event"), less (a) all costs and expenses related thereto, and (b) any and all expenses due to the General Partner (including the Annual Management Fee); provided, however, that "Cash

from Return of Investments" shall not include any financing obtained in connection with the acquisition, development and/or operation of real property for or on behalf of the Partnership.

"**Certificate**" means the Certificate of Limited Partnership filed by the General Partner in the office of the California Secretary of State in order to form the Partnership in accordance with the Partnership Act.

"**Code**" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"**Effective Date**" means the date on which the Certificate is filed on the office of the California Secretary of State.

"**Establishment of Partnership**" means, pursuant to California Corporations Code Section 15901.02(9) which requires two or more partners to form a limited partnership, and Section 15902.01 which requires a partnership agreement in order to form a limited partnership, for all purposes, and in particular for purposes of satisfying Immigration and Nationality Act section 203(b)(5), the date on which the Partnership shall be deemed to be "established" as an original business, which date shall be the Effective Date.

"**General Partner**" means COMPREHENSIVE CARE OF CALIFORNIA LLC, a California limited liability company of which SAN FRANCISCO REGIONAL CENTER, LLC, a California limited liability company seeking federal designation as a regional center, is a managing member, and any substitute General Partner which is a permitted assignee or transferee of the General Partner.

"**Limited Partners**" means the Persons who are designated in Exhibit A as Limited Partners of the Partnership, or any Substitute or Additional Limited Partners admitted to the Partnership. Such term shall include and refer to two (2) or more Limited Partners if more than one (1) Limited Partner shall at any time exist hereunder.

"**Offering**" has the meaning set forth in Section 4.01(1) of this Agreement.

"**Parties**" means the General Partner and all of the Limited Partners.

"**Partners**" means the General Partner and all of the Limited Partners, where no distinction is required by the context in which the term is used herein.

"**Partnership**" means COMPREHENSIVE CARE OF OAKLAND, L.P., a California limited partnership.

"**Partnership Act**" means the California Uniform Limited Partnership Act of 2008 as amended from time to time.

"**Partnership Interest**" means the total of all ownership rights of a Partner in the

Partnership, including a Limited Partner's right to vote on certain limited matters and the right to receive information concerning the business and affairs of the Partnership.

"**Percentage Interest**" means (i) with respect to the General Partner, the Percentage Interest of the General Partner set forth in Exhibit A attached hereto, which interest shall be fifty percent (50%), and (ii) with respect to a Limited Partner, (a) the proportion which the number of Units such Limited Partner owns bears to the aggregate number of Units owned by all Limited Partners, multiplied by (b) fifty percent (50%). Upon completion of the Offering of the Units, the initial Percentage Interest of each Limited Partner shall be set forth on Exhibit A attached hereto. The Limited Partners shall hold an aggregate of fifty percent (50%) of all of the Percentage Interests of the Partnership.

"**Person**" means an individual, partnership, corporation, trust, estate, association, limited liability company or other entity, whether domestic or foreign.

"**Regional Center**" means a special designation of the United States granted by USCIS (as defined under Section 610 of the Departments of Commerce, Justice and State, the Judiciary and Related Agencies Appropriations Act of 1993, as amended). San Francisco Regional Center is currently seeking Regional Center designation. For purposes of this Agreement, any reference to the geographic area of the Regional Center shall mean the areas designated by USCIS in its authorizing letter to the General Partner, which areas are expected to include the counties of San Francisco, Alameda and Contra Costa, California, and which areas may be hereafter expanded by USCIS.

"**Required Majority**" means those Partners owning more than fifty percent (50%) of the applicable percentage interests.

"**Return**" means distributions to the Limited Partners, as and when determined by the General Partner in its sole discretion.

"**SEC**" means the United States Securities and Exchange Commission.

"**Subscription Agreement**" means that certain Subscription Agreement, executed by each Limited Partner who acquired a Unit in connection with the Offering.

"**Subscription Price**" means the total price of Five Hundred Forty Thousand Dollars ($540,000) paid by each Limited Partner to subscribe for one (1) Unit in connection with the Offering, which total price consists of (i) the Unit price of Five Hundred Thousand Dollars ($500,000), which amount constitutes the initial Capital Contribution of the Limited Partner, and (ii) the Syndication Fee.

"**Substitute Partner**" means a Partner who is admitted to the Partnership in accordance with the terms of this Agreement and who received its Partnership Interest in the Partnership as an assignee or transferee of an exiting Partner.

"**Syndication Fee**" means a fee of Forty Thousand Dollars ($40,000) per each

Unit acquired in connection with the Offering. The Syndication Fee shall be paid to the General Partner from the Subscription Price paid by each Limited Partner. The Partners acknowledge and agree that the Syndication Fee does not constitute a Capital Contribution made by a Limited Partner and is being paid to the General Partner by the Partnership, rather than directly to the General Partner by each Limited Partner, for purposes of convenience only. The General Partner will use the Syndication Fee to meet the following expenses for which the General Partner will be responsible: (a) the initial expenses associated with the establishment of the Partnership and the Offering of the Units, including legal and promotional fees, including a "finders' fee", and (b) the legal fees to be incurred in connection with the preparation of Partnership related documents that a Limited Partner and/or his or her legal counsel may reasonably request for submission of his or her applications for classification as an alien entrepreneur. The Partners acknowledge and agree that (i) under no circumstances shall it be construed that the Partnership or General Partner has any obligation to file any immigration petition or application on behalf of a Limited Partner, and (ii) each Limited Partner shall retain his or her independent separate counsel in connection with the submission of such Limited Partner's petition for classification as an alien entrepreneur, application for immigrant visa, and application for removal of conditions from lawful permanent resident status. Such counsel must be experienced and knowledgeable in EB-5 matters and must be approved by the General Partner. In no event will any portion of the Syndication Fee be used for the legal fees of such separate counsel.

"**Treasury Regulations**" means the federal income tax regulations promulgated by the United States Treasury Department under the Code, as such regulations may be amended from time to time. All references herein to a specific section of the Treasury Regulations shall be deemed also to refer to any corresponding provisions of succeeding Treasury Regulations.

"**Unit**" means a unit of Partnership Interest of a Limited Partner in the Partnership acquired, in connection with the Offering, by each Limited Partner for his or her initial Capital Contribution of Five Hundred Thousand Dollars ($500,000). The Partners acknowledge and agree that notwithstanding that each Limited Partner has paid the Subscription Price in order to subscribe for a Unit, only Five Hundred Thousand Dollars ($500,000) of the Subscription Price constitutes the initial Capital Contribution of the Limited Partner; the remaining Forty Thousand Dollars ($40,000) of the Subscription Price constitutes payment of the Syndication Fee.

"**Unreturned Capital Contributions**" means an amount equal to the sum of (1) the total Capital Contributions contributed by a Partner, less (ii) the distributions made to such Partner pursuant to Section 5.03(2).

"**USCIS**" means the United States Citizenship and Immigration Services.

"**Withholding Loan**" has the meaning set forth in Section 5.06(3) of this Agreement.

## III.    ARTICLE III BUSINESS AND PURPOSE OF THE PARTNERSHIP

The intended business of the Partnership shall be to (i) invest, in the sole discretion of the General Partner, in the geographic area of the proposed Regional Center, in order to (a) generate revenue for the Partnership and (b) allow each Limited Partner, who is not a permanent resident of the United States, to apply for a visa pursuant to Section 203(b)(5) of the Immigration and Nationality Act and Section 204.6 of Title 8 of the Code of Federal Regulations, as amended by Section 610(c) of the Appropriations Act of 1993, as amended, and (ii) engage in any lawful activities incidental thereto.

In connection with the foregoing, the Partnership intends to invest in related projects in areas located in the State of California which areas are located within the geographic scope of the Regional Center in the counties of San Francisco, Alameda and Contra Costa. The Partnership presently intends to invest partnership capital in, but not limited to, the acquisition and operation of a nursing home and sub-acute nursing home facility in Oakland, California. The entity will utilize said capital for construction, leasing or purchasing properties for sub acute nursing home facilities and related health care projects or upgrade existing projects that will make way for new commercial entities and development within the Regional Center thus generating new job creation.

In connection with the foregoing paragraph, the Partnership business and purpose are to invest via several projects in several entities by means of direct equity investment and possible low interest rate loans. In none of the abovementioned investment opportunities will a municipal government provide a guarantee or be liable for the return of investment capital to the Partnership. It is anticipated that each project will have a separate governing investment document such as a loan agreement or investment agreement. Each investment project will have a term of a minimum of six years.

Notwithstanding the foregoing, the Partnership may also pursue other reasonable and diversified investment strategies consistent with the Partnership's overall objectives set forth above. The Limited Partners acknowledge and agree that neither the Partnership nor the General Partner guarantee or warrant that a Limited Partner will obtain permanent residence in the United States as a result of the Limited Partner's investment in the Partnership.

## IV.    ARTICLE IV CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

### A.    SECTION 4.01 CAPITAL CONTRIBUTIONS

1.0    Capital Contributions of Limited Partners

The Partners acknowledge and agree that the Partnership may offer for sale up to twenty (20) Units of Limited Partner Partnership Interests (the "Offering") pursuant to that certain Confidential Private Placement Memorandum of the Partnership, dated

10

September 15, 2010 (as the same may be amended). Furthermore, the Partners agree that the Offering will continue to offer Partnership Interests upon the sale of all Units offered in connection with this Offering or 365 days following the date of admission of the first limited partner to the Partnership, whichever occurs first; and at which time the Partnership will not offer new Partnership Interests and the Partnership will be closed. The Partners further acknowledge and agree that (i) the initial Capital Contribution of each Limited Partner, for each Unit acquired by the Limited Partner in connection with the Offering, shall be Five Hundred Thousand Dollars ($500,000), and (ii) the Syndication Fee, paid by each Limited Partner does not constitute a Capital Contribution of the Limited Partner. Upon the completion of the Offering and the admission of the prospective investors in the Units as Limited Partners in accordance with this Agreement and the Subscription Agreement, Exhibit A attached hereto shall be revised to reflect each Limited Partner's initial Capital Contribution and initial Capital Account, the number of Units acquired by each Limited Partner, and the Percentage Interest.

### 2.0   Capital Contribution of General Partner

The Partners acknowledge and agree that (i) the General Partner is not making a Capital Contribution of money, and (ii) for services to be performed by the General Partner on behalf of the Partnership, the General Partner shall receive a fifty percent (50%) Partnership Interest which shall be deemed to be a "profits interest" only, with an initial Capital Account balance of zero (0).

### 3.0   Escrow Account

The Limited Partners acknowledge and agree that the Subscription Price paid by each Limited Partner shall be, or has been, deposited into an escrow or segregated bank account maintained by the Partnership in a commercial bank, as authorized by the General Partner in its sole discretion (the "Escrow"). Funds held in the Escrow Account may be released to the General Partner for the acquisition and renovation of real property to be used in the partnership business prior to approval of the Investor's I-526 petition. In the event the USCIS denies the Investor's I-526 Petition and/or the subscription herein is not accepted by the General Partner, the Subscription Price deposited into the Escrow Account by the Investor, including the Syndication Fee portion of the Subscription Price (i.e., $40,000 per Unit) will be refunded to the Investor.

### 4.0   Withdrawal of Capital

Excepted as provided in this Agreement, no Limited Partner shall have any right to withdraw or make a demand for the withdrawal of his or her Capital Contribution until the full and complete winding up and liquidation of the Partnership; and in no event shall a Limited Partner have the right to terminate his or her Partnership Interest upon a denial of his or her I-829 Petition by USCIS. No Partner shall receive any interest on his or her Capital Contribution.

11

5.0    Additional Capital Contributions

Except as otherwise provided in this Agreement, a Limited Partner shall not be required or obligated to make Capital Contributions to the Partnership other than his or her initial Capital Contribution, as set forth in Section 4.01(1). The Limited Partners shall not be required to lend any funds to the Partnership, nor shall any Limited Partner be liable for any debts, liabilities, contracts or obligations of the Partnership beyond an amount equal to the Limited Partner's agreed- upon Capital Contribution.

6.0    Additional Capital

If and at such time or times as the General Partner determines that the reasonable needs of the Partnership require that a certain amount of additional capital be contributed to the Partnership ("Additional Required Capital"), the General Partner shall engage in the following in the order set forth below:

(a)    Advise each of the Limited Partners of the need for Additional Required Capital.    Each Limited Partner will have the option, but not the obligation, to invest additional equity capital in the Partnership, which in turn may have the effect of reducing pro-rata each Limited Partner's Percentage Interest;

(b)    Arrange for financing from a third party to the Partnership for the amount of the Additional Required Capital not so contributed by the Limited Partners on commercially reasonable terms, as determined by the General Partner, in its sole discretion; and

(c)    The General Partner may admit other Persons (which may include Affiliates of one of the Partners, or any other Person as permitted by this Agreement) as Additional Partners in exchange for a cash Capital Contribution on such terms acceptable to the General Partner in its sole discretion, which in turn shall have the effect of reducing pro-rata each Limited Partner's Percentage Interest.

**B.    SECTION 4.02 CAPITAL ACCOUNTS**

An individual Capital Account shall be established and maintained on the Partnership's books for each Partner in accordance with the Treasury Regulations promulgated under Section 704(b) of the Code. No interest shall be paid on any present or future Capital Account.

**C.    SECTION 4.03 USE OF FUNDS CONTRIBUTED BY LIMITED PARTNERS**

1.0    Investment Risk

Upon the release from Escrow of the initial Capital Contribution made by a

12

Limited Partner as set forth in Section 4.01(3) (or, in the case of a Limited Partner who acquires a Partnership Interest other than through the Offering, upon the contribution of capital to the Partnership), the Capital Contribution of the Limited Partner shall be fully available to the Partnership to conduct the business of the Partnership and shall be at risk of complete loss. Further, it is the Partnership's intent that no portion of any Capital Contribution made to the Partnership by a Limited Partner be held in reserve to exclude such Capital Contribution from at-risk investment and the use of Capital Contributions shall not be contingent upon the occurrence or non- occurrence of other events not contemplated by this Agreement.

### 2.0   Use of Funds for Expenses

No part of the initial Capital Contribution made by a Limited Partner (*i.e.*, $500,000) shall be diverted to pay expenses of the Partnership incurred in connection with (i) the formation of the Partnership and the Offering of the Units, including legal and promotional fees, including a "finders' fee", and (ii) the legal fees to be incurred in connection with the preparation of Partnership related documents that Limited Partners and/or their respective legal counsel may reasonably request for submission of their respective applications for classification as an alien entrepreneur with the USCIS. It is the intent of the Partnership that Capital Contributions be used exclusively for the investment purposes of the Partnership as described in this Agreement. The Partners acknowledge and agree that the Syndication Fee, which shall be paid to the General Partner, shall be used by the General Partner to meet the expenses described in clauses "(i)" and "(ii)" of this paragraph for which expenses the General Partner shall be responsible. The Partners agree that in no event will any portion of the Syndication Fee be used for legal fees incurred by a Limited Partner for services performed by such Limited Partner's separate legal counsel.

### 3.0   Investments

The Partnership shall use its commercially reasonable efforts to advance and accomplish the Partnership's business and purpose as set forth in Article III. The Partnership intends to limit its investment activities to investments in private businesses, municipalities, local government agencies and authorities, and regional redevelopment agencies located within the proposed Regional Center in order to assist in job creation within the areas comprising the Regional Center.

## V.   ARTICLE V ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS OF CASH FLOW; CERTAIN TAX MATTERS

### A.   SECTION 5.01 ALLOCATION OF PROFITS AND LOSSES

### 1.0   Net Profits

Except as otherwise provided herein, the net profits, if any, of the Partnership for each fiscal year of the Partnership (as determined in accordance with Section 5.02) shall

be allocated to the Partners as follows:

      (a)    first, to each Partner until the cumulative profits allocated to such Partner pursuant to this Section 5.01(1) is equal to the cumulative losses allocated to the Partner pursuant to Section 5.01(2); and

      (b)    second, to the Partners, pro rata in proportion to their respective Percentage Interests.

2.0   <u>Net Losses</u>

Except as otherwise provided herein, the net losses, if any, of the Partnership for each fiscal year of the Partnership (as determined in accordance with Section 5.02) shall be allocated to the Partners, as follows:

      (a)    first, to the Partners, pro rata in proportion to their respective share of net profits being offset, until the cumulative losses allocated to such Partners pursuant to this Section 5.01(2) is equal to the cumulative profits allocated to such Partners pursuant to Section 5.01(1)(ii) for any prior period;

      (b)    second, if one or more Partners has a positive balance in his or her Capital Account, to such Partners in proportion to their respective positive Capital Account balances until such Partners' positive Capital Account balances have zero (0) balances; and

      (c)    third, any remaining loss shall be allocated among the Partners pro rate in proportion to their respective Percentage Interests.

## VI.   <u>SECTION 5.02 DETERMINATION OF PROFITS AND LOSSES</u>

The net profits and net losses of the Partnership shall be determined in accordance with the accounting methods followed for federal income tax purposes and otherwise in accordance with generally accepted accounting principles promulgated by the Financial Accounting Standard Board. An accounting shall be made for each fiscal year to determine the Partners' respective shares of net profits or net losses of the Partnership which shall be credited or debited, as the case may be, to the Partners' respective Capital Accounts. For tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to and among the Partners in the same in which they share profits and losses.

