# EXHIBIT 1

**DECLARATION OF STEPHEN G. PREONAS IN SUPPORT OF INTERESTED PARTIES WOMAC PROPERTIES, INC. AND JLG ASSOCIATES, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**

## *SEC* v. *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## NORTHERN DISTRICT OF CALFORNIA CASE NO.  No. 3:17-CV-00223-RS

## DESCRIPTION OF DOCUMENT:

## Complaint filed September 10, 2015 in Alameda Superior Court Case No. RG 15-785236 Entitled WOMAC Properties, Inc., et al. v San Francisco Regional Center, LLC

# EXHIBIT 1

1  KENNETH S. KATZOFF (SBN 103490)
STEPHEN G. PREONAS (SBN 245334)
2  Katzoff & Riggs LLP
1500 Park Avenue, Suite 300
3  Emeryville, CA 94608
Tel. (510) 597-1990
4  Fax. (510) 597-0295

5  Attorneys for Plaintiffs
WOMAC PROPERTIES, INC.
6  and JLG ASSOCIATES, LLC

ENDORSED
FILED
ALAMEDA COUNTY

SEP 10 2015

CLERK OF THE SUPERIOR COURT
By _____
Deputy

7  SUPERIOR COURT OF CALIFORNIA - UNLIMITED CIVIL JURISDICTION

8  COUNTY OF ALAMEDA

9  WOMAC PROPERTIES, INC. a California        ) Case No.  RG15785238
nonprofit public benefit corporation, JLG   )
10  ASSOCIATES, LLC, a California limited      ) **COMPLAINT FOR BREACH OF**
liability company                            ) **CONTRACT, INTENTIONAL**
11                                            ) **MISPRESENTATION AND**
                                              ) **MONEY LENT**
12            Plaintiff,                      )
                                              )
13  vs.                                       )
                                              )
14  SAN FRANCISCO REGIONAL CENTER,            )
LLC, a California limited liability company, )
15  THOMAS M. HENDERSON an individual;        )
and DOES 1 through 20, inclusive             )
16                                            )            BY FAX
                                              )
17            Defendants.                     )
                                              )
18  _____ )

19  **GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

20       1.    Plaintiff WOMAC Properties, Inc. ("WOMAC"), is now, and was at all

21  times relevant herein, a California nonprofit public benefit corporation with its principal

22  place of business in the City of Oakland, County of Alameda, State of California.

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

2.      Plaintiff JLG ASSOCIATES, LLC ("JLGA"), is now, and was at all times relevant herein, a California limited liability company with its principal place of business in the City of Oakland, County of Alameda, and State of California.

3.      Plaintiffs are informed and believe and thereon allege that defendant SAN FRANCISCO REGIONAL CENTER, LLC, ("SFRC") is a California limited liability company with its principal place of business in the City of Oakland, County of Alameda, and State of California.

4.      Plaintiffs are informed and believe and thereon allege that defendant THOMAS M. HENDERSON ("Henderson") is an individual residing in the City of Oakland, County of Alameda, State of California and that Henderson is one a managing member of defendant SFRC.

5.      Plaintiffs are informed and believe and thereon allege that SFRC is an investment firm that obtains foreign investments, primarily from China, through a U.S. Government sponsored program called EB-5.   The United States Citizenship and Immigration Services (USCIS) administers the EB-5 program with oversight provided by the Securities and Exchange Commission (SEC).   Under the EB-5 program a "regional center" such as SFRC invests foreign capital into U.S. businesses with the goal of creating jobs.   If SFRC meets the requirements of EB-5 (primarily creating 10 jobs for each $500K investment) then the foreign investor can obtain U.S. citizenship.

6.      The defendants herein identified as defendants DOE 1 through DOE 20, inclusive, are other persons responsible for the acts, events, omissions, failures, and statements described in this Complaint.  Plaintiffs are currently ignorant of the true names

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510) 597-1990

and capacities of defendants DOES 1 through DOES 20, inclusive.  Said defendants are therefore designated by fictitious names.  Plaintiff will seek leave to amend this Complaint to state the true names and capacities of DOE 1 through DOE 20 when the same are ascertained by plaintiffs.  Generally, Plaintiff alleges that defendants DOE 1 through DOE 10 are persons who performed the wrongful acts and omissions alleged herein as to Henderson.  Defendants DOE 11 through DOE 20 are other persons and/or entities whose wrongful acts and omissions have caused harm or damage to Plaintiffs alleged herein.

7.      Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned defendants SFRC and Henderson and DOES 1 through 20, inclusive (collectively "Defendants"), were the principal, agent, or employee of each other, and acting as either such principal or within the course and scope of such employment or agency, took some part in the acts or omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

8.      This Court has jurisdiction over this case pursuant to California Code of Civil Procedure § 410.10.

9.      Venue is proper under California Code of Civil Procedure § 395(a) because Plaintiffs are informed and believe and based thereon alleged that some of the Defendants reside in and/or have principal places of business in Alameda County, California.

10.      A WOMAC affiliated entity is the sole member of JLGA.  JLGA is the former owner of certain commercial real property located at 800, 850 and 900 Market Street in Oakland commonly known as the Jack London Gateway Shopping Center ("the

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

---

**COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL MISPRESENTATION AND MONEY LENT**

Property").

11.     The present dispute arises out of a series of transactions between WOMAC, JLGA and SFRC relating to the Property.  On or about June 26, 2014 WOMAC and SFRC entered into a written operating agreement ("the Operating Agreement") to form a California limited liability company called JL Gateway, LLC ("JL Gateway").  In connection with the formation of JL Gateway, WOMAC, JLGA and SFRC agreed that JLGA would transfer ownership in the Property from JLGA to JL Gateway.

12.     On or about December 16, 2014 WOMAC and SFRC agreed to amend the Operating Agreement for JL Gateway and enter into an Amended and Restated Operating Agreement for JL Gateway ("the Amended Operating Agreement") which replaced and superseded the Operating Agreement.  A true and correct copy of the Amended Operating Agreement is attached as Exhibit A.  Pursuant to the Amended Operating Agreement SFRC was to own a 75% interest in JL Gateway and WOMAC was to own the remaining 25% interest in JL Gateway.

13.     On or about December 17, 2014, in connection with the formation of JL Gateway, the transfer of the interest in the Property from JLGA to JL Gateway and the execution of the Amended Operating Agreement allocating a 75% membership interest in JL Gateway to SFRC, SFRC executed a promissory note in favor of WOMAC in the amount of $3.7M ("the Note").  A true and correct copy of the Note is attached as Exhibit B.  The Note required SFRC to begin making payments of interest on the Note on February 5, 2015 and required the Note to be paid in full by December of 2015.

14.     In connection with the execution of the Note SFRC and Henderson

**KATZOFF & RIGGS LLP**
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510) 597-1990

represented to WOMAC that they intended to raise funds for the rehabilitation of the Property through the EB-5 program, and that SFRC intended to and in fact would make all required payments of interest and principal due under the Note.

15.     WOMAC caused the title to the Property to be transferred from JLGA to JL Gateway, entered into the Amended Operating Agreement and agreed to form JL Gateway with SFRC and grant SFRC a 75% interest in JL Gateway based upon the false promises of SFRC and Henderson that they intended to raise funds for the rehabilitation of the Property through the EB-5 program, and that SFRC would make all required payment of principal and interest due under the Note ("the Misrepresentations"). In making the Misrepresentations Henderson and SFRC conspired with one another to defraud WOMAC and JLGA of its interest in the Property and fraudulently obtain a 75% membership interest in JL Gateway without providing the agreed upon payments due under the Note or raising funds to rehabilitate the Property in return.

16.     The Misrepresentations proved to be false in that SFRC did not intend to pay all of the amounts due under the Note and did not intend to raise funds for the rehabilitation of the Property through the EB-5 program.  Rather, Defendants intended to use the Misrepresentations to convince WOMAC to cause JLGA to transfer its interest of in the Property to JL Gateway and grant SFRC a controlling interest in JL Gateway, take control of the rents and profits of the Property and then disregard the payment obligations required by the Note and the promise to rehabilitate the Property.   To date SFRC has failed to make any of the payments required by the Note or to take action to rehabilitate the Property.

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

---

**COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL MISPRESENTATION AND MONEY LENT**

**FIRST CAUSE OF ACTION**
(For Breach of Contract re the Note – WOMAC against SFRC)

17.     The "General Allegations Common to All Causes of Action" are restated and incorporated by this reference.

18.     SFRC and WOMAC agreed to form JL Gateway and to grant SFRC a 75% interest in JL Gateway based upon the promise of SFRC to repay WOMAC $3.7M with interest as set forth in the Note.

19.     WOMAC has fully performed all of the terms, conditions, promises, obligations and duties under the Note, except for those terms, conditions, promises, obligations and duties which were excused, waived, prevented or delayed by the consent, acts or omissions of SFRC.

20.     SFRC materially breached the Note by failing to make payments of interest on the Note as required.

21.     As a direct, proximate and foreseeable result of SFRC breaches of the Note, WOMAC has been damaged according to proof within the unlimited jurisdiction of this Court, which at this time is estimated to be at $3,781,091.67.

WHEREFORE, WOMAC requests relief as prayed below.

**SECOND CAUSE OF ACTION**
(For Intentional Misrepresentation re the Note and the Amended Operating Agreement – WOMAC and JLGA against SFRC and Henderson)

22.     The "General Allegations Common to All Causes of Action" and the allegations in the "First Cause of Action" are restated and incorporated by this reference.

23.     At the time the Henderson on behalf of SFRC made the Misrepresentations

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

to WOMAC, Henderson knew that the Misrepresentations were false. Henderson intended the Misrepresentations to induce WOMAC to enter into the agreement to form JL Gateway, to induce JLGA to transfer ownership of the Property to JL Gateway and to induce WOMAC to agree that SFRC would obtain a 75% interest in JL Gateway.

24. WOMAC and JLGA reasonably relied on the Misrepresentations, by entering into the agreement to form JL Gateway, by transferring ownership of the Property to JL Gateway and entering into the Amended Operating Agreement that provide that SFRC had a 75% interest in JL Gateway. But for the Misrepresentations, WOMAC would not have entered the agreement to form JL Gateway, JLGA would not have transferred ownership of the Property to JL Gateway and WOMAC would not have entered into the Amended Operating Agreement granting SFRC a 75% interest in JL Gateway.

25. As a direct and proximate result of the Misrepresentations, WOMAC and JLGA have suffered damages according to proof within the unlimited jurisdiction of the Court, which at this time are estimated to be at least $3,781,091.67.

26. By virtue of the false and fraudulent nature of the Misrepresentations, WOMAC and JLGA have sustained substantial out-of-pocket losses and are entitled to recover damages from SFRC and Henderson in an amount according to proof.

27. The aforementioned conduct of SFRC and Henderson included intentionally false statements, deceit and concealment of material facts known to Henderson and SFRC with the intention on the part of Henderson and SFRC of thereby depriving WOMAC and JLGA of property and legal rights, and was despicable conduct

1    that subjected WOMAC and JLGA to unjust hardship in conscious disregard of their

2    rights, so as to justify an award to WOMAC and JLGA of exemplary and punitive

3    damages.

4         28.    Defendants SFRC and Henderson willfully, intentionally and knowingly

5    agreed and conspired with SFRC other to engage in the alleged unlawful conduct

6    described herein, including the Misrepresentations and the breach of the Note.

7         29.    Defendants SFRC and Henderson did the acts alleged pursuant to and in

8    furtherance of their agreement and/or further the conspiracy by cooperating, encouraging,

9    ratifying or adopting the acts of the other.

10        30.    As a direct and proximate result of these acts in furtherance of the

11   conspiracy, Plaintiffs have suffered injuries and damages in an amount as yet unknown,

12   but to be proven at trial.  The wrongful conduct committed pursuant to the conspiracy

13   was a substantial factor in causing this harm.

14        31.    Defendants' intentional agreement to commit and commission these

15   wrongful acts was willful, malicious, oppressive and in conscious disregard of Plaintiffs'

16   rights and Plaintiffs' are therefore entitled to an award of punitive damages to punish

17   Defendants' wrongful conduct and deter future wrongful conduct.

18        WHEREFORE, Plaintiffs request relief as prayed below.

19                          **THIRD CAUSE OF ACTION**
                       (Money Lent – WOMAC against SFRC)

20

21        32.    Plaintiffs incorporate all paragraphs contained in the "Allegations Common

22   to All Causes of Action," "First Cause of Action," "Second Cause of Action" and as if set

**KATZOFF & RIGGS LLP**
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

1  forth in full herein.

2      33.    On or about December 17, 2014 SFRC became indebted to WOMAC in the

3  amount of $3,700,000.00 plus interest at the rate of three percent (3%) per year.

4      34.    Though demand has been made for payment in full there is due and unpaid

5  the sum of $3,700,000.00 for money lent by WOMAC to SFRC at the request of SFRC

6  together with interest thereon.

7      WHEREFORE, WOMAC requests relief as prayed below.

8                              **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiffs request the Court to grant relief as follows:

10  Plaintiff requests the following relief:

11  1.    For damages in the amount of $3,781,091.67.

12  2.    For prejudgment interest;

13  3.    For attorney's fees, if so allowed by the law and the facts;

14  4.    For cost of suit, if so allowed by the law and the facts; and

15  5.    For such other relief permitted by law and which the Court deems proper.

16

17

18

19

20

21

22

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

---

**COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL MISPRESENTATION
AND MONEY LENT**

1    Dated:  September 10, 2015

2                                                  KATZOFF & RIGGS LLP

3

4

5

6                                                  STEPHEN G. PREONAS

7    Attorneys for Plaintiffs WOMAC
     PROPERTIES, INC. and JLG
8    ASSOCIATES, LLC

9

10

**KATZOFF & RIGGS LLP**
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

11

12

13

14

15

16

17

18

19

20

21

22

---

**COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL MISPRESENTATION
AND MONEY LENT**

# EXHIBIT A

## TO COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL MISPRESENTATION AND MONEY LENT

### *WOMAC PROPERTIES, INC. et al.* **v.** *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## ALAMEDA COUNTY SUPERIOR COURT

## DESCRIPTION OF DOCUMENT:

## AMENDED AND RESTATED OPERATING AGREEMENT FOR JL GATEWAY, LLC A CALIFORNIA LIMITED LIABILITY COMPANY

# EXHIBIT A

AMENDED AND RESTATED OPERATING AGREEMENT
FOR
**JL GATEWAY, LLC**

**A CALIFORNIA LIMITED LIABILITY COMPANY**

**THIS AMENDED AND RESTATED OPERATING AGREEMENT** (the "Agreement") is entered into effective as of December __, 2014, by SAN FRANCISCO REGIONAL CENTER, LLC, ("SFRC") a California limited liability company and WOMAC PROPERTIES, INC., a California nonprofit public benefit corporation, ("WOMAC") doing business in the State of California (hereinafter sometimes collectively referred to as "Members".

**R E C I T A L S**

WHEREAS, on June 26, 2014, "JL GATEWAY, LLC" (the "Company") was formed as a limited liability company by the filing of articles of organization (the "Articles") with the California Secretary of State;

WHEREAS, the Company is currently governed by that certain Operating Agreement, dated as of June 26, 2014, entered into by SFRC, as sole member (the "Original Operating Agreement");

WHEREAS, SFRC desires to admit WOMAC as a Member of the Company, WOMAC desires to be so admitted as a Member of the Company, and SFRC, as a Member and the Manager of the Company, and WOMAC, as a Member, desire to amend and restate the Original Operating Agreement in its entirety on the terms and conditions contained herein;

WHEREAS, SFRC, as a Member and the Manager of the Company, and WOMAC, as a Member of the Company, wish to adopt and approve an agreement to govern the operations of the Company and document the rights and obligations of each Member and Manager with respect to the Company;

NOW THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, WOMAC is hereby admitted as a Member of the Company, and the Original Operating Agreement is hereby amended and restated in its entirety to reflect the agreement of the parties as follows:

**A G R E E M E N T**

# ARTICLE I

## ORGANIZATIONAL MATTERS

1.1 <u>Formation and Purpose</u>. SFRC formed the Company by filing the Articles with the California Secretary of State, and the Members have entered into this Agreement to define the rights and liabilities of the Members. The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act or the laws of the State of California, and in particular, to own, operate, and develop the property commonly known as "Jack London Gateway" shopping center in Oakland, California (the "Project"). Unless otherwise defined herein, capitalized terms shall have the meanings set forth in Section 11.1 hereof. To the extent permitted by the Act, this Agreement shall control the rights or obligations of any Member.

1.2 <u>Name and Term</u>. The name of the Company shall be "JL GATEWAY, LLC" The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Members and Managers deem appropriate or advisable. The terms of this Agreement shall be co-terminous with the existence (including any winding up activities) of the Company.

1.3 <u>Office, Agent, and Addresses of Members and Manager</u>. The Company shall maintain an office and registered agent in California, and may locate its principal office where the Members and Managers may determine. Other offices may also be established as needed within and outside California. The registered agent shall be as stated in the Articles or as otherwise determined by the Members and Managers. The addresses of the Members and of the Managers are set forth on Exhibit "A".

# ARTICLE II

## CAPITAL CONTRIBUTIONS

2.1 <u>Capital Contributions</u>. Each Member shall contribute the amount set forth on Exhibit A as his or her initial Capital Contribution. No Member shall be required to make any additional Capital Contributions. Additional Capital Contributions may be made upon the recommendation of the Managers with the written approval of members holding a Majority Interest. Members shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a pro rata basis in accordance with their Percentage Interests. All Capital Contributions and Percentage Interests, as set forth on Exhibit A, shall be adjusted by the Managers on a regular basis. For purposes of this Agreement, the term "Capital Contribution" shall mean the aggregate fair market value of the cash, property

(including promissory notes) contributed to the Company by Members and services rendered (excluding, however, the value of any services with respect to which the Member is treated solely as an "employee" and not as the equivalent of a partner for federal employment tax purposes).

    2.2  <u>Capital Accounts</u>.  The Company shall establish and maintain in accordance with the Regulations, a "Capital Account" for each Member, which shall carry over to his transferee if transferred in accordance with this Agreement.  No Member shall be entitled to receive any interest on his Capital Contributions.

**ARTICLE III**

<u>**MEMBERS**</u>

    3.1  <u>Limited Liability</u>.  Except as required under the Act or this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contact, tort, or otherwise.

    3.2  <u>Admission of Additional Members</u>.  Additional Members may be admitted to the Company on terms determined by the Managers and approved by the unanimous approval of the Members; provided, however, that "substitute members" may be admitted only in accordance with Article VI.

    3.3  <u>Withdrawals, Resignations, and Termination of Interest</u>.  Any Member may withdraw or resign upon sixty (60) days prior written notice to the Company.  Such Member's Membership Interest shall be subject to purchase and sale as provided in Article VII.  Upon a transfer of a Member's Membership Interest in violation of this Agreement, the occurrence of a Dissolution Event as to that Member which does not result in the dissolution of the Company, or the withdrawal of a Member, the Membership Interest of a Member shall be terminated and may be purchased by the Company or remaining Members as <u>provided for below</u> in Article VI.  Each Member acknowledges and agrees that such termination and acquisition of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

    3.4  <u>Transactions with the Company</u>.  Unless otherwise prohibited herein, a Member may lend money to and transact other business with the Company if the Manager approves after full written disclosure of the Member's involvement is made to members.  Each such Member shall have, in such capacity, the same rights and obligations with respect thereto as a Person who is not a Member.

Notwithstanding the foregoing, no Member shall be entitled to remuneration for acting in the Company business unless: (i) the Member renders services to the Company and the value of those services is not included as part of that Member's Capital contributions under Article II hereof (i.e., the Member is treated solely as an "employee" or independent contractor and not as a partner for federal employment tax purposes); or (ii) the Member acts in connection with the winding up of the Company's affairs pursuant to Article IX.

3.5     <u>Members Are Not Agents</u>.  Pursuant to Section 4.1 and the Articles, the management of the Company is vested in the Manager.  No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

3.6     <u>Voting Rights</u>.  Except as expressly provided herein and excluding Members who are the subject of a Dissolution Event and assignors of a Membership Interest, Members holding a Majority Interest shall have the right to formally approve or disapprove matters, as specifically provided for below (hereinafter "approval" by Members), including, but not limited to, the following: (i) a decision to continue the business of the Company after the occurrence of a Dissolution Event; (ii) the transfer of a Membership Interest and admission of the assignee as a Member of the Company; (iii) a decision to compromise an obligation of a Member or return money or property paid or distributed  in violation of the Act; (iv) the election and removal of the Managers; (v) the reorganization or the dissolution of the Company; and (vi) limitation imposed on, or fees paid to, the Managers.  The unanimous consent of all Members shall be required to amend the Articles or this Agreement or to admit new Members.

3.7     <u>Meetings of Members</u>.  Meetings of members may be held at such date, time and place within or outside California as the Managers may fix from time to time.  However, no meetings of the Members shall be required.  At any Members' meeting, the Managers shall preside at the meeting and appoint a person to act as secretary, prepare minutes of the meeting, and maintain the minute books of the Company.  Unless prohibited by the Act or the Articles, meetings of the Members may be called by the Managers, or upon written demand of a Member (or group of Members) holding more than then percent (10%) of the Percentage interests for the purpose of addressing any matters on which the Members may vote.

