USDC CASE NO. 3:17-CV-0023-RS
SEC V. SFRC, ET AL.

EXHIBIT A

TO

DECLARATION OF SUSAN L. UECKER

In the Matter Of:

ALLAN YOUNG vs. THOMAS M. HENDERSON, et al.,

---

## MOTION HEARING

*May 05, 2016*

---

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland ◆ San Francisco ◆ San Jose ◆ Los Angeles**

**877.451.1580**

**www.aikenwelch.com**



**EXHIBIT A**

1              SUPERIOR COURT OF CALIFORNIA

2                  COUNTY OF ALAMEDA

3            BEFORE HONORABLE JULIA SPAIN

4                    DEPARTMENT 19

5                     ---oOo---

6    ALLAN YOUNG,

7           Plaintiff,

8    vs.                              No. RG15778891

9    THOMAS M. HENDERSON, MATTHEW
     T. HENDERSON, et al.,

10

11          Defendants.
     _____/

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          (Motion for Attorney's Fees)

16                  May 5, 2016

17

18

19        Taken before ERIN F. ROBINSON

20              CSR No. 12199

21

22

23        Aiken Welch Court Reporters
          One Kaiser Plaza, Suite 250
          Oakland, California 94612
24        (510) 451-1580/(877) 451-1580
              Fax:  (510) 451-3797
25              www.aikenwelch.com

```
 1    APPEARANCES OF COUNSEL:

 2    For the Receiver Susan Uecker:

 3          WILLIAM HUCKINS, Esq.
            Allen, Matkins, Leck, Gamble, Mallory & Natsis
 4          Three Embarcadero Center, 12th Floor
            San Francisco, California 94111
 5          (415)837-1515
            whuckins@allenmatkins.com
 6
      For the Plaintiff Allan Young:
 7
            JONATHAN K. LEVINE, Esq.
 8          ELIZABETH C. PRITZKER, Esq.
            Pritzker Levine LLP
 9          180 Grand Avenue, Suite 1390
            Oakland, California 94612
10          (510)415)692-0772
            jkl@pritzkerlevine.com
11          ecp@pritzkerlevine.com

12    For the Defendants SFRC; and Henderson Defendants:

13          LEEDS DISSTON, Esq.
            Casalina Disston
14          409 13th Street, 9th Floor
            Oakland, California 94612
15          (510)835-8110
            casdiss@yahoo.com
16
      Also Present:
17
            Susan Uecker, Receiver
18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              Thursday, May 5, 2016 - 3:20 p.m.

 3                        ---oOo---

 4          THE COURT:  What I'd like to do on the Young

 5   versus Henderson matter is I spent my evening going

 6   through all of the documents that had been presented

 7   thus far to put them into a format that at least I

 8   could better understand.

 9              This may make it more difficult for all of you,

10   but at least it's so I can better understand it.  So

11   we're going to distribute it to you and give you some

12   time to look at it, and then I want to talk about it.

13   Before we do that, we will address the motion that

14   brought you here today because it may determine how we

15   proceed.

16              So let me just get that off of my desk.  I'm

17   going to give you some time to look at all those and

18   take a break to give you time to do that's correct, but

19   before you do spend a lot of time doing it, I feel

20   obliged to address the receiver's ex parte, was it,

21   application for an order authorizing employment and

22   compensation of counsel.

23              You're all welcome to be seated, and then I'm

24   going to have you kindly state your appearances for the

25   record, and I appreciate seeing the court reporter
```

1   here.

2       MR. HUCKINS:  Bill Huckins from Allen Matkins

3   on behalf of the receiver, Susan Uecker.  Ms. Uecker is

4   in the courtroom as well.

5       MR. LEVINE:  Jonathan Levine for the plaintiff.

6       MS. PRITZKER:  Elizabeth Pritzker for the

7   plaintiff.

8       MR. DISSTON:  Leeds Disston for San Francisco

9   Regional Center and the Henderson defendants.

10      THE COURT:  Okay.  Thank you.  I'm going to

11  give you my tentative ruling, and then I'll allow you

12  to respond.  I made this ruling after I put together

13  all these documents.

14      I put these documents together, honestly, by

15  going through the declarations of the receiver that was

16  filed on April the 6th, I think it was, Ms. Baptiste

17  Shepard on April 19th and one from Mr. Henderson on

18  April 22nd that I found very helpful.

19      And honestly, what I had to do was cut and

20  paste them and sort of try to figure out for myself

21  what was lining up under CallSocket I, CallSocket II,

22  CallSocket III and get a handle on, honestly, just how

23  dire the situation appears to be.  Having what felt to

24  me like a fuller understanding of the serious economic

25  situation that at least these three entities find

1    themselves in, I then found myself in a very hard place

2    because.

3            And I'll just -- I am going to -- the tentative

4    ruling is, I will approve the receiver's request to

5    employ legal counsel to provide legal advice to her

6    with respect to the lawful discharge of her powers,

7    rights and duties under the amended order, including

8    securing control of and protecting the assets -- and

9    I'll give you all a copy of this -- granted subject to

10   the following limitations.

11           And that is No. 1, the employment of legal

12   counsel is solely related to providing legal advice.

13   It does not extend to prepare pleadings, reports or

14   writing letters on the receiver's behalf without prior

15   court approval.  It does not extend to, quote unquote,

16   representation of the receiver before this court.

17           I don't frankly think the receiver needs any

18   representation, and I would, quite frankly, far prefer

19   to hear directly from Ms. Uecker herself.  And I

20   consulted several outside resources.  I'm sure you're

21   familiar with them.  There's a Laffey matrix that's put

22   together.  There are some other resources that the

23   court has access to.

24           And ultimately, and also based on my own 20

25   years of experience, the last two of which has been

1    entirely in complex litigation, the average hourly rate

2    for counsel, I discovered, with over ten years of

3    experience in Oakland is between $300 and $400 an hour.

4    And for counsel between five and ten years of

5    experience, it's been $175 and $300 per hour.

6         Now, I have to say, I am quite confident that

7    the receiver and this court would benefit from the

8    great expertise that Mr. Huckins in particular and his

9    firm Allen Matkins has.

10        This seems to me to get only more complicated

11   and convoluted the further I dig into it.  Nonetheless,

12   given what I've discovered about the financial

13   situation of the three entities that are within the

14   jurisdiction at this point of this court, I feel

15   constrained.

16        And I can only approve the employment of

17   counsel by the receiver, not to exceed an average of

18   those ranges which means $350 an hour for counsel with

19   more than ten years' experience and $235 per hour for

20   counsel between five and ten years' experience.

21        And in this case it's hard to believe anybody

22   involved in it hasn't got at least five years of

23   experience.  And approval of the number of hours much

24   will remain subject to prior court approval prior to

25   payment.

1          Now, Counsel that's been employed by the
2    receiver prior to seeking formal court approval should
3    prepare an itemization of fee request and the court
4    will approve reasonable fees incurred to date.  But I
5    am sadly cognizant that the firm Allen Matkins may
6    decide that they cannot provide services within the
7    limitations that the court has approved, imposed.
8          And I will be very sorry if that occurs, but if
9    it does, I will understand.  And the receiver will have
10   to act accordingly.  I want to make it clear that I do
11   not require nor expect legal pleadings from the
12   receiver.  Reports are fine.  A letter addressed to me
13   with copies to the parties is fine.
14         To the degree the receiver has relied upon
15   legal advice in making any recommendations to the
16   court, recommendations that may be included in the
17   report, you can note that and tell me, I consulted with
18   counsel and counsel tells me we should pull the plug.
19         If I require further legal authority in support
20   of a recommendation, I will ask for it.  I'll either
21   ask my own research attorney.  I'll do it myself, or if
22   I am constrained by time and resources, I will prevail
23   upon the receiver to do so.
24         But this is, I regret to say, about the best I
25   can do given the circumstances that we find ourselves

```
 1   in.  And I am sorry.
 2           Does anybody wish to be heard?
 3           MR. HUCKINS:  No, your Honor.  We'll take at
 4   least I will take your ruling under consideration, but
 5   let's -- I think you spent a lot of time and effort
 6   trying to outline things, and let's proceed today and
 7   then we'll decide how we're going to proceed based upon
 8   your ruling, if that's okay.
 9           THE COURT:  Thank you.  I appreciate that, sir.
10   So what I'd like to do is give you some time to look at
11   what I've tried to do here.  What I've done, first of
12   all, just for my own purposes, was to diagram what the
13   San Francisco Regional Center is.
14           And the best I could find, they have partnered
15   with Mr. Young at least in CallSocket I and II, I'm not
16   sure of CallSocket III.  Then there are 13 other
17   entities that are involved with the San Francisco
18   Regional Center somehow that I don't know if they have
19   partners or what's going on with them.
20           And then I have received a request from WOMAC
21   Partners, who has partnered with San Francisco Regional
22   Center in a business called the JL Gateway and who has
23   invested in the JL Gateway Shopping Center.  They want
24   to be joined with this case because they have now also
25   sued for an accounting fraud and breach of contract.
```

1          At this point in time, I put Andew Young and
2    WOMAC Partners on opposite sides of the paper because I
3    honestly see myself at this point as only dealing with,
4    I guess, what is on the far right-hand side of the
5    paper, which clearly conveys to me that this is the
6    smallest piece.  We've got all these other entities
7    about which I know nothing, and over which I have no
8    jurisdiction.

9          So that's what this was to say to me.  Okay,
10   that's what that is.  The next thing I did, honestly,
11   was to start with each CallSocket entity.  So if we go
12   to page 2 of your handout, I went through each and
13   every one, and just tried to figure out based on the
14   declarations that had been submitted under penalty of
15   perjury, what the finances look like for each one.

16         And I'm going to give you time to study them
17   before we talk further, but so the one I came up with
18   for CallSocket I, when I look at it, they raised a
19   total from what I've been told of 19.8 to date through
20   June 30th with the million dollars I approved the last
21   time we were here, they will have spent 19.84 million
22   dollars.

23         And as much as the declaration for
24   Mr. Henderson relied upon some nice letter from some
25   guy named Bennett who thinks that the properties are

```
 1   worth a whole lot more, I did a little bit of research
 2   and used a conservative estimate of 10 percent increase
 3   per year, which still pops it up by 40 percent.  He
 4   paid, what was it, 8 million for the Tribune Tower.
 5   It's now worth 12 at least, maybe more.
 6          But somebody had to get in there and ascertain
 7   the status of that building, which some people think
 8   it's about to fall down on itself, and see what it
 9   would be worth to sell it.  But it's got a 9.9 million
10   dollar loan outstanding on it that also owes CS III a
11   million dollars.  So the equity is 1 million bucks max,
12   it looks to me like right now.
13          So I have not got too much trouble saying CS I
14   is insolvent, completely and totally insolvent, which
15   is of course what the receiver tried to tell me last
16   time which I recognized last time, but was quite torn
17   between the goals of fulfilling investor expectations,
18   employee expectations, maybe not quite prepared to jump
19   off that bridge so early in the game, maybe much more
20   prepared now.
21          Went to CallSocket II, and they raised 15.5
22   million.  You guys probably know all this.  But it's
23   now set forth in a way that I can understand it.  We
24   know that they've expended about 2.23 million in down
25   payments on the two buildings.  They are carrying loans
```

1    on those buildings of 6.3 million, which interestingly
2    was not divided between the two buildings apparently
3    but is instead secured against both.
4           So I allocated it based upon the settlement
5    documents that Mr. Henderson provided to me, so it
6    looks like of the 15.5 raised, they spent 2.23 million.
7    So there's 13.26 million, don't know where it went.
8    Looking for it.
9           Then it turns out that the community bank
10   building according to my allocations probably should
11   have been if they were collecting the rents that they
12   were entitled to, should have been making about
13   $250,000 a year in rent.  Don't know where that went.
14   And it looks to me like the equity in that building is
15   only about 2.49 million dollars.
16          So if you recall last time we were here, and
17   we'll go on to the rest of this, but last time we were
18   here, part of what I relied upon in agreeing to borrow
19   a million bucks from CS III and loan it to CS I was the
20   representation that all together these entities own 48
21   million dollars worth of real estate.  They don't own
22   48 million dollars worth of real estate.
23          The best I'm coming up with, the number as
24   you'll see on the front page, the value of combined
25   equity of all three is around 7.4 million.  So we've

```
 1   got problems, big problems.  I went on, then, and went
 2   through the Duffwin Theatre purchase price, 4.3
 3   million, down payment was 1 million.  The mortgage
 4   attributable to it is probably 3.3 million.  So we know
 5   that it should have been making $40,900 a month in
 6   rental income.
 7            I tried to take out what should be the loan
 8   payment attributable to it, tried to take out what I
 9   guessed was the taxes and insurance attributable to it.
10   Still means it should have been bringing in about
11   almost $174,000 a year in rent.  Don't know where that
12   went.
13            If it started at 4.3 million, it's probably
14   worth somewhere around 6 million.  That could be low.
15   Maybe 7 million.  I don't know.  But it's not going to
16   be worth 15 million.  It's got an outstanding loan of
17   3.3, so I'm arriving at equity of about 2.74.
18            Then I go on to CallSocket III.  Well, I guess
19   I should have -- CallSocket II has the big problem
20   there with the 13 million unaccounted for.  We go on to
21   CallSocket III, they raised 20 million.  They put in a
22   down payment on the I. Magnin building of 3.3.
23            Don't know where the rest of it went, don't
24   know if there were operating expenses for the I. Magnin
25   building.  Haven't been told any of that.  The balance
```

1    of investor funds unaccounted for at this point, 6.6

2    million.  The building as you know was sold.  Okay.

3    They bought it for 9.8, plus all of these ancillary

4    charges they assumed.

