Elizabeth Berke-Dreyfuss (Bar No. 114651)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone:  (510) 834-6600
Fax:  (510) 834-1928
Email:  edreyfuss@wendel.com

Attorneys for Susan L. Uecker, Receiver
and Monitor

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 3:17-CV-00223-RS |
| Plaintiff, | |
| vs. | |
| SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC, | **MONITOR'S REPORT ON NORTH AMERICAN 3PL, LLC, BERKELEY HEALTHCARE DYNAMIC, LLC, COMPREHENSIVE CARE OF OAKLAND, AND COMPREHENSIVE CARE OF CALIFORNIA** |
| Defendants, | |
| -and- | |
| CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC, | |
| Relief Defendants. | |

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

## TABLE OF CONTENTS

Page

I.    REPORT ON NORTH AMERICA 3PL, LLC AND BERKELEY HEALTH CARE DYNAMIC, LLC ........................................................................... 1

    A.    North America 3PL, LLC And Berkeley Healthcare Dynamics, LLC Overview ......................................................................................... 1

    B.    North America 3PL, LLC ............................................................... 2

        1.    Leases at the 20th Street Warehouse ...................................... 2

            a.    Lease No. 1 Dated January 1, 2014 ........................... 3

                i.    First Amendment ........................................... 3

                ii.    Second Amendment ...................................... 3

            b.    Lease No. 1 Issues: ...................................................... 4

            c.    Lease No. 2 Dated August 1, 2014 ............................. 5

            d.    Lease No. 2 Issues: ...................................................... 5

            e.    Lease No. 3 Dated July 1, 2016 to M.R. Sandoval Construction ................................................................. 6

            f.    Lease No 3 Issues: ....................................................... 7

        2.    Business Operations - 3PL LLC .............................................. 7

            a.    Port Of San Francisco/Oakland CES Contracts: ....... 8

            b.    Warehouse Storage Contracts ..................................... 9

        3.    Financial Review - NA3PL, L.P. Loan ................................... 9

        4.    Loan Issues: ........................................................................... 11

    C.    BERKELEY HEALTH CARE DYNAMICS, LLC ........................... 12

        1.    BHD Real Estate Purchase And Ownership/Loan ................... 12

        2.    Real Estate Issues: ................................................................. 12

        3.    East West Bank Loan ............................................................. 13

        4.    East West Bank Loan Issues: ................................................. 14

        5.    Business Operations – BHD .................................................... 14

        6.    Business Operations Issues: ................................................... 16

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

D.      3PL Related Entities ................................................................ 16

      1.      Bay Area Trading, Magic Ear, Tesh and True Agility ................................ 16

      2.      Related Entities Issues: ................................................................ 18

E.      SUMMARY FOR 3PL LLC and BHD: ................................................. 18

II.  REPORT ON COMPREHENSIVE CARE OF OAKLAND, L.P. AND COMPREHENSIVE CARE OF CALIFORNIA, LLC ................................... 19

A.      Comprehensive Care of Oakland, L.P. and Comprehensive Care of California, LLC Overview ................................................................ 19

B.      Real Estate – Facility Property ......................................................... 20

C.      Summit Bank Loans .................................................................... 21

      1.      Loan Issues .................................................................... 23

D.      CCOO Licensing And Contracts ......................................................... 23

      1.      License and Contract Summary ......................................................... 28

E.      Business Operations .................................................................... 28

      1.      Financial Summary ......................................................... 30

      2.      Billmatt Leasing, LLC ......................................................... 30

      3.      Billmatt Summary ......................................................... 31

      4.      Management Fees ......................................................... 32

F.      Summary for CCOO and CCOC ......................................................... 32

III.  RECOMMENDATIONS ......................................................... 33

IV.  CONCLUSION AND PETITION FOR INSTRUCTIONS ................................... 33

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1    Comes now Susan L. Uecker, Monitor, and submits her Monitor Report by respectfully

2  representing as follows:

3    Pursuant to the Order Granting Motion for Preliminary Injunction and to Appoint

4  Receiver,[1] the Monitor was tasked with reporting on Comprehensive Care of California and

5  Comprehensive Care of Oakland and North America 3PL, LLC and Berkeley Health Care

6  Dynamics, LLC as to:  "(a) whether there are reasons justifying expansion of her authority over

7  those entities from "monitor" to "receiver" and' (b) the likelihood, if any, her appointment as

8  receiver over any or all of those entities would cause disruption to any of those entities contractual

9  relationships."  Thereafter, the Court entered  the Order Appointing Receiver and Monitor,[2] Susan

10  L. Uecker was appointed Monitor over Comprehensive Care of California and Comprehensive

11  Care of Oakland, and North America 3PL, LLC and Berkeley Health Care Dynamic, LLC

12  ("Monitor Order").  This Monitor's Report is supported by the Declaration of Susan L. Uecker,

13  Monitor ("Uecker Decl."), filed concurrently herewith.

14  **I.     REPORT ON NORTH AMERICA 3PL, LLC AND BERKELEY HEALTH CARE
         DYNAMIC, LLC**

15       **A.     North America 3PL, LLC And Berkeley Healthcare Dynamics, LLC Overview**

16    As of the date of the Monitor Order, North America 3PL, LLC ("3PL LLC") and Berkeley

17  Healthcare Dynamics, LLC ("BHD") operated a warehousing business and warehouse facility

18  located at 1700 20th Street, Oakland, California ('20th Street Warehouse").  The members of 3PL

19  LLC and BHD are as follows:

20       **3PL LLC:**

21    Thomas Henderson ("Henderson")                    40% interest

22    Clement Chin ("Chin")                              25% interest

23    Kevin Shimamoto ("Shimamoto")                      25% interest

24

25

26  _____
    [1] Order Granting Motion for Preliminary Injunction and to Appoint Receiver, p. 6:27-7:6, entered
27  on March 23, 2017, Docket No. 96.

    [2] Entered on March 29, 2017 (Docket No. 100).
28

| | |
|---|---|
| Jennifer Bronson ("Bronson") | 10% interest[3] |
| **BHD:** | |
| SFRC, LLC[4] | 40% interest |
| Chin | 25% interest |
| Shimamoto | 25% interest |
| Bronson | 10% interest[5] |

Thereafter, the Monitor requested information from the members and their counsel, James Ficenec in order to prepare and issue this report.

Under the EB-5 program, NA3PL, L.P. is a new commercial enterprise (NCE)[6] which was capitalized with $20 million from 40 EB-5 Investors. The 3PL LLC Business Plan ("Business Plan") requires NA3PL LP to provide a six year loan of the EB-5 Funds to 3PL LLC (Job Creating Entity (JCE)) for the operation of the 20th Street Warehouse. (Uecker Decl., Exhibit 1). The loan proceeds were supposed to be used by 3PL LLC to fund the startup expenses of the company, including the development and construction of a state of the art warehouse, purchase of equipment and furnishing the initial salary and wages, and working capital. BHD currently has title to the 20th Street Warehouse.

### B.     North America 3PL, LLC

#### 1.     Leases at the 20th Street Warehouse

As contemplated under the Business Plan, 3PL LLC is the main tenant at the 20th Street Warehouse owned by BHD. The Monitor requested lease information and received the following:

---

[3] Assigned from Henderson on January 1, 2013. Uecker Decl., Exhibit 10.

[4] SFRC is currently owned 50% by Henderson, and 50% by Henderson's son, Matthew Henderson. On September 17, 2014, Henderson's other son, Michael Henderson signed a Commercial Guaranty as a Member of SFRC of the East West Bank loan against the 20th Street Property notwithstanding the fact that the SFRC Operating Agreement has or had been amended to remove Michael Henderson as a member "as of January 1, 2011."

[5] Assigned from SFRC on October 17, 2012.

[6] Under the EB5 program, the new commercial enterprise ("NCE") is the entity into which the investors invest the money.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

#### a.    Lease No. 1 Dated January 1, 2014

3PL LLC provided a Lease dated January 1, 2014 with BHD[7] the essential terms of which indicate the following:

Premises: 68,000 sq ft warehouse and 9,000 sq ft office;

Approximate 92,000 sq ft distribution warehouse and industrial property;

Term:  Five years commencing January 1, 2014 with two (5) five year options to renew on the same terms and conditions (with no rent increase for 10 years);

Gross Rent (includes rent, real property taxes and insurance) at $70,000/month for 2017 and increases to $80,000/month for 2018 with no further rent increases noted there after; and

Utilities:  Tenant pays 73% of all expenses except real property taxes and insurance.

#### i.    First Amendment

Additionally 3PL LLC provided  a First Amendment dated November 1, 2014[8] which modifies the Lease as follows:

Tenant has made improvements of $1,468,672.35 as of 10/31/14 and in consideration, 3PL LLC agrees to add an additional 24,000 sq ft. to the premises;

Tenant is responsible for 100% of the expenses except real property taxes and insurance; and

Landlord pays real property taxes and insurance.

#### ii.    Second Amendment

Finally, 3PL provided a Second Amendment dated January 1, 2017,[9] which modifies the lease as follows:

The initial term's expiration is extended from December 31, 2018 to May 31, 2019; and

Gross rent for January 1, 2019 – May 31, 2019 is $80,000/month (no rent increase from  2018).

