Elizabeth Berke-Dreyfuss (Bar No. 114651)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: edreyfuss@wendel.com

Attorneys for Susan L. Uecker, Receiver
and Monitor

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC,<br><br>Defendants,<br><br>-and-<br><br>CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC,<br><br>Relief Defendants. | Case No. 3:17-CV-00223-RS<br><br>**MOTION FOR ORDERS: (i) APPROVING COMMISSION AGREEMENT; (ii) APPROVING SALE OF RUNWAY ASSETS TO ACTIVE NET, INC.; AND; (iii) APPROVING OVERBIDDING AND AUCTION PROCEDURES FOR SALE**<br><br>Date: June 22, 2017<br>Time: 1:30 p.m.<br>Place: Courtroom 3<br>450 Golden Gate Ave., 17th Floor<br>San Francisco, CA 94102<br>Judge: The Hon. Richard Seeborg |

**TO: ALL PARTIES, THEIR COUNSEL OF RECORD, AND THE HONORABLE COURT:**

In accordance with this Court's March 29, 2017 Order Appointing Receiver and Monitor ("Order") (Docket No. 100"), Susan L. Uecker, the duly appointed and acting Court appointed receiver ("Receiver") for Defendants San Francisco Regional Center, LLC; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; Immedia, LLC; and Relief Defendants, CallSocket Holding Company, LLC; Central California Farms, LLC; and JL Gateway, LLC ("Received Entities"), hereby moves the Court for an order (i) approving the sale of Runway, the technology incubator business operated by CallSocket, L.P. ("CS I"), to Active Net, Inc. for cash in the amount of $525,000, and (i) approving the overbidding procedures and auction procedures for the sale.

## I.      INTRODUCTION

The Receiver was appointed pursuant to the Order for each of the Received Entities, including CS I. Pursuant to the terms of the Order, the Receiver was authorized to take custody, control and possession of all Receivership Property. (Order, Para. 9. B.) The Receiver was further authorized to manage, control, operate and maintain the Receivership Estates until further order of the Court. (Id. at Para. 9. C.) Moreover, the Receiver may be authorized to sell and transfer clear title to any Receivership Property pursuant to such procedures as may be required by the Court and additional authority such as 28 U.S.C. §§ 2001, 2004. (Id. at Paras. 35, 37). A true and correct copy of the proposed Order Approving Receiver's Motion for Orders: (i) Approving Commission Agreement; (ii) Approving Sale of Runway Assets to Active Net, Inc.; and (iii) Approving Overbidding and Auction Procedures for Sale is attached hereto as **Exhibit A**.

### A.      Runway

Runway is a technology innovation hub for entrepreneurs and corporate partners. It provides a place and the partners to assist early stage start-ups. It includes co-working space, corporate partnerships, events and accelerators. Runway was operated by CS I as a dba and although it was ostensibly to be related to CS I's call center operations, it was not, meaning that

Runway was not included in the CSI EB-5 Business Plan. Runway is located in the Twitter Building at 1355 Market Street, San Francisco, California. The Receiver is seeking an order to sell Runway assets which consist of a lease, with six months remaining on the term, partner contracts, membership contracts, IP including name/domain, brand, goodwill, and any personal property ("Runway Assets"). The current lease expires on November 30, 2017.[1]  Uecker Decl., ¶ 2.

### 1. Commission Agreement

During the State Court Action, the Receiver had been authorized to market and sell Runway, and to enter into a Commission Agreement with two current employees of Runway, Katie Doherty and Joe Vasquez, whereby they would each receive 5% of the sale price. The Commission Agreement was a 90-day agreement, commencing on February 6, 2017, and expiring on May 6, 2017. The Receiver is requesting that the Court approve a new Commission Agreement with Katie Doherty and Joe Vasquez that is identical in all respects, except that the new Commission Agreement provides that they would each receive a 7.5% commission on sale transactions of $750,000 and above. The Receiver believes the increase commission is warranted in order to retain Ms. Doherty and Mr. Vasquez, who are key employees, through the Auction and Overbid to ensure competitive and aggressive overbidding, and through the closing and transition to the new buyer. Uecker Decl., ¶ 3.

