Elizabeth Berke-Dreyfuss (Bar No. 114651)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: edreyfuss@wendel.com

Attorneys for Susan L. Uecker,
Receiver and Monitor

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC,<br><br>Defendants,<br><br>-and-<br><br>CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC,<br><br>Relief Defendants. | Case No. 3:17-CV-00223-RS<br><br>**DECLARATION OF ROBERT C. DIVINE IN SUPPORT OF MOTION FOR ORDERS: (i) APPROVING COMMISSION AGREEMENT; (ii) SALE OF RUNWAY ASSETS TO ACTIVE NET, INC.; AND (iii) AND APPROVING AUCTION AND OVERBIDDING PROCEDURES FOR SALE**<br><br>Date:  June 22, 2017<br>Time:  1:30 p.m.<br>Place:  Courtroom 3<br>     450 Golden Gate Ave., 17th Floor<br>     San Francisco, CA 94102<br>Judge:  The Hon. Richard Seeborg |

I, Robert C. Divine, declare:

1. I am an attorney licensed to practice in the State of Tennessee, and a shareholder in the law firm of Baker Donelson, Bearman, Caldwell, & Berkowitz, P.C. ("Baker Donelson"). The following facts are true of my own personal knowledge, and if called upon to do so, I would and could competently testify thereto except as to those matters that are alleged upon information and belief and as to those matters, I believe them to be true. I make this declaration in support of Susan L. Uecker, Receiver's motion for an order authorizing the marketing and sale of Runway.

**Writer's Background and Qualifications**

2. I have practiced immigration law for 30 years as a member of the American Immigration Lawyers Association. I am the author of Immigration Practice (Juris Publishing), a comprehensive treatise on U.S. immigration law, now in its 15th edition. I served from 2004 to 2006 as Chief Counsel and for a time Acting Deputy Director of U.S. Citizenship & Immigration Services, a bureau within the Department of Homeland Security that adjudicates immigration benefit requests and administers the EB-5 Investor Program. For the last seven years I have been elected Vice President of IIUSA (see www.iiusa.org), the primary industry association of regional centers involved in the EB-5 Program.

3. I have extensive experience serving clients throughout the world in the arrangement of all types of business-based temporary and permanent immigration status, including specialty occupations (H-1B, TN, E-3), individual and blanket international transferee programs (L-1), traders and investors (E-1/E-2, EB-5), medical workers, religious workers, labor certification, national interest waivers and extraordinary ability aliens. I have represented and assisted employers and other parties in some of the largest immigration enforcement investigations and prosecutions. I provide strategic advice and training for employers in their immigration compliance efforts.

4.      I also represent many business developers in creating, managing and using "Regional Centers" that can create indirect jobs toward the 10 new U.S. jobs whose creation can give rise to EB-5 permanent residence for investment in the developers' projects.  I also represent many regional centers, mostly private but some owned by state governments, in obtaining and maintaining their designation with USCIS and overseeing, monitoring, and reporting to USCIS about investment projects and participating investors they sponsor.  I coordinate this work with attorneys supporting securities law compliance in offerings to investors, with economists identifying "targeted employment areas" and projecting indirect job creation, with licensed securities brokers coordinating offerings, and with attorneys obtaining U.S. Government (OFAC) licenses to serve investors from restricted countries.  I also represent individual investor immigrants in obtaining conditional permanent residence and in removing conditions from permanent residence.

5.      I am a frequent speaker on immigration matters at professional events, especially in relation to EB-5 issues.  On January 7, 2011, I testified before the Senate Judiciary Committee regarding the job-creating effects of the EB-5 immigrant investor program and the importance of renewing the regional center authorizing legislation. I have written numerous articles about immigration topics and particularly about EB-5 issues.  Many of those articles are linked and viewable from my law firm biography at www.bakerdonelson.com/robert-c-divine. I have served as an expert witness in U.S. and foreign courts about various topics of U.S. immigration.

6.      I have been retained by the Receiver, Susan Uecker of Uecker & Associates ("Receiver"), to advise and assist her concerning immigration matters in relation to her service as receiver in this action.

7.      I have been asked to address the question of whether the sale of Runway, which has been identified as a dba of CallSocket, L.P., would have any negative impact on the investors in CallSocket, L.P. with respect to their goal of obtaining unconditional lawful permanent residence

under the EB-5 program.  For the reasons discussed below, I believe that the sale of Runway will not have a detrimental impact on the EB-5 immigration prospects of the CallSocket, L.P. investors.

