1  Elizabeth Berke-Dreyfuss (Bar No. 114651)
   **WENDEL, ROSEN, BLACK & DEAN LLP**
2  1111 Broadway, 24th Floor
   Oakland, California 94607-4036
3  Telephone: (510) 834-6600
   Fax: (510) 834-1928
4  Email: edreyfuss@wendel.com

5  Attorneys for Susan L. Uecker, Receiver

6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                      SAN FRANCISCO DIVISION

10

11  SECURITIES AND EXCHANGE                 Case No. 3:17-CV-00223-RS
    COMMISSION,
12
              Plaintiff,
13
         vs.
14                                          **RECEIVER'S RECOVERY PLAN**
    SAN FRANCISCO REGIONAL CENTER, LLC;
15  THOMAS M. HENDERSON; CALIFORNIA
    GOLD MEDAL, L.P.; CALLSOCKET, L.P.;
16  CALLSOCKET II, L.P.; CALLSOCKET III,
    L.P.; COMPREHENSIVE CARE OF
17  OAKLAND, L.P.; NA3PL, L.P.; WEST
    OAKLAND PLAZA, L.P.; CALLSOCKET,
18  LLC; CALLSOCKET II, LLC; CALLSOCKET
    III, LLC; COMPREHENSIVE CARE OF
19  CALIFORNIA, LLC; IMMEDIA, LLC; and
    NORTH AMERICA 3PL, LLC,
20
              Defendants,
21
              -and-
22
    CALLSOCKET HOLDING COMPANY, LLC;
23  CALLSOCKET III HOLDING COMPANY,
    LLC; BERKELEY HEALTHCARE
24  DYNAMICS, LLC; CENTRAL CALIFORNIA
    FARMS, LLC; and JL GATEWAY, LLC,
25
              Relief Defendants.
26

27

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

## I.     INTRODUCTION

Pursuant to paragraphs 49 and 50 of the March 29, 2017, Order Appointing Receiver and Monitor (Docket No. 100) ("Order"), the Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Recovery Plan")Within ninety (90) days of the entry of the Order, the Receiver shall file the Recovery Plan in the above-captioned action, and serve  copies to counsel of record.

## II.     IMMIGRATION OVERVIEW

The immigration overview has been prepared by Robert C. Divine, Esq. of Baker Donelson, Bearman, Caldwell & Berkowitz, P.C. as special immigration counsel to the receivership.  Mr. Divine's declaration ("Divine Declaration") regarding the immigration issues in this report is attached. (**Exhibit 1**).

### 1.     General Background on EB-5 Program

(a)     USCIS policy in such matters is not maturely developed, is arguably incorrect, and subject to change by legislation, regulation, or administrative policymaking or through litigation by the Regional Center (concerning termination of its designation) or by investors (seeking review of denial of their I-526 or I-829 petitions).  Recent informal drafts of legislation prepared by staff of the Senate Judiciary Committee to reform the EB-5 program have contained proposals (1) to require USCIS to hold off from various actions in the wake of SEC enforcement to allow receivers and such parties to seek to recover diverted funds, (2) to allow investors to change sponsorship to other regional centers, and (3) to allow investors to change their investment to other projects and regional centers without losing their place in the queue for visa numbers.  The prospects of such legislation are uncertain.  In January 2017 USCIS issued an advance notice of proposed rulemaking asking wide ranging questions about the roles of regional centers, the grounds for their termination, and related issues (82 FR 3211, 1/11/17) and a proposed rule that would, among other things, allow an investor with an approved I-526 petition to retain his or her place in the queue for visa numbers in connection with a subsequently filed petition including for a different project (82 FR 4738, 1/13/17).  (**Exhibit 1**, Divine Decl., ¶ 9).

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

(b)     By way of background, USCIS administers a program that is intended to provide a means by which foreign nationals can obtain permanent resident status in the United States by investing a minimum of $500,000 in a "new commercial enterprise" principally doing business in a Targeted Employment Area in the United States in order to create a minimum of 10 full-time jobs for U.S. workers.  This is commonly referred to as the "EB-5 Program."  (See 8 U.S.C. §1153(b)(5), which is § 203(b)(5) of the Immigration and Nationality Act (the "Act").) The statute sets up a two-step process.  The investor submits a Form I-526 petition, together with evidence (a) of his or her legitimate source of investment funds and (b) of the job-creating capital investment project to be funded by the new commercial enterprise invested in.  USCIS' normal processing time for I-526 adjudication has ranged from one to currently 20 months,[1] but individual cases could take shorter or longer.  Upon approval of the I-526 and availability of a visa number (for which investors born in mainland China may expect to wait for six or more years after I-526 approval),[2] the immigrant investor may process for admission as a conditional lawful permanent resident evidenced by a "green card" (Form I-551) valid for two years from such admission. During the 90-day window leading up to the expiration of that green card, the investor must submit a Form I-829 petition to remove the conditions on permanent residency by submitting documentation showing that the investor has sustained the investment in the enterprise and has created or within a reasonable time will finish creating the minimum of 10 jobs per EB-5 investor in the enterprise (i.e., permanent green card) (See 8 USC § 1186b, or INA § 216A).  USCIS' normal processing time for I-829 petitions currently is about 2.5 years.  The regulations for this program can be found at 8 CFR §§ 204.6, 216.1, 216.2, 216.3, and 216.6.  Most USCIS policy

---

[1] USCIS processing times can be accessed from https://egov.uscis.gov/cris/processTimesDisplayInit.do. The user should click on "IPO Processing Dates" at bottom right for processing times for the USCIS Investor Program Office, the office that adjudicates EB-5 petitions.

[2] The visa number system in this regard is explained in my article, "The Realities and Implications of Chinese EB-5 Investors' Wait for Visa Numbers," available at https://www.bakerdonelson.com/files/Uploads/Documents/Divine%20The%20Realities.pdf. Newer data suggests that new investors from China may wait longer for visa numbers than as discussed in that article from January 2016.  The wait has been growing since the worldwide limit starting being reached in 2014.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  positions on the EB-5 program have been consolidated in late 2016 in the USCIS Policy Manual,

2  Volume 6, Part G.[3]  (**Exhibit 1**, Divine Decl., ¶ 10).

3          (c)     USCIS has indicated that in order to meet the EB-5 requirements, all

4  of the immigrant investor's capital must be placed "at risk" in the new commercial enterprise upon

5  which the investor's I-526 petition is based.  According to the USCIS's Policy Manual on

6  Investors (at Chapter 5(A)(2)), for I-829 approval, the investor must show that he or she sustained

7  this at-risk investment through the period of conditional residence.  The most conservative

8  approach to satisfying this requirement is to make sure that the capital remains invested at risk in

9  the job-creating activity of the job-creating enterprise as described in the I-526.  However, USCIS

10  recently has published policy that (1) an investor could meet the "sustainment" requirement in the

11  event of a liquidation of the NCE's interest in job-creating enterprises after the requisite jobs have

12  been created if the NCE "redeploys" the proceeds (a) in some at risk activity "consistent with the

13  scope of the NCE's ongoing business" as set forth in the I-526 record (b) "within a commercially

14  reasonable period of time" and for the remainder of the "sustainment period"; (2) once an investor

15  has been admitted as a conditional resident the at risk re-deployment can exceed the scope that

16  was contemplated in the I-526 papers and even if not all the required jobs had yet been created;

17  and (3) the "sustainment period" ends on the day that an I-829 petition is due, which is at the end

18  of the two-year period that begins upon the admission of the EB-5 investor as a conditional

19  permanent resident, rather than 2.5 years later when it is finally adjudicated.[4] (**Exhibit 1**, Divine

20  Decl., ¶ 11).

21          (d)     USCIS does not require that the jobs, once created, persist until the

22  I-829 filing or approval in order to count toward I-829 approval.  The recently-published USCIS

23  Policy Manual states at Chapter 5(B):

24

25  [3] Available at https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume6-PartG.html.

26  [4] See USCIS Policy Manual, Chapters 2.A.2, 4.C., 5.A.2, and 5.C.; Policy Alert, June 14, 2017, available at https://www.uscis.gov/policymanual/Updates/20170614-

27  EB5JobsAndCapitalAtRisk.pdf; and "USCIS Policy Manual Update: Finalizes EB-5 Sustainment and Redeployment of Capital" by Robert C. Divine, attached as **Exhibit 2**

28

In making the determination as to whether or not the immigrant investor has created the requisite number of jobs, USCIS does not require that the jobs still be in existence at the time of the petition to remove conditions adjudication in order to be credited to the investor. Instead, the job creation requirement is met if the investor can show that at least 10 full-time jobs for qualifying employees were created by the new commercial enterprise as a result of his or her investment and such jobs were considered to be permanent jobs when created.

\* \* \* \* \*

Direct jobs that are intermittent, temporary, seasonal, or transient in nature do not qualify as permanent full-time jobs. However, jobs that are expected to last for at least 2 years generally are not considered intermittent, temporary, seasonal, or transient in nature.

(**Exhibit 1**, Divine Decl., ¶ 13).

    (e)    In the big picture, there are two general paths for EB-5 qualification:

    Direct: Under the encoded statute at INA § 203(b)(5), 8 USC § 1103(b)(5), the investor must place the minimum amount of capital into a new commercial enterprise ("NCE") that must be the employer of ten full time U.S. operational workers.

    Indirect: Under temporary, un-encoded legislation that has been extended periodically through appropriations bills since 1992,[5] the NCE may use indirect arrangements to place the full minimum capital in one or more job creating enterprises ("JCEs"), and the investors may be credited not only with employees of the JCEs but also with indirect impact jobs up and down the economic chain from the JCEs. This is allowable only if the investors are sponsored by a "regional center" approved by USCIS.  SFRC is such a regional center.  (**Exhibit 1**, Divine Decl., ¶ 13).

    **2.**    **San Francisco Regional Center, LLC  Background**

    (a)    All but the first two of the Enterprises were organized to loan or invest funds into separate JCEs where the jobs would be created, and San Francisco Regional Center, LLC ("SFRC") was the sponsor identified in each Investor's I-526 petition.  The three

---

[5] See Section 610(a) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-395, 106 Stat. 1828, 1874 (October 6, 1992), as amended.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1  CallSocket NCE's received funds directly into the enterprise to create the jobs, so that the NCE

2  and JCE were the same, but they still planned to count indirect job creation (based on operational

3  revenues) and so still required SFRC sponsorship for that.  Comprehensive Care of Oakland, L.P.

4  ("CCOO LP") subscribed investors directly into the NCE/JCE and treated the first 16 under the

5  "direct" program (apparently because SFRC was not yet approved when those investors' I-526

6  petitions were filed) and subscribed the last 9 investors under SFRC sponsorship enabling them to

7  claim credit for indirect job creation.  (**Exhibit 1**, Divine Decl., ¶ 14).

