1  ARNOLD & PORTER KAYE SCHOLER LLP
   GILBERT R. SEROTA (SBN 75305)
2  gilbert.serota@apks.com
   MARJORY GENTRY (SBN 240887)
3  marjory.gentry@apks.com
   Three Embarcadero Center, 10th Floor
4  San Francisco, CA 94111-4024
   Telephone:    415.471.3100
5  Facsimile     415.471.3400

6  Attorneys for Defendant
   THOMAS M. HENDERSON
7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  SECURITIES AND EXCHANGE            Case No.: 3:17-cv-00223-RS
    COMMISSION,
13                                     DEFENDANT THOMAS M. HENDERSON'S
                    Plaintiff,          ANSWER TO COMPLAINT
14
         vs.                           JURY TRIAL DEMANDED
15

16  SAN FRANCISCO REGIONAL CENTER,
    LLC; THOMAS M. HENDERSON;
17  CALIFORNIA GOLD MEDAL, L.P.;
    CALLSOCKET, L.P.; CALLSOCKET II,
18  L.P.; CALLSOCKET III, L.P.;
    COMPREHENSIVE CARE OF OAKLAND,
19  L.P.; NA3PL, L.P.; WEST OAKLAND
    PLAZA, L.P.; CALLSOCKET, LLC;
20  CALLSOCKET II, LLC; CALLSOCKET III,
    LLC; COMPREHENSIVE CARE OF
21  CALIFORNIA, LLC; IMMEDIA, LLC;
    NORTH AMERICA 3PL, LLC;
22
                    Defendants,
23
    CALLSOCKET HOLDING COMPANY,
24  LLC; CALLSOCKET III HOLDING
    COMPANY, LLC; CENTRAL
25  CALIFORNIA FARMS, LLC; BERKELEY
    HEALTHCARE DYNAMICS, LLC; JL
26  GATEWAY, LLC;

27                  Relief Defendants.

28

---

Henderson's Answer                                    No. 3:17-cv-00223-RS

Defendant Thomas Henderson answers Plaintiff's complaint ("the Complaint") as follows:

1. In response to paragraph 1, Mr. Henderson admits that San Francisco Regional Center, LLC ("SFRC") is an Oakland, California-based company that was formed in 2010, and that until January 2, 2017, Mr. Henderson was the managing member of SFRC.  Mr. Henderson further admits that SFRC and related companies have raised at least $107 million from approximately 215 investors since 2010.  Mr. Henderson denies that either he or any company under his control has engaged in fraudulent conduct.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 1.

2. In response to paragraph 2, Mr. Henderson admits that the majority of the investors are Chinese foreign nationals and that each investor invested $500,000.  Mr. Henderson admits that there were seven different entities in which investors made their investments and that each was designed to allow participation in the Employment—Based Immigration Fifth Preference program ("EB-5 Program"), administered by the United States Citizenship and Immigration Services ("USCIS").  Mr. Henderson admits that the EB-5 Program provides a means for foreign nationals to qualify for United States permanent residency provided that certain conditions are met. To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 2.

3. In response to paragraph 3, Mr. Henderson admits that the business projects sponsored by SFRC under the EB-5 Program include a skilled nursing facility, three calls centers, a warehousing/third-party logistics business, a retail grocery and restaurant business, and a dairy processing business and that each investor paid $500,000 for an interest in one of the limited partnerships.  Mr. Henderson admits that written materials, including private placement memoranda and business plans, were provided to agents in Asia with the expectation that they would be provided to potential investors and that the content of these documents speak for themselves. To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 3.

4. Mr. Henderson denies the allegations in paragraph 4.

5. In response to paragraph 5, Mr. Henderson admits that investors paid a "syndication fee" ranging between $40,000 and $60,000, except where waived by SFRC.  Mr. Henderson admits that written materials, including private placement memoranda and business plans, were provided to

- 1 -

agents in Asia with the expectation that they would be provided to potential investors and that the content of these documents speak for themselves.  Mr. Henderson denies that $7.5 million from investor capital contributions were improperly diverted to pay overseas marketing agents. To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 5.

6.  Mr. Henderson denies the allegations in paragraph 6.

7.  Mr. Henderson denies the allegations in paragraph 7.

8.  Paragraph 8 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Mr. Henderson denies the allegations of paragraph 8.

9.  Mr. Henderson denies the allegations in paragraph 9.

10.  In response to paragraph 10, Mr. Henderson denies that he or any Defendant has engaged in any wrong-doing but admits the remainder of paragraph 10.

11.  In response to paragraph 11, Mr. Henderson admits that venue is proper in this district.  Mr. Henderson denies that he has engaged in any unlawful conduct.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 11.

12.  In response to paragraph 12, Mr. Henderson admits that this case is properly assigned to this Division of the Court.  Mr. Henderson denies that he has engaged in any unlawful conduct.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 12.

13.  In response to paragraph 13, Mr. Henderson admits that he is 68 years-old and is a resident of Oakland, California.  Mr. Henderson further admits that pursuant to the terms of the relevant Operating Agreements and Limited Partnership Agreements, Mr. Henderson was authorized to act as an agent and/or manager for the Defendants and Relief Defendants from the date of each of the Defendants and Relief Defendants' formation until, depending on the Defendant or Relief Defendant, (i) the appointment of the pre-judgment receiver in or about March 2016, in connection with *Young v. Henderson, et al.*, Case No. RG15778891, Superior Court of California, Alameda County (filed July 22, 2015) ("*Young v. Henderson*"),(ii) his resignation as a manager of North America 3PL, LLC in or about March 2016, (iii) his resignation as a managing member of SFRC on January 2, 2017, or (iv) the appointment of the Receiver in the present action.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 13.