### A.   SECTION 5.03 DISTRIBUTIONS OF CASH FLOW

1.0   <u>Cash Flow from Operating Profit</u>

Subject to Applicable California Law and any limitations contained elsewhere in this Agreement, the General Partner may elect from time to time, in its sole discretion, to

distribute Cash Flow from Operating Profit to the Partners pro rata in proportion to their respective Percentage Interests.

### 2.0 Cash Flow from Return of Investments

Subject to Applicable California Law and any limitations contained elsewhere in this Agreement, the General Partner may elect from time to time, in its sole discretion, to distribute Cash Flow from Return of Investments to the Partners, in accordance with the following priority:

    (a)    first, to the Partners pro rata in proportion to their Unreturned Capital Contributions until such Unreturned Capital Contributions have been fully repaid; and

    (b)    second, to the Partners pro rata in proportion to their respective Percentage Interests.

### 3.0 Annual Distributions

Subject to Applicable California Law and any limitations contained elsewhere in this Agreement, it is the intention of the General Partner on or about August 31st of each fiscal year, to distribute to the Partners pro rata in proportion to their respective interests, 50% of distributable Cash Flow from Operating Profit accrued by the Partnership during the prior fiscal year.

## VII.   SECTION 5.04 RIGHT TO DISTRIBUTIONS

No Partner shall have the right to receive distributions of property from the Partnership, except as set forth in Sections 5.03 and Article X herein. No Partner shall have the right to receive a return of any or all of the Partner's Capital Contribution.

## VIII.   SECTION 5.05 UNREALIZED RECEIVABLES

In the event of a reduction in a Partner's Partnership Interest (provided such reduction does not result in a complete termination of such Partner's Interest), such Partner's share of the Partnership's "unrealized receivables" (within the meaning of Section 751(c) of the Code), if any, shall not be reduced so that the portion of the net profit which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Partnership or to any Partner, be allocated among the Partners in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any question as to the aforesaid allocation which cannot be resolved in the manner specified above, shall be resolved by the General Partner in its reasonably exercised discretion.

## IX.    SECTION 5.06 WITHHOLDING

### A.    COMPLIANCE WITH WITHHOLDING OBLIGATIONS

The General Partner shall take such action as may be necessary for the Partnership to comply with withholding obligations imposed on the Partnership under the Code and under any other applicable foreign, state or local law.

### B.    WITHHOLDING ON DISTRIBUTIONS

If the Partnership makes a distribution to a Partner and determines that withholding is required, the Partnership shall have the right to withhold from the amount otherwise distributable to such Partner the amount required to be withheld and shall remit such amount to the Internal Revenue Service or the foreign, state or local tax authorities. Any amount withheld from a distribution and remitted shall be deemed distributed to such Partner.

### C.    WITHHOLDING WHERE NO DISTRIBUTION OCCURS

If the Partnership is required to withhold in a situation where no distribution has been or will be made or where the amount of the distribution is insufficient to meet the withholding obligation, the Partnership shall remit the required amount, and the amount shall be treated as a withholding loan ("Withholding Loan") by the Partnership to such Partner. A Withholding Loan shall (i) be payable by a Partner on fifteen (15) days notice from the Partnership, (ii) shall be interest free until the date of expiration of the notice, (iii) bear interest at 10% per annum or the highest rate allowed by law, whichever shall be the higher, from the date of expiration of the notice, and (iv) be secured by such Partner's Interest in the Partnership. Any amount otherwise distributable to a Partner with an outstanding Withholding Loan balance may be retained by the Partnership and offset against amounts owed pursuant to the Withholding Loan.

#### 1.0    Funding Shortfall

If the Partnership is unable to meet a withholding obligation with respect to a Partner (including, but not limited to, a situation in which the Partnership did not withhold a sufficient amount on a distribution to the Partner or made a distribution to the Partner without maintaining a sufficient amount of capital for withholding obligations with respect to such Partner whether described in Section 5.06(2) or (3)), the General Partner shall immediately notify such Partner of the expected shortfall, and upon receipt of such notice such Partner shall immediately transfer funds to the Partnership sufficient to permit the Partnership to remit the required amount to the appropriate tax authority.

#### 2.0    General Partner Not Liable for Excessive Withholding

The General Partner alone shall determine (i) the amounts (if any) required by

16

law to be withheld (absent an exemption) with respect to the tax obligations of any Partner, and (ii) the sufficiency and bona fides of any claim by a Partner to an exemption from such withholding. The Partners acknowledge that withholding with respect to a Partner may be required if (a) no exemption from withholding has been claimed by such Partner, (b) such Partner has not complied with all requirements for any claimed exemption from withholding, or (c) there has been a change in the law applicable to any claimed exemption from withholding. So long as the General Partner acts in good faith in making such determinations, neither the Partnership nor the General Partner shall be liable to any Partner for any amounts withheld and paid over as taxes to any government or political subdivision thereof without regard to whether such amounts are actually owed as taxes by the Partner with respect to which they have been withheld. In making such determinations, the General Partner may engage accountants, lawyers and other consultants, and have their reasonable expenses paid by the Partnership, subject when practicable to prior consultation with the Partner. The General Partner will provide to the Partner such information as is required by law concerning amounts withheld and shall otherwise cooperate with the Partner in any efforts made by the Partner to obtain credit for or a refund of any tax withheld with respect to the Partner.

### D.   SECTION 5.07 OVERRIDING ALLOCATIONS

The allocations of items of net income and net losses provided for in this Section 5.07 shall override all other provisions of this Agreement.

### 1.0   Qualified Income Offset

In the event that net losses, if allocated pursuant to the provisions of Section 5.01, would create deficit balances in the Capital Accounts of a class of Partners (i.e., General Partner or Limited Partners), such losses shall instead be allocated, pro rata to the class of Partners which has positive Capital Account balances to the extent of such positive Capital Account balances. In the event that deficit balances do occur in the Capital Accounts of a class or all classes of Partners, all gains shall be first allocated (pro rata between classes based on such deficit balances) so as to eliminate such deficit balances as quickly as possible. This provision shall be deemed to constitute a Qualified Income Offset for purposes of the Treasury Regulations under Section 704(b) of the Code.

### 2.0   Non-Recourse Debt

Losses attributable to non-recourse debt shall be allocated among the Partners in proportion to their respective positive Capital Account balances, if any, to the extent such allocations would otherwise cause their aggregate negative Capital Accounts to exceed the Minimum Gain (as defined in the Treasury Regulations under section 704(b) of the Code) determined at the end of the taxable year to which such allocations relate.

3.0    Special Allocations

Subject to the provisions of Sections 5.07(1)-(2), but notwithstanding any other provisions of this Agreement, any special allocations made pursuant to Sections 5.07(1)-(2) shall be taken into account for purposes of determining subsequent allocations of net income and net losses so that the total allocations shall, to the extent possible, equal the allocations that would have been made if this Section 5.07 had not previously been applied.

## X.    ARTICLE VI RIGHTS, POWERS AND DUTIES OF GENERAL PARTNER

### A.    SECTION 6.01 POWERS AND RESPONSIBILITIES OF THE GENERAL PARTNER

Subject to the provisions of this Agreement, to the maximum extent permitted by Applicable California Law, the General Partner shall have full, exclusive and complete discretion, power and authority, to manage, control, administer and operate the business and affairs of the Partnership for the purposes herein stated, to make all decisions affecting such business and affairs, including, without limitation, the day-to-day operational decisions for the Partnership, to adopt such accounting rules and procedures as it deems appropriate in the conduct of the business and affairs of the Partnership, and to do all things which it deems necessary or desirable in the conduct of the business and affairs of the Partnership, including, without limitation, for Partnership purposes, the power:

(a)    to receive, invest and expend Capital Contributions and receipts of the Partnership and to incur obligations and liabilities on behalf of the Partnership in furtherance of the Partnership's business;

(b)    to employ such Affiliates and personnel and enter into such management agreements as it shall deem desirable or advisable for the conduct of Partnership activities, including the hiring of permanent, temporary, shared or part-time employees and outside contractors, accountants, attorneys and consultants, and to determine their compensation and other terms of employment;

(c)    to use commercially reasonable efforts to meet the objectives of the Partnership, including investment by the Partnership to create employment for a minimum of ten (10) full-time employees for each Limited Partner within two (2) years of the date that each Limited Partner becomes a conditional permanent resident of the United States (note; full-time employees may include "job-sharing," where two employees combine to fill what is clearly demonstrated as "one full-time position");

(d)    for purposes of meeting the immigration objectives of the Partnership as set forth in Article III, to allocate the jobs created by the Partnership's investments, if any, to the Limited Partners based on the dates on which the

18

Limited Partners obtain conditional permanent residence (by way of example only, the Limited Partner who first obtains conditional permanent residence in the United States will be first allocated the jobs created by the Partnership investments). However, Limited Partners who invest and file I-526 petitions before San Francisco Regional Center obtains Regional Center designation will be allocated direct jobs in the order they obtained conditional permanent residence before Limited Partners who invest and file I-526 petitions after Regional Center designation;

(e)     to take such action and to execute and deliver such documents as may be required in connection with any lease, loan, investment, bond, indemnity, security agreement, escrow, or bank letter of credit;

(f)     to issue a certification of admission of Limited Partners into the Partnership;

(g)     to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with Affiliates, necessary to, in connection with, or incidental to the accomplishment of the objectives of the Partnership;

(h)     to purchase, at the expense of the Partnership, liability and other insurance to protect Partnership assets, as the General Partner deems prudent in its sole discretion;

(i)     to do any and all other things affecting the rights and obligations of the Partnership, including, and without limiting the generality of the foregoing, the employing of attorneys and the incurring of other legal expenses, at the expense of the Partnership, for the conduct or settlement of claims and litigation;

(j)     to confess a judgment against the Partnership; and

(k)     to make decisions with respect to (i) any merger or any other combination of the Partnership with another corporation, partnership or entity, however effected, (ii) any acquisition by the Partnership of all or substantially all of the assets or business of, or a controlling ownership interest in, a corporation, partnership or other entity, (iii) any liquidation, dissolution or winding up of the Partnership (except as otherwise provided in Article X), (iv) any payment of compensation (monetary or non-monetary) by the Partnership, or (v) any agreement, undertaking or commitment of or by the Partnership with, or any transaction between the Partnership and, any Partner, or any Affiliate, manager, officer, director, member, partner or stockholder of any of the foregoing.

## B.     SECTION 6.02 ADDITIONAL RIGHTS, POWERS AND DUTIES OF THE GENERAL PARTNER

Without limiting any rights, power or authority of the General Partner, the General Partner is hereby authorized, to the maximum extent permitted by Applicable

19

California Law, with additional rights, as follows, which is not intended to be an exhaustive list:

(a)    to execute the Subscription Agreement with each Limited Partner;

(b)    to not be liable for any debts, liabilities, contracts or obligations of the Partnership;

(c)    to comply with all federal and state income tax withholding requirements, including withholding requirements applicable to non U.S. residents, in accordance with Section 5.06;

(d)    to approve decisions and other operations of the Partnership, in accordance with Section 6.01;

(e)    to pay, on behalf of the Partnership (and subject to reimbursement if paid by the General Partner), all Partnership expenses and any and all special expenses incurred in accordance with Section 8.01 and Section 8.03;

(f)    to be reimbursed for all expenses paid on behalf of the Partnership, except as otherwise set forth in Section 4.03(2);

(g)    to maintain a list of all Partners and to act as a liaison between the Limited Partners and the Partnership, in accordance with Section 12.03; and

(h)    to deposit Capital Contributions of the Partnership in interest-earning, short-term, liquid accounts as is prudent from time to time, in the General Partner's sole discretion.

(i)    to maintain records and information as required by USCIS.

**C.    SECTION 6.03 WITHDRAWAL OF THE GENERAL PARTNER**

The General Partner may not resign, retire or voluntarily withdraw from the Partnership unless (i) another General Partner is substituted and (ii) counsel for the Partnership is of the opinion such resignation, retirement or withdrawal from the Partnership will not affect any investor's (a) EB-5 petitions for classification as an alien entrepreneur, (b) applications for immigrant visas or adjustment of status, or (c) applications to remove conditions; or cause the Partnership (a) to be dissolved under Applicable California Law, (b) to be classified other than as a partnership for federal income tax purposes, and (c) to be terminated. A General Partner who resigns, retires or withdraws from the Partnership in violation of this Agreement will be and remain liable to the Partnership and the Partners thereof for damages resulting from the General Partner's breach of this Agreement, and without limitation of remedies, the Partnership may offset such damages against the amounts otherwise distributable to the resigning, retiring or withdrawing General Partner.

### D.     SECTION 6.04 TRANSFER OF GENERAL PARTNER INTEREST

The General Partner has the right to sell, exchange, pledge, hypothecate, encumber, assign or otherwise dispose of all or any portion of its Partnership Interest, so long as (i) counsel for the Partnership is of the opinion that such transaction will not cause the Partnership to be classified other than as a partnership for federal income tax purposes or cause the Partnership to terminate for federal income tax purposes, (ii) counsel for the Partnership is of the opinion that such transaction will not require registration of the General Partner's Partnership Interest with the SEC or any state securities agency (unless such registration has been made), (iii) the assignees of the General Partner's Partnership Interest, or portion thereof, have agreed to be bound by the provisions of this Agreement and all other applicable agreements, and (iv) the Partnership is reimbursed by the General Partner for selling, transferring, exchanging or otherwise disposing of its Partnership Interest for the Partnership's expenses in connection with the transaction.

### E.     SECTION 6.05 AMENDMENTS TO PARTNERSHIP AGREEMENT

The General Partner may amend this Agreement, without the consent of the Limited Partners, in any way deemed necessary or desirable by it (i) to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of the Code or any federal or state agency, or in any federal or state statute, compliance with which it deems to be in the best interest of the Partnership, (ii) to comply with any Treasury Regulations regarding Partnership allocations, or (iii) to make ministerial amendments to this Agreement which do not have a material adverse effect upon the rights or interests of the Partners, including, without limitation, amendments to cure any ambiguity or to convert or supplement any provision in a manner consistent with the intent of this Agreement. Additionally, the General Partner shall have the right to amend Exhibit A without consent of the Limited Partners to reflect the admission of Additional or Substitute Limited Partners. Further, the General Partner shall amend this Agreement, without the consent of the Limited Partners, in order to comply with rules and regulations of the USCIS with respect to the Limited Partners attaining lawful permanent resident status, provided such amendments do not violate applicable laws or covenants or materially affect rights or obligations of the General Partner or Limited Partners. Notwithstanding the foregoing, no amendment by the General Partner may affect the voting or economic rights of any Partner without such Partner's express consent.

### F.     SECTION 6.06 REMOVAL OF THE GENERAL PARTNER; PURCHASE PRICE OF INTEREST

1.0     <u>Grounds for Removal</u>

To the extent permitted under the Partnership Act, the General Partner may be removed and a new General Partner admitted to the Partnership if such removal is due to

proof (proof being defined as a judicial determination in a court having jurisdiction of such matter) of (i) a material breach of this Agreement by the General Partner, or (ii) gross negligence or willful or wanton misconduct on the part of the General Partner. If a final judicial determination is made such that the General Partner is properly removed under this Section 6.06(1), the Required Majority of the Limited Partners may elect (a) to convert the General Partner's Partnership Interest to that of a Limited Partner, so long as a substitute General Partner has been appointed and admitted upon a vote of the Required Majority of the Limited Partners, in which case the Percentage Interests of the Limited Partners and the removed General Partner will be reduced pro rata to provide for a Partnership Interest to a substitute General Partner, which interest shall be determined by the Required Majority of the Limited Partners, and the removed General Partner after such conversion shall have only those rights and obligations of a Limited Partner (but shall be entitled to those fees, distributions, profits and losses allocated hereunder to such General Partner prior to its conversion), (b) to dissolve the Partnership in accordance with Article X, or (c) to have the Partnership purchase the removed General Partner's Partnership Interest as provided in Section 6.06(2) hereof, and appoint and admit a substitute General Partner. If the Limited Partners fail to elect one of the foregoing options within ninety (90) days following the final judicial determination that the General Partner is properly removed under this Section 6.06(1), then the Limited Partners shall be deemed to have elected to dissolve the Partnership in accordance with Article X. Any distributions or fees owed to

a removed General Partner shall be held in escrow by the Partnership for a period of not more than ninety (90) days and may be used to offset any amounts owed by such General Partner to the Partnership.

    2.0    <u>Purchase Price of General Partner Interest</u>

The purchase price of the General Partner's Partnership Interest in the event the Limited Partners elect to have the Partnership purchase the General Partner's Partnership Interest in accordance with Section 6.06(1) above or the Partnership business is continued in accordance with Section 10.02 hereof, shall be the balance of the General Partner's Capital Account as of (i) the date a final judicial determination is made that the General Partner is properly removed under Section 6.06(1) above, or (ii) the date of the Governing Occurrence (as defined in Section 10.02 hereof), as the case may be (the "Valuation Date"). For purposes of the foregoing sentence, the General Partner's Capital Account shall be adjusted as of the Valuation Date in accordance with Section 4.02 to include, without limitation, all distributions and allocations of profits, gains, losses and expenses accrued as of the Valuation Date. The General Partner shall also be paid for all accrued, but unpaid fees due under this Agreement to the General Partner as of the Valuation Date. The closing of the purchase and sale of the General Partner's Partnership Interest hereunder shall occur within thirty (30) days after the Limited Partners have elected to acquire the General Partner's Partnership Interest in accordance with Section 6.06(1) above or the Partnership business is elected to continue under Section 10.02 hereof, as the case may be.  The purchase price of the General Partner's Partnership Interest shall be paid in two annual installments, with the first installment due at the time of the closing and the second installment due one year thereafter.