**ARTICLE IV**

**<u>MANAGEMENT AND CONTROL OF THE COMPANY</u>**

4.1     <u>Management of the Company by Managers</u>.

The business, property, and affairs of the Company shall be managed exclusively by the manager(s) selected in accordance with Section 4.2 (the "Manager(s)").  Except for situations in which the approval of the Members is expressly provided for in the Articles of this Agreement, the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters, and to perform any and all the acts customary or incident to the management of the Company's business, property and affairs.

4.2   Election of Managers.

A.   Number; Term; and Qualifications.  The Company shall initially have one (1) Manager.  The number of Managers of the Company shall be fixed from time to time by Members holding a Majority Interest, provided that in no instance shall there be less than one Manager and provided further that if the number of Managers is reduced or increased, the Articles shall be amended as required by the Act.  Unless he resigns or is removed, each Manager shall hold office until a successor is elected and qualified.  The Managers shall be elected by the affirmative vote or written consent of Members holding a Majority Interest.  A Manager need not be a Member, an individual, a resident of California, or a citizen of the United States.

B.   Resignation; Removal; Vacancies.  A Manager may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.  The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The Manager may be removed at any time, with or without cause, by the affirmative vote or written consent of Members holding a Majority Interest.  The resignation or removal of a Manager shall not effect or prejudice the Manager's rights as a Member or otherwise, and shall not constitute a withdrawal of a Member.  Vacancies shall be filled by the affirmative vote or written consent of Members holding a Majority Interest.

4.3   Powers.  Subject to the terms of this Agreement, the Managers shall manage the business, property and affairs of the Company, and shall have all powers needed to do so, including without limitation, the power to exercise all of the powers described in California Corporations Code Section 17704.07.  Notwithstanding the foregoing, a Manager shall not have the authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of all of the Members: (i) the Sale, exchange or other disposition of all, or substantially all the

Company's assets (unless pursuant to the Company's duly
authorized dissolution);  (ii) the merger of the Company with
another limited liability company, limited partnership,
corporation, general partnership or other person; provided,
however, no Member shall be required to become personally liable
(e.g., a general partner), or shall be subjected to an economic
risks of loss in excess of his or her Capital Contribution, in
any merger without his express written consent or unless each
Member is granted dissenter's rights as described in the Act;
(iii) the establishment of different classes of Members; (iv)
transactions between the Company and the Manager or an affiliate
of the Manager, or transactions in which the Manager has a
material financial interest; (v) any act which would make it
impossible to carry on the ordinary business of the Company; (vi)
the confession of a judgment against the Company; or (vii) any
other transaction described herein which requires the approval of
the Members.

    4.4   <u>Members have no Managerial Authority</u>. No Member shall
have the power to participate in the management of the Company
unless expressly authorized or required by this Agreement, the
Articles, or Acts.  Unless authorized in writing to do so by the
Managers, no Member shall have any power or authority to bind or
act on behalf of the Company in any way, to pledge its credit, or
to render it liable for any purpose.

    4.5   <u>Performance of Duties; Liability of Manager</u>.  A
Manager shall perform his managerial duties in good faith, in a
manner he reasonably believes to be in the best interests of the
Company and its Members, and with such care, including reasonable
inquiry, as an ordinary prudent person in like position would use
under similar circumstances, and in accordance with the Manager's
fiduciary duties to the Company as set forth in Section 17704.09
of the Act.  A Manager who so performs shall not be liable to the
Company or to any Member for any loss or damage sustained by the
Company or any Member, unless the loss or damage shall have been
the result of fraud, deceit, negligence, reckless or intentional
misconduct, or a knowing violation of law by the Manager.  The
Managers shall be entitled to rely on information, opinions,
reports, or statements, including financial statements and the
financial data, from the employees, representatives and agents of
the Company, its attorneys and accountants, and the Members,
unless he has knowledge that reliance is unwarranted and that
reasonable inquiry may be appropriate.

    4.6   <u>Devotion of Time; Competing Activities</u>.  A Manager
shall not be required to devote all of his time or business
efforts to the affairs of the Company, and may devote whatever
time, effort, and skill, as he deems appropriate for the
operation of the Company.  The Managers and the Members, and
their employees, representative and agents, may engage or invest
in, independently or with others, any business activities of any

type or description, including without limitation those that might be the same as or similar to the Company's business that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have the right in or to such other ventures or activities or to the income or proceeds derived therefrom.  A Manager shall not be obligated to present any investment opportunity to prospective economic advantage to the Company, even if the opportunity is of a character that, if presented to the Company, could be taken by the Company.  A Manager shall have the right to hold any investment opportunity or prospective economic advantage for his own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Managers and Affiliates of a Manager may own and/or manage the business, including businesses that may compete with the Company and for the Manager's time. Except for any violation by the Manager of the obligations imposed by Section 17704.09 of the Act, the Members hereby waive all rights and claims which they may otherwise have against the Manager and his agents, employees, and affiliates as result of any such activities.

    4.7   <u>Transactions between the Company and the Manager</u>. Upon full and complete disclosure to the Members, and the approval by disinterested Members holding a Majority Interest, a Manager and/or his Affiliate may engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement or by Section 17704.09 of the Act, and the terms and conditions of such transaction, on an overall basis, are as fair and reasonable to the Company as those that are generally available to parties operating at arm's length.

    4.8   <u>Limited Liability</u>.  No person who is a Manager or officer (or both) of the Company shall be personally liable under any judgment of a Court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer (or both) of the Company.

**ARTICLE V**

**<u>ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS</u>**

    5.1   <u>Allocations of Net Losses and Net Profit</u>.  Net losses shall be allocated to the Members in proportion to their Percentage Interests.  Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any,

equal to such member's share of Company "Minimum Gain" (as defined in the Regulations) that would be realized on a foreclosure of the Company's property.  Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 5.1).  Any loss reallocated under this Section 5.1 shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article V, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article V, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article V if no reallocation of losses had occurred under this section 5.1.  Net profit shall be allocated to a Member in proportion to his Percentage Interest. The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their share of Company income and loss for income tax purposes.

    5.2  <u>Special Allocations</u>.  Notwithstanding Section 5.1, if there is a net decrease in Company Minimum Gain during any fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the Regulations, and determined in accordance with Regulations.  Minimum Gain attributable to a Members' "Nonrecourse Debt" (as defined in the Regulations) shall also be charged back and specially allocated in accordance with the Regulations.  This Section 5.2 is intended to comply with the minimum gain chargeback requirement contained in the Regulations and shall be interpreted and applied consistently therewith. Notwithstanding Section 5.1, any "Nonrecourse Deductions" (as defined in the Regulations) for any fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.  Items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Members who bear the economic risk of loss with respect to the Members' Nonrecourse Debt to which such items are attributable as, described in the Regulations.

    5.3  <u>Qualified Income Offset</u>.  Notwithstanding Section 5.1, if any event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 5.3 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article V so that the net amount of any item so allocated and the income, gain, and

losses allocated to each Member pursuant to this Article V to the extent possible shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 5.3 if such expected adjustments, allocations, or distributions had not occurred.

5.4   Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes, and shall not effect or in any way be taken into account in computing a Member's Capital Account of share of profits, losses or other items of distributions pursuant to any provisions of this Agreement.

5.5   Allocation of Net Profits and Losses. If any Membership Interest is transferred, increased or decreased during any Fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day it is accrued or incurred) and allocated to each Member based upon his or her respective Membership Interest at the close of such day.

5.6   Distributions.   Subject to applicable law and this Agreement, a Manager may distribute "Distributable Cash" to the Members in the following order of priority; (a) to Members in proportion to their unreturned Capital Contributions until each Member's Capital Contributions are recovered; and (b) to the Members in proportion to their Percentage Interests.  All such distributions shall be made only to the Persons who are the holders of record of the Economic Interest on the actual date of distributions.  Neither the Company nor the Managers shall incur any liability for making distributions in accordance with this Section 5.6.  A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money.  No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.  Except upon a dissolution and the winding up of the Company, no member may be compelled to accept a distribution of any asset in kind.  Except for distributions made in violation of the Act or this Agreement, no Member or owner of an Economic Interest who is not a Member (hereinafter an "Economic Interest Owner") shall be obligated to

return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.  The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Members or Economic Interest Owner.

     5.7   <u>Restrictions on Distributions</u>.   No distribution shall be made if, after giving effect to the distribution: (a) the Company would not be able to pay its debts as they become due in the usual course of business; (b) the Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that could be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of the Members, if any, upon dissolution that are superior to the rights of the Members receiving the distribution; or (c) the Act.  A Manager who votes for, or otherwise permits, a distribution in violation of this Agreement (or the Act) is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act.

**ARTICLE VI**

**<u>TRANSFER AND ASSIGNMENT OF INTERESTS</u>**

     6.1   <u>Transfer or Assignment of Interests</u>.   No Member shall be entitled to transfer, assign, sell, exchange, encumber or in any way alienate all or any part of his or her Membership Interest except with the prior written consent of Members holding a Majority Interest, which consent may be given or withheld as determined by the Members in their sole discretion.   Transfers in violation of this Article VI shall only be effective to the extent set forth in Section 6.4.  Any Membership Interest (or portion thereof) transferred shall continue to be subject to the terms and provisions of this Agreement. Furthermore, and in addition to the restrictions contained herein, no Member shall transfer, assign, sell, exchange, encumber or in any way alienate all or part of his Membership Interest: (i) without first complying with all applicable state and federal securities laws, and (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all the Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Managers.  Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the date immediately following the date upon which the requirements of this Agreement have been met.

6.2   <u>Substitution of Members</u>.   A transferee of a membership Interest shall have the right to become a substitute Member only if (i) the requirements of Section 6.1 are met, (ii) such Person agrees to be bound by the terms of this Agreement, and (iii) such Person pays any reasonable expenses in connection with his or her admission as a new Member.   The admission of a substitute Member shall not result in the release of a Member who assigned the Membership Interest from any liability that such Member may have to the Company.

6.3   <u>Family and Affiliate Transfer</u>.   The Membership Interest of any Member may be transferred, subject to compliance with Section 6.1 (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii)  to any Affiliate of the Member.   Any transferee of a Membership Interest transferred pursuant to this Section 6.3 shall take such Membership Interest subject to the transfer restrictions imposed by this Agreement.

6.4   <u>No Effect to Transfers in Violation of Agreement</u>.
Upon any transfer of a Membership Interest in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Managers, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the Managers, the transfer shall be null and void and the purported transferee shall not become either a member or an Economic Interest Owner.   Upon any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by a Member (including, without limitation, the rights of the Members to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to the Company for a purchase price of $200, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest.   Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.   Each

Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VI is not unreasonable under the circumstances existing as of the date hereof.

6.5   <u>Right of First Refusal</u>.  Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his Membership Interest (or as required by operation of law or another involuntary transfer to do so) such Member shall first offer such Membership Interest to the Company and the nontransferring Members in accordance with the following provisions:

A.   Such Member shall deliver a written notice to the Company and the other Members stating such Member's bona fide intention to transfer such Membership Interest, the name and address of the proposed transferee, the Membership Interest to be transferred, and the purchase price and terms of payment for which the Member proposes to transfer such Membership Interest.

B.   Within thirty (30) days after receipt of the notice described in Section 6.5A, each nontransferring Member shall notify the Managers in writing of his desire to purchase a portion of the Membership Interest being so transferred.  The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest, which may be so transferred.  Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his pro rata share of Membership Interest, then the other Members can successively and proportionality elect, in the same manner as described in Section 7.3 below, to purchase the entire Membership Interest.  If the notice sets forth noncash consideration, the Company and such purchasing Member each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the noncash consideration offered, as determined by the Managers.

C.   If the Company or the other Members do not elect to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the entire Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) all requirements of

this Article VI are met.  If such Membership Interest is not so
transferred, the transferring Member must give notice in
accordance with this Section prior to any other or subsequent
transfer of such Membership Interest.


### ARTICLE VII

### CONSEQUENCES OF DEATH, DISSOLUTION,
### RETIREMENT OR
### BANKRUPTCY OF MEMBER

7.1  _Dissolution Event_.  Upon the occurrence of a
Dissolution Event, the Company shall dissolve unless, within
ninety (90) days of the Dissolution Event, the Members holding a
Majority of the remaining Membership Interests (the "Remaining
Members") consent to the continuation of the business of the
Company.  Upon the withdrawal of a Member under Section 3.3, or
if the Remaining Members consent to the continuation of the
business of the Company, the Company and/or the Remaining Members
shall purchase, and the Member whose actions or conduct resulted
in the Dissolution Event ("Former Member") shall sell, the Former
Member's Membership Interest (hereinafter "Former Member's
Interest") as provided in this Article VII to avoid dissolution
of the Company.

7.2  _Purchase Price_. The purchase price for the Former
Member's Interest shall be the Capital Account balance of the
Former Member as adjusted pursuant to Article II; provided,
however, that if the Former Member of the Company deems the
Capital Account balance to vary from the fair market value of the
Former Member's Interest by more than ten percent (10%), such
party be entitled to require an appraisal by providing notice of
the request for an appraisal within fifteen (15) days after the
determination by Remaining Members to continue the business of
the Company.  In such event, the value of the Former Member's
Interest shall be determined by three (3) independent appraisers,
one selected by the Former Member (or representative), one
selected by the Company, and one selected by the two appraisers
so named.  The fair market value of the Former Member's Interest
shall be the average of the two appraisals closest in amount to
each other.  The party requesting such appraisal shall pay one-
half of such expense and the Remaining Members shall pay the
remaining one-half of such expense.  Notwithstanding the
foregoing, if the Dissolution Event results from a breach of this
Agreement by the Former Member, the purchase price shall be
reduced by an amount equal to the damages suffered by the Company
or the Remaining Members as a result of such breach.

7.3  _Notice of Intent to Purchase_.  The Managers shall
notify in writing the remaining Members of the purchase price of
the Former Member's Interest within ten (10) days of its

determination, who shall each then notify the managers in writing of his desire to purchase a portion of the Former Member's Interest within twenty (20) days of the date notice is given by the Managers.  The failure of any Remaining Member to submit a notice within the applicable twenty (20) day period shall constitute an election on the part of the Members not to purchase any of the former Member's Interest.  Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.  If any Remaining Member elects to purchase less than all of his pro rata share of the Former Member's Interest, then the Remaining Members shall be entitled to elect to purchase that portion of the Former Member's Interest which has not yet been elected for purchase as is proportionate to the Percentage Interest held by each elected Remaining member, i.e, which bears the same proportion that the Percentage Interest of the Remaining Members bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.  This proportionate right of first refusal shall be repeated (using the ten and twenty day notice periods noted above) until the Remaining Members: (i) no longer wish to acquire any more of the Former Member's Interest or, if sooner, (ii) have elected to acquire one hundred percent of such Former Member's Interest.  If the Remaining Members fail to purchase the entire interest of the Former Member, the Company shall purchase any remaining share of the Former Member's Interest.

   7.4   <u>Payment of Purchase Price</u>.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the remaining Members: (i) the Company or the Remaining Members shall at the closing pay in cash the total purchase price for the Former Member's Interest; or (ii) the Company or the Remaining Members shall pay at the closing one-fifth (1/5) of the purchase price in cash and shall pay the balance of the purchase price in four equal annual principal installments, plus accrued interest, payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at the applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation to pay the balance due shall be evidenced by a promissory note, and if purchase by a Remaining Member, secured by a pledge of the interest in the Company being purchased.

   7.5   <u>Closing Purchase of Former Member's Interest</u>.  The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 a.m. at the principal

office of the Company no later than thirty (30) days after the date on which the exercising of the right of first refusal noted above has been completed, except that if the closing date falls on a Saturday, Sunday, or legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest.  The Former Member, the Company and the Remaining Member shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

## ARTICLE VIII

### ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1   <u>Books and Records</u>.  The books and records of the Company shall reflect all Company transactions and shall be kept in accordance with the accounting methods followed for federal income tax purposes.  The company shall maintain at its principal office in California all of the following: (i) a current list of the full name and last known business or residence address of each Member and Economic Interest Owner, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner; (ii) the full name and business or residence address of the Managers; (iii) a copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed; (iv) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years; (v) a copy of this Agreement and any and all amendments thereto together with executed copes of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed; (vi) copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and (vii) the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

8.2   <u>Delivery to Members and Inspection</u>.   Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interests of the Person as Member, Manager or Economic Interest owner, to (i) inspect and copy during normal business hours any of the Company records described in Section 8.1; and (ii) obtain from the Managers, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

8.3   <u>Annual Statement</u>.  A Manager shall prepare and send an annual report to each of the Members not less than 120 days after the close of each Fiscal Year.  The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year.  Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Managers that the financial statements were prepared without audit from the books and records of the Company.  The Managers shall cause to be prepared at least annually, at the Company's expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns.  The Managers shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax information returns.  The Managers, at Company expense, shall cause to be prepared and timely filed with the appropriate authorities, the income tax returns for the Company, any amendments to, restatements of, the Articles, as well as any reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations.

8.4   <u>Bank Accounts</u>.  The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

8.5   <u>Accounting and Tax Matters</u>.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers.  The Managers shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members.  The Managers, who shall serve as the "Tax Matters Partner," as defined in Code Section 6231, shall represent the Company at the Company's expense in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.  The Tax Matters Partner shall oversee the Company tax affairs in the overall best interest of the Company.  If for any reason the Tax Matters Partner can no longer serve in that capacity or cease to be a Member or Manager, as the case may be, Members holding a Majority interest may designate another to be Tax Matters Partner.

**ARTICLE IX**

<u>**DISSOLUTION AND WINDING UP**</u>

9.1   _Dissolution_.  The Company shall be devolved, its
assets shall be disposed of, and it's affairs wound up in the
first to occur of the following: (i) upon the happening of any
event of dissolution specified in the Articles; (ii) upon the
entry of a decree of judicial dissolution pursuant to Section
17707.03 of the California Corporations Code; (iii) upon the vote
of the Members; (iv) upon the occurrence of a Dissolution Event
and the failure of the Remaining Members to consent in accordance
with Section 7.1 to continue the business of the Company within
ninety (90) days after the occurrence of such event or the
failure of the Company or the Remaining Members to purchase the
Former Member's Interest; or (v) the sale of all or substantially
all of the assets of the Company.  As soon as possible following
the occurrence of any of the foregoing events, the Managers, or
if none, the Members, shall execute a Certificate of Dissolution
in such form as shall be prescribed by the California Secretary
of State and file the Certificate as required by the Act.

9.2   _Winding up_.  Upon the occurrence of any event
specified in Section 9.1, the Company shall continue solely for
the purpose of winding up its affairs in an orderly manner,
liquidating its assets, and satisfying the claims of its
creditors.  The Managers, or, if none, the Members, shall be
responsible for overseeing the winding up and liquidation of the
Company, shall take full account of the liabilities and assets of
the Company, shall either cause its assets to be sold or
distributed (and, if sold, as promptly as is consistent with
obtaining the fair market value thereof), and shall cause the
proceeds therefrom, to the extent sufficient therefor, to be
applied and distributed as provided in Section 9.4.  The Persons
winding up the affairs of the Company shall give written notice
of the commencement of winding up by mail to all known creditors
and claimants whose addresses appear on the records of the
Company.  The Managers or Members winding up the affairs of the
Company shall be entitled to reasonable compensation for such
services.

9.3   _Distribution in Kind_.  Any noncash asset distributed
to one or more Members shall first be valued at its fair market
value to determine the Net Profit or Net Loss that would have
resulted if such asset were sold for such value, such Net Profit
or Net Loss shall then be allocated pursuant to Article V, and
the Members' Capital Accounts shall be adjusted to reflect such
allocations.  The amount distributed and charged to the Capital
Account of each Member receiving an interest in such distribution
asset shall be the fair market value of such interest (net of any
liability secured by such asset that such Member assumes or takes
subject to).  The fair market value of such asset shall be
determined by the Managers or by the Members or, if any Member
objects, by an independent appraiser (any such appraiser must be
recognized as an expert in valuing the type of asset involved)

selected by the Managers or liquidating trustee and approved by the Members.

9.4   <u>Order of Payment of Liabilities Upon Dissolution</u>. After determining that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.  Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.  The payment of a debt or liability, whether the whereabouts of the creditors is known or unknown, has been adequately provided for either of the following means: (i) payment thereof has been assumed or guaranteed in good faith by one or more financially responsible person or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or the Managers to be adequate at the time of any distribution of the assets pursuant to this Section; or (ii) the amount of the debt or liability has been deposited as provided in Section 2008 of the California Corporations Code.  This Section 9.4 shall not prescribe the exclusive means of making adequate provisions for debts and liabilities.

9.5   <u>Compliance with Regulations</u>.  All payments to the Members upon the winding up and dissolution of the Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of the Regulations.

9.6   <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member except as provided in Article X.

9.7   <u>Certificate of Cancellation</u>.   Any Manager or Member who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

9.8   <u>No action for Dissolution</u>. Except as expressly permitted in the Agreement, a Member shall not take any voluntary

action that directly causes a Dissolution Event.  The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company and its Members if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1. Except where the Managers have failed to liquidate the Company as required by the Article IX, each Member hereby waives and renounces his right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles of this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights of interests of the complaining Member. Damages for breach of this Section 9.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE X

### INDEMNIFICATION AND INSURANCE

10.1 <u>Indemnification of Agents</u>. The Company shall indemnify any person who was or is a party or is threatened to be made a party of any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee, or agent of the Company or that being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manger, director, officer, employee or their agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.  The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem prudent.