5            So looking at the settlement documents provided

6    by Mr. Henderson, I'm willing to say their acquisition

7    cost was 11.41 million.  They put in a down payment and

8    some other costs, wound up with a mortgage of 7.6.  So

9    they sold it, and I'm guessing because I have never

10   been told what the sales price was.

11           But based upon what turned out to be the net at

12   the end and knowing they had 7.6 loan I'm guessing they

13   sold it for about 17.3, I don't know, but that's what

14   the math seems to show.

15           MR. LEVINE:  20.1.

16           THE COURT:  How much?

17           MR. LEVINE:  20.1 or 20.6.

18           MR. HUCKINS:  20.5.

19           THE COURT:  Whatever.  Somebody is going to go

20   back, Ms. Uecker and reviews all of these for me and

21   tell me what the real numbers are.  So that's why I've

22   given you this, so you can see because at the end of

23   the day I want to know what the real numbers are.

24           But the best guess I came away with from the

25   information I have been given was that we know that

1   they had 8.8 million still on hand, so I'm looking for
2   about 17.5 of CS III funds that right now I don't know
3   where they went.
4           So it looks like CS I is insolvent, so probably
5   we don't have too much obligation anymore to their
6   investors.  They got their green cards, and that's all
7   they're going to get.  CS II investors, we have a
8   question about what's our obligation to them.  I don't
9   know.  CS III, I'm not, quite frankly, even sure
10  because I don't have a complaint on file if I have any
11  jurisdiction over them.
12          So maybe they're not my problem other than I
13  borrowed a million bucks from them that I've got to
14  make sure gets paid back.  So what I'm going to do is
15  let you have some time to look at this, and then I'm
16  going to come back and we're going to talk about the
17  conclusions and concerns, which is the front page
18  because this is really where I am right now, and we
19  need to discuss where we go from here.
20          So I thought since you were coming anyways, and
21  I had finally had time to really devote to looking at
22  this, that this would be a good opportunity for us to
23  discuss it.  Okay.  So if I give you like ten minutes,
24  is that enough?  You can look at this, and then we'll
25  come back and talk about it?

```
1              MS. PRITZKER:  Yes.

2              MR. HUCKINS:  Yes.

3              MR. LEVINE:  Is it okay if we stay here?

4              THE COURT:  Absolutely.  Make yourselves at

5    home.

6              (Recess taken.)

7              THE COURT:  We're back on the record, and all

8    counsel are present.  The first question I'd like to

9    ask is, where does Runway fit in on my chart?

10             MR. LEVINE:  Your Honor, Jonathan Levine for

11   the record, I was going to walk through the chart and

12   sort of explain a little bit of it, if I could.  Runway

13   is a part of CallSocket I.  Our understanding is that

14   Call Teks Security, which shows up in the middle.

15             THE COURT:  Hold on.  Runway is under

16   CallSocket I.

17             MR. LEVINE:  Call Teks Security which is No. 4

18   in the middle, I believe, is also part of CallSocket I,

19   according to the money flow.  Sort of broader, there

20   are other entities which we can provide the names of.

21   I don't have them offhand, but there are a number of

22   other entities that have appeared on the financial

23   statements that we can fill in.  That would go in the

24   middle of this chart.

25             THE COURT:  You mean other business entities
```

1  where I left the blank boxes?

2           MR. LEVINE:  Yes.  Now, in terms of your sort

3  of -- your Honor's statement about the CallSocket part

4  being the smallest part of this, it's actually, we

5  think, the largest part of this because all the money,

6  the 55 million sits in here, and then all of these

7  entities for the most part have gotten money to or from

8  the CallSocket entities.

9           THE COURT:  And you base that on what?

10          MR. LEVINE:  The financial statements that we

11  have that we're still parsing through.  We have a

12  limited set of financial statements.  They show money

13  flowing to and from directly a number of these

14  entities, and then separately all of the money

15  otherwise flows through SFRC and then may flow down

16  through this.

17          But every penny of investors' funds that came

18  in all 55 million here went immediately out the door,

19  either to Mr. Henderson himself or to SFRC and then

20  gets disbursed and some of it shows up on the financial

21  statements as an SFRC receivable.

22          THE COURT:  I understand those are your

23  contentions.  So it's your contention that none of

24  these other companies, Bear Trading, Berkeley Health,

25  California Gold Medal, et cetera, they did not

```
 1    independently seek investor funds?
 2            MR. LEVINE:  We don't know yet because we don't
 3    have the financial information for any entity other
 4    than the three CallSocket entities.  We have requested
 5    it but haven't gotten it yet.  So we see the money
 6    going out, and we see some of it coming back.
 7            I think my understanding is that all of the
 8    money from the CallSocket entities got moved out, and
 9    then it got brought back as needed, but it was also
10    used for a lot of other purposes including a lot of
11    these other --
12            THE COURT:  We've gone far afield now.  Did you
13    want to say something?
14            MR. DISSTON:  I didn't actually bring a chart
15    that would explain this, but I can certainly help
16    straighten out the concerns that the court has about
17    how these different entities are associated.  There are
18    seven EB-5 projects.
19            THE COURT:  You mean nationwide or within this
20    SF Regional Center?
21            MR. DISSTON:  SF Regional.  There are seven
22    EB-5 projects sponsored by SF Regional Center.  Those
23    are CCOO.  Not on your chart, I don't think.  It's
24    Comprehensive Care of Oakland LP.  General partner is
25    CCOC, Comprehensive Care of California LLC.  They own a
```

1    building on 10th Street.  It's a subacute care

2    facility.  I think that project has 20 investors.

3           THE COURT:  Sir, rather than me taking all this

4    down, why don't you just do a chart?

5           MR. DISSTON:  Well, I have a chart that I could

6    maybe get faxed to the court that lays out the

7    relationship between all these.

8           But as to the seven -- as to the call sockets

9    that we're talking about in this case, there are three

10   CallSocket entities the court knows, and I believe that

11   the companies that are associated with those three

12   besides the confusingly named holding companies and

13   LLCs that have the same names as the call sockets,

14   there is City Brand Media.

15          THE COURT:  And City Brand Media, are these all

16   under CallSocket I?

17          MR. DISSTON:  I, offhand, can't tell you which

18   of the call sockets these are associated with, but with

19   one or more of the call sockets, City Brand Media,

20   Immedia, Magnin Events, TTRG.

21          THE COURT:  What is TTRG?

22          MR. DISSTON:  It's the restaurant.  It's the

23   Tribune Tavern that's in the --

24          THE COURT:  We have a separate one for Tribune

25   Tavern.

```
 1              MR. DISSTON:  Well, it's the same thing.
 2   Tribune Tavern and TTRG are the same thing.  And I
 3   believe Call Teks.  So those entities are associated
 4   with --
 5              THE COURT:  When you say "associated," what do
 6   you mean, owned by?
 7              MR. DISSTON:  Yes, owned by, partnered with,
 8   somehow connected to those call centers.  As I say, I
 9   can -- and, in fact, we'll be provided specific
10   information about that.
11              THE COURT:  Wait a second.  So the Tribune
12   Tavern, TTRG, they are somehow connected to CallSocket
13   II.
14              MR. DISSTON:  The Tribune Tavern is not owned
15   by any of those entities.  It's just in the building.
16              THE COURT:  I know.  It showed up on
17   Mr. Henderson's declaration with its own bank account,
18   and so I tried to figure out why.
19              MR. DISSTON:  I think it has a bank account for
20   conducting business as a restaurant.
21              THE COURT:  Well, does SFRC run the restaurant?
22   He doesn't just lease out the space to a restaurant to
23   run it?
24              MR. DISSTON:  It has an interest in TTRG.  It's
25   a member of the limited liability company that runs the
```

```
 1   restaurant.
 2            THE COURT:  Sir, did you set up all these
 3   companies?
 4            MR. DISSTON:  I'm sorry?
 5            THE COURT:  Did you organize all these
 6   companies?
 7            MR. DISSTON:  Some of them.
 8            THE COURT:  So what was the lawsuit involving
 9   the Tribune Tower about?  The Tribune Tavern?
10            MR. DISSTON:  Mr. Henderson had a partner named
11   Chris Pastina.  They started two restaurants.  One in
12   the Tribune building called the Tribune Tavern.
13   Another in Jack London Square, a hotel, waterfront
14   hotel in Jack London Square that was called Lungomare.
15   Mr. Henderson and Mr. Pastina got into a lawsuit with
16   each other back --
17            THE COURT:  But they also sued all the
18   CallSocket entities, right, Mr. Pastina sued all the
19   CallSocket entities, and you represented them in that
20   lawsuit.
21            MR. DISSTON:  If you're telling me that they
22   were all defendants in that lawsuit, I'm surprised.  I
23   thought Mr. Pastina's case, as I remember it, was
24   against Mr. Henderson and San Francisco Regional
25   Center, but not the CallSocket entities.
```

1         THE COURT:  Well, the counsel who represents

2   WOMAC Partners, who asked me to relate that case here,

3   which thus far, quite honestly, I have declined to do,

4   although the judge that has that case is quite

5   interested in me taking it, also represented the

6   Tribune Tavern plaintiff, Mr. Pastina, I guess.

7         And so he has been alleging there is some

8   relationship, and I don't have any idea because I'm

9   only looking at his notice of related actions.

10         MR. LEVINE:  Your Honor, if I may.

11         THE COURT:  Yes.

12         MR. LEVINE:  I think Mr. Pastina, and I've

13   spoken with Mr. Pastina and with his counsel.  My

14   understanding is that the reason the CallSocket

15   entities were named in that case is because there were

16   payments that there was a dispute about payments and

17   money.

18         And some of the money that went into that

19   restaurant to build it out and to run it was using

20   CallSocket money, and the checks were written on

21   CallSocket accounts so Mr. Pastina when he sued,

22   because he knew that because he saw the checks that

23   said CallSocket on them, he named them as defendants.

24         THE COURT:  I see.  Is that case still ongoing?

25         MR. DISSTON:  No.

```
 1            THE COURT:  So that one is resolved.  I don't
 2   have to worry about being asked to take that one.
 3            MR. LEVINE:  If I may on the WOMAC case, there
 4   are -- that is a completely separate case.  What I will
 5   say is that JL Gateway, which is the entity under
 6   WOMAC, there are payments to or from that entity that
 7   appear on the call -- in certain of the CallSocket
 8   financial statements, as well as just about every other
 9   entity on here.
10            THE COURT:  Well, I'm not overly surprised to
11   hear that, sir, because there's a difference between --
12   there's a difference between being partners in a
13   business, there's a difference as opposed to making a
14   loan to a business, as opposed to failing to maintain
15   business entities as separate entities and commingling
16   all their funds.
17            And I am endeavoring the best I can to give the
18   benefit of the doubt right now, but one reason I put
19   all these on this chart is because I'm already on
20   notice by the declaration, I think, of Ms. Uecker that
21   funds from Immedia were used to pay the call centers
22   payroll by Mr. Henderson that he transferred Immedia
23   funds.
24            And what I'm looking for here is, is he the the
25   CEO of all these companies?  Doesn't he have a board of
```

1    directors?  Isn't there anybody he has to answer to?

2         MR. DISSTON:  He has members in the seven

3    separate EB-5 projects, and just to finish out the

4    chart, NA3PL, LP is an EB-5 project.

5         THE COURT:  Okay.  So NA3PL, so so far I have

6    three, CCOO, CallSocket, NA3PL.  Who are the others?

7         MR. DISSTON:  You've got three call sockets.

8         THE COURT:  They're each their own?

9         MR. DISSTON:  Yes.  So you have CCOO, three

10   call sockets, NA3PL, LP, and JL Gateway, and then

11   California Gold Medal, also you've got Central

12   California Farms here.  That's a separate EB-5 project.

13   So that's the seven entities.

14        THE COURT:  And so you're saying Central

15   California Farms is under California Gold Medal?

16        MR. DISSTON:  Frankly, I can't remember which

17   is the LP and which is the LLC, but one of them is the

18   LP.

19        THE COURT:  Okay.  That's helpful.  Where does

20   Tesh fit?

21        MR. HUCKINS:  Excuse me.  Leeds, I just want to

22   make sure that we've got it squared away.  I think you

23   mentioned that Immedia was an entity within the

24   CallSocket family.  Previously when we met and then I

25   believe that you had explained that Immedia is

1   basically the SFRC level and that that was basically an

2   entity that was created at the same time as SFRC and

3   was essentially, I think the description was, it's

4   basically a dba of SFRC.

5          MR. DISSTON:  I thought that Immedia, and I

6   don't think that's a company that I set up.  If so,

7   I've certainly lost track of it in the mix here, but I

8   think that Immedia was a business that was generally

9   leads for the call centers, and so it is associated

10  with the call centers.

11         So Tesh, Berkeley Health Care Dynamics are

12  associated with the NA3PL and North America 3PL, LLC

13  project.