---

[7] Uecker Decl., Exhibit 2.

[8] Uecker Decl.,Exhibit 3.

[9] Uecker Decl., Exhibit 4.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

**b.      Lease No. 1 Issues:**

1.)      Lease No. 1 is an under market lease.  The current rent of $70,000 is $.76 per sq. ft. on a gross basis.  Typically a lease for this type of property would be on a triple net lease not a gross lease, meaning that the tenant pays rent and expenses plus the taxes and insurance (no costs to landlord).  The taxes and insurance costs currently run approximately $.15 per sq. ft. which would reduce the effective rent from $70,000 to $56,120 on a net basis.  A market lease would be approx. $.90 net or $82,800 per month.  The difference equates to $26,680 per month ($82,800 - 56,120) or $320,160 per year in lost rent.  In addition, a market lease would have annual increases of approximately 3% per year and options at fair market value.  As a result, the value of the current lease continues to decrease because the annual rent remains the same while the annual cost of taxes and insurance continues to increase.

2.)      The First Amendment provided for tenant improvement credits of $1.4 million; however while the 2014 balance sheet indicates Fixed Assets – Leasehold Improvements of $1,468,672, the general ledger back up for Leasehold Improvements shows that only $551,361.60 was actually paid out to vendors for tenant improvements by 3PL LLC with the balance of $917,310.75 as a 12/31/14 journal entry "Due To BHD, LP" (per G/L detail activity page 147-149 and page 373) (Uecker Decl., Exhibit 5).  In other words, 3PL LLC only paid $551,361.60 in tenant improvements but received the benefit of 24,000 additional sq. feet of space, while their rent did not increase AND they owe BHD, LP the balance for the tenant improvements.

3.)      The Second Amendment is dated January 2017 just prior to the SEC filing its complaint and provided even more tenant rent concessions for no consideration because it extended the term of the lease while rent remained flat.

4.)      The current lease and amendments represent an under market lease and lease concessions that are not justified and constitute a basis to expand the monitor's authority over 3PL LLC to a receivership because the leases depress the market value of 20th Street Warehouse, to the detriment of various EB-5 NCEs whose funds were used to purchase the property and should be entitled to share in the appreciation of that property.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

**c.     Lease No. 2 Dated August 1, 2014**

In addition, the Monitor is in possession of another 3PL LLC lease for the same space but dated August 1, 2014 and signed by Casalina & Disston (Owner's Agent/BHD, LP) and 3PL LLC as the (Tenant)[10]. The Monitor was informed that the August 1, 2014 lease was filed with the United States Custom and Immigration Service ("USCIS") and was included in the 3PL LLC Business Plan on page 9 under the Section entitled "About the Building" stating that a lease has been negotiated with a start date of August 1, 2014 for a term of five years, with three five year options to extend.[11]

The lease terms are as follows:

Rent at $156,164/month or $1,873,968/annual Options to Extend: three five year options to extend with six months prior written notice. The base rent for the option terms shall be an amount equal to 103% of the rent in effect at the end of the Base Term. Full service lease with landlord paying all the expenses and real property taxes and insurance. There is a base year for property tax, insurance and expenses of 8/1/14-7/31/15 which resets in 2019 at the first option period.

Alteration Allowance of approx. $2,510,000. Tenant may elect to pay for alterations.

**d.     Lease No. 2 Issues:**

This is a second lease for the same 20th Street Warehouse and is significantly different from the one presented by 3PL LLC. It is supported by the Business Plan as to the lease inception date and some basic terms. Of note is that the rent is significantly higher at $156,164/month vs. $70-80,000/month. The tenant under the lease is 3PL LLC and is signed by Henderson as Manager of SFRC, Managing Member. The Monitor is informed that this lease was submitted to the USCIS with the NA3PL, L.P. I-526 Investor forms. It is interesting to note that this lease is consistent with the lease terms in the Business Plan and is closer to a "market rate" lease for the property. However, the 3PL LLC general ledger provided does not reflect that the lease terms set forth in the August 2014 lease were applied for its operations of the 20th Street Warehouse

---

[10] Uecker Decl., Exhibit 6.

[11] Uecker Decl., Exhibit 1, p. 9.

1   property.  Thus, it appears that this lease was provided to USCIS for improper purposes.[12]  The

2   Monitor would not have been aware of this lease except that counsel for some of the NA3PL, L.P.

3   Investors provided the information from the I-526 submittal to the USCIS for review and

4   consideration.  The use of this lease as part of the NA3PL, L.P. Investors' I-526s provides another

5   reason to expand the powers of the receivership over 3PL.

6              **e.      Lease No. 3 Dated July 1, 2016 to M.R. Sandoval Construction**

7              There is another lease for the 20th Street Warehouse between BHD and M.R. Sandoval

8   Construction Inc., dated July 1, 2016[13] that was provided to the Monitor by 3PL LLC and

9   indicates the following:

10             Premises:  200 sq ft of storage space within the real property located at 1733 West Grand

11  Avenue, Oakland, CA[14]  which is 8,000 sq ft storage and office property;

12             Term:  Three years commencing July 1, 2016 and ending June 30, 2019; and

13             Gross Rent (includes rent, expenses, real property taxes and insurance) at $500/month for

14  2017, increases to $600/month for 2018 and $700/month for 2019.

15             There is a First Amendment dated January 1, 2017[15] which modifies the lease as follows:

16             The lease may be terminated upon 60 days written notice;

17             Term remains the same but either party may terminate prior to June 30, 2019 upon 60 days

18  written notice; and

19             Gross rent is reduced to $25/month for the term of the lease.

20

21

---

22  [12] 3PL LLC disputes the veracity of the August 1, 2014 lease because it was signed by Henderson as Managing Member of SFRC; SFRC was not a member of 3PL LLC, Thomas Henderson,

23  individually was the member of 3PL LLC.  Whether the August 1, 2014 lease was signed by the proper party is not the issue.  The issue is that the August 1, 2014 lease was submitted to the

24  USCIS as part of the Business Plan and thus may constitute  a fraud on that agency and the NA3PL, L.P. Investors..

25  [13] Uecker Decl., Exhibit 7.

26  [14] While the street address may be different, the premises are located within the 20th Street

27  Warehouse.

[15] Uecker Decl., Exhibit 8.

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

   **f.**  **Lease No 3 Issues:**

    1.)  The lease payments for 2016 at $500/month were never paid.

    2.)  The First Amendment dated January 2017 just prior to the filing of the SEC complaint, provided concessions reducing rent significantly. A typical landlord would not reduce rent when the tenant is already delinquent for the first six months of the lease.

    3.)  The Sandoval lease represents another under market lease with new lease concessions that are not justified and constitutes a reason to expand the receivership over 3PL LLC and BHD.

   **2.**  **Business Operations - 3PL LLC**

   3PL LLC  was formed  approximately in July 2010. [16]  The initial members and allocation percentages from 2010 to 2013 were as follow:

Henderson  50% [17]

Chin   25%

Shimamoto  25%

   On April 18, 2016, Henderson was removed as the manager of 3PL, but retained his membership interest.  (Uecker Decl., Exhibit 9).

   3PL LLC was inactive from 2010 through most of 2012.  According to counsel for 3PL LLC, its business operations began in 2013.  In 2014, 3PL LLC became a U.S. Customs and Border Protection ("USCBP") authorized Centralized Examination Station ("CES").  This is an inspection program for cargo arriving at the Port of Oakland from overseas to ensure compliance with U.S. and world trade regulations.  While USCBP personnel perform the actual inspections, 3PL LLC provides the facility, labor and administrative services to facilitate the inspections.  3PL LLC commenced operations as a CES on May 5, 2014 under an interim agreement which was effective for five years from the date of commenced operations.  The agreement is discussed in

---

[16] There is a slight discrepancy between the tax returns which show that operation commenced on July 22, 2010, and the Operating Agreement which shows that operations commenced on July 26, 2010.

[17] In 2013, 10% of the Henderson share was transferred to Bronson via an Assignment of Economic Interest.  (Uecker Decl., Exhibit 10).

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1  detail in Section B.2.a. below.  3PL LLC also has a Department of Homeland Security/USCBP

2  bond issued March 10, 2017 with an effective date of April 9, 2017 for Custodian of Bonded

3  Merchandise in the amount of $250,000.

4       The 3PL LLC Business Plan, submitted to the USCIS, indicates the "company is projected

5  to directly hire 338 permanent full time jobs by 2017.  When considering indirect and induced jobs

6  created by the company based on its economic impact, a total of 596.8 jobs will be created by

7  2017."  (Uecker Decl., Exhibit 1, pp. 28-30.) The March 31, 2017 current employee listing

8  indicates a total of 29 salary and hourly employees with two being members, Chin and

9  Shimamoto.  The company has clearly not met the job creation requirement as anticipated in the

10  Business Plan.  Under the current warehouse operation, it does not appear that 3PL LLC could

11  ever attain the employment goals set forth in its Business Plan.  It also appears that the 3PL LLC

12  is not fully or dedicated to job creation because its employees are not exclusive to 3PL LLC.  3PL

13  LLC shares some of its employees among several SFRC related entities.

14       In reviewing the 3PL LLC Income Statements[18] for profitability during the past few years

15  of operation, the information breaks out as follows:

16       2014 – Operating Profit     $(93,358.13)

17       2015 – Operating Profit     $310,375.11

18       2016 – Operating Profit     $337,803.47

19       After a review of the 3PL LLC leases it is clear that if 3PL LLC paid market rent as noted

20  above in Section B.1.b.) - Lease No. 1 Issues, expenses would increase by $26,680 per month

21  ($82,800 - $56,120), or $320,160 per year, resulting in a negative cash flow based on the 2015 and

22  2016 income statements.  Expansion of the receivership would allow for a further review and

23  analysis of the business operations.