### 2. Sale of Runway Satisfies the Receiver's Business Judgment

In the Receiver's best business judgment, the time is also right to sell the Runway Assets, because CS I's call center was closed on July 20, 2016, pursuant to order in the State Court Action, and CS I has no further business operations. Uecker Decl., ¶ 4. Pre-State Court Action receivership, CS I did not maintain separate financial statements for Runway. Runway's financial information had been comingled with CS I, so it was impossible to determine how Runway

---

[1] Prior to the Receiver's appointment in this matter, the Receiver was the receiver in the litigation styled, *Young v. Henderson* et al, Case No. RG15778891, pending before the Superior Court of the State of California, County of Alameda ("State Court Action"). During the prior State Court receivership, the Receiver was authorized not to exercise the option to renew the lease. Uecker Decl., ¶ 2, fn. 1.

performed as a stand-alone entity.  During the State Court Action receivership, in November 2016 and December 2016, Runway only had a modest net income of $38,852, and a net loss of ($113,94.25), respectively.  Since January, and February, 2017, Runway posted net losses of ($56,636.95) and ($9,250.52), respectively.  In March 2017, Runway posted a net income of $28,456.70, but in April 2017, posted a net loss of ($83,068.83).  For the six months from November 2016 to April 2017, Runway lost ($195,590.10).  The Receiver anticipates the economic forecast for Runway to remain the same, if not weaker.  Uecker Decl., ¶ 4.  Equally important, in the Receiver's best business judgment, it is crucial to sell the Runway Assets including assignment of the lease, before the lease expires in November 2017, so that a new owner can negotiate a new term or vacate.  Uecker Decl., ¶ 4.

### 3. Marketing of Runway

On or about February 6, 2017, the Receiver created a data room, and placed all of the pertinent information regarding the Runway Assets in the Data Room.  The Runway employees, under the direction of the Receiver solicited thirty interested parties.  In response to the solicitation, eighteen interested parties signed nondisclosure agreements.  On March 13, 2017, the Receiver requested letters of intent, and in response the Receiver received five letters of intent to purchase the Runway Assets.  The Receiver entered into negotiations with the two highest bidders, but neither of those transactions materialized.  The Receiver now seeks approval of the sale of the Runway Assets to Active Net, Inc. ("Active Net") for $525,000 cash on the following terms and conditions pursuant to the Asset Purchase Agreement. Uecker Decl., ¶ 5.  A true and correct copy of the Asset Purchase Agreement is attached as Exhibit C to the Uecker Decl.  Given the extensive marketing and solicitation for the Runway Assets, and the two prior higher bidders that were unable or unwilling to complete negotiations for the Runway Assets, the Receiver believes the purchase price to be paid by Active Net is fair and reasonable and represents the fair market value of the Runway Asset.  Uecker Decl., ¶ 6.

### B. Active Net Asset Purchase Agreement

Under the terms of the Asset Purchase Agreement, the purchaser, Active Net will purchase the following:

1. **Assets:**

    a. **Runway Platform, Member Online Portal, and Research and Innovation Reports**

    **Runway platform / Member Online Portal** - An online platform for members to access information on Runway office logistics, reserving conference rooms, registering guests, team perks and discounts, and events. Members can also choose to create team and individual profiles to more easily search and connect with other members, partners, and mentors.