**EB-5 Background**

8. By way of background, the USCIS administers a program that is intended to provide a means by which foreign nationals who invest a minimum of $500,000 in a new commercial enterprise principally doing business in a Targeted Employment Area in the United States to create a minimum of ten full-time jobs for U.S. workers can obtain permanent resident status in the United States.  This is commonly referred to as the "EB-5 Program."  (See 8 U.S.C. §1153(b)(5).)  The statute sets up a two-step process.  The investor submits a Form I-526, together with evidence of his or her legitimate source of investment funds and of the job-creating capital investment project to be funded by the new commercial enterprise invested in.  Upon approval of the I-526 and availability of a visa number, the immigrant investor may process for admission as a conditional lawful permanent resident evidenced by a "green card" (Form I-551) valid for two years from such admission.  During the 90-day window leading up to the expiration of that green card, the investor must submit a Form I-829 to remove the conditions to permanent residence by submitting documentation showing that the investor has sustained the investment in the enterprise and has created or within a reasonable time will finish creating the minimum of ten jobs per EB-5 investor in the enterprise (i.e., permanent green card).

9. USCIS has indicated that in order to meet the EB-5 requirements, all of the immigrant investor's capital must be placed "at risk" in the new commercial enterprise upon which the investor's I-526 petition is based.  Relying on *Matter of Izummi*, 22 I&N Dec. 169 (AAU 1998),[1] when a regional center is involved allowing credit for indirect job creation, USCIS requires that the NCE make all EB-5 capital available to the "job creating enterprise(s)" (JCE(s)) and used for job creating purposes and not for payment of marketing and other expenses of

---

[1] Available at https://www.justice.gov/sites/default/files/eoir/legacy/2014/07/25/3360.pdf.

originating EB-5 capital, of administrative expenses of organizing the new commercial enterprise, of regional center or related fees, or of personal expenses of organizers.

10. According to the USCIS's Policy Manual on Investors (at Chapter 5(A)(2)), for I-829 approval, the investor must show that he or she sustained this at-risk investment through the period of conditional residence. The most conservative approach to satisfying this requirement is to make sure that the capital remains invested at risk in the job-creating activity of the JCE as described in the I-526. However, in a draft policy published August 10, 2015, USCIS suggested that an investor could meet the "sustainment" requirement by showing that the capital was lost in at risk business activity or, in the event of a liquidation of the NCE's interest in job-creating assets after the requisite jobs have been created, by the NCE's "redeployment" of the proceeds in some at risk activity for the remainder of the sustainment period. In discussing the draft policy with stakeholders in 2015, USCIS representatives also tentatively opined (without recording their statements in writing) that the requirement to sustain the investment would end by the time an I-829 petition is due, which is at the end of the two-year period that begins upon the admission of the EB-5 investor as a conditional permanent resident.

11. Since publishing the draft 2015 memo, USCIS has not finalized policy about liquidation and redeployment, but it has confirmed that USCIS does not require the jobs, once created, to persist until the I-829 filing or approval in order to count toward I-829 approval. The recently-published USCIS Policy Manual states at Chapter 5(B):

> In making the determination as to whether or not the immigrant investor has created the requisite number of jobs, USCIS does not require that the jobs still be in existence at the time of the petition to remove conditions adjudication in order to be credited to the investor. Instead, the job creation requirement is met if the investor can show that at least 10 full-time jobs for qualifying employees were created by the new commercial enterprise as a result of his or her investment and such jobs were considered to be permanent jobs when created.
>
> * * * * *
>
> Direct jobs that are intermittent, temporary, seasonal, or transient in nature do not qualify as permanent full-time jobs. However, jobs that are expected to last for at least 2 years generally are not considered intermittent, temporary, seasonal, or transient in nature.

**A Potentially Over-Arching Problem**

12. The SEC complaint alleges that SFRC and its principals commingled the EB-5 capital, including from CallSocket LP, for these enterprises and diverted much of the capital to purposes other than those job creating activities for their respective Enterprises as allowed under the EB-5 program. USCIS could determine, as it has in other cases with similar allegations by the SEC, that such actions preclude investors from establishing that they met the requirement to "sustain investment" in at risk job creating activity, resulting in denial of their I-829 petitions regardless of what happens with the Runway asset. This issue will be the subject of more discussion in the Receiver's Plan of Recovery. USCIS also could use such actions as a basis to terminate SFRC's designation as a regional center, creating an independent basis for denial of I-829 petitions of investors, but with I-829 petitions already filed for all CallSocket LP investors they might be immune to this particular basis for denial.

**Runway-Specific Issues**

13. In light of the USCIS' stated policies and its interpretation and application of those policies, determining whether the sale of Runway could have a negative impact on the investors' immigration status requires an assessment of two factors:

(a) Did CallSocket, L.P.'s business plan and economic analysis submitted to USCIS with the investors' I-526 and I-829 petitions show that jobs were created at Runway using the investors' capital for the purpose of satisfying the immigrant investors' EB-5 requirements?