8           (b)       According to the SEC complaint, SFRC sponsored seven "new

9  commercial enterprises" (the "Enterprises") that were to invest in or loan money to a wide group

10  of projects that were to create jobs in an array of industries in Alameda, San Francisco, and Tulare

11  Counties in California (the "job creating enterprises" or "JCEs").  From review of the case list that

12  came from USCIS and from James Yang, one of the investors' counsel, it appears that the

13  investors in the Enterprises (the "Investors") collectively span the spectrum of stages in the

14  process of pursuing permanent residence under the EB-5 program: some have I-526 petitions

15  pending with USCIS; some have I-526 petitions approved but await availability of an immigrant

16  visa number or await completion of processing for an immigrant visa or adjustment of status

17  within the U.S.; some have been admitted as permanent residents and await the time to file Form

18  I-829 with USCIS to remove conditions on permanent residence; some have filed I-829 petitions

19  with USCIS and await adjudication; and some have received I-829 petition approval and have

20  unconditional permanent residence. For the most part, the Investors in Enterprises that subscribed

21  Investors earlier have Investors who are farther along in the process.  For instance, all Investors in

22  CCOO LP have approved I-526's and have been admitted as conditional residents, almost all have

23  filed I-829 petitions, and about half have I-829 approvals. Similarly, all but one of the 36 Investors

24  in CallSocket, L.P. have filed their I-829s, and the one remaining Investor approaches the filing

25  deadline for I-829.  In the middle, about half of CallSocket III, L.P. Investors have I-526 petitions

26  still pending but the other half have approved I-526 petitions and await visa numbers or have

27  immigrated and await I-829 filings in 2018 or beyond.  And on the other end of the spectrum all

28  27 of the California Gold Medal, LP Investors have I-526 petitions pending.  Mr. Divine did not

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1   have official access to information reflecting which of the Investors with approved I-526 petitions

2   and without pending or approved I-829 petitions may have used such approval and available visa

3   number to immigrate to the U.S. as conditional residents.  This is important, because USCIS

4   policy draws an important (and arguably arbitrary) line between those who have not yet been

5   admitted as conditional permanent residents and those who have. However, Mr. Divine received

6   confirmation from attorneys for some Investor groups concerning which Investors have been

7   admitted as conditional residents.  (**Exhibit 1**, Divine Decl., ¶ 15).

8             (c)      The SEC complaint alleges and the Declaration of Ellen Chen

9   testifies that SFRC and its principals commingled the EB-5 capital for these Enterprises and

10  diverted much of the capital to purposes other than those job creating activities for their respective

11  Enterprises as allowed under the EB-5 program and that the Enterprises may not be on course to

12  create the jobs projected.  These actions and failures have negative implications for the ability of

13  the Investors to meet the requirements to obtain the immigration benefits they sought through their

14  investment.  USCIS could determine that such actions preclude Investors from establishing that

15  they met the requirement to "sustain investment" in at risk job creating activity, resulting in denial

16  of their I-526 or I-829 petitions.  USCIS also could use such actions as a basis to terminate

17  SFRC's designation as a regional center, creating an independent basis for denial or revocation of

18  I-526 petitions of Investors for those investors not yet admitted as conditional residents.

19  (**Exhibit 1**, Divine Decl., ¶ 16).

20             **3.      Framework for Analysis of EB-5 Issues for SFRC-sponsored Investors**

21             (a)      In deciding what to do with SFRC, and the Enterprises and the

22  JCEs, the Receiver must assess the nature of the challenges to immigration qualification, the

23  extent to which any deficiencies may be remediable, and the likelihood of immigration success of

24  the investors under reasonably likely scenarios.  If obtaining immigration benefits is essentially

25  hopeless, then the Receiver may be well advised to ignore immigration considerations and manage

26  or liquidate the entities accordingly.  If obtaining immigration benefits seems reasonably likely,

27  the Receiver may more reasonably consider choosing to undertake more business risk than she

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   would otherwise to pursue courses of action likely to result in achieving those immigration

2   benefits.  (**Exhibit 1**, Divine Decl., ¶ 17).

3         (b)     The comprehensive commingling of funds presents an additional

4   challenge to the Receiver in making the above assessment, because it seems difficult to determine

5   how much of the available funds should be credited to particular enterprises for possible use in

6   pursuing their respective business plans.  (**Exhibit 1**, Divine Decl., ¶ 18).

7         (c)     Mr. Divine noted that one might expect the Receiver to be able to

8   consult with the agency about the best course of action in order to chart a course most

9   advantageous to the investors.  In his experience over the last several years USCIS has refused to

10  engage in such discussions and takes adverse action against the regional center under receivership

11  and against its sponsored investors without consultation despite urgent requests for such.  The

12  Receiver might consider asking the court to require USCIS to engage in such discussions or even

13  to send representatives to the court for discussion of options and of USCIS policies, but Mr.

14  Divine has not seen that done before.  (**Exhibit 1**, Divine Decl., ¶ 19).

15        (d)     There are three essential requirements the Investors need to meet to

16  maintain immigration qualification.  Failure to meet any of the three requirements would be likely

17  to result in EB-5 denials for the Investors, even if one or two of the other requirements are met.

18  (**Exhibit 1**, Divine Decl., ¶ 20).

19      **4.**    **Issue 1: The Investors are sponsored by a regional center in good standing with USCIS.**

20

21        (a)     Because all of the Investors (other than the initial 16 investors in

CCOO LP) were sponsored by a regional center in order to count indirect job creation, they face

22
the risk of USCIS terminating the regional center designation of SFRC.  From observation of other

23  projects in which the SEC has intervened to stop diversion and commingling of invested funds, it

24  seems likely that USCIS may swiftly seek to terminate the designation of SFRC on account of the

25  failure of SFRC to "promote the economy of the region" using the EB-5 program properly, with

26  special emphasis on the wrongdoing of the regional center principal(s) especially when they,

27  through the regional center or independently, also happen to have controlled the NCEs or JCEs or

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  both.  USCIS then tends to use the regional center's termination as a sole basis upon which to

2  deny and revoke the I-526 petitions of investors in the NCEs sponsored by the regional center, not

3  even giving investors a chance to show that they have maintained their investment in the

4  enterprise and have created the jobs (issues #2 and #3 below), and not even waiting for the

5  regional center to complete any available administrative appeals process on the regional center

6  termination.  USCIS recently published policy that termination of a regional center before an

7  investor's admission as a conditional resident constitutes a material change requiring denial or

8  revocation of the I-526, but for an investor who already obtained conditional residence it does not

9  have an effect on I-829, even for claiming indirect job creation.[6] Mr. Divine has seen a May 12,

10  2017 USCIS notice of intent to deny an I-526 petition involving an investor in an enterprise

11  unrelated to this action, stating that change of sponsorship from one regional center to another

12  constitutes a material change requiring I-526 denial thus, it appears that USCIS policy requires

13  denial of revocation of an I-526 of an investor not yet admitted as a conditional resident if the

14  sponsoring regional enters is terminated or changed.  (**Exhibit 1**, Divine Decl., ¶ 21).

15        (b)      In efforts to preserve Investors' claims to immigration benefits, the

16  Receiver could pursue one or more of the following courses of action:

17        *Seek to defend SFRC against termination by USCIS.*  Effort to avoid

18  termination could include removing Mr. Henderson permanently from management and ownership

19  of SFRC and placing it in the control and ownership of a new long term manager who has plans to

20  use the SFRC for further development as well as a commitment to oversee the existing projects in

21  compliance with USCIS policies.  With Mr. Henderson removed from control of SFRC by the

22  Receiver, SFRC could argue that it is not likely to repeat the wrongdoing of the past.  USCIS has

23  shown a tendency to give very heavy weight to the fact of past wrongdoing of the type alleged by

24

25

26   

27  [6] See USCIS Policy Manual, Vol 6, Chapters 4.C. and 5.C; "USCIS Finalizes EB-5 Sustainment and Redeployment of Capital Issues and Consequences of Regional Center Termination," by Robert C. Divine (**Exhibit 2**).

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1    SEC against Mr. Henderson without regard for the current receivership.[7]  USCIS also tends to cite

2    the apparent lack of plans for use of the regional center to develop future job creating projects.  In

3    practice, it would be inconceivable for a new enterprise and its investors to choose sponsorship by

4    SFRC until USCIS affirms the continued designation of SFRC in the aftermath of the receivership

5    and other SEC enforcement.  Thus, a new owner/manager of SFRC would need to try to establish

6    a credible present intention to sponsor new projects once USCIS affirms SFRC's designation.

7                           *Contract with one or more alternative regional centers*.  The

8    Receiver, on behalf of the respective Enterprises, could contract with a regional center already

9    approved for the relevant geographic area (Alameda, San Francisco, and Tulare Counties in

10   California) to take over sponsorship of the investors in the Enterprises.  As stated above, USCIS

11   policy is that change of regional center after an I-526 petition has been filed probably would

12   constitute a material change requiring denial of pending I-526 petitions (and possibly revocation

13   of approved petitions) with the opportunity for the investors to file new I-526 petitions under the

14   new regional center's sponsorship.  And in Mr. Divine's observation USCIS has failed to suggest

15   to any investor the possibility of changing regional centers when USCIS issued notices of I-526

16   denial purely on the basis of an administratively non-final regional center termination. I-526 denial

17   and re-filing is very detrimental to investors born in mainland China, who would lose their place

18   in the long and growing queue for limited visa numbers (delaying their actual immigration for

19   years more) and whose children might consequently be deemed to have "aged out" of derivative

20   eligibility for permanent residence if they have reached age 21.  Any change of regional center

21   would need to be only to support the possibility of a change in policy, regulation, or legislation, or

22   to support investor lawsuits by denied or revoked investors challenging USCIS' "material change"

23   policy as arbitrary and capricious.

24                           *Alternative transfer*. The Receiver could consider making a

25   contractual arrangement with a replacement regional center to take effect immediately only upon a

26   ────────────────────

[7] See, e.g., Matter of P-A-K- (AAO June 9, 2017), available at
27   https://www.uscis.gov/sites/default/files/err/K2%20-
%20Regional%20Center%20Termination/Decisions_Issued_in_2017/JUN092017_01K2610.pdf.
28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1   termination of SFRC's designation, thus giving full chance to avoid SFRC termination (and

2   thereby to avoid the issue of the effect of a change of regional center) while still preserving the

3   arguments that regional center change can be effective without need to deny or revoke petitions.

4              *Argue different treatment for admitted Investors.*  As mentioned

5   above, USCIS recently has issued policy that for an investor who already obtained conditional

6   residence regional center termination does not have an effect on I-829, even for claiming indirect

7   job creation. This primarily affects investors in CCOO L.P., CallSocket, L.P., and maybe

8   CallSocket II, L.P. and CallSocket III, L.P. Investors would assert this policy in their respective I-

9   829 petitions.

10  (**Exhibit 1,** Divine Decl., ¶ 22).

11             (c)      Even if the problem of possible regional center termination could be

12  overcome, at least two other significant problems outlined below still would need to be resolved.

13  (**Exhibit 1**, Divine Decl., ¶ 23).

14             5.      **Issue 2: The Investors "sustained the investment" in the NCE and all
                       the way to the JCE in job creating activity in keeping with the business
15                     plan throughout the Investors' periods of conditional residence.**

16             (a)      USCIS requires that investors not only place the capital in the NCE

17  and not receive any return of capital until the end of their conditional residence (which would be at

18  least until the I-829 is due to be filed two years after admission), but also that the minimum

19  required capital be substantially used for job creating activity in the NCE or, in the case of

20  regional center sponsorship, in the JCE(s).[8]  Non-compliant diversions include payment of

21  marketing and other expenses of originating EB-5 capital, of administrative expenses of

22  organizing the new commercial enterprise, of regional center or related fees, or of personal

23  expenses of organizers.  In other cases, USCIS repeatedly has taken the position that diversion of

24  general capital of an NCE away from the required use in job creation activity precludes any of the

25

---

26  [8]  For this position USCIS primarily relies on *Matter of Izummi*, 22 I&N Dec. 169 (AAU 1998),
    available at https://www.justice.gov/sites/default/files/eoir/legacy/2014/07/25/3360.pdf. USCIS
27  requires that the plan be to use every dollar in compliant investment, but at the I-829 stage the
    regulations allow "substantial" compliance, as discussed further below.
28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  investors in that NCE (who invested only the minimum $500,000) from meeting this requirement.