- 2 -

14.  In response to paragraph 14, Mr. Henderson admits that SFRC is a California limited liability company that was formed on or around September 14, 2010.  Mr. Henderson admits that SFRC's principal place of business is in Oakland, California.  Mr. Henderson admits that until January 2, 2017 he was the managing member, Chief Executive Officer, and President of SFRC.  Mr. Henderson admits that he has a 50 percent ownership interest in SFRC and that he previously inaccurately testified that he has a 67 percent ownership interest in SFRC.  Mr. Henderson admits that SFRC is the General Partner of Defendants NA3PL, L.P., West Oakland Plaza, L.P., and California Gold Medal, L.P.  With respect to the allegations concerning SFRC's ownership interest in other Defendants and Relief Defendants, Mr. Henderson repeats and realleges his responses to paragraphs 15 through 31 below.  Mr. Henderson admits that USCIS designated SFRC a "Regional Center," on or about November 2011.  Mr. Henderson admits that between October 2010 to December 2014, nine bank accounts were opened in SFRC's name and that Mr. Henderson was the sole signatory on those accounts.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 14.

15.  In response to paragraph 15, Mr. Henderson admits that Immedia, LLC ("Immedia") is a California limited liability company formed on or around September 14, 2010, with its principal place of business in Oakland, California.  Mr. Henderson admits that Immedia is owned by SFRC and Henderson and operates as a DBA for SFRC.  Mr. Henderson admits that since November 2015, Immedia has not engaged in any independent business operations other than opening bank accounts used for conducting SFRC related business, including transactions related to the EB-5 Projects.  Mr. Henderson admits that two bank accounts in Immedia's name were opened in November 2014 and that Mr. Henderson was the sole signatory on these accounts.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 15.

16.  In response to paragraph 16, Mr. Henderson admits that Comprehensive Care of California, LLC is a California limited liability company formed on or around September 10, 2010, with its principal place of business in Oakland, California.  Mr. Henderson admits that California Care of California, LLC is the general partner of Comprehensive Care of Oakland, L.P. and that until June 5, 2017 had the right to exercise control over Comprehensive Care of Oakland, L.P. as outlined

in Comprehensive Care of Oakland, L.P.'s Limited Partnership Agreement.  Mr. Henderson admits that until June 5, 2017, SFRC was a manager of Comprehensive Care of California, LLC.  Mr. Henderson further admits that SFRC held a 50 percent interest in Comprehensive Care of California, LLC until August, 2016.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 16.

17.  In response to paragraph 17, Mr. Henderson admits that Comprehensive Care of Oakland, L.P. is a California, limited partnership, formed on or around September 14, 2010, with its principal place of business in Oakland, California.  Mr. Henderson admits that the limited partners of Comprehensive Care of Oakland, L.P. are investors, some of whom became partners via a stand-alone EB-5 enterprise and others who became partners through a EB-5 enterprise sponsored by SFRC.  Mr. Henderson admits that written materials, including private placement memoranda and business plans, were provided to agents in Asia with the expectation that they would be provided to potential investors and that the content of these documents speak for themselves.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 17.

18.  In response to paragraph 18, Mr. Henderson admits that CallSocket, LLC is a California limited liability company, formed on or around July 5, 2011, with its principal place of business in Oakland, California.  Mr. Henderson admits that CallSocket, LLC is the general partner of CallSocket, L.P.  Mr. Henderson admits that SFRC is the managing member and 47.5 percent owner of CallSocket, LLC.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 18.

19.  In response to paragraph 19, Mr. Henderson admits that CallSocket, L.P. is a California limited partnership, formed on or around September 1, 2011, with its principal place of business in Oakland, California.  Mr. Henderson admits that the limited partners of CallSocket, L.P. are investors who became partners through a EB-5 enterprise sponsored by SFRC.  Mr. Henderson admits that written materials, including private placement memoranda and business plans, were provided to potential investors and that the content of these documents speak for themselves.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 19.

1    20.  In response to paragraph 20, Mr. Henderson admits that CallSocket II, LLC is a

2  California limited liability company, formed on or around June 14, 2012, with its principal place of

3  business in Oakland, California. Mr. Henderson admits that CallSocket II, LLC is the general partner

4  of Defendant CallSocket II, L.P.  Mr. Henderson admits that SFRC is a managing member and sole

5  owner of CallSocket II, LLC.  To the extent not specifically admitted, Mr. Henderson denies the

6  remaining allegations of paragraph 20.

7    21.  In response to paragraph 21, Mr. Henderson admits that CallSocket II, L.P. is a California

8  limited partnership, formed on or around June 14, 2012, with its principal place of business in

9  Oakland, California.  Mr. Henderson admits that the limited partners of CallSocket II, L.P. are

10 investors who became partners through an EB-5 enterprise sponsored by SFRC.  Mr. Henderson

11 admits that written materials, including private placement memoranda and business plans, were

12 provided to agents in Asia with the expectation that they would be provided to potential investors and

13 that the content of these documents speak for themselves.  To the extent not specifically admitted,

14 Mr. Henderson denies the remaining allegations of paragraph 21.

15    22.  In response to paragraph 22, Mr. Henderson admits that CallSocket III, LLC is a

16 California limited liability company, formed on or around February 25, 2014, with its principal place

17 of business in Oakland, California. Mr. Henderson admits that CallSocket III, LLC is the general

18 partner of Defendant CallSocket III, L.P.  Mr. Henderson admits that SFRC is a managing member

19 and sole owner of CallSocket III, LLC.  To the extent not specifically admitted, Mr. Henderson

20 denies the remaining allegations of paragraph 22.

21    23.  In response to paragraph 23, Mr. Henderson admits that CallSocket III, L.P. is a

22 California limited partnership, formed on or around January 3, 2013, with its principal place of

23 business in Oakland, California.  Mr. Henderson admits that the limited partners of CallSocket III,

24 L.P. are investors who became partners through an EB-5 enterprise sponsored by SFRC.  Mr.

25 Henderson admits that written materials, including private placement memoranda and business plans,

26 were provided to agents in Asia with the expectation that they would be provided to potential

27 investors and that the content of these documents speak for themselves.  To the extent not specifically

28 admitted, Mr. Henderson denies the remaining allegations of paragraph 23.