G.   **SECTION 6.07 PERFORMANCE OF DUTIES; LIABILITY OF GENERAL PARTNER**

To the fullest extent permitted under Applicable California Law, the General Partner shall not be liable to the Partnership or to any Partner for any loss or damage sustained by the Partnership or any Partner, unless the loss or damage shall have been the result of the General Partner's material breach of this Agreement, gross negligence or willful or wanton misconduct. The General Partner does not guarantee (i) the return to any Partner of such Partner's Capital Contribution or any profit from the operation of the Partnership, and the General Partner shall not be responsible to any Partner as a result of a loss of his or her investment in the Partnership, and (ii) that a Limited Partner will obtain permanent residence in the United States as a result of such Limited Partner's investment in the Partnership, and the General Partner shall not be responsible to a Limited Partner as a result of the Limited Partner being unable to obtain such residency. The General Partner shall perform its duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and its Partners, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. The General Partner who so performs the duties of a general partner shall not have any liability by reason of being or having been the General Partner of the Partnership.

H.   **SECTION 6.08 COMPENSATION AND FEES TO GENERAL PARTNER**

1.0   Payment of Fees and Expenses

Subject to Section 5.03 hereof, the Partnership intends that the income and profits derived from the investments made by the Partnership in accordance with this Agreement will be retained by the Partnership, in the sole discretion of the General Partner, to meet various outlays, including, but not limited to, the payment of the Annual Management Fee to the General Partner, the payment of operating expenses, administrative costs, acquisition costs, and professional fees. Each Partner acknowledges and agrees that its investment in the Partnership is a long-term investment with no defined redemption option other than as provided in this Agreement and there is no guarantee that any Returns shall be paid to the Limited Partners.

2.0   Annual Management Fee

In addition to the Syndication Fee, the General Partner shall be paid an annual management fee equal to two percent (2.00%) of the Limited Partners' total initial Capital Contributions (the "Annual Management Fee") on a quarterly basis. The Annual Management Fee shall not be taken from Limited Partners' capital contributions. The Annual Management Fee shall (i) be deemed to be earned by the General Partner on a pro rata basis throughout each year, (ii) accrue each month in an amount calculated as follows: (A) the product of (x) the total initial Capital Contributions of the Limited

Partners as of the end of such month, multiplied by (y) 2.00%, <u>divided by</u> (B) twelve (12), (iii) commence accruing with the first month in which a Limited Partner's initial Capital Contribution is released to the Partnership from Escrow or Segregated Account, and (iv) be due and payable, with respect to the amount accrued, on January 1, April 1, July 1 and October 1 of each fiscal year of the Partnership. By way of example only, assume the total initial Capital Contributions made to the Partnership by the Limited Partners equals Six Million Dollars ($6,000,000) as of the end of January, February and March, 2011 and Ten Million Dollars ($10,000,000) as of the end of April, May and June 2011 then the accrued Annual Management Fee due and payable on July 1, 2011 is equal to One Hundred Seventy Thousand Dollars ($80,000) calculated as follows:

$6,000,000 x 2.00% = $120,000/12 = $10,000.00   (accrued per month)
                                        x 3   (January, Feb, March)
                          $30,000.00   (total accrued Annual Management
                                        Fee for January-March)

$10,000,000 x 2.00% = $200,000/12= $16,667.00   (accrued per month)
                                        x 3   (April, May, June)
                          $50,000.00   (total accrued for April-
                                        June)

Total Annual Management Fee accrued and payable for the period January through June 2011 is Eighty Thousand Dollars ($80,000).

    3.0   <u>Payment of Ordinary Expenses</u>

    The General Partner agrees that it shall use the proceeds of the Annual Management Fee to pay for normal, recurring daily operating expenses of the Partnership, incurred in the ordinary course of business, including, without limitation, accounting, record keeping, rent, utilities, providing Partnership related documents to Limited Partners and their respective immigration attorneys, and any other normal, recurring day-to-day operating expenses. Notwithstanding the foregoing, the General Partner shall not be responsible for expenses incurred outside of the ordinary course of business of the Partnership, including, without limitation, legal fees (including legal fees incurred by Limited Partners for immigration matters), litigation costs, audits by outside agencies, audits conducted pursuant to Section 12.01 herein, natural disasters, economic disruption, theft or fraud by third parties, and any extraordinary expenses incurred outside the normal course of business, including any costs associated with securing the return of the original investment capital to the Partnership.

## XI.   ARTICLE VII RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

### A.   SECTION 7.01 RIGHTS, POWERS AND DUTIES OF LIMITED PARTNERS

    To the fullest extent permitted under the Partnership Act, the Limited Partners

shall only have the rights expressly set forth in this Agreement. Notwithstanding any contrary provision contained in this Agreement, no Limited Partner shall take part in the day-to-day management of the business of, or transact any business for, the Partnership, or perform or exercise any right, power or duty which would deprive such Limited Partner of limited partnership status or limited liability under the Applicable California Law, including the Partnership Act, and no Limited Partner shall have the power to sign for or bind the Partnership in any manner whatsoever. No salary shall be paid to any Limited Partner nor shall any Limited Partner have a drawing account. No Limited Partner shall perform any act which is detrimental to the best interests of the Partnership or which would make it impossible to carry on the ordinary business of the Partnership.

**B.    SECTION   7.02   APPROVAL   RIGHTS   OF   THE   LIMITED PARTNERS**

Notwithstanding anything in Article VI, the Limited Partners shall have the right to vote on those matters set forth below in this Section 7.02.  The approval of the Required Majority of the Limited Partners shall be required for the following:

(a)    any change in the policy or nature of the Partnership's business as stated in Article III; and

(b)    the liquidation, dissolution or termination of the Partnership, as set forth in Article X hereof.

**C.    SECTION 7.03 REGULAR CONSULTATION AND ADVICE OF LIMITED PARTNERS**

Although not required by this Agreement, the Partnership may hold annual meetings at the place and time selected by the General Partner. Partners may participate in any meeting through the  use of any means of conference  telephones or similar communications equipment as long as all Partners participating can hear one another. A Partner so participating  is deemed to be present in person at the meeting. At such meetings, the Limited Partners may consult with and advise the General Partner with Respect to the financial matters and operation of the business of the Partnership, including, but not limited to, the following:

(a)    the formulation of the business policies and practices of the Partnership;

(b)    the expansion or contraction of the business of the Partnership; and

(c)    such other Partnership matters as any Partner may choose to discuss at such meetings.

In addition to the foregoing, a meeting of the Partners may be called by the General Partner or by Limited Partners holding more than ten percent (10%) of the

Percentage Interests held by the Limited Partners for any matters on which the Limited Partners may vote under this Agreement or to consult with and advise the General Partner with respect to the financial matters and operation of the business of the Partnership, as set forth above.

Furthermore, the General Partner shall provide reports to the Limited Partners regarding the business and investment of the Partnership to the extent required under the Partnership Act.

## XII.   ARTICLE VIII TRANSFER OF PARTNERSHIP INTERESTS

### A.   SECTION 8.01 ASSIGNMENT OF LIMITED PARTNERSHIP INTERESTS

#### 1.0   Transfer of Interest

Subject to Sections 8.01(3), 8.01(4), 8.02 and 8.09 of this Agreement, a Limited Partner may sell, transfer or otherwise assign its Partnership Interest as a Limited Partner by a duly executed written instrument of assignment, provided that the terms of such instrument are first approved by the General Partner, which approval may be withheld in the General Partner's sole discretion, and are not in contravention of any of the provisions of this Agreement. Any assignee of a Partnership Interest (whether or not such assignee becomes a Substitute Partner) who desires to make further assignments of such Partnership Interest shall be subject to all of the restrictions on the transferability of such Partnership Interest contained herein. Unless an assignee becomes a Substitute Partner pursuant to Section 8.02 hereof, it shall not be entitled to any of the rights granted to a Limited Partner hereunder other than the right, unless prohibited by Section 8.01(2), to receive all or part of the share of profits, losses and distributions to which its assignor would otherwise be entitled.

#### 2.0   Rights of Assignee

An assignee of record shall be entitled to receive distributions of Cash Flow from Operations, distributions of Cash Flow from Return of Investments, distributions on liquidation of the Partnership, and allocations of profits and losses attributable to the Partnership Interest acquired by reason of such assignment from and after the effective date of the assignment of such Partnership Interest to it; however, anything herein to the contrary notwithstanding, the Partnership and the General Partner shall be entitled to treat the assignor of such Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of profit, loss, or distributions which are made in good faith to such assignor, until such time as the conditions set forth in Section 8.01(3) have been met and the duly executed written instrument of assignment has been delivered and approved as set forth in Section 8.01(1). Provided the Partnership has actual notice of an assignment of the Partnership Interest, the effective date of such assignment on which the assignee shall be deemed an assignee of record shall be the last day of the month of receipt and approval of the written instrument of assignment by

26

the Partnership, unless the General Partner agrees to accept some other effective date.

3.0   Restrictions on Transfer

No sale, transfer, assignment, pledge or other disposition of all or any part of a Partnership Interest in the Partnership (whether voluntary, involuntary or by operation of law) may be made unless all of the following conditions have been satisfied:

(a)   no such sale, transfer, assignment, pledge or other disposition shall be made which, in the opinion of counsel to the Partnership, may result in the termination of the Partnership for the purposes of Section 708 of the Code;

(b)   no such sale, transfer, assignment, pledge or other disposition shall be made where the assignor and assignee agree in connection therewith that the assignor shall exercise any residual powers remaining in it as a Limited Partner in favor of or in the interest or at the direction of the assignee;

(c)   no such sale, transfer, assignment, pledge or other disposition shall be made to a minor or incompetent;

(d)   no such sale, transfer, assignment, pledge or other disposition shall be made if, in the opinion of counsel to the Partnership, such assignment may not be effected without registration under the Applicable Securities Acts;

(e)   no such sale, transfer, assignment, pledge or other disposition of any Limited Partner's Partnership Interest shall be made until after the removal of the condition on the Limited Partner's permanent residence status;

(f)   no such sale, transfer, assignment, pledge or other disposition shall be made unless it complies with the applicable provisions of the Applicable Securities Acts;

(g)   the assignee, if requested by the General Partner, presents an opinion of counsel, acceptable to counsel to the Partnership, that such assignment will not adversely affect the status of the Partnership as a partnership for federal income tax purpose; and

(h)   in the case of a purchase by the Partnership of a Limited Partner's Partnership Interest, the purchase price may not exceed the fair market value of the Partnership Interest, as determined by an impartial appraisal.

4.0   Prohibited Transfer

Any assignment, sale, exchange, transfer or other disposition in contravention of any of the provisions of this Section 8.01 shall be void and ineffectual, and shall not bind or be recognized by the Partnership.

## VIII.   SECTION 8.02 ABSOLUTE DISCRETION OF GENERAL PARTNER AS TO SUBSTITUTION OF LIMITED PARTNER

No Limited Partner shall have the right to substitute an assignee as a Limited Partner in its place without the written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. Additionally, in no event shall an assignee become a Substitute Partner in place of his assignor unless all of the following conditions are first satisfied:

(a)    the assignor and assignee shall have executed and acknowledged a written instrument of assignment, in a form acceptable to the General Partner, and shall have filed such instrument with the Partnership, which instrument shall specify, among other things, the Partnership Interest being assigned;

(b)    the assignor and assignee shall have executed and acknowledged such other instruments as the General Partner may deem necessary or desirable to effect such substitution including the written acceptance and adoption by the assignee of the provisions of this Agreement; and

(c)    the provisions of Sections 8.01(3), 8.03 and 8.04 of this Agreement are satisfied.

### A.   SECTION 8.03 PAYMENT OF COSTS AND EXPENSES

All costs and expenses incurred by the Partnership in connection with the assignment of a Partnership Interest, and/or the substitution of an assignee as a Substitute Partner, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be pre-paid by the assigning Partner, or if not paid by it, then by the assignee.

### B.   SECTION 8.04 SUBSTITUTE PARTNERS BOUND

Each person who becomes a Limited Partner in the Partnership by becoming a Substitute Partner, shall and does hereby agree to be bound by the provisions of this Agreement and does hereby ratify and agree to be bound by all prior action taken by the Partnership.

### C.   SECTION 8.05 NO BUY OR SELL OPTIONS

The Limited Partners do not have a sell or buy option concerning the transfer of a Partnership Interest.

### D.   SECTION 8.06 PROHIBITION OF REDEMPTION

The Partnership is not obligated to redeem or purchase a Limited Partner's Partnership Interest at any time or under any circumstances.

E.    **SECTION 8.07 ADMISSION OF LIMITED PARTNERS ACQUIRING UNITS**

Each Limited Partner subscribing to a Unit in connection with the Offering shall be admitted upon (i) the approval of the Limited Partner's I-526 Petition (if applicable) and (ii) the written approval of the General Partner authorizing the admission of the Limited Partner; provided, however, that the General Partner has the right, in its sole discretion, to reject any subscription for any reason, even if the Limited Partner's I-526 Petition is approved.

F.    **SECTION 8.08 LIMITED RIGHT OF WITHDRAWAL BY A LIMITED PARTNER**

A Limited Partner shall have the limited right to withdraw as a Limited Partner in the following event: the Limited Partner's I-526 Petition is approved, however, the investor fails to obtain an immigrant visa, adjustment of status, or conditional lawful permanent resident status for any reason. In such case, the Limited Partner shall provide the Partnership with written notification of its election to withdraw by no later than fifteen (15) business days following the denial of the Limited Partner's conditional visa. The withdrawal of the Limited Partner shall be effective as of the date of the notice given by the Limited Partner. Upon the Limited Partner's withdrawal in accordance with this Paragraph 8.08, the Initial Capital Contribution (Unit Price) of $500,000 made by the Limited Partner shall be paid to the Limited Partner as soon as the Partnership has funds available to make such payment; provided, however, that in no event shall the Partnership be required to make such payment if it would have an adverse effect on the business and/or immigration objectives of the Partnership and/or adversely effect any other Limited Partner's immigration objective of obtaining permanent residence in the United States. Upon withdrawal, the Limited Partner shall not be entitled to any allocation or distribution of profits or gains that may have accrued from the time that the Limited Partner's Initial Capital Contribution was released to the Partnership to the date receipt of written notice by the General Partner. Further, such profit or gain, if any, is deemed earned by the General Partner to recoup costs associated with liquidating the investment of the Limited Partner's Initial Capital Contribution pursuant to this Section 8.08.

G.    **SECTION 8.09 ADMISSION OF ADDITIONAL LIMITED PARTNERS**

The Partnership shall refuse to register any transferee or assignee of a Partnership Interest unless the transfer is made in accordance with the Agreement, Regulation S as promulgated by the Securities Exchange Commission and/or other applicable provisions of the Applicable Securities Acts. Substitute Partners may be admitted to the Partnership subject to the provisions of this Section 8.09, pursuant to the provisions of Article VIII hereof.

### IX.   ARTICLE IX EXPENSES AND REIMBURSEMENTS

### A.   SECTION 9.01 FORMATION AND OFFERING EXPENSES

In accordance with Section 4.03 hereof, the Syndication Fee shall be paid to the General Partner and shall be used by the General Partner to pay for (i) the expenses incurred in connection with the formation of the Partnership and the Offering of the Units, including legal and promotional fees, including a "finders' fee", and (ii) the legal fees to be incurred in connection with the preparation of Partnership related documents that Limited Partners and/or their respective legal counsel may reasonably request for submission of their respective applications for classification as an alien entrepreneur with the USCIS. The Partners agree that in no event will any portion of the Syndication Fee be used for legal fees incurred by a Limited Partner for services performed by such Limited Partner's separate counsel.

### B.   SECTION 9.02 COMMERCIALLY REASONABLE ONGOING EXPENSES

The Partners acknowledge and agree that beyond the initial formation and Offering expenses set forth in Section 9.01 hereof, the Partnership anticipates incurring day-to-day expenses to operate the business of the Partnership. In accordance with Section 6.08(3), such day-to- day expenses incurred in the ordinary course of business of the Partnership shall be paid by the General Partner from the Annual Management Fee paid to the General Partner; provided, however, that under no circumstances shall the expenses described in Section 9.03 hereof be paid by the General Partner from the Annual Management Fee paid to the General Partner.

### C.   SECTION 9.03 EXTRAORDINARY EXPENSES

Notwithstanding any contrary provision, the Partnership shall be responsible for expenses of the Partnership incurred outside of the ordinary course of business of the Partnership, including, but not limited to, legal fees, litigation costs, audits by outside agencies, audits conducted pursuant to Section 12.01 herein, natural disasters, economic disruption, theft or fraud by third parties, costs incurred to recover any investment funds due and owing the Partnership and other extraordinary expenses incurred outside the ordinary course of business. Such foregoing expenses shall be paid directly by the Partnership and the Partnership shall not look to the General Partner to pay such expenses as a part of the Annual Management Fee paid to the General Partner. Limited Partners' capital investments shall not be used except to cover costs incurred by the entity most closely responsible for creating the employment upon which the Limited Partners' I-526 Immigrant Petitions by Alien Entrepreneur and I-829 Petition by Entrepreneur to Remove Conditions are based.