10.2 <u>Indemnification by SFRC</u>. In addition to the indemnity set forth above, in consideration for WOMAC's admission to the Company, SFRC shall indemnify WOMAC to the extent that WOMAC is a party or is threatened to be made a party of any threatened, pending or completed action, suit or proceeding by reason of the fact that WOMAC is or was a Member to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit; provided, however, in no event shall SFRC have any obligation to indemnify WOMAC for claims related to WOMAC's gross negligence or willful misconduct.

10.3   Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

## ARTICLE XI

## DEFINITIONS; MISCELLANEOUS

11.1   Definitions.  When used in this Agreement, the following terms shall have the meanings set forth below.  Terms not defined in the Section 11.1 shall have the meanings set forth elsewhere in this Agreement, or, if not so defined, the meanings given to such terms under laws of the State of California.

A.   "Act" shall mean the California Revised Uniform Limited Liability Company Act, codified in the California Corporations Code, Section 17701.01 et seq., as the same may be amended from time to time.

B.   "Affiliate" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member.  The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

C.   "Bankruptcy" shall mean: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United State Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of Section 303(f)(1) of the United

Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

   D.    "Code" Shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable the Regulations (as defined below).

   E.    "Dissolution Event" Shall mean with a respect to any Member one or more of the following: death, insanity, withdrawal, resignation, expulsion, Bankruptcy, dissolution or occurrence of any other event which terminates the continued membership of any Member unless the other Members consent to continue the business of the Company pursuant to Section 9.1.

   F.    "Distributable Cash" shall mean the amount of cash which the Managers deem available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Managers deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

   G.    "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of Members, including, without limitation, the right to vote or participate in the management, except as provided in Section 17704.10 of the Corporations Code, any right to information concerning the business and affairs of the Company.

   H.    "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

   I.    "Majority Interest" shall mean one or more Percentage Interests of members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

   J.    "Member" shall mean each Person (said term to include all authorized legal representatives) who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with this Agreement or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

   K.    "Net Profits and Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles, consistently applied, employed under the method of accounting used by the Company at the close of each fiscal year on the

Company's information tax return filed for federal income tax purposes.

L. "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit "A" hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement. Percentage Interests shall be determined annually, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of the Members, effective as of the first day of the Company's Fiscal Year but with all distributions under this Agreement to be deemed to have occurred on such day immediately prior to determination of the Percentage Interest of a Member.

M. "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

11.2  Legends.  Each Member understands and agrees that the certificates (if any) evidencing the Membership Interest may bear the following or a substantially similar legend:

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE LAWS OF ANY STATE, AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS ALSO SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS SET FORTH HEREIN.

11.3  Headings; Interpretation.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption of burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his counsel.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

11.4 <u>Jurisdiction</u>. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Alameda County, California in any action on a claim arising out of, under, or in connection with the Agreement or the transactions contemplated by this Agreement.  Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 11.7 of this Agreement, and that when so made shall be as if served upon him personally within California.

11.5 <u>Severability; Exhibits</u>.  If any provision of the Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

11.6 <u>Additional Documents and Acts</u>.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

11.7 <u>Notices</u>.  Any notice to be given or to be served upon the Company or any party hereto in connection with the Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to the Members or Managers at the address specified in Exhibit "A" hereto.  Any party may, at any time by giving five (5) days' prior written notice to other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

11.8 <u>Reliance on Authority of Person Signing</u>.  If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

11.9 <u>No Interest in Company Property</u>.  No Member or Economic Interest Owner has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the

Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

11.10 <u>Attorney's Fees</u>.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without litigation, reasonable attorney's fees and expenses.

11.11 <u>Time is of the Essence; Remedies Cumulative</u>.  All dates and times in this Agreement are of the essence.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

11.12 <u>Special Power of Attorney</u>.  Subject to the Act, and the limitations of this Agreement each Member grants the Managers a special power of attorney irrevocably making, constituting, and appointed the Managers as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to the execution, acknowledgement, delivery and filing of promissory notes, security agreements, UCC-1 financing statements, assignments of certificates of membership interest, or other documents of transfer to be delivered pursuant this Agreement, as well as any consent to the representation of the Company by counsel.  The foregoing special power: (i) is irrevocable except upon resignation or removal of Manager as set forth herein, (ii) is coupled with an interest, and (iii) shall survive a Member's death, incapacity, or dissolution.

11.13 <u>Binding Effect; Parties in Interest</u>.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement of any Persons other than the Members and Managers and their respective successors and assigns, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

11.14 <u>Complete Agreement; Amendments</u>.  This Agreement and the Articles constitute the complete and exclusive statements of agreement among the Members and Managers with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managers or any of them.  No representation,

statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Managers or have any force or effect whatsoever. To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control. All amendments to this Agreement must be in writing and signed by all of the Members. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

11.15 <u>On-Going Community Liaison and Outreach Fee</u>. As of the date of this Agreement, the Company and WOMAC have entered into a services agreement (the "Community Liaison Agreement") pursuant to which the Company has retained WOMAC to provide certain community outreach and marketing services for the benefit of the Project, and the community primarily served by the Project. As more particularly set forth in the Community Liaison Agreement, such services include (but are not limited to), working with tenants of the Project, in particular, the grocery store operator, in attracting community residents to utilize the Project, planning and organizing community events for the benefit of the Project and the community, and other marketing assistance and community support for the tenants of the Project. In consideration for such services provided by WOMAC to the Company, the Company shall pay an annual fee to WOMAC in the amount of $50,000 per year as more particularly set forth in the Community Liaison Agreement (the "Community Liaison Fee"). The Members and Manager each agree that the Community Liaison fee is reasonable, and that the Community Liaison Agreement is in the best interest of the Company. Notwithstanding any provision in this Agreement to the contrary, the Members acknowledge that the Community Liaison Fee does not constitute a distribution under Article V of this Agreement.

11.16 <u>Special Purpose Bankruptcy Remote Entity Requirements</u>. Each and all of the provisions set forth in Exhibit "B" (the "SPE Provisions")attached hereto are incorporated herein and shall constitute part of this Agreement pursuant to and in accordance with the express terms set forth in Exhibit "B".

IN WITNESS WHEREOF, all of the Members of JL GATEWAY, LLC, a California limited liability company, have executed this Agreement, effective as of _____*DEC 16*_____, 2014.

_____
THOMAS HENDERSON for
SAN FRANCISCO REGIONAL CENTER,
LLC, Manager

_____
For WOMAC PROPERTIES INC.

IN WITNESS WHEREOF, all of the Members of JL GATEWAY, LLC, a California limited liability company, have executed this Agreement, effective as of _____, 2014.


_____
THOMAS HENDERSON for
SAN FRANCISCO REGIONAL CENTER,
LLC, Manager


For WOMAC PROPERTIES INC.

## EXHIBIT "A"

CAPITAL CONTRIBUTION OF MEMBERS AND ADDRESS OF MEMBERS AND
MANAGER AS OF
JL GATEWAY, LLC

_____, 2014

| Members'<br>Names | Members'<br>Capital Contribution | Members'<br>Percentage Interest |
|---|---|---|
| 1.  SAN FRANCISCO REGIONAL<br>CENTER, LLC | | 75% |
| 2.  WOMAC PROPERTIES, INC. | | 25% |

Managers' Names and Addresses

1.  SAN FRANCISCO REGIONAL CENTER, LLC, 419 13TH Street, Suite 888, Oakland, CA 94612.

FAX No. (510) 893-9881

2.  WOMAC PROPERTIES INC. 1156 8th Street, Oakland CA 94607

FAX No. (510)

## EXHIBIT "B"

All capitalized terms (other than the term "Company" which shall have the meaning given to term in the Agreement to which this Exhibit is attached and forms a part) used but not otherwise defined in this Exhibit "B" shall have the meanings given to such terms in that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of December __, 2014, made by the Company for the benefit of Thorofare Asset Based Lending Fund III, L.P., a Delaware limited liability company (together with its successors and assigns, "Lender").

Notwithstanding anything to the contrary in this Agreement and any provision of law that otherwise empowers the Company, and so long as any Indebtedness remain outstanding and is not discharged in full, the Company covenants and agrees that it shall be and remain a special purpose bankruptcy remote entity and shall at all times comply with the following covenants:

(i)    The purpose for which the Company is organized shall be limited to (a) owning, holding, selling, leasing, transferring, exchanging, operating and managing the Company's interest in the Trust Property, (b) entering into the Loan, (c) refinancing the Trust Property in connection with a permitted repayment of the Loan, and (d) transacting any and all lawful business that is incident, necessary and appropriate to accomplish the foregoing.

(ii)   The Company does not own and will not own any asset or property other than (i) the Trust Property and (ii) incidental personal property necessary for and used in connection with the ownership or operation of the same.

(iii)  The Company shall not engage in a business other than the ownership, operation and management of the Trust Property and any other property which is hereafter acquired by the Company with Lender's prior written consent.

(iv)   Except as provided in this Agreement as to the applicable Manager of the Company, the Company will not enter into any contract or agreement with any affiliate, Guarantor or any affiliate of Guarantor.

(v)    The Company has not incurred and will not incur any indebtedness, secured or unsecured, other than (1) the Loan and incidental costs and expenses associated therewith, (2) indebtedness incurred in the ordinary course of business to vendors and suppliers of services to the Trust Property (not more than thirty (30) days past due), and (3) non-delinquent property taxes and assessments.

(vi)   The Company has not made and will not make any loans or advances to any person or entity and shall not acquire obligations or securities of an affiliate.

(vii)  The Company is and will remain solvent and the Company will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same

shall become due, provided that this covenant shall not imply any capital contribution obligation.

(viii) The Company has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and the Company will not amend, modify or otherwise change the special purpose entity requirements in the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of the Company without the written consent of Lender.

(ix) The Company shall maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates. The Company's assets will not be listed as assets on the financial statement of any other person. The Company shall have its own separate financial statement. To the extent the Company is required to file any tax returns, the Company will file its own tax returns and will not file a consolidated federal income tax return with any other corporation, except to the extent the Company is a disregarded entity for tax purposes. The Company shall maintain its books, records, resolutions and agreements as official records.

(x) The Company will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other person or entity, shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name and shall not identify itself or any of its affiliates as a division or part of the other.

(xi) The Company will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, provided that this covenant shall not imply any capital contribution obligation.

(xii) Neither the Company nor any constituent party will seek the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, or, except as permitted under the Loan Documents, the sale of material assets of the Company.

(xiii) The Company will not commingle the funds and other assets of the Company with those of any other person, and will not participate in a cash management system with any person other than Lender.

(xiv) The Company will not commingle its assets with those of any other person and will hold all of its assets in its own name.

(xv) The Company will not guarantee or become obligated for the debts of any other person and does not and will not hold itself out as being responsible for the debts or obligations of any other person.

(xvi) The Company shall not pledge its assets for the

benefit of any other person, other than with respect to the Loan.

(xvii)Without the unanimous consent of each of the Company's members, partners or other equity interest holders, as applicable, the Company shall not file a petition for relief under the Bankruptcy Code, or under any other present or future state of federal law regarding bankruptcy, reorganization or other debtor relief law.

# EXHIBIT B

## TO COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL MISPRESENTATION AND MONEY LENT

### *WOMAC PROPERTIES, INC. et al.* v. *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

### ALAMEDA COUNTY SUPERIOR COURT

### DESCRIPTION OF DOCUMENT:

### Promissory Note from San Francisco Regional Center to WOMAC in the Amount of $3,700,000 dated December 17, 2014

# EXHIBIT B

# PROMISSORY NOTE

**Principal Amount:**     **$3,700,000.00**              **Effective Date: December _1 7,_ 2014**

FOR VALUE RECEIVED, the undersigned [[SAN FRANCISCO REGIONAL CENTER]], a California [[limited liability company]] ("***Borrower***") promises to pay to the order of WOMAC or its assignee (***"Holder")***, the sum of Three Million Seven Hundred Thousand and xx/100 Dollars ($3,700,000.00), with interest from the date set forth above until paid, at the rate of three percent (3.0%) per annum, together with applicable fees, costs and attorneys' fees and costs, until repayment in full of all obligations hereunder.

1.      **ADVANCES**. The funds advanced pursuant to this promissory note ("***Promissory Note***" or "***Note***") are for the purpose of acquiring that certain real property commonly known as 800-900 Market, Oakland, California ("***Property***") from Holder. All principal shall be disbursed in one advance, at closing or pursuant to escrow instructions given by Holder. This Note does not revolve. Any principal repaid by Borrower shall not be re-advanced by Holder.

. 2.     **REPAYMENT; INTEREST PAYMENTS; MATURITY**. This Note and all amounts due and owing hereunder shall be repaid as follows:

A.      Interest shall be paid monthly commencing on the 5th day of February, 2015, and continuing on the Fifth (5th) day of each month thereafter (each, a "***Payment Date***") until the Maturity Date hereof (each such interest payment referred to as an "***Interest Payment***"). Any failure by Borrower to make an Interest Payment on or before the due date of such payment shall result in an immediate Event of Default hereunder.

B.      Notwithstanding any other provision of this Note, all outstanding principal, together with accrued and unpaid interest, fees and costs, including but not limited to late charges and all attorneys' fees and costs (together, "Holder Expenses") that may remain due and owing (if any), shall be due and payable in full on December _____ 2015, (the "***Maturity Date***").

3.      **FIXED INTEREST RATE**. The interest rate on this Note shall be fixed at three percent (3.00%) per annum. The annual interest rate for this Note is computed based on a 360 day year and a thirty day month (i.e., the daily interest amount equals the annual interest amount at the stated per annum rate for principal outstanding, divided by 360; such daily interest amounts summed for thirty days in the period). Borrower will pay Holder at Holder's address as Holder may designate in writing from time to time. Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

4.      **PREPAYMENTS**. Borrower may make prepayments of principal hereunder without penalty.

5.      **EARLY PAYMENTS**. So long as Borrower is not in default hereunder, any Interest Payment received by Holder before a Payment Date will be applied by Holder to outstanding Holder Expenses, if any, with the remainder to the Interest Payment due as of next occurring Payment Date. Amounts received in excess of outstanding Holder Expenses (if any) and accrued interest due as of the Payment Date will be applied to principal. Early Interest Payments will not, unless agreed to by Holder in writing, relieve Borrower of Borrower's obligation to continue to make Interest Payments on each Payment Date. Borrower agrees not to send Holder payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Holder may accept it without losing any of Holder's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Holder.

6.　　**LATE CHARGE.** Borrower recognizes that delay by Borrower in making the payments required under this Note, including, but not limited to, payments of interest, will result in Holder incurring additional expense in servicing this Note, in loss to Holder of the use of the money due, and in frustration to Holder in meeting its financial commitments. Borrower agrees that if, for any reason, Borrower fails to make any Interest Payment when due under this Note, Holder shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impracticable to ascertain the extent of such damages. Borrower therefore agree that if a payment is not made when due, Borrower will be charged **5.0% of the unpaid portion of the payment,** which is a reasonable estimate of such damages.   Notwithstanding the foregoing, the payment of a late charge shall not affect Holder's right to fully enforce the terms of this Agreement, and shall not operate as forbearance or cause a stay in any right of Holder hereunder.

7.　　**NO TRANSFER OF BORROWER'S INTEREST.** Without the prior written consent of Holder (which consent will not be unreasonably withheld), Borrower shall not sell, hypothecate, encumber, assign, contract to sell, grant an option to sell, lease, or otherwise transfer or convey the Property or any portion thereof or interest therein or suffer its title therein to be divested whether voluntarily, by operation of law or otherwise.   If such an event occurs without Holder's prior written consent, Holder may, in his sole option and upon written notice to Borrower, accelerate the Maturity Date of the sums secured hereby and declare all sums immediately due and payable.

8.　　**CONDITIONS; REPRESENTATIONS AND WARRANTIES.** Borrower hereby represents and warrants to Holder the following:

A.　　**Due Organization.** Borrower is duly existing and in good standing in its jurisdiction of formation.

B.　　**Authorization.** The execution, delivery and performance by Borrower of this Note and any related loan documents to which it is a party have been duly authorized, and do not (i) conflict with any of Borrower's organizational documents, or (ii) contravene, conflict with, constitute a default under or violate any material Requirement of Law.

C.　　**Bankruptcy.** No proceedings in bankruptcy or insolvency have ever been instituted by or against Borrower or any member, manager, partner or affiliate thereof, and no such proceeding is now pending or contemplated.

D.　　**Solvency.** Borrower is, and if there are any general partners or members or managers of Borrower, such partners, members or managers are solvent pursuant to the laws of the United States, as reflected by the entries in Borrower's books and records and as reflected by the actual facts.

9.　　**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

A.　　**Payment Default.** Borrower fails to make any Interest Payment when due under this Note, or pay on the Maturity Date all outstanding principal together with accrued interest and any other sums due and owing as of the Maturity Date.

B.　　**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Holder and Borrower.

C.　　**False Statements/Reports.** Any warranty, representation or statement made or furnished to Holder by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect.

D.　　**Insolvency.** The insolvency of Borrower, the appointment of a receiver for any

Promissory Note – Jack London Gateway

part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or either of them.

10. **LENDER'S RIGHTS.** Upon the occurrence of an Event of Default, Holder may declare the entire unpaid principal balance under this Note, all accrued unpaid interest and any other sums owing immediately due and payable without further notice or demand.

11. **ATTORNEYS' FEES; EXPENSES.** Holder may hire or pay someone else to enforce its rights under the Note and help collect this Note if Borrower does not pay, and Borrower shall pay such fees and costs.

12. **SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower and shall inure to the benefit of Holder and its successors and assigns.

13. **TIME OF THE ESSENCE.** Time is of the essence in performance under this Note.

14. **GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Holder may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower understands and agrees that, with or without notice to Borrower, Holder may release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Holder may choose; and determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs or endorses this Note, to the extent allowed by law, waives any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Holder may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Holder's security interest in the collateral; and take any other action deemed necessary by Holder without the consent of or notice to anyone.

15. **GOVERNING LAW.** This Note will be governed by the laws of the State of California without regard to its conflicts of law provisions.

16. **CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Holder's request to submit to the jurisdiction of the State and Federal courts of Alameda County, State of California.

17. **JURY WAIVER.** TO THE EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR CLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR HOLDER TO ENTER INTO THIS AGREEMENT. BORROWER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, TO THE EXTENT PERMITTED BY LAW, FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

**BORROWER:**

[[SAN FRANCISCO REGIONAL CENTER]]

By: _Thomas m Henderson_

Name: _THOMAS M HENDERSON_

Title: _MANAGING MEMBER_

# EXHIBIT 2

**DECLARATION OF STEPHEN G. PREONAS IN SUPPORT OF INTERESTED PARTIES WOMAC PROPERTIES, INC. AND JLG ASSOCIATES, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**

## *SEC* v. *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## NORTHERN DISTRICT OF CALFORNIA CASE NO.  No. 3:17-CV-00223-RS

## DESCRIPTION OF DOCUMENT:

## Deed of Trust from JL Gateway LLC to Thorofare Asset Based Lending Fund III. LP dated December 17, 2014

# EXHIBIT 2

# PROMISSORY NOTE SECURED BY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

$6,945,000.00

December 17, 2014

FOR VALUE RECEIVED, and upon the terms and conditions set forth herein, JL GATEWAY, LLC, a California limited liability company, having an address for purposes of notices and legal process at 409 13th Street, Suite 888, Oakland, California 94612 ("**Borrower**"), promises to pay to those individuals and/or entities listed on Exhibit A attached hereto, or order (collectively, "**Lender**"), at 601 South Figueroa Street, Suite 2050, Los Angeles, California 90017 or at any such other place as may be designated in writing by Lender, the principal sum of Six Million Nine Hundred Forty-Five Thousand and 00/100 Dollars ($6,945,000.00), in lawful money of the United States of America, together with interest thereon to be computed from the date hereof at the Interest Rate (as defined below), and to be paid in accordance with the terms of this Promissory Note Secured by Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (this "**Note**").

1.  **INTEREST**.     The term "**Interest Rate**" as used herein shall mean an interest rate equal to ten and 50/100 percent (10.50%) per annum. Interest for any month or fractional part thereof shall be calculated on the basis of a 360-day year and the daily amount so determined shall be multiplied by the actual number of days for which interest is being paid.

2.  **PAYMENT TERMS**.