14         THE COURT:  So Berkeley health and NA3PL and

15  Tesh are all related?

16         MR. DISSTON:  They're all related.

17         THE COURT:  Okay.

18         MR. DISSTON:  Along with Magic Ear.

19         THE COURT:  Magic Ear belongs with the NA3PL.

20         MR. DISSTON:  Yes.

21         THE COURT:  Okay.  The EB-5 project that is JL

22  Gateway has a partner named WOMAC in that entity, and

23  there's a lawsuit where WOMAC is suing San Francisco

24  Regional Center alleging that a note from San Francisco

25  Regional Center has been paid.

```
 1              THE COURT:  Right.  That's the one they're
 2    asking me to consolidate, which I'm not inclined to do.
 3              MR. DISSTON:  It's an unrelated --
 4              THE COURT:  So you're confirming my instinct.
 5    Where does Bay Area Trading fit in?
 6              MR. DISSTON:  Bay Area Trading, I believe -- I
 7    believe Bay Area Trading is with the call centers.  I
 8    can't remember if it's part of the call centers or if
 9    it's with NA3PL.  If I were going to make an educated
10    guess, I'd say it was with the call centers.
11              THE COURT:  What does with the call centers
12    mean?  They own it?
13              MR. DISSTON:  Yes, that would be what it means.
14    They are members.  Either one of the call centers or
15    several of the call centers are members of that --
16              THE COURT:  What does them being a member mean,
17    an investor?
18              MR. DISSTON:  LLC.  The only investors, the
19    only investor businesses are the limited partnerships
20    that are CCOO, LP, CallSocket LP --
21              THE COURT:  Thank you.  All of this is quite
22    interesting, but it doesn't address any of my concerns
23    right now, and we've only got ten more minutes.  So I'd
24    like to address my concerns.  And the first one is
25    because, you know, I cannot tell -- I don't know
```

```
1    whether you're trying to tell me, Mr. Disston, that
2    these Bay Area Trading Call Teks Security, City Brand
3    Media, are all assets belonging to CallSocket?
4              MR. DISSTON:  Some of them certainly are in
5    that counsel indicated that what happens when investors
6    release the funds from escrow to the limited
7    partnership, that is the entity that they are investing
8    in, it then goes to San Francisco Regional Center.  It
9    is then used by San Francisco Regional Center to pay
10   expenses of some of these entities.
11             And so in the accounting that Mr. Tate is
12   preparing for the court, there's a tracking of all of
13   the funds from the time they come from the investor,
14   where they go, when they go to San Francisco Regional
15   Center, and then where they're invested by San
16   Francisco Regional Center.
17             MR. LEVINE:  Your Honor, we have slightly
18   different view of this.
19             THE COURT:  Okay.  I'm not interested in all of
20   that right now, quite frankly.  What I am interested in
21   is whether I'm going to close down the call center
22   today or next week or whenever.
23             MR. HUCKINS:  Let's deal with the values.  The
24   receiver has got her own opinions on the values of the
25   property.
```

```
 1              THE COURT:  Excellent.  That's what I was going

 2    to ask you to do.  Do you have it with you?

 3              MS. Uecker:  Yes.

 4              MR. HUCKINS:  Do you mind if she brings it up?

 5              THE COURT:  Has everybody seen this?  You can't

 6    talk to me.

 7              MR. DISSTON:  I have not.

 8              THE COURT:  I'm going to read it out loud.  So

 9    what do you base these numbers on?

10              MS. UECKER:  This is from a broker opinion of

11    value from Colliers International Brokerage.

12              THE COURT:  Is it just over the phone?

13              MS. UECKER:  No, I have them written.  I didn't

14    have them all today, but I called my office.

15              THE COURT:  Tribune building could be worth

16    between 22 and 24.  It thinks the Duffwin Theatre could

17    be worth between 10.2 and 10.8.  It thinks the 17th

18    Street property, which I think is the Community Bank

19    could be worth between 7.2 and 7.5, and the 20th Street

20    property, what's that?

21              MS. UECKER:  That's the warehouse.

22              THE COURT:  That's not part of us.  That's part

23    of the Berkeley thing.  So I don't know if I can -- one

24    of the things we have to address here is the limit of

25    my jurisdiction.  So what I'm looking at here is if I
```

```
 1   just take the averages, I've got 23, 10.5, and I have
 2   got 7.35, so if we rely upon those numbers, then you
 3   might not have been so far off the mark in terms of the
 4   gross value.  It could be as much as 41 million dollars
 5   gross.  Now, who has the number of what the total loans
 6   are, off the top of their head?
 7           MR. HUCKINS:  The debt on the Tribune Tower we
 8   talked to lender's counsel this week and they said --
 9           THE COURT:  Hold on.  Let me get my paper so I
10   can write it down.  The Tribune Tower debt right now is
11   how much?
12           MR. HUCKINS:  They said 9.9 million dollars.
13           THE COURT:  That's the number I used.
14           MR. HUCKINS:  And they said that was a soaking
15   wet number, so I'm assuming that's the high end.  And I
16   believe the cross-collateralized loan on the Duffwin
17   and the Broadway buildings is 6.2 million.
18           THE COURT:  Okay.  I think I used 6.3, but
19   let's just double-check here.  Okay.  So they brought
20   that down.  So 6.2 on Duffwin.  So that means we owe
21   16.1.  We've got we've got 16.1, so that means we might
22   have as much equity as 24.9.  Okay.  Well, that's a
23   whole lot better than 15.
24           MR. DISSTON:  And then there's 8 --
25           THE COURT:  Right.  But let me explain that
```

1   problem as I went over this, Mr. Disston.   If I were an

2   investor sitting someplace else in the world and I

3   invested in CallSocket II, and I found out that I

4   have -- I gave my $500,000 and my 500,000 and all

5   that's left of it right now, it's hard because of the

6   way they did that, 7, 17.7, and we owe 6.2 and 5 -- and

7   so if we just separate that out and we talk about

8   CallSocket II, I would think that the 9.5 in equity

9   they might have is all mine.

10        And since we raised 15.5, we're at a loss

11   already of 6 million in CallSocket II.   So I'm still

12   not going to get my whole 500,000 grand back.   But I

13   would not be happy if I did not get back -- have you

14   got your calculator -- my 1/31, since there were 31

15   investors, my 1/31 of the 9.5 there is to be had.   Do

16   you see what I'm saying?

17        So here's where I had this real problem and

18   this is where my jurisdictional problem comes because I

19   don't have a complaint on file.   I don't know if the

20   purpose of this whole lawsuit is just to get you an

21   accounting.

22        I don't know yet if the purpose of this lawsuit

23   is to liquidate the assets and return to the investors

24   what they originally invested.   I don't even know if

25   Mr. Young was an investor in terms of actually

1   contributing cash.  So this is why when we were here on

2   April 20th I'm kind of like, what the heck, I don't

3   even -- I don't know the scope of my jurisdiction.

4            I can't even be exactly sure right now who the

5   parties are because Mr. Tate has at various times been

6   a party when SFRC gets sued.  So I'm a little concerned

7   about him coming forward and volunteering all this

8   information off the record without counsel.  Quite

9   frankly, we're going to have to visit that.

10           So this is the deal.  You can't just keep

11  saying, we have all this money and these three separate

12  entities and three separate groups of investors we can

13  just shuffle the walnut shells however we want.

14           MR. HUCKINS:  Your Honor, can I give you a

15  couple of other data points that you may need?

16           THE COURT:  Please.

17           MR. HUCKINS:  We're trying to break down the

18  payroll for you because I think it's getting to your

19  ultimate question.

20           THE COURT:  Are these people all making $5,000

21  a month, you've got 100 employees and they're pulling

22  5,000 a month, that's 5 grand a person, at a call

23  center?

24           MR. LEVINE:  No, it's management fees, which is

25  the higher level people taking huge chunks of money

1    out.

2          MS. UECKER:  If I may, Runway in San Francisco

3    are higher salaries anywhere from 50 to 100.  The call

4    centers are hourly individuals, but what you add to it

5    is all the benefits.  We have 100 percent health

6    insurance, Kaiser, vision, dental, Workers' Comp.  We

7    have a lot of benefits.

8          THE COURT:  Does the payroll you requested of

9    me on April 20th include Runway?

10         MS. UECKER:  Yes.

11         THE COURT:  Okay.  That was not clear to me.  I

12   thought Runway was standalone self-supporting at this

13   point.

14         MS. UECKER:  No, no.  What I've tried to do as

15   the receiver is to try to pull the information out of

16   CallSocket I to see if Runway can stand on its own

17   because it's really a separate operation.  It is not a

18   call center.  It's truly an incubator space in

19   San Francisco.

20         So what I plan to do for the next hearing was

21   pull out from CallSocket I a separate Runway financial

22   so we could see.  I believe they're close to breaking

23   even, but I haven't run all the final numbers, your

24   Honor.

25         THE COURT:  Okay.  Well, you're one step ahead,

```
 1   and I regret that I'm feeling time pressure.  We can
 2   stay as late as 5:00, but after that it gets a little
 3   bit dicey with the sheriffs, and they don't get happy
 4   and they start billing us for overtime in court, and I
 5   have the administrators on my neck.
 6           MR. HUCKINS:  Do you want the payroll
 7   information, the head count numbers?
 8           THE COURT:  If you have it, yes.
 9           MR. HUCKINS:  CallSocket I head count, 105
10   employees, and that includes the Runway employees, and
11   I think the receiver said it was 30 to 40.
12           THE COURT:  Runway is 30 to 40?
13           MS. UECKER:  No, no, 8 employees.
14           MR. HUCKINS:  CallSocket II, head count is 65.
15           THE COURT:  And just for purposes of future, I
16   really expect to be hearing from Ms. Uecker.
17           MR. HUCKINS:  That's fine.
18           THE COURT:  You're only supposed to give legal
19   advice.
20           MS. UECKER:  And your Honor, these numbers are
21   for the last payroll.  There's new payroll that's
22   coming out tomorrow.  Our numbers are going down
23   because you didn't allow any hiring and there's been
24   some.
25           THE COURT:  Good.  So how many does CS II own
```

```
 1   or hire, how many has it got?  How many employees does
 2   CS II have?
 3           MS. UECKER:  65.
 4           THE COURT:  They have 65 employees already?
 5           MS. UECKER:  What happened is this is the
 6   second payroll for CallSocket II.  Mind you, they
 7   haven't been up and running, but they geared up and
 8   hired a bunch of people in CallSocket II.
 9           THE COURT:  According to the declaration filed
10   by Ms. Baptiste Shephard, they only started March of
11   2016.  This lawsuit was filed the end of March.
12           MS. PRITZKER:  Actually, we've been on file
13   since July of last year.
14           MS. UECKER:  Your Honor, so it's clear, the CS
15   II employees have only been employed and been on
16   payroll for the last two payrolls, so one month, these
17   65 people.
18           THE COURT:  How did this get out, they've only
19   been employed for one month and how did this get up
20   to -- when you came in, you asked me to shut down what
21   I understood was CallSocket I, conference whatever it
22   is, call center 1.
23           MS. UECKER:  Well, call center -- CallSocket I
24   and 2 are co-mingled.  They're on the fourth floor and
25   the sixth floor of the Tribune Tower.
```

```
 1            THE COURT:  So you can't tell one employee from
 2    another?  You can't tell who is an employee of which
 3    entity?
 4            MS. UECKER:  You can if you go through the
 5    payroll reports.  But there's two reports.  The plan
 6    was for CallSocket II to be in the Duffwin building,
 7    but they can't because that space is vacant.  I have
 8    seen that space.
 9            THE COURT:  So what I'm getting at is -- and
10    this is where we could use some legal advice -- should
11    CallSocket I be put into bankruptcy, should the doors
12    just be closed?
13            What's more important to the investors, getting
14    their green card or getting the financial return on
15    their investment with regard to CallSocket I, I don't
16    think it matters because they're insolvent anyways,
17    their money has all gone bye-bye.
18            So what happens if we close call center 1, we
19    start saving all that money, we don't let call center 2
20    hire anybody else, and my understanding, what were
21    their requirements, they had to hire ten people per
22    investor, so they had 31 investors, so they're supposed
23    to wind up with 310 employees in order to qualify under
24    the BK 5 thing?
25            MR. DISSTON:  I think CallSocket II has, I
```

1    believe, 29 investors.  The first four investors will

2    submit IA-29 petitions by the end of this month.  That

3    is the reason that there are, if the head count is 65

4    for employees for CallSocket II, because the first

5    batch of investors will be submitting their IA-29

6    petitions, so there will be an accounting prepared for

7    the USCIS for all --

8              THE COURT:  Sir, I appreciate that.

9              MR. DISSTON:  14.5 million.

10             THE COURT:  Yeah, right.  You know, I found

11   this excellent brochure, I guess it is, that had been

12   attached to, I believe it was somebody's declaration,

13   the CallSocket II --

14             MR. DISSTON:  Business plan?

15             THE COURT:  No, it was the CallSocket II sales

16   brochure for investors.  And it basically explains to

17   them that within five years they're going to be making

18   a great profit.

19             And I read that and I thought to myself, gee,

20   given that the actual experience with CallSocket I has

21   been insolvency within five years, how could the

22   representation be made that you're going to start

23   turning a profit on your investment within the first

24   two years and by five years you are going to be home

25   free?

1        MR. DISSTON:  I confess I can't respond given

2   that I'm not familiar with the brochure that you are

3   talking about.

4        THE COURT:  You produced it.  It was attached

5   to your documentation.

6        MR. DISSTON:  We copied that for the court to

7   indicate -- I thought it was the business plan.  But if

8   it's something else, then I'm not sure what that was.

9   But the purpose --

10        MS. UECKER:  Your Honor, if I could, there's

11   one concern that I don't think anyone has addressed,

12   but if we're going to do anything with these employees,

13   we have what's called the WARN Act notice issues and

14   that I do need legal counsel but that affects

15   CallSocket I employees.

16        The majority of them have been there long

17   enough that the notice would be required, where the

18   CallSocket II employees, because they're only there for

19   the last 30 days, there would only be one WARN notice

20   that would be required.  My concern is if we go down

21   that road is to make sure we comply with the WARN Act

22   in giving appropriate notice.

23        THE COURT:  How much notice do you need, two

24   weeks?

25        MR. HUCKINS:  It's 60 days.  It's basically a

1    day-for-day penalty.  So if you terminate prior to 60

2    days, you basically owe the employees every day of

3    compensation that's a qualified employee.

4          THE COURT:  You mean if you close the whole

5    thing?

6          MR. HUCKINS:  If we were to shut down tomorrow

7    and we didn't give the requisite notice, potentially a

8    WARN Act claim for 60 days.

9          THE COURT:  And what if you lay off in stages?

10         MR. HUCKINS:  I've discussed that briefly with

11   my counsel, and I've talked to one of my labor

12   partners, and he said that's frowned upon, and they may

13   look through it.  But that's a possibility as well.