24       **a.**    **Port Of San Francisco/Oakland CES Contracts:**

25       3PL LLC entered into two contracts with the Port of San Francisco/Oakland for the

26  operation of a Centralized Examination Stations (CES).[19]  A CES is defined as a "privately

27   

28  [18] Uecker Decl., Exhibit 11.

operated facility at which imported merchandise identified by Customs for physical examination is made available to Customs inspectors for that purpose." The actions that could result in termination, suspension, or revocation of the CES agreement are set forth in 19 CFR § 118.21. The appointment of a receiver over 3PL LLC does not appear to be an action that would trigger termination, suspension or revocation of the CES agreement. This appears to be the correct interpretation because, notwithstanding the appointment of the receiver, the CES agreement would remain in the name of the owner and operator, 3PL, LLC, subject to the receiver's management, and thus would not effect a transfer. This interpretation was confirmed during a conference call with counsel for USCBP, Brian Beddingfield on April 18, 2017 who confirmed that the appointment of the receiver would not disrupt the CES agreement, and the receiver could continue to operate 3PL, LLC,  notwithstanding the strict prohibition against transfer, sale, conveyance, in any form, of the CES agreement, since there would not be a transfer of ownership or assets. Uecker Decl., ¶ 14.  19 C.F.R. § 118.3

### b.      Warehouse Storage Contracts

3PL LLC also has three warehouse storage agreements for the facility.  There are no default provisions triggered by the appointment of a receiver under those storage agreements. Additionally, the agreements may be terminated on 30 and 60 days' notice.  Thus, the receiver could operate 3PL without disrupting the CES Agreements or warehouse storage  agreements provided they were profitable, and if not profitable, the receiver could liquidate it (as provided by the terms of the CES agreement).

### 3.      Financial Review - NA3PL, L.P. Loan

The Business Plan provided that NA3PL, L.P. was to loan $20 million to 3PL LLC ("Investor Loan") to fund startup expenses of the company, including the development and construction of a state of the art warehouse (the 20th Street Warehouse), purchase of equipment and furnishing the initial salary and wages, and working capital.  Investors were to obtain an

---

[19] Uecker Decl., Exhibits 12, 13.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  equity investment in the limited partnership NA3PL, L.P. 3PL LLC's Business Plan[20] described

2  the investor loan as follows:

> **Amount of Loan:** NA3PL, LLC promises to pay NA3PL, LP the principal sum of twenty million dollars together with interest in arrears on the unpaid principal balance at an annual rate equal to one percent per annum.
>
> **Project Term**: The partnership business is to invest in one project by making a $20 million loan and/or by direct equity investment. The investment project will have a term of a minimum of six years.
>
> **Interest Payments on Loan**: The interest payment on the unpaid principal balance of this note shall be due and payable in consecutive quarterly installment of fifty thousand dollars (or less if a partial payment has been made on principal) commencing on the first day of each calendar quarter. Interest will be paid until the principal amount has been paid in full.

11  The Business Plan[21] on the 3PL LLC Timeline states as of June 2014 that NA3PL, L.P.

12  loaned $15 million to 3PL LLC for warehouse and logistics services.

13  There are three executed promissory notes that were provided to the receiver. One is dated

14  May 1, 2014 for the sum of $10 million and a second note is dated May 1, 2014 for the sum of $15

15  million (Uecker Decl. Exhibits 14, 15). Both of those notes state "This Note has been executed

16  and delivered pursuant to and in accordance with the terms and conditions of the Confidential

17  Private Placement Memoranda, Business Plans and formation documents related to the NA3PL,

18  LP EB-5 projects described therein." Both of the dated Promissory Notes are guaranteed by

19  BHD. There is a third undated Promissory Note in the amount of $15 million. (Uecker Decl.,

20  Exhibit 16) The undated Promissory Note is not guaranteed by BHD, and unlike the other

21  Promissory Notes, the place of payment had been removed. None of the notes state that it is a

22  modification or replacement of any of obligation owing by 3PL LLC to NA3PL, L.P. All of the

23  notes could represent separate and independent obligations. Therefore, it appears that 3PL LLC

24  could owe up to $40 million to NA3PL, L.P.; however, it is unclear what amount was actually

---

[20] Uecker Decl., Exhibit 1, p. 2.

[21] Uecker Decl., Exhibit 1, p. 2.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  loaned, and which of the Promissory Notes should be enforced.  The Monitor has not located a

2  promissory note in the amount of $20 million as referenced in the Business Plan.

3          In reviewing the 3PL LLC balance sheets for 2014, 2015 and 2016, none of the loans as

4  represented by these Promissory Notes are referenced in the balance sheets under Other Current

5  Liabilities as "Loan Payable." (Uecker Decl., Exhibit 17).  However the 3PL LLC's 2016 balance

6  sheet indicates that there are Other Current Assets booked as "Due From" in the total amount of

7  $21,585,011 from various entities with the largest amount due from SFRC at $15,670,628.  The

8  Other Current Liabilities booked as " Due To" in the total amount of $22,665,722 with the largest

9  amount due to NA3PL, LP in the amount of $18,289,204.  The net result is <$1,080,161> or the

10 current liabilities are greater than the current assets under "Due From/To" various entities.

11 Therefore, it appears that the majority of the investor funds may have been funneled into SFRC,

12 through 3PL LLC, and they have not been repaid to NA3PL, LP or 3PL, LLC and remain

13 outstanding as they are Due From SFRC.  The use of Due From/To complicates the accounting

14 review and makes it difficult to easily determine the source of the funds received and actually used

15 by 3PL LLC.  See Declaration of Ellen Chen In Support of Plaintiff Securities And Exchange

16 Commission's Motion for Preliminary Injunction And Appointment Of Receiver, Docket No. 19,

17 ¶ 10, describing the transfer of $18 million in funds from NA3PL, L.P. to 3PL, and then to SFRC

18 and Immedia.

19          **4.      Loan Issues:**

20          Either the NA3PL, L.P Promissory Notes provided to the USCIS as part of the Investors I -

21  526s were only used to support the Business Plan but ultimately were improper (bordering on

22 fraudulent given that there are multiple Promissory Notes with no explanation) or the loans (all of

23 the Promissory Notes) were  simply ignored by 3PL LLC and NA3PL, L.P. (controlled by SFRC,

24 as the general partner) and the terms of Promissory Notes were not enforced, or both.[22]  These

25 improper loans are not in an amount consistent with the Business Plan, but for which 3PL LLC

---

[22] On February 15, 2017, counsel for Randy Sugarman, the former manager of SFRC, sent a letter
to counsel for 3PL advising that 3PL had failed to make interest and principal payments under the
Promissory Note.  (Uecker Decl., Exhibit 18).

1   appears to be liable for, together with the questionable accounting method of reporting the

2   obligations as "Due From/To" evidencing a possible pass through transfer which requires further

3   investigation and grave concern over the improper use of the funds.  Thus, this provides another

4   justification to expand the receivership.

5       **C.      BERKELEY HEALTH CARE DYNAMICS, LLC**

6           **1.      BHD Real Estate Purchase And Ownership/Loan**

7           The 20th Street Warehouse was initially purchased in 2012 by Berkeley Healthcare

8   Dynamics, LP ("BHD") (before 3LP LLC became operational).  However the tracing of funds by

9   bank statements received from Marvin Tate, CPA indicates that funds were transferred from

10  CallSocket L.P. ("CS LP") ( another entity under the receivership) investors to SFRC and SFRC to

11  First American Title Company to purchase the 20th Street Warehouse. (Uecker Decl., Exhibit 19).

12  The Buyer's Final Settlement Statement dated December 20, 2012 shows deposits from SFRC of

13  $2,699,181.21 (CS LP funds) and a deposit from Clement Chin in the sum  of $100,000.  The

14  settlement statement shows a purchase price of $8,250,000 with a loan of $6,200,000 from East

15  West Bank and a settlement date of 11/09/2012( Uekcer Decl., Exhibit 20).  CS LP provided the

16  majority of funds (96.4%) to purchase this property and title should have been in the name of CS

17  LP or if it was a loan to BHD, then a promissory note and deed of trust for the loan should have

18  been provided to CS LP.  No loan documents were provided and no deed of trust was recorded

19  against the property per the Old Republic Preliminary Title Report dated March 17, 2017.

20  (Uecker Decl., Exhibit 21).