    **Research and Innovation Reports** - Runway performs ongoing scouting and evaluation of startups in Corporate Partners' strategic focus areas and produces reports to be reviewed in-person or via video conference with the Corporate Partners' teams. Formats of reports are dependent on Corporate Partner preferences, but typically include information on the market, company, investor, technology and team. Runway has also created a number of industry reports, pulling from public information to compile analysis and overviews of technology, investing, and customer trends in specific verticals.

    b. **Membership Agreements -** the transfer and assignment of the Membership Agreements (the "Membership Agreements") are not subject to the consent of the non-Seller parties to the Membership Agreements.

    c. **Partnership Agreement -** that the transfer and assignment of the Partnership Agreements (the "Partnership Agreements") are subject to the consent of the non-Seller parties to the Partnership Agreements. Receiver agrees to use best efforts to obtain the non-Seller party's consent to the transfer and assignment of the Partnership Agreements to Buyer prior to the Closing.

    d. **Office Lease -** Buyer acknowledges and agrees that the transfer and assignment of the Office Lease (the "Office Lease") is subject to approval of SRI Nine Market Square LLC ("Landlord"). Seller agrees to use best efforts to assist Buyer in obtaining Landlord approval for the transfer and assignment of the Office Lease to Buyer prior to the Closing. Buyer acknowledges and agrees to use its best efforts to assist Receiver in negotiations with Landlord to obtain release of Receiver's Letter of Credit held by Landlord pursuant to Paragraph 6 of the Office Lease and to negotiate directly with Landlord for a replacement Letter of Credit or such other Security Deposit as the Landlord and Buyer may mutually agree upon in connection with Buyer's assignment and assumption of the Office Lease. The transfer and assignment of the Office Lease shall include all tenant improvements that are not affixed to the premises.

    e. **Domain Name -** Runway.is

    f. **Furniture, Fixtures and Equipment**

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

      **g.**     **Goodwill, Trade Names, Trade Marks and Service Marks -** All goodwill associated with the business, CallSocket, L.P. dba Runway.  All trade names, trademarks, and all service marks, including the name Runway.

Uecker Decl., Exhibit C, Asset Purchase Agreement, Art. 2., Exhibits B, C, D, E, F, G.  All of the Assets are described on the Exhibits attached to Asset Purchase Agreement.  Id.  Any asset that is not listed as an included asset, is an excluded asset and will remain the property of the Receivership Estate.  Uecker Deck., Exhibit C, Asset Purchase Agreement, Art. 2.2.

    **2.**     **Liabilities**

Active Net shall not assume any of the liabilities of Runway with the exception of two critical vendor contracts, the ISP contracts with Unwired and Zayo.  Uecker Decl., Exhibit C, Asset Purchase Agreement, Art. 3, Exhibit H.

    **3.**     **Purchase Price**

Active Net shall pay a total of $525,000 for the Runway Assets.  Active Net paid a deposit of $52,500 ("Deposit") upon the signing of the Asset Purchase Agreement and shall pay the remaining $472,500 balance upon the close of escrow. Uecker Decl., Exhibit C, Art. 5, 6.

    **4.**     **Court Approval**

      **a.**     **Overbidding Procedures**

The approval of the sale of the Runway Assets to Active Net and Asset Purchase Agreement is subject to Court approval and is subject to overbidding as provided for in the Asset Purchase Agreement.  Immediately prior to the hearing on the approval of the sale of the Runway Assets and Asset Purchase Agreement, the Receiver will conduct an Auction and Overbid at 450 Golden Gate Ave., 17th Floor, outside of Courtroom 3, San Francisco, California  94102.

        **i.**     **Determination of "Qualified Bidder" Status.**

The determination of bidder qualification is solely within the discretion of the Receiver.  To participate in the Auction and be deemed a "Qualified Bidder," each prospective bidder other than Active Net must deliver to the Receiver the following by no later than five (5) days prior to the date of the Auction:

        1.      a written statement pursuant to which such bidder (A) offers to purchase all of the Assets and the Critical ISP Vendor Contracts and (B) agrees that, if such bidder has the highest bid at the Auction, such bidder will purchase the Assets and the Critical ISP Vendor Contracts on the identical terms and conditions as contained in this Agreement except as to the identity of the bidder and as to price;

        2.      an asset purchase agreement, pursuant to which such bidder proposes to purchase the Assets and the Critical ISP Vendor Contracts from the Receiver, that is identical to the Agreement except as to the identity as to the bidder and the purchase price, signed by an authorized representative of such bidder;

        3.      documentation as requested by the Receiver demonstrating that such bidder is financially capable of consummating the transactions contemplated by the Agreement.  Proof of funds must be in the name of the proposed bidder; and

        4.      a deposit in an amount equal to at least $52,500 that is refundable if such bidder is not the winning bidder at the Auction.