(b) Even if that were true, would selling Runway's assets and closing it down meaningfully increase the risk of denial of the investors' I-829 petitions?

14. As for the first question, I reviewed CallSocket, L.P.'s business plan and that plan provided only for the establishment and operation of a call center as a means of direct job creation. A copy of the undated CallSocket Business Plan ("Plan" or "Business Plan") I reviewed is attached hereto as **Exhibit A** and is incorporated herein by this reference. This appears to be the same plan that was attached as Exhibit A to the November 21, 2016 Declaration of Max Shapiro submitted in support of San Francisco Regional Center LLC's Supplemental Information Regarding Runway dated November 18, 2016 ("SFRC Supplement") filed in the State Court

1  Action.[2]  According to the Plan, the call center would be operated at two locations—one in the

2  Tribune Tower at 409-13th Street in Oakland, California, and one in the "Twitter" Building at 1355

3  Market Street in San Francisco, California.  The Plan anticipated the creation of "at least 191

4  direct full-time jobs and 267 indirect jobs for a total of 458 jobs within 24 months of operation."

5  Plan, p. 19.  According to the Plan, "[a] wide spectrum of positions will be filled to meet the needs

6  of a thriving call center operation, including the positions in the following table and graph."  Plan,

7  pp. 19-20.  There is no mention of a technology incubator in the Plan.   Attached as **Exhibit B** is a

8  September 2011 report of Beacon Economics prepared for San Francisco Regional Center

9  estimating the economic impact of investments in a "CallSocket" call center business with

10 operations in Oakland and in San Francisco and an unnamed "comprehensive care facility" in

11 Oakland (which appears to be a senior housing project completely unrelated to CallSocket) (the

12 "Economic Report").  The Economic Report categorizes CallSocket, LP under NAICS code

13 561422 for telemarketing bureaus and other contact centers and the broader RIMS II industry

14 561400 for business support services.  The Economic Report presumes $22.7 million in projected

15 revenue based on the business plan, applies the RIMS II multiplier of 20.4832 jobs for each

16 million dollars of revenue for that industry and area, and concludes the business would generate

17 458.8 total new jobs (direct, indirect, and induced). I presume that this report was given to

18 CallSocket investors along with Exhibit A to show USCIS how their investment would create 10

19 direct and indirect jobs for them to show USCIS in their I-526 petitions how they would create the

20 jobs.

21          15.     I have reviewed the Declaration Of James D. Yang ("Yang Declaration") dated

22 November 18, 2016, and filed as part of the SFRC Supplement in the State Court Action opposing

23 the Receiver's motion in that court for approval to sell Runway.  In Paragraph 3 of that declaration,

24 Mr. Yang asserts that "CallSocket's business plan indicated that it would use the EB-5

25 investments from foreign investors to create jobs both at its Oakland call-center facility and San

---

[2] *Young v. Henderson et al.,* <u>Case No. RG15778891, pending before the Superior Court of the State of California, County of Alameda</u> ("State Court Action").

1  Francisco Runway." The Business Plan makes no reference either to "Runway" or a technology
2  incubator. Instead it refers only to call center operations that would potentially be conducted at
3  two specific locations in Oakland and San Francisco. Assuming that Exhibit A is the business
4  plan submitted by investors to USCIS in their I-526 petitions, Mr. Yang's assertion in Paragraph 6
5  of his declaration that the "sale of CallSocket's San Francisco Runway will further jeopardize the
6  limited partners' chances of getting approvals on the I-829 petitions because it will cause the
7  company to further deviate from its initial plan" is incorrect since the Plan makes no mention of
8  Runway or a technology incubator.

9      16.    I have reviewed the project-related portion of an I-829 petition of an investor who
10 filed in 2015. That filing contains a June 1, 2015 letter from Tom Henderson on behalf of
11 CallSocket LP, attached as **Exhibit C**, stating that the company operated its call center operations
12 in the Tribune building and used the Twitter building (1355 Market Street in San Francisco) for
13 marketing of the call center. Henderson's letter said nothing about a technology incubator. The
14 exhibits to the letter contained a printout from an accounting system reflecting categories of
15 expenditures for build-out (over $2 million), furniture (over $200,000), and computer equipment
16 ($55,000) for "Runway, 1355 Market Street." So in effect Henderson claimed to have spent
17 significant capital on the facilities we now know as Runway but did not identify for USCIS what
18 we now understand to be its type of business. It is not clear to me whether the 2015 letter from
19 Henderson consciously hid the different nature of the Runway operations from what had been
20 stated in the original Business Plan or whether the use of the Runway facility only later morphed
21 into an incubator and technology center.