2  USCIS has taken the position in some recent adjudications of investors in entities (Jay Peak) that

3  extensive commingling precludes investors from showing that they sustained their investment in

4  the job creating project they invested to capitalize and therefore precludes approval of their I-829

5  petitions to remove conditions from permanent residence at the end of the EB-5 immigration

6  process. USCIS has made these findings even in the absence of any evidence that the investors had

7  anything to do with or knowledge of the misconduct. Mr. Divine is not aware of any case in which

8  the SEC has alleged commingling and diversion and then investors obtained approval of their

9  outstanding I-526 and I-829 petitions.  (**Exhibit 1**, Divine Decl., ¶ 24).

10          (b)     Out of the approximately $84 million that SFRC-sponsored

11  Investors contributed in capital, the SEC complaint alleges that Mr. Henderson diverted $9.6

12  million of EB-5 capital to his own personal expenses and unrelated business ventures and that he

13  diverted $7.5 million more to pay extra commissions (beyond the separate administrative fee paid

14  by investors on top of their capital contribution) to overseas marketing agents involved in

15  originating the investors.  Even as to moneys not alleged to be diverted, the SEC complaint alleges

16  a "shell game" of commingling funds among the various NCEs and JCEs sponsored by SFRC.

17  (**Exhibit 1**, Divine Decl., ¶ 25).

18          (c)     For investors who have not already reached the end of their period

19  of conditional residence (again, the I-829 due date), a liquidation of NCE assets and distribution of

20  proceeds to the NCE investors would prevent them from sustaining their investment in the NCE

21  and thereby prevent approval of their I-829 petitions, even if job creation requirements already had

22  been met. Therefore in regard to most of the NCE's (but not CCOO LP and CallSocket LP), a

23  choice must be made between liquidation and distribution of assets and preservation of

24  immigration benefits.  (**Exhibit 1**, Divine Decl., ¶ 26).

25          (d)     In an effort to overcome the immigration consequences of such

26  commingling and diversion, the Receiver can pursue the following options:

27          (i)     *Seek to restore all of the commingled and diverted funds and*

28  *deploy them in job creating activity in keeping with the business plans filed with their I-526*

*petitions.*  USCIS has not published policy reflecting that restoring such funds can restore investors to qualification after the violation, and it is not clear to what extent restoration of less than all of mishandled funds would be sufficient even in the event of a generous interpretation from USCIS, or from a court after denial of petitions.  The regulations for the I-829 adjudication stage at 8 CFR 216.6(a)(4)(iii) and 216.6(c)(1)(iii) seem to provide for a "substantiality" test on this issue, stating:

> The alien will be considered to have sustained the actions required for removal of conditions if he or she has, in good faith, **substantially met the capital investment requirement of the statute and continuously maintained his or her capital investment over the two years of conditional residence.**  [emphasis added]

Mr. Divine is not aware of any USCIS policy statement providing detailed interpretation of this language in the regulations, but the USCIS Policy Manual at Vol. 6, Part G, Ch. 5., § A.2. repeats this substantiality standard, stating:

> When filing a petition to remove conditions, the full amount of required capital does not need to have been invested, but the immigrant investor must provide evidence that he or she has substantially met the requirement.

It would seem that the more the Receiver can recover for restoration, the greater the chance of success on this point could be.  The Receiver must assess the likelihood that such restoration actually could be accomplished, even substantially.  In connection with a prior state court action the Receiver already has sold some significant property that was acquired with commingled funds (not diverted from the collection of "EB-5 entities" as defined in paragraph 13.a. of the declaration of Ellen Chen).  The Receiver may have information reflecting the likelihood of gaining title to and selling assets that Mr. Henderson bought for himself or for unrelated business interests.  It may be quite challenging to figure out which NCE's particular funds actually came from to credit them back properly.  Some NCEs' funds may be restored more substantially than others.  The Receiver might seek to shame or sue the overseas marketing agents, seeking also to pursue assets that they or their principals may hold in the United States or Canada, but that may be found to be unrealistic or impractical.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1        (ii)    *Identify other capital to be deemed diverted*. The Receiver

2 may identify other capital in the JCEs' financing stack that can be deemed to have been used for

3 the otherwise inappropriate expenditures, so that the EB-5 Investors' funds can be deemed

4 properly spent.  USCIS frequently has recognized that other sources could be attributable to

5 expenditures that are not EB-5 compliant as long as the documents governing such sources do not

6 specify uses to which that source's funds were restricted (such as a construction loan limiting use

7 of proceeds to construction expenditures through a draw process).  It is not apparent from the SEC

8 complaint or the offering documents Mr. Divine has reviewed  that the JCEs here had any

9 meaningful capitalization other than EB-5 capital through the NCEs.

10        (iii)    *Add new capital to restore the diverted capital*.  Perhaps the

11 Receiver could find additional capital to inject into the capital stacks of the JCEs, with the hope

12 that those funds could be retroactively allocated to the non-qualifying expenses.  This could

13 include third party equity, loans, or even additional equity from the EB-5 investors injected

14 through the respective NCEs.  USCIS has not published policy recognizing this kind of approach,

15 and there is a meaningful possibility that USCIS would find that, to use an analogy, the glass once

16 broken cannot be glued back together.

17 (**Exhibit 1**, Divine Decl., ¶ 27).

18        (iv)    Investors also could independently pursue their own

19 arguments to overcome the diversion in their I-526 or I-829 petitions:

20        *Diversion from NCE is still capital at risk*.  Investors whose entire

21 capital actually made it to the Enterprise could argue that they met their requirement to make and

22 sustain their investment in the Enterprise as required by the statute, and if the job creation

23 requirement can be met even with less than the intended capital for actual use in job creating

24 activity, the Investors have met their requirements and should not be punished for someone else's

25 misuse of their capital without their knowledge. Mr. Divine would not expect USCIS to accept this

26 argument, but an immigration judge or a federal court might accept it finding USCIS' position

27 arbitrary or capricious.

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

*Substantial compliance.* Even with diversion the investment was substantially used properly, as discussed above with a less than clear standard. (**Exhibit 1**, Divine Decl., ¶ 28).

6.     **Issue 3: The NCEs/JCEs created the requisite jobs, directly or indirectly.**

(a)     Please see above discussion about direct vs regional center/indirect arrangements.  Other than the first 16 investors in CCOO LP the Investors all filed their I-526 petitions for indirect job creation based on SFRC's regional center sponsorship.  Please note that creating the jobs is not sufficient by itself, so if the jobs were created but some of the minimum required capital were diverted, USCIS still could deny or revoke the Investors' petitions. (**Exhibit 1**, Divine Decl., ¶ 29).

(b)     Direct jobs are shown by evidence of actual employment, such as payroll records, tax forms (W-2 and 941), I-9 employment verification forms, etc.  For investors sponsored by a regional center, jobs can be shown by evidence of expenditures on construction,[9] by evidence of operational revenues, and by economic analysis using reasonable methodologies to show the indirect effects of such expenditures or revenues or direct employment.  (**Exhibit 1**, Divine Decl., ¶ 30).

(c)     At the I-526 stage, the investor must show USCIS that the jobs will be created within 2.5 years after USCIS adjudicates the I-526.  The idea of  USCIS policy is to approve I-526 petitions only for investors with credible plans to create the required jobs by the time they will need to file Form I-829 to remove conditions, and the 2.5 years is meant to allow six months for the investor to process for an immigrant visa and be admitted or to adjust status within the U.S. and then two years of conditional residence leading up to the I-829 filing.[10]  At the

---

[9] USCIS policy allows credit for "direct" construction jobs in construction projects that last for two years or more, but otherwise only the "indirect" and "induced" jobs that arise from the construction.

[10]  USCIS has not adjusted its policy to account for the reality that investors born in mainland China who invested after mid-2014 face lengthy waits for visa numbers that will delay their admission and thus their I-829.

RECEIVER'S RECOVERY PLAN                    15                    3:17-CV-00223-RS

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

I-526 stage, job creation is shown either by evidence of jobs already created or by a credible business plan showing how jobs will be created within the prescribed time.  (**Exhibit 1**, Divine Decl., ¶ 31).

(d)  At the I-829 stage, the law requires a showing that the required 10 new jobs per investor have been created or will be created within a reasonable time, which USCIS policy interprets to be one year in the absence of "extreme circumstances" such as force majeure. Mr. Divine is not aware of any USCIS policy determination about whether wrongdoing by principals of the NCE or JCE (in the absence of collusion by the investor) can be "extreme circumstances" justifying consideration of plans for job creation more than one year after filing Form I-829.  (**Exhibit 1**, Divine Decl., ¶ 32).

(e)  USCIS policy gives credit for full-time jobs that were created by the new commercial enterprise as a result of the investor's investment and were expected to last two years when created, even if the jobs no longer exist at the time the I-829 is filed or adjudicated. While USCIS' Policy Manual does not mention exceptions to this policy, however, in some cases USCIS has determined that jobs on the NCE's or JCE's payroll could not be credited because they were not created in good faith, since the revenues of the enterprise were insufficient to justify the employment levels.  In other words, investors may not be credited with full employment when an enterprise artificially uses up the EB-5 capital on an obviously unsustainable trajectory of employment without having or reasonably expecting the business to support that payroll. (**Exhibit 1**, Divine Decl., ¶ 33).

(f)  In the absence of an agreement among investors otherwise (such as in the Limited Partnership Agreement), USCIS credits jobs created by an NCE to the NCE's investors in the order in which they file their I-829 petitions.  At least one of the Enterprise's Limited Partnership Agreement provides authority for the General Partner to allocate jobs among investors in the order in which they are admitted as conditional permanent residents.  Since an investor's Form I-829 is due exactly two years after such admission (but can be filed up to 90 days earlier), the USCIS default policy and the Enterprise's policy are roughly equivalent.  The Receiver must consider that actions to create some jobs, but less jobs than are required to meet the

1   requirements of all Investors in an Enterprise, may benefit earlier-immigrating investors while

2   leaving later-immigrating investors unqualified for immigration approval.  (**Exhibit 1**, Divine

3   Decl., ¶ 34).

4            (g)       The Receiver must determine how many full-time jobs expected to

5   last for two years have been created and could be created within the necessary time frames for the

6   Enterprises' respective Investors to be successful in their I-526 and I-829 filings.  (**Exhibit 1**,

7   Divine Decl., ¶ 35).

8            **7.        Resulting Considerations**

9        Stepping back from the discrete requirements discussed above, in order to preserve

10   opportunities for EB-5 investors sponsored by SFRC to obtain their immigration benefits (should

11   the Receiver and Court determine that such benefits are likely enough to be realized to justify the

12   effort and risk reduced economic returns in the process), the Receiver should consider the

13   following steps and issues, not necessarily in this order:

(a)    Continue to seek guidance from USCIS concerning a number of
       issues identified above that are not clear in USCIS published policy.
       From Mr. Divine's recent experience he does not expect useful
       response from USCIS, but one may keep asking.

(b)    If there seems to be a meaningful chance to meet the "sustainment"
       and job creation requirements otherwise for investors who have not
       yet been admitted as conditional residents:

       (i)     Seek bids from qualified persons to buy and operate SFRC
               indefinitely, including to sponsor new projects, with or apart
               from its ownership and control of the NCEs and JCEs; or

       (ii)    Seek bids from regional centers approved for the relevant
               counties to replace SFRC as the sponsor of the Enterprises
               and their investors, to take effect either immediately or upon
               termination of SFRC's designation by USCIS, to preserve
               arguments for investors in litigation against USCIS.