24.   In response to paragraph 24, Mr. Henderson admits that North America 3PL, LLC is a California limited liability company, formed on or around July 22, 2010, with its principal place of business in Oakland, California.  Mr. Henderson admits that North America 3PL, LLC's function under the "Loan Model" for EB-5 projects was summarized in the business plan provided and that the content of this business plan speaks for itself.  Mr. Henderson further admits that North America 3PL, LLC's business is the operation of a warehouse/third-party logistics business.  Mr. Henderson admits that he is a member of Norther America 3PL, LLC and that he currently owns a 40 percent interest in the company.  Mr. Henderson further admits that until on or about March 2016, Mr. Henderson was a manager of Norther America 3PL, LLC.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 24.

25.   In response to paragraph 25, Mr. Henderson admits that NA3PL, L.P. is a California limited partnership, formed on or around February 25, 2014, with its principal place of business in Oakland, California.  Mr. Henderson admits that the limited partners of NA3PL, L.P. are investors who became partners through an EB-5 enterprise sponsored by SFRC.  Mr. Henderson admits that written materials, including private placement memoranda and business plans, were provided to agents in Asia with the expectation that they would be provided to potential investors and that the content of these documents speak for themselves.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 25.

26.   In response to paragraph 26, Mr. Henderson admits that West Oakland Plaza, L.P. is a California limited partnership, formed on or around January 16, 2015, with its principal place of business in Oakland, California.  Mr. Henderson admits that the limited partners of West Oakland Plaza, L.P. are investors who became partners through an EB-5 enterprise sponsored by SFRC.  Mr. Henderson admits that written materials, including private placement memoranda and business plans, were provided to agents in Asia with the expectation that they would be provided to potential investors and that the content of these documents speak for themselves.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 26.

27.   In response to paragraph 27, Mr. Henderson admits that California Gold Medal, L.P. is a California limited partnership, formed on or around March 4, 2015, with its principal place of

1    business in Oakland, California.  Mr. Henderson admits that the limited partners of California Gold

2    Medal, L.P. are investors who became partners through an EB-5 enterprise sponsored by SFRC.  Mr.

3    Henderson admits that written materials, including private placement memoranda and business plans,

4    were provided to agents in Asia with the expectation that they would be provided to potential

5    investors and that the content of these documents speak for themselves.  To the extent not specifically

6    admitted, Mr. Henderson denies the remaining allegations of paragraph 27.

7         28.  Mr. Henderson denies the allegations in paragraph 28.

8         29.  In response to paragraph 29, Mr. Henderson admits that CallSocket Holding Company,

9    LLC is a California limited liability company formed on or around November 4, 2011, with its

10   principal place of business in Oakland, California.  Mr. Henderson admits that from approximately

11   December 2011 to approximately December 2016, CallSocket Holding Company, LLC held title to

12   real property known as the Oakland Tribune Tower, located at 409 13th Street in Oakland, California.

13   Mr. Henderson admits that approximately $1.3 million of funds originating from Comprehensive

14   Care of Oakland, L.P. were used to purchase the Tribune Tower.  Mr. Henderson admits SFRC is a

15   member and holds an 80 percent interest in CallSocket Holding Company LLC in trust for

16   CallSocket, L.P.  Mr. Henderson admits that pursuant to the Operating Agreement, SFRC is the sole

17   manager of CallSocket Holding Company LLC.  Mr. Henderson admits that CallSocket Holding

18   Company LLC was placed into the pre-judgment receivership created in *Young v. Henderson* in or

19   about March 2016.  Mr. Henderson admits that the Receiver in this action currently controls both

20   CallSocket Holding Company LLC and the proceeds from the sale of the Oakland Tribune Tower.

21   To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph

22   29.

23        30.  In response to paragraph 30, Mr. Henderson admits that CallSocket III Holding

24   Company, LLC, is a California limited liability company formed on or around March 11, 2013, with

25   its principal place of business in Oakland, California.  Mr. Henderson admits that from June 2013 to

26   March 2016, CallSocket III holding Company, LLC held title to real property known as the I. Magnin

27   Building, located at 2001 Broadway, Oakland, California.  Mr. Henderson admits that the I. Magnin

28   Building was sold in or about March 2016.  Mr. Henderson admits that approximately $2.4 million of

funds originating from CallSocket, L.P. and CallSocket II, L.P. were used for the purchase of the I. Magnin Building in June 2013.  Mr. Henderson admits that SFRC is the sole member of CallSocket III Holding Company, LLC and holds 100 percent of the interest in CallSocket III Holding Company in trust for CallSocket III, L.P.  Mr. Henderson admits that pursuant to the Operating Agreement, SFRC is the sole manager of CallSocket III Holding Company LLC.  Mr. Henderson admits that CallSocket Holding Company LLC was placed into the pre-judgment receivership created in *Young v. Henderson* in or about March 2016.  Mr. Henderson admits that the Receiver in this action currently controls both CallSocket III Holding Company LLC and the proceeds from the sale of the I. Magnin Building, to the extent that these proceeds have not been expended by the pre-judgment receiver appointed in *Young v. Henderson*.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 30.

31.  In response to paragraph 31, Mr. Henderson admits that Berkeley Healthcare Dynamics, LLC, is a California limited liability company, formed in or around October 2012, with its principal place of business in Oakland, California.  Mr. Henderson admits that SFRC owns a 40 percent interest in Berkeley Healthcare Dynamics, LLC and that Mr. Henderson owns a 50 percent interest in SFRC.  Mr. Henderson admits that Berkeley Healthcare Dynamics, LLC holds legal title to real property located at 1700 20th Street in Oakland, California.  Mr. Henderson admits that approximately $2.5 million originating from CallSocket, L.P. was used to purchase the property at 1700 20th Street.  Mr. Henderson admits that the property at 1700 20th Street was placed into the pre-judgment receivership created in *Young v. Henderson*.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 31.

32.  In response to paragraph 32, Mr. Henderson admits that JL Gateway, LLC is a California limited liability company, formed on or around June 26, 2014, with its principal place of business in Oakland, California.  Mr. Henderson admits that JL Gateway, LLC holds legal title to real property located at 800-900 Market Street in Oakland, California.  Mr. Henderson admits that approximately $150,000 originating from CallSocket III, L.P. and NA3PL, L.P. was used towards the purchase of the property located at 800-900 Market Street.  Mr. Henderson admits that SFRC is a managing

1   member and a 75 percent owner of JL Gateway, LLC.  To the extent not specifically admitted, Mr.