### X.   ARTICLE X DISSOLUTION OF THE PARTNERSHIP

## A.    SECTION 10.01 EVENTS OF DISSOLUTION

The death, legal incompetence, liquidation, dissolution, bankruptcy or withdrawal of any Limited Partner shall not dissolve the Partnership. The Partnership shall be dissolved upon the earlier of (i) the expiration of the term of the Partnership as provided in Section 1.04 or (ii) the happening of any of the following:

(a)    the sale or disposition of all or substantially all of the Partnership assets, or all investments made by the Partnership no longer remain outstanding, and the distribution of the proceeds thereof to the Partners so long as the dissolution occurs after a period of seven (7) years from the Effective Date and is approved by the General Partner;

(b)    the consent of the General Partner and the affirmative vote of the Required Majority of the Limited Partners; provided, however, that the Limited Partners agree that the General Partner shall not vote or consent to a dissolution if such dissolution would be inconsistent with the business and objectives of the Partnership as set forth in Article III hereof;

(c)    the death, legal incompetence, resignation, withdrawal, liquidation, dissolution, or bankruptcy of a General Partner, unless the Partnership is continued in accordance with Section 10.02 hereof;

(d)    the removal of the General Partner and the election of the Limited Partners to dissolve the Partnership in accordance with Section 6.06 hereof;

(e)    upon an event which makes it unlawful for the Partnership to continue to conduct its business; or

(f)    the entry of a decree of judicial dissolution in accordance with the Act. Notwithstanding any contrary provision, dissolution of the Partnership shall not be effectuated if it would adversely affect any Limited Partner's I-829 Petition by Entrepreneur to Remove Conditions and as long as the Partnership maintains public or private sector investments within the Regional Center.

## B.    SECTION 10.02 ELECTION TO CONTINUE

Upon the occurrence of any event provided in Section 10.01(iii) of this Agreement (a "Governing Occurrence"), the Partnership shall be dissolved unless (i) a new General Partner is substituted within ninety (90) days of the Governing Occurrence, and such new General Partner elects to continue the business of the Partnership in accordance with the terms of this Agreement, or (ii) a Required Majority of the Limited Partners elects to continue the business of the Partnership in accordance with the terms of this Agreement upon the selection, effective as of the date of the Governing Occurrence, by a Required Majority of the Limited Partners, of a new General Partner within ninety (90) days of the Governing Occurrence, or (c) the

Partnership then maintains any public sector investment possessing a maturity date past the Partnership's termination date set forth in Section 1.04 of this Agreement, in which case a Required Majority of the Limited Partners shall elect a new General Partner. In the event of a General Partner's death, legal incompetence, resignation, withdrawal, liquidation, dissolution, or bankruptcy and the Partnership is continued pursuant to this Section 10.02, the General Partner's Partnership Interest shall be purchased by the Partnership for the purchase price set forth in, and otherwise in accordance with, Section 6.06(2) hereof.

### C.    SECTION 10.03 WINDING UP

Upon dissolution under Section 10.01, no further business shall be conducted by the Partnership except for the taking of such action as shall be necessary for the winding up of the affairs of the Partnership and the distribution of its assets to the Partners pursuant to the provisions hereof; provided, however, that if the dissolution is caused by removal, death, legal incompetence, resignation, withdrawal, liquidation, dissolution, or bankruptcy of the General Partner (and no General Partner is substituted), such Person or Persons as the Required Majority of Limited Partners shall designate as a liquidator (hereinafter, in the event, referred to as the "Liquidator") shall act as liquidating trustee and immediately proceed to wind up and terminate the business and affairs of the Partnership.

### D.    SECTION 10.04 SALE OF PARTNERSHIP ASSETS

Upon dissolution, the General Partner or Liquidator, as the case may be, shall sell such of the Partnership assets as it deems necessary or appropriate. In lieu of the sale of any or all of the Partnership property, the General Partner or Liquidator, as the case may be, may convey and assign all or any part of the Partnership property to the Partners in undivided interests as tenants in common or such other form of similar ownership as shall be applicable to the jurisdiction where the property is located. A full accounting shall be made of the accounts of the Partnership and each Partner thereof and of the Partnership's assets, liabilities, and income, from the date of the last accounting to the date of such dissolution. The net profits and net losses of the Partnership shall be determined to the date of dissolution and allocated, as provided in Article V, to the respective Capital Accounts of the Partners. In accounting for distributions of Partnership property, such property shall be valued at the fair market value at the date of dissolution as determined by an appraisal secured by the General Partner or Liquidator, as the case may be, except that no value shall be placed upon the firm name or goodwill of the Partnership. Any difference between the valuation of the Partnership property and its book value shall be considered as though it represented net profit or net loss, and shall be allocated to the Capital Accounts of the Partners as though it represented net profit or net loss, in accordance with Article V. Any gain or loss on disposition of Partnership property shall be credited or charged to the Capital Accounts of the Partners in the same manner as the difference between the valuation of Partnership property and its book value.

### E.     SECTION 10.05 DISTRIBUTION OF ASSETS

The General Partner or Liquidator, as the case may be, shall apply the remaining Partnership assets, in the following order of priority:

(a)     first, to the payment and discharge of, or reservation for, all of the Partnership's debts and liabilities to third parties and to the General Partner but not any of the Limited Partners, and the expenses of dissolution and winding up, in the order or priority as provided by law;

(b)     second, to the payment to a fund for contingent liabilities to the extent deemed reasonable by the General Partner or Liquidator, as the case may be;

(c)     third, the payment and discharge of any loans made by the Partners to the Partnership, including all interest thereon; and

(d)     fourth, to the Partners to the extent of and in proportion to their respective remaining positive Capital Accounts after taking into account the allocations of net profit or net loss, and prior distributions of cash or property pursuant to Article V, until the Capital Accounts are reduced to zero (0).

### F.     SECTION 10.06 RETURN OF CAPITAL CONTRIBUTIONS

The Limited Partners shall look solely to the assets of the Partnership for the return of their Capital Contributions, and if the Partnership property remaining after the payment or discharge of the debts, obligations and liabilities of the Partnership is insufficient to return the Capital Contributions made by the Limited Partners, the Limited Partners shall have no recourse therefore against the General Partner or Liquidator, as the case may be.

## XI.     ARTICLE XI ACCOUNTING PROVISIONS

### A.     SECTION 11.01 FISCAL YEAR

The fiscal year of the Partnership shall begin on the date of filing of the Certificate of the Partnership and end on December 31 of the calendar year in which such filing occurs and each subsequent period beginning on January 1 of each calendar year during the existence of the Partnership and ending on the earlier of December 31 of each such calendar year or the date on which the Partnership is deemed to have been dissolved pursuant to the provisions of Article X of this Agreement.

### B.     SECTION 11.02 PARTNERSHIP ELECTIONS

In the case of a distribution of property made in the manner provided in Section 734 of the Code, or in the case of a transfer of a Partnership Interest permitted by this Agreement made in the manner provided in Section

743 of the Code, the General Partner, on behalf of the Partnership, shall file an election under Section 754 of the Code in accordance with the procedures set forth in the applicable Treasury Regulations.

## XII.   ARTICLE XII REPORTS

### A.   SECTION 12.01 REPORTS

Any Partner shall have the right to private audit of the Partnership's books or accounting, provided that such audit is made at the expense of the Partner desiring same and after due and reasonable written notice to the General Partner. All Partnership tax returns, Partner's schedules, and other reports shall be at the expense of the Partnership.

### B.   SECTION 12.02 EMPLOYMENT VERIFICATION

The Partnership shall make commercially reasonable efforts to provide copies of employment records to Limited Partners for use in the Limited Partner's immigration application.

### C.   SECTION 12.03 PARTNERSHIP LIST

The General Partner shall maintain a list of the names and addresses of all Partners at the office of the General Partner. Such list shall be made available for the review of any Partner or its representative at any reasonable time upon adequate written notice.

### D.   SECTION 12.04 ACCESS

The Partners and/or their authorized representative shall be permitted access to all records of the Partnership after adequate written notice, at any reasonable time.

## XIII.   ARTICLE XIII INDEPENDENT ACTIVITIES; TRANSACTIONS WITH AFFILIATES

### A.   SECTION 13.01 DEVOTION OF TIME

The General Partner is not obligated to devote all of its time or business efforts to the affairs of the Partnership. The General Partner shall devote whatever time, effort and skill as it deems appropriate, in its sole discretion, for the operation of the Partnership; provided, however, that in no event will this Section 13.01 excuse the General Partner from performing its express obligations under this Agreement.

### B.   SECTION 13.02 COMPETING ACTIVITIES

The General Partner and its members, managers, officers, employees, Affiliates,

and each of the entities in which any of them hold an interest, may engage or invest in any business activity of any type or description, including, without limitation, those that might be the same as or similar to the Partnership's business and that might be in direct or indirect competition with the Partnership. Neither the Partnership nor any Partner shall have any right in or to such other activities or to the income or proceeds derived there from. Neither the General Partner nor its members, managers, officers, employees, Affiliates and each of the entities in which any of them hold an interest, shall be obligated to present any investment opportunity or prospective economic advantage to the Partnership, even if the opportunity is of the character that, if presented to the Partnership, could be invested in by the Partnership.    The General Partner and its members, managers, officers, employees, Affiliates, and each of the entities in which any of them hold an interest, shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Partnership. The Partners acknowledge that the General Partner and each of its members, managers, officers, employees, and Affiliates own and/or manage or may own and/or manage other businesses, including businesses that may compete with the Partnership and for the General Partner's time.    In particular, the Partners acknowledge that they have been informed that the members, managers, officers and employees of the General Partner intend to serve as members, managers, officers and employees of the general partner of other limited partnerships which may be formed that will seek to raise capital from foreign national investors for investments in other regional centers. The Partners hereby waive any and all rights and claims which they may otherwise have against the General Partner and its members, managers, officers, employees, Affiliates and the entities in which any of them hold an interest, as a result of any such competitive activities.

## XIV.    ARTICLE XIV INDEMNIFICATION OF THE GENERAL PARTNER AND OTHERS

### A.    SECTION 14.01 LIABILITY OF GENERAL PARTNER

To the fullest extent permitted under the Act, the General Partner (and its members, managers, officers, employees, attorneys and agents) shall not be liable to the Partnership or to the Limited Partners for any act or omission performed in good faith and within what was believed to be the scope of Partnership business, unless such General Partner (or its members, managers, officers, employees, attorneys or agents) shall have committed a material violation of the provisions of this Agreement, gross negligence or willful or wanton misconduct.

### B.    SECTION 14.02 INDEMNIFICATION

To the fullest extent permitted under the Act, the Partnership shall indemnify, hold harmless, and defend the General Partner (and its members, managers, officers, employees, attorneys and agents) against any and all claims, actions, demands, costs, expenses (including attorneys' fees), damages and losses as a result of any allegation, claim or legal proceeding relating to any act or omission concerning the activities of

the Partnership, including, without limitation, any act or omission concerning the immigration laws and security laws as they relate to the Partnership and its activities, unless the person or party against whom any such allegation or claim is made, or legal proceeding directed, committed a material violation of the provisions of this Agreement, gross negligence or willful or wanton misconduct. The indemnification of the General Partner (and its members, managers, officers, employees and agents), shall be limited to and recoverable only out of the assets of the Partnership.

## XV.   ARTICLE XV ASSURANCES

### A.   SECTION 15.01 EXECUTION OF DOCUMENTS BY LIMITED PARTNERS

Each Limited Partner agrees to execute all such certificates and other documents conforming hereto and to do all such filing, recording, publishing and other acts as they may be deemed by the General Partner to be appropriate to comply with the requirements of applicable law for the formation and operation of a limited partnership and any amendment or cancellation of any certificate thereof in all jurisdictions where the Partnership shall conduct business, and to comply with the requirements of USCIS for the San Francisco Regional Center to obtain and maintain designation as a USCIS Regional Center.

### B.   SECTION 15.02 FILING OF DOCUMENTS BY THE GENERAL PARTNER

The General Partner shall promptly execute, acknowledge, file with the proper offices and publish in each jurisdiction in which the Partnership conducts business, such notices, certificates, statements or other instruments as may be necessary or appropriate to comply with the requirements for the formation and operation of a limited partnership under the laws of the State of California and all other jurisdictions in which the Partnership may conduct business.

## XVI.   ARTICLE XVI AMENDMENTS

Except as provided in Section 6.05, this Agreement shall not be amended except by the affirmative vote of a Required Majority of Partners; provided, however, that any provisions affecting a Partner's obligation to make Capital Contributions, its Capital Account, or its Unreturned Capital Contribution shall not be amended without such Partner's written consent. If this Agreement is amended, each Partner agrees to promptly execute or cause to be executed one or more amendments to this Agreement and such certificates to reflect the adoption by the Partnership of any such amendment of this Agreement as may be required by the laws of the jurisdictions in which the Partnership does business at such time.

## XVII.   ARTICLE XVII POWER OF ATTORNEY

### A.   SECTION 17.01 APPOINTMENT OF GENERAL PARTNER

Each Limited Partner does hereby irrevocably make, constitute and appoint the General Partner, and any successor thereto, with full power of substitution, as its true and lawful attorney and agent, with full power and authority in its name, place and stead to execute, swear to, acknowledge, deliver, file, publish and record on its behalf (i) one or more certificates of limited partnership as may be required under applicable law; (ii) all instruments (including, without limitation, amended certificates and amendments to this Agreement) which the General Partner deems appropriate or necessary to reflect any amendment, change or modification of the Partnership in accordance with the terms of this Agreement, or as required by applicable law; (iii) certificates of fictitious or assumed name; (iv) all certificates and other instruments and all amendments thereto which the General Partner deems necessary to qualify, or continue the qualification of, the Partnership as a limited partnership wherein the Limited Partners have limited liability in the jurisdiction in which the Partnership may conduct business; (v) all conveyances and other instruments or documents which the General Partner deems necessary to reflect the acquisition, disposition or exchange of any assets of the Partnership, or dissolution and termination of the Partnership pursuant to the terms of this Agreement; and (vi) any amendments to this Agreement or Exhibit A, amended certificates of limited partnership and other documents which relate to the transfer of Partnership Interests or the admission of Substituted or Additional Partners, or the withdrawal of Partners pursuant to the terms of this Agreement.

### B.   SECTION 17.02 SURVIVAL OF POWER OF ATTORNEY

The foregoing Power of Attorney is hereby declared to be irrevocable and a power coupled with an interest, and (to the extent permitted by Applicable Law) it shall survive the incapacity of a Limited Partner or, if such Limited Partner is a corporation, partnership, trust or association, the dissolution or termination thereof. The foregoing Power of Attorney may be exercised by the General Partner by reference to any list, including Exhibit A, of the Limited Partners with the single signature of such attorney-in-fact acting as attorney-in-fact for all of them. It shall survive the delivery of any assignment by a Limited Partner of its interest until the assignee is approved for admission as a Substituted Limited Partner. Each Limited Partner hereby agrees to be bound by any representations made by the General Partner and any successor thereto, acting in good faith pursuant to such Power of Attorney, and each Limited Partner hereby waives any and all defenses which may be available to contest, negate or disaffirm the actions of the General Partner, and any successor thereto taken in good faith under such Power of Attorney.

## XVIII.   ARTICLE XVIII MISCELLANEOUS

### A.   SECTION 18.01 NOTICES

All distributions to Partners, and notices or other communications required or permitted to be given pursuant to this Agreement, shall be considered as properly given or made if hand delivered or mailed from within the United States by first class mail, postage prepaid, and addressed to a Partner or its authorized legal agent at the address of the Partner indicated in this Agreement, as changed from time to time by giving such notice to all Partners. Commencing on the tenth (10th) day after the giving of such notice such newly designated address shall be such Partner's address for the purpose of all notices or other communications required or permitted to be given pursuant to this Agreement. Notices to the Partnership shall be deemed made if given to the General Partner. Time periods shall commence on the date of hand delivery or mailing of a notice or any other communication. Any notice which is required to be given within a stated period of time shall be considered timely if postmarked before midnight of the last day of such period.

## B.    SECTION 18.02 GENDERS AND HEADINGS

The use of any gender herein shall be deemed to be or include the other gender and the use of the singular herein shall be deemed to be or include the plural (and vice-versa), wherever appropriate. The headings herein are inserted only as a matter of convenience and reference and in no way define, limit or describe the scope of this Agreement, or the intent of the provisions thereof.

## C.    SECTION 18.03 BINDING EFFECT

This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns, except as otherwise expressly provided herein.

## D.    SECTION 18.04 COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be considered an original and all of which taken together shall constitute one and the same instrument.

## E.    SECTION 18.05 INTEREST HELD FOR INVESTMENT

Each Limited Partner does hereby represent and warrant by the execution of this Agreement that (A) its Partnership Interest was obtained for investment purposes only and not for resale of distribution, (B) it is qualified by its personal experience to analyze the merits and risks of a contribution to the Partnership, and(C) it has not relied on the advice of the General Partner, or its legal counsel in making its decision to contribute to the Partnership and become a Limited Partner herein.