    2.1.    Borrower agrees to pay sums under this Note in installments as follows:

    2.1.(a) On the date hereof an amount equal to the earned interest from the date of this Note through and including December 31, 2014;

    2.1.(b) Thereafter, except as may be adjusted in accordance with this Section 2.1(b), Borrower shall pay to Lender consecutive monthly installments of accrued interest for each immediately prior month in an amount equal to the Monthly Payment Amount (as defined below) (together with any other amounts required to be paid under any of the other Loan Documents [as defined below]), commencing on February 1, 2015, and continuing on the first day of each month thereafter through and including June 1, 2016, with all principal, accrued and unpaid interest and all other amounts then due and owing under the Loan Documents due and payable, in full on the date that is eighteen (18) months after the date hereof (the "**Maturity Date**"). The "**Monthly Payment Amount**" shall equal interest-only payments on the outstanding principal balance, calculated at an annual interest rate equal to the Interest Rate, computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) months of thirty (30) days each. Commencing on the date hereof, the Monthly Payment Amount shall equal Sixty Thousand Seven Hundred Sixty-Eight and 75/100 Dollars ($60,768.75). For payments of accrued interest for partial months, the Monthly Payment Amount shall be adjusted to equal the pro rata amount for the number of days that interest has accrued during such partial month. Notwithstanding the foregoing, provided (i) that no Event of Default (as defined below)

or any event that with the passage of time or the giving of notice would constitute an Event of Default, has at any time occurred under this Note or any of the other Loan Documents (whether or not subsequently cured), (ii) that the loan to value ratio of the loan evidenced by this Note (the "**Loan**") to the Property (based upon Lender's then current valuation of the Property in its sole discretion) is equal to or less than 68% (and provided further, that (i) the Loan meets Lender's then current underwriting criteria and (ii) Lender shall have received, at Borrower's sole cost and expense, an MAI appraisal indicating a value supporting such loan to value ratio), and (iii) that the "Debt Yield" (as hereinafter defined) for the Loan shall be at least ten percent (10%) as determined by Lender in its sole discretion, then Borrower shall have one (1) option to extend the Maturity Date by six (6) additional months (the "**Extension Term**"), by written notice to Lender not less than thirty (30) days (and not more than sixty (60) days) prior to the Maturity Date (the "**Extension Request Notice**") together with (i) payment in immediately available funds to Lender of an extension fee in the amount of Eighty-Six Thousand Eight Hundred Twelve and 50/100 Dollars ($86,812.50) for such extension and (ii) payment in immediately available funds to Lender of an extension processing fee in the amount of Two Thousand Nine Hundred Ninety-Five and 00/100 Dollars ($2,995.00).   Except as expressly set forth in the preceding sentence, Borrower shall have no right to extend the Maturity Date of this Note. Concurrently with Borrower's delivery of an Extension Request Notice pursuant to this Section 2.1(b), and thereafter, within three (3) business days following Lender's request therefor, Borrower shall deliver to Lender statements of income and expense for the Property and any and all other financial information with respect to the Property as Lender shall require in its sole discretion.   As used herein, the following terms shall have the following meanings:

(i)     "**Debt Yield**" for the Loan shall mean the ratio (expressed as a percentage) of (a) the product of (i) the "Projected Net Operating Income" (as defined below) for the Extension Term as determined by Lender in its sole discretion multiplied by (ii) the number two (2), to (b) the outstanding principal balance of the Loan (plus any undisbursed portion of the Loan) as of the Maturity Date.

(ii)     "**Projected Net Operating Income**" shall mean the amount, if any, by which (a) rent and other revenues anticipated to be derived from the ordinary operations of the Property (and in the case of rent, solely from tenants that are in occupancy, open for business and paying full contractual rent without right of offset or credit and beyond any free rent period), as determined by Lender in its sole discretion, exceeds (b) operating expenses anticipated to be incurred or otherwise applicable to the Property (including all costs and expenses anticipated to be incurred in connection with the operating, maintenance and management of the Property such as utilities, repairs, insurance, taxes, advertising expenses, tenant improvement costs and leasing commissions) as determined by Lender in its sole discretion, including, without limitation, such market-based adjustments to such expenses as Lender shall determine in its sole discretion.

2.1.(c) All accrued and unpaid interest, the unpaid principal balance hereof and any other amounts due and payable under the Loan Documents (as defined below) are due and payable on the earlier to occur of (i) the Maturity Date, or (ii) the date on which the Indebtedness (as such term is defined in Section 5.1 hereof) becomes immediately due and payable hereunder (the "**Acceleration Date**").

2.2.   Prepayment.  Borrower shall have the right to pre-pay in whole, but not in part, all of the outstanding principal balance, accrued interest and other amounts owing under the Loan Documents; provided that if such pre-payment occurs prior to the expiration of the sixth (6th) month of the term of this Note, Borrower shall pay to Lender an additional amount equal to the difference between the interest payments actually made under this Note and the interest payments that would be due for six (6) months under this Note (the "**Yield Protection Fee**").  In addition to the Yield Protection Fee, upon repayment of this Note at any time, Borrower shall pay to Lender an "**Exit Fee**".  Provided that no Event of Default (as defined below) shall have occurred under this Note or any of the other Loan Documents (whether or not subsequently cured), the Exit Fee shall be Sixty-Nine Thousand Four Hundred Fifty and 00/100 Dollars ($69,450.00).  In the event that an Event of Default has at any time occurred under this Note or any of the other Loan Documents (whether or not subsequently cured), the Exit Fee shall be Four Hundred Sixteen Thousand Seven Hundred and 00/100 Dollars ($416,700.00).  Borrower acknowledges and agrees that the increase of the Exit Fee as a result of the occurrence of an Event of Default as provided herein, is not a penalty, but is a material inducement for Lender to make the Loan and represents a fair and equitable allocation of risk and loss to Lender as a result of the occurrence of an Event of Default.

2.3.   All parties hereto, whether Borrower, principal, surety, guarantor or endorser, hereby waive demand, notice of demand, presentment for payment, notice of dishonor, protest and notice of protest.

3.  **DEED OF TRUST/ADDITIONAL LOAN DOCUMENTS**.

3.1.   This Note is secured by (a) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith between Borrower, as trustor, Lender, as beneficiary, and a trustee as identified therein (the "**Deed of Trust**") encumbering that certain real property located in the County of Alameda, State of California, with an address of 800-900 Market Street, Oakland, California 94607 (the "**Property**") and (b) certain other instruments and agreements dated of even date herewith from Borrower to Lender or between Borrower and Lender (collectively said documents and agreements may be referred to herein as the "**Loan Documents**").  All of the terms, covenants, conditions and agreements contained in the Deed of Trust are hereby incorporated herein and made a part hereof.  Notwithstanding anything to the contrary contained in any of the Loan Documents, Borrower acknowledges and agrees that although the "Guaranty Agreement" and "Environmental and Hazardous Substances Indemnity Agreement", each of even date herewith, form a part of the Loan Documents, the Guaranty Agreement and Environmental and Hazardous Substances Indemnity Agreement are not secured by the Deed of Trust.

4.  **APPLICATION OF PAYMENTS**.

4.1.   Each Monthly Payment Amount paid by Borrower hereunder, at the option of Lender, shall be applied as follows:

4.1.(a)  First, to any costs of collection hereunder;

4.1.(b) Then, to any unpaid costs or balances of advances made by Lender in connection with the Deed of Trust and/or any Loan Documents and/or this Note and to any other amounts which may be overdue on account of any of the several terms, provisions, conditions or covenants contained in this Note, the Deed of Trust and the Loan Documents;

4.1.(c) Then, to late charges and any other fees or charges due hereunder, if any;

4.1.(d) Then, to interest then due and payable hereunder;

4.1.(e) Then to the principal balance hereof; and

4.1.(f) The remainder, to any amounts advanced by Lender to cure defaults in connection with the Loan, relating to remediation of any hazardous substances on the Property.

4.2.    Monthly installments of principal (if required) and interest shall be paid when due, regardless of the prior acceptance by Lender of payments in excess of the regular monthly installment of principal (if required) and interest.

4.3.    The designation or allocation by Borrower of the disposition or allocation of any payments made will not be binding upon Lender which may allocate any and all such payments to interest, principal and other fees and charges due hereunder or to any one or more of them, in such amount, priorities and proportions as Lender may determine in its sole discretion in accordance with the terms hereof.

5.  **DEFAULT AND ACCELERATION.**

5.1.    It is hereby expressly agreed that (i) the whole of the principal sum of this Note, (ii) interest, default interest, late charges, fees and other sums, as provided in this Note, (iii) all other monies agreed or provided to be paid by Borrower in this Note, the Deed of Trust or the Loan Documents, (iv) all sums advanced pursuant to the Deed of Trust and the other Loan Documents, and (v) all sums advanced and costs and expenses reasonably incurred by Lender in connection with the Indebtedness (as defined below) or any part thereof, any renewal, extension, or change of or substitution for the Indebtedness or any part thereof, or the acquisition or perfection of the security granted pursuant to the Deed of Trust, whether made or incurred at the request of Borrower or Lender (the sums referred to in (i) through (v) above shall collectively be referred to as the "**Indebtedness**") shall, **WITHOUT NOTICE**, become immediately due and payable at the option of the holder hereof upon the happening of any of the following events (each, an "**Event of Default**"):

5.1.(a) Borrower fails to pay any amount due to Lender under this Note within ten (10) days from the due date for such payment, or if no due date is provided for, within ten (10) days from the date written demand therefor is made;

5.1.(b) Borrower fails to pay any amount due and payable to Lender under

the Deed of Trust or the other Loan Documents within ten (10) days from the date written demand therefor is made;

        5.1.(c) Borrower fails to keep, observe or perform any other promise, condition or agreement contained in this Note, the Deed of Trust, the Guaranty Agreement and/or the Environmental and Hazardous Substances Indemnity Agreement or any of the other Loan Documents or any other documents described herein or delivered in connection herewith or is otherwise in default under the terms, covenants and conditions of the Deed of Trust or the Loan Documents, and such failure or default is not remedied within fifteen (15) days from the date of written notice to Borrower thereof; provided that if such condition is not reasonably susceptible to cure within such fifteen (15) day period and Borrower is diligently pursuing cure, Borrower shall be entitled to up to fifteen (15) additional days to cure;

        5.1.(d) There is a material misstatement in any certificate and/or certification delivered in connection with this Note, the Loan Documents or the Deed of Trust, or any representation, disclosure, warranty, statement, financial information, application and/or other instrument, record, documentation or paper made or furnished by or on behalf of Borrower in connection with this Note shall be materially misleading, untrue or incorrect;

        5.1.(e) A receiver, liquidator or trustee shall be appointed for Borrower or for any of its property, an assignment shall be made for the benefit of creditors, Borrower shall be adjudicated a bankrupt or insolvent, or any petition for bankruptcy, reorganization or arrangement pursuant to the United States Bankruptcy Code, or under the provisions of any federal or state bankruptcy or receiver laws, shall be filed by or against Borrower, unless such appointment, assignment, adjudication or petition was involuntary, in which event only if the same is not discharged, stayed or dismissed within forty-five (45) days;

        5.1.(f) A final judgment for the payment of money which would materially adversely affect such Borrower's ability to make payments under this Note shall be rendered against Borrower and such party shall not discharge the same or cause it to be discharged within forty-five (45) days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered within twenty (20) days, and thereafter to secure a stay of execution pending such appeal;

        5.1.(g) Borrower shall have concealed, removed and/or permitted to be concealed or removed any substantial part of its property and/or assets with the intent to hinder, delay or defraud Lender of any of its property and/or assets which may be fraudulent under any federal or state bankruptcy, fraudulent conveyance or similar law now or hereafter enacted, or if Borrower shall have made any transfer of any of its property and/or assets to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid, or if Borrower shall have suffered or permitted to be suffered, while insolvent, any creditor to obtain a lien upon any of its property and/or assets through legal proceedings or distraint which is not vacated within (30) days from the date of entry thereof;

        5.1.(h) A default occurs under any lien that is prior or subordinate to the

lien of the Deed of Trust or the holder of any prior or subordinate lien including, without limitation, any fee or leasehold deed of trust holder who claims a right to disturb Borrower's possession or right to possession, commences a foreclosure action and/or proceeding in connection therewith or any other demand, action or proceeding is begun to collect any lien that is superior or inferior to the Deed of Trust;

     5.1.(i) If any of the events enumerated in Sections 5.1(e) through 5.1(g) above shall happen to any party guaranteeing the loan evidenced by this Note or pledging assets to Lender as additional security for the Indebtedness (hereinafter, each such guarantor and/or pledgor may be referred to, with those guarantors and pledgors specifically listed above, as a "**Guarantor**") or any of its property, and such event or occurrence is not remedied or cured within thirty (30) days from the date of written notice thereof;

     5.1.(j) Any Guarantor of the obligations of Borrower hereunder defaults under or attempts to withdraw, cancel or disclaim liability under any pledge, pledges, guaranty or guaranties given to Lender, and such event or occurrence is not remedied or cured within ten (10) days after notice thereof;

     5.1.(k) Borrower or any Guarantor defaults under any other note, instrument, agreement, contract, pledge, mortgage or encumbrance evidencing and/or securing the Indebtedness or any other indebtedness of Borrower to Lender or serviced or arranged by Thorofare Capital, Inc., and such event or occurrence is not remedied or cured within twenty (20) days from the date of written notice thereof.

     5.2.    After the occurrence of an Event of Default, Lender may accept any payments from Borrower without prejudice to the rights and remedies of Lender provided herein or in the Deed of Trust or the Loan Documents.

     5.3.    Borrower hereby represents and warrants that the Property is not its current principal residence, and hereby covenants that during the term of the Note, Borrower shall not ever make the Property its principal residence. Borrower acknowledges that Lender would not have entered into the transaction contemplated by this Note if Borrower occupied the Property or intended to occupy the Property as its principal residence. In the event Borrower occupies the Property as its principal residence at anytime during the term of this Note, such action shall cause an immediate Event of Default and the Indebtedness shall be immediately due and payable.

Borrower's Initials

6.  **DEFAULT INTEREST/LATE CHARGES**.

     6.1.    Upon the occurrence of any Event of Default, then, from and after the date of such Event of Default, interest shall accrue on such unpaid Indebtedness at a rate equal to the lesser of (a) the Interest Rate plus seven percent (7%) or (b) the highest rate permitted by law,

computed from said due date until the date such Event of Default is cured (the "**Default Rate**"). The Default Rate shall be computed from the date of the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Indebtedness is paid in full. Interest calculated at the Default Rate shall be added to the Indebtedness, and shall be deemed secured by the Deed of Trust and the Loan Documents. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Indebtedness nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

6.2.    If any payment (or part thereof) provided for herein shall not be made within ten (10) days from the date due (other than the balloon payment of principal on the Maturity Date), a late charge of ten percent (10%) of the amount so overdue shall become immediately due and payable to the holder of this Note as liquidated damages for failure to make prompt payment and the same shall be secured by the Deed of Trust and the Loan Documents. Such charge shall be payable in any event no later than the due date of the next subsequent installment, or at the option of Lender, may be deducted from any deposits held by Lender or by any other party acting as escrow agent in connection with any escrow created or being held as additional security for this Note. Nothing herein is intended to or shall extend the due dates set forth for payments under this Note. Such late fee may be charged repeatedly, however, said late fee shall not be compounded on prior late fees, but rather, only on the amount outstanding exclusive of prior late fees.

6.3.    Lender shall have the right unilaterally to correct patent errors in this Note or any of the other Loan Documents and to fill in any blank spaces herein or in any of the other Loan Documents, so as to conform to the terms upon which the loan evidenced hereby is made.

6.4.    Should the Indebtedness or any part thereof be collected at law or in equity, or in bankruptcy, receivership or any collected at law or in equity, or in bankruptcy, receivership or any other court proceeding (whether at the trial or appellate level), or should this Note be placed in the hands of attorneys for collection under default, Borrower agrees to pay, in addition to the principal, any late payment charge and interest due and payable hereunder, all reasonable costs of collecting or attempting to collect the Indebtedness, including reasonable attorneys' fees and expenses and court costs, regardless of whether any legal proceeding is commenced hereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

6.5.    After the entry of a judgment and/or a foreclosure judgment, Lender shall have the right to continue to charge Borrower and to increase the amount of the judgment for post-judgment reasonable attorneys' fees and costs, post-judgment interest at the Default Rate provided for herein, real estate taxes, utilities, maintenance, security and other charges that may be incurred by Lender.

6.6.    Borrower acknowledges and agrees that the loan evidenced by this Note was "arranged" within the meaning of California Civil Code Section 1916.1 by Thorofare Capital, Inc., a licensed California real estate broker. Notwithstanding anything heretofore set forth to the contrary, in no event shall any interest payable under this Note exceed the maximum

interest rate permitted under law or the rate that could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate that Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the interest rate hereinabove set forth or the Default Rate, as the case may be, shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Indebtedness, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of this Note until payment in full so that the rate or amount of interest on account of the Indebtedness does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Indebtedness for so long as the Indebtedness is outstanding. Borrower agrees to an effective rate of interest that is the rate stated herein plus any additional rate of interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Borrower, or any benefit received or to be received by Lender, in connection with this Note.

## 7. **WAIVERS.**

7.1.   To the maximum extent permitted by applicable law, Borrower and all parties who may become eligible for the payment of all or any part of the Indebtedness, whether principal, surety, guarantor, pledgor, or endorser, hereby waive demand, notice of demand, presentment for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, notice of dishonor, protest, notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note.

7.2.   The liability of Borrower and any guarantor, pledgor or endorser shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by the holder hereof, including, but not limited to any extension of time, renewal, waiver or other modification. No release of any security for the Indebtedness or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Deed of Trust, or any other guaranty or instrument made by agreement of Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other person or entity who may become liable for the payment of all or any part of the Indebtedness under this Note.

7.3.   No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand on Borrower as provided for in this Note. Any failure of the holder of this Note to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any time and from time to time thereafter. Lender or any holder may accept late payment, or partial payment, even though marked "payment in full" or containing words of similar import or other conditions, without waiving any of its rights.   No amendment, modification or waiver of any provision of this Note nor consent to any departure by Borrower therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the

specific instance and for the specific purpose for which given.

7.4.    BORROWER AND EACH ENDORSER AGREE THAT ANY ACTION, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS NOTE MAY BE INITIATED AND PROSECUTED IN THE STATE OR FEDERAL COURTS, AS THE CASE MAY BE, LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND EACH ENDORSER CONSENT TO AND SUBMIT TO THE EXERCISE OF JURISDICTION OVER THE SUBJECT MATTER, WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENT THAT ALL SUCH SERVICE OF PROCESS BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER OR SUCH ENDORSER AT ITS ADDRESS SET FORTH ABOVE OR TO ANY OTHER ADDRESS AS MAY APPEAR IN LENDER'S RECORDS AS THE ADDRESS OF BORROWER OR SUCH ENDORSER (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW).

7.5.    BORROWER AND LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREE THAT ANY ACTION TO RESOLVE A DISPUTE RELATING TO OR ARISING OUT OF THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE DETERMINED BY JUDICIAL REFERENCE PURSUANT TO SECTION 638, ET SEQ., OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND BORROWER AND LENDER SHALL ATTEMPT TO SELECT AND PROPOSE JOINTLY TO THE COURT A MUTUALLY AGREEABLE RETIRED JUDGE AS A REFEREE AND, FAILING THAT, EACH OF BORROWER AND LENDER SHALL RECOMMEND TO THE COURT A LIST OF RETIRED JUDGES WHO MAY SERVE AS THE REFEREE.  EACH OF BORROWER AND LENDER KNOWINGLY AND IRREVOCABLY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION TO RESOLVE ANY DISPUTE RELATING TO OR ARISING OUT OF THIS NOTE OR THE OTHER LOAN DOCUMENTS OR ANY PART HEREOF OR THEREOF; AND IN CONNECTION WITH THIS NOTE OR THE OTHER LOAN DOCUMENTS, EACH OF BORROWER AND LENDER REPRESENTS THAT IT HAS DISCUSSED SUCH WAIVER WITH ITS OWN INDEPENDENT COUNSEL AND HAS RELIED ON ADVICE OF ITS COUNSEL AND MAKES SUCH WAIVER KNOWINGLY AND VOLUNTARILY.

7.6.    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND EACH ENDORSER ALSO WAIVE (I) THE RIGHT TO INTERPOSE ANY SET-OFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION, (II) ANY OBJECTION BASED ON FORUM NON CONVENIENS OR VENUE, AND (III) ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES.

_DMH_
Borrower's Initials

8. **INTENTIONALLY OMITTED**.

9. **NOTICES**.  All notices to be given pursuant to this Note shall be in writing and given in accordance with Section 47 of the Deed of Trust.

10. **MISCELLANEOUS**.

10.1.   Time shall be of the essence with respect to all provisions of this Note.

10.2.   If any payment to be made by Borrower shall otherwise become due on a day other than a Business Day (as defined below), such payment shall be made on the prior preceding day which is a Business Day. "Business Day" shall mean any day of the week other than a Saturday, Sunday or federal holiday.

10.3.   Borrower represents that it has full power, authority and legal right to execute and deliver this Note, and that this Note constitutes the valid and binding obligation of Borrower.

10.4.   Wherever pursuant to this Note it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, without limitation, legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement of the expenses of in-house staff, counsel, or otherwise. Borrower shall pay to Lender on demand any and all expenses, including legal expenses and reasonable attorneys' fees, incurred or paid by Lender in enforcing this Note.

10.5.   This Note cannot be changed, modified, amended, waived, extended, discharged or terminated orally or by estoppel or waiver, regardless of any claimed partial performance referable thereto, or by any alleged oral modification or by any act or failure to act on the part of Borrower or Lender.

10.6.   The agreements contained herein shall remain in full force and effect, notwithstanding any changes in the individuals or entities comprising Borrower, and the term "Borrower," as used herein, shall include any alternate or successor person or entity, but any predecessor person or entity, and its partners or members, as the case may be, shall not thereby be released from any liability. Nothing in the foregoing shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in Borrower which may be set forth in this Note, the Deed of Trust or the Loan Documents.