14         MS. UECKER:  I also have had experience in

15   bankruptcy court where they have not given the WARN Act

16   notice because it's an emergency, which is another

17   situation I've actually encountered where debtor's

18   counsel did not have the time to give the notice.  But

19   I just bring it up, your Honor, if it's something

20   you're looking at in an orderly shutdown, you may want

21   to stage it.

22         MR. HUCKINS:  And just so that we're trying to

23   give you the facts I think that you need, we were

24   before this hearing talking to counsel and we had

25   presented them with the necessity of filing a

1    stipulated motion to present to your Honor laying out

2    the cash flow burn that the receiver has experienced to

3    date so that the court would have what it needed to

4    make an informed decision because we were going to need

5    another funding request before the June 9th hearing.

6           The receiver has the numbers in front of her

7    for what's left from the million dollars, but it is a

8    significant burn.  And the best guess is that million

9    dollars might carry us through the middle of this

10   month.

11          MS. UECKER:  Through hopefully the May 20th

12   payroll.

13          THE COURT:  My understanding is you're coming

14   back May 17th anyways.  We have a reservation for you

15   on May 17th at 2:30.  But that doesn't mean I'm going

16   to give you any money that day.  That's the day that we

17   had reserved for you to come back and ask.

18          So I am very concerned about the rate at which

19   that money is being used.  As you see down here, what

20   I've basically said is if we were to try to fund the

21   call center payroll through all CS entities, it would

22   be all of the entities then would be completely

23   insolvent within a matter of 25 to 30 months.

24          And why would I consider doing that when it's

25   very clear now that call center 1 is insolvent other

1   than maybe this new information about the Tribune

2   Tower, and it can't pay any of the money back, so I'm

3   not going to advance any more money to call center 1

4   unless I am confident it can be paid back.

5          And I just have to -- so I don't know here.

6   This is new information.  It's information I very much

7   needed.  And this is further information which I need.

8   So in the interest of time, we've got the fair market

9   value apparently of the properties.

10         I need to know if any of the CS entities are

11  actually generating any income.  So if they actually

12  have, I need to see the operating income and expense

13  sheet for every CallSocket entity that has income and

14  expense.  I only understand those right now to be

15  CallSocket I, CallSocket II and Runway.

16         Now, maybe it extends to the real property, the

17  Tribune Towers.  I'm hoping that real estate agency you

18  hired is monitoring the rents and kicking out the

19  people who aren't paying.

20         MS. UECKER:  Along that line, your Honor, the

21  real difficulty is in the Tribune Tower the majority of

22  the tenants are Henderson entities that do not pay

23  rent.

24         THE COURT:  They have no rental agreement.

25         MS. UECKER:  They have rental agreements.  They

1   do not pay rent.

2          THE COURT:  Evict them.

3          MS. UECKER:  I'm just -- and we also have Tesh

4   who is a tenant at the Duffwin building.  Magic Ear was

5   going to be a tenant at Broadway.  It's pervasive.  So

6   we are trying to pull those numbers together.  It's

7   going to look at what the rent should be and then what

8   it actually is and what is collected.  They're very

9   different numbers.

10          MR. HUCKINS:  I know your Honor needs to have

11  the necessary factual record to make the decision, but

12  I believe that when the facts are presented, there will

13  be sufficient equity or at least the foundation for

14  sufficient equity in the Tribune Tower building to at

15  least make the payroll obligations that have already

16  been incurred.

17          And then we would need authorization, a

18  receiver would need authorization to essentially shut

19  down the operations to terminate further losses.

20          THE COURT:  Okay.  This is what I want you to

21  do right now.  I want you to lay off -- I want you to

22  cut the call center and any other related expenses by

23  30 percent.  So we're going to begin to stop the

24  bleeding.

25          Do you wish to be heard, Mr. Disston?

```
 1              MR. DISSTON:  Yes, your Honor.  May we deal
 2   with that issue by either increasing the revenues to a
 3   sufficient extent to cover whatever your --
 4              THE COURT:  What revenues?
 5              MR. DISSTON:  The revenues from the call
 6   center.  When we presented the --
 7              THE COURT:  Sir, I don't know how much pie in
 8   the sky you believe in, but you've had five years to
 9   turn that into an income-producing business.
10              MR. DISSTON:  And I believe we're there.  So
11   all I'm asking for is that if what we're trying to do
12   is reduce the burn rate that we do that by either
13   laying people off or by increasing the revenues.
14         There are new agreements that are either in
15   effect or are, if they're not in effect, they're being
16   followed by clients of the call center, and I think
17   that the revenues are increased or increasing.  If we
18   lay off --
19              THE COURT:  Why shouldn't we just put the call
20   center 1 into bankruptcy and let the trustee worry
21   about this?
22              MR. HUCKINS:  We need a voluntary petition by
23   the debtor, which is possible.  Mr. Disston is trying
24   to do that.  Or you need an involuntary petition.  You
25   need to petition the creditor to do so.  The receiver,
```

1    I don't believe, is authorized at this point to

2    essentially put the CallSocket entity into bankruptcy.

3              MR. LEVINE:  Our hope, your Honor, was to try

4    and effectuate in a less -- bankruptcy is obviously

5    very expensive, takes on a life of its own.

6              And our hope was to try and effectuate an

7    orderly wind-down of the entities to marshall the

8    assets that could be marshalled, stop the bleeding and

9    then figure out where that money, who that money

10   belongs to and claw back as much as possible from

11   Mr. Henderson and all these other entities.

12             We've taken all these monies out which are

13   legitimately assets of the CallSocket entities.  That

14   could take a while, but we've stopped the burn, got the

15   money from the properties, we don't need a receiver or

16   counsel there, and we can come back and figure out a

17   way to distribute that money but without doing the

18   bankruptcy.

19             The bankruptcy will eat up a good hunk of this

20   money and that was our hope to do that.  We would hope

21   that Mr. Henderson --

22             THE COURT:  Well, the bankruptcy can eat it up

23   or the receiver and counsel can eat it up.  Either way,

24   there isn't going to be anything left.  Let's face the

25   facts.

```
1              MR. LEVINE:  There could be if Mr. Henderson
2    would stop fighting and, you know, step off.  There
3    could be substantial money here left to return to some
4    of the investors, which is what we think should be done
5    at this point.
6              THE COURT:  What makes you believe that they
7    care more about getting a return on their investment
8    than on their green card?
9              MR. LEVINE:  It's my belief that they don't,
10   the investors, that they probably want their green
11   cards.  But if getting their green cards means
12   perpetrating a fraud on the investors and perpetrating
13   a fraud on the federal government and not complying
14   with the EB-5 program, that's not something I think any
15   of us sitting at this table want to participate in.
16             THE COURT:  The EB-5 program, as far as I can
17   thus far ascertain, only requires that the business be
18   viable until they get their green cards.  There's
19   nothing that says, and this has to be a solidly based
20   business that we can count on is going to go on even
21   for a three-year term that the IRS requires that you
22   can take a loss on a business for three years.
23             I couldn't find a single thing that said, and
24   if we're not satisfied that this is a viable business,
25   so as long as you can -- I'm sorry to say this so
```

1   plainly, but it's the only way I know how to talk.   If
2   you can keep a sham up for five years and all your
3   investors get their green cards, mission accomplished.
4          MR. LEVINE:   I frankly don't -- they're
5   supposed to be sustainable jobs.   Sustainable should
6   mean something.
7          THE COURT:   Five years.
8          MR. LEVINE:   I guess the question is if it's --
9   I think you're right.   And I think that's why there's
10  so many problems with this program and why it's so ripe
11  with abuse and there's so much fraud in it.   But it is
12  not being -- it is our view, at least, that this
13  program is not being implemented properly.
14         And if it was simply a matter of they tried
15  their best and used all the money of these programs to
16  create the jobs and simply couldn't make them
17  sustainable but everyone got their green cards, that
18  would be one thing.   But that's not what's happening
19  here.
20         What's happening here is this money is not
21  being used to create sustainable jobs through the call
22  centers.   It's being diverted for lots and lots of
23  other purposes for Mr. Henderson and his family for
24  personal gain.   And that is not something --
25         THE COURT:   Now you're off into argument for

1    which I don't yet have any proof.  So you need to -- I

2    can only deal with what I have right now, and what I

3    have right now and what makes this such a challenge is

4    because I don't know where the target is.

5        I don't know is the target to leave --

6    CallSocket I has accomplished its purpose, so we can

7    safely shut it down and now move on to CallSocket II

8    and help those people get their green cards by

9    fulfilling its mission, and if we can -- if the call

10   center stays viable for three, four years, however long

11   it takes for them to get their green cards, then okay.

12       Under the BK 5 program, mission accomplished

13   and then move on to Cal socket 3, I don't know.  And

14   the problem is because you don't have a complaint on

15   file.

16       MR. LEVINE:  We do have a complaint on file.

17   We don't have an amended complaint.

18       THE COURT:  No.  It's been demurred.  In the

19   eyes of the court, there is no viable complaint on

20   file.  So you got notice from defense counsel that

21   you're not going to file until May 13th.  Don't seek

22   another extension.

23       And I need to see a complaint on file, and I

24   need to find out what the scope of this is because if

25   all I have is one 50 percent investor who is concerned

1    about all of this, then the easy way out is buy him out

2    and get rid of him and let the other investors get

3    their green cards because that's apparently all they

4    wanted.

5            MR. DISSTON:  Mr. Young is not an investor.

6    The --

7            THE COURT:  He's pay 50 percent partner

8    according to the representations I have thus far.

9            MR. DISSTON:  And so your Honor has scheduled a

10   hearing to sit down and go through all of the financial

11   documents.  My understanding is that Mr. Tate is

12   preparing all of the financial documents for all of the

13   entities that are at issue here, and some kind of a

14   cash flow analysis to show how that all works.

15           THE COURT:  Thank you, sir.  And now I'd like

16   to address the further things I need, and I don't know

17   whether I'm going to bring you back next week.  See, I

18   am not available from May the 18th until the 31st, so

19   but I've gotten the fair market values now.

20           I want the operating expense, income and

21   expense for all CallSocket entities, and your request,

22   Mr. Disston, is denied.  We will roll back the call

23   center expenses by 30 percent effective, giving

24   whatever notice you need to give under the law.  But

25   we've got to stop the bleeding now.  Any tenants that

```
 1   are not paying rent should be evicted.
 2         If they have some kind of a rental agreement in
 3   place, my understanding is the receiver is now in
 4   charge of the real properties, and it's up to you to
 5   decide what the rents should be or abide by the monthly
 6   rental agreements or the leases.  Anybody who doesn't
 7   pay rent gets out.
 8         MS. UECKER:  I will absolutely follow that,
 9   your Honor.  The other issue is some tenants have
10   leases that are sweetheart deals at very, very low
11   rents.
12         THE COURT:  There's unfortunately not too much
13   we can do about that without getting sued.
14         MS. UECKER:  One is SFRC and Mr. Disston on the
15   ninth floor pay $1 a year rent.
16         MR. HUCKINS:  Your Honor, as a procedural
17   matter on these eviction matters if we go that route,
18   can we relate those so you're aware of those?
19         THE COURT:  What are you talking about?
20         MR. HUCKINS:  If the receiver ends upbringing
21   eviction proceedings to displace tenants at the various
22   properties because they're not paying rent or they have
23   some, lack of a better term, sweetheart deal that
24   doesn't make economic sense, can we bring those, you
25   don't want the UB proceedings in your court.
```

```
 1              THE COURT:  I would be glad to have them except
 2     I believe it would be unethical for me to do so if I
 3     have ordered the evictions, gee, how would you feel if
 4     you were the tenant?
 5              MR. HUCKINS:  Fair enough.  Can I have two
 6     other things that would be helpful for you to have?
 7     The payroll breakdown so that you have the dollars, the
 8     employees by entity?
 9              The other thing I think you need to understand
10     is the amount of cash that the receiver has because you
11     can probably tell from my voice and the points that I'm
12     making, cash flow is critical and we are nearing a
13     crisis.
14              THE COURT:  You mean you've almost already
15     blown through a million bucks?
16              MS. UECKER:  No, your Honor.  We have
17     approximately 500,000 left, and I have a payroll on May
18     20th of 230,000 and we have not yet paid the Tribune
19     loan which is 71,000, and then I have another payroll
20     on June 3rd.
21              THE COURT:  Okay.  Well, payroll is going to
22     begin decreasing substantially.  When I say cut by 30
23     percent, I really don't understand how this whole BK
24     thing works, but so when you were here before, the
25     information I had was that the call center 1 payroll
```

1   was 250,000, and the call center 2 payroll was only

2   50,000 a month.

3            MS. UECKER:  That is correct.

4            MR. HUCKINS:  That was every pay period.

5            THE COURT:  Biweekly.  So the call center two

6   payroll is 100 grand.  Okay.  And call center 2 is

7   sitting on substantially more assets than call center 1

8   from the best I can tell right now in terms of what's

9   clear.  And so the 30 percent does not apply to call

10  center 2.

11           Call center 1 is the one that we're going to

12  start ratcheting down and so you're going to cut call

13  center 1 expenses by 30 percent.  We're going to leave

14  call center 2 expenses where they are right now, but

15  don't you dare hire anybody else.

16           And see if at least a few of those investors

17  can obtain their goal of a temporary green card or at

18  least a preferential green card placement.  So I've got

19  the fair market value.

20           So I've already gotten the information that I

21  needed, then, is that we are looking at a wind-down of

22  CS I more than likely you don't think the receiver has

23  the authority to put CS I into bankruptcy, and I'm not

24  sure what the advantages would be of the bankruptcy

25  anyways other than it wouldn't be my headache.  It

1  would be somebody else's.  Okay.