21          The property is insured and the real estate taxes and mortgage are current.

22          **2.      Real Estate Issues:**

23          The 20th Street Warehouse was purchased primarily with CS LP funds.  Either the

24  property should have been placed in the name of CS LP or there should have been a note with a

25  second deed of trust recorded and payments issued with interest since 2012.  Thus, another

26  entities' funds has been used  without any consideration, and it has  not been  repaid.  To date,

27  BHD has not provided evidence or even an idea as to how it would either repay CS LP, with

28  interest, or transfer an interest of the property to allow CS LP to recover its funds and share in the

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  appreciation of the property.  The real estate issues constitute a justification for expanding  the

2  receivership.

### 3.   East West Bank Loan

4  On September 17, 2014, Berkeley Health Care Dynamics, LLC (BHD) obtained a

5  $6,200,000 loan from East West Bank ("Bank") ("Loan").  This appears to be a refinance of the

6  original loan.  The Loan is secured by a Deed of Trust against BHD's real property, the 20th Street

7  Warehouse.  The Promissory Note contains an Assignment of a Deposit Account.[23]  The Loan is

8  guaranteed by BHD, 3PL LLC, SFRC, the Chin Revocable Trust of April 29, 2011, The

9  Shimamoto Trust dated April 19, 2014, Clement Chin, Thomas Henderson, and Kevin

10  Shimamoto.

11  Under the terms of the Promissory Note, the Business Loan Agreement, Deed of Trust and

12  Assignment of Rents (collectively, "Loan Documents)[24], the appointment of a receiver would

13  constitute an Event of Default.  In addition, the appointment of a receiver over the guarantors, 3PL

14  LLC and SFRC also constitutes an Event of Default.

15  Upon an Event of Default, under the terms of the Loan Documents, the Bank can

16  automatically accelerate the entire unpaid principal balance and accrued interest becomes due and

17  payable under the Promissory Note.  In addition, if permitted by applicable law, the Bank is

18  entitled to charge default interest of a 5.000 percentage points ("Default Rate").  The Loan is a

19  variable rate loan with a current rate of 3.5% with a monthly payment of approx. $25,500 and

20  balance outstanding of $5,946,362 at May 1, 2017.

21  Under the Deed of Trust and Assignment of Rents, the Bank could take possession of the

22  property and exercise its rights to collect rents and proceed to judicial or nonjudicial foreclosure.

23  Even if the appointment of the receiver over BHD (or 3PL LLC or SFRC as guarantors) were to

24  constitute an Event of Default under the Loan Documents, the Order Appointing Receiver and

---

25  [23] The Assignment of the Deposit Account was missing from the Loan Documents.

26  [24] The Loan Documents are signed by Thomas Henderson individually, as manager of BHD, LLC.
27  However, Henderson, individually, was never a manager of BHD, LLC.  SFRC was a manager of
   BHD LLC, and Henderson was a manager of SFRC.  On April 18, 2016, SFRC was removed as a
28  manager of BHD, LLC.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Monitor ("Order"), would prevent certain actions by the Bank.  Paragraph 25 of the Order would authorize the receiver to serve the Bank with the Order.  Paragraph 28 enjoins and restrains all persons receiving notice of the Order from directly or indirectly taking any action or causing any action to be taken (without the express written agreement of the Receiver) which would (i) take possession of any Receivership Property; (ii) enforce a lien upon any Receivership Property; (iii) accelerate (the due date) of any loan, mortgage, indebtedness, security agreement executed by any Receivership Defendant, or Relief Defendant or which otherwise affects any Receivership Property. Order, ¶ 28, subpara. A., C.  While those provisions would prevent the Bank from accelerating the Promissory Note, collecting the rents, and initiating a foreclosure action, it would not prevent the Bank from charging Default Rate interest.[25]   However, SFRC is already under a receivership and the Receiver has not been advised by the bank that the loan is in default. Moreover, the 20th Street Warehouse was included in the State Court Receivership and East West Bank did not declare a default on the loan.

### 4.   East West Bank Loan Issues:

It appears that the Bank can charge default interest upon the appointment of a receiver however it was clear in speaking with the East West Bank representatives that the Bank's primary concern is to have the loan  kept current and for this legal situation to be resolved as it relates to the property.  The appointment of a receiver should not cause disruption over the East West Loan provided  the loan is kept current.  This can be done through the payment of market rent from a tenant or the liquidation of the property.

### 5.   Business Operations – BHD

BHD started business on October 17, 2012 per the tax returns.  The initial members and allocation percentages were as follow:

---

[25] Each of the Loan Documents contain slightly different attorney's fees provisions.  The Promissory Note provides for attorney's fees and expenses incurred in the collection of the Note if the borrower (BHD) does not pay.  The Business Loan Agreement provides for attorney's fees and expenses incurred in the enforcement of the Agreement.  The Deed of Trust provides for attorney's fees and expenses if the Bank initiates an action to enforce the Deed of Trust.  Because the Order would prohibit the actions which entitle the Bank to attorney's fees, the appointment of the receiver should not trigger the attorney's fees provisions.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  SFRC          40%

2  Chin          25%

3  Shimamoto     25%

4  Bronson       10%

5      BHD holds title to the 20th Street Warehouse and as the landlord collects rent and pays

6  property expenses for insurance, taxes and mortgage payments on the East West Loan.  The

7  Monitor received the BHD balance sheets and P&L's for 2012 - 2016 but no general ledgers were

8  provided.  In response to the request counsel indicated:

9           Neither Mr. Shimamoto, Mr. Chin, nor Ms. Bronson have the prior
            general ledgers for BHD, LP or BHD, LLC.  These were kept by
10          Marvin Tate.  In January 2017, I requested that Mr. Tate transfer to
            Mr. Shimamoto all records for BHD, LLC, BHD, LP, and North
11          America 3PL, LLC.  Mr. Tate has not complied.  The information
            that Mr. Shimamoto has in Quickbooks was reconstructed from tax
12          returns and any information he could get from Mr. Tate's office.
            For these reasons, we do not have the detail of "Other assets -
13          Investment in BHD, LP" or the detail for "Other current liabilities -
            Due to Other" in the records kept in Quickbooks.
14
15      The two items referenced are Other Assets - Investment in BHD, LP for ($2,236,977) and

16  Current Liability Due to Other for $2,379,598.  These are large amounts for which the members

    do not have any explanation other than "we do not have the detail."
17
        An additional inquiry was related to the Other Current Liabilities.
18
        Due to Clement Chin for $130,000 and Due to Kevin Shimamoto $50,000 with a response
19
    from counsel as follows:
20
21          With respect to the loans owed to Clement, he initially loaned
            $100,000 for the purchase of the warehouse, and was repaid $20,000
22          (leaving an $80,000 balance).  He also loaned $50,000 to SFRC.
            That was transferred to BHD, LLC in exchange for a $50,000
23          reduction of debt owed by BHD, LLC to SFRC.  Mr. Shimamoto
            also loaned $50,000 to SFRC.  That debt was transferred to BHD,
24          LLC in exchange for a $50,000 reduction in debt owed by BHD,
            LLC to SFRC.
25
26      It is a highly unusual or questionable business practice for a loan from Chin and

27  Shimamato to SFRC to be exchanged for a reduction on debt owed by BHD to SFRC.  This

    implies that the members are offsetting amounts due from another entity.
28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

**6.      Business Operations Issues:**

It appears that the current members do not have complete knowledge of the BHD operations since they cannot respond to significant balance sheet line items for Other Assets and Current Liabilities.  While it is plausible that the members may not have the the current accounting records, it is simply unbelievable that Chin and Shimato who have been setting off their personal loans over the past few years would have no records to evidence these transactions and failed to make any inquiries into the balance sheet items to be able to provide a reasonable explanation for those issues.

Additionally the  members are offsetting their own loans (to SFRC) against BHD without documentation.  It is impossible to know if this is a result of the members hiding information, lack of understanding of business operations, or failure to  appropriately document insider transactions. The members inability to respond to important balance sheet issues, and their conduct of offsetting obligations warrants expansion of the monitorship to receivership.

**D.      3PL Related Entities**

**1.      Bay Area Trading, Magic Ear, Tesh and True Agility**

The Monitor requested information on the following known 3PL LLC related entities who owe it money:Bay Area Trading (BAT); California Export Group dba Magic Ear; LLC (CEG); Tesh, LLC (Tesh); and True Agility

These entities owe funds to 3PL LLC per the 2016 balance sheet[26]as follows:

Due from BAT                    $    34,700.57

Due from Magic Ear          $  263,807.55

Due from Tesh                    $1,951,135.28

Due from True Agility         $    99,846.25

The responses to the Monitor's requests were as follows:

> With respect to the other entities, the following is Mr. Chin and Mr. Shimamoto's understanding:  BAT was originally set up to be an wholesaler and importer, and use North America 3PL, LLC services for logistics services.   CEG was to export goods which Mr.