        5.      if the bidder has not already done so, execute a nondisclosure agreement in a form satisfactory to the Receiver.

        **ii.**      **Auction.**

The Receiver shall timely communicate via electronic mail to Buyer and any Qualified Bidders the time and place of the Auction.

        1.      An "Overbid" is any bid or bids made at the Auction that complies with the following conditions:

        (i)      the first Overbid must be an amount equal to at least $750,000;

        (ii)      any Overbid thereafter shall be made in increments of not less than $50,000 more than the any prior Overbid that is the then-highest bid; and

        (iii)      Active Net shall be permitted to bid additional consideration at the Auction.

2. In addition to complying with the above requirements, the Auction shall be governed by the following procedures:

(i) the Auction will be conducted openly, and only Active Net and the Qualified Bidders shall be entitled to make subsequent bids at the Auction;

(ii) Active Net and each Qualified Bidder shall be required to represent that it has not engaged in any collusion with respect to the bidding or the sale of the Assets and the Critical ISP Vendor Contracts and disclose any and all affiliations with the defendants in the *Securities and Exchange Commission v. San Francisco Regional Center, LLC* Action;

(iii) Active Net and each Qualified Bidder or the Qualified Bidder's designated representative participating in the Auction must appear in person at the Auction.

Uecker Decl., Exhibit C, Asset Purchase Agreement, Art. 4.

### 5. Closing

The closing of the sale of the Runway Assets to Active Net will occur under the terms of the Asset Purchase Agreement on or within five (5) days after the District Court signs the Order approving the sale and the Asset Purchase Agreement. Uecker Decl., Exhibit C, Art. 6.

### 6. Termination

If the District Court does not approve the Asset Purchase Agreement, the Deposit is refundable to Active Net. However, if the District Court approves the Asset Purchase Agreement and Active Net fails to close through no fault of the Receiver, the Receiver is entitled to retain the Deposit, the Asset Purchase Agreement is terminated, and all of the Receiver's obligations under the agreement are terminated. Uecker Decl., Exhibit C, Art. 4.2.

### C. Legal Argument

#### 1. This Court Has Inherent Authority To Order The Disposition Of Receivership Assets.

"The power of a district court to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws.

Rather, the authority derives from the inherent power of a court of equity to fashion effective relief." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir 1986).

District courts have the broad power of a court of equity to determine the appropriate action in the administration and supervision of an equity receivership. *See SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005); *see also CFTC. v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the court's supervisory role, and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership for the benefit of creditors.").

In the estate administration context, courts are deferential to the business judgment of bankruptcy trustees, receivers, and similar estate custodians. *See, e.g., Bennett v. Williams*, 892 F.2d 822, 824 (9th Cir. 1989); *Southwestern Media, Inc. v. Rau*, 708 F.2d 419, 425 (9th Cir. 1983); *In re Thinking Machines Corp.*, 182 B.R. 365, 368 (D. Mass. 1995) (rev'd on other grounds, *In re Thinking Machines Corp.*, 67 F.3d 1021 (1st Cir. 1995)).

The Court's powers to administer the receivership and, specifically, to sell receivership assets, are not limited by the terms of private contracts. The Court's authority over the assets of a receivership estate derives from the Court's inherent power to exercise jurisdiction over assets taken into the receivership, rather than from underlying contracts. *SEC v. American Capital Investments, Inc.*, 98 F.3d 1133, 1143-45 (9th Cir. 1996) (approving sale of property over limited partners' objections based on court's equitable powers, irrespective of state law or contract rights). Accordingly, this Court has broad equitable powers and discretion to grant this Motion and authorize and approve the terms of the Asset Purchase Agreement.