22     17.    CallSocket LP and its investors could claim to USCIS that any jobs created through
23 investment in Runway as a technology incubator could be credited to the investors because such
24 investment was immaterially different from the business plan approved in the I-526 petitions or
25 was done after the investors were admitted as conditional residents-- either way within USCIS
26 policy. It could be argued to USCIS that the services of a technology company incubator facility
27 fall under the RIMS II industry 561400 for business support services, so that the revenues-to-jobs
28 multiplier in the Economic Report submitted in the I-526 petitions was still applicable and the

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

change was not material to the critical USCIS analysis of job creation from the investment. However, as stated in Max Shapiro's declaration, "Runway as a technology incubator earns revenue in three primary ways: membership fees or desk rental fees, corporate sponsorships, and events."  It is not apparent that Runway's business creates the concentration of jobs per square foot of space or per million dollars of revenue that the Economic Report claims call centers do, and USCIS probably would challenge use of the same jobs multiplier for incubator revenues. Nevertheless, investors might argue that they need not claim revenues of Runway as a basis for the NCE's job creation and instead that Runway served as a vehicle to drive sales and thereby increase employment levels of the call center services of CallSocket, as described in the October 27, 2013 email of Allan Young attached as Exhibit C to Max Shapiro's Declaration.  Because Runway has been operated as part of CallSocket LP without separate FEIN, the employees of Runway in the I-829 package are indistinguishable from the call center employees.  I have read in a transcript from initial hearings in the State Court Action receivership that there were only six relatively highly paid employees at Runway. If that is accurate, the impact of Runway in demonstrating 10 jobs per investor for 36 investors is minimal.  I have reviewed the project portion of the I-829 petition package of the last batch of CallSocket LP investors, and that package suggested that there were 240 direct jobs. The economic analysis had said that 146 indirect jobs would result from 230 direct jobs for a total of 376.  With 240 direct jobs, the indirect might be about five more, for a total of 391.  The loss of 6 direct jobs and perhaps 3 indirect jobs from sale of Runway might still leave 380 jobs, enough to cover the 36 CallSocket LP investors even if (1) USCIS disavowed its policy that jobs count even if they are lost before the end of conditional residence and even if (2) USCIS found that an obligation to maintain employment lasted beyond the point of I-829 filing.

18. Moreover, if USCIS considered the use of EB-5 capital for Runway as a "material change," then USCIS could consider this a basis for revocation of the I-526 petitions and termination of conditional permanent residence of the CallSocket LP investors if it found this change to have occurred before the investors were admitted as conditional residents.  See USCIS Policy Manual Vol. 6, Ch. 4C and 5C.  It might be in the investors' best interest, in obtaining I-829

1  approval, for CallSocket LP to sell Runway and use the proceeds to create more jobs in the call
2  center industry that was the subject of the Business Plan and economic analysis.
3      19.   Even if one investor has not yet filed his or her I-829 Form for the same reasons
4  stated above the loss of jobs resulting the sale of Runway probably would not itself negatively
5  impact that investor's I-829 adjudication if enough job creation to cover that investor had occurred
6  before the sale.
7      20.   The analysis above relates only to the requirement of job creation.  USCIS also
8  requires that each investor sustain his or her investment through the end of conditional residence.
9  USCIS has not clarified exactly when the "sustainment period" ends.  The safest course for
10 investors and NCEs is to sustain the investment to the point of USCIS adjudication of the
11 investor's I-829, but USCIS has informally indicated that it may find instead that the sustainment
12 requirement ends at the end of the two year period following the investor's admission, which
13 coincides with the due date for filing the investor's I-829 petition.  In a draft policy document
14 USCIS has suggested that, in the event of a liquidation of an NCE's job-creating assets after the
15 creation of sufficient qualifying jobs, the investor can be found to have sustained the investment if
16 the NCE "redeploys" the liquidated capital in some other "at risk" investment.  USCIS has not
17 finalized the policy and has not clarified such questions as what constitutes such at risk
18 investment, how much time may pass between liquidation and re-deployment, etc.
19     21.   It is my understanding that almost all of the CallSocket, L.P. investors had already
20 filed their I-829 petitions prior to the closing of the call center on July 20, 2016.  For USCIS
21 purposes, pursuant to the USCIS policy quoted above in paragraph 11 of this Declaration, so long
22 as the claimed jobs were created before the end of the two year period of conditional residence, the
23 fact that the jobs are no longer in existence while their I-829 petitions are pending should not harm
24 their immigration status or trigger a denial of their I-829 petitions.  Therefore, I do not expect that
25 sale of any of the assets after the filing of all investors' I-829 petitions will subject the I-829
26 petitions to denial, since I think the obligation to sustain the investment ends at the point of such
27 filing.
28

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 7, 2017 at Chattanooga, Tennessee.

                /s/ Robert C. Divine
                ROBERT C. DIVINE