(c)    Prepare to defend SFRC from the USCIS Notice of Intent to
       Terminate the regional center designation of SFRC that is expected
       to be issued soon.

(d)    Forensically assess the flow of capital from escrows through NCEs
       and beyond and asses the feasibility and extent of restoration of
       capital to the rightful NCEs and JCEs. Determine whether all or
       substantially all funds could be restored to some or all such entities
       to meet USCIS standards for "sustainment of the investment."

RECEIVER'S RECOVERY PLAN        17                    3:17-CV-00223-RS

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

(e)     Determine the state of development and operations of each NCE/JCE pairing, how much capital has been spent legitimately in the JCE, how much more capital actually is available or can be recovered, how many jobs have been created, and how many more jobs could be created.

(f)     Report to the Court and the Investors the assessment of the feasibility of immigration success and the risks of losing capital that otherwise could be liquidated and obtain input from investors about their interest in taking further business risk to seek immigration benefits.

(g)     Determine whether to liquidate one or more of the entities or to pursue the business plans toward job creation to support immigration efforts of the Investors.

(h)     To the extent projects are pursued rather than liquidated, prepare the required documents about the project's planned or actual use of capital and job creation.  Given the SEC's allegations of improprieties by the principal of SFRC, which in turn seems to have controlled the NCEs and JCEs, one could expect USCIS to scrutinize more heavily than usual the assertions in the filings already made.  Prior packages for I-829s might need to be reviewed for accuracy.

(**Exhibit 1**, Divine Decl., ¶ 36).

## B.     IMMIGRATION ISSUES - PROJECT BY PROJECT

The immigration issues section titled "I-526 And I-829 Status And Risks" on a project by project basis was also prepared by Robert C. Divine, Esq. of Baker Donelson, Bearman, Caldwell & Berkowitz, P.C. as special immigration counsel to the receivership. (**Exhibit 1**).

(a)     Having outlined above the more general considerations and challenges, the following attempts to apply the considerations to what is to understood about the specific projects sponsored by SFRC.  The documents reviewed are set forth in the Divine Declaration  (**Exhibit 1**, ¶ 6). The USCIS case chart does not indicate the date as of which it was current, it does not show if or when any investor who has not filed I-829 petition was admitted as a permanent resident, and it does not show when the I-526 petitions were filed (which would give a hint as to whether the investors who have not filed I-829 might have entered the U.S., since as of June 1, 2017 Investors born in mainland China could obtain a visa number only if their I-526

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  petition had been filed before June 8, 2014).[11] James Yang has provided some of that information

2  informally.  (**Exhibit 1**, Divine Decl., ¶ 37).

3          (b)     The allegations of commingling and diversion of capital seem to

4  affect all projects, and to that extent all Investors are at risk of denial based purely on the failure to

5  sustain the investment.  The comments below are not informed by any data or analysis about the

6  exact nature or extent of commingling and diversion affecting particular projects other than some

7  general conclusions suggested by Ellen Chen in her declaration.  Thus, they do not suggest any

8  project-specific course of action to attempt to remedy the threat of denial.  It is entirely possible

9  that all other efforts could prove useless (1) if the Receiver cannot arrange to restore the EB-5

10 funds to be properly spent on job creation in their originally intended project and USCIS accepts

11 such remediation as curative of the problem, or (2) if USCIS or reviewing courts will not accept

12 the argument that it was sufficient for the investors to have placed and kept their capital at risk in

13 the NCE and created sufficient jobs in the JCE without regard to diversion of some of the capital

14 from the intended job creating uses without knowledge of the investors.  (**Exhibit 1**, Divine

15 Decl., ¶ 38).

16          (c)     The threat posed by termination of the designation of SFRC as a

17 regional center hangs over some or all of the investors in most of the projects who have not

18 already have been admitted as conditional residents.

19 **C.    COMPREHENSIVE CARE OF OAKLAND AND COMPREHENSIVE
        CARE OF CALIFORNIA - 1833 10TH AVENUE, OAKLAND, CA**

20     **1.    Overview**

21      Comprehensive Care of Oakland, L.P. ("CCOO") and, its general partner, Comprehensive

22 Care of California, LLC ("CCOC") operate a 99 bed skilled nursing facility with 66 beds

23 designated as sub-acute care located at 1833 10th Street, Oakland, CA (Facility Property).  The

24 members are as follows:

25

---

26 [11] For current and historical Visa Bulletins, see https://travel.state.gov/content/visas/en/law-and-

27 policy/bulletin.html, and the relevant date in each chart is under "A. Final Action Dates for
   Employment-Based Preference Cases" in the final row for "5th Regional Center (I5 and R5)."

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  **CCOO:**

2  CCOC                                      40 % interest

3  Investors                                 60% interest

4  EB-5 Investor Limited Partners

5  **CCOC:**

6  **Shirley Ma**                            **50% interest**

7  SFRC                                      50% interest[12]

8          **2.      Business Plan And Investor Information**

9          Under its Business Plan, CCOO was to be capitalized with $12.5 million from 25 EB-5

10 Investors. CCOO currently has title to the Facility Property. The Business Plan provided for the

11 usage of EB-5 funds as capital to acquire the property and complete renovations in the interior

12 space with a budget of $2.3 million as well as to hire and train 291 full-time employees when fully

13 operational within a five year period.  Both of the entities, CCOO and CCOC, have consolidated

14 operations to include both the business and real estate.

15         After review of the USCIS information submitted to the SEC (USCIS Records), Central

16 Escrow information, and 2015 CCOO Tax Return, the EB-5 Investor funds invested for the CCOO

17 Project would total $12,500,000 (25 investors x $500,000 each). Typically each Investor deposited

18 $500,000+ and then various costs were charged for escrow, syndication and other fees.

19         Per CCOO USCIS Records, twenty CCOO Project Investors have had I-829 Receipts

20 issued and eleven Investors have had I-829 approved. There are noted Investor Exceptions

21 outlined as follows:

22                 (i)      Only two CCOO Investor funds went through Central

23 Escrow. To date, Receiver is unable to identify deposits of the balance of Investor funds for

24 CCOO Investors which did not go through Central Escrow. (**Exhibit 3**).

25

26 _____

27 [12] The Receiver is informed that Ms. Ma contends that she purchased SFRC's or Thomas
Henderson's interest in CCOC, and that she is now the sole member. The Receiver contests that
28 transaction and is investigating it further, and reserves all rights with respect to that transfer.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

This entity is different from the other EB5 entities as it started as direct job creation without escrow accounts and then added the SFRC Regional Center allowing for indirect job creation and escrow accounts for Investor funding.

### 3.      Current Business And Real Estate Status

The business was recently placed into the Receivership. The Receiver is working with the Administrator to continue operations. The Receiver has been advised that some 160 jobs have been created while 185 are required. The goal would be to complete the job requirement by 2018. The Receiver is advised not all Investor funds were provided to the entity, and that CCOO is short some $4 million+. However a loan of $2 million was obtained and secured by the property in order to fund cash flow.

### 4.      I-526 And I-829 Status And Risks For CCOO

CCOO  is both the Enterprise and the JCE, without any separate investment enterprise. The project was organized and the first 16 Investors subscribed and filed I-526 petitions to USCIS as "direct" Investors without any regional center sponsorship before SFRC was approved by USCIS as a regional center on November 30, 2011.  This means that these 16 Investors only can claim jobs for 160 direct employees of CCOO.  All 16 Investors were admitted as conditional permanent residents, since the USCIS chart assigns an "alien number" to them, which normally only happens at the point of immigrant admission.  Nine of the 16 appear to have received I-829 approval, and the USCIS chart shows a case number but no action on the other seven direct Investors' I-829 petitions.  (**Exhibit 1**, Divine Decl., ¶ 40).

Of the nine regional center sponsored Investors, who could also claim indirect job creation, one was denied or withdrew at the I-526 stage and never immigrated (and presumably was refunded), two have I-829 petitions approved, and two have I-829 pending with USCIS.  The other four have been admitted as conditional residents but have not reached the point of filing their I-829 petitions or the end of their conditional residence period.  (**Exhibit 1**, Divine Decl., ¶ 41).

All CCOO investors at least have been admitted as conditional residents.  Therefore, under newly announced USCIS policy, termination of the regional center will not hinder the regional center sponsored Investors from claiming credit for the indirect job creation they need to qualify

for I-829 approval.  They must maintain their investment in the NCE through the end of conditional residence, which is when their respective I-829 petitions are due.  CCOO is a going concern skilled nursing facility apparently operating profitably, so as long as the owners or Receiver do not sell the NCE before the end of their conditional residence (the date their I-829 petitions are due), the investors can have a chance of meeting the requirement to sustain their investment, subject to issues discussed below.  (**Exhibit 1**, Divine Decl., ¶ 42).

The economic analysis prepared for the regional center sponsored Investors (and approved by USCIS when it approved the I-526 petitions) projected that if 185 direct jobs were created, this would result in 55 indirect and induced jobs, for a total of 240, which would be just enough for the 24 investors who have immigrated.  CCOO currently employs about 160 workers, but it has reasonable plans to increase employment to 185.  Thus, it appears that all 24 Investors can meet their job creation requirement through continued operation of CCOO.  (**Exhibit 1**, Divine Decl., ¶ 43).

However, it appears that only $8 million of the $12 million invested by the 24 active CCOO Investors actually made it to CCOO, with $4 million diverted through SFRC.  It appears from the Declaration of Ellen Chen that some of the $8 million might have been first used to buy assets or pay other expenses for CallSocket or other entities but then other capital commingled from other Enterprises was restored to CCOO , and it is not clear what USCIS might make of that. The Receiver can try to recover and restore some of the net diverted funds to CCOO and use them perhaps to repay financing that someone might have had to invest in order to cover for the missing EB-5 capital, treating that other capital as bridge financing that USCIS policy allows EB-5 capital to repay.  Or restored capital might be used for marketing or other expenses to expand operations to the point that the last of 185 direct employment positions could be filled, as is needed.  Even without any restoration, investors could argue in their I-829 petitions that they substantially met the investment requirement because (1) they invested in good faith with no knowledge or expectation of or participation in the diversion, (2) two thirds of their capital made it to and was spent in job creation in the Enterprise, and (3) the required jobs have been created.  USCIS might find that failure of the missing EB-5 capital to make it to the Enterprise constitutes a more material

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

failure to substantially meet the investment requirement.  Investors can argue that they had no control over that and should not be penalized for it and it should not make a difference at which level Mr. Henderson diverted the funds.  It is not clear how USCIS would consider this. (**Exhibit 1**, Divine Decl.,  ¶ 44).

Because CCOO is a functioning and apparently self-sustaining business on its way to create the necessary number of jobs, and because all of its investors have been admitted as conditional residents, the major problem is meeting the "sustainment of investment" requirements.  (**Exhibit 1**, Divine Decl., ¶ 45).

While USCIS might deny remaining I-829 petitions on that basis alone, there is a credible opportunity for the Investors to be approved on the basis of substantially meeting the sustainment requirement.  The last four investors need CCOO to remain operational in order to maintain their investment until they reach the end of their conditional residence period.  Id.

### 5.    Recommendation

These Entities (CCOO and CCOC) were added to the Receivership on June 5, 2017 pursuant to the Order Extending Scope of Receivership. The Receiver is working with the existing Administrator regarding ongoing operations. It appears that this entity may be able to complete the job creation requirement and would try to work through the use of investment funds requirement in order to obtain the final I-829's for the Investors.

The Receiver anticipates obtaining a valuation of the business and real estate assets.