2   Henderson denies the remaining allegations of paragraph 32.

3        33.   In response to paragraph 33, Mr. Henderson admits that Central California Farms, LLC,

4   is a California limited liability company, formed in or around January 16, 2015, with a business

5   addresses listed with the California Secretary of State in Oakland, California.   Mr. Henderson admits

6   that Central California Farms, LLC holds legal title to real property located at 417 and 615 North

7   Burnett Road, Tipton, California, and approximately $2.48 million originating from California Gold

8   Medal, L.P. was used to purchase this property.  Mr. Henderson admits that SFRC is the sole owner

9   and managing member of California Farms, LLC.  To the extent not specifically admitted, Mr.

10  Henderson denies the remaining allegations of paragraph 33.

11       34.   In response to paragraph 34, Mr. Henderson admits that beginning in September 2010

12  through October 2016, he has been involved in a management capacity with multiple entities

13  involved in EB-5 Projects and that these efforts have resulted in the formation of seven limited

14  liability partnerships, the generation of millions of dollars of revenue and the creation of hundreds of

15  new jobs in the Oakland area.  Mr. Henderson denies that he has directly solicited investors for the

16  EB-5 Projects but admits that he has provided input into written materials that were intended to be

17  provided to potential investors and has attended meetings in Asia with potential investors. Mr.

18  Henderson admits that as of the end of 2016, the entities engaged in EB-5 Projects had raised over

19  $107 million in capital contributions and in excess of $8.9 million in syndication fees.  To the extent

20  not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 34.

21       35.   In response to paragraph 35, Mr. Henderson admits that potential investors in each of the

22  EB-5 Projects were provided with a Business Plan and a Private Placement Memorandum ("PPM").

23  Mr. Henderson admits that after final versions of the Business Plans and PPMs were prepared, with

24  input from third parties and internal resources with specialized knowledge and information, Mr.

25  Henderson approved these documents with the understanding that they would be provided to agents

26  in Asia with the expectation that they would be provided to potential investors.  Mr. Henderson

27  admits that there were different PPMs for each EB-5 Project and that the contents of these documents

28

Henderson's Answer                                               No. 3:17-cv-00223-RS

1    speak for themselves.  To the extent not specifically admitted, Mr. Henderson denies the remaining

2    allegations of paragraph 35.

3         36.  Mr. Henderson admits the allegations in paragraph 36.

4         37.  In response to paragraph 37, Mr. Henderson admits that investors in the EB-5 Projects

5    paid a "syndication fee" of either $40,000, $50,000 or $60,000, depending on the particular EB-5

6    Project in which their investment was made, except where waived by SFRC.  Mr. Henderson admits

7    that the PPM and the limited partnership agreements prepared in connection with each of the EB-5

8    Projects state that it was anticipated that  the syndication fees would be used to pay the "(a) the initial

9    expenses associated with the establishment of the Partnership and the Offering of the Units, including

10   legal and promotional fees, including a 'finders' fee', and (b) the legal fees to be incurred in

11   connection with the preparation of Partnership related documents that the investors and/or their

12   respective legal counsel may reasonably request for submission of their respective applications for

13   classification as an alien entrepreneur."  Mr. Henderson further admits that the PPM and the limited

14   partnership agreements prepared in connection with each of the EB-5 Projects state that "[t]he

15   payment of the Syndication Fee to the General Partner for the General Partner's responsibility to

16   cover the foregoing expenses is intended to assure that $500,000 of each Subscription Price is capital

17   contribution and available to the Partnership for job-creating investments."  To the extent not

18   specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 37.

19        38.   In response to paragraph 38, Mr. Henderson admits that he reviewed the Business Plan

20   and the PPM for each EB-5 Project and that he approved the documents for distribution to

21   prospective investors on behalf of SFRC, the general partners, and the limited partnerships for each

22   of the EB-5 Projects.  Mr. Henderson admits that both he and SFRC staff directed overseas agents to

23   deliver the Business Plans and PPMs to prospective investors in the EB-5 Projects.  To the extent not

24   specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 38.

25        39.  Mr. Henderson denies the allegations in paragraph 39.

26        40.  In response to paragraph 40, Mr. Henderson admits that bank accounts were opened in

27   the names of SFRC and Immedia and that Mr. Henderson was a signatory on those accounts.  Mr.

28   Henderson admits that funds from the EB-5 Projects were deposited into these accounts both to pay

1    the direct expenses of the EB-5 Projects and in connection with loans made by the EB-5 Projects.

2    Mr. Henderson denies that the purpose of these accounts and transfers was to commingle the funds,

3    to mask the source of the funds, to create a common fund or to enrich Mr. Henderson.  To the extent

4    not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 40.

5         41.  In response to paragraph 41, Mr. Henderson admits that funds from the EB-5 Projects

6    were deposited into SFRC and Immedia bank accounts both to pay the direct expenses of the EB-5

7    Projects and in connection with loans made by the EB-5 Projects.  Mr. Henderson denies that funds

8    were redirected without regard to the original source of funds.  To the extent not specifically

9    admitted, Mr. Henderson denies the remaining allegations of paragraph 41.

10        42.  Mr. Henderson denies the allegations in paragraph 42.

11        43.  Mr. Henderson denies the allegations in paragraph 43.

12        44.  In response to paragraph 44, Mr. Henderson denies that he improperly took any investor

13   funds for himself.  Mr. Henderson admits that approximately $3.8 million was paid from the SFRC

14   bank accounts for expenses associated with two restaurants in Oakland, California.  Mr. Henderson

15   denies that EB-5 investor funds were improperly used in connection with these expenditures.  Mr.