## F.    SECTION 18.06 SECURITIES LAWS RESTRICTIONS

The Limited Partnership interests described in this Agreement have not been registered under the Applicable Securities Acts. Consequently, the Limited Partnership interests may not be sold, transferred, assigned, pleased, hypothecated or otherwise disposed of, except in accordance with the provisions of the Applicable Securities Acts and this Agreement.

### G.    SECTION 18.07 APPLICATION OF SUBCHAPTER K

No election shall be made by the Partnership, the General Partner, or any other Partner for the Partnership to be excluded from the application of the provisions of Subchapter K of the Code, or from any similar provisions of Applicable California Law and foreign tax laws which relate to the taxation of partnerships.

### H.    SECTION 18.08 WAIVER OF PARTITION

Each Partner (and its representatives, successors and assigns) hereby irrevocably waives any and all right to maintain any actions for partition or to compel any sale with respect to any assets or properties of the Partnership.

### I.    SECTION 18.09 ENTIRE AGREEMENT

This Agreement contains a complete statement of all arrangements among the Parties with respect to the Partnership and cannot be changed or terminated orally or in any manner other then as provided in Section 6.05 or Article XVI. Except as set forth in the Subscription Agreement, there are no representations, agreements, arrangements or understandings (including, but not limited to, any payments to any Partner hereto), oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

### J.    SECTION 18.10 GOVERNING LAW

This Agreement and its interpretation are governed by the laws of the State of California.

## XIX.   ARTICLE XIX REPRESENTATIONS AND WARRANTIES

### A.    SECTION 19.01 REPRESENTATIONS AND WARRANTIES OF ALL LIMITED PARTNERS

Without limiting the generality of Section 18.05 and 18.06, each Limited Partner, by executing and delivering this Agreement (or a counterpart signature page hereto), hereby represents and warrants to the General Partner, the other Partners and the Partnership, as follows:

1.0    The Limited Partner's Partnership Interest is being purchased for such Partner's own account for investment purposes only and not with a view to or for the

39

sale or other distribution thereof.

2.0     The Limited Partner acknowledges that the Limited Partner's Partnership Interest has not been and will not be registered under the 1933 Securities Act, or under the laws of any applicable state jurisdiction; that the Partnership is under no obligation and does not intend to register the Partnership Interest now or in the future; and that, in the absence of a registration of the Partnership Interest or the availability of an exemption from registration, the Limited Partner may have to hold its Partnership Interest indefinitely.

3.0     The Limited Partner acknowledges that (i) there are substantial restrictions on the transferability of the Partnership Interest pursuant to this Agreement; (ii) there is no public market for the Partnership Interest and none is expected to develop; and (iii) it may not be possible for the Partner to liquidate its investment in the Partnership.

4.0     The Limited Partner acknowledges that the Partnership Interest is a speculative investment which involves a substantial degree of risk of loss by the Limited Partner of its entire investment in the Partnership and that the Partnership is newly organized and has no financial or operating history. The Limited Partner further acknowledges that it is able to bear the economic risk of its investment in the Partnership and has read and understands all of the risks set forth in the Subscription Agreement.

5.0     The Limited Partner is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

6.0     The Limited Partner has been advised to consult with its own attorney regarding all legal matters concerning an investment in the Partnership and the tax consequences of participating in the Partnership, and has done so, to the extent the Limited Partner considers necessary.

7.0     The Limited Partner acknowledges that an investment in the Partnership may have tax consequences to the Limited Partner, and neither the Partnership, nor its General Partner, Partners, or officers, nor the partners, members, managers, agents, shareholders, officers, directors, employees, Affiliates or consultants of any of them, will be responsible or liable for the tax consequences to the Limited Partner of an investment in the Partnership. The Limited Partner will look solely to, and rely upon, its own advisers with respect to the tax consequences of this investment.

8.0     The Limited Partner acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Partnership and the Partners of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Partnership or the allocations of items of income, gain, loss, deduction or credit among the Partners may not be challenged by the Internal Revenue Service.

9.0     The Limited Partner has made, and is solely responsible for making, its own

independent evaluation of the economic, credit and other risks involved in its investment in the Partnership and its own independent decision to make such investment; the Limited Partner has been given the opportunity to ask questions of, and receive answers from, the Partnership with respect to the business to be conducted by the Partnership, the financial condition and capital of the Partnership and the terms and conditions of the Offering; and such Limited Partner has been given the opportunity to obtain such additional information necessary to verify the accuracy of the information that was provided in order for such Limited Partner to evaluate the merits and risks of investment in the Partnership to the extent that the Partnership possesses such information or can acquire it without unreasonable effort or expense; such Limited Partner has been furnished with a copy this Agreement and any other documents that such Limited Partner has deemed necessary and adequate in connection with its evaluation of the Offering, and has relied solely on such Limited Partner's own independent evaluation of the economic, credit and other risks involved in its investment in the Partnership in making such Partner's investment decision.

10.0    The Limited Partner acknowledges that no guarantee has been made that an investment in the Partnership will result in the Limited Partner obtaining permanent residence in the United States, and the Limited Partner further acknowledges that neither the Partnership nor the General Partner has any obligation to file any immigration petition or application on behalf the Limited Partner.

11.0    The Limited Partner acknowledges that the Partnership is relying on the Limited Partner's representations set forth in this Section 19.01 in issuing the Partnership Interests without registration under the 1933 Securities Law and without registration or qualification under the laws of all other applicable state jurisdictions.

## B.    SECTION 19.02 REPRESENTATIONS AND WARRANTIES OF U.S. MEMBERS

In the case of a Limited Partner who is a "U.S. Person" (as hereinafter defined), such Limited Partner, by executing and delivering this Agreement (or a counterpart signature page hereto), hereby represents and warrants to the General Partner, the other Partners and the Partnership, as follows:

1.0    The Limited Partner is a "U.S. Person" (as hereinafter defined). For purposes of this Agreement, the term "U.S. Person" means (i) any natural person resident of the United States; (ii) any partnership or corporation organized or incorporated under the laws of the United States; (iii) any estate of which any executor or administrator is a U.S. Person; (iv) any trust of which any trustee is a U.S. Person; (v) any agency or branch of a foreign entity located in the United States; (vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (viii) any partnership or corporation if: (A) organized or incorporated under the laws of any foreign jurisdiction; and (B) formed by a U.S. Person principally for the purpose of investing in

41

securities not registered under the 1933 Securities Law, unless it is organized or incorporated, and owned, by "accredited investors" (as defined in Rule 501(a) of Regulation D, promulgated under the 1933 Securities Law) who are not natural persons, estates or trusts. Additionally, for purposes of this Agreement, "United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

2.0     The Limited Partner acknowledges that the Partnership Interest is being offered by the Partnership without registration under the 1933 Securities Law, or the securities laws of certain states, in reliance on the private offering exemption contained in Regulation D, promulgated under the 1933 Securities Law ("Regulation D"), and in reliance on exemptions from registration or qualification under applicable state laws.

3.0     The Limited Partner is an "accredited investor" as defined in Rule 501(a) of Regulation D.

4.0     With respect to the offer or sale of a Partnership Interest in the State of California, the Limited Partner acknowledges that the Partnership Interest has not been nor will it be qualified under the California Corporate Securities Law of 1968 and the rules and regulations promulgated there under ("1968 Law") in reliance on Section 25102(f) of the 1968 Law and Regulation D; that the Partnership is under no obligation and does not intend to qualify the Partnership Interest now or in the future; and that any Transfer (as hereinafter defined for purposes of this Article XIX) of the Partnership Interest may be limited by the 1968 Law and Regulation D.

5.0     The Limited Partner has either (i) a pre-existing business or personal relationship with the Partnership or its General Partner, officers or controlling persons; or (ii) by reason of its business or financial experience, or the business or financial experience of its professional advisors (who are unaffiliated with and who are not compensated, directly or indirectly, by the Partnership or any Affiliate or selling agent of the Partnership), the Limited Partner has the capacity to protect its own interests in connection with this transaction.

6.0     The Limited Partner shall not offer for sale, sell, transfer, pledge or hypothecate (collectively, for purposes of this Article XIX, "Transfer") or offer to Transfer all or any part of the Partnership Interest unless:

        (a)     The Partnership Interest has been registered under the 1933 Securities Law and the laws of all other applicable state jurisdictions or qualified under the 1968 Law; or

        (b)     The Partnership is given prior written notice of the intended Transfer or offer to Transfer and the Transfer of the Partnership Interest is exempt from registration under the 1933 Securities Law and the laws of all other applicable state jurisdictions and qualification under the 1968 Law and the Limited Partner has forwarded to the Partnership a written opinion of

counsel, satisfactory to the Partnership, confirming that the Transfer is exempt from registration and qualification.

7.0    The Limited Partner understands that the certificates (if any) evidencing the Partnership Interest may bear one (1) or more of the following legends:

(a)    "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH IN THE OPERATING AGREEMENT FOR THIS PARTNERSHIP.

IF ANY PURPORTED TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR ANY INTEREST HEREIN TO A PURCHASER DOES NOT COMPLY WITH THE REQUIREMENTS SET FORTH IN THIS LEGEND OR THE PARTNERSHIP AGREEMENT FOR THIS PARTNERSHIP, THEN THE PURPORTED TRANSFEROR OF THIS SECURITY OR INTEREST HEREIN SHALL BE REQUIRED TO CAUSE THE PURPORTED TRANSFEREE TO SURRENDER THE TRANSFERRED INTEREST OR ANY INTEREST THEREIN IN RETURN FOR A REFUND OF THE CONSIDERATION PAID THEREFORE BY SUCH TRANSFEREE (TOGETHER WITH INTEREST THEREON) OR TO CAUSE THE PURPORTED TRANSFEREE TO DISPOSE OF SUCH SECURITY OR INTEREST PROMPTLY TO ONE OR MORE PERSONS EACH OF WHOM SATISFIES THE REQUIREMENTS OF THE REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS LEGEND AND THE PARTNERSHIP AGREEMENT FOR THE PARTNERSHIP, AND SUCH PURPORTED TRANSFEROR SHALL TAKE AND SHALL CAUSE SUCH TRANSFEREE TO TAKE, ALL FURTHER ACTION NECESSARY OR DESIRABLE, IN THE JUDGMENT OF THIS PARTNERSHIP TO INSURE THAT SUCH SECURITY OR ANY INTEREST THEREIN IS HELD BY PERSONS IN COMPLIANCE THEREWITH.   ANY TRANSFER IN VIOLATION OF THE FOREGOING PROVISIONS OF THIS LEGEND OR THE PARTNERSHIP AGREEMENT FOR THE PARTNERSHIP WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THIS PARTNERSHIP."

(b)     Any legend required by applicable state securities laws.

8.0     The Limited Partner acknowledges that if any purported Transfer of the Partnership Interest or any interest therein to a purchaser does not comply with the requirements set forth in this Agreement, then the purported transferor of the Partnership Interest or interest therein shall be required to cause the purported transferee to surrender the transferred Partnership Interest or any interest therein in return for a refund of the consideration paid therefore by such transferee (together with interest thereon) or to cause the purported transferee to dispose of such Partnership Interest or interest promptly to one or more persons each of whom satisfies the requirements of the representations, warranties and covenants set forth in this Agreement, and such purported transferor shall take and shall cause such transferee to take, all further action necessary or desirable, in the judgment of the Partnership to insure that such Partnership Interest or any interest therein is held by persons in compliance herewith. Any transfer in violation of this Agreement will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, not withstanding any instructions to the contrary to the Partnership.

9.0     The Limited Partner acknowledges and agrees that he or she (i) initiated discussions with the Partnership relating to the purchase of the Partnership Interest on an unsolicited basis, (ii) did not receive any information regarding such purchase and sale through any general solicitation or general advertising within the meaning of Rule 502 of Regulation D, promulgated under the 1933 Securities Act, and (iii) is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D, promulgated under the 1933 Securities Act.

10.0     The Limited Partner acknowledges that the Partnership shall, in connection with the Partnership Interests sold to a U.S. Person pursuant to this Agreement, issue stop transfer instructions to the Partnership's transfer agent, if any, with respect to such Partnership Interests, or, if the Partnership transfers its own Partnership Interests, make a notation in the appropriate records of the Partnership prohibiting any resales, Transfers or other dispositions of the Partnership Interests in violation of this Agreement.

11.0     The Limited Partner acknowledges that the Partnership is relying on the Limited Partner's representations set forth in this Section 19.02 in issuing the Partnership Interests without registration under the 1933 Securities Law and the laws of all other applicable state jurisdictions and qualification under the 1968 Law.

## C.     SECTION 19.03 REPRESENTATIONS AND WARRANTIES OF NON-U.S. LIMITED PARTNERS

In the case of a Limited Partner who is not a U.S. Person, such Limited Partner, by executing and delivering this Agreement (or a counterpart signature page hereto), hereby represents and warrants to the General Partner, the other Partners and the Partnership, as follows:

1.0    The Limited Partner acknowledges that the Limited Partner's Partnership Interest has not been and will not be registered under the 1933 Securities Law in reliance upon the exemption provided by Regulation S promulgated under Section 5 of the 1933 Securities Law ("Regulation S"), which provides an exemption for the offer and sale of securities to non-U.S. Persons, who at the time a buy order for the Partnership Interest is originated, is outside the United States.

2.0    The Limited Partner is not a U.S. Person.

3.0    The Limited Partner is an "accredited investor" as defined in Rule 501(a) of Regulation D.

4.0    The Limited Partner's Partnership Interest is not being purchased for the account or the benefit of a U.S. Person.

5.0    At the time the buy order for the Partnership Interest is originated, the Limited Partner is outside the United States in accordance with Regulation S. The Limited Partner has not entered into any discussions regarding its acquisition of its Partnership Interest, and is not acquiring its Partnership Interest, while it is in the United States.

6.0    The Limited Partner acknowledges that it is acquiring the Partnership Interest without (i) any directed selling efforts made in the United States by the Partnership, a distributor of the Partnership, any of their respective affiliates, or any persons acting on behalf of any of the foregoing, and (ii) any advertisement or publication by the Partnership in violation of Regulation S.

7.0    The Limited Partner understands that the Partnership Interest has not been registered under the 1933 Securities Law in reliance upon the exemption provided by Regulation S and, therefore, the Limited Partner agrees:

(a)    the Partnership Interest (or any interest therein) may not be Transferred except (a) only in accordance with the provisions of Regulation S (Rule 901 through 905, and Preliminary Notes contained therein), or (b) if either (A) the Partnership Interest has been registered under the 1933 Securities Law and the laws of all other applicable state jurisdictions or qualified under the 1968 Law, or (B) the Transfer of the Partnership Interest is exempt from registration under the 1933 Securities Law and the laws of all other applicable state jurisdictions and qualification under the 1968 Law and the Limited Partner has forwarded to the Partnership a written opinion of counsel, satisfactory to the Partnership, confirming that the Transfer is exempt from registration and qualification; and

(b)    not to engage in hedging transactions with regard to the Partnership Interest unless in compliance with the 1933 Securities Law.

8.0    The Limited Partner understands that the certificates (if any) evidencing the

45

Partnership Interest may bear one (1) or more of the following legends:

(i) "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE IN THE UNITED STATES OR ANY OTHER JURISDICTION, AND MAY NOT BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT ("REGULATION S") (RULE 901 THROUGH 905, AND PRELIMINARY NOTES CONTAINED THEREIN), PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT AND REGISTRATION OR QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION OR QUALIFICATION. HEDGING TRANSACTIONS INVOLVING THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH IN THE PARTNERSHIP AGREEMENT FOR THIS PARTNERSHIP.

IF ANY PURPORTED TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR ANY INTEREST HEREIN TO A PURCHASER DOES NOT COMPLY WITH THE REQUIREMENTS SET FORTH IN THIS LEGEND OR THE PARTNERSHIP AGREEMENT FOR THIS PARTNERSHIP, THEN THE PURPORTED TRANSFEROR OF THIS SECURITY OR INTEREST HEREIN SHALL BE REQUIRED TO CAUSE THE PURPORTED TRANSFEREE TO SURRENDER THE TRANSFERRED INTEREST OR ANY INTEREST THEREIN IN RETURN FOR A REFUND OF THE CONSIDERATION PAID THEREFORE BY SUCH TRANSFEREE (TOGETHER WITH INTEREST THEREON) OR TO CAUSE THE PURPORTED TRANSFEREE TO DISPOSE OF SUCH SECURITY OR INTEREST PROMPTLY TO ONE OR MORE PERSONS EACH OF WHOM SATISFIES THE REQUIREMENTS OF THE REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS LEGEND AND THE PARTNERSHIP AGREEMENT FOR THE PARTNERSHIP, AND SUCH PURPORTED TRANSFEROR SHALL TAKE AND SHALL CAUSE SUCH TRANSFEREE TO TAKE, ALL FURTHER ACTION NECESSARY OR DESIRABLE, IN THE JUDGMENT OF THIS PARTNERSHIP TO INSURE THAT SUCH SECURITY OR ANY INTEREST THEREIN IS HELD BY PERSONS IN COMPLIANCE THEREWITH. ANY TRANSFER IN VIOLATION OF THE FOREGOING PROVISIONS OF THIS LEGEND OR THE PARTNERSHIP AGREEMENT FOR THE PARTNERSHIP WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THIS PARTNERSHIP."