10.7.   Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provision hereof.

10.8.   If any paragraph, clause or provision of this Note is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such voidness, invalidity or unenforceability will not affect the remaining paragraphs, clauses and provisions of this Note, which shall nevertheless be binding upon the parties hereto with the same effect as though the void or unenforceable part had been severed and deleted.

10.9.   If more than one person is named in this Note as "Borrower", each obligation of Borrower shall be the "joint and several" obligation of such party or entity.   No person or entity will be a mere accommodation maker, but each will be primarily and directly liable.

10.10.   The terms and provision of this Note shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law. As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective heirs, executors, legal representative, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.

10.11.   All the terms and words used in this Note, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context or sense of this Note or any paragraph or clause herein may require, the same as if such work had been fully and properly written in the correct number and gender.

10.12.   This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

## [CONTINUED ON FOLLOWING PAGE]

TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY EXPRESSLY (i) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THIS NOTE, IN WHOLE OR IN PART, WITHOUT PAYMENT OF A PREPAYMENT FEE, UPON ACCELERATION OF THE MATURITY DATE, AND (ii) AGREES THAT ANY PURCHASE OF THE PROPERTY AT A FORECLOSURE SALE OR TRUSTEE'S SALE SHALL BE DEEMED A VOLUNTARY PREPAYMENT HEREUNDER AND LENDER SHALL BE ENTITLED TO RECEIVE OUT OF THE PROCEEDS OF SUCH SALE ALL OF THE AMOUNTS REQUIRED UNDER THIS NOTE, INCLUDING, WITHOUT LIMITATION, THE YIELD PROTECTION FEE AND THE EXIT FEE. BORROWER HEREBY DECLARES THAT THE AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS NOTE AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER FOR THIS WAIVER AND AGREEMENT.

**IN WITNESS WHEREOF,** the undersigned has duly executed this Note as of the date first above written.

**BORROWER:**

JL GATEWAY, LLC,
a California limited liability company

By:    San Francisco Regional Center, LLC,
       a California limited liability company,
       its Manager

       By: _Thomas M Henderson_
       Name: Thomas M. Henderson
       Title:   Manager

## EXHIBIT A

### SCHEDULE OF BENEFICIARIES

Thorofare Asset Based Lending Fund III, L.P., a Delaware limited partnership

# EXHIBIT 3

**DECLARATION OF STEPHEN G. PREONAS IN SUPPORT OF INTERESTED PARTIES WOMAC PROPERTIES, INC. AND JLG ASSOCIATES, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**

## *SEC* v. *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## NORTHERN DISTRICT OF CALFORNIA CASE NO.  No. 3:17-CV-00223-RS

## DESCRIPTION OF DOCUMENT:

**Right to Attach Order Entered November 6, 2015 in Alameda Superior Court Case No. RG 15-785236 Entitled WOMAC Properties, Inc., et al. v San Francisco Regional Center, LLC**

# EXHIBIT 3

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Kenneth S. Katzoff (103490) / Stephen G. Preonas (245334)<br>Katzoff & Riggs LLP<br>1500 Park Avenue, Suite 300, Emeryville, CA 94608<br>TELEPHONE NO: 510-597-1990   FAX NO. *(Optional):* 510-597-0295<br>E-MAIL ADDRESS *(Optional):* spreonas@katzoffriggs.com<br>ATTORNEY FOR *(Name):* Plaintiffs WOMAC Properties, Inc., et al. | **FILED**<br>**ALAMEDA COUNTY**<br><br>NOV – 6 2015<br><br>CLERK OF THE SUPERIOR COURT<br>By _____<br>Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Alameda
STREET ADDRESS: 1221 Oak Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA
BRANCH NAME: County Administration Building

PLAINTIFF: WOMAC PROPERTIES, INC., et al.

DEFENDANT: SAN FRANCISCO REGIONAL CENTER, LLC, et al.

| ☑ **RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT AFTER HEARING**<br>☐ **ORDER FOR ISSUANCE OF ADDITIONAL WRIT OF ATTACHMENT AFTER HEARING** | CASE NUMBER:<br>RG-15-785236 |
|---|---|

1. a. The application of plaintiff *(name):* WOMAC PROPERTIES, INC.

   for  ☑ a right to attach order and order for issuance of writ of attachment
   ☐ an order for issuance of additional writ of attachment

   against the property of defendant *(name):* SAN FRANCISCO REGIONAL CENTER, LLC ("SFRC")
   came on for hearing as follows:
   (1) Judge *(name):* ROBERT MCGUINESS
   (2) Hearing date: November 3 , 2015     Time: 3PM     ☑ Dept. 22     ☐ Div.:     ☐ Rm.:

   b. The following persons were present at the hearing:
   (1) ☐ Plaintiff *(name):*                        (3) ☑ Plaintiff's attorney *(name):* Stephen G. Preonas
   (2) ☐ Defendant *(name):*                       (4) ☐ Defendant's attorney *(name):*

**FINDINGS**

2. THE COURT FINDS
   a. Defendant *(specify name):* SFRC                        is a  ☐ natural person  ☐ partnership
      ☐ unincorporated association  ☐ corporation  ☑ other *(specify):* limited liability company
   b. The claim upon which the application is based is one upon which an attachment may be issued.
   c. Plaintiff has established the probable validity of the claim upon which the attachment is based.
   d. The attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.
   e. The amount to be secured by the attachment is greater than zero.
   f. ☑ Defendant failed to prove that all the property described in plaintiff's application is exempt from attachment.
   g. ☐ The following property of defendant, described in plaintiffs application
      (1) ☐ is exempt from attachment *(specify):*

      (2) ☐ is not exempt from attachment *(specify):*

   h. ☐ The following property, not described in plaintiff's application, claimed by defendant to be exempt,
      (1) ☐ is exempt from attachment *(specify):*

      (2) ☐ is not exempt from attachment *(specify):*

   i. ☑ An undertaking in the amount of: $ 10,000                is required before a writ shall issue, and plaintiff
      ☐ has  ☐ has not  filed an undertaking in that amount.
   j. A Right to Attach Order was issued on *(date):*  November 3, 2015                       pursuant to
      ☑ Code of Civil Procedure section 484.090 (on hearing)   ☐ Code of Civil Procedure section 485.220 (ex parte)
   k. ☐ other *(specify):*

Form Approved for Optional Use
Judicial Council of California
AT-120 [Rev. July 1, 2010]

**RIGHT TO ATTACH ORDER AFTER HEARING AND ORDER
FOR ISSUANCE OF WRIT OF ATTACHMENT (Attachment)**

Code of Civil Proc., §§ 482.030, 484.090;
Welfare & Institutions Code, § 15657.01
www.courtinfo.ca.gov

**AT-120**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| SERIES AGI WEST LINN OF APPIAN v. VPC-OR WEST LINN | RG-15-785236 |

## ORDER

3. THE COURT ORDERS

  a. Plaintiff has a right to attach property of defendant *(name):*   SAN FRANCISCO REGIONAL CENTER, LLC
    in the amount of: $  3,803,591.67

  b. ☐   The property described in items 2g(1) and 2h(1) of the findings is exempt and shall not be attached.

  c. The clerk shall issue   ☒ a writ of attachment   ☐ an additional writ of attachment   in the amount stated in item 3a
    ☐ forthwith   ☒ upon the filing of an undertaking in the amount of: $   10,000

    (1) ☒   for any property of a defendant who is **not** a natural person for which a method of levy is provided.

    (2) ☐   for the property of a defendant who is a natural person that is subject to attachment under Code of Civil
        Procedure section 487.010 described as follows *(specify):*

    (3) ☐   for the property covered by a bulk sales notice with respect to a bulk transfer by defendant or the proceeds of sale
        of such property, described as follows *(specify):*

    (4) ☐   for plaintiff's pro rata share of proceeds from an escrow in which defendant's liquor license is sold. The license
        number is *(specify):*

  d. ☒   Defendant shall transfer to the levying officer possession of

    (1) ☒   any documentary evidence in defendant's possession of title to any property described in item 3c;

    (2) ☒   any documentary evidence in defendant's possession of debt owed to defendant described in item 3c;

    (3) ☐   the following property in defendant's possession *(specify):*

> **NOTICE TO DEFENDANT: FAILURE TO COMPLY WITH THIS ORDER MAY SUBJECT YOU TO ARREST
> AND PUNISHMENT FOR CONTEMPT OF COURT.**

  e. ☐   Other *(specify):*

  f. Total number of boxes checked in item 3:   6

Date:  4/6/'15

JUDICIAL OFFICER   Robert D. McGuiness

**RIGHT TO ATTACH ORDER AFTER HEARING AND ORDER FOR
ISSUANCE OF WRIT OF ATTACHMENT (Attachment)**

# EXHIBIT 4

**DECLARATION OF STEPHEN G. PREONAS IN SUPPORT OF INTERESTED PARTIES WOMAC PROPERTIES, INC. AND JLG ASSOCIATES, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**

## *SEC* v. *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## NORTHERN DISTRICT OF CALFORNIA CASE NO.  No. 3:17-CV-00223-RS

## DESCRIPTION OF DOCUMENT:

## Order Granting Summary Adjudication in Alameda Superior Court Case No. RG 15-785236 Entitled WOMAC Properties, Inc., et al. v San Francisco Regional Center, LLC

# EXHIBIT 4

Katzoff & Riggs
Attn:  Preonas Esq, Stephen G.
1500 Park Avenue, Suite 300
Emeryville, CA   94608_____

CASALINA & DISSTON
Attn:  Disston, Leeds
409 13th Street
9th Floor
Oakland, CA   94612

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Womac Properties, Inc., a Cal<br><br>Plaintiff/Petitioner(s)<br><br>VS.<br><br><br>San Francisco Regional Cent<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG15785236</u><br><br>Order<br><br>Motion for Summary Adjudication<br>Granted |

The Motion for Summary Adjudication was set for hearing on 10/25/2016 at 03:00 PM in Department 22 before the Honorable Robert McGuiness.  The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:  The Motion of Plaintiff Womac Properties, Inc. ("Womac") for Summary Adjudication, filed on August 10, 2016, is GRANTED.

The motion seeks summary adjudication of the First Cause of Action (breach of contract) in the First Amended Complaint ("FAC") filed on January 27, 2016.  That cause of action alleges, in material part: that in connection with the formation of JL Gateway, LLC ("JL Gateway"), the transfer of the interest in the subject property to JL Gateway, and the execution of the "Amended and Restated Operating Agreement" for JL Gateway, Defendant San Francisco Regional Center, LLC ("SFRC") executed a promissory note (the "Note") in favor of Womac in the amount of $3.7M plus interest (see FAC, ¶¶ 13, 17 and 18); that Womac has fully performed all of its conditions and obligations under the Note; that SFRC materially breached the Note by failing to make payments of interest on the Note as required; and that as a direct, proximate result of the breach Womac has been damaged in the amount of $3,781,901.67.  (FAC, ¶¶ 19-21.)

In its motion, Womac met its burden under C.C.P. § 437c(p)(1) of introducing evidence proving each element of its cause of action entitling it to a judgment against SFRC in the amount set forth below.  (See Separate Statement of Undisputed Material Facts ["UMF"], Nos. 1-11 and evidence cited.)  The court notes that, to meet this burden, it is not necessary for a plaintiff to introduce evidence directed to a defendant's affirmative defense.  (C.C.P. § 437c(p)(1); Oldcastle Precast, Inc. v. Lumbermens Mut. Cas. Co. (2009) 170 Cal.App.4th 554, 565.)

In opposition, SFRC failed to introduce admissible evidence to meet its burden of setting forth "specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (See C.C.P. § 437c(p)(1); Defendant's Separate Statement ["DSS"] Nos. 1-13 and evidence cited except that to which objections are sustained.)  Significantly, the DSS reflects that most of the facts are undisputed, including the execution of the Note, transfer of ownership of the subject property to JL Gateway under the parties' agreement, SFRC's failure to make any of the payments of interest required by the Note despite the demand of Womac to do so, and the provision in the Note that the entire unpaid principal, interest, fees and costs were due and payable under the Note by December 2015.  (DSS Nos. 1-6 and 8-10.)

---

Order

The only facts in the UMF purportedly "disputed" are reflected in DSS Nos. 7 and 11, in which SFRC purports to dispute that the "Note required SFRC to begin making interest payments by [February] 5, 2015" (incorrectly typed as "December 5, 2015") and that "[a]s of the date of the filing of this action the amount of principal and interest due on the Note remaining unpaid is $3,781,091.67." SFRC's purported dispute as to DSS Nos. 7 and 11 is supported solely by reference to paragraphs 14 and 15 of the FAC, which SFRC (incorrectly) characterizes as stating that "it was the intention of the parties that the Jack London Gateway Shopping Center would be developed with investor money and that Womac would be paid the amounts due under the promissory note from the profits generated by the shopping center." In fact, the relevant allegation in paragraphs 14 and 15 of the FAC is to the effect that SFRC "represented to Womac that [it] intended to raise funds for the rehabilitation of the Property through the EB-5 program, and that SFRC intended to and in fact would make all required payments of interest and principal due under the Note." This allegation does not raise any dispute that the Note required SFRC to begin making interest payments on February 5, 2015 or as to the amount of principal and interest due of $3,781,091.67. (See UMF Nos. 7 and 11 and evidence cited, including Patterson Decl., ¶ 8 and Exh. B [the Note], ¶ 2.A.) The same is true of DSS No. 13, which is SFRC's "additional disputed fact" to the same effect, also supported solely by reference to paragraphs 14 and 15 of the FAC.

The court notes that, although not cited anywhere in the DSS, paragraph 9 of the Declaration of Thomas M. Henderson attests as follows: "At the time that the promissory note was executed by SFRC to Womac the parties understood and agreed that the Jack London Gateway Shopping Center would be developed with investor money and that Womac would be paid the amounts due under the promissory note from the profits generated by the shopping center." Aside from the fact that this attestation is conclusory and devoid of any details as to which representative of SFRC or Womac "understood or agreed" about this matter, or when or by what means, and that Womac has successfully objected to it on various evidentiary grounds (addressed below), even if the statement were admitted and accepted as true it does not raise any dispute as to the Note's requirement that SFRC begin making interest payments on February 5, 2015 or as to the amount of principal and interest due of $3,781,091.67. Instead, it merely reflects that SFRC expected to make payments from profits generated from the shopping center. This is not admissible evidence that the parties agreed to modify the payment schedule expressly set forth in the Note; instead, it simply goes to SFRC's expected source of funds, which does not modify the payment dates.

The only other additional fact in the DSS bearing on this matter is DSS No. 14, to the effect that "as a result of the filing of this lawsuit SFRC has been unable to raise money from investors for the development of the shopping center...," citing paragraph 10 of the Henderson Declaration. This statement, even if admitted and taken as true, does not raise a triable issue as to SFRC's default in making the interest payments required as of February 5, 2015, which was 7 months before this lawsuit was filed, and which constituted a default allowing the entire balance to become due and payable at that time, regardless of what effect the filing of the lawsuit had on investors 7 months later.

On Womac's Objections to Evidence, filed on October 20, 2016 and numbered 1-2, the court rules as follows:
No. 1 - SUSTAINED on grounds of lack of foundation and legal conclusion.
No. 2 - SUSTAINED on grounds of relevance and lack of foundation.
Nevertheless, even if both challenged statements were admitted and taken as true, they would not give rise to a triable issue as discussed above.

Accordingly, IT IS ORDERED that Womac is entitled to judgment against SFRC on the First Cause of Action in the amount of $3,700,000.00 (principal) plus interest on that amount at 3% annually as reflected in paragraph 3 of the Note. The court will not enter judgment, however, until the remainder of the FAC is adjudicated or otherwise resolved. (See C.C.P. § 437c(k) and (n)(1).)


Dated:  10/25/2016

_____
Judge Robert McGuiness

# EXHIBIT 5

**DECLARATION OF STEPHEN G. PREONAS IN SUPPORT OF INTERESTED PARTIES WOMAC PROPERTIES, INC. AND JLG ASSOCIATES, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**

## *SEC* v. *SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## NORTHERN DISTRICT OF CALFORNIA CASE NO.  No. 3:17-CV-00223-RS

## DESCRIPTION OF DOCUMENT:

## Notice from Oakland Redevelopment Agency Regarding Jack London Gateway Shopping Center dated October 2, 2003

# EXHIBIT 5

**CITY OF OAKLAND AND**
**REDEVELOPMENT AGENCY OF THE C I T Y  O F  O A K L A N D** ~~FILED~~
OFFICE OF THE CITY CLERK
*COUNCIL AND AGENCY AGENDA REPORT* OAKLAND

2003 OCT -2 PM 3: 23

TO: Office of the City Manager and Agency Administrator
ATTN: Deborah Edgerly, Interim City Manager
FROM: Community and Economic Development Committee
DATE: October 14, 2003

RE: **A CITY COUNCIL RESOLUTION AMENDING RESOLUTION NO. 75142 C.M.S TO REPLACE COMMUNITY PLAZA DEVELOPERS, LLC, WITH JLG ASSOCIATES, LLC, AS PURCHASER AND DEVELOPER OF THE JACK LONDON GATEWAY SHOPPING CENTER; AND**

**A REDEVELOPMENT AGENCY RESOLUTION AMENDING RESOLUTION NO. 99-34 C.M.S TO REPLACE COMMUNITY PLAZA DEVELOPERS, LLC, WITH JLG ASSOCIATES, LLC, AS PURCHASER AND DEVELOPER OF THE JACK LONDON GATEWAY SHOPPING CENTER**

## SUMMARY

Staff recommends that the Redevelopment Agency and City Council approve a request to replace Community Plaza Developers, LLC (CPD) with JLG Associates, LLC (JLG) in order to facilitate the sale of Jack London Gateway Shopping Center (Center) to JLG.

CPD has managed the property for the Agency, which currently owns the Center, since 1998. Resolutions by the City Council and Agency, approved in 1999, authorized staff to sell the Center, then known as the Acorn Plaza Shopping Center, to CPD through a Development and Disposition Agreement (DDA). CPD is a limited liability corporation composed of for-profit subsidiaries of East Bay Asian Local Development Corporation (EBALDC) and Westside Economic Development Corporation (WEDC), and Portfolio Properties, Inc. (PPI).

Due to on-going problems with WEDC, City staff have continued working with EBALDC and PPI, who have requested approval to proceed with the sale of the Center to JLG. This new partnership will **be** comprised of subsidiaries of EBALDC, PPI and a new community-based member, West Oakland Marketplace Advancement Company (WOMAC). EBALDC/PPI and WEDC are currently negotiating the terms for the dissolution of CPD. As of this writing, no settlement has been reached. However, the action recommended in this report is to authorize staff to negotiate an agreement with new entity JLG, and any failure amongst the members of CPD to resolve issues regarding a settlement will not impede the ability of JLG to proceed with the purchase and rehabilitation of the Center.

## FISCAL IMPACT

No new fiscal impact is expected as a result of this action. Grant and loan funding for the project has already been allocated. Additional discussion of the sources and uses of the previously approved funding is provided in the Project Description section of this report.

## BACKGROUND

The Jack London Gateway Shopping Center was constructed in 1983 by a non-profit entity, the Greater Acorn Community Improvement Association, and financed by a federal Economic Development

Item: **5**

C&ED Committee
October 14, 2003

Administration grant and an Agency loan.  The Center was established with a grocery store serving as the anchor tenant, but the Center and grocery store struggled financially during the first few years of operations.

The Agency subsidized the Center throughout the mid-1980's, investing nearly $6 million before reassuming ownership of the property through a quit claim in 1986.  The Agency sold the Center to a private investor, Alex Hahn, in 1989 for $1.91 million, of which $600,000 in proceeds were returned to the federal funding source.  After Hahn closed the grocery store due to low sales, the Agency responded to concerns from the community about the deterioration of the Center and lack of a grocery store and re-acquired the property for $2.97 million in December 1996.

The Agency commissioned a market study to determine the viability of a grocery store in the Center.  The study found that a grocery store was feasible.  The Agency then approved up to $230,000 for emergency repairs, operation and maintenance costs, bringing the total Agency investment in the Center to $8.7 million as of December 1998.

In early 1997, the Agency issued a Request for Proposals (RFP) for a new owner/operator for the Center.  CPD's proposal was approved by Council in July 1997 as a result of that process.  CPD is a limited liability corporation composed of PPI and subsidiaries of EBALDC and WEDC.  EBALDC brings significant property development experience—both commercial and residential—to the partnership, while PPI has experience as a commercial property management firm.  WEDC's role was to provide a connection to the surrounding community and assume responsibility for fundraising from foundations.  CPD received strong support from the community, particularly since the surrounding neighborhood had not had a full-service grocery store since 1996.

CPD entered into an Exclusive Negotiating Agreement with the Agency in November 1997, and executed an interim Operating and Management Agreement for $700,000 with the Agency in October 1998.  In 1999, the Agency and Council approved resolutions to sell the Center to CPD for $2.97 million through a DDA, allow CPD to assume $4.2 million in existing EEC Flagship funds and lend an additional $1.3 million in EEC funds (pending approval by HUD), divided evenly between grant and loan funds.  More details regarding the project's financing are provided in the Project Description section of this report and in the attachments.