2          So what I'm going to do now is I'm going to go

3  back over all of my projected financials, and I'm going

4  to plug in the new information you've given me

5  Ms. Uecker with regard to the fair market values.  I'm

6  going to see where it looks like we stand, but this

7  again is my problem.

8          So much of that fair market value, the current

9  equity would be what the investors in each separate

10  CallSocket would have expected as the return on their

11  investment.  So we have to keep these separate.  So let

12  me see here now.

13          If it should turn out that the Tribune should

14  be worth 22, then maybe it has a value of 10, and maybe

15  if we shut it down, we'll have some money to give back

16  to those investors, if we put the Tribune Tower up for

17  sale.

18          MR. HUCKINS:  The loan matures in October, so

19  it would be appropriate to do so.

20          THE COURT:  Has it not been being paid monthly?

21          MR. HUCKINS:  It is.

22          MS. UECKER:  It matures.

23          THE COURT:  But it's going to be -- so it's one

24  of these balloon payment things, it's not a 30-year

25  mortgage or something.

```
1              MR. HUCKINS:  It might have a small
2    amortization to it, but basically 9.9 million would be
3    due in October.
4              THE COURT:  Put it up for sale.
5              MR. DISSTON:  And taking some giant steps here
6    at a hearing that --
7              THE COURT:  Do you want me to continue this
8    until next week, Mr. Disston?  I'll be happy to.
9              MR. DISSTON:  I certainly want to be able to
10   present a record on whether we ought to lay off a bunch
11   of people at the call center and sell the building.
12             What I was going to request was that since
13   Ms. Shepherd is, in effect, managing the employees at
14   the call center, that she be consulted with respect to
15   who gets notices if what we're doing is laying people
16   off there.  There are employees who are more productive
17   employees at the call center than others, and --
18             THE COURT:  I certainly think that the receiver
19   would do that.  If she's going to lay people off, I
20   would expect that it's part of her obligation to
21   preserve the assets that she would choose the least
22   productive of the employees.
23             Now, if you want me to -- if you want to
24   continue this hearing, what I have ordered thus far is
25   that anybody who is not paying their rent be given a
```

```
1    three-day notice and get evicted.  And that to the
2    degree that there are sham rental agreements for which
3    no value is being received like, for example, for all I
4    know Mr. Disston is waiving the huge attorney fees that
5    are being incurred.  I don't know.
6              So but it boggles the mind that SFRC is not
7    paying any rent.  So to the degree something is a sham,
8    give them notice that it appears to be a sham and
9    consult with legal counsel about what your obligations
10   and responsibilities are in terms of being able to
11   evict them, or set aside the rental agreement and tell
12   them what their new rent is.  Maybe they'll pay it.
13             So that's all effective -- that's effective
14   now.  And the cutting the CS call center expenses by 30
15   percent is effective now.  Now, if you want me to
16   continue this until next week so that you can have a
17   fuller opportunity to be heard as to whether or not we
18   put the Tribune Tower up for sale, I'll gladly do that,
19   Mr. Disston.
20             MR. DISSTON:  Thank you, your Honor.  When
21   would you like to do that?
22             THE COURT:  Let's see.  I can do it next
23   Thursday.
24             MR. DISSTON:  All right.  That's fine.
25             MR. LEVINE:  In the afternoon, your Honor?
```

```
 1              MR. HUCKINS:  The receiver is in Delaware.
 2          THE COURT:  When can you be here?
 3          MS. UECKER:  Monday.  I'm out Tuesday,
 4  Wednesday, Thursday, I'll be flying back Friday.
 5          THE COURT:  Monday doesn't give you a lot of
 6  notice.  You already have this date reserved for the
 7  17th at 2:30.  Do you want to just let that be the day?
 8          MR. DISSTON:  That's fine, your Honor.
 9          THE COURT:  And in the meantime, find a broker.
10          MS. UECKER:  I've got a broker, your Honor.
11          MR. HUCKINS:  In terms of the receiver's
12  filings with the court, do you want them submitted --
13  you had suggested that letters would be fine.
14          THE COURT:  Letters are fine and numbers are
15  fine.  I read numbers really well.  So just give me
16  the -- I just want the facts.  Me and the guy on
17  Dragnet.  The facts, please, nothing but the facts.
18          MR. LEVINE:  The hearing on the 17th is listed
19  as a case management conference.  Do you expect case
20  management statements?
21          THE COURT:  I absolutely don't.  And that was
22  just because my wonderful clerk wanted to be sure she
23  reserved you a space.  And we don't have a lot of
24  options with our electronic system, so she just picked
25  one that she thought would fit.  No, I don't want
```

1    statements.

2          What I want is to see your complaint because

3    I'll tell you I am concerned about, first of all, can't

4    the receiver get all the accountant's documents

5    anyways?  I mean, you're the receiver.  Can't you just

6    go and say you're the accountant, give me all the

7    stuff?  Isn't that within your purview?

8          MS. UECKER:  Typically, your Honor, there's in

9    house bookkeeping and the company that's the defendant,

10   Mr. Tate is a third-party CPA firm.  I'm not sure that

11   I can go into his space like I can the Tribune Tower

12   and take things.

13         THE COURT:  Of course, you can't just take them

14   but you can make the request.  And you've got a lawyer.

15         Ask your lawyer now, as long as Mr. Huckins is

16   still willing to be your lawyer, you can tell Mr. Tate

17   that he's now your accountant, apparently, and you want

18   all the documents because I am not -- I am having some

19   real reservations about our plan to sit down with him

20   and just grill him about these documents and him not

21   being represented.

22         He has been a party in the past, as I said.

23   I'm not going to put him in that position.  That would

24   be overstepping as an officer of the court myself.  I'm

25   not ever going to put somebody in that position.  So

1  maybe he's going to volunteer, and I'll have to give

2  him his whole 5th Amendment rights or something.

3  That's also a possibility.

4           MR. LEVINE:  He was represented earlier.  He

5  does have a lawyer.

6           THE COURT:  And I invited him at the last

7  hearing to bring him if he chose to, but I'm still

8  uncomfortable.

9           MR. LEVINE:  We understand.  We're all having

10  great difficulties getting information out of Mr. Tate.

11           Mr. Disston and I had a two-hour meeting

12  earlier this week and we made it abundantly clear to

13  Mr. Disston that information we need in advance of this

14  meeting that we can't rely on simply a spreadsheet

15  Mr. Tate provides.  We need the underlying general

16  ledgers.

17           THE COURT:  Supporting documentation.

18           MR. LEVINE:  Mr. Disston is, I hope, getting it

19  for us for all these other entities.

20           THE COURT:  Well, I can put it to you this way.

21  And Mr. Disston, I really hesitate to do this because

22  at this point I don't know if I'm just looking at a

23  mismanagement situation where funds were co-mingled and

24  not maintained separately.

25           But maybe there are documents someplace that

1    has tracked all of this so we can undo this and all is

2    well, or if I'm looking at a situation that at some

3    point needs to be turned over to the district

4    attorney's office, just to be perfectly candid.

5              MR. DISSTON:  Your Honor referred it to the

6    USCIS and the SEC, I think the last time we were here,

7    and at least one of those entities is now receiving

8    documents and other information.

9              THE COURT:  I'm glad to hear it because their

10   pursue will extend to all seven EB-5 entities and mine

11   will not.  And that's the other issue that I have been

12   quite concerned about.

13             So I want to -- I guess what I wanted to say

14   was the more information I receive that I can rely

15   upon, the more likely it is that I feel comfortable in

16   delaying decisions that could result in the divestment

17   of all CallSocket assets because that's clearly where

18   we are, where some of us are headed and what's being

19   considered.

20             And I am painfully aware that, even were we to

21   divest of all the current assets, that will not answer

22   many of the discovery issues in this case.  So that's

23   not going to tell us where all the money went in the

24   past.  So I'll see you all back.  I'll redo my numbers.

25             To the degree you find it helpful, I can read

1    you these numbers and send you back this so you see

2    where I'm looking at, you have it in advance of our May

3    17th meeting and the May 17th meeting we will notice on

4    right now is for the receiver's request for additional

5    funding which may or may not be granted and is on for

6    consideration of whether or not the Tribune Tower needs

7    to be put up for sale.

8         Okay.  Thank you.  Sorry it went so long.

9         (Whereupon, proceedings concluded at

10            5:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3       I, ERIN F. ROBINSON, a Shorthand Reporter, State

4   of California, do hereby certify:

5       That said proceedings were taken before me at

6   said time and place, and were taken down in shorthand

7   by me, a Certified Shorthand Reporter of the State of

8   California, and were thereafter transcribed into

9   typewriting, and that the foregoing transcript

10  constitutes a full, true and correct report of said

11  proceedings that took place;

12      IN WITNESS WHEREOF, I have hereunder subscribed my

13  hand this 8th day of May 2016.

14

15

16

17

18   *Erin F. Robinson*
     _____
     ERIN F. ROBINSON, CSR NO. 12199
19   State of California

20

21

22

23

24

25

**$**

$1  47:15
$174,000  12:11
$175  6:5
$235  6:19
$250,000  11:13
$300  6:3,5
$350  6:18
$40,900  12:5
$400  6:3
$5,000  30:20
$500,000  29:4

**-**

---ooo---  3:3

**1**

1  5:11 10:11 12:3 33:22
 34:18 38:25 39:3 41:20
 48:25 49:7,11,13
1/31  29:14,15
10  10:2 50:14
10.2  27:17
10.5  28:1
10.8  27:17
100  30:21 31:3,5 49:6
105  32:9
10th  18:1
11.41  13:7
12  10:5
13  8:16 12:20
13.26  11:7
13th  45:21
14.5  35:9
15  12:16 28:23
15.5  10:21 11:6 29:10

16.1  28:21
17.3  13:13
17.5  14:2
17.7  29:6
17th  27:17 38:14,15
 53:7,18 57:3
18th  46:18
19.8  9:19
19.84  9:21
19th  4:17

**2**

2  9:12 33:24 34:19 49:1,
 6,10,14
2.23  10:24 11:6
2.49  11:15
2.74  12:17
20  5:24 12:21 18:2
20.1  13:15,17
20.5  13:18
20.6  13:17
2016  3:2 33:11
20th  27:19 30:2 31:9
 38:11 48:18
22  27:16 50:14
22nd  4:18
23  28:1
230,000  48:18
24  27:16
24.9  28:22
25  38:23
250,000  49:1
29  35:1
2:30  38:15 53:7

**3**

3  45:13

3.3  12:4,17,22
30  32:11,12 36:19 38:23
 40:23 46:23 48:22 49:9,
 13 52:14
30-year  50:24
30th  9:20
31  29:14 34:22
310  34:23
31st  46:18
3:20  3:2
3PL  24:12
3rd  48:20

**4**

4  15:17
4.3  12:2,13
40  10:3 32:11,12
41  28:4
48  11:20,22

**5**

5  3:2 29:6 30:22 34:24
 45:12 48:23
5,000  30:22
50  31:3 45:25 46:7
50,000  49:2
500,000  29:4,12 48:17
55  16:6,18
5:00  32:2
5:05  57:10
5th  55:2

**6**

6  12:14 29:11
6.2  28:17,20 29:6
6.3  11:1 28:18
6.6  13:1

60  36:25 37:1,8
65  32:14 33:3,4,17 35:3
6th  4:16

**7**

7  12:15 29:6
7.2  27:19
7.35  28:2
7.4  11:25
7.5  27:19
7.6  13:8,12
71,000  48:19

**8**

8  10:4 28:24 32:13
8.8  14:1

**9**

9.5  29:8,15
9.8  13:3
9.9  10:9 28:12 51:2
9th  38:5

**A**

abide  47:5
absolutely  15:4 47:8
 53:21
abundantly  55:12
abuse  44:11
access  5:23
accomplished  44:3
 45:6,12
account  19:17,19
accountant  54:6,17
accountant's  54:4
accounting  8:25 26:11
 29:21 35:6

**accounts** 21:21

**acquisition** 13:6

**act** 7:10 36:13,21 37:8, 15

**actions** 21:9

**actual** 35:20

**add** 31:4

**additional** 57:4

**address** 3:13,20 25:22, 24 27:24 46:16

**addressed** 7:12 36:11

**administrators** 32:5

**advance** 39:3 55:13 57:2

**advantages** 49:24

**advice** 5:5,12 7:15 32:19 34:10

**affects** 36:14

**afield** 17:12

**afternoon** 52:25

**agency** 39:17

**agreeing** 11:18

**agreement** 39:24 47:2 52:11

**agreements** 39:25 41:14 47:6 52:2

**ahead** 31:25

**alleging** 21:7 24:24

**Allen** 4:2 6:9 7:5

**allocated** 11:4

**allocations** 11:10

**amended** 5:7 45:17

**Amendment** 55:2

**America** 24:12

**amortization** 51:2

**amount** 48:10

**analysis** 46:14

**ancillary** 13:3

**Andew** 9:1

**anymore** 14:5

**apparently** 11:2 39:9 46:3 54:17

**appearances** 3:24

**appeared** 15:22

**appears** 4:23 52:8

**application** 3:21

**apply** 49:9

**approval** 5:15 6:23,24 7:2

**approve** 5:4 6:16 7:4

**approved** 7:7 9:20

**approximately** 48:17

**April** 4:16,17,18 30:2 31:9

**Area** 25:5,6,7 26:2

**argument** 44:25

**arriving** 12:17

**ascertain** 10:6 43:17

**assets** 5:8 26:3 29:23 42:8,13 49:7 51:21 56:17,21

**assumed** 13:4

**assuming** 28:15

**attached** 35:12 36:4

**attorney** 7:21 52:4

**attorney's** 56:4

**attributable** 12:4,8,9

**authority** 7:19 49:23

**authorization** 40:17, 18

**authorized** 42:1

**authorizing** 3:21

**average** 6:1,17

**averages** 28:1

**aware** 47:18 56:20

**B**

**back** 13:20 14:14,16,25

15:7 17:6,9 20:16 29:12,13 38:14,17 39:2, 4 42:10,16 46:17,22 50:3,15 53:4 56:24 57:1