---

[26] Exhibit__.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Henderson explained would help with induced job counts under the EB-5 program.  To Mr. Chin and Mr. Shimamoto's understanding, the entity was inactive.  However, Marvin Tate supplied information in mid-March 2017 indicating that MagicEar was a dba of CEG.  Mr. Chin and Mr. Shimamoto believe that is incorrect.  Mr. Chin and Mr. Shimamoto expect to close that entity.  The MagicEar entity was to assemble and sell hearing devices.  Mr. Chin and Mr. Shimamoto understand that MagicEar is owned by Creative Dynamics and Berkeley Healthcare Dynamics, LP.  North America 3PL, LLC was supposed to provide logistics services and some sourcing in Asia, warehouse parts, and provide some assembly and packaging services.  Mr. Chin and Mr. Shimamoto have asked Mr. Tate for the tax filings, but Mr. Tate has not responded.  It does not appear that MagicEar currently serves any purpose.

With respect to Tesh, Mr. Chin and Mr. Shimamoto's initial understanding was that North America 3PL, L.P. was a member of Tesh.  However, in mid-March, Mr. Chin and Mr. Shimamoto saw tax returns prepared by Mr. Tate showing that SFRC, and not North America 3PL, LLC, was the member.  The original concept was that North America 3PL, LLC would provide logistics services, sourcing in Asia, warehousing, and distribution service and possibly establish an e-commerce operation for Tesh.   That has not come to fruition.

These responses were totally unresponsive as to the relationship between 3PL LLC and these related entities.

For example Magic Ear, LLC had an invalid lease at the Broadway Building (owned by CallSocket II, L.P.).  There are invoices paid from 3PL LLC to Magic Ear via wires dated 5/1/2016 – 10/1/2016, for close to $50,000 for payroll and other payments to Steve Morando Sr., and others.  (Uecker Decl., Exhibit 22.)  Mr. Ottaviano in 2014 was the President of Magic Ear.  (3PL  LLC Business Plan under Letters of Support, Magic Ear, Uecker Decl., Exhibit 1, p 50.)  The Letter of Support indicates that "Magic Ear is seeking to expand…to the West Coast...interested in assembly capabilities that are planned for the NA3PL facility."  No explanation has been provided as to why Magic Ear was paid in 2016 or what the relationship was between 3PL LLC and Magic Ear.  CEG dba Magic Ear does not appear to be inactive as it relates to 3PL LLC.  On or about January 31, 2017, shortly after the SEC filed its Complaint and Motion for Preliminary Injunction and Appointment of Receiver, BHD, L.P. transferred its interest in Magic Ear to Creative Dynamics, LLC (Chuck Ottaviano) for $1.00.  (Uecker Decl., Exhibit 23).

Tesh, LLC is another related entity that was a tenant at the Dufwin Building (owned by CallSocket II, L.P.) property and was evicted and a judgement was entered for $37,726.47.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   (Uecker Decl., Exhibit 24).  Then Tesh moved out of the Dufwin Building to the Tribune Tower

2   (was evicted by the new owner who evicted a group of Henderson entities) and then they moved to

3   JL Gateway before the appointment of a separate state court receiver (in a separate action brought

4   by the lender).  Shimamoto appeared at the eviction hearing and testified as the Manager of 3PL

5   LLC which is the Member of Tesh, LLC.  On December 30, 2016 Shimamoto signed on behalf of

6   3PL LLC and as Member of Tesh, LLC in order to change the signers on the bank account

7   (Uecker Decl., Exhibit 25).  Tesh owes almost $2 million to 3PL LLC.

8           **2.**      **Related Entities Issues:**

9        All of these entities, Bay Area Trading, Magic Ear, Tesh and True Agility, all owe money

10   to 3PL LLC.  The members' failure to investigate or collect the receivables owing to 3PL LLC is a

11   serious issue.

12   **E.**      **SUMMARY FOR 3PL LLC and BHD:**

13        The 3PL LLC and BHD entities should become part of the receivership under the Order

14   Appointing Receiver and Monitor.  The contracts with USCBP will not be disrupted by a

15   receivership because the receiver can continue to operate the CES operation without constituting a

16   change in ownership or location.  The East West Bank loan will not be disrupted by the

17   receivership except perhaps as to potential default interest.

18        There are numerous additional reasons for justifying the expansion from monitor to

19   receiver including the following:  a) entering into under market leases and potentially devaluing

20   the real property; b) overstating tenant improvements; c) entering into improper and possibly

21   fraudulent leases with insiders; d) claiming profitability based on an under market "lease deal"; e)

22   issuing improper loans; and (3) promissory notes; f) ignoring the issues relating to the down

23   payment/purchase of the real property); g) offsetting against another entity for the repayment of

24   personal loans of members; and h) funding and collection issues of related entities.  The business

25   activities of 3PL LLC and BHD are questionable and its actions warrant expansion to a

26   receivership.

27

28

## II. REPORT ON COMPREHENSIVE CARE OF OAKLAND, L.P. AND COMPREHENSIVE CARE OF CALIFORNIA, LLC

### A. Comprehensive Care of Oakland, L.P. and Comprehensive Care of California, LLC Overview

As of the entry of the  Monitor Order, Comprehensive Care of Oakland, L.P. ("CCOO") and, its general partner, Comprehensive Care of California, LLC ("CCOC") operated a 99 bed skilled nursing facility with 66 beds designated as sub-acute care within the facility located at 1833 10th Street, Oakland, CA ("Facility Property"). The members of CCOO and CCOC are as follows:

**CCOO**:

| | |
|---|---|
| CCOC | 40% interest |
| EB-5 Investor Limited Partners | 60% interest |

**CCOC**:

| | |
|---|---|
| SFRC | 50% interest[27] |
| Shirley S. Ma ("Ma") | 50% interest |

Ma operates the day to day operations of CCOC. After her appointment, the Monitor requested information from Ma and her counsel, Yosef Peretz and Sumy Kim, of Peretz & Associates, to prepare and issue this report.

Under its Business Plan, CCOO was to be capitalized with $12 million from 25 EB-5 investors.  (Uecker Decl. Exhibit 27, p. 2)  CCOO currently has title to the Facility Property.  The Business Plan provided for the usage of EB-5 funds as capital to acquire the property and complete renovations in the interior space with a budget of $2.3 million as well as to hire and train 291 full-time employees when fully operational within a five year period. (Id. at p. 23). Both of the entities, CCOO and CCOC, have consolidated operations to include both the business

---

[27] On August 9, 2016, Ma entered into An Assignment of Interest in Comprehensive Care of California, LLC with San Francisco Regional Center, LLC, whereby SFRC assigned its interest in CCOC to Ma for $1 million.  Under the terms of the Assignment, SFRC remained the manager of CCOC, with access to all of the books and records of CCOC, and retained the ability to provide to the limited partners of CCOC any and all documents CCOC deemed necessary to comply with USCIS requirements for approval of the I-526s and I-829s.  Uecker Decl., Exhibit 26.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

operations (the skilled nursing and sub-acute care facility) and the real estate.  The Monitor has been advised that there is no written lease between the entities.

**B.      Real Estate – Facility Property**

The skilled nursing facility located at the Facility Property was purchased out of foreclosure in June 2011 with a Trustee's Deed Upon Sale. (Uecker Decl., Exhibit 28). The unpaid debt was $3,382,127.24.  The bank statements  received from Marvin Tate, CPA, reflect that funds in the amount of $3,382,130 were withdrawn from CCOO investor funds account and paid by CCOO  to purchase the property. (Uecker Decl., Exhibit 29).

The Old Republic Preliminary Title Report indicates that there is a recorded deed of trust securing a loan in the sum of $2 million dated January 29, 2014  from Summit Bank to CCOO , and a UCC financing statement recorded on February 11, 2014. (Uecker Decl., Exhibit 30).  There is also evidence of another $1 million loan recorded on December 12, 2016 from Summit Bank to Ma, Bill J. Longwell (Ma's husband) and CCOC.  Id.  The Monitor was advised that Ma purportedly used the loan proceeds  to buy out SFRC's interest in CCOC, which she now believes that she owns 100%.  The Monitor requested backup documentation on the loans and specifically information on the 2016 loan, and to date has not received a sufficient explanation regarding this transaction.  There are other issues relating to the second loan as discussed in Section C below.

The Monitor was informed there were substantial improvements completed to the building on the Facility Property to comply with the required sub-acute care facility standards, including the following:

> Replaced heating/cooling system;
>
> Upgraded emergency power, including the replacement of emergency generator;
>
> Upgraded electrical power, including emergency power to every room, hallway, emergency power for computer system for electronic charting;
>
> Installed ventilator alarm system;
>
> Installed new Ansel system (fire safety system) for the kitchen, improved pantry area;
>
> Renovated laundry room;

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1        Renovated reception area, patio, nursing stations, and shower rooms;

2        Implemented electronic medical records; and

3        Installed new floors, new paint, and wall coverings.

4        The Monitor toured the facility recently and noted some of the improvements within the

5 facility.

6        The property is insured and the 2016-2017 real estate taxes are current. The title report

7 indicates a tax default for non-payment of state taxes for 2012-2013 of approximately $75,000. A

8 payment plan had been established for payment of the amounts due and the remaining amount due

9 as of May 2017 under the payment plan is $18,752.14.