**2.     The Court Should Approve The Terms Of Sale Including The Auction And Overbidding**

The Receiver may sell the Runway Assets pursuant to the terms of the Order and 28 U.S.C. §§ 2001, 2004. Order, ¶¶ 35-37 (Docket No. 100). Section 2004 requires that personal property

sold pursuant to an order of a court of the United States be sold in accordance with Section 2001. Section 2001, which sets forth the requirements for sales of real property, requires that property sold either at a public sale on the court house steps, or as the court directs. 28 U.S.C. § 2001(b). [2] After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest or part thereof for cash or other consideration and upon such terms and conditions as the court approves if it finds that the best interests of the estate will be served thereby.

A public sale is one made at an auction to the highest bidder and which all persons have a right to come in and bid. *Offredi v. Huhla,* 60 A.2d 779, 781 (1948)(probate sale). The purpose of the public sale to capture the highest value of the property, and not afford the buyer an opportunity to make off with a bargain at expense of the debtor or creditors. *National Oil & Gas, Inc. v. Gingrich,* 716 N.E.2d 491 (Ind. Ct. App. 1999).

The Receiver's proposed sale procedures, providing for notice to interested parties who have previously executed nondisclosure agreements,[3] an Auction in the Federal Courthouse, outside of the Courtroom and competitive Overbidding immediately prior to hearing on confirmation of the sale of the Runway Assets and approval of the Asset Purchase Agreement for all intents and purposes qualifies the Receiver's sale as public sale.  The combination of soliciting offers, negotiating an Asset Purchase Agreement, holding an open Auction subject to Overbid at the Court substantially complies with the meaning of a public sale under 28 U.S.C.§ 2001(a),(b).

---

[2] Section 2001(b) also authorizes the sale of property by private sale.  However, prior to confirmation of a private sale, the court must appoint three disinterested persons to appraise the property, and no private sale can be confirmed that is at a price less than two-thirds of the appraised value.  28 U.S.C. § 2001(b).  The Receiver is of the opinion that the value of the Runway Assets could not support the appointment of three appraisers, and given the fact that the two prior bidders were unable to complete the negotiations of an asset purchase agreement at higher prices than are being offered suggests that the current price is the fair market value.  Uecker Decl., ¶ 7.

[3] The Runway Assets consist of confidential membership and partner contracts, and IP so that all potential bidders must have already executed a nondisclosure agreement regarding the Runway Assets.  The pool of bidders served with notice of the Auction and Overbidding are the thirty parties who were originally solicited as interested parties.  Uecker Decl., ¶ 7, fn.2.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

009589.0024\4714259.6

MOTION FOR ORDERS APPROVING COMMISSION AGMT; SALE OF RUNWAY, OVERBIDDING AND AUCTION PROCEDURES

10

3:17-CV-00223-RS

In either event, the Section 2001(b) authorizes the Court to approve a sale upon such conditions terms and conditions as the Court approves if it finds that the sale is in the best interests of the estate. The Receiver submits that the proposed sale to Active Net or such other Qualified Over Bidder is in the best interests of the CS I receivership estate because Runway is a "melting" asset, posting losses virtually every month. The closer Runway moves to lease termination, the less value there will be to the Runway Assets and there is insufficient ability to move locations after the lease terminates. Uecker Decl., ¶ 7. The Receiver requests that the Court approve the sale of the Runway Assets as proposed as in the best interests of the CS I Receivership Estate.

## II. CONCLUSION

Wherefore, the Receiver request that the Court approve the Commission Agreement; approve the sale of the Runway Assets to Active Net for $525,000; and approve the proposed Auction and Overbidding Procedures for sale, and for such other and further relief as the Court deems proper.

DATED: May 31, 2017                    WENDEL, ROSEN, BLACK & DEAN LLP

By:  */s/  Elizabeth Berke-Dreyfuss*
Elizabeth Berke-Dreyfuss
Attorneys for Susan L. Uecker, Receiver
and Monitor

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

009589.0024\4714259.6

MOTION FOR ORDERS APPROVING
COMMISSION AGMT; SALE OF RUNWAY,
OVERBIDDING AND AUCTION PROCEDURES

11

3:17-CV-00223-RS