### D.    CALLSOCKET, L.P.

#### 1.    Overview

CallSocket, L.P. and CallSocket, LLC (CS) funded and operated a call center business in Oakland and an incubator technology business ( Runway) in San Francisco, CA.  The members are as follows:

**CallSocket, LP:**

| | |
|---|---|
| CallSocket, LLC | 40% interest |
| Investors | 60% interest |

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

**CallSocket, LLC:**

| | |
|---|---|
| SFRC | 85% interest |
| Clement Chin | 10% interest |
| Max Shapiro | 5% interest |

**SFRC:**

| | |
|---|---|
| Thomas Henderson | 50% interest |
| Matthew Henderson | 50% interest |

### 2.      Business Plan And Investor Information

Under the EB-5 program, CallSocket, LP is the New Commercial Enterprise ("NCE") and the Job Creating Entity ("JCE").  The Business Plan provided for the use of EB-5 funds of $15 million from 30 investors.  (**Exhibit 4**). The loan proceeds were to be used to facilitate the call center operations 24 hours a day and 7 days a week and build out the call center premises located at the Tribune Tower in Oakland and the incubator space at the Twitter building at 1355 Market Street, San Francisco, CA. CS was to create 191 direct full-time jobs and 267 indirect jobs for a total of 458 jobs within 24 months of operation. CS also planned to hire and train 500 full time employees when fully operational within five years.

After review of the USCIS investor status information submitted to the SEC, ("USCIS Records"), Central Escrow information and the 2015 CS Tax Return, the EB-5 Investor funds invested for the CS Project would total approximately $18,000,000 (36 Investors x $500,000 each). Typically each Investor deposited $500,000+ and then various costs were charged for escrow, syndication and other fees.

Per the CS USCIS Records, 33 of the CS Project Investors have had I-829 Receipts issued. There are noted Investor Exceptions outlined as follows:

(i)      The Receiver received funds in April 2017 from Central Escrow for one CS investor in the amount of $550,000.00. These funds are being held by the Receiver.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1       (ii)  One investor, whose investment funds were received by

2   Central Escrow and transferred to CS, does not appear on the CS USCIS Records but does appear

3   on CS 2015 Tax Return.

4       (iii)  Three investors appear on CS USCIS Records and 2015 CS

5   Tax Return but no receipt/transfer of investor funds reflected on Central Escrow summary or

6   identified as deposited directly to CS account.  (**Exhibit 5**).

7      **3.**  **Current Business And Real Estate Status**

8      The call center business was closed on July 20, 2016 pursuant to an order of the State

9   Court issued in the State Court Action[13] due to insufficient revenues to sustain the business. The

10   sale of the assets of Runway was approved by minute order (Docket No. 183) entered on June 22,

11   2015 by the the District Court.

12      CallSocket Holding Company, LLC ("CSHC") held title to the real estate located at 409

13   13th Street in Oakland, CA. However based on the tracing of funds prepared by Marvin Tate CPA

14   in the State Court Action ("Tate Tracing"), the property was purchased with CS, LP funds of

15   $500,000 and SFRC/CSHC/CCOO, L.P. funds of $1,340,000.  (**Exhibit 6**). The real property was

16   sold on December 29, 2016 for $20,400,000 gross and $10,326,326 net per the settlement

17   statement.  (**Exhibit 7**).

18      **4.**  **I-526 And I-829 Status And Risks For CS**

19      Like CCOO , CS, L.P. also was both the Enterprise and the JCE, although apparently all

20   Investors were sponsored by SFRC and planned to take credit for indirect job creation through the

21   operation of a call center business.  Thirty-six Investors placed capital in CS, even though the

22   Business Plan only called for 30.  It appears that all of the Investors have been admitted as

23   conditional residents, and all but one have filed their I-829 petitions (Hong Zhao, due August 4,

24   2017). The packages filed with USCIS for the I-829 petitions asserted ultimately that all of the $18

25   million EB-5 capital investment had been spent in the project (much of it in buying and renovating

26

27   ---
[13] *Young v. Henderson et al.*, Case No. RG15778891, pending before the Superior Court of the
State of California, County of Alameda.

28

1  office space) and that all of the required jobs had been created through the direct employment of

2  more than 230 direct full-time workers and 146 indirect and induced jobs determined by

3  multiplying the 230 direct jobs by a multiplier provided in the RIMS II economic model for the

4  broad industry category for business support services.  (**Exhibit 1**, Divine Decl.,  ¶ 46).

5  USCIS policy requires that the Investors sustained their investment until their I-829

6  petitions were due.  Almost all of the CS Investors had filed their I-829 petitions (within 90 days

7  of when due) before the Receiver started selling assets associated with CS.  It seems unlikely that

8  USCIS would find that these sales prevented them from meeting their "sustainment" requirement."

9  What may be evaluated in the I-829 adjudication, in light of the SEC allegations and investigation,

10 is whether the capital that came into CS was used properly by and remained in CS.  Diversion of

11 capital from CS  into other entities or to Mr. Henderson personally and commingling with other

12 entities, all before the Investors reached the end of their "sustainment period," could be found to

13 undermine the "Investors" eligibility even if the jobs were created and even if the capital actually

14 started at CS.  (**Exhibit 1**, Divine Decl.,  ¶ 47).

15 USCIS might audit and challenge CS claims of employees, but it is not currently apparent

16 that the workers claimed were not in fact employed at the time the respective filings were made to

17 USCIS.  The facility at the Twitter Building at 1355 Market Street in San Francisco was referred

18 to in all immigration filings as a sales office for the call center business when in fact it was a

19 technology incubator. If this "Runway' technology incubator business was pursued before the

20 Investors were admitted to the U.S. as conditional residents, USCIS could use this inconsistency

21 with the business plan as "material change" and thus a basis to deny I-829 petitions on the ground

22 that the I-526 petitions were approved in error.  Investors would counter that the number of

23 workers involved in the Runway incubator (reportedly only about six in 2017) is immaterial, the

24 salaries of those particular incubator employees were  unusually high (so that their indirect effect

25 was even greater than each call center worker), and the industry of "business support services"

26 would cover the incubator workers anyway.  If the use of the Twitter facility for a technology

27 incubator rather than a call center sales office occurred after the investors were admitted as

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1  conditional residents, USCIS policy would not support a challenge even to a material change to

2  the business plan.  (**Exhibit 1**, Divine Decl.,  ¶ 48).

3  CS employment dwindled and ultimately ended, but USCIS policy allows the workers to

4  be counted as long as the jobs were created originally with the intention that they be permanent (to

5  last at least two years).  There is no evidence that such intention did not exist.  (**Exhibit 1**, Divine

6  Decl., ¶ 49).

7  Most importantly, because almost all of the Investors have reached the end of their

8  "sustainment period" and created enough jobs before filing I-829 petitions, and because the

9  overwhelming majority of operations of CS have been disposed of, it does not appear that

10  prospective action in managing or disposing of the remaining CS business operations will have

11  meaningful impact on the adjudication of the Investors' pending I-829 petitions.  The main issue of

12  concern is whether substantially all of their investment made it into CS and remained there

13  through the end of their sustainment period.  If it did not, then the Receiver faces challenges of

14  recovering diverted funds and what to do with them if diverted.  (**Exhibit 1**, Divine Decl.,  ¶ 50).

15  More likely, Investors would need to rely on arguments of substantial compliance as

16  discussed above.  Id.

17  **5.       Recommendation**

18  CS I-829's should continue to be processed by USCIS. (USCIS does not require that the

19  jobs, once created, persist until the I-829 filing or approval in order to count toward I-829

20  approval.)

21  The Receiver recommends the completion and closing of the Runway asset sale.

22  **E.     CALLSOCKET II, LP**

23  **1.       Overview**

24  CallSocket II, LP and CallSocket II, LLC ("CS II") funded and currently operate a call

25  center business with limited personnel in Oakland, CA.   The members of CS II are as follows:

26  **CallSocket II, LP:**

27  CallSocket II, LLC                 61.666657% interest

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

| | |
|---|---|
| Investors | 48.333343% interest |
| **CallSocket II, LLC:** | |
| SFRC | 50% interest |
| Allan Young | 50% interest |
| **SFRC:** | |
| Thomas Henderson | 50% interest |
| Matthew Henderson | 50% interest |

### 2.    Business Plan And Investor Information

Under the EB-5 program, CallSocket II, L.P. ("CS II") is the NCE and the JCE.  The Business Plan provided for the use of EB-5 Funds in the amount of $15 million from 30 investors. (**Exhibit 8**). The loan proceeds were to be used by CS II to facilitate the call center operations twenty-four hours a day, seven days a week, located on four floors of 519 17th Street (Dufwin Building), Oakland, CA.  During the State Court Action receivership, CS II was initially located at the Tribune Tower and subsequently moved to one floor of the Dufwin Building. CS II was projected to create 458 direct and indirect jobs and will create 300 direct full-time jobs within 24 months. They planned to hire and train a total of 373 employees when fully operational in five years. The Receiver obtained a CS II, USCIS Expenditures submittal from Marvin Tate, CPA with a summary attached. (**Exhibit 9**). Based on the filing of I-829's, it appears that a CS II submittal was filed with USCIS. The summary brings to light issues relating to use of funds and job creation.  In particular in the "Wages" category under CS allocation and SFRC allocation columns indicates at April 30, 2016 a total of $2,782,381 and at May 31, 2016 at total of $3,316,060 before any CS II employees were hired or jobs created.

After review of the USCIS information submitted to the SEC (USCIS Records), Central Escrow information and 2015 CS II Tax Return, the EB-5 Investor funds invested for the CS II Project would total approximately $15,000,000-$16,000,000 (30-32 Investors x $500,000 each). Typically each Investor deposited $500,000+ and then various costs were charged for escrow, syndication and other fees.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1    Per the CS II UCIS Records, no CS II Investor has had an I-829 Receipt issued.  There are

2    noted Investor Exceptions outlined as follow:

3            (i)      One Investor, whose investment funds were received by

4    Central Escrow and transferred to CS II, does not appear on the CS II USCIS Records or 2015 CS

5    II Tax Return (but does appear on NA3PL, L.P.  I-526 Case Investor listing).

6            (ii)     One Investor appears on CS II USCIS Records and 2015 CS

7    II Tax Return but no receipt/transfer of investor funds reflected on Central Escrow summary or

8    identified as deposited directly to CS II account.

9            (iii)    Two investors, had investment funds refunded by Central

10   Escrow but still appear on CS II USCIS Records but are not reflected as Investors on 2015 CS II

11   Tax Return.  (**Exhibit 10**).

12        **3.**      **Current Business And Real Estate Status**

13   After the sale of the Dufwin Building, the call center entered into a month to month lease

14   for the full fourth floor offices where the business is currently operating on a limited basis. The

15   State Court ordered a hiring freeze and so employees have not been hired since the move to the

16   Dufwin Building in the Fall of 2016 and attrition leaves the call center with only a dozen or so

17   employees.

18   There are two options available for the call center as follow:

19           (i)      operate the call center; or

20           (ii)     close the call center business.