16   Henderson admits that SFRC has a 75 percent ownership interest in the Tribune Tavern.  Mr.

17   Henderson admits that SFRC previously had an ownership interest in the Lungomare.  Mr.

18   Henderson admits that he has a 50 percent interest in SFRC.  Mr. Henderson admits that the offering

19   materials provided to the EB-5 investors did not specifically disclose that investor funds may be used

20   for loans and/or investments into the two restaurants.  Mr. Henderson denies that, to the extent

21   investor funds were used to make loans and/or investments in restaurants, that such expenditures are

22   contrary to the information provided to investors in the offering materials.  To the extent not

23   specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 44.

24        45.  In response to paragraph 45, Mr. Henderson admits that from January 2013 to December

25   2013, approximately $257,000 was paid to or on behalf of Starr Brand, LLC by SFRC.  Mr.

26   Henderson admits that SFRC had an ownership interest in Starr Brand, LLC and that Mr. Henderson

27   has a 50 percent ownership interest in SFRC.  Mr. Henderson admits that he testified that Starr

28   Brand, LLC was intended to be part of an EB-5 project involved with meat processing and that the

- 11 -

1   EB-5 project never conducted any business, meaning that while steps were taken to establish the

2   business, the business never became fully operational.  Mr. Henderson admits that the offering

3   materials provided to the EB-5 investors did not specifically disclose that investor funds may be used

4   for loans and/or investments into Starr Brand, LLC.  Mr. Henderson denies that, to the extent that

5   investor funds were used for loans and/or investments into Starr Brand, LLC, such expenditures are

6   contrary to the information provided to investors in the offering materials.  To the extent not

7   specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 45.

8        46.  In response to paragraph 46, Mr. Henderson denies that he misused investor money either

9   on non-EB-5 business ventures or for his personal benefit.  Mr. Henderson admits that in November

10  2012, funds originating from CallSocket, L.P. were used to purchase a warehouse in Oakland,

11  California.  Mr. Henderson admits that the title of the warehouse is in the name of Berkeley

12  Healthcare Dynamics, LLC and that it was originally placed in the name of Berkeley Healthcare

13  Dynamics, L.P.  Mr. Henderson admits that NA3PL, L.P. was formed in February 2014 in connection

14  with a warehouse and third-party logistics EB-5 Project.  Mr. Henderson admits that the first investor

15  funds into NA3PL, L.P. were placed into escrow in April, 2014 and released from escrow in May,

16  2014.  Mr. Henderson admits that the warehouse operations for the EB-5 Project connected with

17  NA3PL, L.P. are located at the warehouse property that Berkeley Healthcare Dynamics, LLC holds

18  title to and that rents have been paid to Berkeley Healthcare Dynamics, LLC for the use of this space.

19  Mr. Henderson admits that SFRC owns a 40 percent interest in Berkeley Healthcare Dynamics, LLC

20  and that Mr. Henderson owns a 50 percent interest in SFRC.  To the extent not specifically admitted,

21  Mr. Henderson denies the remaining allegations in paragraph 46.

22       47.  In response to paragraph 47, Mr. Henderson admits that funds originating from NA3PL,

23  L.P. and CallSocket III, L.P. were used towards the purchase of the shopping complex located at 800-

24  900 Market Street in Oakland, California.  Henderson admits that the title of the shopping complex

25  located at 800-900 Market Street was placed in JL Gateway, LLC's name.  Mr. Henderson admits

26  that SFRC is a managing member and a 75 percent owner of JL Gateway, LLC and that Mr.

27  Henderson owns a 50 percent interest in SFRC.  Mr. Henderson admits that the PPMs and business

28  plans provided to the EB-5 investors in NA3PL, L.P. and CallSocket III, L.P. did not specifically

1   disclose that investor funds may be used for loans made in connection with the purchase of the

2   shopping complex.  Mr. Henderson denies that, to the extent investor funds were used for the

3   purchase of the shopping complex, such an expenditure is contrary to the information provided to

4   investors in the offering materials.  Mr. Henderson admits that the Business Plan for West Oakland

5   Plaza, L.P. states that, among other things, investor monies would be used to make loans to support

6   the development and operations of a grocery store/restaurant and a related commercial kitchen and

7   that this document speaks for itself.  Mr. Henderson admits that West Oakland Plaza, L.P. was

8   formed in January 2015 and that the first investor funds were received into escrow in September,

9   2015 with the first funds released from escrow in November 2015.  Mr. Henderson admits that from

10  May 2016 to November 2016, West Oakland Plaza made rent payments to JL Gateway, LLC on

11  behalf of West End Market, LLC.  To the extent not specifically admitted, Mr. Henderson denies the

12  remaining allegations in paragraph 47.

13       48.  In response to paragraph 48, Mr. Henderson denies that he converted assets purchased

14  with EB-5 investor funds to his own purpose.  Mr. Henderson admits that the rent for the use of space

15  in the Tribune Tower by the Tribune Tavern was waived for a period of time in an effort to increase

16  the value of the EB-5 Projects' investment in the property both directly and through the enticement of

17  additional tenants into the building.  Mr. Henderson admits that the law firm of Casalina & Disston

18  used space in the Tribune Tower and paid, at least at times, reduced rent for the use of this space in

19  exchange for the provision of services.  To the extent not specifically admitted, Mr. Henderson denies

20  the remaining allegations in paragraph 48.

21       49.  Mr. Henderson denies the allegations in paragraph 49.

22       50.  Mr. Henderson denies the allegations in paragraph 50.

23       51.  Mr. Henderson denies the allegations in paragraph 51.

24       52.  In response to paragraph 52, Mr. Henderson admits that the PPMs for each of the EB-5

25  Projects described the anticipated use of the "syndication fees" and that these documents speak for

26  themselves.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations

27  in paragraph 52.