        (ii)     Any legend required by applicable state securities laws.

9.0   The Limited Partner acknowledges that if any purported transfer of the Partnership Interest or any interest therein to a purchaser does not comply with the requirements set forth in this Agreement, then the purported transferor of the Partnership Interest or interest therein shall be required to cause the purported transferee to surrender the transferred Partnership Interest or any interest therein in return for a refund of the consideration paid therefore by such transferee (together with interest thereon) or to cause the purported transferee to dispose of such Partnership Interest or interest promptly to one or more persons each of whom satisfies the requirements of the representations, warranties and covenants set forth in this Agreement, and such purported transferor shall take and shall cause such transferee to take, all further action necessary or desirable, in the judgment of the Partnership to insure that such Partnership Interest or any interest therein is held by persons in compliance herewith.  Any transfer in violation of this Agreement will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, not withstanding any instructions to the contrary to the Partnership.

10.0   The Limited Partner acknowledges that the Partnership is relying on the Limited Partner's representations set forth in this Section 19.03 in issuing the Partnership Interests without registration under the 1933 Securities Law and without registration or qualification under the laws of all applicable state jurisdictions.

11.0   The Limited Partner acknowledges that the Partnership shall, in connection with the Partnership Interests sold to non-U.S. Persons, pursuant to this Agreement, issue stop transfer instructions to the Partnership's transfer agent, if any, with respect to such Partnership Interests, or, if the Partnership transfers its own Partnership Interests, make a notation in the appropriate records of the Partnership prohibiting any resales, Transfers or other dispositions of the Partnership Interests in violation of this Agreement.

[The Remainder of This Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the General Partner, on its own behalf and on behalf of the Limited Partners, executed this Agreement as of the Effective Date, and the Partners hereby agree to all of the foregoing.

<u>**GENERAL PARTNER:**</u>

**COMPREHENSIVE CARE OF CALIFORNIA LLC,**
**a California limited liability company**

By: *Thomas M Henderson*

Thomas M. Henderson, on behalf of San Francisco Regional Center LLC, Managing Member

**Appointed Attorney and Agent of Limited Partners**

**COMPREHENSIVE CARE OF CALIFORNIA LLC,**
**a California limited liability company**

By: *Thomas M Henderson*

Thomas M. Henderson, on behalf of San Francisco Regional Center LLC, Managing Member

**INVESTOR:**

*Zhao Xiao Qing* 赵小青
**Type or print name of Investor**

*Zhao Xiao Qing*
**Signature of Investor**

*2011. 04. 01*
**Date**

48

# EXHIBIT 3

## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $2,000,000.00 | 01-29-2014 | 01-28-2021 | REDACTED | 17 / 9 | REDACTED | 176 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Comprehensive Care of Oakland, L.P.
1833 10th Avenue
Oakland, CA 94606

**Lender:** Summit Bank
OAKLAND OFFICE
2969 BROADWAY
OAKLAND, CA 94611

---

**Principal Amount: $2,000,000.00**                  **Date of Note: January 29, 2014**

**PROMISE TO PAY.** Comprehensive Care of Oakland, L.P. ("Borrower") promises to pay to Summit Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million & 00/100 Dollars ($2,000,000.00), together with interest on the unpaid principal balance from January 29, 2014, until paid in full.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 83 regular payments of $11,479.40 each and one irregular last payment estimated at $1,667,445.12. Borrower's first payment is due February 28, 2014, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on January 28, 2021, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is Lender's Prime Rate (the "Index"). This is the rate Lender charges, or would charge, on 90-day unsecured loans to the most creditworthy corporate customers. This rate may or may not be the lowest rate available from Lender at any given time. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day as Summit Bank's Prime Rate changes. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.500 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.750%. NOTICE: Under no circumstances will the interest rate on this Note be less than 4.750% per annum or more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Summit Bank
2969 Broadway
Oakland, CA 94611

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 4:00 PM Pacific Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Summit Bank, 2969 Broadway Oakland, CA 94611.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 4.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency

**PROMISSORY NOTE**
**(Continued)**

of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**FINANCIAL STATEMENTS.** Borrower agrees to provide Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ALAMEDA County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated January 29, 2014, to a trustee in favor of Lender on real property located in Alameda County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Borrower is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Borrower. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B) an Assignment of All Rents to Lender on real property located in Alameda County, State of California.

(C) inventory, chattel paper, accounts, equipment, general intangibles and fixtures described in a Commercial Security Agreement dated January 29, 2014.

**CHANGES TO YOUR PAYMENT AMOUNT.** Your regularly scheduled monthly principal and interest loan payment will be changed at the time the index to which your interest rate is tied changes. Your new monthly payment amount will become effective on your payment date in the month following the change in the loan index. Your new payment amount will be based upon the then outstanding principal balance and interest rate amortized over the remaining term of your loan to an amount which the Bank believes will repay the outstanding principal balance and all accrued unpaid interest. If the index for your loan increases, your payment amount will increase; and if the index decreases your payment amount may, but not necessarily will, decrease. Any changes in your payment amount will also reflect the effect of any late payments and the inclusion of any other charges added to the principal balance of your loan.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Summit Bank 2969 Broadway Oakland, CA 94611.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for

**EXHIBIT 4**

**KAISER PERMANENTE.**

## HEALTH CARE SERVICES AGREEMENT

the right to pursue and collect such claims for its own account, and Contractor agrees to assist Payor's collection efforts by Promptly informing Payor of Services provided by Contractor for which there may be potential third party liability.

3.6 **Changes to Payment Rates.** Either party may propose a change to the rate of compensation with at least sixty (60) Calendar Days Notice, provided, however, that the effective date of the rate change occurs after the Base Period, including contractual extensions thereto, if any. The payment rates in effect as of the date of submission of such proposed changes shall remain in effect unless the parties mutually agree to a change to the payment rates and execute a written amendment to this Agreement.

3.7 **Interest.** Payor shall pay Contractor any interest and penalties on late payment of Claims only as required by applicable Law. The parties acknowledge that the Law on applicable interest and penalties may differ according to the type of Member receiving Covered Services.

## ARTICLE 4. TERM AND TERMINATION

4.1 **Term.** This Agreement will begin on the Effective Date, will proceed for at least the Base Period (which shall not be less than one (1) year) and thereafter continue until such time that one or more parties terminate the Agreement in accordance with the terms of this Agreement.

4.2 **Termination of This Agreement.**

4.2.1 **General Termination Rights.** Any party to the Agreement may terminate this Agreement as to such party's participation at any time, effective after the completion of the Base Period, for any reason or no reason, upon one (1) year prior Notice, or such other period set forth in the Exhibits. In such an event, the parties will comply with the requirements of Article 8 (Notice) and all other applicable provisions of this Agreement.

4.2.2 **For Cause.** This Agreement may be terminated for cause for any of the following events:

4.2.2.1 Material breach of this Agreement by KPCP or Contractor, Including a failure by Contractor to meet the availability requirements set forth in this Agreement or to cooperate with KP's QI standards;

4.2.2.2 To the extent expressly afforded by Law, failure by KPCP and Contractor to reach agreement as to a material modification to the Provider Manual applicable to KPCP or KPMCP Affiliated Payors (other than a modification that is required by Law or the requirements imposed upon KPMCP by an accrediting or regulatory agency, or in order for KPMCP to participate in government-funded KPMCP products) that KP has determined will be implemented and effective with respect to Contractor notwithstanding Contractor's written objection to the modification;



**KAISER PERMANENTE®**

## HEALTH CARE SERVICES AGREEMENT

4.2.2.3   Failure by Contractor to materially comply with any Program Requirements (other than licensure, certification and permit requirements subject to Section 4.2.2.4);

4.2.2.4   Failure by Contractor to maintain any licenses, certifications or permits required to perform its obligations under this Agreement;

4.2.2.5   Any misrepresentation or falsification of any licensure, credentialing or recredentialing information submitted by Contractor;

4.2.2.6   Contractor's dissolution, merger or consolidation, or the sale of all or substantially all of Contractor's assets, or a change of control in Contractor's ownership or legal structure;

4.2.2.7   Any act or conduct by Contractor or Subcontractor which threatens the health, safety or legal privacy rights of any Member;

4.2.2.8   Failure by Contractor or Subcontractor to comply with the insurance requirements in Article 9 (Insurance and Indemnification);

4.2.2.9   Contractor's filing of a petition in or for bankruptcy, reorganization or an arrangement with creditors; making a general assignment for the benefit of creditors; being adjudged bankrupt; being unable to pay debts as they come due; having a trustee, receiver or other custodian appointed on its behalf; or having a case or proceeding commenced against it under any bankruptcy or insolvency law;

4.2.2.10  Contractor's, Subcontractor's, Practitioner's or Facility's sanction under or debarment from or exclusion from any federal program, Including Medicare or Medicaid; or

4.2.2.11  Incapability of Contractor to perform Services, or failure to adequately provide such Services.

4.2.3   **Cure Period.**  The nonbreaching party shall notify the breaching party of the breach in a manner that complies with the requirements of Article 8 (Notice) and all other applicable provisions of this Agreement ("Proper Notice"). For those causes set forth in Sections 4.2.2.1, 4.2.2.2 and 4.2.2.3, or any other cause not specified above, the breaching party will have thirty (30) Calendar Days from receipt of the Proper Notice, or such later time as is specified by the nonbreaching party, to cure such breach to the satisfaction of the nonbreaching party ("Cure Period"). For those causes set forth in Sections 4.2.2.4 through 4.2.2.11, KPCP may specify a shorter or longer Cure Period, Including the option of no cure period. At the close of the Cure Period, the nonbreaching party shall send Notice to the breaching party which shall either (i) confirm that the breach has been cured, or (ii) invoke the right to terminate the Agreement ("Termination Notice").

4.2.4   **For Cause Termination Notice Period.**  If the nonbreaching party sends a Termination Notice, the termination shall be effective ninety (90) Calendar Days, or such later date as

# EXHIBIT 5



# MEDICARE ENROLLMENT APPLICATION

## INSTITUTIONAL PROVIDERS

## CMS-855A

**SEE PAGE 1 TO DETERMINE IF YOU ARE COMPLETING THE CORRECT APPLICATION**

**SEE PAGE 3 FOR INFORMATION ON WHERE TO MAIL THIS APPLICATION.**

**SEE PAGE 52 TO FIND A LIST OF THE SUPPORTING DOCUMENTATION THAT MUST BE SUBMITTED WITH THIS APPLICATION.**



DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0685

## WHO SHOULD COMPLETE THIS APPLICATION

Institutional providers can apply for enrollment in the Medicare program or make a change in their enrollment information using either:

- The Internet-based Provider Enrollment, Chain and Ownership System (PECOS), or
- The paper enrollment application process (e.g., CMS 855A).

For additional information regarding the Medicare enrollment process, including Internet-based PECOS, go to *www.cms.gov/MedicareProviderSupEnroll*.

Institutional providers who are enrolled in the Medicare program, but have not submitted the CMS 855A since 2003, are required to submit a Medicare enrollment application (i.e., Internet-based PECOS or the CMS 855A) as an initial application when reporting a change for the first time.

The following health care organizations must complete this application to initiate the enrollment process:

- Community Mental Health Center
- Comprehensive Outpatient Rehabilitation Facility
- Critical Access Hospital
- End-Stage Renal Disease Facility
- Federally Qualified Health Center
- Histocompatibility Laboratory
- Home Health Agency
- Hospice
- Hospital
- Indian Health Services Facility
- Organ Procurement Organization
- Outpatient Physical Therapy/Occupational Therapy /Speech Pathology Services
- Religious Non-Medical Health Care Institution
- Rural Health Clinic
- Skilled Nursing Facility

If your provider type is not listed above, contact your designated fee-for-service contractor before you submit this application.

Complete this application if you are a health care organization and you:

- Plan to bill Medicare for Part A medical services, or
- Would like to report a change to your existing Part A enrollment data. A change must be reported within 90 days of the effective date of the change; per 42 C.F.R. 424.516(e), changes of ownership or control must be reported within 30 days of the effective date of the change.

## BILLING NUMBER INFORMATION

The National Provider Identifier (NPI) is the standard unique health identifier for health care providers and is assigned by the National Plan and Provider Enumeration System (NPPES). **Medicare healthcare providers, except organ procurement organizations, must obtain an NPI prior to enrolling in Medicare or before submitting a change to your existing Medicare enrollment information.** Applying for an NPI is a process separate from Medicare enrollment. To obtain an NPI, you may apply online at *https://NPPES.cms.hhs.gov*. As an organizational health care provider, it is your responsibility to determine if you have "subparts." A subpart is a component of an organization that furnishes healthcare and is not itself a legal entity. If you do have subparts, you must determine if they should obtain their own unique NPIs. Before you complete this enrollment application, you need to make those determinations and obtain NPI(s) accordingly.

**IMPORTANT: For NPI purposes, sole proprietors and sole proprietorships are considered to be "Type 1" providers. Organizations (e.g., corporations, partnerships) are treated as "Type 2" entities. When reporting the NPI of a sole proprietor on this application, therefore, the individual's Type 1 NPI should be reported; for organizations, the Type 2 NPI should be furnished**.

For more information about subparts, visit *www.cms.gov/NationalProvIdentStand* to view the "Medicare Expectations Subparts Paper."

The Medicare Identification Number, often referred to as the CMS Certification Number (CCN) or Medicare "legacy" number, is a generic term for any number other than the NPI that is used to identify a Medicare provider.

## INSTRUCTIONS FOR COMPLETING AND SUBMITTING THIS APPLICATION

- Type or print all information so that it is legible. Do not use pencil.
- Report additional information within a section by copying and completing that section for each additional entry.
- Attach all required supporting documentation.
- Keep a copy of your completed Medicare enrollment package for your records.
- Send the completed application with original signatures and all required documentation to your designated Medicare fee-for-service contractor.

## AVOID DELAYS IN YOUR ENROLLMENT

To avoid delays in the enrollment process, you should:
- Complete all required sections.
- Ensure that the legal business name shown in Section 2 matches the name on the tax documents.
- Ensure that the correspondence address shown in Section 2 is the provider's address.
- Enter your NPI in the applicable sections.
- Enter all applicable dates.
- Ensure that the correct person signs the application.
- Send your application and all supporting documentation to the designated fee-for-service contractor.

## OBTAINING MEDICARE APPROVAL

The usual process for becoming a certified Medicare provider is as follows:

1. The applicant completes and submits a CMS-855A enrollment application and all supporting documentation to its fee-for-service contractor.

2. The fee-for-service contractor reviews the application and makes a recommendation for approval or denial to the State survey agency, with a copy to the CMS Regional Office.

3. The State agency or approved accreditation organization conducts a survey. Based on the survey results, the State agency makes a recommendation  for approval or denial (a certification of compliance or noncompliance) to the CMS Regional Office. Certain provider types may elect voluntary accreditation by a CMS-recognized accrediting organization in  lieu of a State survey.

4. A CMS contractor conducts a second contractor review, as needed, to verify that a provider continues to meet the enrollment requirements prior to granting Medicare billing privileges.

5. The CMS Regional Office makes the final decision regarding program eligibility. The CMS Regional Office also works with the Office of Civil Rights to obtain necessary Civil Rights clearances. If approved, the provider must typically sign a provider agreement.

## ADDITIONAL INFORMATION

For additional information regarding the Medicare enrollment process, visit *www.cms.gov/MedicareProviderSupEnroll*.

The fee-for-service contractor may request, at any time during the enrollment process, documentation to support or validate information reported on the application. You are responsible for providing this documentation in a timely manner.

The information you provide on this application will not be shared. It is protected under 5 U.S.C. Section 552(b)(4) and/or (b)(6), respectively. For more information, see the last page of this application for the Privacy Act Statement.

## MAIL YOUR APPLICATION

The Medicare fee-for-service contractor (also referred to as a fiscal intermediary or a Medicare administrative contractor) that services your State is responsible for processing your enrollment application. To locate the mailing address for your fee-for-service contractor, go to *www.cms.gov/MedicareProviderSupEnroll*.

## SECTION 1: BASIC INFORMATION

### NEW ENROLLEES

If you are:
- Enrolling with a particular fee-for-service contractor for the first time.
- Undergoing a change of ownership where the new owner will not be accepting assignment of the Medicare assets and liabilities of the seller/former owner.

### ENROLLED MEDICARE PROVIDERS

The following actions apply to Medicare providers already enrolled in the program:

**Reactivation**
To reactivate your Medicare billing privileges, submit this enrollment application. In addition, you must be able to submit a valid claim and meet all current requirements for your provider type before reactivation can occur.

**Voluntary Termination**
A provider should voluntarily terminate its Medicare enrollment when:

- It will no longer be rendering services to Medicare patients,
- It is planning to cease (or has ceased) operations,
- There has been an acquisition/merger and the new owner will not be using the identification number of the entity it has acquired,
- There has been a consolidation and the identification numbers of the consolidating providers will no longer be used, or
- There has been a change of ownership and the new owner will not be accepting assignment of the Medicare assets and liabilities of the seller/former owner, meaning that the number of the seller/former owner will no longer be used.