Under this new management, the Center has proven successful, and Gateway Foods, a full-service grocery, has been the anchor tenant since 1999.  Numerous improvements, financed from the Center's cash flow and Section 108/EDI funds, have been undertaken.  These include accessibility improvements, signage to promote the visibility of the Center, and parking lot repaving, as well as tenant improvements to individual stores.  Aside from the first year of operations, revenue has exceeded expenses since CPD took over management of the Center (see Attachment A).  The Center has also performed well in terms of job creation, meeting 96% of its job creation goals under the HUD Section 108 program as of May 2003 (see Attachment B).

However, the relationship between WEDC and EBALDC/PPI has become strained over time, resulting in a delay in the sale of the Center.  Their partnership agreement called for WEDC to raise donations for capital contributions for the Center, which WEDC failed to do.  Therefore, City staff requested that EBALDC and PPI seek another community-based member.  They have proposed to substitute WOMAC for WEDC as their community-based member and form JLG, a new partnership.  If the Council and Agency approve this action, the Agency would then sell the Center to JLG.  WOMAC members are affiliated with the Council

of Acorn Residents (CARI), which has long-standing ties to the Acorn neighborhood, and have been involved with the Center in the past in an advisory capacity.

CPD's members are currently negotiating the terms for the termination of the organization, although no settlement has been reached to date. However, since the action recommended in this report is to authorize staff to negotiate an agreement with new entity JLG, any failure amongst the members of CPD to resolve issues regarding a settlement will not impede the ability of JLG to proceed with the purchase and rehabilitation of the Center.

## KEY ISSUES AND IMPACTS

CPD has progressed substantially in addressing the key issues regarding the Center's operations identified by staff in 1999, including reestablishment of a full-service grocery store and other neighborhood-serving retail, job creation, and improvement of the neighborhood. CPD has attracted a variety of tenants that serve the needs of the surrounding community, including not only the grocery store, but also a credit union and other retail establishments. They have also undertaken some of the necessary improvements to tenant and common area spaces, and have further plans for the revitalization of the Center.

However, sufficient progress towards the goal of promoting community ownership of the Center has not been achieved. This is primarily due to WEDC's inability to meet its fundraising responsibilities for the Center. In addition, there have been significant disagreements between WEDC and the other members regarding each member's role, relationship with the grocery store, and funding. The proposed action will allow the partnership to replace the existing community-based member with WOMAC and to move forward with the acquisition and further revitalization of the Center, facilitating its rehabilitation and helping it continue to become a better community resource for the neighborhood.

The partnership agreement currently under negotiation between the members and WOMAC includes provisions for eventual transition of ownership to WOMAC. These provisions ensure that the goal of eventual ownership by a community organization as approved by the Agency in 1999 is preserved.

## PROJECT DESCRIPTION

### Jack London Gateway Shopping Center Description

Since assuming responsibility for operating the Center, CPD has proven t  be a good     g of the Center, responding to community concerns and making the Center economically viable. The Center i         )     square feet of retail space and an additional 5,400 square feet f  p   leased to long-term fast food tenants         y    l  ick  and McDonald s. The    l acre ite h   481 parking spaces. Landscaping has been added to the recently repaired parking area. Signage for the Center was added this year to increase the visibility of the Center and its merchants, and improvements have b     made t  the interior of   ore  the roof and the general        ilit  of the Center.

.1 way Foods, a full-service grocery store occupying approximately 20,000 square feet and run by Scan Loloee, has served as the anchor tenant in the Center since 1999, providing residents wi   ready access to fresh produce and meats, as well as  th r grocery items (including a      t  of ethnic foods). I  2001 the  c  l   Community Partnership Federal Credit Union opened for business at the Center,  c      the only financial institution in Oakland west of Interstate 980. Other stores are smaller community-serving retail, including a shoe store, discount clothing outlet, restaurants and a florist. Only one storefront is currently vacant.

Deborah Edgerly
October 14. 2003                                                                          Page No. 4

The Center has met approximately 96% of its job creation goals as of May 2003, and additional jobs are expected to be generated through the planned rehabilitation of the Center's original façade. Future ideas for development at the Center, which would be privately financed, include additional development on a portion of the lot. Development of residential units has also been identified as a possibility. If successful, this would further revitalize the Center as a mixed use asset to the West Oakland neighborhood, and generate additional construction and retail employment and services.

Description of Proposed JLG Associates. LLC Partnership
CPD was selected to assume the operation and ownership of the Center via the RFP process in 1997 because it included a financially viable plan for maintaining a grocery store in the Center and drawing other retailers to serve the community. Each member also brought to the team valuable experience in one or more facets of running a community-serving shopping center. JLG retains the two performing members of the partnership, EBALDC and PPI, allowing them to capitalize on the momentum they have already begun at the Center with a new community member, WOMAC.

EBALDC, formed in 1975, is a community economic development organization dedicated to the betterment of the East Bay community, particularly the low-income and Asian and Pacific Islander population, through development of physical, human and economic assets for individuals and community organizations. EBALDC has developed over six hundred units of affordable housing as well as 190,000 square feet of retail and office space in Oakland and Emeryville. EBALDC brings valuable development expertise to the partnership and has experience dealing with the complex hiring and other requirements imposed by use of federal funds. PPI is an experienced property management firm, with offices in Oakland. PPI handles the day to day management of the Center, and has done a remarkable job of recruiting and retaining commercial tenants (including the grocery), negotiating leases, collecting rents and maintaining the Center over the last six years.

WOMAC is affiliated with the Council of Acorn Residents (CAN), providing a valuable link to residents within the neighborhood. Its principals include a core group of community organizers that have been active in advising and promoting the revitalization of the nearby Acorn housing development. WOMAC's principals have also served on the Center's Community Advisory Board as voting members for over three years, and thus are already familiar with the operations of the Center.

WOMAC's primary responsibility in the partnership at first will be marketing and promotions, with the goal of improving relations between residents and Center merchants. WOMAC has proposed to reduce commercial tenant turnover and increase profits through a community consultation process geared towards familiarizing merchants with the needs of residents, educating community members on handling their personal finances, and providing a conduit for linking merchants and community organizations. The organization will guide future development efforts at the Center so that it remains viable and benefits the surrounding West Oakland community (see Attachment C for WOMAC "Concept Statement").

The City and Agency are asked to approve the sale of the Center to JLG rather than CPD. This action will allow staff to move forward with executing the Development and Disposition Agreement (DDA) per 1999 authorization from the Agency, and sell the Center to JLG. JLG will assume responsibility for ownership of the Center, in addition to maintaining its role in its operations and management, with additional guidance and input from new member WOMAC. In accordance with the actions approved by City Council and the Agency in 1999, EBALDC or its affiliate will have 55% membership interest in the Center, PPI or its affiliate will have a 20% interest and the WOMAC as the community member will have a 25% interest.

Item: __5__
C&ED Committee
October 14.2003

Deborah Edgerly
October 14, 2003
Page No. **5**

As mentioned in the "Key Issues" section of this report, WOMAC members will receive training to increase their capacity in property management and commercial and housing development from EBALDC and PPI. The partnership agreement between WOMAC, EBALDC and PPI will include provisions guiding the eventual transition of ownership from JLG to WOMAC, fulfilling the goal of eventual ownership by a West Oakland-based community group.

Center Finances and Rehabilitation Costs
In fiscal year 1999–2000, Agency Resolution 99-34 C.M.S. and Council Resolution 75142 C.M.S. authorized the sale of the Center to CPD for $2.97 million through a DDA and allowed CPD to assume a total of $5.5 million in Enhanced Enterprise Community (EEC) Flagship/HUD Section 108 program funds. Of the $5.5 million in requested EEC funds, $4.2 million had been approved in fiscal year 1996-1997 per Agency Resolution 96-61 C.M.S. for the acquisition and partial improvement of the Center by the Agency. This loan, if Council approves the action recommended in this report, will be assumed by JLG instead. Pending HUD approval, the remaining $1.3 million in EEC loan and grant funds that was authorized by Council and the Agency in fiscal year 1999-2000 will be assumed by JLG once approval is given to proceed with the sale of the Center to the newly reconstituted partnership. JLG will be responsible for repayment of at least $1.47 million, to be repaid from cash flow under the terms approved in Agency Resolution 99-34 C.M.S. This figure represents the $2.97 million Section 108 loan plus $1.5 million in debt service that will be paid by revenue from the property tax increment, business license fees and sales tax generated by the Center, committed by the Agency and City in 1999 to repay the remaining balance. Per the EEC program, half of the EEC funds will be provided in the form of an EEC Section 108 Loan and the other half will be provided as an Economic Development Initiative (EDI) Grant. A detailed Project Development Budget, including sources and uses and an accounting of funds spent for work completed to date, is provided as Attachment D.

| | **SOURCES** | | **USES** | |
|---|---|---|---|---|
| 108 Loan | $2,970,000 | | $2,970,000 | Acquisition |
| EDI Grant | $2,530,000 | | $2,904,497 | Construction Costs |
| Redevelopment Funds | $1,067,114 | | $1,653,576 | **Soft** Costs |
| Shopping Center Revenue | $ 666,384 | | **$7,528,073** | Total |
| Heron Foundation | $ 100,000 | | | |
| City NCR Grant | $ 10,000 | | | |
| Overage (capital to be raised) | $ 269,954 | | | |
| Total: | **$7,528,073** | | | |

In 2002, the Center generated a net cash flow of $131,000, prior to payment of debt service. As of June 30, 2003, the Center's year-to-date net income before debt service was $155,492, exceeding budget projections by 19%.

Once a loan agreement for the remaining Section 108 loan/grant funds of $1.3 million is approved by HUD, and the ownership of the Center transferred to JLG, the planned rehabilitation of the Center's façade will commence.

On-Going Role of the Agency
Although the Agency will cease to have an ownership interest in the Center, and the on-going responsibility for its operation and maintenance, it will maintain an active role both as a lender and through on-going



monitoring of the Center's performance in job creation required by the HUD Section 108 program. The Development and Disposition Agreement adopted will include provisions for repayment of the loan and a requirement that the Center include a full-service grocery as long as the Acorn Urban Renewal Plan remains in effect. Transfer of the property to ownership by WOMAC would also require the approval of the Agency Administrator, and would not occur until WOMAC can buy out the other partners and demonstrate their ability to operate the Center effectively. The Agency will maintain the right of reentry in the event of default on the part of JLG, including a provision for resale of the property to recover costs.

## SUSTAINABLE OPPORTUNITIES

The project will continue to provide and expand Opportunities to promote economic, social and environmental stability. Economic opportunities have primarily appeared in the form of jobs from the Center (mostly retail, but also some construction). In addition, the opening of the Credit Union in the Center provides an opportunity for residents to have a viable banking option in their community, and encourages investment in West Oakland.

Social sustainability is promoted through increasing opportunities for residents of West Oakland to shop in their neighborhood for groceries, clothing and other basic necessities. A local community organization, WOMAC, will have substantial involvement in guiding the future of the shopping center. The rehabilitation of the Center will enhance the appearance of the neighborhood. JLG will also be encouraged to have its contractors use environmentally sensitive materials.

## DISABILITY AND SENIOR CITIZEN ACCESS

With accessibility improvements undertaken at Gateway Foods and repairs to the Center's parking lot, the Center should now be fully accessible to persons with disabilities. If additional issues arise, JLG will he responsible for implementing an appropriate response. Seniors living in private units and several affordable housing complexes near the Center will benefit from ready access to groceries, as well as retail and financial services.

## RECOMMENDATION AND RATIONALE

Staff recommends that the Redevelopment Agency and City Council approve a request to replace Community Plaza Developers, LLC with JLG Associates, LLC in order to facilitate the sale of Jack London Gateway Shopping Center to JLG.

This action retains successful members EBALDC and PPI from the original CPD partnership selected to own and operate the Center, allowing them to build on the momentum achieved at the Center, while adding a new community member, WOMAC. It will allow JLG to take over ownership of the Center from the Agency, allow the Agency and JLG to execute agreements required for the remaining funding needed for extensive rehabilitation efforts at the Center, and provide a path to eventual community-based ownership of the Center.

## ALTERNATIVE RECOMMENDATION

None recommended. The Agency does not want to have continued responsibility for owning a shopping center. One possible alternative would be for the Agency to issue a new RFP for the



Item:  5
C&ED Committee
October 14, 2003

ownership and operation of the site. However, staff does not believe that this would be a superior alternative, since the managing and real estate partners have performed admirably in operating the Center to date, and are prepared to move forward quickly with the rehabilitation of the Center. In addition, the new community partner promises to take an active role in bridging communications gaps between merchants and local residents and advocating that the Center meets **the** needs of the surrounding neighborhood. In addition, the recommended action will facilitate eventual community-based ownership of the Center. Issuing a new RFP would delay the rehabilitation of the Center, endanger the momentum created there thus far, and not necessarily provide better results.

**ACTION REQUESTED OF THE CITY COUNCIL**

Staff recommends that the Redevelopment Agency and City Council approve a request to replace Community Plaza Developers, LLC with JLG Associates, LLC in order to facilitate the sale of Jack London Gateway Shopping Center to JLG.

Respectfully submitted,

**DANIEL VANDERPRIEM**
Housing, Economic Development and
Redevelopment Director

Prepared by:
Roy L. Schweyer, Director
Housing and Community Development

Christia Mulvey, Housing Development
Coordinator

APPROVED AND FORWARDED TO THE
COMMUNITY AND ECONOMIC
DEVELOPMENT COMMITTEE

Office of the City Manager and Agency Administrator

Attachments

Item: **5**
C&ED Committee
October 14, 2003

**ATTACHMENT A**
**Jack London Gateway Shopping Center**

- **Year-to-Date Budget Report  (as of June 30, 2003)**
- **Annual Asset and Liability Statements for 1999 - 2002**

Acorn Shopping Center

Budget Comparison Report
6/30/2003
Acorn Shopping Plaza

| | CURRENT ACTUAL | CURRENT BUDGET | CURR. VARIANCE | PERCNT | YTD ACTUAL | YTD BUDGET | YTD VARIANCE | PERCNT |
|---|---|---|---|---|---|---|---|---|
| | | | REVENUE | | | | | |
| **RENTAL INCOME** | | | | | | | | |
| Gateway Food Co. | 8,886 | 11,241 | (2,355) | (21) | 53.311 | 67,446 | (14,131) | (21) |
| People's Comm.Cr.Union | 1,191 | 1,191 | 0 | 0 | 7.146 | 7,146 | 0 | 0 |
| David Lai | 3,210 | 3.220 | 0 | 0 | 3,220 | 3.210 | 0 | 0 |
| One Price Clothing | 0 | 5.832 | (5,832) | (100) | 19.160 | 34,991 | (5,832) | (17) |
| Lyman Caulk | 0 | 0 | 0 | *** | 8,680 | 0 | 8,680 | *** |
| Star-Light Donuts | 1,550 | 1,550 | 0 | 0 | 9.300 | 9,300 | 0 | 0 |
| Pizza Love | 1,778 | 1,700 | 78 | 5 | 10,803 | 10,200 | 603 | 6 |
| Hong Kong Express | 2,704 | 2,704 | 0 | 0 | 16,224 | 16,224 | 0 | 0 |
| Showers of Flowers | 1,260 | 1,260 | 0 | 0 | 7,560 | 7,560 | 0 | 0 |
| I.C. Beauty Supplies | 2,600 | 2,551 | 47 | 2 | 15,606 | 15,318 | 288 | 2 |
| Angel's Discount Clothing | 2,421 | 2.363 | 58 | 2 | 17.111 | 14.178 | 2.934 | 21 |
| Hairs The Point | 2,044 | 1.044 | 0 | 0 | 12.265 | 12,264 | I | 0 |
| @ Track Shoes | 0 | 1.760 | (1,760) | (100) | 474 | 10,560 | (10,086) | (96) |
| McDonald's | 3,895 | 3.895 | 0 | 0 | 23,370 | 13,370 | 0 | 0 |
| Kentucky Fried Chicken | 5,108 | 5,108 | 0 | 0 | 30,648 | 30,648 | 0 | 0 |
| Total Rental Income | 16,651 | 46,121 | (9,764) | (21) | 214.885 | 262,418 | (17,543) | (7) |
| **COMMON AREA MAINTENANCE** | | | | | | | | |
| People's Comm.Cr.Union | 229 | 240 | (11) | (5) | 1.589 | 1.440 | 149 | 10 |
| David Lai | 840 | 840 | 0 | 0 | 840 | 5.040 | (4,200) | (83) |
| One Price Clothing | 186 | 1,469 | (1,283) | (87) | 7.603 | 8,814 | (1,211) | (14) |
| Lyman Caulk | 0 | 0 | 0 | .. | 4,538 | 0 | 4,538 | *** |
| Star-Light Donuts | 354 | 360 | (6) | (2) | 2,295 | 2,160 | 135 | 6 |
| Pizza Love | 377 | 360 | 17 | 5 | 1,119 | 2,160 | 59 | 3 |
| Hong Kong Express | 496 | 600 | (104) | 1171 | 3.394 | 3,600 | (206) | (6) |
| Showers of Flowers | 360 | 160 | 0 | 0 | 2,342 | 2,160 | 182 | 6 |
| I.C. Beauty Supplies | 654 | 630 | 24 | 4 | 3,810 | 3,780 | 30 | 1 |
| Angel's Discount Clothing | 566 | 540 | 26 | 5 | 4,079 | 3,240 | 839 | 26 |
| Hairs The Point | 414 | 420 | (6) | (1) | 2,611 | 2,520 | 94 | 4 |
| @ Track Shoes | 0 | 480 | (480) | (100) | 2,400 | 2,880 | 14801 | (17) |
| McDonald's | 660 | 660 | 0 | 0 | 3,300 | 3,960 | (660) | (17) |
| Kentucky Fried Chicken | 800 | 800 | 0 | 0 | 4,923 | 4,800 | 123 | 3 |
| Total CAM | 5.936 | 7,759 | (1,823) | (24) | 45,946 | 46,554 | 16081 | (1) |
| **CAM-PRIOR YEARS** | | | | | | | | |
| Other Income | 0 | 0 | 0 | *** | 13,543 | 0 | 13,543 | *** |
| Late Charges | (209) | 0 | (209) | *** | 244 | 0 | 244 | *** |
| NSF Fees | 0 | 0 | 0 | .* | 25 | 0 | 25 | *** |
| Total Income | 41,384 | 54,180 | (11,796) | (22) | 304,643 | 308,982 | (4,339) | (1) |

Acorn Shopping Center

Budget Comparison Report
6/30/2003
Acorn Shopping Plaza

| | CURRENT ACTUAL | CURRENT BUDGET | CURR. VARIANCE | PERCNT | YTD ACTUAL | YTD BUDGET | YTD VARIANCE | PERCNT |
|---|---|---|---|---|---|---|---|---|
| **PASS-THROUGH EXPENSES** | | | | | | | | |
| Electricity | 1,019 | 1,000 | (29) | (3) | 6,717 | 6,000 | (727) | (12) |
| Water | 11671 | 0 | 167 | *** | (21) | 0 | 21 | ■■■ |
| Water-Irrigation | 0 | 0 | 0 | *** | 196 | 1,400 | 1,104 | 86 |
| Garbage | 1,044 | 1,118 | 74 | 7 | 6,265 | 6,708 | 443 | 7 |
| Janitorial Service | 2,338 | 2,700 | 362 | 13 | 14,416 | 16,200 | 1,784 | 11 |
| Janitorial Supplies | 0 | 15 | 25 | 100 | 0 | 150 | 150 | 100 |
| Sweeping Service | 353 | 350 | (3) | (1) | 3,418 | 2,100 | (1,318) | (63) |
| Security Service | 8,678 | 8,190 | (488) | (6) | 48,266 | 48,469 | 203 | 0 |
| R & M General | (1,094) | 500 | 1,594 | 319 | (14,654) | 5,000 | 19,654 | 393 |
| R & M Plumbing | 0 | 0 | 0 | *** | 3,128 | 115 | (2,903) | (999) |
| R & M Landscaping | 1,200 | 1,400 | 200 | 14 | 6,000 | 8,400 | 2,400 | 19 |
| R & M Pest Control | 80 | 80 | 0 | 0 | 480 | 480 | 0 | 0 |
| R & M Supplies | 0 | 100 | 100 | 100 | 156 | 600 | 444 | 74 |
| R & M Electrical | 795 | 75 | (720) | (960) | 795 | 450 | (345) | (77) |
| R & M Roof | 0 | 100 | 100 | 100 | 0 | 600 | 600 | 100 |
| R & M Life Safety | 19 | 30 | 11 | 37 | 1,088 | 1,156 | 68 | 6 |
| R & M Other | 0 | 1,500 | 1,500 | 100 | 0 | 9,000 | 9,000 | 100 |
| Telephone | 38 | 0 | (38) | ■■■ | 38 | 0 | (38) | *** |
| Insurance | 1,205 | 1,115 | 10 | 1 | 9,610 | 9,673 | 53 | 1 |
| Total Pass-Through Exp. | 15,518 | 18,383 | 2,865 | 16 | 85,918 | 116,611 | 30,693 | 16 |
| | | | | | | | | |
| **OWNER R & M EXPENSES** | | | | | | | | |
| R & M Electricity/Gas | 0 | 10 | 10 | 100 | 0 | 60 | 60 | 100 |
| R & M Garbage-Best Price | 277 | 277 | 0 | 0 | 1,660 | 1,661 | 2 | 0 |
| R & M General | 7,900 | 0 | (7,900) | ¥** | 15,800 | 0 | (15,800) | *** |
| R & M HVAC | 104 | 0 | (104) | * | 104 | 0 | (104) | *** |
| R & M Plumbing | 1,775 | 0 | (1,775) | *** | 1,177 | 0 | 12,1771 | *** |
| R & M Signage | 134 | 0 | (134) | .. | 134 | 0 | (134) | *** |
| Non-Capitalized Repairs | 0 | 200 | 100 | 100 | 0 | 1,200 | 1,100 | 100 |
| Property Taxes | 0 | 0 | 0 | *** | 0 | 13,000 | 13,000 | 100 |
| Telephone | 50 | 35 | (15) | (43) | 197 | 110 | (87) | 1411 |
| Property Management Fee | 5,000 | 5,000 | 0 | 0 | 30,000 | 30,000 | 0 | 0 |
| Total Owner R & M Exp. | 15,240 | 5,522 | (9,718) | (176) | 50,172 | 46,132 | (4,040) | (9) |
| | | | | | | | | |
| **ADMINISTRATIVE EXPENSES** | | | | | | | | |
| Tenant Relations | 0 | 0 | 0 | ■■■ | 250 | 0 | (250) | *** |
| Advertising & Promotion | 0 | 0 | 0 | *** | 1,646 | 0 | 11.6461 | *** |
| Marketing | 0 | 0 | 0 | ■■■ | 0 | 7,500 | 7,500 | 100 |
| Legal Fee | 0 | 300 | 300 | 100 | 5,160 | 1,800 | (3,360) | (187) |
| accounting Fee | 1,000 | 1,000 | 0 | 0 | 6,000 | 6,000 | 0 | 0 |
| Bank Charge | 0 | 0 | 0 | *** | 5 | 0 | (5) | *** |
| Postage & Delivery | 0 | 15 | 15 | 100 | 0 | 90 | 90 | 100 |