**balance** 12:25

**balloon** 50:24

**bank** 11:9 19:17,19 27:18

**bankruptcy** 34:11 37:15 41:20 42:2,4,18, 19,22 49:23,24

**Baptiste** 4:16 33:10

**base** 16:9 27:9

**based** 5:24 8:7 9:13 11:4 13:11 43:19

**basically** 24:1,4 35:16 36:25 37:2 38:20 51:2

**batch** 35:5

**Bay** 25:5,6,7 26:2

**Bear** 16:24

**begin** 40:23 48:22

**behalf** 4:3 5:14

**belief** 43:9

**belonging** 26:3

**belongs** 24:19 42:10

**benefit** 6:7 22:18

**benefits** 31:5,7

**Bennett** 9:25

**Berkeley** 16:24 24:11, 14 27:23

**big** 12:1,19

**Bill** 4:2

**billing** 32:4

**bit** 10:1 15:12 32:3

**Biweekly** 49:5

**BK** 34:24 45:12 48:23

**blank** 16:1

**bleeding** 40:24 42:8 46:25

**blown** 48:15

**board** 22:25

**boggles** 52:6

**bookkeeping** 54:9

**borrow** 11:18

**borrowed** 14:13

**bought** 13:3

**boxes** 16:1

**Brand** 18:14,15,19 26:2

**breach** 8:25

**break** 3:18 30:17

**breakdown** 48:7

**breaking** 31:22

**bridge** 10:19

**briefly** 37:10

**bring** 17:14 37:19 46:17 47:24 55:7

**bringing** 12:10

**brings** 27:4

**broader** 15:19

**Broadway** 28:17 40:5

**brochure** 35:11,16 36:2

**broker** 27:10 53:9,10

**Brokerage** 27:11

**brought** 3:14 17:9 28:19

**bucks** 10:11 11:19 14:13 48:15

**build** 21:19

**building** 10:7 11:10,14 12:22,25 13:2 18:1 19:15 20:12 27:15 34:6 40:4,14 51:11

**buildings** 10:25 11:1,2 28:17

**bunch** 33:8 51:10

**burn** 38:2,8 41:12 42:14

**business** 8:22 15:25 19:20 22:13,14,15 24:8 35:14 36:7 41:9 43:17, 20,22,24

**businesses** 25:19

**buy** 46:1

**bye-bye** 34:17

**C**

**Cal** 45:13

**calculator** 29:14

**California** 16:25 17:25 23:11,12,15

**call** 15:14,17 18:8,13, 18,19 19:3,8 22:7,21 23:7,10 24:9,10 25:7,8, 10,11,14,15 26:2,21 30:22 31:3,18 33:22,23 34:18,19 38:21,25 39:3 40:22 41:5,16,19 44:21 45:9 46:22 48:25 49:1, 5,6,7,9,11,12,14 51:11, 14,17 52:14

**called** 8:22 20:12,14 27:14 36:13

**Callsocket** 4:21,22 8:15,16 9:11,18 10:21 12:18,19,21 15:13,16, 18 16:3,8 17:4,8 18:10, 16 19:12 20:18,19,25 21:14,20,21,23 22:7 23:6,24 25:20 26:3 29:3,8,11 31:16,21 32:9,14 33:6,8,21,23 34:6,11,15,25 35:4,13, 15,20 36:15,18 39:13, 15 42:2,13 45:6,7 46:21 50:10 56:17

**candid** 56:4

**card** 34:14 43:8 49:17, 18

**cards** 14:6 43:11,18 44:3,17 45:8,11 46:3

**care** 17:24,25 18:1 24:11 43:7

**carry** 38:9

**carrying** 10:25

**case** 6:21 8:24 18:9 20:23 21:2,4,15,24 22:3,4 53:19 56:22

**cash** 30:1 38:2 46:14 48:10,12

**CCOC** 17:25

**CCOO** 17:23 23:6,9 25:20

**center** 4:9 8:13,18,22, 23 17:20,22 20:25 24:24,25 26:8,9,15,16, 21 30:23 31:18 33:22, 23 34:18,19 38:21,25 39:3 40:22 41:6,16,20 45:10 46:23 48:25 49:1, 5,6,7,10,11,13,14 51:11,14,17 52:14

**centers** 19:8 22:21 24:9,10 25:7,8,10,11, 14,15 31:4 44:22

**Central** 23:11,14

**CEO** 22:25

**cetera** 16:25

**challenge** 45:3

**charge** 47:4

**charges** 13:4

**chart** 15:9,11,24 17:14, 23 18:4,5 22:19 23:4

**checks** 21:20,22

**choose** 51:21

**chose** 55:7

**Chris** 20:11

**chunks** 30:25

**circumstances** 7:25

**City** 18:14,15,19 26:2

**claim** 37:8

**claw** 42:10

**clear** 7:10 31:11 33:14 38:25 49:9 55:12

**clerk** 53:22

**clients** 41:16

**close** 26:21 31:22 34:18 37:4

**closed** 34:12

**co-mingled** 33:24

55:23

**cognizant** 7:5

**collected** 40:8

**collecting** 11:11

**Colliers** 27:11

**combined** 11:24

**comfortable** 56:15

**commingling** 22:15

**community** 11:9 27:18

**Comp** 31:6

**companies** 16:24 18:11,12 20:3,6 22:25

**company** 19:25 24:6 54:9

**compensation** 3:22 37:3

**complaint** 14:10 29:19 45:14,16,17,19,23 54:2

**completely** 10:14 22:4 38:22

**complex** 6:1

**complicated** 6:10

**comply** 36:21

**complying** 43:13

**Comprehensive** 17:24,25

**concern** 36:11,20

**concerned** 30:6 38:18 45:25 54:3 56:12

**concerns** 14:17 17:16 25:22,24

**concluded** 57:9

**conclusions** 14:17

**conducting** 19:20

**conference** 33:21 53:19

**confess** 36:1

**confident** 6:6 39:4

**confirming** 25:4

**confusingly** 18:12

**connected** 19:8,12

**conservative** 10:2

**consideration** 8:4 57:6

**considered** 56:19

**consolidate** 25:2

**constrained** 6:15 7:22

**consult** 52:9

**consulted** 5:20 7:17 51:14

**contention** 16:23

**contentions** 16:23

**continue** 51:7,24 52:16

**contract** 8:25

**contributing** 30:1

**control** 5:8

**conveys** 9:5

**convoluted** 6:11

**copied** 36:6

**copies** 7:13

**copy** 5:9

**correct** 3:18 49:3

**cost** 13:7

**costs** 13:8

**counsel** 3:22 5:5,12 6:2,4,17,18,20 7:1,18 15:8 21:1,13 26:5 28:8 30:8 36:14 37:11,18,24 42:16,23 45:20 52:9

**count** 32:7,9,14 35:3 43:20

**couple** 30:15

**court** 3:4,25 4:10 5:15, 16,23 6:7,14,24 7:2,3,7, 16 8:9 13:16,19 15:4,7, 15,25 16:9,22 17:12,16, 19 18:3,6,10,15,21,24 19:5,11,16,21 20:2,5,8, 17 21:1,11,24 22:1,10 23:5,8,14,19 24:14,17, 19,21 25:1,4,11,16,21 26:12,19 27:1,5,8,12, 15,22 28:9,13,18,25

30:16,20 31:8,11,25
32:4,8,12,15,18,25
33:4,9,18 34:1,9 35:8,
10,15 36:4,6,23 37:4,9,
15 38:3,13 39:24 40:2,
20 41:4,7,19 42:22
43:6,16 44:7,25 45:18,
19 46:7,15 47:12,19,25
48:1,14,21 49:5 50:20,
23 51:4,7,18 52:22
53:2,5,9,12,14,21
54:13,24 55:6,17,20
56:9

**courtroom** 4:4

**cover** 41:3

**CPA** 54:10

**create** 44:16,21

**created** 24:2

**creditor** 41:25

**crisis** 48:13

**critical** 48:12

**cross-collateralized**
28:16

**CS** 10:10,13 11:19 14:2,
4,7,9 32:25 33:2,14
38:21 39:10 49:22,23
52:14

**current** 50:8 56:21

**cut** 4:19 40:22 48:22
49:12

**cutting** 52:14

---

### D

**dare** 49:15

**data** 30:15

**date** 7:4 9:19 38:3 53:6

**day** 13:23 37:2 38:16
53:7

**day-for-day** 37:1

**days** 36:19,25 37:2,8

**dba** 24:4

**deal** 26:23 30:10 41:1
45:2 47:23

**dealing** 9:3

**deals** 47:10

**debt** 28:7,10

**debtor** 41:23

**debtor's** 37:17

**decide** 7:6 8:7 47:5

**decision** 38:4 40:11

**decisions** 56:16

**declaration** 9:23 19:17
22:20 33:9 35:12

**declarations** 4:15 9:14

**declined** 21:3

**decreasing** 48:22

**defendant** 54:9

**defendants** 4:9 20:22
21:23

**defense** 45:20

**degree** 7:14 52:2,7
56:25

**Delaware** 53:1

**delaying** 56:16

**demurred** 45:18

**denied** 46:22

**dental** 31:6

**description** 24:3

**desk** 3:16

**determine** 3:14

**devote** 14:21

**diagram** 8:12

**dicey** 32:3

**difference** 22:11,12,13

**difficult** 3:9

**difficulties** 55:10

**difficulty** 39:21

**dig** 6:11

**dire** 4:23

**directly** 5:19 16:13

**directors** 23:1

**disbursed** 16:20

**discharge** 5:6

**discovered** 6:2,12

**discovery** 56:22

**discuss** 14:19,23

**discussed** 37:10

**displace** 47:21

**dispute** 21:16

**Disston** 4:8 17:14,21
18:5,17,22 19:1,7,14,
19,24 20:4,7,10,21
21:25 23:2,7,9,16 24:5,
16,18,20 25:3,6,13,18
26:1,4 27:7 28:24 29:1
34:25 35:9,14 36:1,6
40:25 41:1,5,10,23
46:5,9,22 47:14 51:5,8,
9 52:4,19,20,24 53:8
55:11,13,18,21 56:5

**distribute** 3:11 42:17

**district** 56:3

**diverted** 44:22

**divest** 56:21

**divestment** 56:16

**divided** 11:2

**documentation** 36:5
55:17

**documents** 3:6 4:13,
14 11:5 13:5 46:11,12
54:4,18,20 55:25 56:8

**dollar** 10:10

**dollars** 9:20,22 10:11
11:15,21,22 28:4,12
38:7,9 48:7

**door** 16:18

**doors** 34:11

**double-check** 28:19

**doubt** 22:18

**Dragnet** 53:17

**due** 51:3

**Duffwin** 12:2 27:16
28:16,20 34:6 40:4

**duties** 5:7

**Dynamics** 24:11

---

### E

**Ear** 24:18,19 40:4

**earlier** 55:4,12

**early** 10:19

**easy** 46:1

**eat** 42:19,22,23

**EB-5** 17:18,22 23:3,4,
12 24:21 43:14,16
56:10

**economic** 4:24 47:24

**educated** 25:9

**effect** 41:15 51:13

**effective** 46:23 52:13,
15

**effectuate** 42:4,6

**effort** 8:5

**electronic** 53:24

**Elizabeth** 4:6

**else's** 50:1

**emergency** 37:16

**employ** 5:5

**employed** 7:1 33:15,19

**employee** 10:18 34:1,2
37:3

**employees** 30:21
32:10,13 33:1,4,15
34:23 35:4 36:12,15,18
37:2 48:8 51:13,16,17,
22

**employment** 3:21 5:11
6:16

**encountered** 37:17

**end** 13:12,22 28:15
33:11 35:2

**endeavoring** 22:17

**ends** 47:20

**entities** 4:25 6:13 8:17
9:6 11:20 15:20,22,25

16:7,8,14 17:4,8,17
18:10 19:3,15 20:18,19,
25 21:15 22:15 23:13
26:10 30:12 38:21,22
39:10,22 42:7,11,13
46:13,21 55:19 56:7,10