10    **C.**    **Summit Bank Loans**

11        On January 29, 2014, CCOO obtained a $2,000,000 loan from Summit Bank ("Bank")

12 ("First Loan"). The First Loan is secured by a Deed of Trust against the Facility Property as well

13 as security interest and UCC-1 against all of CCOO's personal property, inventory, equipment,

14 accounts, chattel paper, instruments, documents, deposit accounts, and general intangibles, all

15 presently owned and future acquired property. The First Loan is personally guaranteed by Bill J.

16 Longwell, individually and the Bill J. Longwell and Shirley Longwell Revocable Trust, and

17 Shirley Ma, individually.[28]

18        Under the terms of the Promissory Note, the Business Loan Agreement, Commercial Loan

19 Agreement, Security Agreement (collectively, "Loan Documents"), the appointment of a receiver

20 would constitute an event of default.

21        Upon an event of default, under the terms of the Loan Documents, the Bank may, in its

22 discretion, accelerate the entire the unpaid principal balance and accrued interest due and payable

23 under the Promissory Note. In addition, if permitted by applicable law, the Bank is entitled to

24 charge default interest of a 4.000 percentage points ("Default Rate"). Under the Commercial

25 Security Agreement, the Bank may exercise its right to collect all accounts or direct accounts to a

26

27

---

28 [28] Bill J. Longwell is Shirley Ma's spouse. Ma is Shirley Ma's maiden name.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

lock box, assemble and sell the collateral and obtain a deficiency.  Under the Deed of Trust, the Bank could exercise its rights to proceed to judicial or non-judicial foreclosure.

Even if the appointment of the receiver over CCOO or CCOC were to constitute an Event of Default under the Loan Documents, the Monitor Order would prevent certain actions by the Bank.  Paragraph 25 of the Monitor Order  authorizes the receiver to serve the Bank with the Order. Paragraph 28 enjoins and restrains all persons receiving notice of the Order from directly or indirectly taking any action or causing any action to be taken (without the express written agreement of the Receiver) which would (i) take possession of any Receivership Property; (ii) enforce a lien upon any Receivership Property; (iii) accelerate (the due date) of any loan, mortgage, indebtedness, security agreement executed by any Receivership Defendant, or Relief Defendant or which otherwise affects any Receivership Property.  Order, Para. 28, subpara. A., C. While those provisions would prevent the Bank from accelerating the Promissory Note, collecting the accounts, and assembling and selling the collateral, and initiating a foreclosure action, it would not prevent the Bank from charging Default Rate interest.[29]

As set forth above, on December 12, 2016, Ma, Bill J. Longwell and CCOC signed a second Promissory Note to Summit Bank in the amount of $1,000,000 ("Second Loan").  The Promissory Note was secured by a Deed of Trust against the Facility Property, and personally guaranteed by Bill J. Longwell and Shirley Longwell, Trustees of the Bill J. Longwell and Shirley Longwell Revocable Trust. The Promissory Note, Business Loan Agreement and Deed of Trust have essentially the same terms and conditions as the First Loan and the analysis as to whether the appointment of a receiver would constitute an Event of Default would be the same, as would the

---

[29] Each of the Loan Documents contain slightly different attorney's fees provisions.  The Promissory Note provides for attorney's fees and expenses incurred in the collection of the Note if the borrower (CCOO) does not pay.  The Business Loan Agreement and the Commercial Security Agreement each provide for attorney's fees and expenses incurred in the enforcement of the Agreement.  The Deed of Trust provides for attorney's fees and expenses if the Bank initiates an action to enforce the Deed of Trust.  Because the Order would prohibit the actions which entitle the Bank to attorney's fees, the appointment of the receiver should not trigger the attorney's fees provisions.

conclusion that Paragraph 28 of the Order could enjoin and restrain most of the Bank's actions after default.

### 1.    Loan Issues

The 2016 Summit Second Loan is problematic as to the propriety of the loan and security belonging to CCOO/CCOC.  Ma contends that she purchased the Henderson interest in CCOC in August 2016 for $1,000,000.  While Ma describes the transaction as the  purchase of Henderson's interest in CCOO, Ma actually purchased SFRC's interest in CCOC pursuant to the Assignment of Interest in Comprehensive Care of California, LLC.  (Uecker Decl., Exhibit 26; Fn. 27). Ma paid $1 million for SFRC's interest in CCOC in August 2016 by a wire transfer from Longwell's Merrill Lynch account into the Casalina & Disston trust account on August 10, 206. (Uecker Decl., Exhibit 31).  There was no asset valuation completed to support the amount of the buyout of SFRC's interest in CCOC.  Counsel for Ma indicated that the Second Loan was a refinance, however the Second Loan proceeds were used to repay  the Longwell's Merrill Lynch account per the Summit Bank Disbursement Request. (Uecker Decl., Exhibit 32)  Ma's purchase of SFRC's interest in CCOC was a personal obligation, not an obligation of CCOC or CCOO, and no Deed of Trust should ever have been recorded against the Property in connection with that transaction. Although Ma has subsequently caused Summit Bank to remove the December 2016 Deed of Trust[30] against the Facility Property, claiming that the recording by the Bank had been an error (even though Ma signed the Deed of Trust, and authorized the recording), CCOC has yet to be removed as an obligor from the Promissory Note to the Bank for the $1 million.

### D.    CCOO Licensing And Contracts

The Monitor retained and consulted with a health care attorney, Samuel Maizel at Dentons US LLP to analyze the license and contract issues relating to CCOO/CCOC. His report[31] is as follows:

> You have asked us to review the contracts and licenses of
> Comprehensive Care of Oakland, LP ("CCOO"), doing business as

---

[30] Uecker Decl., Exhibit 33.

[31] Uecker Decl., Exhibit 34.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Bay Area Healthcare Center, 1833 10th Avenue, Oakland, CA 94606, in light of certain allegations made in the "Defendants Comprehensive Care Of Oakland, LP's and Comprehensive Care of California, LLC's Opposition To Plaintiff's Motion For Preliminary Injunction and For The Appointment of Receiver," in *SEC v. San Francisco Regional Center, LLC, et. al.*, Case No. 3:17-vcv-00223-RS, currently pending in the United States District Court for the Northern District of California, San Francisco Division. Bay Area Healthcare Center is a skilled nursing facility ("SNF"), licensed by the State of California. . . . .

First, generally, attorneys at Dentons who have been actively involved in healthcare insolvency cases for more than two decades, believe it unlikely that licensing authorities or contracting parties will seek to terminate their agreements with CCOO based solely on the appointment of a receiver.

**Licenses**

A state license is required to operate a SNF in California,[32] and the SNF must have a state licensed Administrator.[33] Additionally, the Medicare Provider Agreement and the Medi-Cal Provider Agreement are not contracts but rather are licenses. *See, e.g., PAMC, Ltd. v. Sebelius*, 747 F.3d 1214, 1221 (9th Cir. 2014) ("We have, on occasion, stated that providers and others have contracts with the government in this area, but our decisions have turned on the regulatory regime rather than on contract principles. .... As the Eleventh Circuit Court of Appeals held when hospitals complained of legislative impairment of their contract rights in this area because they had agreements with the Secretary: "Upon joining the Medicare program, however, the hospitals received a statutory entitlement, not a contractual right.").[34] Thus, the Medicare and

---

[32] See Title 22, California Code of Regulations, chapter 3 (dealing with SNFs generally) and sections 72001-72217 (dealing with SNF Licenses specifically).

[33] A nursing home administrator is educated and trained to carry out the policies of a nursing home, and is licensed in accordance with California Health and Safety Code, Section 1416; Title 22, California Code of Regulations, section 72007 (Administrator). The nursing home administrator is charged with the general administration of a nursing home, regardless of whether he or she has an ownership interest and whether the administrator's function or duties are shared with others.

[34] *See also Memorial Hospital v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983) ("Upon joining the Medicare Program, however, the hospitals received a statutory entitlement, not a contractual right."); *U.S. ex rel Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d. 810, 820 (W.D. La. 2007) ("Medicare Provider Agreements create statutory, not contractual, rights."); *Maximum Care Home Health Agency v. HCFA*, 1998 WL 901642, *5 (N.D. Tex. Apr. 14, 1998) ("[A] Medicare service provider agreement is not a contact in the traditional sense. It is a statutory entitlement created by the Medicare Act."). There is some confusion on this point, because in bankruptcy cases the federal government argues that the Medicare Provider Agreement is a contract. However, other than in bankruptcy cases, the government uniformly argues that the Provider Agreements are <u>not</u> a contract but, rather, are a license, and courts uniformly agree. *See* United States' Sur-Reply to Tenant's Reply to its Motion for Summary Adjudication (Statute of Limitations), at 2, *United States v. Tenant Healthcare Corp.*, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005) ("The Provider Agreements referenced by defendants are one page documents that do no more than notify

---

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

Medi-Cal Provider Agreements are in the nature of a license, not a contract.