21   The Receiver has a proposal with a summary business plan that includes financials with

22   assumptions and strategies from a call center operator, Akila Digital, (**Exhibit 11**) that would

23   require funding of approximately $2.15 million to gear up operations in order to create jobs for CS

24   II.  The primary issue in operating the call center is the source of funds necessary for substantial

25   hiring and ongoing operations. It appears that there are two sources of funding  available with 1)

26   direct funding from Investors who may benefit from the job creation; or 2) use of existing

27   receivership estate funds. The difficulty with using the receivership estate funds is that the

28   commingling and diversion of funds makes it difficult to separate out ownership of the funds by

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   each entity (in the absence of a forensic accounting) so that the only funds used to operate the CS

2   II call center are truly CS II funds.

3        CS II. held title to the real estate at 519 17th Street (Dufwin Building) and 1750 Broadway,

4   both which are located in Oakland, CA. However, based on the Tate Tracing, the Dufwin Building

5   was purchased with funds from CS II Investors but 1750 Broadway was purchased with

6   $1,650,000 in funds from CS,and over $1 million in funds from SFRC.  (**Exhibit 12**).

7        The Dufwin Building was sold on November 30, 2016 for a $8,400,000 gross and

8   $7,901,068 net, while the 1750 Broadway property was sold on October 16, 2016 for $9,200,000

9   gross and $2,382,135 net.[14]  (**Exhibits 13-14**).

10            **4.        I-526 And I-829 Status And Risks For CS II**

11        Like CS, CS II was both the Enterprise invested in and the JCE.  The original offering

12   documents were quite vague about the business plan and arrangements, but a response to a USCIS

13   "request for evidence" apparently used identically for all Investors reflected that SFRC planned to

14   operate CS , CS II, and CS III (as defined below) as one business with commingled accounts and

15   operations.  (**Exhibit 1**, Divine Decl.,  ¶ 51).

16        The RFE response's cover memorandum boldly acknowledges that $100,000 of the Dufwin

17   Towers purchase was provided from CS, and states:

18            SFRC has transferred capital from its two CallSocket projects to its own accounts
             to develop and pay the expenses of all three of its CallSocket projects. CallSocket,
19            LP, CallSocket II, LP, CS II, and CallSocket III, LP are three phases of the same
             project: the development and operation of customer contact centers in the bay area.
20            They share the same senior management, same business model, same name, same
             affiliate structure with SFRC, although they are separate limited partnerships
21            located in separate buildings in Oakland.

22        A declaration of Tom Henderson in the RFE response includes this statement at

23   paragraph  8:

24            As the check registers also demonstrate, SFRC has withdrawn capital from
             CallSocket, LP and CallSocket II, LP for SFRC to purchase the "I. Magnin"
25            building on behalf of CallSocket Ill, LLC, which owns it in trust for CallSocket Ill,

---

26   [14] The Dufwin Building and 1750 Broadway were collateral for the same Opus Bank loan. The
     sale proceeds for 1750 Broadway were offset by payment in full of the joint loan resulting in
27   lower net proceeds compared to the Dufwin Building which was no longer encumbered by the
     loan at the time of sale.
28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

LP and other owners. The purchase of this building completes the real estate purchases for all three CallSocket projects. Funds are now being raised for CallSocket III, LP. Once acquired these funds will be used to repay the other CallSocket limited partnerships. The CallSocket group will then be fully funded and will complete its business development and hiring.

Id.

Apparently USCIS approved the CS II Investors' I-526 petitions after reviewing the RFE Response.  (**Exhibit 1**, Divine Decl.,  ¶ 52).

Twenty-nine EB-5 Investors subscribed to the offering and obtained I-526 approvals. Some of those approvals were as early as February of 2014, and at least some of the Investors have been admitted as conditional residents and maybe even have reached the end of their sustainment period.  The government charts do not reflect any immigration progress or filings by any CS II investors after their I-526 approval and do not reflect the I-526 filing date that marks the place in the queue for visa numbers, applicable as a practical matter to investors born in mainland China.[15]  The declaration of Tom Henderson dated November 16, 2016 supporting an I-829 petition states that as of that time half of the CS II investors had been admitted as conditional residents and the others awaited visa numbers. A chart provided by James Yang reflects that all but two CS II Investors have been admitted as conditional residents, 10 CS II Investors have filed I-829s, one is due to file I-829 on June 28, and the rest are due to file I-829s in November 2017 or beyond.   Therefore, all but two Investors are immune to effects of regional center termination and new material changes to the Business Plan, but most need to sustain their investment for more time, and many for substantially more time.  (**Exhibit 1**, Divine Decl.,  ¶ 53).

The economic analysis submitted in I-526 filings based the creation of direct and indirect jobs based on revenues, applying a multiplier times the projected annual revenues to derive a total number of direct and indirect jobs.  At the I-829 stage, a different economic analysis has been supplied using direct operational jobs times a RIMS II multiplier of just under 1.6 to yield the total

---

[15] Currently the State Department's Visa Bulletin shows that the EB-5 investors born in mainland China who are at the front of their queue for visa numbers, based on the date of I-526 filing, filed their I-526 before June 8, 2014.  See the State Department's monthly Visa Bulletin available at https://travel.state.gov/content/visas/en/law-and-policy/bulletin.html.

1   direct and indirect jobs created.  In December of 2016 the project papers submitted with an I-829

2   claimed creation of 63 direct jobs for a total of 100 direct and indirect jobs.  USCIS may find a

3   basis to challenge the direct jobs.  It is unknown how many creditable direct full-time jobs were

4   created in CS II before jobs were lost.  According to the Receiver only about a dozen employees

5   remain at CS II.  (**Exhibit 1**, Divine Decl.,  ¶ 54).

6         The overwhelming majority of CS II Investors who already were admitted as conditional

7   residents may claim all direct and indirect jobs even if the regional center becomes terminated.

8   The few who have not been admitted might suffer I-526 revocation based on regional center

9   termination, failure to sustain the investment (particularly in light of commingling and diversion),

10  and material change in the credibility of the plan to reach the necessary level of job creation**.**

11  (**Exhibit 1**, Divine Decl.,  ¶ 55).

12        It is unknown the extent to which capital of CS II was diverted from CS II.  The Receiver

13  could consider above strategies concerning diversion and commingling.  This issue could

14  independently give rise to I-526 revocations and prevent I-829 approvals.  (**Exhibit 1**, Divine

15  Decl.,  ¶ 56).

16        For Investors who had been admitted as conditional residents already, the Receiver's

17  closing down of CS II operations might not be independently fatal to the Investors' immigration

18  pursuits if the Receiver were able to use proceeds from sale of buildings to re-establish call center

19  operations.  Given the purported interdependency of the operations of the three CallSockets, it is

20  not clear whether jobs created already for CS  and CS II and then lost would be counted or

21  disregarded in USCIS analysis of job creation for CS II in a resurgence of call center operations.

22  USCIS could argue that newly created jobs cannot count again without subtracting the previously

23  created and lost (and credited) call center jobs.  Investors could argue the opposite.  (**Exhibit 1**,

24  Divine Decl.,  ¶ 57).

25        USCIS could use the liquidation of CallSocket assets (particularly the sale of the Duffwin

26  building) as a basis for denial of some Investors, asserting that the liquidation occurred before the

27  jobs were created that would be credited for those investors.  Id.

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

RECEIVER'S RECOVERY PLAN                    32                    3:17-CV-00223-RS

In summary, CS II presents probably the "closest call" whether the overwhelming majority of investors have a meaningful chance to retain immigration benefits. Some liquidated assets are available to re-deploy in the original business plan for a call center. Given the commingling, it might not be clear which NCEs' investors should have the opportunity to use the assets available to the Receiver. If that problem can be resolved so that enough capital is available to make a credible effort to create 182 direct jobs (times a multiplier of 1.6 to yield 290 direct and indirect jobs), most of the Investors could have a basic argument for I-829 approval. USCIS could choose many grounds, discussed above, to deny those petitions, and the chances of success are well below 50%. The interest of the Investors in pursuing immigration benefits at the risk of losing any liquidation interest and ultimate return should be solicited and considered. (**Exhibit 1**, Divine Decl., ¶ 58).

### 5.  Recommendation

CS-II could operate with funding from Investors, if available or receivership funds, if approved by the Court. The likelihood of immigration success under CS II may be a possibility (under 50%) but certainly has associated risks. CS II would need to sustain the investment per the Business Plan and create the required amount of jobs.

The alternative is to seek court permission, on notice to interested parties and Investors, to close the call center.

### F.  CALLSOCKET III, LP

#### 1.  Overview

CallSocket III, LP and CallSocket III, LLC ("CS III") were funded to operate a call center business in Oakland, CA. The members are as follows:

**CallSocket III, LP:**

| | |
|---|---|
| CallSocket III, LLC | 34.999987% interest |
| Investors | 65.000013% interest |

**CallSocket III, LLC:**

| | |
|---|---|
| SFRC | 99.00% interest |

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1    Hu Kexing                          1.00% interest

2    **SFRC:**

3    Thomas Henderson                   50% interest

4    Matthew Henderson                  50% interest

5

6              **2.      Business Plan And Investor Information**

7          Under the EB-5 program, CallSocket III, LP ("CS III") is the NCE and the JCE. The

8    Business Plan provided for the use of EB-5 Funds of $15 million from 30 investors. A ten year

9    lease for 50,000 sq ft was proposed for the call center operations along with renovations to the

10   property located at the I. Magnin Building at 2001 Broadway in Oakland, CA. (**Exhibit 15**). CS

11   III was to create 300 direct jobs within the first two years of operations. They planned to hire and

12   train 373 employees when fully operational within 5 years. The Receiver does not believe that any

13   jobs were created or that all of the Investor funds were used for this project. Upon her appointment

14   in the State Court Action, CS III was not operational and the I. Magnin Building had already been

15   sold.

16         After review of the USCIS information submitted to the SEC (USCIS Records), Central

17   Escrow information and 2015 CS III Tax Return, the EB-5 Investor funds invested for the CS III

18   Project would total approximately $20,000,000-$21,000,000 (40-42 investors x $500,000 each).

19   Typically each investor deposited $500,000+ and then various costs were charged for escrow,

20   syndication and other fees.

21         Per CS III USCIS Records, no CS III Project Investor has had I-829 Receipt issued. There

22   are noted Investor Exceptions outlined as follow:

23                  (i)     Three (3) investors whose investment funds were received

24   by Central Escrow and transferred to CS III Project do not appear on the CS III USCIS Records or

25   2015 CS III Tax Return.

26                  (ii)    Four investors appear on CS III USCIS Records and 2015

27   CS III Tax Return but no receipt/transfer of investor funds reflected on Central Escrow summary

28   or identified as deposited directly to CS III account.  (**Exhibit 16**).

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

### 3. Current Business And Real Estate Status

CallSocket III Holding Company, LLC held title to the real estate at 2001 Broadway (I. Magnin building) located in Oakland, CA.  However based on the Tate Tracing, the property was purchased with funds from CS in the amount of $400,000, CS II in the amount of $2.3 million and SFRC in the amount of $2.9 million.  (**Exhibit 17**).

The I. Magnin Building was sold in February 2016 prior to the appointment of the receiver in the State Court Action. (**Exhibit 18**). The State Court Action receiver took possession of the net proceeds of sale from the bank account in late March/early April 2016.  The call center was never built out for the call center operations and the business was never started.

### 4. I-526 And I-829 Status And Risks For CS III

Like the other two CallSockets, CS III is both the Enterprise and the JCE.  It sought initially $15 million from 30 Investors but ended up subscribing $19.5 million from 39 investors. The initial filings and even an RFE response did not recite the details of commingling funds revealed in the CS II RFE responses, but they did say that "The two prior CallSocket projects are closely related to and integrated with CallSocket III in that they all provide the same service, share the same business model and marketing platform, and are managed by the same experienced management team." The plan proposed to operate from the same I. Magnin building in Oakland as part of CS II, with expectation of 300 direct workers within two years and project revenues of $10.5 million in year 1, $16.5 million by year 2, and $20.5 million by year 5. An economic report presumed the $16.5 million revenues from year 2, applied a multiplier and projected 338 jobs. (**Exhibit 1**, Divine Decl.,  ¶ 59).