28

1    53.   In response to paragraph 53, Mr. Henderson admits that between November 2011 through

2    June 2016 he directed the transfer of monies from SFRC and related bank accounts overseas.  Mr.

3    Henderson denies that the total amount of transfers overseas during this period totaled $16.6 million.

4    Mr. Henderson further denies that all of the transfers of monies represented payment of finders' fee

5    as some of the monies transferred overseas were sent for reasons other than the payment of finders'

6    fees, such as the return of investment funds to investors who withdrew from the EB-5 Projects, the

7    payment for investor management services related to relocation services and the sponsorship of

8    Agent office operations.  Mr. Henderson admits  that syndication fees were paid by all investors in

9    the EB-5 Projects, except where waived by SFRC, but denies that the total amount of syndication

10   fees paid by investors totaled $8.9 million.  Mr. Henderson denies that $7.5 million or more in

11   investor capital contributions were paid to overseas marketing agents.  Mr. Henderson denies that any

12   overseas payments were made contrary to the PPMs.  To the extent not specifically admitted, Mr.

13   Henderson denies the remaining allegations in paragraph 53.

14   54.   Mr. Henderson denies the allegations in paragraph 54.

15   55.   Mr. Henderson denies the allegations in paragraph 55.

16   56.   Mr. Henderson denies the allegations in paragraph 56.

17   57.   Mr. Henderson denies the allegations in paragraph 57.

18   58.   Mr. Henderson admits the allegations in paragraph 58.

19   59.   Mr. Henderson admits the allegations in paragraph 59.

20   60.   In response to paragraph 60, Mr. Henderson admits that investors in CCOO were

21   provided with business plans and that these documents describe the use of investor money in the

22   capitalization and operation of a subacute care skilled nursing facility in Oakland, California.  To the

23   extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 60.

24   61.   In response to paragraph 61, Mr. Henderson admits that potential investors in CCOO

25   were provided with PPMs, both prior to and after SFRC was designated a Regional Center.  Mr.

26   Henderson admits that the language quoted in paragraph 61 appears in the PPMs.  Mr. Henderson

27   admits that after final versions of the Business Plans and PPMs were prepared, with input from third

28   parties and internal resources with specialized knowledge and information, Mr. Henderson approved

- 14 -

1    these documents in his capacity as the managing member of SFRC and in his capacity as the Chief

2    Executive Officer of Comprehensive Care of California, LLC.  To the extent not specifically

3    admitted, Mr. Henderson denies the remaining allegations in paragraph 61.

4            62.  Mr. Henderson denies the allegations in paragraph 62.

5            63.  In response to paragraph 63, Mr. Henderson admits that in December 2011 approximately

6    $1.3 million of CCOO funds were used in connection with the purchase of the Tribune Tower,

7    located at 409 13th Street in Oakland California.  Mr. Henderson admits that the total purchase price

8    of the Tribune Tower was $8 million and that the title for the Tribune Tower was placed in

9    CallSocket Holding Company, LLC's name.  Mr. Henderson admits that while the PPM and Business

10   Plan for CCOO specifically disclosed that investor funds may be used to make "low interest rate

11   loans" and/or to "pursue other reasonable and diversified investment strategies consistent with the

12   Partnership's overall objectives," neither the PPM or the Business Plan specifically disclosed that

13   funds may be used for the purpose of purchasing the Tribune Tower.  To the extent not specifically

14   admitted, Mr. Henderson denies the remaining allegations in paragraph 63.

15           64.  Mr. Henderson denies the allegations in paragraph 64.

16           65.  Mr. Henderson admits the allegations in paragraph 65.

17           66.  In response to paragraph 66, Mr. Henderson admits that from November 2012 to June

18   2014, CallSocket II, L.P. ("CallSocket II") raised approximately $14.5 million in capital

19   contributions from 29 investors, plus syndication fees totaling approximately $1.5 million.  Mr.

20   Henderson admits that from November 2013 to January 2016, CallSocket III, L.P. ("CallSocket III")

21   raised approximately $19.5 million in capital contributions plus a total of approximately $1.6 million

22   in syndication fees from 39 investors.  To the extent not specifically admitted, Mr. Henderson denies

23   the remaining allegations in paragraph 66.

24           67.  Mr. Henderson admits the allegations in paragraph 67.

25           68.  In response to paragraph 68, Mr. Henderson admits that Business Plans and PPMs were

26   prepared for each of the CallSocket EB-5 Projects and that the content of these documents speak for

27   themselves.  Mr. Henderson admits that the language quoted in paragraph 68 appear in the PPMs.

28   Mr. Henderson admits that after final versions of the Business Plans and PPMs were prepared, with

1    input from third parties and internal resources with specialized knowledge and information, Mr.

2    Henderson approved these documents in his capacity as the managing member of SFRC and in his

3    capacity as the Chief Executive Officer of CallSocket, LLC, CallSocket II, LLC, and CallSocket III,

4    LLC. To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in

5    paragraph 68.

6          69.  Mr. Henderson denies the allegations in paragraph 69.

7          70.  In response to paragraph 70, Mr. Henderson admits that in November 2012, a warehouse

8    property located at 1700 20th Street in Oakland California was purchased for $8.25 million and that

9    title to this property is in the name of Berkeley Healthcare Dynamics, LLC and that title was

10   originally placed in the name of Berkeley Healthcare Dynamics, L.P.  Mr. Henderson admits that

11   funds originating from CallSocket, L.P. were used to purchase the warehouse.  Mr. Henderson admits

12   that the warehouse operations for the EB-5 Project are located at the warehouse property and that

13   rents have been paid to Berkeley Healthcare Dynamics, LLC for the use of this space.  To the extent

14   not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 70.

15         71.  In response to paragraph 71, Mr. Henderson admits that in or around October 2012

16   approximately $797,000 of funds originating from CallSocket, L.P. were used to purchase the

17   Community Bank Building, located at 1750 Broadway in Oakland, California.  Mr. Henderson admits

18   that the title to the Community Bank Building was placed in the name of CallSocket II, L.P.  To the

19   extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 71.

20         72.  In response to paragraph 72, Mr. Henderson admits that in or around December 2012,

21   $453,000 of funds from CallSocket, L.P. were used to purchase a property known as the Dufwin

22   Theatre, located at 519 17th Street in Oakland, California.  Mr. Henderson admits that title to the

23   Dufwin Theatre was placed in the name of CallSocket II, L.P.  To the extent not specifically

24   admitted, Mr. Henderson denies the remaining allegations in paragraph 72.