**NOTE:** A voluntary identification number termination cannot be used to circumvent any corrective action plan or any pending/ongoing investigation, nor can it be used to avoid a period of reasonable assurance, where a provider must operate for a certain period without recurrence of the deficiencies that were the basis for the termination. The provider will not be reinstated until the completion of the reasonable assurance period.

**Change of Ownership (CHOW)**
A CHOW typically occurs when a Medicare provider has been purchased (or leased) by another organization. The CHOW results in the transfer of the old owner's Medicare Identification Number and provider agreement (including any outstanding Medicare debt of the old owner) to the new owner. The regulatory citation for CHOWs can be found at 42 C.F.R. 489.18. If the purchaser (or lessee) elects not to accept a transfer of the provider agreement, then the old agreement should be terminated and the purchaser or lessee is considered a new applicant.

## SECTION 1: BASIC INFORMATION *(Continued)*

**Acquisition/Merger**

An acquisition/merger occurs when a currently enrolled Medicare provider is purchasing or has been purchased by another enrolled provider. Only the purchaser's Medicare Identification Number and tax identification number remain.

Acquisitions/mergers are different from CHOWs. In the case of an acquisition/merger, the seller/former owner's Medicare Identification Number dissolves. In a CHOW, the seller/former owner's provider number typically remains intact and is transferred to the new owner.

**Consolidation**

A consolidation occurs when two or more enrolled Medicare providers consolidate to form a new business entity.

Consolidations are different from acquisitions/mergers. In an acquisition/merger, two entities combine but the Medicare Identification Number and tax identification number (TIN) of the purchasing entity remain intact. In a consolidation, the TINs and Medicare Identification Numbers of the consolidating entities dissolve and a new TIN and Medicare Identification Number are assigned to the new, consolidated entity.

> Because of the various situations in which a CHOW, acquisition/merger, or consolidation can occur, it is recommended that the provider contact its fee-for-service contractor or its CMS Regional Office if it is unsure as to whether such a transaction has occurred. The provider should also review the applicable federal regulation at 42 C.F.R. 489.18 for additional guidance.

**Change of Information**

A change of information should be submitted if you are changing, adding, or deleting information under your current tax identification number. Changes in your existing enrollment data must be reported to the Medicare fee-for-service contractor in accordance with 42 C.F.R. 424.516(e).

**NOTE:** Ownership changes that do not qualify as CHOWs, acquisitions/mergers, or consolidations should be reported here. The most common example involves stock transfers. For instance, assume that a business entity's stock is owned by A, B, and C. A sells his stock to D. While this is an ownership change, it is generally not a formal CHOW under 42 C.F.R. 489.18. Thus, the ownership change from A to D should be reported as a change of information, not a CHOW. If you have any questions on whether an ownership change should be reported as a CHOW or a change of information, contact your fee-for-service contractor or CMS Regional Office.

If you are already enrolled in Medicare and are not receiving Medicare payments via EFT, any change to your enrollment information will require you to submit a CMS-588 application. All future payments will then be made via EFT.

**Revalidation**

CMS may require you to submit or update your enrollment information. The fee-for-service contractor will notify you when it is time for you to revalidate your enrollment information. Do not submit a revalidation application until you have been contacted by the fee-for-service contractor.

# EXHIBIT 6

State of California—Health and Human Services Agency                                    Department of Health Care Services



## MEDI-CAL PROVIDER AGREEMENT
### (Institutional Provider)
### (To Accompany Applications for Enrollment)*

| | FOR STATE USE ONLY |
|---|---|

*Do not use* staples *on this form or on any attachments.*
*Type or print clearly in ink.  If you must make corrections, please line through, date, and initial in ink.*
*Do not leave any questions, lines, etc. blank.  Enter N/A if not applicable to you.*

| Date |
|---|
| 7 / 1 /2012 |

| Legal name of applicant or provider (as listed with the IRS) | Business name (if different than legal name) |
|---|---|
| Comprehensive Care of Oakland, L.P. | Bay Area Healthcare Center |

| Provider number (NPI number) | | | Business Telephone Number |
|---|---|---|---|
| <span style="color:red">REDACTED</span> | | | ( 510 ) 536-6512 |

| Business address (number, street) | City | State | Nine-digit ZIP code |
|---|---|---|---|
| 1833 - 10th Avenue | Oakland | CA | 94606-3023 |

| Mailing address (number, street, P.O. Box number) | City | State | Nine-digit ZIP code |
|---|---|---|---|
| 1833 - 10th Avenue | Oakland | CA | 94606-3023 |

| Pay-to address (number, street, P.O. Box number) | City | State | Nine-digit ZIP code |
|---|---|---|---|
| 1833 - 10th Avenue | Oakland | CA | 94606-3023 |

| Previous business address (number, street, P.O. Box number) | City | State | Nine-digit ZIP code |
|---|---|---|---|
| N/A | | | |

| Taxpayer Identification Number** |
|---|
| <span style="color:red">REDACTED</span> |

**EXECUTION OF THIS PROVIDER AGREEMENT BETWEEN AN APPLICANT OR PROVIDER (HEREINAFTER JOINTLY REFERRED TO AS "PROVIDER") AND THE DEPARTMENT OF HEALTH CARE SERVICES (HEREINAFTER "DHCS"), IS MANDATORY FOR PARTICIPATION OR CONTINUED PARTICIPATION AS A PROVIDER IN THE MEDI-CAL PROGRAM PURSUANT TO 42 UNITED STATES CODE, SECTION 1396a(a)(27), TITLE 42, CODE OF FEDERAL REGULATIONS, SECTION 431.107, WELFARE AND INSTITUTIONS CODE, SECTION 14043.2, AND TITLE 22, CALIFORNIA CODE OF REGULATIONS, SECTION 51000.30(a)(2).**

**AS A CONDITION FOR PARTICIPATION OR CONTINUED PARTICIPATION AS A PROVIDER IN THE MEDI-CAL PROGRAM, PROVIDER AGREES TO COMPLY WITH ALL OF THE FOLLOWING TERMS AND CONDITIONS, AND WITH ALL OF THE TERMS AND CONDITIONS INCLUDED ON ANY ATTACHMENT(S) HERETO, WHICH IS/ARE INCORPORATED HEREIN BY REFERENCE:**

1. **Term and Termination.** This Agreement will be effective from the date applicant is enrolled as a provider by DHCS, or, from the date provider is approved for continued enrollment.  Provider may terminate this Agreement by providing DHCS with written notice of intent to terminate, which termination shall result in Provider's immediate disenrollment and exclusion (without formal hearing under the Administrative Procedure Act) from further participation in the Medi-Cal program, including deactivation of any provider agreement, unless and until such time as Provider is re-enrolled by DHCS in the Medi-Cal Program. DHCS may immediately terminate this Agreement for cause if Provider is suspended/excluded for any of the reasons set forth in Paragraph 25(a) below, which termination will result in Provider's immediate disenrollment and exclusion (without formal hearing under the Administrative Procedures Act) from further participation in the Medi-Cal program.

2. **Compliance With Laws and Regulations.** Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters.  Provider further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or any other regulations promulgated by DHCS pursuant to these Chapters, it may be subject to all sanctions or other remedies available to DHCS. Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers.

---

* Every applicant and provider must execute this Provider Agreement.
** The taxpayer identification number may be a Taxpayer Identification Number (TIN) or a social security number for sole proprietors.

DHCS 9098 (6/10)                                                                                        Page 1 of 8

3. **National Provider Identifier (NPI).** Provider agrees not to submit any treatment authorization requests (TARs) or claims to DHCS using an NPI unless that NPI is appropriately registered for this provider with the Centers for Medicare and Medicaid Services (CMS) and is in compliance with all NPI requirements established by CMS as of the date the claim is submitted. Provider agrees that submission of an NPI to DHCS as part of an application to use that NPI to obtain payment constitutes an implied representation that the NPI submitted is appropriately registered and in compliance with all CMS requirements at the time of submission.  Provider also agrees that any subsequent defect in registration or compliance of the NPI constitutes an "addition or change in the information previously submitted" which must be reported to DHCS under the requirements of Title 22, California Code of Regulations, Section 51000.40 and 51000.52(b).

4. **Forbidden Conduct.** Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

5. **Nondiscrimination.** Provider agrees that it shall not exclude or deny aid, care, service or other benefits available under Medi-Cal or in any other way discriminate against any Medi-Cal patient because of that person's race, color, ancestry, marital status, national origin, gender, age, economic status, physical or mental disability, political or religious affiliation or beliefs in accordance with California and federal laws.  In addition, Provider shall not discriminate against Medi-Cal beneficiaries in any manner, including, but not limited to, admission practices, room selection and placement, meals provision and waiting time for surgical procedures. Without exception, Provider shall provide to Medi-Cal patients their specific Medi-Cal benefit inpatient services in the same manner as Provider also directly, or indirectly, renders those same services to non-Medi-Cal patients, regardless of payor source.

6. **Scope of Health and Medical Care.** Provider agrees that the health care services it provides may include diagnostic, preventive, corrective, and curative services, goods, supplies, and merchandise essential thereto, provided by qualified personnel for conditions that cause suffering, endanger life, result in illness or infirmity, interfere with capacity for normal activity, including employment, or for conditions which may develop into some significant handicap or disability. Provider further agrees such health care services may be subject to prior authorization to determine medical necessity.

7. **Licensing.** Provider agrees to possess at the time this Agreement becomes effective, and to maintain in good standing throughout the term of this Agreement, valid and unexpired license(s), certificate(s), or other approval(s) to provide health care services, which is appropriate to the services, goods, supplies, and merchandise being provided, if required by the state or locality in which Provider is located, or by the Federal Government. Provider further agrees it shall be automatically suspended as a provider in the Medi-Cal program pursuant to Welfare and Institutions Code, Section 14043.6, if Provider has license(s), certificate(s), or other approval(s) to provide health care services, which are revoked or suspended by a federal, California, or another state's licensing, certification, or approval authority, has otherwise lost that/those license(s), certificate(s), or approval(s), or has surrendered that/those license(s), certificate(s), or approval(s) while a disciplinary hearing on that/those license(s), certificate(s), or approval(s) was pending. Such suspension shall be effective on the date that Provider's license, certificate, or approval was revoked, suspended, lost, or surrendered.  Provider further agrees to notify DHCS within ten business days of learning that any restriction has been placed on, or of a suspension of Provider's license, certificate, or other approval to provide health care. Provider further agrees to provide DHCS complete information related to any restriction to, or revocation or loss of, Provider's license, certificate, or other approval to provide health care services.

8. **Record Keeping and Retention.** Provider agrees to make, keep and maintain in a systematic and orderly manner, and have readily retrievable, such records as are necessary to fully disclose the type and extent of all services, goods, supplies, and merchandise provided to Medi-Cal beneficiaries, including, but not limited to, the records described in Section 51476 of Title 22, California Code of Regulations, and the records described in Section 431.107 of Title 42 of the Code of Federal Regulations. Provider further agrees that such records shall be made at or near the time at which the services, goods, supplies, and merchandise are delivered or rendered, and that such records shall be retained by Provider in the form in which they are regularly kept for a period of three years from the date the goods, supplies, or merchandise were delivered or the services rendered or a claim was submitted. Providers using billing agents shall assure that the billing agents maintain and submit documents required.

9. **DHCS, CDPH, AG and Secretary Access to Records; Copies of Records.** Provider agrees to make available, during regular business hours, all pertinent financial records, all records of the requisite insurance coverage, and all records concerning the provision of health care services to Medi-Cal beneficiaries to any duly authorized representative of DHCS, CDPH, the California Attorney General's Medi-Cal Fraud Unit ("AG") or the Health, Education and Welfare Unit, and the Secretary of the United States Centers for Medicare and Medicaid Services (Secretary). Provider further agrees to provide, if requested by any of the above, copies of the records and documentation, and that failure to comply with any request to examine or receive copies of such records shall be grounds for immediate suspension of Provider or its billing agent from participation in the Medi-Cal program.  Provider will be reimbursed for reasonable copy costs as determined by DHCS, CDPH, AG or Secretary.

10. **Confidentiality of Beneficiary Information.** Provider agrees that all documents, whether paper, electronic or in any media, that contain protected health information as defined under the Health Information Portability and Accountability Act or personal, confidential information of beneficiaries made or acquired by Provider, shall be confidential and shall not be released without the written consent of the beneficiary or his/her personal representative, or as otherwise authorized by law. Provider agrees to enter into a business associate agreement with any billing agents to assure that they comply with these requirements.

11. **Disclosure of Information to DHCS.** Provider agrees to disclose all information as required in Federal Medicaid laws and regulations and any other information required by DHCS, and to respond to all requests from DHCS for information.  Provider further agrees that the failure of Provider to disclose the required information, or the disclosure of false information shall, prior to any hearing, result in the denial of the application for enrollment or shall be grounds for termination of enrollment status or suspension from the Medi-Cal program, which shall include deactivation of all provider numbers used by Provider to obtain reimbursement from the Medi-Cal program. Provider further agrees that all bills or claims for payment to DHCS by Provider shall not be due and owing to Provider for any period(s) for which information was not reported or was reported falsely to DHCS. Provider further agrees to reimburse those Medi-Cal funds received during any period for which information was not reported, or reported falsely, to DHCS.

12. **Background Check.**  Provider agrees that DHCS may conduct a background check on Provider for the purpose of verifying the accuracy of the information provided in the application and in order to prevent fraud or abuse. The background check may include, but not be limited to, the following: (1) on-site inspection prior to enrollment; (2) review of medical and business records; and, (3) data searches.

13. **Unannounced Visits By DHCS, AG and Secretary.** Provider agrees that DHCS, AG and/or Secretary may make unannounced visits to Provider, at any of Provider's business locations, before, during or after enrollment, for the purpose of determining whether enrollment, continued enrollment, or certification is warranted, to investigate and prosecute fraud against the Medi-Cal program, to investigate complaints of abuse and neglect of patients in health care facilities receiving payment under the Medi-Cal program, and/or as necessary for the administration of the Medi-Cal program and/or the fulfillment of the AG's powers and duties under Government Code Section 12528. Premises subject to inspection include billing agents, as defined in Welfare and Institutions Code Section 14040.1. Pursuant to Welfare and Institutions Code Section 14043.7(b), such unannounced visits are authorized should the department have reason to believe that the provider will defraud or abuse the Medi-Cal program or lacks the organizational or administrative capacity to provide services under the program. Failure to permit inspection by DHCS, AG or Secretary or any agent, investigator or auditor thereof, shall be grounds for immediate suspension of provider from participation in the Medi-Cal program.

14. **Provider Fraud and Abuse.** Provider agrees that it shall not engage in or commit fraud or abuse. "Fraud" means an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person.  It includes any act that constitutes fraud under applicable federal or state law. "Abuse" means either: (1) practices that are inconsistent with sound fiscal or business practices and result in unnecessary cost to the Medicare program, the Medi-Cal program, another state's Medicaid program, or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state; (2) practices that are inconsistent with sound medical practices and result in reimbursement by the Medi-Cal program or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state, for services that are unnecessary or for substandard items or services that fail to meet professionally recognized standards for health care.

15. **Investigations of Provider for Fraud or Abuse.** Provider certifies that, at the time this Agreement was signed, it was not under investigation for fraud or abuse pursuant to Subpart A (commencing with Section 455.12) of Part 455 of Title 42 of the Code of Federal Regulations or under investigation for fraud or abuse by any Federal, state or local law enforcement agency, including the Medicaid investigation units of DHCS and the Office of the Inspector General for the Federal Department of Health and Human Services. Provider further agrees to notify DHCS within ten business days of learning that it is under investigation for fraud or abuse by any such entity. Provider further agrees that it may be subject to temporary suspension pursuant to Welfare and Institutions Code, Section 14043.36(a), which may include temporary deactivation of all provider numbers used by Provider to obtain reimbursement from the Medi-Cal program, if it is discovered that Provider is under investigation as described in that section. Provider further agrees to cooperate with and assist DHCS and any state or federal agency charged with the duty of identifying, investigating, sanctioning, or prosecuting suspected fraud and abuse, although Provider does not waive any timely and properly asserted rights it may have under the 5th Amendment privilege against self-incrimination.

16. **Provider Fraud or Abuse Convictions and/or Civil Fraud or Abuse Liability.** Provider certifies that it and its owners, officers, directors, employees, and agents, have not: (1) been convicted of any felony or misdemeanor involving fraud or abuse in any government program, within the last ten years; or (2) been convicted of any felony or misdemeanor involving the abuse of any patient; or (3) been convicted of any felony or misdemeanor substantially related to the qualifications, functions, or duties of a provider; or (4) entered into a settlement in lieu of conviction for fraud or abuse, within the last ten years; or, (5) been found liable for fraud or abuse in any civil proceeding, within the last ten years. Provider further agrees that DHCS shall not enroll Provider if within the last ten years, Provider has been convicted of any felony, or any misdemeanor involving fraud or abuse in any government program, has entered into a settlement in lieu of conviction for fraud or abuse, or has been found liable for fraud or abuse in any civil proceeding.

17. **Changes to Provider Information.** Provider agrees to keep its application for enrollment in the Medi-Cal program current by informing the California Department of Public Health (CDPH), District Office, in writing on a form or forms to be specified by DHCS, within 35 days of any changes to the information contained in its application for enrollment, its disclosure statement, this Agreement, and/or any attachments to these documents.