Acorn Shopping Center

Budget Comparison Report
6/30/2003
Acorn Shopping Plaza

|  | CURRENT ACTUAL | CURRENT BUDGET | CURR. VARIANCE | PERCNT | YTD ACTUAL | YTD BUDGET | YTD VARIANCE | PERCNT |
|---|---|---|---|---|---|---|---|---|
| Total Administrative Exp. | 1,000 | 1,315 | 315 | 24 | 13,061 | 15,390 | 2,329 | 15 |
| -Total Expenses | 31,758 | 25,220 | (6,538) | (26) | 149,151 | 178,133 | 28,982 | 16 |
| Net Income/Loss | 10,626 | 28,960 | (18,334) | (63) | 155,492 | 130,849 | 24,643 | 19 |

n sopping Center

12/30/2002

## ASSETS

CASH

| | | | |
|---|---|---|---|
| Petty Cash | $ | 100 | |
| Cash-Union Bank of CA | | 27,394 | |
| Total Cash | | | 27,494 |

ACCOUNTS RECEIVABLE

| | | |
|---|---|---|
| A/R-M.M.Rosa's Pizza | 8,174 | |
| Cash Flow-Developmnt.Acct | 421,005 | |
| A/R City of Oakland | . 142 | |
| N/R | (8,900) | |
| A/R Security Deposits PY | 3,788 | |
| Total Receivables | | 424,121 |
| Construction.Costs | 1,281 | |
| Amort. Def. Leasing Comm | (1,650) | (1,650) |
| Total Assets | | 451.246 |

## LIABILITIES & OWNERS EQTY

ACCOUNTS PAYABLE

| | | |
|---|---|---|
| Tenant Security Deposits | 37,062 | |
| Total Accounts Payable | | 37,062 |

LONG TERM DEBT

| | |
|---|---|
| Total Liabilities | 37,062 |

### OWNERS'CAPITAL

| | | |
|---|---|---|
| Owners' Contribution | 72,386 | |
| Cumulative Profit/Loss | | 210,358 |
| Total Equity | | 282,744 |
| YTD Net Income | | 131,440 |
| Total Liabilities & Eqty. | | 451,246 |

Acorn **Shopping Center**

12/31/2001

## ASSETS

**CASH**

| | | |
|---|---|---|
| Petty Cash | $ 100 | |
| Cash-Union Bank of CA | 12,019 | |
| Total Cash | | 12,111 |

**ACCOUNTS RECEIVABLE**

| | | |
|---|---|---|
| A/R-M.M.Rosa's Pizza | 0,174 | |
| Cash Flow-Development Acct | 296,005 | |
| A/R City of Oakland | 142 | |
| N/R | (8,030) | |
| Total Receivables | | 296,291 |

| | | |
|---|---|---|
| Construction Costs | 1,281 | |
| Amort. Def. Leasing Comm | (1,650) | (1,650) |

| | | |
|---|---|---|
| Total Assets | | 308,041 |

## LIABILITIES & OWNERS EQTY

**ACCOUNTS PAYABLE**

| | | |
|---|---|---|
| Tenant Security Deposits | 25,297 | |
| Total Accounts Payable | | 25,297 |

**LONG TERM DEBT**

| | | |
|---|---|---|
| Total Liabilities | | 25,297 |

### OWNERS' CAPITAL

| | | |
|---|---|---|
| Owners'Contribution | 72,386 | |
| Cumulative Profit/Loss | | 33,647 |
| Total Equity | | 106,033 |
| YTD Net Income | | 176,711 |

| | | |
|---|---|---|
| Total Liabilities & Eqty. | | 308,041 |

Acorn Shopping Center

12/31/68

### ASSETS

| CASH | | | |
|---|---|---|---|
| Petty Cash | $ 100 | | |
| _Cash-Union Bank of CA | 46,746 | | |
| Total Cash | | 46,846 | |
| ACCOUNTS RECEIVABLE | | | |
| A/R-M.M.Rosa's Pizza | 8,174 | | |
| Cash Flow-Developmnt.Acct | 81,005 | | |
| N/R | (3,420) | | |
| Total Receivables | | 85,759 | |
| Costruction Costs | 375 | | |
| Amort. Def. Leasing Comm | (1,650) | (1,650) | |
| Total Assets , ; | | | 131,330 |

### LIABILITIES & OWNERS EQTY

| :OUNTS PAYABLE | | | |
|---|---|---|---|
| Tenant Security Deposits | 25,297 | | |
| Total Accounts Payable | | 25,297 | |
| LONG TERM DEBT | | | |
| Total Liabilities | | | 25,297 |

### OWNERS' CAPITAL

| Owners'Contribution | 72,386 | | |
|---|---|---|---|
| Cumulative Profit/Loss | | (88,469) | |
| Total Equity | | | (16,083) |
| YTD Net Income | | | 122,116 |
| Total Liabilities & Eqty. | | | 131,330 |

Acorn Shopping Center

12/31/99

### ASSETS

| CASH | | |
|---|---|---|
| Petty Cash | $ 100 | |
| .. Cash-Union Bank of CR | (4,263) | |
| Total Cash | | (4,163) |
| ACCOUNTS RECEIVABLE | | |
| N/R | (420) | |
| Total Receivables | | (420) |
| Total Assets | | (4,583) |

### LIABILITIES 4 OWNERS EQTY

'  ζ ι '

| ACCOUNTS PAYABLE | | |
|---|---|---|
| Tenant Security Deposits | 11,500 | |
| ⁻tal Accounts Payable | | 11,500 |

LONG TERM DEBT

| Total Liabilities | | 11,500 |
|---|---|---|

### OWNERS' CAPITAL

| Owners' Contribution | 12,386 | |
|---|---|---|
| Cumulativr Profit/Loss | | (37,208) |
| Total Equity | | 35,178 |
| YTD Net Income | | (51,2611 |
| Total Liabilities & Eqty. | | (4,583) |

**ATTACHMENT B**
**Jack London Gateway Shopping Center**

■ **HUD Section 108 Performance - May 2003 Jobs Creation Status of Center**

**REGULAR HUD-108. EEC HUD-108/EDI AND FLAGSHIP LOAN JOB CREATION MATRIX**
May 2003 (Excerpt)

| Borrower Name | | Original Loan Amount | Job Monitor Start Date (JMSD) | # at JMSD* | # of Current Employees | Job Growth since JMSD* | Total Job Created | % Total EEC Project Met | # EEC Residents since JMSD* | % EEC Residents since JMSD* | # Oakland since JMSD* | % Oakland since JMSD* | # Current Low/Mod Employed | # Current Oakland Employed | Oakland Resident Current | Resident Current |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**PERFORMING EEC LOANS**
**\* JOB MONITOR START DATE (JMSD)**

| Acorn Plaza | EEC/RLF HUD 108 | | 11/4/1997 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Jack London Gateway) | EDI Loan | | 11/4/1997 | | | | | | | | | | | | | |
| | EDI Grant | $800,000 | 11/4/1997 | 60 | 142 | 82 | 85 | 96% | 6 | 7.3% | 15 | 10.6% | 43 | 55 | 66 | 27 |

*Reported - March 2003.  Number reporting on is 69.  Missing some low-mod forms.  Many forms are incomplete.  McDonald's and KFC will not provide information.*

*Please note:  Numbers included for current employees at Mc Donald's and KFC are from original numbers at JMSD.  We do not have any information from McDonald's & KFC to include on EEC, Oakland resident or Low/Mod.*

## ATTACHMENT C
## Jack London Gateway Shopping Center

- **West Oakland Marketplace Advancement Company (WOMAC) – DRAFT Concept Statement**



**Bringing Residents and Merchants Together**

**A Concept Statement**

**Draft 6/3/03**

**WOMRO**

## Introduction

The concepts of mixed use and citizen participation have been central to quality urban planning theory for decades. But practice has often been otherwise. Inner city low income communities are frequently as far removed from these ideals as can be imagined. Too often, inner city residents are disempowered and cut out of the decision-making process, while commercial development takes place in islands cut off from the community. The unfortunate result is often minority and low-income neighborhoods that are without reasonable access to competitive vendors, and merchants who feel besieged rather than supported by their customers. Merchants and residents live in a state of uneasy truce. In moments of social crisis, pent-up resentments may flare to the surface, resulting in the destruction and looting of commercial establishments, after which the community's isolation from the normal competitive marketplace only deepens.

Here in West Oakland, California, we have a historic opportunity to build on a different, more positive model.

At the center of the West Oakland district stands the Acorn residential community (formally known now as the Town Center and Courtyards at Acorn). Originally conceived as middle-class housing, the Acorn community fell under irresponsible private ownership some decades ago and deteriorated over the course of time into a dilapidated, high-crime, high-problem area whose blight became notorious throughout the City of Oakland. The adjacent shopping area became a dismal panorama of broken glass, boarded-up windows, litter, and abandoned signage.

About a dozen years ago, a movement for community renewal began in the heart of the Acorn residential community. A handful of black women residents, with the support of some key allies, initiated a long, slow, often painful, but ultimately successful community renaissance. Organizing unit by unit, walking endless miles within the community, organizing hundreds of meetings, confronting private owners, managers, and public agencies from the neighborhood level all the way up to the federal housing authorities, these tireless, fearless organizers have wrought a remarkable physical and moral

**WOMAC**

transformation in the Acorn community.  The irreparably deteriorated housing units have been demolished.  All the remaining units have been thoroughly upgraded and renovated.  The grounds have been cleaned up, landscaped, and secured.  New ownership and management are in place. Most important, the residents' own association, inspired by the goal of one day winning full tenant ownership and self-management, has become the virtual government of the community, resulting in a vibrant, cohesive, morally invested group of residents. Acorn today has become a desirable place to live and there is a waiting list to get in.

Unfortunately the adjacent shopping area (here termed the Acorn Marketplace) has remained on the margins of the Acorn community's renaissance. Despite the advantage of close physical proximity – the shops are within easy walking distance from the center of the Acorn residential area – the merchant community has not been able to achieve the kind of acceptance that would translate into commercial stability.  The residential community has not embraced the Acorn Marketplace with unqualified enthusiasm.  As a result, the store vacancy rate remains too high.  There is too much turnover and delinquency in rent payments.  Many of the merchants are dissatisfied with aspects of their lessor's management policies.  Although

there has been some progress, the consensus is that the Acorn Marketplace is just not working as it should, and that unless there is a serious reorganization, the advances made in recent years are liable to evaporate and leave the marketplace area blighted once again.

## What WOMAC Proposes

WOMAC is the core group of community organizers who have created the Acorn renaissance over the course of the past dozen years. (Biographies are in the Appendix.)  WOMAC brings to the table more than a century of black woman-years of experience in the West Oakland district, resulting in a well-earned prominence today as community representatives and moral leaders.  Everyone in Acorn knows the WOMAC principals and everyone who knows them, respects them. There is no group of people in West Oakland as well acquainted with all the members of this community, and more experienced in dealing with all the private and public powers who impinge on it, than the WOMAC principals.

WOMAC was formed for the specific purpose of bringing the residential community and the adjacent merchant community closer together for the mutual benefit.  It is obvious that both sides have something to gain

**WOMAC**

from a closer relationship. The residents of the community want, need, and deserve a selection of shops and services that meet their needs and preferences at competitive prices. The merchants want, need and deserve a customer base that is loyal, respectful of property, and financially responsible. Closer integration between the residential and commercial aspects of the community is a sound policy that will improve the quality of life for all participants.

Toward this end, and in partnership with other responsible developers, and to the extent of its available resources, WOMAC proposes:

### Community Consultation.
Too often merchants have no idea whether the community where they open their shop really needs them and wants them. The blindfolded hit-or-miss method of commercial investment can result in a surplus **of** one kind of vendor (for example, fast food) and a shortage of others equally vital to the community (for example, banks, or vendors **of** fresh vegetables). WOMAC proposes to initiate a community consultation process to give voice to the community residents' perceived needs for the kinds of stores and services they want in their immediate neighborhood. Merchants considering locating in the Acorn marketplace can obtain a direct hearing by the community's residents and can

get an immediate sounding about their commercial prospects, resulting in enormous potential savings. Franchisors can obtain guidance in selecting franchisees who have community support. Established merchants can get feedback from the community about the level of customer satisfaction and obtain specific recommendations and comments about their products and services.

### Community Education.
Many aspects of the commercial relationship are partly or wholly under the control of the customer. For example, if merchants provide waste receptacles, it is up to the customers to use them. It is up to customers to return shopping carts to the stores. Customers can speed transactions by knowing their payment options and by proficiency in using credit cards, debit cards, and checks. Customers who engage in shoplifting drive up prices and cause tension in the shopping atmosphere. WOMAC'S principals know about the demoralizing effect of litter in the residential community and have waged an effective campaign to eliminate it there. WOMAC's people can help get shopping carts out of the residential premises and back into the stores. One of the key elements in the Acorn renaiss-ance is resident education, including education about handling personal finances, organized by WOMAC principals.

**WOMAC**

WOMAC'S leadership teaches that petty crime, including shoplifting, degrades the individual, the family, and the whole community. WOMAC brings a powerful moral influence that can reduce merchant/community friction and smooth the transaction stream for both sides.

### Building Good Will.

WOMAC can help build good will between merchants and community members in a variety of ways. WOMAC's informal community grapevine can often be more effective in bringing customers to a store than any amount of advertising. Where merchants offer free or reduced goods or services, WOMAC can provide volunteers to help distribute them or to bring customers to the marketplace. Where the community needs donations for special causes or events, WOMAC can advise the merchants specifically what is wanted, by whom, for what, and when. WOMAC can encourage merchants to list job openings First in the local community and to rely primarily on local recommendations in filling vacancies. WOMAC can advise merchants about deserving young people for scholarships and other awards. WOMAC can bestow community recognition on deserving merchants, and help merchants become more active and involved members of the community, thereby building priceless long-term good will.

**Other Services.** Many marketplace developments today include police and security services, and some also include a variety of social service agencies. Because of its close community roots, WOMAC is well positioned to advise on the need for such services and to build acceptance for agencies that fill a real community need. Many commercial developments today include set-asides for low-income housing, either immediately or as part of future expansion. WOMAC is the ideal partner and consultant for this type of development. In today's uncertain economic and political climate, economic actors have to anticipate crisis situations and emergencies. Because of its intimate knowledge of the community and its deep community roots, WOMAC is a reliable crisis management partner. In these and other ways, WOMAC can leverage its principals' decades of experience with residential community-building into a valuable resource for community-conscious commercial developers.

## What WOMAC Needs

WOMAC's principals are community organizers and have a very broad range of experience in consensus building and in advocacy before private and governmental bodies. However, WOMAC's

**WOMAC**

principals are not real estate developers, merchandising specialists, or commercial leasing managers. In order for WOMAC to succeed, the merchant side of the table must perform in an optimum manner. Therefore, the success of WOMAC's involvement in advancing togetherness between the residential and the commercial communities of the West Oakland district requires WOMAC to enter into partnership with an entity or entities having the requisite commercial development and commercial management experience.

WOMAC at this time has minimal financial resources. The principals of WOMAC continue to invest major portions of their time as volunteers in the nonprofit Acorn Residents' Council (CARI) and in WOHDI, a nonprofit entity designed to share the Acorn experience with other nonprofit residential community organizing projects. They maintain jobs and/or small businesses of their own for economic survival. Therefore, the success of WOMAC requires an infusion of sufficient funds to permit the WOMAC principals, or some of them, to rely on their WOMAC commitment as the principal, or substantially principal, source of their income. **Issues** such as the availability of suitable office space, equipment, staffing, and other startup and operating expenses will also have to be resolved before WOMAC can become an operational entity.

## Conclusion: A Historic Opportunity

A central asset of the Acorn residential community and the Acorn marketplace area is their physical proximity. One only has to cross Market Street. The potential for a close and mutually satisfactory relationship certainly exists. To make that potential into a reality, merchants and the community need to enter into a conscious, planned partnership having specific program components and definable goals. The goal is to build an organizational bridge across Market Street. The pillar of that bridge on the community side has been a-building for the past dozen years. It is the Acorn residents' association, built by the core group of community organizers who brought about the Acorn renaissance. Now these community activists, organized under the banner of WOMAC, stand ready to extend a hand of cooperation to the merchant community on the other side of the street. This is a historic opportunity for the entire West Oakland district and for the City of Oakland.

**WOMAC**

Appendix:
**WOMAC's** Principals

[Names, photos, short sketches
of WOMAC officers and
directors]

WOMAC

## Appendix: The Principals of WOMAC

The principals in the formation of WOMAC are long-time West Oakland community activists who are also the principals of WOHDI, the non-profit development entity, and of CARI (the Acorn Residents Council, also nonprofit).

**WOMAC Management Board**

- JANET L. PATTERSON, MANAGER
- MARILYN HARRIS
- GERMAINE DAVIS
- MATTIE WHITFIELD
- ERNESTINE NATHANIEL
- ELEXIE BERRI
- CONNIE PARKER

**Board of Directors of WOHDI:**

- JANET L. PATTERSON, PRESIDENT
- MARILYN HARRIS, VICE PRESIDENT
- GERMAINE DAVIS, SECRETARY
- MATTIE WHITFIELD, TREASURY

**Board of Directors of CARI (ACORN RESIDENTS COUNCIL)**

- JANET L. PATTERSON, PRESIDENT
- MARILYN HARRIS, 1ST VICE CHAIR
- GAIL BETTY REYNOLDS, 2ND VICE CHAIR
- CHIQUITA JOHNSON, TREASURER
- MATTIE WHITFIELD, PARLIAMENTARIAN

All members of the Board of Directors of the two nonprofit corporations and the Manager and members of the Management Board of WOMAC were founding members of the Acorn Residents' Council and and are elected courtyard representatives of the Town Center &Courtyards at Acorn currently. In addition, Janet Patterson and Marilyn Harris are members of the ownership board of the Town Center & Courtyards at Acorn. All of the board members are very active in the Acorn &West Oakland Communities.

Taking an active role in mixed income and ownership development projects, the active residents and board members formed WOHDI in August 2001 and became part of the Bridge Corporation team. As such, this residents' group was instrumental in

**WOMAC**

obtaining, publicizing, and starting up two Hope IV housing development projects, namely the Chestnut/Linden Development and the Mandela Development.

The principals have worked closely with other CBOs, foundations, and and private employers in an effort to obtain the maximum resources to meet the West Oakland community's needs.

Toward that end, the principals (particularly Janet Patterson, Marilyn Harris, Mattie Whitfeld, Ernestine Nathaniel, and Germaine Davis) have for about seven years played an active role in the Community Development Block Grant board process. They have been involved in numerous funding recommendations and decisions affecting the community.

This group of principals has also been actively involved in numerous other community initiatives over the past twelve years, including:

- Community Policing
- CAA board
- Enhance Empowerment Committee
- Enterprise Zone process
- East Bay MUD's Community Board
- Street planning processes
- Seventh Street NCR project
- McClymonds Initiatives
- MTC Eighth Street Corridor improvement
- Stopping the closing of the Market Street exit w/Cal Trains process
- Workforce Investment Advisory
- Advisory Committee on Youth to to the Police Department
- Khadafy Foundation
- Advisory board to Iack London Gateway

As community leaders, the principals of WOMAC are also actively involved in local Churches, including Greater St. Paul, Zion Tabernacle Baptist, True Vine, and Victory Mission.