**entitled**  11:12

**entity**  9:11 17:3 22:5,6,
9 23:23 24:2,22 26:7
34:3 39:13 42:2 48:8

**equity**  10:11 11:14,25
12:17 28:22 29:8 40:13,
14 50:9

**escrow**  26:6

**essentially**  24:3 40:18
42:2

**estate**  11:21,22 39:17

**estimate**  10:2

**evening**  3:5

**Events**  18:20

**evict**  40:2 52:11

**evicted**  47:1 52:1

**eviction**  47:17,21

**evictions**  48:3

**exceed**  6:17

**excellent**  27:1 35:11

**Excuse**  23:21

**expect**  7:11 32:16
51:20 53:19

**expectations**  10:17,18

**expected**  50:10

**expended**  10:24

**expense**  39:12,14
46:20,21

**expenses**  12:24 26:10
40:22 46:23 49:13,14
52:14

**expensive**  42:5

**experience**  5:25 6:3,5,
19,20,23 35:20 37:14

**experienced**  38:2

**expertise**  6:8

**explain**  15:12 17:15
28:25

**explained**  23:25

**explains**  35:16

**extend**  5:13,15 56:10

**extends**  39:16

**extension**  45:22

**extent**  41:3

**eyes**  45:19

---

**F**

**face**  42:24

**facility**  18:2

**fact**  19:9

**facts**  37:23 40:12 42:25
53:16,17

**factual**  40:11

**failing**  22:14

**fair**  39:8 46:19 48:5
49:19 50:5,8

**fall**  10:8

**familiar**  5:21 36:2

**family**  23:24 44:23

**Farms**  23:12,15

**faxed**  18:6

**federal**  43:13

**fee**  7:3

**feel**  3:19 6:14 48:3
56:15

**feeling**  32:1

**fees**  7:4 30:24 52:4

**felt**  4:23

**fighting**  43:2

**figure**  4:20 9:13 19:18
42:9,16

**file**  14:10 29:19 33:12
45:15,16,20,21,23

**filed**  4:16 33:9,11

**filing**  37:25

**filings**  53:12

**fill**  15:23

**final**  31:23

**finally**  14:21

**finances**  9:15

**financial**  6:12 15:22
16:10,12,20 17:3 22:8
31:21 34:14 46:10,12

**financials**  50:3

**find**  4:25 7:25 8:14
43:23 45:24 53:9 56:25

**fine**  7:12,13 32:17
52:24 53:8,13,14,15

**finish**  23:3

**firm**  6:9 7:5 54:10

**fit**  15:9 23:20 25:5 53:25

**floor**  33:24,25 47:15

**flow**  15:19 16:15 38:2
46:14 48:12

**flowing**  16:13

**flows**  16:15

**flying**  53:4

**follow**  47:8

**formal**  7:2

**format**  3:7

**forward**  30:7

**found**  4:18 5:1 29:3
35:10

**foundation**  40:13

**fourth**  33:24

**Francisco**  4:8 8:13,17,
21 20:24 24:23,24 26:8,
9,14,16 31:2,19

**frankly**  5:17,18 14:9
23:16 26:20 30:9 44:4

**fraud**  8:25 43:12,13
44:11

**free**  35:25

**Friday**  53:4

**front**  11:24 14:17 38:6

**frowned**  37:12

**fulfilling**  10:17 45:9

**fuller**  4:24 52:17

**fund**  38:20

**funding**  38:5 57:5

**funds**  13:1 14:2 16:17
17:1 22:16,21,23 26:6,
13 55:23

**future**  32:15

---

**G**

**gain**  44:24

**game**  10:19

**Gateway**  8:22,23 22:5
23:10 24:22

**gave**  29:4

**geared**  33:7

**gee**  35:19 48:3

**general**  17:24 55:15

**generally**  24:8

**generating**  39:11

**get all**  54:4

**giant**  51:5

**give**  3:11,17,18 4:11
5:9 8:10 9:16 14:23
22:17 30:14 32:18 37:7,
18,23 38:16 46:24
50:15 52:8 53:5,15 54:6
55:1

**giving**  36:22 46:23

**glad**  48:1 56:9

**gladly**  52:18

**goal**  49:17

**goals**  10:17

**Gold**  16:25 23:11,15

**good**  14:22 32:25 42:19

**government**  43:13

**grand**  29:12 30:22 49:6

**granted**  5:9 57:5

**great** 6:8 35:18 55:10

**green** 14:6 34:14 43:8, 10,11,18 44:3,17 45:8, 11 46:3 49:17,18

**grill** 54:20

**gross** 28:4,5

**groups** 30:12

**guess** 9:4 12:18 13:24 21:6 25:10 35:11 38:8 44:8 56:13

**guessed** 12:9

**guessing** 13:9,12

**guy** 9:25 53:16

**guys** 10:22

---

**H**

**hand** 14:1

**handle** 4:22

**handout** 9:12

**happened** 33:5

**happening** 44:18,20

**happy** 29:13 32:3 51:8

**hard** 5:1 6:21 29:5

**head** 28:6 32:7,9,14 35:3

**headache** 49:25

**headed** 56:18

**health** 16:24 24:11,14 31:5

**hear** 5:19 22:11 56:9

**heard** 8:2 40:25 52:17

**hearing** 31:20 32:16 37:24 38:5 46:10 51:6, 24 53:18 55:7

**heck** 30:2

**helpful** 4:18 23:19 48:6 56:25

**Henderson** 3:5 4:9,17 9:24 11:5 13:6 16:19 20:10,15,24 22:22 39:22 42:11,21 43:1

44:23

**Henderson's** 19:17

**hesitate** 55:21

**high** 28:15

**higher** 30:25 31:3

**hire** 33:1 34:20,21 49:15

**hired** 33:8 39:18

**hiring** 32:23

**Hold** 15:15 28:9

**holding** 18:12

**home** 15:5 35:24

**honestly** 4:14,19,22 9:3,10 21:3

**Honor** 8:3 15:10 21:10 26:17 30:14 31:24 32:20 33:14 36:10 37:19 38:1 39:20 40:10 41:1 42:3 46:9 47:9,16 48:16 52:20,25 53:8,10 54:8 56:5

**Honor's** 16:3

**hope** 42:3,6,20 55:18

**hoping** 39:17

**hotel** 20:13,14

**hour** 6:3,5,18,19

**hourly** 6:1 31:4

**hours** 6:23

**house** 54:9

**Huckins** 4:2 6:8 8:3 13:18 15:2 23:21 26:23 27:4 28:7,12,14 30:14, 17 32:6,9,14,17 36:25 37:6,10,22 40:10 41:22 47:16,20 48:5 49:4 50:18,21 51:1 53:1,11 54:15

**huge** 30:25 52:4

**hunk** 42:19

---

**I**

**IA-29** 35:2,5

**idea** 21:8

**II** 4:21 8:15 10:21 12:19 14:7 19:13 29:3,8,11 32:14,25 33:2,6,8,15 34:6,25 35:4,13,15 36:18 39:15 45:7

**III** 4:22 8:16 10:10 11:19 12:18,21 14:2,9

**Immedia** 18:20 22:21, 22 23:23,25 24:5,8

**immediately** 16:18

**implemented** 44:13

**important** 34:13

**imposed** 7:7

**inclined** 25:2

**include** 31:9

**included** 7:16

**includes** 32:10

**including** 5:7 17:10

**income** 12:6 39:11,12, 13 46:20

**income-producing** 41:9

**increase** 10:2

**increased** 41:17

**increasing** 41:2,13,17

**incubator** 31:18

**incurred** 7:4 40:16 52:5

**independently** 17:1

**individuals** 31:4

**information** 13:25 17:3 19:10 30:8 31:15 32:7 39:1,6,7 48:25 49:20 50:4 55:10,13 56:8,14

**informed** 38:4

**insolvency** 35:21

**insolvent** 10:14 14:4 34:16 38:23,25

**instinct** 25:4

**insurance** 12:9 31:6

**interest** 19:24 39:8

**interested** 21:5 26:19, 20

**interesting** 25:22

**interestingly** 11:1

**International** 27:11

**invested** 8:23 26:15 29:3,24

**investing** 26:7

**investment** 34:15 35:23 43:7 50:11

**investor** 10:17 13:1 17:1 25:17,19 26:13 29:2,25 34:22 45:25 46:5

**investors** 14:6,7 18:2 25:18 26:5 29:15,23 30:12 34:13,22 35:1,5, 16 43:4,10,12 44:3 46:2 49:16 50:9,16

**investors'** 16:17

**invited** 55:6

**involuntary** 41:24

**involved** 6:22 8:17

**involving** 20:8

**IRS** 43:21

**issue** 41:2 46:13 47:9 56:11

**issues** 36:13 56:22

**itemization** 7:3

---

**J**

**Jack** 20:13,14

**JL** 8:22,23 22:5 23:10 24:21

**jobs** 44:5,16,21

**joined** 8:24

**Jonathan** 4:5 15:10

**judge** 21:4

**July** 33:13

jump 10:18

June 9:20 38:5 48:20

jurisdiction 6:14 9:8 14:11 27:25 30:3

jurisdictional 29:18

### K

Kaiser 31:6

kicking 39:18

kind 30:2 46:13 47:2

kindly 3:24

knew 21:22

knowing 13:12

### L

labor 37:11

lack 47:23

Laffey 5:21

largest 16:5

late 32:2

law 46:24

lawful 5:6

lawsuit 20:8,15,20,22 24:23 29:20,22 33:11

lawyer 54:14,15,16 55:5

lay 37:9 40:21 41:18 51:10,19

laying 38:1 41:13 51:15

lays 18:6

leads 24:9

lease 19:22

leases 47:6,10

leave 45:5 49:13

ledgers 55:16

Leeds 4:8 23:21

left 16:1 29:5 38:7 42:24 43:3 48:17

legal 5:5,11,12 7:11,15, 19 32:18 34:10 36:14 52:9

legitimately 42:13

lender's 28:8

letter 7:12 9:24

letters 5:14 53:13,14

level 24:1 30:25

Levine 4:5 13:15,17 15:3,10,17 16:2,10 17:2 21:10,12 22:3 26:17 30:24 42:3 43:1,9 44:4, 8 45:16 52:25 53:18 55:4,9,18

liability 19:25

life 42:5

limit 27:24

limitations 5:10 7:7

limited 16:12 19:25 25:19 26:6

lining 4:21

liquidate 29:23

listed 53:18

litigation 6:1

LLC 17:25 23:17 24:12 25:18

LLCS 18:13

loan 10:10 11:19 12:7, 16 13:12 22:14 28:16 48:19 50:18

loans 10:25 28:5

London 20:13,14

long 36:16 43:25 45:10 54:15 57:8

loss 29:10 43:22

losses 40:19

lost 24:7

lot 3:19 8:5 10:1 17:10 28:23 31:7 53:5,23

lots 44:22

loud 27:8

low 12:14 47:10

LP 17:24 23:4,10,17,18 25:20

Lungomare 20:14

### M

made 4:12 35:22 55:12

Magic 24:18,19 40:4

Magnin 12:22,24 18:20

maintain 22:14

maintained 55:24

majority 36:16 39:21

make 3:9 7:10 14:14 15:4 23:22 25:9 36:21 38:4 40:11,15 44:16 47:24 54:14

makes 43:6 45:3

making 7:15 11:12 12:5 22:13 30:20 35:17 48:12

management 30:24 53:19,20

managing 51:13

March 33:10,11

mark 28:3

market 39:8 46:19 49:19 50:5,8

marshall 42:7

marshalled 42:8

math 13:14

Matkins 4:2 6:9 7:5

matrix 5:21

matter 3:5 38:23 44:14 47:17

matters 34:16 47:17

matures 50:18,22

max 10:11

means 6:18 12:10 25:13 28:20,21 43:11

meantime 53:9

Medal 16:25 23:11,15

Media 18:14,15,19 26:3

meeting 55:11,14 57:3

member 19:25 25:16

members 23:2 25:14, 15

mentioned 23:23

met 23:24

middle 15:14,18,24 38:9

million 9:20,21 10:4,9, 11,22,24 11:1,6,7,15, 19,21,22,25 12:3,4,13, 14,15,16,20,21 13:2,7 14:1,13 16:6,18 28:4, 12,17 29:11 35:9 38:7,8 48:15 51:2

mind 27:4 33:6 52:6

mine 29:9 56:10

minutes 14:23 25:23

mismanagement 55:23

mission 44:3 45:9,12

mix 24:7

Monday 53:3,5

money 15:19 16:5,7,12, 14 17:5,8 21:17,18,20 30:11,25 34:17,19 38:16,19 39:2,3 42:9, 15,17,20 43:3 44:15,20 50:15 56:23

monies 42:12

monitoring 39:18

month 12:5 30:21,22 33:16,19 35:2 38:10 49:2

monthly 47:5 50:20

months 38:23

mortgage 12:3 13:8 50:25

motion 3:13 38:1

move 45:7,13

moved 17:8

**N**

NA3PL 23:4,5,6,10 24:12,14,19 25:9
named 9:25 18:12 20:10 21:15,23 24:22
names 15:20 18:13
nationwide 17:19
nearing 48:12
necessity 37:25
neck 32:5
needed 17:9 38:3 39:7 49:21
net 13:11
nice 9:24
ninth 47:15
Nonetheless 6:11
North 24:12
note 7:17 24:24
notice 21:9 22:20 36:13,17,19,22,23 37:7, 16,18 45:20 46:24 52:1, 8 53:6 57:3
notices 51:15
number 6:23 11:23 15:21 16:13 28:5,13,15
numbers 13:21,23 27:9 28:2 31:23 32:7,20,22 38:6 40:6,9 53:14,15 56:24 57:1

**O**

Oakland 6:3 17:24
obligation 14:5,8 51:20
obligations 40:15 52:9
obliged 3:20
obtain 49:17
occurs 7:8

October 50:18 51:3
offhand 15:21 18:17
office 27:14 56:4
officer 54:24
ongoing 21:24
operating 12:24 39:12 46:20
operation 31:17
operations 40:19
opinion 27:10
opinions 26:24
opportunity 14:22 52:17
opposed 22:13,14
opposite 9:2
options 53:24
order 3:21 5:7 34:23
ordered 48:3 51:24
orderly 37:20 42:7
organize 20:5
originally 29:24
outline 8:6
outstanding 10:10 12:16
overly 22:10
overstepping 54:24
overtime 32:4
owe 28:20 29:6 37:2
owes 10:10
owned 19:6,7,14