The appointment of a receiver may require notification to the Centers for Medicare & Medi-caid Services ("CMS"), which runs the Medicare Program. A change in ownership ("CHOW") must be reported to CMS. A CHOW typically occurs when a Medicare Provider has been purchased or leased by another healthcare provider. However, determining when a CHOW has occurred is complicated because the regulation, 42 C.F.R. § 489.18, delineates CHOWs by the type of entity at issue. Purchase of all the stock or membership interests or the merger of another corporation into the provider corporation does not constitute a CHOW. 42 C.F.R. § 489.18 (1994). The appointment of a Receiver should not constitute a CHOW because there is no change in ownership nor a transfer of ownership of CCOO's assets. Instead, the Receiver is vested with jurisdiction and control over the property and the right to take possession of it. See 28 U.S.C. § 754; *see also* 28 U.S.C. § 959(b). Nonetheless, it would be prudent to notify CMS of the appointment. Thus, we recommend you notify CMS of the appointment, and we can help you with that if so desired.[35]

The Medi-Cal Subacute Care license and the Medi-Cal Provider Agreements also require notification of a change in ownership. We have researched the issue of whether your appointment as receiver over the facility requires notification to the California Department of Public Health ("CDPH") of the appointment and any qualifications required for a receiver, including discussions with CDPH. Although the individuals that we spoke with at CDPH have experience with receivers appointed under state law, they were not familiar with a federal court receiver. Additionally, the applicable regulations and statutes deal comprehensively with the appointment of a receiver appointed under state law, but are less clear about the licensing requirements related to appointment of a federal court receiver. *See* Title 22, California Code of Regulations, section 72805 (Duties of a Receiver). So, the path forward for a federally appointed receiver is not as straightforward as for a state court appointed receiver.

---

providers of the statutory and regulatory provisions of the Medicare program and do not in themselves convert the government's statutory and common law remedies into contractual ones."). *See also* Samuel R. Maizel and Jody A. Bedenbaugh, "*The Medicare Provider Agreement: Is It a Contract or Not? And Why Does Anyone Care?*," 71 The Business Lawyer 1207, Fall 2016.

[35] A CHOW must be reported to CMS within 30 days of the change by both the buyer and the seller. 42 C.F.R. § 424.516 (2012). This is accomplished by submitting Form CMS 855A or Form CMS 855B. The default rule under 42 C.F.R. § 489.18 is that CMS automatically assigns the existing Medicare provider agreement to the new owner. See 42 C.F.R. § 489.18 (1994). Automatic assignment allows for the uninterrupted participation of the acquired provider, which translates into uninterrupted Medicare payments. Because of the automatic assignment, the provider is generally not required to undergo a survey by the accrediting organization which normally follows CHOW acquisitions.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Based on our communication with the CDPH Centralized Applications Unit, we strongly recommend that you leave the current Administrator in place since she has experience operating a healthcare facility generally and with this SNF in particular.  Plus, a licensed Administrator is necessary, and unless and until you have an adequate replacement identified, she or someone licensed must be available.  Additionally, we strongly recommend that you notify CDPH of the appointment of a receiver.  The following information should be submitted to CDPH: (i) a cover letter explaining the situation; (ii) Form HS 215A (Applicant Individual Information) for you and the current administrator; (iii) a copy of the initial license application and (iv) detailed resume for you and the administrator. It is possible that CDPH may request additional information in addition to what is initially submitted.  We can help you make this submission.

In any event, we are continuing communication with CDPH to obtain additional information about licensing requirements related to the appointment of a federal receiver and will provide you with any updates to this information.

### Contracts

There are only two contracts which expressly state that the appointment of a receiver would provide a basis to terminate the contract.  Specifically, we looked at Article 4.2.2.9 of a contract between CCOO and Kaiser Permanente which provides that the assignment of a receivership would terminate the contract. Additionally, the terms of a loan taken by CCOO on January 29, 2014 provide that the appointment of a receiver would constitute an event of default, and that upon default, the lender may declare the entire unpaid principal balance under the note and all accrued unpaid interest immediately due.

The order appointing you as receiver has provisions which appear to nullify the rights of any other parties to loans or contracts to effect such *ipso facto* clauses.  Specifically, Order Appointing Receiver And Monitor, Docket No. 100, filed on 3/29/17 (the "Order"), expressly enjoins any action to be taken without your permission, including actions which would "[d]issipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, … attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date) of any … loan … or other agreement executed by any Receivership Defendant or Relief Defendant or which otherwise affects any Receivership Property."  Order, at 8-9, ¶28.C. . . . . This provision arguably also nullifies the ability of Kaiser to terminate the contract with CCOO due to the appointment of a receiver. Further, the Order also prohibits acts which "[i]nterfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to, using self-help … for the purpose of … taking possession of or interfering with … any Receivership Property." Order, at 8, ¶28.A.  Exercising rights under these *ipso facto* clauses would likely be considered an act of self-help to interfere with the

Receiver's rights with regard to the Kaiser Contract, which contract rights are Receivership Property.

Even if the Court were to find that the provisions in the Order discussed above did not suffice, there is an argument that general receivership principles should nullify those provisions. The general issue of whether *ipso facto* clauses in the contracts which purport to terminate the contracts in the event of the appointment of a receiver, are effective in a receivership, or, as in bankruptcy, those clauses are rendered ineffective, is unclear. Unfortunately, there is no provision under receivership statutes which, with regard to ipso facto clauses, nullifies such provisions such as is included in the Bankruptcy Code. 11 U.S.C. § 365(e)(1); *In re S. Pac. Funding Corp.*, 268 F.3d 712, 715–16 (9th Cir. 2001).

Moreover, there is very little case law discussing *ipso facto* clauses in the context of a receivership. The most on-point discussion of this matter took place in *In re Huntington Ltd.*, 654 F.2d 578 (9th Cir. 1981). In that case, an involuntary bankruptcy petition was filed against the debtor by its creditors. Subsequently, the debtor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.* The bankruptcy court then appointed a receiver to arrange the debtor's estate. *Id.* The lease contained an anti-assignment provision. *Id.* at 587. In its analysis, the court began by quoting Section 70(b) of the Bankruptcy Act, which states that "[a] general covenant or condition in a lease that it shall not be assigned shall not be construed to prevent the trustee from assuming the same at his election and subsequently assigning the same." Bankr. Act, § 70(b), 11 U.S.C. § 110(b). Ultimately, the court concluded that "Section 70(b) codified the long-standing rule that a receiver or trustee in bankruptcy is empowered to sell or assign a lease for the benefit of the debtor's estate irrespective of a general anti-assignment clause which purports to prohibit such action." *Id.* at 588 (emphasis added).

Another case that is somewhat on point is *In re Crow Winthrop Operating P'ship*, 241 F.3d 1121(9th Cir. 2001). That case involved a "change of ownership" provision in a contract, which essentially stated that the parking and management rights which the debtor enjoyed while it owned some office buildings would terminate once the debtor no longer owned those buildings. *Id.* at 1123. The Court of Appeals held that "[t]he bankruptcy court did not err in invalidating the change [of] ownership provision as an unenforceable assignment clause under [11 U.S.C. § 365(f)]." *Id.* Even though the clause in the contract was not specifically an anti-assignment clause, the court reasoned that it "look[s] beyond the literal wording of a contractual provision to see whether it operates as a de facto anti-assignment clause in violation of § 365(f)." *Id.* at 1124.

Additionally, even though case law on this is sparse, the same public policy arguments in favor of not enforcing ipso facto clauses in the bankruptcy context should apply to a provision terminating an agreement upon the appointment of a receiver. Namely, the lack of enforcement of such clauses is intended to

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

promote the rehabilitation of the debtor and protect the debtor by enabling the bankruptcy trustee to assume, and thus continue in force, beneficial contracts that otherwise would have terminated automatically. *In re S. Pac. Funding Corp.*, 268 F.3d 712, 716 (9th Cir. 2001). This same logic should apply to ipso facto clauses where a receiver has been appointed.

Finally, similar laws in other contexts suggest that such an ipso facto clause would be unenforceable here. *See, e.g.*, 12 U.S.C. § 1821(e)(13)(A) ("The conservator or receiver may enforce any contract, other than a director's or officer's liability insurance contract or a depository institution bond, entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of or the exercise of rights or powers by a conservator or receiver.").

Attached is Exhibit A with Relevant Contract and License Provisions.

### 1.    License and Contract Summary

As to licensing, a receiver could retain an administrator under a management agreement to manage and operate the facility. A receiver would also make the necessary notifications to the contractual and governmental entities, without any apparent harm to the operations of the facility or patient care.

### E.    Business Operations

According to counsel for CCOO, the facility was originally operated by Oakland Spring Healthcare.  Then Superior Healthcare took over the business but ceased operations in November 2011. CCOO opened a new skilled nursing facility, doing business as Bay Area Healthcare Center, and provided subacute care beginning January 2013.

The April 27, 2017 employee/payroll report indicates a total of 167 salary and hourly employees with one being member, Shirley Ma.  The Business Plan projected a total of 291 full-time employees when fully operational within a 5-year period. The business is trying to meet its job creation requirement. (Uecker Decl., Exhibit 27, p. 23).