About half of the I-526 petition are approved, and the rest are mostly pending with a very few apparently withdrawn.  Only one Investor is shown by James Yang to have immigrated.  Only six more with approved I-526 petitions have a place in the visa number queue (marked by their I-526 filing date) earlier than the currently published cut-off date of June 8, 2014, so no more than those seven could have immigrated.  The rest are awaiting a visa number or I-526 adjudication. No I-829 petitions are due or filed or anywhere close.  (**Exhibit 1**, Divine Decl.,  ¶ 60).

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1    Without having reached the end of the "sustainment period," the sale of assets and closing

2    of call center business could prevent investors from meeting their sustainment of investment

3    requirement unless the Enterprise were to re-deploy the capital.  For Investors not yet admitted as

4    conditional residents (all but one Investor), that re-deployment would need to be in call centers,

5    the only industry mentioned in the I-526 package.  (**Exhibit 1**, Divine Decl., ¶ 61).

6    As with the other projects, diversion and commingling may pose the greatest challenge to

7    Receiver and Investors.  It appears from the Declaration of Ellen Chen that almost all of the CS III

8    capital was commingled into SFRC and spent on other projects or diverted to uses outside the EB-

9    5 entities.  It seems likely that USCIS will terminate the regional center and use that to deny and

10   revoke the I-526 petitions of the CS III Investors before they could immigrate.  The lone

11   conditional resident is likely to have conditional residence terminated or be unable to show

12   sustainment of investment and job creation.  It seems unlikely that the Receiver could recover

13   capital sufficient to start another call center from scratch and create 390 jobs.  Therefore, the

14   chances of preserving immigration benefits for CS III Investors seem quite low.  (**Exhibit 1**,

15   Divine Decl., ¶ 62).

16   **5.      Recommendation**

17   In order to operate CS III, it would require a full start-up with extensive capital funding for

18   the call center build-out, set up, operations and job creation.  Since obtaining immigration benefits

19   is essentially hopeless in CS III due to lack of job creation and missing Investor Funds, the

20   Receiver does not recommend proceeding with operations.

21   **G.      NA3PL, LP**

22   **1.      Overview**

23   NA3PL, L.P. ("NA3PL") and North America 3PL, LLC ("3PL") operate a warehousing

24   logistics business located at 1700 20th Street, Oakland, California ("20th Street Warehouse") for

25   which title is held by Berkeley Healthcare Dynamics, LLC .  The members are as follows:

26   **NA3PL:**

27   SFRC                                    38.33% interest

28

| Limited Partners | 61.67% interest |
|---|---|
| **3PL:** | |
| Thomas Henderson ("Henderson") | 40% interest |
| Clement Chin ("Chin") | 25% interest |
| Kevin Shimamoto ("Shimamoto") | 25% interest |
| Jennifer Bronson ("Bronson") | 10% interest |
| **BHD:** | |
| SFRC, LLC | 40% interest |
| Chin | 25% interest |
| Shimamoto | 25% interest |
| Bronson | 10% interest |
| **SFRC:** | |
| Thomas Henderson | 50% interest |
| Matthew Henderson | 50% interest |

### 2.    Business Plan And Investor Information

Under the EB-5 program, NA3PL,  is the NCE with capitalization of $20 million from 40 EB-5 Investors.  The Business Plan requires NA3PL to provide a six year loan of the funds to 3PL.  (**Exhibit 19**).  3PL is the JCE with its location at the 20th Street Warehouse.  The loan proceeds were to be used by 3PL to fund the startup expenses of the company, including the development and construction of a state of the art warehouse, purchase of equipment and furnishing the initial salary and wages, and working capital. The $20 million in loan funds came in to 3PL and $15 million of the funds went back out to SFRC. It appears that a substantial portion of the investor funds have not been used in this project.

3PL was projected to directly hire 338 permanent full time jobs by 2017. When considering indirect and induced jobs created by the company based on its economic impact, a total of 596.8 jobs will have to be created by 2017. The March 2017 current 3PL employee listing indicates a total of 29 salary and hourly employees. The company has not met the job creation

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   requirement and it does not appear that it could ever attain the employment goals set forth in the

2   Business Plan.

3   After review of the USCIS information submitted to the SEC (USCIS Records), Central

4   Escrow information and 2015 NA3PL Tax Return, the EB-5 Investor funds invested for the 3PL

5   Project would total approximately $18,0,000-$20,500,000 (36-41 Investors x $500,000 each).

6   Typically each Investor deposited $500,000+ and then various costs were charged for escrow,

7   syndication and other fees.

8   Per  USCIS Records, no NA3PL Project Investor has had an I-829 Receipt issued. There

9   are noted Investor Exceptions outlined as follow:

10   (i)      The Receiver received funds in April 2017 from Central

11   Escrow for one NA3PL Investor in the amount of $560,024.00. These funds are being held by the

12   Receiver.

13   (ii)     One Investor, whose investment funds were received by

14   Central Escrow and transferred to the NA3PL Project, does not appear on the NA3PL USCIS

15   Records but does appear on 2015 NA3PL Tax Return.

16   (iii)    Five investors appear on the NA3PL USCIS Records and

17   Investment funds deposited to Central Escrow and transferred to the NA3PL Project but do not

18   appear on 2015 3PL Tax Return.  (**Exhibit 20**).

19   **3.      Current Business And Real Estate Status**

20   As contemplated under the Business Plan, 3PL is the main tenant at the 20th Street

21   Warehouse.  The business has a CES designation and a non-transferable contract with U.S.

22   Customs and Border Patrol. There are a few other commercial tenants at the warehouse.

23   Berkeley Healthcare Dynamics, LLC ("BHD") holds title to the real estate at 1700 20th

24   Street Broadway located in Oakland, CA.  However based on the Tate Tracing, the property was

25   purchased with funds from CS. (**Exhibit 21**).

26   These Entities (NA3PL, 3PL, and BHD) were subject to the Court ordered monitorship

27   pursuant to the March 29, 2017 Order Appointing Receiver and Monitor.  Each of those Entities

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  were recently added to the Receivership pursuant to the terms of the Court's June 5, 2017 Order

2  Extending Scope of Receivership.

### 4.   I-526 And I-829 Status And Risks For 3PL

4  NA3PL, L.P. (NA3PL) used the more common model in which the Enterprise planned to

5  raise $15 million of EB-5 investment from 30 Investors and in turn loaned the capital to the JCE,

6  North America 3PL, LLC (3PL) for development and operation of a warehousing, third-party

7  logistics, and export trading business in leased space in Oakland to be renovated.  The economic

8  analysis presumed year 2 revenues of $37.9 million found to correlate through the model to 338

9  direct operational jobs and 244 indirect jobs, and presumed $2.6 million expenditure on

10  construction hard costs found to correlate through the model to 14.8 indirect construction jobs for

11  a total of 596 jobs creditable.  (**Exhibit 1**, Divine Decl.,  ¶ 63).

12  In fact NA3PL subscribed 40 investors, with almost half receiving I-526 approval and the

13  rest pending I-526 adjudication.  None have been admitted as a conditional resident, and only one

14  investor filed I-526 before the current visa number cut-off date for investors born in mainland

15  China, so only a couple of investors born in Vietnam could have immigrated.  Thus, termination of

16  regional center would give rise to I-526 denial or revocation, which seems likely, and any

17  liquidation of assets would need to lead to prompt re-deployment in similar industry.  (**Exhibit 1**,

18  Divine Decl.,  ¶ 64).

19  As with the other projects, diversion and commingling may pose the greatest challenge to

20  Receiver and Investors. Only about 30 people are employed in NA3PL JCEs, and it is not likely

21  that the requisite jobs could be created. (**Exhibit 1**, Divine Decl.,  ¶ 65).

22  Therefore, the chances of Investors being able to obtain I-526 approval, admission, and I-

23  829 approval seem quite low.  (**Exhibit 1**, Divine Decl.,  ¶ 66).

### 5.   Recommendation

25  Both Entities and the Relief Defendant, BHD were added to the receivership on June 5,

26  2017. The Receiver is working with existing staff regarding ongoing operations. However, it does

27  not appear that the existing entity will be able to create the required amount of jobs or be able to

28  account for the use of all Investor funds into the entity.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

H.     **WEST OAKLAND PLAZA, L.P.**

1.     **Overview**

West Oakland Plaza, LP ("WOP") and West End Market, LLC ("West Oakland") were established to operate a shopping center and grocery store in Oakland, CA.   The members are as follows:

**WOP:**

| | |
|---|---|
| SFRC | 95% interest |
| Investor | 5% interest |

Note: Per 2015 WOP Tax Return

Note: Most Investor funds received in 2016

**West End Market, LLC:**

No Information Available

**JL Gateway, LLC:**

| | |
|---|---|
| SFRC | 75% interest |
| WOMAC Properties, Inc. | 25% interest |

**SFRC:**

| | |
|---|---|
| Thomas Henderson | 50% interest |
| Matthew Henderson | 50% interest |

2.     **Business Plan And Investor Information**

Under the EB-5 program, West Oakland Plaza, LP is the NCE with capitalization of $10 million from 20 EB-5 Investors. The Business Plan provided for a loan of the EB-5 Funds to West End Market, LLC ("West End") the JCE.  (**Exhibit 22**).  The loan proceeds were to be used to develop a grocery store and commercial kitchen space in a neighborhood retail center.  The development was to include 1) a full-service grocery store that will feature affordable, high quality grocery products and sundries; 2) an in-house restaurant; and 3) a commercial kitchen or commissary space from which it will prepare food for the deli section of the grocery store.  The funds were also to renovate the grocery located in the shopping center with a lease of 24,000 sq ft

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1    at $50,000 per month.  WOP was to create 204 direct jobs or up to 300 with induced and indirect

2    impact.

3         After review of the USCIS information submitted to the SEC (USCIS Records) , Central

4    Escrow information and 2015 WOP Tax Return, the EB-5 Investor funds invested for the WOP

5    Project would total approximately $2,000,000 (4 Investors x $500,000 each). Typically each

6    Investor deposited $500,000+ and then various costs were charged for escrow, syndication and

7    other fees.  (**Exhibit 23**).

8         Per USCIS Records, no WOP Project Investor has had an I-829 Receipt issued.

9                       **3.      Current Business And Real Estate Status**

10        The grocery store business was never started, no improvements were ever made to the

11   proposed space within the shopping center and no employees were hired.

12        JLGateway, LLC holds title to the retail shopping center complex located at 800- 900

13   Market Street, Oakland, CA. The shopping center contains approx. 58,500 sq feet of leasable area.

14   The site area is 6.52 acres or 283,796 square feet, which includes 1.35 acres or 58,935 sq ft of land

15   comprising a common area condominium site that was approved for development of an additional

16   14,000 sq ft of retail space within a larger adjacent senior apartment complex.  However based on

17   the settlement statement, the property was purchased in December 2014 with a deposit of

18   $150,000 from SFRC.  (**Exhibit 24**).

19        This property has been valued at $10,400,000 by Colliers - Broker Opinion of Value

20   (**Exhibit 25**). The title report shows a loan of approximately $7 million in debt indicating potential

21   net sale proceeds.  (**Exhibit 26**).

22        The property was placed under state court receiver in late February 2017 and the Receiver

23   has engaged a property management company to manage and operate the shopping center.