25         73.  In response to paragraph 73, Mr. Henderson admits that approximately $2.4 million of

26   funds originating from CallSocket, L.P. and CallSocket II, L.P. were used for the purchase of the I.

27   Magnin Building, located at 2001 Broadway in Oakland, California.  Mr. Henderson admits that the

28   title to the I. Magnin Building was placed in the name of CallSocket III Holding Company, LLC.

Mr. Henderson admits that the I. Magnin Building was sold in or about March 2016 for approximately $19.5 million with net proceeds of approximately $9.8 million.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 73.

74.  In response to paragraph 74, Mr. Henderson admits that funds were transferred to SFRC and Immedia to cover expenses related to the CallSocket Projects.  Mr. Henderson lacks knowledge or information sufficient to form a belief to admit or deny the exact amount of funds transferred to SFRC and Immedia and therefore denies the allegations regarding the amounts transferred.  Mr. Henderson admits that an operational call center has not yet opened under CallSocket III, L.P.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 74.

75.  Mr. Henderson denies the allegations in paragraph 75.

76.  Mr. Henderson admits the allegations in paragraph 76.

77.  In response to paragraph 77, Mr. Henderson admits that a Business Plan and PPM were prepared for NA3PL, L.P. and that the content of these documents speak for themselves.  Mr. Henderson admits that the language quoted in paragraph 77 appears in the PPM and Business Plan. Mr. Henderson admits that after final versions of the Business Plans and PPMs were prepared, with input from third parties and internal resources with specialized knowledge and information, Mr. Henderson approved these documents in his capacity as the managing member of SFRC and in his capacity as the Chief Executive Officer of NA3PL, LLC. To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 77.

78.  In response to paragraph 78, Mr. Henderson admits that funds were transferred to SFRC and Immedia to cover expenses related to the warehouse and third-party logistics EB-5 Project.  Mr. Henderson lacks knowledge or information sufficient to form a belief to admit or deny the exact amount of funds transferred to SFRC and Immedia and therefore denies the allegations regarding the amounts transferred.  To the extent not specifically admitted, Mr. Henderson denies the remaining allegations of paragraph 78.

79.  In response to paragraph 79, Mr. Henderson.  Mr. Henderson admits that in December 2014, approximately $150,000 originating from NA3PL, L.P. and CallSocket III, L.P. was used towards the purchase of the shopping complex located at 800-900 Market Street in Oakland,

- 17 -

1   California.  Mr. Henderson denies that the EB-5 projects are unrelated to each other.  Mr. Henderson

2   admits that title to the shopping complex was placed in the name of JL Gateway, LLC.  Mr.

3   Henderson admits that a Business Plan was prepared for the West Oakland Plaza EB-5 Project and

4   that this document speaks for itself.  To the extent not specifically admitted, Mr. Henderson denies

5   the remaining allegations in paragraph 79.

6        80.  Mr. Henderson denies the allegations in paragraph 80.

7        81.  In response to paragraph 81, Mr. Henderson admits that from November 2015 to

8   September 2016, West Oakland Plaza, L.P. raised approximately $2 million in capital contributions

9   and approximately $210,000 in syndication fees from four investors.  Mr. Henderson admits that

10   West Oakland Plaza, L.P. received capital contributions from the investors in this project.  Mr.

11   Henderson denies that Immedia received capital contributions from investors in this EB-5 Project.

12   To the extent not specifically admitted, Mr. Henderson denies the remaining allegations in paragraph

13   81.

14        82.  In response to paragraph 82, Mr. Henderson admits that a Business Plan and PPM were

15   prepared for West Oakland Plaza, L.P. and that the content of these documents speak for themselves.

16   Mr. Henderson admits that the language quoted in paragraph 82 appears in the PPM and Business

17   Plan.  Mr. Henderson admits that after final versions of the Business Plans and PPMs were prepared,

18   with input from third parties and internal resources with specialized knowledge and information, Mr.

19   Henderson approved these documents in his capacity as the managing member of SFRC and in his

20   capacity as the Chief Executive Officer of West End Market, LLC. To the extent not specifically

21   admitted, Mr. Henderson denies the remaining allegations in paragraph 82.

22        83.  In response to paragraph 83, Mr. Henderson admits that from April 2016 to August 2016

23   payments were made by West Oakland Plaza, L.P., on behalf of West End Market, LLC, to North

24   America 3PL, LLC.  Mr. Henderson denies that these funds were diverted for improper purposes but

25   instead were to pay for services related to the retail center business.  To the extent not specifically

26   admitted, Mr. Henderson denies the remaining allegations in paragraph 83.

27        84.  In response to paragraph 84, Mr. Henderson admits that West Oakland Plaza, L.P. has not

28   yet loaned funds directly to West End Market, LLC, but rather has paid expenses incurred on behalf

1    of West End Market, LLC.  To the extent not specifically admitted, Mr. Henderson denies the

2    remaining allegations in paragraph 84.

3         85.  Mr. Henderson denies the allegations in paragraph 85.

4         86.  In response to paragraph 86, Mr. Henderson admits that California Gold Medal, L.P.

5    raised funds from investors beginning in August 2015.  To the extent not specifically admitted, Mr.

6    Henderson denies the remaining allegations in paragraph 86.

7         87.  In response to paragraph 87, Mr. Henderson admits that a Business Plan and PPM were

8    prepared for California Gold Medal, L.P. and that the content of these documents speak for

9    themselves.  Mr. Henderson admits that the language quoted in paragraph 87 appears in the PPM and

10   Business Plan.  Mr. Henderson admits that after final versions of the Business Plans and PPMs were

11   prepared, with input from third parties and internal resources with specialized knowledge and

12   information, Mr. Henderson approved these documents in his capacity as the managing member of

13   SFRC and in his capacity as the Chief Executive Officer of Crystal Golden, LLC. To the extent not

14   specifically admitted, Mr. Henderson denies the remaining allegations in paragraph 87.

15        88.  In response to paragraph 88, Mr. Henderson admits that in November 2015,

16   approximately $2.48 million of funds originating from California Gold Medal, L.P. were used to

17   purchase property, including an existing dairy processing facility, in Tipton, California.  Mr.