18. **Prohibition of Rebate, Refund, or Discount.** Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage, dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission, preference, patronage, dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it will not take any other action or receive any other benefit prohibited by state or federal law.

19. **Payment From Other Health Coverage Prerequisite to Claim Submission.** Provider agrees that it shall first seek to obtain payment for services provided to Medi-Cal beneficiaries from any private or public health insurance coverage to which the beneficiary is entitled, where Provider is aware of this coverage and to the extent the coverage extends to these services, prior to submitting a claim to DHCS for the payment of any unpaid balance for these services. In the event that a claim submitted to a private or public health insurer has not been paid within 180 days of billing by Provider, Provider may submit a claim to DHCS but must provide documentation of denial when requested to do so by DHCS. Providers billing for services to beneficiaries who are dual eligible Medicare-Medi-Cal must submit payment denial from Medicare Part A&B with all claims.

20. **Beneficiary Billing.** Provider agrees that it shall not submit claims to or demand or otherwise collect reimbursement from a Medi-Cal beneficiary, or from other persons on behalf of the beneficiary, for any service included in the Medi-Cal program's scope of benefits in addition to a claim submitted to the Medi-Cal program for that service, except to: (1) collect payments due under a contractual or legal entitlement pursuant to Welfare and Institutions Code, Section 14000(b); (2) bill a long-term care patient for the amount of his/her liability; and, (3) collect a co-payment pursuant to Welfare and Institutions Code, Sections 14134 and 14134.1. Provider further agrees that, in the event that a beneficiary willfully refuses to provide current other health care coverage billing information as described in Section 50763(a)(5) of Title 22, California Code of Regulations, Provider may, upon giving the beneficiary written notice of intent, bill the beneficiary as a private pay patient.

21. **Payment From Medi-Cal Program Shall Constitute Full Payment.** Provider agrees that payment received from DHCS in accordance with Medi-Cal fee structures shall constitute payment in full, except that Provider, after making a full refund to DHCS of any Medi-Cal payments received for services, goods, supplies, or merchandise, may recover all of Provider's fees to the extent that any other contractual entitlement, including, but not limited to, a private group or indemnification insurance program, is obligated to pay the charges for the services, goods, supplies, or merchandise provided to the beneficiary. Providers agree to submit all claims within 60 days of the dates of service but no later than six months to receive full payment. Providers agree to comply with Welfare and Institutions Code Section 14115 and California Code of Regulations, Title 22, Section 51008 and 51008.5.

22. **Return of Payment for Services Otherwise Covered by the Medi-Cal Program.** Provider agrees that any beneficiary who has paid Provider for health care services, goods, supplies, or merchandise otherwise covered by the Medi-Cal program received by the beneficiary shall be entitled to a prompt return from Provider of any part of the payment which meets any of the following: (1) was rendered during any period prior to the receipt of the beneficiary's Medi-Cal card, for which the card authorizes payment under Welfare and Institutions Code, Sections 14018 or 14019; (2) was reimbursed to Provider by the Medi-Cal program, following audits and appeals to which Provider is entitled; (3) is not payable by a third party under contractual or other legal entitlement; (4) was not used by the beneficiary to satisfy his/her paid or obligated liability for health care services, goods, supplies, or merchandise, or to establish eligibility.

23. **Compliance With Requirements.** Provider and any billing agent agree that it shall comply with all of the requirements set forth in the Welfare and Institutions Code and its implementing regulations, and the Medi-Cal Provider Manuals, including applicable changes to the Medi-Cal Provider Manuals published by DHCS subsequent to the effective date of this Agreement. Providers and their billing agents agree to comply with Welfare and Institutions Code Section 14115 and California Code of Regulations, Title 22, Section 51008 and 51008.5. Providers agree to submit all claims within 60 days of the dates of service but no later than six months to receive full payment. Provider and its billing agent also agree to exhaust all administrative remedies with the fiscal intermediary prior to filing a writ of mandate pursuant to Welfare and Institutions Code Section 14104.5. In the event DHCS determines a reimbursement overpayment has been made to Provider or monies are otherwise owed pursuant to this Agreement, Provider agrees to promptly repay the amounts owed in accordance with applicable federal and California statutes and regulations, and rules and policies of DHCS. DHCS may recoup any overpayment from monies otherwise payable to Provider under this Agreement under any provider number of Provider.

24. **Deficit Reduction Act of 2005, Section 6032 Implementation.** To the extent applicable, as a condition of payment for services, goods, supplies and merchandise provided to beneficiaries in the Medical Assistance Program ("Medi-Cal"), providers must comply with the False Claims Act employee training and policy requirements in 1902(a) of the Social Security Act (42 USC 1396a(a)(68)), set forth in that subsection and as the federal Secretary of Health and Human Services may specify.

25. **Provider Suspension; Appeal Rights; Reinstatement.** Provider agrees that it is to be subject to the following suspension actions. Provider further agrees that the suspension of Provider shall include deactivation of all of Provider's provider numbers and shall preclude Provider from submitting claims for payment, either personally or through claims submitted by any individual, clinic, group, corporation, or other association to the Medi-Cal program for any services, supplies, goods, or merchandise that provider has provided directly or indirectly to a Medi-Cal beneficiary, except for services, supplies, goods, or merchandise provided prior to the suspension.

   a. **Automatic Suspensions/Mandatory Exclusions.** The provider shall be automatically suspended under the following circumstances:

      (1) Upon notice from the Secretary of the United States Department of Health and Human Services that Provider has been excluded from participation in the Medicare or Medicaid programs. No administrative appeal of a suspension on this ground shall be available to Provider. (Welfare and Institutions Code, Section 14123(b),(c)).

      (2) If Provider has license(s), certificate(s), or other approval(s) to provide health care services, revoked or suspended by a federal, California, or another state's licensing, certification, or approval authority, has otherwise lost that/those license(s), certificate(s), or approval(s), or has surrendered that/those license(s), certificate(s), or approval(s) while a disciplinary hearing on that license, certificate, or approval was pending. (Welfare and Institutions Code, Section 14043.6).

      (3) If Provider is convicted of any felony or any misdemeanor involving fraud, abuse of the Medi-Cal program or any patient, or otherwise substantially related to the qualifications, functions, or duties of a provider of service. Suspension following conviction is not subject to the proceedings under Welfare and Institutions Code Section 14123(c). However, the director may grant an informal hearing at the request of the provider to determine in the director's sole discretion if the circumstances surrounding the conviction justify rescinding or otherwise modifying the suspension.

   b. **Permissive Suspensions/Permissive Exclusions.** The provider may be suspended under the following circumstances:

      (1) Provider violates any of the provisions of Chapter 7 of the Welfare and Institutions Code (commencing with Section 14000 except for Sections 14043-14044), or Chapter 8 (commencing with Section 14200) or any rule or regulations promulgated by DHCS pursuant to those provisions. Administrative appeal pursuant to Health and Safety Code, Section 100171. (Welfare and Institutions Code, Section 14123(a),(c)).

      (2) Provider fails to comply with DHCS's request to examine or receive copies of the books and records pertaining to services rendered to Medi-Cal beneficiaries. Administrative appeal pursuant to Health and Safety Code, Section 100171. (Welfare and Institutions Code, Section 14124.2).

      (3) Provider participating in the Medi-Cal dental program provides services, goods, supplies, or merchandise that are below or less than the standard of acceptable quality, as established by the California Dental Association Guidelines for the Assessment of Clinical Quality and Professional Performance, Copyright 1995, Third Edition, as periodically amended. (Welfare and Institutions Code, Section 14123(f)).

c. **Temporary Suspension.** The provider may be temporarily suspended under the following circumstances:

(1) Provider fails to disclose all information as required in federal Medicaid regulations or any other information required by DHCS, or discloses false information. Administrative appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.2(a)).

(2) If it is discovered that Provider is under investigation for fraud or abuse. Administrative appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.36(a)).

(3) Provider fails to remediate discrepancies discovered as a result of an unannounced visit to Provider. Administrative appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.7(c)).

(4) When necessary to protect the public welfare or the interests of the Medi-Cal program. Administrative appeal pursuant to Health and Safety Code, Section 100171. (Welfare and Institutions Code, Section 14123(c)).

(5) Provider submits claims for payment under any provider number from an individual or entity that is suspended, excluded or otherwise ineligible. This includes a provider on the Suspended and Ineligible Provider List or any list published by the Office of the Inspector General or the Department of Health and Human Services. Appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.61).

26. **Provider Grievances and Complaints.** A provider who has a grievance or complaint concerning the processing or payment of money alleged to be payable for services provided to eligible Medi-Cal beneficiaries shall comply with and exhaust all administrative remedies and procedures outlined in statute, regulation or the Provider Manual, including the following:

a. The provider and its billing agent shall comply with and exhaust all administrative remedies provided by the Fiscal Intermediary or Contractor prior to filing a court action.

b. The provider and its billing agent shall comply with and exhaust all proceeding for claims processing outlined in the Provider Manual including all appeal procedures.

c. The provider and its billing agent shall submit to the Fiscal Intermediary or Contractor all source documentation to support its claim, including but not limited to the source documentation outlined in California Code of Regulations, Title 22, Section 51476.

d. The provider and its billing agent shall comply with all timeliness requirements including but not limited to those outlined in Welfare and Institutions Code Section 14115 and California Code of Regulations, Title 22, Section 51008 and 51008.5.

27. **Provider Termination, Imposition of Federal Sanctions, and Appeal Rights for Long Term Care Facilities.** Provider agrees that it is subject to any federal sanctions authorized under the state plan including termination of this provider agreement in accordance with federal law. Provider further agrees that the termination of this provider agreement or imposition of other federal sanctions authorized under the state plan shall include deactivation of all of Provider's provider numbers and shall preclude Provider from submitting claims for payment either personally or through claims submitted by any individual, clinic, group, corporation, or other association to the Medi-Cal program for any services, supplies, goods, or merchandise that provider has provided directly or indirectly to a Medi-Cal beneficiary, except for services, supplies, goods, or merchandise provided prior to the termination or imposition of sanctions.

a. Skilled Nursing Facility and Intermediate Care Facility Appeal Procedures. SNF and ICF Medi-Cal Providers shall have the appeal rights set forth in Article 1.6 of Chapter 3 of Division 3 of Title 22.

b. Intermediate Care Facilities-Mental Retardation Appeal Procedures. Intermediate Care Facilities Developmentally Disabled; Intermediate Care Facilities-Developmentally Disabled-Habilitative; Intermediate Care Facilities-Developmentally Disabled-Nursing shall have the appeal rights set forth in 42 CFR 431.153 and 431.154.

28. **Liability of Group Providers.** Provider agrees that, if it is a provider group, the group, and each member of the group, are jointly and severally liable for any breach of this Agreement, and that action against any of the providers in the provider group may result in action against all of the members of the provider group.

29. **Legislative and Congressional Changes.** Provider agrees that this Agreement is subject to any future additional requirements, restrictions, limitations, or conditions enacted by the California Legislature or the United States Congress which may affect the provisions, terms, conditions, or funding of this Agreement .

30. **Provider Capacity.**  Provider agrees that Provider, and the officers, directors, employees, and agents of Provider, in the performance of this Agreement, shall act in an independent capacity and not as officers or employees or agents of the State of California.

31. **Indemnification.**  Provider agrees to indemnify, defend, and save harmless the State of California, its officers, agents, and employees, from any and all claims and losses accruing or resulting to any and all persons, firms, or corporations furnishing or supplying services, materials, or supplies in connection with Provider's performance of this Agreement, and from any and all claims and losses accruing or resulting to any Medi-Cal beneficiary, or to any other person, firm, or corporation who may be injured or damaged by Provider in the performance of this Agreement.

32. **Governing Law.**  This Agreement shall be governed by and interpreted in accordance with the laws of the State of California.

33. **Venue.**  Venue for all actions, including federal actions, concerning this Agreement, lies in Sacramento County, California, or in any other county in which the California Department of Justice maintains an office.

34. **Titles.**  The titles of the provisions of this Agreement are for convenience and reference only and are not to be considered in interpreting this Agreement.

35. **Severability.**  If one or more of the provisions of this Agreement shall be invalid, illegal, void, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired. Either party having knowledge of such a provision shall promptly inform the other of the presumed non-applicability of such provision. Should the non-applicable provision go to the heart of this Agreement, the Agreement shall be terminated in a manner commensurate with the interests of both parties.

36. **Assignability.**  Provider agrees that it has no property right in or to its status as a Provider in the Medi-Cal program or in or to the provider number(s) assigned to it, and that Provider may not assign its provider number for use as a Medi-Cal provider, or any rights and obligations it has under this Agreement except to the extent purchasing owner is joining this provider agreement with successor joint and several liability.

37. **Waiver.**  Any action or inaction by DHCS or any failure of DHCS on any occasion, to enforce any right or provision of this Agreement, shall not be interpreted to be a waiver by DHCS of its rights hereunder and shall not prevent DHCS from enforcing such provision or right on any future occasion. The rights and remedies of DHCS herein are cumulative and are in addition to any other rights or remedies that DHCS may have at law or in equity.

38. **Complete Integration.**  This Agreement, including any attachments or documents incorporated herein by express reference, is intended to be a complete integration and there are no prior or contemporaneous different or additional agreements pertaining to the subject matter of this Agreement, unless such additional agreement(s) is between DHCS and the Provider, expressly references or incorporates all or part of this Agreement, and is signed by the Provider.

39. **Amendment.**  Any alteration or modification by the applicant or Provider of this Medi-Cal Provider Agreement (DHCS Form 9098) or to any of the terms in its exhibits or attachments, shall automatically and immediately void this agreement upon submission of the signed agreement to the State, unless such agreement is also signed by the State.

40. **Provider Attestation.**  Provider agrees that all information it submits on the application form for enrollment, this Agreement, and all attachments or changes to either, is true, accurate, and complete to the best of Provider's knowledge and belief. Provider further agrees to sign the application form for enrollment, this Agreement, and all attachments or changes to either, under penalty of perjury under the laws of the State of California.

The parties agree that this agreement is a legal and binding document and is fully enforceable in a court of competent jurisdiction. The provider signing this agreement warrants that he/she has read this agreement and understands it.

I declare under penalty of perjury under the laws of the State of California that the foregoing information is true, accurate, and complete to the best of my knowledge and belief.

I declare I am the provider or I have the authority to legally bind the provider, which is an entity and not an individual person.

---

1. Printed legal name of provider

Comprehensive Care of Oakland, L.P.

2. Printed name of person signing this declaration on behalf of provider (if an entity or business name is listed in Item 1 above)

Shirley S Ma

3. Original signature of provider or representative if this provider is an entity other than an individual person as sole proprietor

*[signature]*

4. Title of person signing this declaration

Managing Member of G.P.

5. Notary Public (Affix notary seal or stamp in the space below)

State of California, County of Alameda
On 24th July 2012 before me, MURSHAD BOBBY KHAN
Notary Public, personally appeared SHIRLEY S. MA
who proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California
that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.



MURSHAD BOBBY KHAN
Commission # 1975609
Notary Public - California
Alameda County
My Comm. Expires May 17, 2016

Executed at: __ALAMEDA__, __CALIFORNIA__ on __July 124/ 2012__
　　　　　　　　(City)　　　　　　　　(State)　　　　　　　(Date)

---

Applicants and providers licensed pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, the Osteopathic Initiative Act, or the Chiropractic Initiative Act ARE NOT REQUIRED to have this form notarized.  If notarization is required, the Certificate of Acknowledgement signed by the Notary Public must be in the form specified in Section 1189 of the Civil Code.

---

6.   Contact Person's Information
　☑ Check here if you are the same person identified in item 2.  If you checked the box, provide only the email address and phone number below.

| Contact Person's Name | (last) | (first) | (middle) | (gender) |
|---|---|---|---|---|
| | Ma | Shirley | S | ☐ Male ☑ Female |

| Title/Position | Email address | Telephone Number |
|---|---|---|
| Managing Member of G.P. | sma@ccooak.com | 510   536-6512 |

**Privacy Statement**
**(Civil Code Section 1798 et seq.)**

All information requested on the application, the disclosure statement, and the provider agreement is mandatory with the exception of the social security number for any person other than the person or entity for whom an IRS Form 1099 must be provided by the Department pursuant to 26 USC 6041. This information is required by the Department of Health Care Services, Provider Enrollment Division, by the authority of Welfare and Institutions Code Section 14043.2(a).  The consequences of not supplying the mandatory information requested are denial of enrollment as a Medi-Cal provider or denial of continued enrollment as a provider and deactivation of all provider numbers used by the provider to obtain reimbursement from the Medi-Cal program. The consequence of not supplying the voluntary social security number information requested is delay in the application process while other documentation is used to verify the information supplied.  Any information provided will be used to verify eligibility to participate as a provider in the Medi-Cal program.  Any information may also be provided to the State Controller's Office, the California Department of Justice, the Department of Consumer Affairs, the Department of Corporations, or other state or local agencies as appropriate, fiscal intermediaries, managed care plans, the Federal Bureau of Investigation, the Internal Revenue Service, Medicare Fiscal Intermediaries, Centers for Medicare and Medicaid Services, Office of the Inspector General, Medicaid, and licensing programs in other states.