**ATTACHMENT D**
**Jack London Gateway Shopping Center**

■ **Project Development Budget**

| Description | Budget | Cost to Date Actual | Cost to Complete |
|---|---|---|---|
| **ACQUISITON** | $2,970,000 | $2,970,000 | $0 |
| | | | |
| 1502 ENTITLEMENT FEES | | $1,461 | $L,539 |
| 1560 EBMUD | $6,732 | $6,732 | $0 |
| | | | |
| **2000 SITE IMPROVEMENT** | | | |
| 2005 DEMOLITION/REMEDIATION | $7,200 | $7,200 | $0 |
| | | | |
| **2500 ENGINEERING** | | | |
| 2503 ENGINEERING-CIVIL | $10,000 | $1,954 | $8,046 |
| 2510 ENGINEERING-STRUCTURAL | $15,600 | $850 | $14,750 |
| 2515 CONSTRUCTION MANAGEMENT | $64,500 | $4,500 | $60,000 |
| 2519 TESTING AND INSPECTION | $20,000 | $0 | $20,000 |
| | | | |
| **3000 DIRECT CONSTRUCTION** | | | |
| 3001 BUILDING & FACADE | $1,021,521 | $20,049 | $1,001,472 |
| 3002 PARKING & LANDSCAPE | $243,000 | $0 | $243,000 |
| 3798 CONTINGENCY | $110,180 | $0 | $110,180 |
| | | | |
| **4000 INDIRECTS** | | | |
| 4135 MAINTENANCE | $27,752 | $27,752 | $0 |
| 4140 TENANT IMPROVEMENT | $1,045,769 | $986,424 | $59,345 |
| 4145 ROOFING | $368,657 | $368,657 | $0 |
| 4150 SIGNAGE | $80,418 | $80,418 | $0 |
| | | | |
| 5000 PROJECT DEVELOPMENT | | | |
| 5001 ARCHITECT - BASE CONTRACT | $131,575 | $110,658 | $20,917 |
| 5003 ARCHITECT - ADDITIONAL SERVICE | $69▮ | | $10,617 |
| 5004 ARCHITECT - ROOF | $13,285 | $13,285 | $0 |
| 5005 ARCHITECT - PARKING LOT | $71,495 | $71,495 | $0 |
| 5008 CONSULTANT- ADA | $4,000 | $3,274 | $726 |
| 5109 BLUEPRINT-DELIVERY | $3,500 | $2,204 | $1,296 |
| 5362 LEGAL-PROJECT DEVELOPMENT | $105,000 | $80,11▮ | $24,889 |
| 5460 INSURANC▮ | ▮000 | $3,331 | $21,669 |
| 5461 INSURANCE-BUILDER RISK | $25,000 | $0 | $25,000 |
| 5463 ACCOUNTING AND AUDITING | $12,750 | $750 | $12,000 |
| 5598 CONTINGENCY | $100,000 | $0 | $100,000 |
| | | | |
| **5900 OVERHEAD** | | | |
| 5901 DEVELOPER FEE-EEALDC | $380,000 | $0 | $380,000 |
| 5904 ADMINISTRATIVE | $30,000 | $23,998 | $6,003 |
| | | | |
| **5950 APPRAISAL, LEGAL, TITLE** | | | |
| 6012 ESCROW/TITLE FEES-LOAN | $30,000 | $0 | $30,000 |
| | $110,000 | $0 | $110,000 |
| 6180 REPLACEMENT RESERVE | $50,000 | $0 | $50,000 |
| 6498 CONTINGENCY | $12,000 | $0 | $12,000 |
| | | | |
| **6600 INTEREST EXPENSE** | | | |
| 6610 PREDEVELOPMENT LOAN INTEREST | $6,000 | $4,500 | $1,500 |
| 6620 CONSTRUCTION LOAN INTEREST | $50,000 | $0 | $50,000 |
| | | | |
| **6800 PROPERTY TAX** | | | |
| 6820 PROPERTY TAX | $68,000 | $11,253 | $56,747 |
| | | | |
| **7400 MARKETING** | | | |
| 7497 MARKETING | $30,000 | $830 | $29,170 |
| 7498 COMMISSION EXPENSE | $130,000 | $109,503 | $20,497 |
| | | | |
| **9999 TOTAL** | $7,528,073 | $4,987,397 | $2,540,675 |

| Construction Capital Sources | Original Budget | Spent to Date | Available |
|---|---|---|---|
| EEC GRANT/LOAN ACQUISITION | $2,970,000 | $2,970,000 | $0 |
| EEC GRANT/LOAN | $2,530,000 | $302,120 | $2,227,880 |
| Redevelopment Funds | $1,067,114 | $1,067,114 | $0 |
| Shopping Center Revenue | $666,384 | $548,164 | $118,220 |
| Heron Foundation | $100,000 | $100,000 | $0 |
| City NCR Grant | $10,000 | $0 | $10,000 |
| TOTAL CONSTRUCTION CAPITAL | $7,343,498 | $4,987,398 | $2,356,100 |
| | | | |
| TOTAL CONSTRUCTION BUDGET | $7,528,073 | | |
| TOTAL CONSTRUCTION CAPITAL | $7,343,498 | | |
| CAPITAL REQUIRED (TO BE RAISED BY CPD) | $184,575 | | |

APPROVED AS TO FORM AND LEGALITY:

Deputy City Attorney

# OAKLAND CITY COUNCIL

## RESOLUTION No. _____ C.M.S.

**A RESOLUTION AMENDING RESOLUTION NO. 75142 C.M.S TO REPLACE COMMUNITY PLAZA DEVELOPERS, LLC, WITH JLG ASSOCIATES, LLC, AS PURCHASER AND DEVELOPER OF THE JACK LONDON GATEWAY SHOPPING CENTER**

**WHEREAS,** on December 26,1996, the Redevelopment Agency of the City of Oakland acquired the Acorn Plaza Shopping Center at 900 Market Street, now known as the Jack London Gateway Shopping Center (the "Center" or the "Project"), to develop a new shopping center to provide jobs primarily within Oakland's Enhanced Enterprise Community ("EEC) areas and maintain services provided by the community shopping center: and

**WHEREAS,** on November 4, 1997, the City Council, through Resolution No. 73913 C.M.S., authorized $4.2 million in HUD EEC funding to the Agency, of which $2.1 million was an EEC Section 108 loan, and **$2.1** million was an Economic Development Initiative ("EDI") loan and grant, toward the acquisition and rehabilitation of the Center; and

**WHEREAS,** Community Plaza Developers, LLC ("CPD") was selected through an RFP to manage, acquire, and develop the Center; and

**WHEREAS,** CPD's members include East Bay Asian Local Development Corporation ("EBALDC"), Portfolio Properties, Inc. ("PPI"), and Westside Economic Development Corporation ('WEDC); and

**WHEREAS,** on July 20, 1999, through Resolution No. 99-34 C.M.S., the Agency authorized the Agency Administrator or his designee to negotiate and enter into a Disposition and Development Agreement ("DDA) with CPD for the sale and rehabilitation of the Center: and

**WHEREAS,** on July 20, 1999, through Resolution No. 75142 C.M.S., the City Council consented to the sale of the Center to CPD, authorized an additional $1.3 million in Section 108 and EDI funding for the Center (pending approval by HUD), authorized the assignment of the Section 108 loan and the Economic Development Initiative funding (which was entirely converted to a grant per the

5.1
COMMUNITY & ECONOMIC
DEVELOPMENT CMTE
OCT 1 4 2003

terms of Resolution No. 73913 C.M.S.) to CPD, and authorized the transfer of sales tax revenue from the Center to the Agency for five years to repay the Section 108 loan; and

**WHEREAS,** EBALDC and PPI are forming a new entity, JLG Associates, LLC, of which they are members, which will include West Oakland Marketplace Advancement Company ('WOMAC") in place of WEDC as the community member; and

**WHEREAS,** the execution of the DDA and funding documents have been delayed pending resolution of issues related to the composition of the purchasing and development entity; now, therefore, be it

**RESOLVED:** That the City Council hereby amends Resolution No. 75142 C.M.S. to approve the sale of the Center and authorize the making of the Section 108 loan and EDI grant to JLG Associates, LLC, or an affiliated entity approved by the City Manager or her designee in her discretion; and be it further

**RESOLVED:** That the City Council hereby affirms its appointment of the City Manager and her designee as agent of the City to conduct negotiations, execute documents, administer funding, extend or modify the repayment terms, and take any other action with respect to, Project funding and the Center consistent with this Resolution and its basic purpose.

IN COUNCIL, OAKLAND, CALIFORNIA,_____ ,2003

**PASSED BY THE FOLLOWING VOTE:**

AYES-        BROOKS, BRUNNER, CHANG, NADEL, QUAN, REID, WAN, AND PRESIDENT
             DE LA FUENTE.

NOES-

ABSENT-

ABSTENTION-

ATTEST:_____
                    CEDA FLOYD
          City Clerk for the City of Oakland

*S.¹*

COMMUNITY & ECONOMIC
DEVELOPMENT CMTE

OCT 1 4 2003



APPROVED AS TO FORM AND LEGALITY

Agency Counsel

# REDEVELOPMENT AGENCY
# OF THE CITY OF OAKLAND

RESOLUTION NO. ——————— C.M.S.

**A RESOLUTION AMENDING RESOLUTION NO. 99-34 C.M.S TO REPLACE COMMUNITY PLAZA DEVELOPERS, LLC, WITH JLG ASSOCIATES, LLC, AS PURCHASER AND DEVELOPER OF THE JACK LONDON GATEWAY SHOPPING CENTER**

**WHEREAS,** on December 26, 1996, the Redevelopment Agency acquired the Acorn Plaza Shopping Center at 900 Market Street, now known as the Jack London Gateway Shopping Center (the "Center" or the "Project"), to develop a new shopping center to provide jobs primarily within Oakland's Enhanced Enterprise Community ("EEC) areas and maintain services provided by the community shopping center; and

**WHEREAS,** on November 4, 1997, the City Council of the City of Oakland, through Resolution No. 73913 C.M.S., authorized $4.2 million in HUD EEC funding to the Agency, of which $2.1 million was an EEC Section 108 loan, and $2.1 million was an Economic Development Initiative ("EDI") loan and grant, toward the acquisition and rehabilitation of the Center; and

**WHEREAS,** Community Plaza Developers, LLC ("CPD") was selected through an RFP to manage, acquire, and develop the Center; and

**WHEREAS,** CPD's members include East Bay Asian Local Development Corporation ("EBALDC), Portfolio Properties, Inc. ("PPI"), and Westside Economic Development Corporation ("WEDC"); and

**WHEREAS,** on July 20, 1999, through Resolution No. 99-34 C.M.S., the Agency authorized the Agency Administrator or his or her designee to negotiate and enter into a Disposition and Development Agreement ("DDA) with CPD for the sale and rehabilitation of the Center: and

**WHEREAS,** on July 20, 1999, through Resolution No. 75142 C.M.S., the City Council authorized an additional $1.3 million in Section 108 and EDI funding for the Center, and authorized the assignment of the Section 108 loan (pending approval by HUD) and the Economic Development Initiative funding (which was entirely converted to a grant per the terms of Resolution No. 73913 C.M.S.) to CPD; and

S. a

COMMUNITY & ECONOMIC
DEVELOPMENT CMTE
OCT 1 4 2003

**WHEREAS,** the Agency through Resolution No. 99-34 C.M.S. authorized the Agency Administrator to assign the Section 108 and EDI funding to CPD; and

**WHEREAS,** the Agency through Resolution No. 99-34 C.M.S. also authorized a dedication of $1.5 million in proceeds from Acorn Redevelopment funds to repay $1.5 million of the HUD Section 108 loan, and an Agency grant in the amount of $439,500 from Acorn Redevelopment funds for the rehabilitation of the Center (which grant amount has since been spent by the Agency in rehabilitating the Center); and

**WHEREAS,** EBALDC and PPI are forming a new entity, JLG Associates, LLC, of which they are members, which will include West Oakland Marketplace Advancement Company ("WOMAC") in place of WEDC as the community member; and

**WHEREAS,** the execution of the DDA and funding documents have been delayed pending resolution of issues related to the composition of the purchasing and development entity; now, therefore, be it

**RESOLVED:**  That the Redevelopment Agency hereby amends Resolution No. 99-34 C.M.S. to authorize the sale of the Center and the provision of Agency financial assistance to the Project to JLG Associates, LLC, or an affiliated entity approved by the Agency Administrator or her designee in her discretion; and be it further

**RESOLVED:**  That the Agency hereby affirms its appointment of the Agency Administrator and her designee as agent of the Agency to conduct negotiations, execute documents, administer funding, extend or modify the repayment terms, and take any other action with respect to the DDA, Project funding, and the Center consistent with this Resolution and its basic purpose.

IN AGENCY, OAKLAND, CALIFORNIA,_____ ,2003

**PASSED BY THE FOLLOWING VOTE:**

AYES-          BROOKS, BRUNNER, CHANG, NADEL. QUAN, REID, WAN, AND
               CHAIRPERSON DE LA FUENTE,

NOES-

ABSENT·

ABSTENTION-

ATTEST:_____
CEDA FLOYD
*Secretary of the Redevelopment Agency
of the City of Oakland*

**COMMUNITY & ECONOMIC
DEVELOPMENT CMTE**

**OCT 1 4 2003**

# EXHIBIT 6

**DECLARATION OF STEPHEN G. PREONAS IN SUPPORT OF INTERESTED PARTIES WOMAC PROPERTIES, INC. AND JLG ASSOCIATES, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**

## *SEC v. SAN FRANCISCO REGIONAL CENTER, LLC, et al.*

## NORTHERN DISTRICT OF CALFORNIA
## CASE NO.  No. 3:17-CV-00223-RS

## DESCRIPTION OF DOCUMENT:

## Order to Show Cause in Alameda Superior Court Case No. RG 15-785236 Entitled WOMAC Properties, Inc., et al. v San Francisco Regional Center, LLC

# EXHIBIT 6

*14132971*

1  KENNETH S. KATZOFF (SBN 103490)
   STEPHEN G. PREONAS (SBN 245334)
2  Katzoff & Riggs LLP
   1500 Park Avenue, Suite 300
3  Emeryville, CA 94608
   Tel. (510) 597-1990
4  Fax. (510) 597-0295

5  Attorneys for Plaintiffs
   WOMAC PROPERTIES, INC.
6  and JLG ASSOCIATES, LLC

**FILED**
ALAMEDA COUNTY

FEB 1 0 2017

CLERK OF THE SUPERIOR COURT
By _____
              Deputy

7  SUPERIOR COURT OF CALIFORNIA - UNLIMITED CIVIL JURISDICTION

8  COUNTY OF ALAMEDA

9

10  WOMAC PROPERTIES, INC. a California
    nonprofit public benefit corporation, JLG
    ASSOCIATES, LLC, a California limited
11  liability company

12           Plaintiff,

13     vs.

14  SAN FRANCISCO REGIONAL CENTER,
    LLC, a California limited liability company,
15  THOMAS M. HENDERSON an individual;
    and DOES 1 through 20, inclusive
16

17           Defendants.

18  _____

Case No. RG-15-785236

ASSIGNED FOR ALL PURPOSES TO THE
HONORABLE ROBERT MCGUINESS
DEPARMENT 22

[PROPOSED] **ORDER GRANTING
PLAINTIFFS'** *EX PARTE*
**APPLICATION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE REGARDING
PRELIMINARY INJUNCTION**

Date: February 8, 2017
Complaint Filed: Sept. 10, 2015
**Trial Date: TBD**

19  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

20      The *ex parte* application of plaintiffs WOMAC Properties, Inc. ("WOMAC") and

21  JLG Associates, LLC ("JLGA" and with WOMAC, collectively "Plaintiffs") for a

22  Temporary Restraining Order, and Order to Show Cause why a preliminary injunction

---

**[PROPOSED] ORDER GRANTING PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

should not issue came before this Court for consideration on February 8, 2017.  Based upon the parties' submissions to the Court, the applicable law, the relevant pleadings and papers on file in this action, and the arguments of counsel, and good cause appearing therefore, the Court hereby GRANTS Plaintiffs' application and ORDERS as follows:

**ORDER TO SHOW CAUSE**

Defendants San Francisco Regional Center, LLC ("SFRC") and Thomas Henderson ("Henderson" and with SFRC collectively "Defendants") are hereby ordered to show cause at ~~9:00~~ 2pm (time) on ____2/16/17____ (date), or as soon thereafter as counsel may heard in Department 22 of the above entitled Court, located at 1221 Oak Street, Oakland, CA 94612 why SFRC should not be removed as manager of JL Gateway, LLC ("JL Gateway), why WOMAC should not replace SFRC as manager of JL Gateway, LLC ("JL Gateway"), and why Defendants and their agents, servants, assigns, and all those acting in concert with Defendants, or on Defendants' behalf, including but not limited to Randy Sugarman, Schur and Sugarman Business Management, Marvin Tate, CPA, and Marvin Tate should not be further restrained and enjoined from:

(1) participating in any manner in the management of JL Gateway;

(2) Receiving or managing the funds of JL Gateway in any way;

(3) receiving rents or profits from the operation of the shopping center owned by JL Gateway ("the Project");

(4) denying WOMAC signing authority for JL Gateway's bank and financial accounts;

(5) denying WOMAC access to JL Gateway's financial accounts, books, and

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 100
EMERYVILLE, CA 94608
(510)597-1990

---

**[PROPOSED] ORDER GRANTING PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**
2

1    credit card accounts;

2         (6) denying WOMAC access to records for the Project including but not limited to

3    rental leases, deeds, tenants' contact information, collections details, rental licenses, lists

4    of security deposits by name of tenant and amount of deposit, tenant ledgers, copies of all

5    open work orders for the properties and other such documents reasonably necessary for

6    WOMAC to manage JL Gateway;

7         (7) denying WOMAC possession of the keys and alarms codes for the Project

8    owned by JL Gateway;

9         (8) denying WOMAC control and possession of the rents paid by the tenants of the

10   Project; and

11        (9) otherwise denying the ability of WOMAC to perform all duties as the new

12   manager of JL Gateway pursuant to this order.

13        This Order to Show Cause and supporting papers shall be served on Defendants no

14   later than __2/13/17__(date) by __FAX OR EMAIL__(manner of service).  Proof of such

15   service shall be filed and delivered in the manner provided by Code of Civ. Proc. §527.

16        The following briefing schedule shall apply: Any opposition papers to the Order to

17   Show Cause shall be filed and served on Plaintiffs no later than __2/15/17__ (date). (Service

     ON FAX SERVICE ALLOWED)

18        Any reply ~~papers to such opposition shall be filed and served~~ on Defendant no

19   later than _____ (date).   NA

20   **TEMPORARY RESTRAINING ORDER**  ( DENIED WITHOUT PREJUDICE)

21        The Court, for purposes of this Temporary Restraining Order ("TRO"), finds that

22   Plaintiffs have demonstrated a likelihood of success on the merits of their claims against

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

Defendant and have also demonstrated the possibility of irreparable injury were this injunction not to issue. This Court further finds that Plaintiffs have demonstrated that the balance of harm tips in favor of Plaintiffs.

Accordingly, it is hereby ORDERED that, pending hearing on the above Order to Show Cause, Defendants and their agents, servants, assigns, and all those acting in concert with Defendants, or on Defendants' behalf, including but not limited to Randy Sugarman, Schur and Sugarman Business Management, Marvin Tate, CPA, and Marvin Tate are further restrained and enjoined from:

(1) participating in any manner in the management of JL Gateway;

(2) receiving or managing the funds of JL Gateway in any way;

(3) receiving rents or profits from the operation of the shopping center owned by JL Gateway ("the Project");

(4) denying WOMAC signing authority for JL Gateway's bank and financial accounts;

(5) denying WOMAC access to JL Gateway's financial accounts, books, and credit card accounts;

(6) denying WOMAC access to records for the Project including but not limited to rental leases, deeds, tenants' contact information, collections details, rental licenses, lists of security deposits by name of tenant and amount of deposit, tenant ledgers, copies of all open work orders for the properties and other such documents reasonably necessary for WOMAC to manage JL Gateway;

(7) denying WOMAC possession of the keys and alarms codes for the Project

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

**[PROPOSED] ORDER GRANTING PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

4

1    owned by JL Gateway;

2        (8) denying WOMAC control and possession of the rents paid by the tenants of the

3    Project; and

4        (9) otherwise denying the ability of WOMAC to perform all duties as the new

5    manager of JL Gateway pursuant to this order.

6

7        The above temporary restraining order is effective on Plaintiffs filing an

8    undertaking in the sum of $_____.

9

10   Date:   February 10, 2017

11

12

13                                                 _____
                                                   Hon. Robert McGuiness   Robert D. McGuiness

14   * COUNSEL IS DIRECTED TO THE COURT'S

15   ORDER IN RG17847232 ENTERED ON 2/3/17

16

17

18

19

20

21

22

KATZOFF & RIGGS LLP
1500 PARK AVENUE, SUITE 300
EMERYVILLE, CA 94608
(510)597-1990

---

**[PROPOSED] ORDER GRANTING PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**
5