**P**

p.m. 3:2 57:10
paid 10:4 14:14 24:25 39:4 48:18 50:20
painfully 56:20
paper 9:2,5 28:9
parsing 16:11

part 11:18 15:13,18 16:3,4,5,7 25:8 27:22 51:20
parte 3:20
participate 43:15
parties 7:13 30:5
partner 17:24 20:10 24:22 46:7
partnered 8:14,21 19:7
partners 8:19,21 9:2 21:2 22:12 37:12
partnership 26:7
partnerships 25:19
party 30:6 54:22
past 54:22 56:24
paste 4:20
Pastina 20:11,15,18 21:6,12,13,21
Pastina's 20:23
pay 22:21 26:9 39:2,22 40:1 46:7 47:7,15 49:4 52:12
paying 39:19 47:1,22 51:25 52:7
payment 6:25 12:3,8, 22 13:7 50:24
payments 10:25 21:16 22:6
payroll 22:22 30:18 31:8 32:6,21 33:6,16 34:5 38:12,21 40:15 48:7,17,19,21,25 49:1,6
payrolls 33:16
penalty 9:14 37:1
penny 16:17
people 10:7 30:20,25 33:8,17 34:21 39:19 41:13 45:8 51:11,15,19
percent 10:2,3 31:5 40:23 45:25 46:7,23 48:23 49:9,13 52:15
perfectly 56:4

period 49:4
perjury 9:15
perpetrating 43:12
person 30:22
personal 44:24
pervasive 40:5
petition 41:22,24,25
petitions 35:2,6
phone 27:12
picked 53:24
pie 41:7
piece 9:6
place 5:1 47:3
placement 49:18
plainly 44:1
plaintiff 4:5,7 21:6
plan 31:20 34:5 35:14 36:7 54:19
pleadings 5:13 7:11
plug 7:18 50:4
point 6:14 9:1,3 13:1 31:13 42:1 43:5 55:22 56:3
points 30:15 48:11
pops 10:3
position 54:23,25
possibility 37:13 55:3
potentially 37:7
powers 5:6
prefer 5:18
preferential 49:18
prepare 5:13 7:3
prepared 10:18,20 35:6
preparing 26:12 46:12
present 15:8 38:1 51:10
presented 3:6 37:25 40:12 41:6

preserve 51:21

pressure 32:1

prevail 7:22

Previously 23:24

price 12:2 13:10

prior 5:14 6:24 7:2 37:1

Pritzker 4:6 15:1 33:12

problem 12:19 14:12
 29:1,17,18 45:14 50:7

problems 12:1 44:10

procedural 47:16

proceed 3:15 8:6,7

proceedings 47:21,25
 57:9

produced 36:4

productive 51:16,22

profit 35:18,23

program 43:14,16
 44:10,13 45:12

programs 44:15

project 18:2 23:4,12
 24:13,21

projected 50:3

projects 17:18,22 23:3

proof 45:1

properly 44:13

properties 9:25 39:9
 42:15 47:4,22

property 26:25 27:18,
 20 39:16

protecting 5:8

provide 5:5 7:6 15:20

provided 11:5 13:5
 19:9

providing 5:12

pull 7:18 31:15,21 40:6

pulling 30:21

purchase 12:2

purpose 29:20,22 36:9
 45:6

purposes 8:12 17:10
 32:15 44:23

pursue 56:10

purview 54:7

put 3:7 4:12,14 5:21 9:1
 12:21 13:7 22:18 34:11
 41:19 42:2 49:23 50:16
 51:4 52:18 54:23,25
 55:20 57:7


**Q**

qualified 37:3

qualify 34:23

question 14:8 15:8
 30:19 44:8

quote 5:15


**R**

raised 9:18 10:21 11:6
 12:21 29:10

ranges 6:18

ratcheting 49:12

rate 6:1 38:18 41:12

read 27:8 35:19 53:15
 56:25

real 11:21,22 13:21,23
 29:17 39:16,17,21 47:4
 54:19

reason 21:14 22:18
 35:3

reasonable 7:4

recall 11:16

receivable 16:21

receive 56:14

received 8:20 52:3

receiver 4:3,15 5:16,17
 6:7,17 7:2,9,12,14,23
 10:15 26:24 31:15
 32:11 38:2,6 40:18
 41:25 42:15,23 47:3,20
 48:10 49:22 51:18 53:1
 54:4,5

receiver's 3:20 5:4,14
 53:11 57:4

receiving 56:7

recess 15:6

recognized 10:16

recommendation
 7:20

recommendations
 7:15,16

record 3:25 15:7,11
 30:8 40:11 51:10

redo 56:24

reduce 41:12

referred 56:5

regard 34:15 50:5

Regional 4:9 8:13,18,
 21 17:20,21,22 20:24
 24:24,25 26:8,9,14,16

regret 7:24 32:1

relate 21:2 47:18

related 5:12 21:9
 24:15,16 40:22

relationship 18:7 21:8

release 26:6

relied 7:14 9:24 11:18

rely 28:2 55:14 56:14

remain 6:24

remember 20:23 23:16
 25:8

rent 11:13 12:11 39:23
 40:1,7 47:1,7,15,22
 51:25 52:7,12

rental 12:6 39:24,25
 47:2,6 52:2,11

rents 11:11 39:18 47:5,
 11

report 7:17

reporter 3:25

reports 5:13 7:12 34:5

representation 5:16,
 18 11:20 35:22

representations 46:8

represented 20:19
 21:5 54:21 55:4

represents 21:1

request 5:4 7:3 8:20
 38:5 46:21 51:12 54:14
 57:4

requested 17:4 31:8

require 7:11,19

required 36:17,20

requirements 34:21

requires 43:17,21

requisite 37:7

research 7:21 10:1

reservation 38:14

reservations 54:19

reserved 38:17 53:6,23

resolved 22:1

resources 5:20,22
 7:22

respect 5:6 51:14

respond 4:12 36:1

responsibilities 52:10

rest 11:17 12:23

restaurant 18:22
 19:20,21,22 20:1 21:19

restaurants 20:11

result 56:16

return 29:23 34:14
 43:3,7 50:10

revenues 41:2,4,5,13,
 17

reviews 13:20

rid 46:2

right-hand 9:4

rights 5:7 55:2

ripe 44:10

road 36:21

roll 46:22

route 47:17

ruling 4:11,12 5:4 8:4,8

run 19:21,23 21:19 31:23

running 33:7

runs 19:25

Runway 15:9,12,15 31:2,9,12,16,21 32:10, 12 39:15

**S**

sadly 7:5

safely 45:7

salaries 31:3

sale 50:17 51:4 52:18 57:7

sales 13:10 35:15

San 4:8 8:13,17,21 20:24 24:23,24 26:8,9, 14,15 31:2,19

satisfied 43:24

saving 34:19

scheduled 46:9

scope 30:3 45:24

seated 3:23

SEC 56:6

secured 11:3

securing 5:8

Security 15:14,17 26:2

seek 17:1 45:21

seeking 7:2

self-supporting 31:12

sell 10:9 51:11

send 57:1

sense 47:24

separate 18:24 22:4,15 23:3,12 29:7 30:11,12 31:17,21 50:9,11

separately 16:14 55:24

services 7:6

set 10:23 16:12 20:2 24:6 52:11

settlement 11:4 13:5

SF 17:20,21,22

SFRC 16:15,19,21 19:21 24:1,2,4 30:6 47:14 52:6

sham 44:2 52:2,7,8

sheet 39:13

shells 30:13

Shepard 4:17

Shephard 33:10

Shepherd 51:13

sheriffs 32:3

Shopping 8:23

show 13:14 16:12 46:14

showed 19:16

shows 15:14 16:20

shuffle 30:13

shut 33:20 37:6 40:18 45:7 50:15

shutdown 37:20

side 9:4

sides 9:2

significant 38:8

simply 44:14,16 55:14

single 43:23

sir 8:9 18:3 20:2 22:11 35:8 41:7 46:15

sit 46:10 54:19

sits 16:6

sitting 29:2 43:15 49:7

situation 4:23,25 6:13 37:17 55:23 56:2

sixth 33:25

sky 41:8

slightly 26:17

small 51:1

smallest 9:6 16:4

soaking 28:14

socket 45:13

sockets 18:8,13,18,19 23:7,10

sold 13:2,9,13

solely 5:12

solidly 43:19

somebody's 35:12

someplace 29:2 55:25

sort 4:20 15:12,19 16:2

space 19:22 31:18 34:7,8 53:23 54:11

specific 19:9

spend 3:19

spent 3:5 8:5 9:21 11:6

spoken 21:13

sponsored 17:22

spreadsheet 55:14

Square 20:13,14

squared 23:22

stage 37:21

stages 37:9

stand 31:16 50:6

standalone 31:12

start 9:11 32:4 34:19 35:22 49:12

started 12:13 20:11 33:10

state 3:24

statement 16:3

statements 15:23 16:10,12,21 22:8 53:20 54:1

status 10:7

stay 15:3 32:2

stays 45:10

step 31:25 43:2

steps 51:5

stipulated 38:1

stop 40:23 42:8 43:2 46:25

stopped 42:14

straighten 17:16

Street 18:1 27:18,19

study 9:16

stuff 54:7

subacute 18:1

subject 5:9 6:24

submit 35:2

submitted 9:14 53:12

submitting 35:5

substantial 43:3

substantially 48:22 49:7

sued 8:25 20:17,18 21:21 30:6 47:13

sufficient 40:13,14 41:3

suggested 53:13

suing 24:23

support 7:19

Supporting 55:17

supposed 32:18 34:22 44:5

surprised 20:22 22:10

Susan 4:3

sustainable 44:5,17, 21

sweetheart 47:10,23

system 53:24

**T**

table 43:15

takes 42:5 45:11

taking 18:3 21:5 30:25 51:5

**talk** 3:12 9:17 14:16,25 27:6 29:7 44:1

**talked** 28:8 37:11

**talking** 18:9 36:3 37:24 47:19

**target** 45:4,5

**Tate** 26:11 30:5 46:11 54:10,16 55:10,15

**Tavern** 18:23,25 19:2, 12,14 20:9,12 21:6

**taxes** 12:9

**Teks** 15:14,17 19:3 26:2

**telling** 20:21

**tells** 7:18

**temporary** 49:17

**ten** 6:2,4,19,20 14:23 25:23 34:21

**tenant** 40:4,5 48:4

**tenants** 39:22 46:25 47:9,21

**tentative** 4:11 5:3

**term** 43:21 47:23

**terminate** 37:1 40:19

**terms** 16:2 28:3 29:25 49:8 52:10 53:11

**Tesh** 23:20 24:11,15 40:3

**Theatre** 12:2 27:16

**thing** 9:10 19:1,2 27:23 34:24 37:5 43:23 44:18 48:9,24

**things** 8:6 27:24 46:16 48:6 50:24 54:12

**thinks** 9:25 27:16,17

**third-party** 54:10

**thought** 14:20 20:23 24:5 31:12 35:19 36:7 53:25

**three-day** 52:1

**three-year** 43:21

**Thursday** 3:2 52:23 53:4

**time** 3:12,17,18,19 7:22 8:5,10 9:1,16,21 10:16 11:16,17 14:15,21 24:2 26:13 32:1 37:18 39:8 56:6

**times** 30:5

**today** 3:14 8:6 26:22 27:14

**told** 9:19 12:25 13:10

**tomorrow** 32:22 37:6

**top** 28:6

**torn** 10:16

**total** 9:19 28:5

**totally** 10:14

**Tower** 10:4 20:9 28:7, 10 33:25 39:2,21 40:14 50:16 52:18 54:11 57:6

**Towers** 39:17

**track** 24:7

**tracked** 56:1

**tracking** 26:12

**Trading** 16:24 25:5,6,7 26:2

**transferred** 22:22

**Tribune** 10:4 18:23,24 19:2,11,14 20:9,12 21:6 27:15 28:7,10 33:25 39:1,17,21 40:14 48:18 50:13,16 52:18 54:11 57:6

**trouble** 10:13

**trustee** 41:20

**TTRG** 18:20,21 19:2,12, 24

**Tuesday** 53:3

**turn** 41:9 50:13

**turned** 13:11 56:3

**turning** 35:23

**turns** 11:9

**two-hour** 55:11

**Typically** 54:8

**U**

**UB** 47:25

**Uecker** 4:3 5:19 13:20 22:20 27:3,10,13,21 31:2,10,14 32:13,16,20 33:3,5,14,23 34:4 36:10 37:14 38:11 39:20,25 40:3 47:8,14 48:16 49:3 50:5,22 53:3,10 54:8

**ultimate** 30:19

**ultimately** 5:24

**unaccounted** 12:20 13:1

**uncomfortable** 55:8

**underlying** 55:15

**understand** 3:8,10 7:9 10:23 16:22 39:14 48:9, 23 55:9

**understanding** 4:24 15:13 17:7 21:14 34:20 38:13 46:11 47:3

**understood** 33:21

**undo** 56:1

**unethical** 48:2

**unquote** 5:15

**unrelated** 25:3

**upbringing** 47:20

**USCIS** 35:7 56:6

**V**

**vacant** 34:7

**values** 26:23,24 46:19 50:5

**versus** 3:5

**viable** 43:18,24 45:10, 19

**view** 26:18 44:12

**vision** 31:6

**visit** 30:9

**voice** 48:11

**voluntary** 41:22

**volunteer** 55:1

**volunteering** 30:7

**W**

**Wait** 19:11

**waiving** 52:4

**walk** 15:11

**walnut** 30:13

**wanted** 46:4 53:22 56:13

**warehouse** 27:21

**WARN** 36:13,19,21 37:8,15

**waterfront** 20:13

**Wednesday** 53:4

**week** 26:22 28:8 46:17 51:8 52:16 55:12

**weeks** 36:24

**wet** 28:15

**wind** 34:23

**wind-down** 42:7 49:21

**WOMAC** 8:20 9:2 21:2 22:3,6 24:22,23

**wonderful** 53:22

**Workers'** 31:6

**works** 46:14 48:24

**world** 29:2

**worry** 22:2 41:20

**worth** 10:1,5,9 11:21,22 12:14,16 27:15,17,19 50:14

**wound** 13:8

**write** 28:10

**writing** 5:14

**written** 21:20 27:13

| Y |
| --- |

**year** 10:3 11:13 12:11
  33:13 47:15

**years** 5:25 6:2,4,22
  35:17,21,24 41:8 43:22
  44:2,7 45:10

**years'** 6:19,20

**Young** 3:4 8:15 9:1
  29:25 46:5