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1     In reviewing the CCOO/CCOC Income Statements[36] for profitability during the past few

2 years of operation, the information breaks out as follows:

3     2014 – Net Income     $155,033

4     2015 – Net Income     $117,960

5     2016 – Net Income     $646,220

6     The 2016 financials are unaudited statements.  These statements are consolidated and

7 include expenses for both CCOO and CCOC.  Id.   In reviewing the balance sheets from 2011 -

8 2013 there are significant cash accounts beginning in 2011 through 2013 with annual cash

9 amounts in the sum of $3.7 million,  $2.5 million and $1.4 million respectively. (Uecker Decl.,

10 Exhibit 36).

11     In 2014 - 2016, the cash accounts were around $2 million and there was the addition of a

12 new note payable of $2 million (the 2014 Summit Bank First Loan), and patient receivables were

13 included in the cash assets.  Id.

14     Of interest is that the 2011 - 2013 balance sheets list the Equity Holders and account for

15 investor funds as $9 million in 2011 and by 2013 the amount is $12,500,000. Id.

16     In 2014, the balance sheet shows that  the amount "Due from Affiliates" was $6.3 million

17 and the "Payable to Affiliates" dropped to just $527,062 , indicating a large reduction of over $3

18 million ($3.805 – 527,062).  In 2015 and 2016, the "Other Current Assets" category relating to

19 SFRC/Affiliates showed the 2015 amount "Due from Affiliates" increased to $16.3 million (from

20 $6.3) and the amount "Due to Affiliates" increased to $12.8 million (from $527,062) with  no

21 information on the capital account. The amounts "Due to Affiliates" and "Due from Affiliates"

22 fluctuate from year to year without explanation and sometimes without detail as to which affiliates

23 owe or are owed the funds. There are significant unanswered accounting issues, and it is troubling

24 that no documentation for the insider transfers has been provided.

25

26

27

---

[36] Uecker Decl., Exhibit 35.

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

### 1.   Financial Summary

The balance sheets set forth the Equity/Capital Accounts of the investors through 2013 show  total investments  of $12.5 million. Ma has stated that CCOC  received investors funds of up to approximately $8 million and was unware of the total equity contribution of $12 million plus. Although she did file a lawsuit demanding an additional $ 4 million that CCOC was to receive. The early balance sheets demonstrate that investor funds were in excess of $8 million CCOC received.

### 2.   Billmatt Leasing, LLC

In reviewing the operating expenses, the Monitor inquired into a vendor named Billmatt Leasing, LLC ("Billmatt" ) and was informed that "this is a company that leases ventilators for the use of patients in the subacute care unit. Their rates are well under market." The Monitor inquired further and after research discovered that the  principals of Billmatt are Matthew Henderson (Thomas Henderson's son) and Bill Longwell ( Ma's husband). Per the California Secretary of State's records (as well as address reflected on checks), the business address for Billmatt is 409 13th Street, Oakland CA 94612. Billmatt's agent for service is Leeds Disston, Esq. of Cassalina & Disston, former counsel for SFRC and Henderson.

Further review and inquiry found that on April 1, 2013, CCOO entered into Agreement to Lease Equipment (with Warranty) with Billmatt to lease ventilator equipment (Uecker Decl., Exhibit 37).  CCOO has provided a summary of CCOO accounting of payments to Billmatt for the period 4/1/13-4/30/17 ("CCOO Accounting") (Uecker Decl., Exhibit 38).  The summary reflects total payments of $874,680.00 of which $271,320.00 were "withheld" (no explanation provided) with net payments to Billmatt of $603,360.00.   CCOO payments of $874,680 have been verified against the CCOO Purchase Journal Detail for Billmatt. Id.

In reviewing the available Billmatt East West Bank statements for account ending 6364 for the period August 13, 2013 to November 30, 2016, of note are four (4) 2015 CCOO payments totaling $198,040.00 which are not reflected as deposits to the Billmatt account. (Uecker Decl., Exhibit 40).  This brings up serious issues of where did these payments go, is there another Billmatt bank account or were they paid to another entity. Additionally, the CCOO Accounting

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1    indicates the Cost of Equipment as $454,693.96 whereas Billmatt payments to Post Acute Care

2    LLC and Wayne Sheppard/AMP, Hill-Rom presumably for equipment total $512,654.12.  Further

3    information was not provided.

4           The CCOO Accounting indicates the August 12, 2016, payment by Billmatt to CCOO

5    (Check #1026 8/12/16 $139,055.00) was repayment of a loan to Billmatt. No loan agreement has

6    been provided and payment of $139,055.00 is supported by corresponding Billmatt invoices per

7    CCOO Purchase Journal Detail. (Uecker Decl., Exhibit 40, p.3).

8           The Billmatt transaction is not an arms-length lease with regular monthly payments, a

9    UCC-1 filing, insurance certificates issued to the lessor and notations about "payback loan."

10   Furthermore, it would appear Billmatt had no other clients and was solely created for the purpose

11   of ventilator leasing to CCOO. The Monitor was advised by counsel to CCOO that:

12          "payments were not made by CCOO on a regular basis. The
             payments made reflect cost of purchase of the equipment and
13          maintenance. Now that CCOO is moving away from using Billmatt
             for ventilation services, and after Matt Henderson made several
14          unauthorized draws from the Billmatt account, CCOO believes that
             it is no longer obligated to make any additional payments to
15          Billmatt."

16   CCOO further provided a May 8, 2017 Bay Area Healthcare Center letter terminating the

17   lease for Respiratory Ventilators (Uecker Decl., Exhibit 41). The Monitor was further informed

18   that:

19          "CCOO intends to keep all the respiratory ventilators and maintain
             them through third parties"
20

21   The Lease is not a financing agreement as the Lease Agreement Paragraph 9 requires surrender of

22   the equipment upon termination of the lease to the Lessor and Paragraph 16 states equipment is. . .

23   the sole and exclusive property of Lessor (Billmatt). (Uecker Decl., Exhibit 37).  It is not clear

24   how the Lease can be terminated without return of the equipment to Billmatt.

25                  **3.      Billmatt Summary**

26          Based upon the insider relationship between CCOO and Billmatt, the inability to reconcile

27   CCOO payments to and monies deposited by Billmatt this transaction is suspect and was not

28

1  disclosed by CCOO to the Monitor as a related entity. To date the transaction has not been

2  adequately explained.

#### 4.    Management Fees

4       The Monitor inquired about a CCOC accounting entry "adm mgmt. services" specifically

5  of $100,000 in 2016 and was advised by counsel to Ma that "These are management fees under the

6  Agreement between CCOO and CCOC.  The amount was posted for accounting purposes but was

7  never taken by Shirley Ma."  However the Monitor located a payment issued from CCOO to

8  CCOC in July 28, 2016 for $100,000 for management fees. The check was sent to CCOC at the

9  409 13th Street 8th floor, Oakland, CA address. It is not clear if the management fees were issued

10 on a monthly basis, just posted for accounting purposes or actually issued and sent to the address

11 for the various Henderson entities. Additionally the Monitor located another CCOO check dated

12 June 23, 2016 for $100,000 payable to SFRC with a note "loan."  (Uecker Decl., Exhibit 42).

13 These transactions are questionable with no support.

#### F.    Summary for CCOO and CCOC

15      The CCOO and CCOC entities should be placed in the receivership under the Monitor

16 Order. Health care counsel engaged by the Monitor has reviewed the contracts and finds that a

17 receivership would not result in the termination of license or contracts and that an administrator

18 could be retained to comply with licensing requirements. The Summit Bank loan should not be

19 disrupted by the receivership except as to default interest rate due to the provisions of the Monitor

20 Order.

21      There are several other reasons that justify the expansion from monitor to receiver

22 including the following: the Second Loan placed on the Facility Property was improper, and even

23 though the second Deed of Trust has been removed from the Property, CCOC has not been

24 removed as an obligor under the Promissory Note, and the Billmatt Leasing issue. A receivership

25 ensures that the business operates profitably and in a professional manner, that the Facility

26 Property is not further encumbered, that any vendor leases/contracts are not insider agreements,

27 and all transactions are properly documented.  Additionally a receiver would be in a position to

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  review the potential replacement of the Regional Center and make recommendations to the Court

2  in order to address potential immigration issues.

3  **III.     RECOMMENDATIONS**

4      As detailed above, the Monitor has recommended that the monitorship over 3PL LLC and

5  BHD be expanded to receivership because to do so would not interfere with those entities

6  contractual rights under the CES Agreements or the East West Bank Loan (except to the extent of

7  default interest) and significant other reasons justify the expansion.  Similarly, the monitorship

8  over CCOO and CCOC should also be expanded to receivership because expansion will not

9  interfere with CCOO's licensing as a skilled nursing and sub-acute care facility, or with its

10 contracts and entitlements with Medicaid, Medical, and Kaiser or its loan with Summit Bank

11 (again except to the extent of default interest).  Equally important, a number of transactions

12 described between CCOO and CCOC's insiders warrant expansion of the monitorship to

13 receivership.

14 **IV.     CONCLUSION AND PETITION FOR INSTRUCTIONS**

15     Accordingly, the Monitor requests that the Court enter an Order:

16     1.     Accepting the Monitor's Report and the information presented therein; and

17     2.     Providing for such other and further relief as the Court deems necessary and

18 appropriate.

19 DATED:  May 15, 2017

20

21                         By:  _____/s/  Susan L. Uecker_____

22                              Susan L. Uecker, Monitor

23

24

25

26

27

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036