24                    **4.      I-526 And I-829 Status And Risks For West Oakland Plaza, L.P.**

25        West Oakland Plaza, L.P. ("WOP") is the Enterprise intended to raise $10 million from 20

26   EB-5 Investors and loan that capital to West End Market, LLC as the JCE to develop and operate a

27   grocery store, restaurant, and commercial kitchen in a retail center in West Oakland, CA.  The

28   economic analysis presumed from the JCE's business plan that it would employ 204 direct

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1  employees (123 in grocery, 47 in commissary, 12 in restaurant/café, and 22 cross-over jobs) and

2  concluded that this would create 96.5 indirect jobs for a total of 300.5 jobs created. (**Exhibit 1**,

3  Divine Decl., ¶ 69).

4  Only four Investors subscribed and filed I-526 petitions, which are pending with USCIS.

5  Thus, termination of regional center would give rise to I-526 denial or revocation, which seems

6  likely, and any liquidation of assets would need to lead to prompt re-deployment in similar

7  industry.  To be eligible for I-526 approval, Investors would need to show credibility of the

8  Business Plan, which may be heavily undermined by the interruption of fundraising arising from

9  the receivership, SEC complaint and allegations, etc.  Any diversion or commingling of capital

10 also would pose challenges to I-526 approval.  I-526 approval for the WOP Investors appears

11 quite unlikely.  (**Exhibit 1**, Divine Decl., ¶ 70).

12      **5.**    **Recommendation**

13 This entity never raised the required investor funds and never started the grocery store

14 business as proposed under the Business Plan. It appears that WOP will not be able to create the

15 required amount of jobs or sustain the investment (which was never fully funded.)

16 The Receiver recommends that the property be marketed and sold.

17 **I.**    **CALIFORNIA GOLD MEDAL, L.P.**

18     **1.**    **Overview**

19 California Gold Medal, LP ("CGM") and Crystal Golden, LLC ("Crystal Golden") planned

20 to support the development and operations of a dairy processing company to source California

21 milk and process it into UHT (ultra-high temperature) dairy products specifically for the export

22 market. The members[16] are as follows:

23     **CGM:**

24     SFRC                   93 % interest

25     Investors            7% interest

26

27 ──────────────────

28 [16] Per 2015 CGM Tax Return.  Most investor funds received in 2016

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

**Crystal Golden:**

| | |
|---|---|
| SFRC | 50 % interest |
| Steven Weststeyn | 40% interest |
| Red Rock Capital Mgmt Corp | 10% interest |

**Central Golden California Farms, LLC:**

| | |
|---|---|
| SFRC | 50% interest |
| Jake Weststeyn | 50% interest |

**SFRC:**

| | |
|---|---|
| Thomas Henderson | 50% interest |
| Matthew Henderson | 50% interest |

### 2. Business Plan And Investor Information

Under the EB-5 program, California Gold Medal, L.P. ("CGM") is the NCE while Crystal Golden, LLC is the JCE with its location at the Tipton Plant. The Business Plan provided for the use of EB-5 Funds of $50 million from 100 Investors. (**Exhibit 27**). The loan proceeds were to be used by Crystal Golden to fund the startup expenses of the company including sourcing milk and the ground up renovation of an existing dairy processing facility. The loan will be due and payable in five years after the execution of the promissory note.

After review of the USCIS information submitted to the SEC (USCIS Records), Central Escrow information and 2015 CGM Tax Return, the EB-5 Investor funds invested for the CGM Project would total approximately $13,500,000-$24,000,000 (27-48 Investors x $500,000 each). Typically each Investor deposited $500,000+ and then various costs were charged for escrow, syndication and other fees.

Per CGM USCIS Records, no CGM Project Investor has had I-829 Receipt issued. There are noted Investor Exceptions outlined as follow:

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

(i)     The Receiver received funds in April 2017 from Central Escrow for 32 CGM Investors in the amount of $15,746,217.00. These funds are being held by the Receiver.

(ii)     27 Investors appear on CGM USCIS Records. 11 of those investors' Investment funds were turned over to the Receiver.  14 of those Investors' investment funds went to CGM Project.

(iii)     One Investor's investment funds were transferred to CGM Project but the investor does not appear on CGM USCIS Records.

(iv)     Only 6 Investors appear on CGM 2015 Tax Return likely due to the balance of Investor funds being transferred post 2015.  (**Exhibit 28**).

### 3.     Current Business And Real Estate Status

In May 2016, CGM entered into an agreement with Shambaugh & Son LP ("Shambaugh") for design build services for UHT/Aseptic Milk Plant at the Tipton plant. In January 2017, Shambaugh completed a Scope of Work/Pricing/Schedule Proposal to commence UHT milk production. Shambaugh Guaranteed Maximum Pricing sets forth a cost of approximately $66 million.  (**Exhibit 29**).

In December 2016 and January 2017 there was an auction of a majority of the equipment located at the plant which netted sale proceeds of $259,033.00.  No auction proceeds were turned over to the Receiver. Equipment remains for which the auctioneer, M. Davis Group, has submitted a proposal to 1) auction the remaining equipment for an estimated auction price of $25,000.00-$45,000.00 or 2) purchase the remaining equipment directly for $25,000.00.  (**Exhibit 30**).

The facility has never operated since its purchase in November 2015 for $4 million.

Property Issues:

(i)     Authorized removal of the auctioned equipment appears to have caused extensive damage to portions of the property, including fire safety system no longer functioning, power to northern end of building disconnected, portions of walls removed, general debris.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

(ii)     There were issues with 3 wells on the property. Two were repaired (outstanding invoice due for work $46,000+); one well was determined to be unrepairable. Proposal to dig a new well on the property was prepared by Arthur Orum Well Drilling but not performed due to permitting issues on a portion of the property.

(iii)     The Tipton property currently accrues costs of approximately $10,000.00 per month for basic services (minimal required security, electricity, sewer and guard trailer) which amount currently does not include loan payments, secured property tax payments or insurance.

Central California Farms, LLC owns the real estate at 417 and 615 N Burnett Road, Tipton, CA. The title report indicates a loan of $1.5 million at interest only of $15,000/month payments with Mid-Valley Financial, Inc. Interest has been paid through June 2017. The loan comes due on November 1, 2017 at which time the full $1.5 million will be due. Interest payments for July through October will be an additional $60,000.00.  (**Exhibit 31**).  The real property taxes are delinquent in the approximate amount of $160,0000.  The commercial liability and umbrella insurance coverage (due to expire 11/3/2017) are at issue due to unoccupied building status.

The current value based on a recent Broker Opinion of Value and reinspection after the equipment auction (removal) is $1.1 million which is less than the current debt on the property. (**Exhibit 32**).

#### 4.     I-526 And I-829 Status And Risks For CGM

California Gold Medal, L.P. ("CGM") is the Enterprise that is to make a business of loaning EB-5 capital to Crystal Golden, LLC (the JCE) to develop and operate a new Ultra-High Temperature milk processing and production facility in Tipton, CA for sale and export to global markets.  The JCE was to spend the capital in renovating and upgrading a leased facility, buying equipment, and startup of operations.  The plan was to raise $50 million from 100 EB-5 Investors, and job creation projections were based on an assumption of over $6 million in construction expenditures, $23 million in equipment purchases, and $241 million revenues in operational year 2. The economist projected 1,565 direct and indirect jobs from operations and equipment expenditures and indirect jobs from construction expenditures. The USCIS chart reflects 27

1   Investors filed I-526 petitions, while the chart from James Yang reflects 47 investors who filed I-

2   526, but both charts reflect that all petitions are pending at USCIS. Thus, termination of regional

3   center would give rise to I-526 denial or revocation, which seems likely, and any liquidation of

4   assets would need to lead to prompt re-deployment in a similar industry.  (**Exhibit 1**, Divine

5   Decl.,  ¶ 67).

6          To be eligible for I-526 approval, Investors would need to show credibility of the business

7   plan, which may be heavily undermined by the interruption of fundraising arising from the

8   receivership, SEC complaint and allegations, etc.  Any diversion or commingling of capital, which

9   appears to be substantial, also would pose challenges to I-526 approval.  I-526 approval for CGM

10  investors appears quite unlikely.  (**Exhibit 1**, Divine Decl.,  ¶ 68).

11                      **5.        Recommendation**

12         It does not appear that this Entity will be able to create the required amount of jobs or be

13  able to account for the use of all investor funds.

14         The Receiver recommends the sale of the remaining equipment to M. Davis and immediate

15  removal.

16         The Receiver will seek Court approval to negotiate with the lender to accept a deed in lieu

17  of foreclosure or stipulate to a non-judicial foreclosure.

18  **J.        San Francisco Regional Center, LLC ("SFRC")**

19         As of the date of the appointment of the Receiver, SFRC operated as the Regional Center

20  from the Tribune Tower located at 409 13th Street, Oakland California (.  The members of SFRC

21  are as follows:

22         **SFRC:**

23          Thomas Henderson                    50% interest

24          Matt Henderson                        50% interest

25

26         The Immigration Overview describes in detail the Regional Center issues.

27         SFRC has interests in entities as follows:

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036

1         (a)    This Is their Restaurant, LLC is a restaurant located in the Tribune

2 Tower of which SFRC owns a 75% interest. The other members have proposed a buy-out of the

3 SFRC interest however extensive construction work is anticipated which may affect the value. The

4 Receiver will be seeking a valuation of the business.

5         (b)    The Receiver believes there may be additional SFRC interests

6 available to the estate and is investigating.

7    **K.**    **Project Summary With Priorities**

8    The Receiver will be filing motions relating to specific project issues with priorities as

9 follows:

10    CS II – File a motion seeking authority to either operate the call center with a funding

11 source that addresses the current funding issues, or to shut down the operation;

12    CGM – File a motion for authority to sell the remaining equipment and either provide the

13 lender with a deed in lieu of foreclosure or to stipulate to a non-judicial foreclosure;

14    WOP – File a motion for authority to retain a broker to market and sell the real estate;

15    3PL – Meet with the necessary parties to discuss future operations, wind down, and sale of

16 real estate;

17    CCOO – Obtain business and real estate valuations;

18    SFRC – Liquidation of interests in other entities; and

19    Forensic Accounting – expand scope of CPA engagement.

20    **L.**    **FORENSIC ACCOUNTING**

21    In the course of preparing the   Recovery Plan, it became apparent to the Receiver and her

22 professionals that a forensic accounting is  required in this case.  One of the recommendations for

23 preservation of Investors' immigration benefits is a forensic accounting to assist the Receiver to

24 trace the Investors' funds from the escrows through the NCEs and beyond in the hopes of

25 restoring those funds to the rightful NCEs.  In addition, the forensic accounting will assist the

26 Receiver in following the flow of funds from each of the NCEs to SFRC and beyond in analyzing

27 litigation claims against third party claims for the recovery of Investor funds wrongly transferred,

28 and the feasibility of recovery of those funds.  Last, the forensic accounting will assist the

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   Receiver in determining actual ownership of the comingled funds presently held in the

2   receivership estate as the proceeds of real property sales, so that those proceeds can be restored to

3   the rightful NCE Entities.

4       The Receiver has requested a proposal for a complete forensic accounting along with a cost

5   estimate from the Receiver's accountants, Bachecki, Crom & Co., LLP, CPAs.

6   **M.    LITIGATION**

7       The Receiver is investigating and reviewing numerous causes of action and claims against

8   third parties and when appropriate, will seek Court authority to pursue those claims pursuant to

9   Paragraphs 39 and 40 of the Order Appointing Receiver and Monitor.

10

11   DATED:  June 26, 2017

12

13                  By:         */s/  Susan L. Uecker*

14                       Susan L. Uecker, Receiver

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607-4036