18   Henderson admits that title to this property was placed in the name of Central California Farms, LLC.

19   Mr. Henderson admits that SFRC is the sole owner and managing member of California Farms, LLC

20   and that Mr. Henderson owns a 50 percent interest in SFRC.  Mr. Henderson admits that Central

21   California Farms is not identified in the PPM or Business Plan  as the "Job Creating Entity."  Mr.

22   Henderson denies that the purchase of the property in Tipton, California was contrary in any material

23   way to  representations in the Business Plan and PPM.  To the extent not specifically admitted, Mr.

24   Henderson denies the remaining allegations in paragraph 88.

25        89.  In response to paragraph 89, Mr. Henderson admits that approximately $1.8 million of

26   funds from California Gold Medal, L.P. were used to pay for expenses and services related to the

27   dairy EB-5 Project.  Mr. Henderson denies that these payments were contrary in any material way to

28

1   the representations in the Business Plan and the PPM.  To the extent not specifically admitted, Mr.

2   Henderson denies the remaining allegations in paragraph 89.

3       90.   In response to paragraph 90 of the Complaint, Mr. Henderson admits that funds were

4   transferred from California Gold Medal, L.P. to SFRC and Immedia as rental payments owed by

5   Crystal Golden, LLC to Central California Farms, LLC.  Mr. Henderson lacks knowledge or

6   information sufficient to form a belief as to the total amount of funds transferred between California

7   Gold Medal, L.P. to SFRC and Immedia and on that basis denies that the total amount transferred and

8   not returned to California Gold Medal, L.P. equals $1.4 million.  To the extent not specifically

9   admitted, Mr. Henderson denies the remaining allegations in paragraph 90.

10      91.   Mr. Henderson denies the allegations in paragraph 91.

11      92.   In response to paragraph 92 of the Complaint, Mr. Henderson repeats and realleges his

12   responses to paragraphs 1 through 91 above.

13      93.   Mr. Henderson denies the allegations in paragraph 93.

14      94.   Mr. Henderson denies the allegations in paragraph 94.

15      95.   Mr. Henderson denies the allegations in paragraph 95.

16      96.   In response to paragraph 96 of the Complaint, Mr. Henderson repeats and realleges his

17   responses to paragraphs 1 through 91 above.

18      97.   Mr. Henderson denies the allegations in paragraph 97.

19      98.   Mr. Henderson denies the allegations in paragraph 98.

20      99.   Mr. Henderson denies the allegations in paragraph 99.

21      100.  In response to paragraph 100 of the Complaint, Mr. Henderson repeats and realleges his

22   responses to paragraphs 1 through 91 above.

23      101.  Mr. Henderson denies the allegations in paragraph 101.

24      102.  Mr. Henderson denies the allegations in paragraph 102.

25      103.  Mr. Henderson denies the allegations in paragraph 103.

26      104.  In response to paragraph 104 of the Complaint, Mr. Henderson repeats and realleges his

27   responses to paragraphs 1 through 91 above.

28      105.  Mr. Henderson denies the allegations in paragraph 105.

106.  Mr. Henderson denies the allegations in paragraph 106.

107.  Mr. Henderson denies the allegations in paragraph 107.

108.  In response to paragraph 108 of the Complaint, Mr. Henderson repeats and realleges his responses to paragraphs 1 through 91 above.

109.  Mr. Henderson denies the allegations in paragraph 109.

110.  Mr. Henderson denies the allegations in paragraph 110.

111. Any allegation not specifically admitted is denied.

112. The prayer for relief contains summary allegations, legal conclusions, and requests for relief to which no response is required.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof for defenses that he would not otherwise have, Mr. Henderson asserts the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted against Mr. Henderson.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations and statutes of repose.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims for monetary penalties are barred because the acts upon which these claims are based occurred outside of the relevant limitations period.

### FOURTH AFFIRMATIVE DEFENSE

At all relevant times, any alleged misstatements or omissions of which Plaintiff complains were not false or materially misleading.

### FIFTH AFFIRMATIVE DEFENSE

At all relevant times, any alleged misstatements or omissions of which Plaintiff complains were not material to or relied upon by investors.

### SIXTH AFFIRMATIVE DEFENSE

- 21 -

Plaintiff's claims are barred in whole or in part because Mr. Henderson acted in good faith and with good cause at all times.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Mr. Henderson did not act with the requisite scienter.

## EIGTH AFFIRMATIVE DEFENSE

Mr. Henderson was not negligent.

## NINTH AFFIRMATIVE DEFENSE

Mr. Henderson relied in good faith on the statements, representations, advice, professional judgment and opinions of others, including but not limited to accounting professionals, upon which Mr. Henderson was entitled to rely on.

## TENTH AFFIRMATIVE DEFENSE

Mr. Henderson had no duty to disclose the allegedly omitted information or to revise, update, or correct any previously made statements that Plaintiff allege were not subsequently revised, updated or corrected.

## ELEVENTH AFFIRMATIVE DEFENSE

Mr. Henderson has insufficient knowledge or information upon which to form a belief as to whether it may have additional yet unstated affirmative defenses.  Mr. Henderson reserves the right to assert any additional affirmative defenses as may be discovered during the conduct of this litigation.

WHEREFORE, Mr. Henderson respectfully requests that the Court enter judgement as follows:

1. Dismissing the Complaint against Mr. Henderson in its entirety;

2. Entering judgment in favor of Mr. Henderson on all claims asserted against it;

3. Denying any and all relief requested by Plaintiff against Mr. Henderson;

4. Awarding Mr. Henderson his attorneys' fees and expenses, including indemnification from the relief defendants; and

5. Granting Mr. Henderson such other and further relief as the Court deems just and proper.

- 22 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Henderson demands a trial by jury on all issues so triable.

Dated:  July 26, 2017

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:   */s/ Gilbert R. Serota*
Gilbert R. Serota
Marjory Gentry

Attorneys for Thomas M. Henderson

- 23 -