# EXHIBIT A

1   JINA L. CHOI (N.Y. Bar No. 2699718)
    ERIN E. SCHNEIDER (Cal. Bar No. 216114)
2     schneidere@sec.gov
    STEVEN D. BUCHHOLZ (Cal. Bar No. 202638)
3     buchholzs@sec.gov
    ANDREW J. HEFTY (Cal. Bar No. 220450)
4     heftya@sec.gov
    SUSAN F. LaMARCA (Cal. Bar No. 215231)
5     lamarcas@sec.gov
    THOMAS J. EME (Ill. Bar No. 6224870)
6     emet@sec.gov

7   Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
8   44 Montgomery Street, Suite 2800
    San Francisco, CA 94104
9   Telephone: (415) 705-2500
    Facsimile:  (415) 705-2501

10

11                      UNITED STATES DISTRICT COURT

12                     NORTHERN DISTRICT OF CALIFORNIA

13                         SAN FRANCISCO DIVISION

14

15  SECURITIES AND EXCHANGE COMMISSION,      Case No. 3:17-cv-00223-RS

16            Plaintiff,

17        v.                                 [PROPOSED] ORDER APPOINTING
                                             RECEIVER AND MONITOR
18  SAN FRANCISCO REGIONAL CENTER, LLC;
    THOMAS M. HENDERSON; CALIFORNIA
19  GOLD MEDAL, L.P.; CALLSOCKET, L.P.;
    CALLSOCKET II, L.P.; CALLSOCKET III, L.P.;
20  COMPREHENSIVE CARE OF OAKLAND, L.P.;
    NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.;
21  CALLSOCKET, LLC; CALLSOCKET II, LLC;
    CALLSOCKET III, LLC; COMPREHENSIVE
22  CARE OF CALIFORNIA, LLC; IMMEDIA, LLC;
    and NORTH AMERICA 3PL, LLC,

23            Defendants, and

24  CALLSOCKET HOLDING COMPANY,
    LLC; CALLSOCKET III HOLDING
25  COMPANY, LLC; BERKELEY
    HEALTHCARE DYNAMICS, LLC;
26  CENTRAL CALIFORNIA FARMS, LLC;
    and JL GATEWAY, LLC,

27

28            Relief Defendants.

1       This matter came before this Court upon the motion of the Securities and Exchange

2  Commission ("SEC"or "Commission") for an order seeking the appointment of a receiver over San

3  Francisco Regional Center, LLC; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.;

4  CallSocket III, L.P.; Comprehensive Care of Oakland, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.;

5  CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; Comprehensive Care of California, LLC;

6  Immedia, LLC; North America 3PL, LLC (collectively, the "entity Defendants"); CallSocket Holding

7  Company, LLC; CallSocket III Holding Company, LLC; Berkeley Healthcare Dynamics, LLC;

8  Central California Farms, LLC; and JL Gateway, LLC (collectively, the "Relief Defendants").  The

9  Court has considered the Commission's Motion for Preliminary Injunction and for the Appointment

10  of Receiver and the Declarations of Ellen Chen, Thomas J. Eme, and Andrew J. Hefty, the exhibits

11  thereto, and any responses thereto; and the record in these proceedings before the Court.

12       On the basis of this record, the Court finds that this Court has subject matter jurisdiction over

13  this action and personal jurisdiction over the entity Defendants and Relief Defendants.  The Court

14  also finds that the appointment of a receiver in this action is necessary and appropriate for the

15  purposes of marshaling and preserving all assets of Defendants San Francisco Regional Center, LLC;

16  California Gold Medal, L.P.; Callsocket, L.P.; Callsocket II, L.P.; Callsocket III, L.P.; NA3PL, L.P.;

17  West Oakland Plaza, L.P.; Callsocket, LLC; Callsocket II, LLC; Callsocket III, LLC; Immedia, LLC

18  (collectively, the "Receivership Defendants"); and of Relief Defendants CallSocket Holding

19  Company, LLC; CallSocket III Holding Company, LLC; Central California Farms, LLC; and JL

20  Gateway, LLC (collectively, "Receivership Relief Defendants") that: (a) are attributable to funds

21  derived from investors of the Defendants or Relief Defendants; (b) are held in constructive trust for

22  the entity Defendants or Relief Defendants; (c) were fraudulently transferred by the Defendants or

23  Relief Defendants; and/or (d) may otherwise be includable as assets of the estates of the entity

24  Defendants or Relief Defendants (collectively, the "Recoverable Assets").

25       The Court further finds that the appointment of a monitor in this action is necessary and

26  appropriate as to Defendants Comprehensive Care of California, LLC; Comprehensive Care of

27  Oakland, L.P.; and North America 3PL, LLC (collectively, the "Monitorship Defendants"); and of

28  Relief Defendant Berkeley Healthcare Dynamics, LLC (the "Monitorship Relief Defendant").

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Commission's Motion for Appointment of a Receiver is GRANTED as to the Receivership Defendants and Receivership Relief Defendants.

2.     This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the Receivership Defendants and Receivership Relief Defendants.

3.     Until further Order of this Court, Susan L. Uecker is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Defendants and the Receivership Relief Defendants.

4.     Until further Order of this Court, Susan L. Uecker is also hereby appointed to serve without bond as monitor (the "Monitor") for the estates of the Monitorship Defendants and the Monitorship Relief Defendant.

5.     Within 45 days of the date of this Order, the Monitor will submit a report to the Court as to (a) whether there are reasons justifying expansion of her authority over the Monitorship Defendants and Monitorship Relief Defendant from "monitor" to "receiver," and; (b) the likelihood, if any, that her appointment as a receiver over any or all of the Monitorship Defendants and Monitorship Relief Defendant would cause disruption to any of those entities' contractual relationships with third parties.

**I.     General Powers and Duties of Receiver**

6.     The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers, and general and limited partners of the Receivership Defendants and Relief Defendants under applicable state and federal law, by the governing charters, by-laws, articles, and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, and Fed. R. Civ. P. 66.

7.     The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys, and other agents of the Receivership Defendants and Relief Defendants are hereby dismissed and the powers of any general partners, directors, and/or managers are hereby

1  suspended.  Such persons and entities shall have no authority with respect to the Receivership

2  Defendants' and Relief Defendants' operations or assets, except to the extent as may hereafter be

3  expressly granted by the Receiver.  The Receiver shall assume and control the operation of the

4  Receivership Defendants and Relief Defendants and shall pursue and preserve all of their claims.

5       8.      No person, other than the Receiver, holding or claiming any position of any sort with

6  any of the Receivership Defendants or Relief Defendants shall possess any authority to act by or on

7  behalf of any of the Receivership Defendants or Relief Defendants.

8       9.      Subject to the specific provisions in Sections II through XIII below, the Receiver shall

9  have the following general powers and duties:

10        A.      To use reasonable efforts to determine the nature, location, and value of all
           property interests of the Receivership Defendants and Relief Defendants and
11         all other Recoverable Assets, including, but not limited to, monies, funds,
           securities, credits, effects, goods, chattels, lands, premises, leases, claims,
12         rights, and other assets, together with all rents, profits, dividends, interest, or
           other income attributable thereto, of whatever kind, which the Receivership
13         Defendants or Relief Defendants own, possess, have a beneficial interest in, or
           control directly or indirectly ("Receivership Property" or, collectively, the
14         "Receivership Estates");

15        B.      To take custody, control, and possession of all Receivership Property and
           records relevant thereto from the Receivership Defendants and Relief
16         Defendants; to sue for and collect, recover, receive, and take into possession
           from third parties all Receivership Property and records relevant thereto;
17

18        C.      To manage, control, operate, and maintain the Receivership Estates and hold in
           her possession, custody, and control all Receivership Property, pending further
19         Order of this Court;

20        D.      To use Receivership Property for the benefit of the Receivership Estates,
           making payments and disbursements and incurring expenses as may be
21         necessary or advisable in the ordinary course of business in discharging her
           duties as Receiver;

22        E.      To take any action which, prior to the entry of this Order, could have been
           taken by the officers, directors, partners, managers, trustees, and agents of the
23         Receivership Defendants or Relief Defendants;

24        F.      To engage and employ persons in her discretion to assist her in carrying out
           her duties and responsibilities hereunder, including, but not limited to,
25         accountants, attorneys, securities traders, registered representatives, financial
           or business advisers, liquidating agents, real estate agents, forensic experts,
26         brokers, traders, or auctioneers;

27        G.      To take such action as necessary and appropriate for the preservation of
           Receivership Property or to prevent the dissipation or concealment of
28         Receivership Property;

H.  To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure, concerning any subject matter within the powers and duties granted by this Order;

I.  To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver;

J.  To pursue, resist, and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and

K.  To take such other action as may be approved by this Court.

## II.   Access to Information

10.   The officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the Receivership Defendants and Relief Defendants, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants or Relief Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

11.   Within twenty (20) days of the entry of this Order, the Receivership Defendants and Relief Defendants shall serve upon the Receiver and the Commission a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and any other agents or contractors of the Receivership Defendants and Relief Defendants; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Defendants and Relief Defendants.

12.   Within thirty (30) days of the entry of this Order, the Receivership Defendants and Relief Defendants shall provide to the Receiver and the Commission copies of the Receivership Defendants' and Relief Defendants' federal income tax returns for the tax years 2010 through 2015, with all relevant and necessary underlying documentation.

13.   The officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the Receivership Defendants and Relief Defendants, as well as those acting in their place, shall answer to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the

1 Receivership Defendants and Relief Defendants, or any other matter relevant to the operation or

2 administration of the receivership or the collection of funds due to the Receivership Defendants.  In

3 the event that the Receiver deems it necessary to require the appearance of the aforementioned

4 persons or entities, the Receiver shall make discovery requests in accordance with the Federal Rules

5 of Civil Procedure.

6      14.     The Receivership Defendants and Relief Defendants, individual Defendant Thomas

7 M. Henderson, the officers, directors, agents, managers, general and limited partners, trustees,

8 attorneys, accountants, and employees of the Receivership Defendants and Relief Defendants, as well

9 as those acting in their place, are required to assist the Receiver in fulfilling her duties and

10 obligations.  As such, they must respond promptly and truthfully to all requests for information and

11 documents from the Receiver.

12               **III.   Access to Books, Records, and Accounts**

13      15.     The Receiver is authorized to take immediate possession of all assets, bank accounts

14 or other financial accounts, books and records and all other documents or instruments relating to the

15 Receivership Defendants or Relief Defendants.  All persons and entities having control, custody, or

16 possession of any Receivership Property are hereby directed to turn such property over to the

17 Receiver.

18      16.     The Receivership Defendants and Relief Defendants, as well as their agents, servants,

19 employees, attorneys, any persons acting for or on behalf of the Receivership Defendants or Relief

20 Defendants, and any persons receiving notice of this Order by personal service, email, facsimile, or

21 otherwise, having possession of the property, business, books, records, accounts, or assets of the

22 Receivership Defendants or Relief Defendants, or other Receivership Property, are hereby directed to

23 deliver the same to the Receiver, her agents and/or employees.

24      17.     All banks, brokerage firms, financial institutions, and other persons or entities which

25 have possession, custody, or control of any Receivership Property that receive actual notice of this

26 Order by personal service, email, facsimile, or otherwise shall:

27           A.     Not liquidate, transfer, sell, convey, or otherwise transfer any Receivership
Property except upon instructions from the Receiver;

28

B.  Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.  Within five (5) business days of receipt of notice of this Order, serve upon the Receiver and counsel for the Commission a certified statement setting forth, with respect to any account or other asset that is Receivership Property, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and

D.  Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## IV.  **Access to Real and Personal Property**

18.  The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media, or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

19.  The Receiver is authorized to take immediate possession of all real property of the Receivership Defendants and Relief Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures.  Upon receiving actual notice of this Order by personal service, email, facsimile, or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or (c) destroying, concealing, or erasing anything on such premises.

20.  In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above.  The Receiver shall have exclusive control of the keys.  The Receivership Defendants and Relief Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership (without the express written permission of the Receiver).

1    21.    The Receiver is authorized to open all mail directed to or received by or at the offices

2  or post office boxes of the Receivership Defendants and Relief Defendants, and to inspect all mail

3  opened prior to the entry of this Order, to determine whether items or information therein fall within

4  the mandates of this Order.

5    22.    Upon the request of the Receiver, the United States Marshal Service, in any judicial

6  district, is hereby ordered to assist the Receiver in carrying out her duties to take possession, custody,

7  and control of, or identify the location of, any assets, records, or other materials belonging to the

8  Receivership Estate.

9                              **V.    Notice to Third Parties**

10    23.    The Receiver shall promptly give notice, which may be by electronic means, of her

11  appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors,

12  managers, and general and limited partners of the Receivership Defendants and Relief Defendants, as

13  the Receiver deems necessary or advisable to effectuate the operation of the receivership.

14    24.    All persons and entities owing any obligation, debt, or distribution with respect to an

15  ownership interest to the Receivership Estate shall, until further ordered by this Court, pay all such

16  obligations in accordance with the terms thereof to the Receiver and its receipt for such payments

17  shall have the same force and effect as if the Receivership Defendant or Relief Defendant had

18  received such payment.

19    25.    In furtherance of her responsibilities in this matter, the Receiver is authorized to

20  communicate with, and/or serve this Order upon, any person, entity, or government office that she

21  deems appropriate to inform them of the status of this matter and/or the financial condition of the

22  Receivership Estates.  All government offices which maintain public files of security interests in real

23  and personal property shall, consistent with such office's applicable procedures, record this Order

24  upon the request of the Receiver or the SEC.

25    26.    The Receiver is authorized to instruct the United States Postmaster to hold and/or

26  reroute mail which is related, directly or indirectly, to the business, operations or activities of any of

27  the Receivership Defendants or Relief Defendants (the "Receiver's Mail"), including all mail

28  addressed to, or for the benefit of, the Receivership Defendants or Relief Defendants.  The

1    Postmaster shall not comply with, and shall immediately report to the Receiver, any change of

2    address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail.

3    The Receivership Defendants and Relief Defendants shall not open any of the Receiver's Mail and

4    shall immediately turn over such mail, regardless of when received, to the Receiver.  The foregoing

5    instructions shall apply to any proprietor, whether individual or entity, of any private mail box,

6    depository, business or service, or mail courier or delivery service, hired, rented, or used by the

7    Receivership Defendants or Relief Defendants.  The Receivership Defendants and Relief Defendants

8    shall not open a new mailbox, or take any steps or make any arrangements to receive mail in

9    contravention of this Order, whether through the U.S. mail, a private mail depository, or courier

10    service.

11        27.     Subject to payment for services provided, any entity furnishing water, electric,

12    telephone, sewage, garbage or trash removal services to the Receivership Defendants or Relief

13    Defendants shall maintain such service and transfer any such accounts to the Receiver unless

14    instructed to the contrary by the Receiver.

15                 **VI.**    **Injunction Against Interference with Receiver**

16        28.     The Receivership Defendants and Relief Defendants and all persons receiving notice

17    of this Order by personal service, email, facsimile, or otherwise, are hereby restrained and enjoined

18    from directly or indirectly taking any action or causing any action to be taken, without the express

19    written agreement of the Receiver, which would:

20            A.     Interfere with the Receiver's efforts to take control, possession, or
21                management of any Receivership Property; such prohibited actions include but
               are not limited to, using self-help or executing or issuing or causing the
22                execution or issuance of any court attachment, subpoena, replevin, execution,
               or other process for the purpose of impounding or taking possession of or
23                interfering with or creating or enforcing a lien upon any Receivership Property;

24            B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of
               her duties; such prohibited actions include but are not limited to, concealing,
25                destroying, or altering records or information;

26            C.     Dissipate or otherwise diminish the value of any Receivership Property; such
               prohibited actions include but are not limited to, releasing claims or disposing,
27                transferring, exchanging, assigning, or in any way conveying any Receivership
               Property, enforcing judgments, assessments, or claims against any
28                Receivership Property or any Receivership Defendant or Relief Defendant,
               attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate

1

(the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or Relief Defendant or which otherwise affects any Receivership Property; or

2

3

D.    Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

4

29.    The Receivership Defendants and Relief Defendants shall cooperate with and assist

5

the Receiver in the performance of her duties.

6

30.    The Receiver shall promptly notify the Court and SEC counsel of any failure or

7

apparent failure of any person or entity to comply in any way with the terms of this Order.

8

### VII.   Stay of Litigation

9

31.    As set forth in detail below, the following proceedings, excluding the instant

10

proceeding and all police or regulatory actions and actions of the Commission related to the above-

11

captioned enforcement action, are stayed until further Order of this Court:

12

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in her capacity as Receiver, or the Monitor, in her capacity as Monitor; (b) any Receivership Property, wherever located, or any property interests of the Monitorship Defendants or Relief Defendant; (c) any of the Receivership Defendants or Relief Defendants, or Monitorship Defendants or Relief Defendant, including subsidiaries and partnerships; or (d) any of the Receivership Defendants' and Relief Defendants' or Monitorship Defendants' or Relief Defendant's past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

13

14

15

16

17

18

19

32.    The parties to any and all Ancillary Proceedings are enjoined from commencing or

20

continuing any such legal proceeding, or from taking any action, in connection with any such

21

proceeding, including, but not limited to, the issuance or employment of process.

22

33.    All Ancillary Proceedings are stayed in their entirety, and all Courts having any

23

jurisdiction thereof are enjoined from taking or permitting any action until further Order of this

24

Court.  Further, as to a cause of action accrued or accruing in favor of one or more of the

25

Receivership Defendants or Relief Defendants or Monitorship Defendants or Monitorship Relief

26

Defendant against a third person or party, any applicable statute of limitation is tolled during the

27

period in which this injunction against commencement of legal proceedings is in effect as to that

28

cause of action.

## VIII.  **Managing Assets**

34.     For each of the Receivership Estates, where appropriate and necessary in the judgment of the Receiver, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

35.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

36.     Subject to Paragraph 37, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

37.     Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

38.     The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

## IX.   **Investigate and Prosecute Claims**

39.     Subject to the requirement, in Paragraph 40, immediately below, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in her discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

40.     Subject to her obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants and Relief Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate.  The Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order.

41.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Defendants and Relief Defendants.

42.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, her Retained Personnel (as that term is defined below), and the Receivership Estate.

## X.     Bankruptcy Filing

43.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendants and Relief Defendants.  If a Receivership Defendant or Relief Defendant is placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as a debtor in possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity.  Pursuant to Paragraph 7 above, the Receiver is vested with management authority for all Receivership Defendants and Relief Defendants and may therefore file and manage a Chapter 11 petition.

44.     The provisions of Section VII above bar any person or entity, other than the Receiver, from placing any of the Receivership Defendants in bankruptcy proceedings.

## XI.   Liability of Receiver

45.   Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with her fiduciary obligations in this matter.

46.   The Receiver and her agents, acting within the scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

47.   This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

48.   In the event the Receiver decides to resign, the Receiver shall first give written notice to the Court, and to the SEC's counsel of record, of her intention, and the resignation shall not be effective until the Court appoints a successor.  The Receiver shall then follow such instructions as the Court may provide.

## XII.   Recommendations and Reports

49.   The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Recovery Plan").

50.   Within ninety (90) days of the entry of this Order, the Receiver shall file the Recovery Plan in the above-captioned action, with service copies to counsel of record.

51.   Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of the Receivership Estates (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those

claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

52.   The Quarterly Status Report shall contain the following:

A.   A summary of the operations of the Receiver;

B.   The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.   A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.   A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.   A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting such judgments);

F.   A list of all known creditors with their addresses and the amounts of their claims;

G.   The status of any litigation brought by the Receivership Estate and of any Creditor Claims Proceedings, after such proceedings have been commenced; and

H.   The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

53.   On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIII.   Fees, Expenses and Accountings

54.   Subject to Paragraphs 55 to 61 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

55.     Subject to Paragraph 56 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist her in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

56.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

57.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

58.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

59.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

60.     Each Quarterly Fee Application shall:

A.     Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

B.     Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and (ii) with the exception of the Billing Instructions, the Receiver has not entered into

any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

61.    At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

## XIV.  Powers of the Monitor

62.    The Monitor shall be empowered to:

A.    Have full and complete access to each of the Monitorship Defendants' and the Monitorship Relief Defendant's books and records, including internal records as well as bank, financial institution and other records, but excluding attorney-client communications between the Monitorship Defendants and their respective counsel;

B.    Have full and complete access to the principals, officers, employees, agents, and consultants of each of the Monitorship Defendants and the Monitorship Relief Defendant, or anyone else who is otherwise associated with those entities to carry out the Monitor's assignment, except that no one shall be required to disclose attorney client communications between the Monitorship Defendants and their respective counsel;

C.    Have full and complete access to the counterparties to any contracts of the Monitorship Defendants and the Monitorship Relief Defendant, for the purpose of evaluating the terms of the contract including whether the contractual relationship would be disrupted by converting the Monitor to a Receiver over that entity;

D.    Review and monitor a report prepared every two weeks of all transactions of any Monitorship Defendants or the Monitorship Relief Defendant;

E.    Enter into any and all offices and premises and facilities maintained or managed by any of the Monitorship Defendants or the Monitorship Relief Defendant, except those facilities for which additional credentials are necessary (and Monitor Defendants and/or Monitor Relief Defendants shall assist the Monitor in obtaining the necessary additional credentials if so requested);

F.    Identify and locate all money, assets, real property, and investments held by, or for the benefit of, each of the Monitorship Defendants and the Monitorship Relief Defendant;

G.    Identify and locate all investors and owners in each of the Monitorship Defendants and the Monitorship Relief Defendant;

H.    Identify all debts, accounts payable, liabilities and unpaid obligations of the Monitorship Defendants and the Monitorship Relief Defendant;

I.    Engage and employ the same persons as those employed in her capacity as Receiver to assist her in carrying out her duties and responsibilities as Monitor,

including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

J.    Contact any of the EB-5 investors associated with any the Monitorship Defendants and Monitorship Relief Defendant or, if they are represented, counsel for such investors;

K.    Apply to the Court for an order compelling compliance with this Order or seeking a modification of this Order.

## XV.    Fees and Expenses of the Monitor

63.    The Monitor is authorized to employ the same persons and entities she employs as Receiver to assist her in carrying out her duties and responsibilities as Monitor. The Monitor shall not engage any such persons or entities without first obtaining an Order from the Court authorizing such engagement.

64.    The Monitor and anyone she employs pursuant to Paragraphs 62 and 63 are entitled to reasonable compensation and expense reimbursement. Such compensation shall require the prior approval of the Court.

65.    The Monitorship Defendants and the Monitorship Relief Defendant shall each pay, upon approval of this Court as set forth below, the reasonable costs, fees and expenses of the Monitor incurred in connection with the performance of the powers and duties described herein related to their respective businesses, as identified by the Monitor, including but not limited to such costs, fees and expenses of all persons retained by the Monitor with the Court's approval to assist in carrying out the Monitor's powers and duties. All applications for costs, fees and expenses of the Monitor and those employed by the Monitor shall be made by application to the Court, with notice to all parties and an opportunity to be heard, setting forth in reasonable detail the nature of such costs, fees, and expenses. Such applications shall be submitted quarterly at the same time as the applications made by the Receiver.

## XVI.    Liability of Monitor

66.    The Monitorship Defendants and Monitorship Relief Defendant shall indemnify, defend and hold harmless the Monitor and her agents, employees, consultants, successors, and assigns, from and against all actions (pending or threatened and whether at law or in equity in any forum), liabilities, damages, losses, costs, and expenses, including but not limited to reasonable

1  attorneys' and other professionals' fees, arising from the conduct or omission of the Monitor or her

2  agents, employees and consultants under the terms of this Order, except for any such conduct or

3  omission adjudged by the Court to be the result of gross negligence or willful misconduct.

### XVII.   **Bankruptcy Filing**

5  67.    The Monitorship Defendants and Monitorship Relief Defendant are each hereby

6  enjoined from filing a voluntary petition in bankruptcy without at least five days' notice to the

7  Monitor, to the SEC (by notice to the attorneys appearing on the SEC's behalf in this matter), and to

8  the Court.  Upon receiving such notice, the Monitor or the SEC may seek appropriate expedited relief

9  from this Court.

### XVIII.  **Binding Notice**

11 68.    In accordance with Rule 65(d) of the Federal Rules of Civil Procedure, this Order shall

12 be binding upon all parties to this action and upon all persons who receive actual notice of it through

13 personal service or otherwise.


15 IT IS SO ORDERED.


19 DATED _March 29_, 2017                          Richard Seeborg
                                                  UNITED STATES DISTRICT JUDGE

# EXHIBIT B



1130 South Braddock Avenue • Suite 200 • Pittsburgh, PA 15218 • P 412.521.5751 • F 412.871.5613 • www.mdavisgroup.com

June 13, 2017

Cynthia Gray
Uecker & Associates, Inc.
1613 Lyon Street, Suite A
San Francisco, CA 94115

RE:   *Engagement of M. Davis Group for the Sale of Equipment onsite at the former*
*Crystal Golden facility by Auction*

Dear Cynthia,

We wish to thank Uecker & Associates (UECK) for contacting the M. Davis Group
("MDG") regarding the sale of the equipment located in Tipton, CA and as more fully
described in the attachments and prior communications hereto (the "Equipment"). This
letter will outline what you may expect from us and what we may expect from you
during this course of this engagement (this "Agreement"). We will undertake to act as
exclusive agent to you under the following terms. If these terms are acceptable, please
execute this Agreement at your earliest convenience.

By signing this Agreement, UECK authorizes MDG to market and sell the Equipment
by contacting end users and dealers of similar equipment pursuant to the following
terms:

MDG's Agreement to Market

1.  MDG shall use its best efforts to fully market the Equipment and will include
    most or all of the following methods, as practicable and necessary:

    a.  Complete listing on MDG's website;
    b.  Listing on an online auction platform;
    c.  Listing online with industry websites and publications; and
    d.  Direct marketing utilizing MDG's client and customer lists. (Direct
        marketing includes: "flyers" or "mailers" sent through the U.S.
        Postal system, e-blasts and telemarketing, and/or marketing via
        contact lists rented from relevant industry listings.

2.  Upon execution of this Agreement, MDG will immediately commence marketing
    the Equipment, to be featured in an online auction. The auction closing date or
    dates will be determined by UECK and mutually agreed to by MDG. MDG will
    fund a marketing program to sufficiently foster industry awareness of the auction
    sale.

**EXHIBIT B**



3. Following the sale of any item of Equipment, MDG shall collect funds from the buyers (pursuant to the terms of MDG's agreement therewith) and promptly remit 85% of the sale price (excluding any buyer premium over and above the sale price) to UECK, upon removal of said Equipment. Successful buyers will also be required to pay MDG an industry standard buyer's premium. The buyer's premium is separate and exclusive of the sales price.

   In MDG's professional opinion, the sale will gross $25,000 - $45,000.

   Should UECK prefer to sell the assets, MDG will pay $25,000.00 for the assets described in the Schedule A below.

4. For purposes of clarification, MDG shall require from the buyer that it be the sole responsibility of the buyer to remove, load and ship the Equipment post sale or auction. Any assets left onsite by a buyer for more than 60 days post sale will be considered abandoned.

<u>Warranties of the Parties:</u>

5. MDG represents and warrants the following: (i) it is a premier auction, appraisal and equipment sales provider with all of the necessary expertise, licenses, permits and other qualifications required to make and sell the Equipment; (ii) it shall perform its obligations hereunder in full compliance with all applicable Federal, state and local laws, rules and regulations; and (iii) it maintains the type and level of insurance appropriate for performance of its obligations hereunder, and in no case less than what is required by law.  MDG shall promptly furnish such proof of insurance if so required by you.

6. MDG warrants that is shall sell the Equipment on an as-is, where-is basis to any buyer.

7. UECK represent and warrant that the Equipment is owned by UECK and is free and clear of any and all liens and encumbrances prior to the opening date of the auction.

We appreciate the opportunity to work with you and would like to begin our marketing efforts as soon as possible.  Once you have approved these terms, please execute below and we will immediately begin working with you to schedule the successful auction sale of your Equipment.

1130 South Braddock Avenue • Suite 200 • Pittsburgh, PA 15218 • P 412.521.5751 • F 412.871.5613 • www.mdavisgroup.com



Should you have any questions, please don't hesitate to call.

Sincerely,

Harry Davis
Authorized Representative of M. Davis Group

Uecker & Associates

By:_____

Title: _____

Print Name:_____

1130 South Braddock Avenue ● Suite 200 ● Pittsburgh, PA 15218 ● P 412.521.5751 ● F 412 871 5613 ● www.mdavisgroup.com

M. Davis Group | 1130 S Braddock Ave. Suite 200 | Pittsburgh, PA 15218
412.521.5751 | www.mdavisgroup.com



**Schedule A:**

S/S Air-Valve

(2) Milk Transfer Hoses

2007 Acqua Int. Falling Film "Cyclovap Tech" S/S MVR Evaporator, Model CYCLOVAP, (Designed for 26,000 lbs / 12,056 kg per hr. on Whey – 53 GPM 7-8x Concentration), Steam Heated, Utilized ISG (Inline Swirl Generation) Technology, Aprox. 86" Dia. Main Chamber (Calandria) with 675 2" & 8" Tubes x Aprox. 36 ft. H x 8 ft. Wide, with Pillar 277 hp / 177.3 kw Turbo Compressor / Turbo Fan, Type 40778 KKXGAE 80560, with VFD Controls, Includes S/S Duct Work, (7) Fristam & Other Centrifugal Pumps up to 25hp, Related APV & Other Valves, PSI, Mag & Mass Flow Sensor Transmitters, Temp & Conductivity Sensors, Related Piping & Fittings & PLC Controls,

4-Tank CIP System, Includes (2) Walker Dome-Top/Cone-Bottom 1,600 Gallon Tanks Model SSBT S/N 530-1520 & 534-1520, Equipped with Inlet and Outlet Air Valves, (2) Approx 1,500 Gallon Hinge-Top Cone-Bottom, S/S Control Panel with (3) Centrifugal Pumps

S/S CIP Operators Platform

Heat Exchanger Skid Equipped with Therma Line Plate Frame with Approx. (56) Plates, Model T28CH, Secondary Therma Line Heat Exchanger, (3) Online Filters, Wright Flow Centrifugal Pump

Recirculation Skid Equipped with (4) Centrifugal Pumps, Including (3) AMCO 25 HP & Wright Flow Pumps, Micromotion Online Flow Meter with Digital Read-Out

Flotronics Vertical Filter Tank, Model BFVCES2-31, S/N 2201, Equipped with (4) Grundfoss Pumps, Water Softning Tanks with Online Filters, (4) Dosing Pumps

Ammonia Refrigeration Department including: (3) Vilter Compressors, Ammonia Accumulation System, Pumps, Valves & Fittings

(3) Jacketed Silos with Associated Chart Recorders, Control Systems, Valves and Fittings

Centrifugal Pumps with associated valves

Pallet Racks in warehouse, product storage and other areas of the plant

1140 South Braddock Avenue • Suite 200 • Pittsburgh, PA 15218 • P 412.621.575 • F 412.871.5513 • www.mdavisgroup.com

# EXHIBIT C





# Broker Opinion of Value

Updated June 19, 2017

**Newmark Grubb Knight Frank**



**615 N. BURNETT ROAD**

**TIPTON, CA 93272**

**±50,929 SF**

**±3.72 ACRES**

**BOV FOR:** SUSAN L. UECKER

UECKER & ASSOCIATES, INC.

1613 LYON STREET, SUITE A

SAN FRANCISCO, CA 94115

415-362-3440

SUECKER@UECKERASSOC.COM

**PRESENTED BY:**

NICK AUDINO, SIOR

SENIOR VICE PRESIDENT-INDUSTRIAL DIVISION

559-447-6270

NAUDINO@PEARSONREALTY.COM

CA BRE# 01231272

KELLY WOOD

ASSOCIATE-INDUSTRIAL DIVISION

559-447-6236

KWOOD@PEARSONREALTY.COM

CA BRE# 02014068



**EXHIBIT C**



# PROPERTY OVERVIEW

**Newmark Grubb
Knight Frank**

# Property Overview



| | |
|---|---|
| **Year Built:** | 1927-2008 |
| **Address:** | 615 N. Burnett Road Tipton, CA 93272 |
| **Gross Building Area:** | ±50,929 sf |
| **Acres:** | ±3.72 acres (situated on 3 parcels) |
| **Building Details:** | ±5,708 sf office (two stories) |

±7,590 sf dry storage

3-dock high doors with pit load levelers, pipe bollards, trailer lights, dock locks, brush guards, and dock seals

1- ramped door

±13,207 Cold Storage (2 rooms)
**(not sure cold storage is still functional)**

powered by 3 ammonia compressors with 95.7 ton capacity

dry fire sprinkler system

T-5 lighting

floor drains

room 1: 24' clear height , room 2: 34' clear height

±12,810 sf Food Processing

Food processing rooms have been stripped of all equipment and plumbing

sloped tile floors with drains

14' clear height








# Property Assessment



### Positive Attributes

*   Cold Storage is in relatively high demand in Central California.  ( if operable)

*   Good loading dock configuration.

*   Good clear height in cold storage.  (if operable)

*   Three water wells (approximately 450'-580' deep) on site (if remaining)

*   Ample Power original main- 1,600 amps 277/480 volt 3-phase service. New Service

    2008-4,000 amps 277/480 volt 3-phase service.

*   Natural Gas:  The Gas Company



### Points of Market Resistance

**Plant has been completely stripped out.  Highest and best use in current
Condition is dry storage.  One half of building is not usable as dry storage.**

*   Location in Tipton, CA is remote.

*   Processing area is not connected to city sewer.

*   Processing areas are segregated and inefficient.

*   Parts of the plant are very old.

*   Limited room for expansion.

*   Plant has been closed for almost two years.

*   Deed restriction on cheese manufacturing.



# Executive Summary



**Opinion of Value**  I was involved in the previous sale of the property in November 2015.  The sale price of the property at that time was $4,000,000.  This sale occurred shortly after the previous owner closed its cheese making operation and the plant was in good condition.  Included in the price was over $1,000,000 of equipment.  At the present time all equipment has been removed from the building and it is in extremely poor condition.  The highest and best use for the building is dry storage. The former processing area has almost no value.

Remaining functional sections are:  office area ±5,708 sf, dry storage ±7,590 sf, cold storage if operable ±13,207 sf.  Total usable square feet is ±26,505.  Market value for dry storage is $35 psf.  The remainder of the building's food processing and ancillary portions thereto are ±24,424 sf. The value of those sections is $7 psf.  Total value for the property is $1,100,000.

# Agent Bio



Professional Background

Mr. Audino has been a Senior Vice President at Newmark Grubb Pearson Commercial since 2013 where he specializes in sales, leasing, acquisition, disposition and ground-up development of industrial property throughout the Central San Joaquin Valley.

Mr. Audino began his career at CBRE in 1997 after graduating from California State University Fresno with a Bachelor of Science Degree in Real Estate and Land Use Economics. During Mr. Audino's tenure at CBRE, he maintained the status of being one of the top producers from 2003 to 2013, and he was honored as the "Top Producer" for six consecutive years.

Mr. Audino has continued his top performance status at Newmark Grubb Pearson Commercial ranking in the "Top Three Producers" overall in 2014 and 2015.

He was also honored by his peers in 2014 receiving the "Peer Award" in recognition of maintaining the highest standards of personal integrity, superior work ethic and individual professionalism.

Professional Affiliations and Accreditations

☐ Newmark Grubb Knight Frank–"Top Producer" Designation 2014 & 2015
☐ Recipient of Pearson Realty "Peer Award" for 2014
☐ CB Richard Ellis Salesperson of the Year 2007, 2008, 2009, 2010, 2011 & 2012
☐ Member, Society of Industrial and Office Realtors (SIOR)
☐ Board of Directors – Cen-Cal Small Business Finance
☐ Vice Chair Board of Directors Executive Committee -- Fresno County EDC
☐ Key Note Speaker Industrial Specialist, EDC Annual Forecast Event, 2007, 2009, 2012, 2014, and 2016
☐ Member, City of Fresno Mayor's Council on Industrial Development
☐ Member, Economic Development Department's task force on High Speed Rail Relocations
☐ Advisory Committee City of Clovis Economic Development Strategy 2014
☐ Executive Profile 2016 - The Business Journal, Fresno-Kings-Madera-Tulare



NICHOLAS J. AUDINO, SIOR
Senior Vice President
BRE License #01231272

Years of Experience
20 Years
Areas of Specialization
☐ Industrial Real Estate Valuation
☐ Real Estate Leasing
☐ Title
☐ Research
☐ Public Speaking
☐ Site Design
☐ Purchase & Sale Analysis
☐ Marketing
☐ Contract Negotiation
☐ Real Asset Repositioning
Education
☐ California State University, Fresno- Bachelor of Science, with an emphasis in Land Use and Real Estate Economics.

# EXHIBIT D

## AGREEMENT FOR DEED IN LIEU OF FORECLOSURE
## AND ESCROW INSTRUCTIONS

THIS AGREEMENT FOR DEED IN LIEU OF FORECLOSURE AND ESCROW INSTRUCTIONS ("**Agreement**") is made and effective as of this _____ day of _____, 2017 by and between Tipton Investment Group, LLC, a California limited liability company ("**Lender**") and Susan L. Uecker, the Receiver ("**Receiver**") for Central California Farms, LLC, a California limited liability company ("**Borrower**"), with reference to the facts and objectives in the recitals set forth below.

### RECITALS

     **A.**      Borrower has executed the following loan documents in favor of Lender (collectively, the "Loan Documents"):

         **1.**      Promissory Note Secured by Deed of Trust in the amount of $1,500,000.00 dated October 23, 2015 attached hereto as **Exhibit A** ("**Note**"); and

         **2.**      Deed of Trust, Assignment of Leases, Rents and Profits, Security Agreement and Fixture Filing dated October 25, 2015 and recorded on November 4, 2015 in the Official Records of the Tulare County Recorder as Instrument No. 2015-0066476 ("**Deed of Trust**") on certain real property commonly known as 615 N. Burnett Road in the City of Tipton, California, as more particularly described in the attached **Exhibit B** ("**Property**"). The Note, the Deed of Trust and related documents are referred to collectively as the "**Loan Documents**."

     **B.**      In connection with the Loan Documents, Jakob G. Weststeyn and Gladys Y. Weststeyn (individually, a "**Guarantor**" and collectively, the "**Guarantors**") each executed a Guaranty (individually, a "**Guaranty**" and collectively, the "**Guaranties**") whereby the Guarantors each guaranteed to Lender and agreed to pay to Lender the full amount of the "Loan" payable under the Loan Documents. In no event shall the Guaranties be deemed to be included in the "Loan Documents" as defined and referenced in this Agreement.

     **C.**      The beneficial interest under the Deed of Trust was assigned by Mid Valley Services, Inc. pursuant to a Corporation Assignment of Deed of Trust (the "**2015 Assignment**") dated November 9, 2015 and recorded December 2, 2015 in Official Records under Instrument No. 2015-0071279 to the following (collectively, the "Holder Group"): Slater and Company 401(k) Pension & Profit Sharing Plan, John Slater, Trustee, an undivided 4.000% interest and Michael G. Hurst and Denise S. Hurst, Trustees of the Michael G. Hurst and Denise S. Hurst Declaration of Trust Established June 27, 2011, an undivided 10.000% interest and Nick M. Shubin, as Trustee of the Amendment and Restatement of the Nick M. Shubin Revocable Trust, an undivided 17.000% interest and Lou Telesmanic and Joanne Telesmanic, husband and wife as joint tenants, an undivided 10.000% interest and George H. Lehman, as Trustee of the George H. Lehman 2003 Trust, an undivided **[?]** % beneficial interest, an undivided 10.000% interest and Thomas A. Miller and Judith A. Miller, husband and wife as joint tenants, an undivided 6.667% interest and George A. Bertolucci and Lori A. Bertolucci, husband and wife as joint tenants, an undivided 5.667% interest and Pensco Trust Company, Custodian FBO Sudeep Singh IRA, an undivided 3.333% interest and Sudeep Singh FLLLP, an undivided 10.000% interest and Robert

**EXHIBIT D**

E. Wilson and Jacquelyne E. Wilson, Trustees of the Robert E. Wilson and Jacquelyne E. Wilson Revocable Family Trust, an undivided 10.000% interest and Steve J. Zupanovich and Katherine A. Zupanovich, Trustees of the Steve J. and Katherine A. Zupanovich Trust, an undivided 13.333% interest.

**D.**     The beneficial interest under the Deed of Trust was subsequently assigned by the Holder Group pursuant to an Assignment of Deed of Trust (the "**2017 Assignment**") dated August ___, 2017 and recorded August ___, 2017 in Official Records under Instrument No. 2017-_____ to Lender (Tipton Investment Group, LLC, a California limited liability company), the current holder.

**E.**     Pursuant to that certain Order Appointing Receiver and Monitor filed in the United States District Court, Northern District of California, San Francisco Division, on March 29, 2017 in the case styled, *Securities and Exchange Commission v. San Francisco Regional Center LLC, et al.*, Case No. 3:17-CV-00223-RS, pending before the United States District Court, Northern District of California, Susan L. Uecker was appointed as a Receiver for Relief Defendant, Central California Farms, LLC, a California limited liability company (the "**Receivership**").

**F.**     As of _____, 2017, the amount due under the Note as of the date of this Agreement, including accrued interest and other amounts due thereunder is approximately $_____ (the "**Debt**").

**G.**     Lender and Receiver believe that the fair market value of the Property is less than the Debt.  To spare the expense of a foreclosure sale of the Property, Receiver desires to transfer the Property to Lender in lieu of foreclosure and has requested Lender to accept a deed in lieu of foreclosure.  Lender has agreed to accept a deed in lieu of foreclosure with respect to the Property, subject to the terms and conditions set forth in this Agreement.

**H.**     In addition to the foregoing, subject to the full satisfaction of all the terms and conditions set forth in this Agreement, the parties hereto wish to settle, dismiss, covenant not to sue, and release one another in full of certain claims and obligations arising out of or related to the Loan Documents.

### AGREEMENT

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as set forth below.

**1.**     **Court Approval**.  This Agreement shall be subject to Court approval by the Court with jurisdiction over the Receivership.  The Receiver shall file a motion requesting the entry of an order approving this Agreement as soon as practicable.

**2.**     **Conveyance of Property**.  Subject to the full satisfaction on the Closing Date (as defined below) of the conditions set forth in **Section 5** below, Borrower agrees to grant, convey and transfer to Lender and Lender agrees to accept, fee simple title to the Property, by a grant deed in Escrow Holder's (as defined below) standard form, with the information and an attachment as set forth in the attached **Exhibit C** (collectively, the "**Grant Deed**").  Such

transfer of the Property shall include an absolute assignment by Receiver to Lender, effective as of the Closing, of all right, title and interest in and to any and all documents and other rights relating to the Property, including, but not limited to, any leases and rental agreements, construction, architect's or other agreements, maps, warranties and indemnities, surveys, permits, deposits, insurance policy premiums, rebates, environmental reports, civil and soil engineering reports, rights of entitlement from government agencies, site plans, plans and specifications relating to improvements thereon (whether constructed or not) and all other plans, reports, and other work relating to the Property (collectively, the "**Documents**"), to be delivered to Lender as provided below. The Documents shall be assigned by Receiver to Lender pursuant to that certain Assignment of Property Documents and Rights in the form attached as **Exhibit D** ("**Assignment of Property Documents and Rights**"). In addition to the other consideration referenced in this Agreement, Lender and Receiver acknowledge and agree that, subject to the full satisfaction of the conditions set forth in **Section 5** of this Agreement on or before the Closing Date as provided herein, Lender has agreed to accept Receiver's conveyance of the Property and the Documents in full, final and complete settlement of the Debt as to Borrower.

      **3.**    **Escrow**. Within two (2) business days after the entry of an order approving this Agreement, Lender shall open an escrow (the "**Escrow**") with _____ (the "**Escrow Holder**") by delivering a fully executed copy of this Agreement to the Escrow Holder. Escrow Holder's General Provisions are set forth in **Exhibit E**. The Escrow shall be deemed opened upon execution by the Escrow Holder of the "Consent of Escrow Holder" set forth at the end of this Agreement. This Agreement shall constitute joint escrow instructions to the Escrow Holder in connection with the Escrow. The costs and expenses of the Escrow (including Escrow Holders fees and charges, recording charges, and any documentary transfer taxes due, shall be shared equally by Lender and Receiver. Lender and Receiver hereby agree to execute such additional instructions and documents not inconsistent with this Agreement as may be reasonably required by the Escrow Holder to consummate the transactions contemplated herein.

      **4.**    **Closing Date**. The Escrow shall close (the "**Closing**") as soon as possible after the satisfaction of all the conditions contained in this Agreement, but in no event later than _____, 2017 (the "**Closing Date**"). The parties acknowledge and agree that time is of the essence and if such Closing cannot be effected by the Closing Date, for any reason, then at the election of either party, the Escrow shall be canceled and all documents shall be returned to the party entitled to possession of same should the Escrow not have been opened and Escrow Holder shall have no further obligations hereunder. In such event, Receiver and Lender shall share equally all costs associated with the cancellation of the Escrow. In no event shall the Escrow be extended, except upon the express written authorization of Lender and Receiver.

      **5.**    **Deliveries into Escrow**. Receiver shall deliver or cause to be delivered to Escrow Holder, prior to the Closing Date: (i) order approving this Agreement; (ii) the Grant Deed executed and acknowledged by Borrower; (iii) a Certificate of Non-Foreign Status in conformance with California and federal law, (iv) all of the Documents; (v) the Assignment of Property Documents and Rights executed by Receiver; and (vi) immediately available funds in an amount sufficient to pay Receiver's share of Escrow Holder's costs hereunder. Lender shall have deposited immediately available funds in an amount sufficient to pay all amounts due from Lender hereunder for Lender's share of Escrow Holder's fees and costs, the premium for the

Title Policy (as defined below) and the amount due to the Lender under the Deed of Trust, and documents sufficient to rescind the Notices of Default.

6.  **Conditions Precedent to Closing**.  The following shall constitute conditions to the Closing:

(a)  Receiver and Lender shall have delivered all of the items set forth in **Section 4**;

(b)  The Receiver shall have obtained an order of the United States District Court of the Northern District of California in the *Securities and Exchange Commission v. San Francisco Regional Center LLC, et al.*, Case No. 3:17-CV-00223-RS authorizing and approving this Agreement;

(c)  _____ ("**Title Insurer**") shall be unconditionally committed to issue a binder for an American Land Title Association ("**ALTA**") Owner's Policy of Title Insurance in a liability amount equal to $_____ (the "**Title Policy**"), or such other form of insurance or binder, as may be acceptable to Lender, at Lender's election, showing title to the Property vested in Lender, or its nominee in fee, free and clear of all encumbrances, liens, charges and claims, except those matters described in **Exhibit G** ("**Approved Exceptions**"), and no others except as may be expressly agreed to in writing by Lender; and

(d)  No material adverse change shall have occurred with respect to the Property.

7.  **Escrow Instructions**.  Escrow Holder is hereby authorized to record the Grant Deed in the Official Records of Tulare County, when and only when each of the following conditions have been satisfied:

(a)  Escrow Holder has received all of the deliveries referred in **Section 4** above,

(b)  The conditions precedent set forth in **Section 5** of this Agreement has been satisfied by Borrower or waived by Lender; and

(c)  Escrow Holder holds (or has obtained a commitment with respect to) the Title Policy.

8.  **Actions Upon Closing**.  Upon the Closing, the Escrow Holder shall:

(a)  Deliver a conformed copy of the Grant Deed to Lender and to Borrower;

(b)  Deliver or cause to be delivered to Lender the original of the Title Policy;

(c)  Deliver the original Certificate of Non-Foreign Status to Lender;

**(d)**     Deliver the Documents to Lender; and

**(e)**     Deliver the original Assignment of Property Documents and Rights to Lender.

**9.     New Agreements**.  Receiver shall not, from and after the date of this Agreement, amend or terminate any Document, enter into any sales agreements, leases, contracts or other agreements materially affecting the Property, or create or cause any additional exception to title to the Property to exist subsequent to its execution of this Agreement without first obtaining the prior written consent of Lender, which consent Lender shall not unreasonably withhold, delay or condition.

**10.     Incidental Expenses**.  Lender and Receiver shall each pay their own incidental expenses (including attorneys' fees) incurred in connection with the transaction contemplated hereby.

**11.     Vacation of Property**.  Receiver shall vacate the Property on or before the Closing Date and shall deliver all keys, and security devices to Lender immediately upon the Closing.

**12.     Expenses Relating to the Property**.  Prior to the Closing, Receiver shall not cancel any utilities servicing the Property and shall coordinate with Lender with respect to the transfer of any utilities serving the Property to the name of Lender.  Receiver shall pay all utilities with respect to the Property relating to the period preceding the transfer of the Property. Receiver shall have no responsibility for the payment of any expenses relating to the Property accruing on or after the transfer of the Property, except with respect to claims or expenses arising under any indemnification obligations under this Agreement.

**13.     Taxes and Assessments**.  As of the Closing, Lender shall be responsible for the payment of all real property taxes and assessments relating to the Property, whether due before or after the Closing.

**14.     Insurance**.  Receiver shall not cause the insurance with respect to the Property to be canceled prior to the Closing.

**15.     Release and Indemnification**.

**(a)     Mutual Release and Covenant Not to Sue**.  Subject to the satisfaction of the conditions set forth in **Section 5** as provided therein, and except as to the rights and obligations arising under or in connection with this Agreement, Lender unilaterally and bilaterally forever releases, discharges, and covenants not to sue Receiver and Borrower and/or its respective agents, insurers, servants, partners, officers, directors, shareholders, employees, predecessors and assigns and assignors, jointly and severally, and Receiver and Borrower unilaterally and bilaterally forever releases, discharges, and covenants not to sue Lender and/or its agents, insurers, servants, officers, directors, shareholders, employees, predecessors and assigns and assignors, jointly and severally, from any and all claims, demands, controversies, actions, causes of actions, obligations, liability, costs, expenses, attorneys' fees and damages of whatsoever character, nature or kind, in law or in equity, which arise from or are

related to the Loan Documents (collectively the "**Released Claims**"); provided, however, that (i) nothing contained in this Agreement shall be deemed to be a release of the lien of the Deed of Trust or the obligations secured thereby and (ii) nothing contained in this Agreement shall be deemed to release the Guarantors from any liability under the Guaranties.

**(b)      Waiver of Civil Code Section 1542.**  It is the intention of the parties hereto that the foregoing release shall be effective so as to bar all claims, demands, controversies, actions, causes of action, obligations, liabilities, costs, expenses, attorneys' fees and damages of whatsoever character, nature and kind, known or unknown, suspected or unsuspected, which arise from or are. related or unrelated to the Released Claims, and the parties hereto expressly acknowledge and waive any and all rights and benefits conferred upon them by the provisions of Section 1542 of the Cal. Civil Code, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM, MUST HAVE MATERIALLY AFFECTED IRS SETTLEMENT WITH THE DEBTOR.

The parties hereto acknowledge the foregoing waiver of the provisions of Section 1542 of the Cal. Civil Code was separately bargained for; they expressly consent that this Agreement shall be given full force and effect in accordance with each and all of its express terms and provisions, including those terms and provisions relating to unknown and unsuspected claims, demands and causes of action, if any, to the same effect as those terms and provisions relating to any other claims, demands and causes of action hereinabove specified.

**(c)      Representations and Warranties and Mutual Indemnification**. Subject to the satisfaction of the conditions set forth in **Section 5** above, each party hereto mutually represents and warrants as of the date of this Agreement (a) to the actual knowledge of each party, no other entity or person has any right, title or interest whatsoever in the Released Claims and (b) that there has been no assignment, transfer, conveyance or other disposition by the parties to this Agreement of any of the Released Claims.  Each party hereto acknowledges that the other has relied and are relying upon such representations and warranties in entering into this Agreement.

**(d)      Additional Representations**.  This Agreement represents a settlement of doubtful and disputed claims between the parties hereto and does not constitute any admission of liability by either party to the other party to this Agreement hereby expressly denies any liability to, the other party.

**16.      Unconditional and Absolute Transfer**.  The grant, assignment, conveyance and transfer of the Property and the Documents as provided herein shall be unconditional and absolute and Borrower shall not have (and does not reserve) any right, title or interest of any kind whatsoever in or to any part of the Property and the Documents.  Borrower hereby forever waives and releases any and all rights of redemption and other rights, if any, which it might have or have had in connection with the Property, whether arising from the grant, assignment,

conveyance and transfer of the Property described herein, or arising from any foreclosure sale which Lender might have elected to hold or may hereinafter hold pursuant to the Deed of Trust. Lender does not assume, directly or indirectly, any liability, obligation, duty or responsibility whatsoever for the payment, discharge or other resolution of any liability, obligation, indebtedness, lien, security interest, encumbrance, claim or other problem, condition or matter which has been or may hereafter be created or assumed by Borrower, anyone associated with Borrower or any of Borrower's predecessors in interest or which may otherwise presently exist with respect to the Documents or the Property.  Lender may at any time sell, transfer, lease, assign or abandon the Property and may take or omit to take any action which Lender in its discretion may deem to be in its best interest without regard to Borrower or any other person, and Borrower shall have no right, title or interest in or to any portion of any consideration received by Lender in connection with any such sale, transfer, lease, assignment or abandonment of the Property or the Documents.

17.     **Right to Reconvey**.  Lender, in its sole discretion, may effect a reconveyance of the Property granted pursuant to the Deed of Trust, by releasing the Property from the obligations of the Deed of Trust.  Lender shall be entitled to effect such reconveyance without the consent of or notice to the Borrower or any of the parties consenting to this Agreement.

18.     **No Merger**.  It is the intent of the parties that upon execution, delivery and recordation of the Grant Deed and the consummation of the transaction contemplated by this Agreement, the Grant Deed shall not merge with the Deed of Trust, and that Lender and its successors and assigns, shall continue to enjoy all rights and remedies set forth in the Deed of Trust, including the right to foreclose either by judicial action or under the power of sale contained in the Deed of Trust.

19.     **Miscellaneous**.

19.1    **Notices**.  Any notice to be given or other document to be delivered by any party to the other or others hereunder, may be delivered in person to an officer of any party, or may be deposited in the United States mail, duly certified or registered, return receipt requested, with postage prepaid, or by Federal Express or other similar overnight delivery service, and addressed to the party for whom intended, as follows:

To Lender:          _____
                    _____
                    _____
                    _____

With a copy to:     _____
                    _____
                    _____
                    _____

| | |
|---|---|
| To Receiver: | Susan L. Uecker<br>Receiver for Central California Farms, LLC<br>1613 Lyon Street, Suite A<br>San Francisco, CA  94115 |
| With a copy to: | Wendel, Rosen, Black & Dean LLP<br>1111 Broadway, 24th Floor<br>Oakland, CA  94607<br>Attn:  Elizabeth Berke-Dreyfuss, Esq. |
| To Escrow Agent: | _____<br>_____<br>_____<br>_____ |

Any party hereto may from time to time, by written notice to the other, designate a different address which shall be substituted for the one above specified.  Unless otherwise specifically provided for herein, all notices, payments, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly given and received (i) upon personal delivery, or (ii) as of the third business day after mailing by United States registered or certified mail, return receipt requested, postage prepaid, addressed as set forth above, or (iii) the immediately succeeding Business Day after deposit with Federal Express or other similar overnight delivery system.

**19.2    Survival**.  All covenants, representations, warranties and other agreements under this Agreement to be performed or relating to the period shall survive the consummation of this transaction upon the Closing.

**19.3    Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

**19.4    Attorneys' Fees**.  Should any party hereto reasonably retain counsel for the purpose of enforcing or preventing the breach of any provision hereof including, but not limited to, instituting any action or proceeding to enforce any provisions hereof for damages by reason of any alleged breach of any provisions hereof, for a declaration of such party's rights or obligations hereunder or for any other judicial remedy, then, if said matter is settled by judicial determination (which term includes arbitration judicially affirmed), the prevailing party shall be entitled, in addition to such other relief as granted, to be reimbursed by the losing party for all costs and expenses incurred thereby, including, but not limited to, reasonable attorneys' fees and costs for the services rendered to such prevailing party.

**19.5    Further Assurances**.  The parties hereto hereby agree to execute such other documents and to take such other action as may be reasonably necessary to further the purposes of this Agreement.

19.6    **Time of Essence**. Time is expressly declared to be of the essence in this Agreement and of every provision hereof in which time is an element.

19.7    **Governing Law**. This Agreement has been negotiated and entered into in the State of California, and shall be governed by, construed and enforced in accordance with the internal laws of the State of California, applied to contracts made in California by California domiciliaries to be wholly performed in California.

19.8    **Benefit and Burden**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

19.9    **Waiver and Amendment**. No breach of any provision hereof can be waived unless in writing. Waiver of any one breach of any provision hereof shall not be deemed to be a waiver of any other breach of the same or any other provision hereof. This Agreement may be amended only by a written agreement executed by the parties in interest at the time of the modification.

19.10   **Captions and Interpretations**. Titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or any provision hereof. No provision in this Agreement is to be interpreted for or against either party because that party or his legal representative drafted such provision.

19.11   **Authority**. Any corporation signing this Agreement represents and warrants that this Agreement is executed with the authority of the Board of Directors of said corporation. Each individual executing this Agreement on behalf of an entity represents and warrants: (i) he or she is duly authorized to execute and deliver this Agreement on behalf of the entity in accordance with its governing documents; (ii) this Agreement is binding upon such entity in accordance with the terms hereof; (iii) such entity is a duly organized and legally existing entity, in good standing under the laws of the state where it was organized, and if different from the state where the Property are located, is duly qualified to conduct business in such state, and is in good standing under the laws of the state where the Property is located; and (iv) the execution and delivery of this Agreement will not result in any breach of or constitute a default under any mortgage, deed of trust, lease, loan, credit agreement, partnership agreement or other contract or instrument to which such entity is a party or by which such entity may be bound. All individuals signing this Agreement each represents and warrants that it has the requisite power and authority to execute this Agreement on its own behalf and that no other individual must execute this Agreement in order for each such individual party to be bound hereby.

19.12   **Integration**. This Agreement constitutes the entire, final and integrated agreement between the parties hereto pertaining to the subject matter hereof, fully supersedes any and all prior understandings, representations, warranties and agreements between the parties hereto, or any of them, pertaining to the subject matter hereof, and may be modified only by written agreement signed by all of the parties hereto.

**19.13   Severance**.  If any provision of this Agreement is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, such provision will be deemed to be severed and deleted from the agreement as a whole and neither such provision, nor its severance and deletion shall in any way affect the validity of the remaining provisions of this Agreement.

**19.14   Independent Advice of Counsel**.  The parties hereto and each of them, represent and declare that in executing this Agreement they rely solely. upon their own judgment, belief and knowledge, and the advice and recommendations of their own independently selected counsel, concerning the nature, extent and duration of their rights and claims, and that they have not been influenced to any extent whatsoever in executing the same by any of the parties hereto or by any person representing them, or any of them.

**19.15   Voluntary Agreement**.  The parties hereto, and each of them, further represent and declare that they have carefully read this Agreement and know the contents thereof, and that they sign the same freely and voluntarily.

**19.16   Recitals and Exhibits**.  The recitals at the beginning of this Agreement and the exhibits referenced in and attached to this Agreement are incorporated in and made a part of this Agreement.

[*SIGNATURES ON FOLLOWING PAGE*]

IN WITNESS WHEREOF, the parties hereby have executed this Agreement as of the date and year set forth above.

Lender:                                          Borrower:

Tipton Investment Group, LLC, a California
limited liability company

By:_____          By:_____
Name:_____                Susan L. Uecker, Receiver for Central
Title:_____               Farms, LLC in the case of Securities and
                                             Exchange Commission vs San Francisco
By:_____                 Regional Center, LLC, et.al. (Case
Name:_____                 No. 3:17-CV-00223-RS in the United
Title:_____               States District Court, Northern District of
                                             California)

## ACCEPTANCE OF ESCROW HOLDER

By executing this Acceptance of Escrow Holder, _____ by its duly authorized officer(s), hereby agrees to accept the foregoing Agreement as supplemental escrow instructions with respect to the Escrow described therein and to be bound by such Agreement in the performance of its duties as Escrow Holder hereunder.

                                   By:_____
                                   Name:_____
                                   Title:_____
                                   Date:_____

## LIST OF EXHIBITS

Exhibit A          Promissory Note

Exhibit B          Deed of Trust

Exhibit C          Grant Deed Attachment

Exhibit D          Assignment of Property Documents and Rights

Exhibit E          General Provisions

Exhibit F          Approved Exceptions

**EXHIBIT A**

**Promissory Note**

[To Be Attached]

1

**EXHIBIT B**

**Description of the Property**

[To Be Attached]

# EXHIBIT C

## Grant Deed Attachment

The property subject to this Grant Deed is described as follows:

**[Legal Description]**

BY EXECUTING THIS EXHIBIT A, GRANTOR AND GRANTEE ACKNOWLEDGE AND AGREE THAT THIS DEED IS FREELY AND FAIRLY MADE AND IS AN ABSOLUTE CONVEYANCE, THE GRANTOR HAVING SOLD SAD) PROPERTY TO THE GRANTEE FOR A FAIR AND ADEQUATE CONSIDERATION, SUCH CONSIDERATION, IN ADDITION TO THAT ABOVE RECITED, BEING THE RELEASE OF GRANTOR FROM PERSONAL LIABILITY WITH RESPECT TO CERTAIN OBLIGATIONS SECURED BY THE DEED OF TRUST WHEREIN GRANTOR (OR GRANTOR'S PREDECESSOR) WAS TRUSTOR AND GRANTEE (OR GRANTEE'S PREDECESSOR) WAS BENEFICIARY, DATED OCTOBER 23, 2015 AND RECORDED NOVEMBER 4, 2015 AS INSTRUMENT NO. 2015-0066476 IN THE OFFICIAL RECORDS OF TULARE COUNTY ("DEED OF TRUST").

GRANTOR:                                  GRANTEE:


By:_____          By:_____
    Susan L. Uecker, Receiver for Central       Name:_____
    Farms, LLC in the case of Securities and    Title:_____
    Exchange Commission vs San Francisco
    Regional Center, LLC, et.al. (Case      By:_____
    No. 3:17-CV-00223-RS in the United      Name:_____
    States District Court, Northern District of  Title:_____
    California)


THE FOLLOWING INFORMATION SHALL BE INCLUDED BY ESCROW HOLDER ON THE FACE OF THE GRANT DEED:

THE GRANTEE HEREIN WAS THE BENEFICIARY.

THE AMOUNT OF THE UNPAID PRINCIPAL WAS $_____.

THE AMOUNT PAID BY GRANTEE WAS $0.

THE DOCUMENTARY TRANSFER TAX WAS $0.

## EXHIBIT D

## ASSIGNMENT OF PROPERTY DOCUMENTS AND RIGHTS

This ASSIGNMENT OF PROPERTY DOCUMENTS AND RIGHTS ("**Assignment**") is executed this ____ day of _____, by and between _____ ("**Assignor**"), and _____ ("**Assignee**"), with reference to the facts set forth below.

### RECITALS

A.     Assignor has conveyed to Assignee the real property and the improvements located thereon more particularly described on Schedule 1 attached hereto and by this reference made a part hereof (the "**Property**") of even date herewith.

B.     In connection with the conveyance of the Property, Assignor and Assignee intend that all of Assignor's right, title and interest in, under and to any and all documents and other rights relating to the Property, including, but not limited to, all leases and rental agreements, construction, architect's or other agreements, warranties and indemnities, maps, surveys, permits, deposits,' insurance policy premiums, rebates, environmental reports, civil and soil engineering reports, rights of entitlement from government agencies, site plans, plans and specifications relating to improvements on the Property (whether constructed or not) and all other plans, reports, and other work relating to the Property ("**Property Documents and Rights**") to be assigned and transferred to Assignee pursuant to the terms and conditions set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as set forth below.

1.     **Assignment of Property Documents and Rights**.  Assignor hereby absolutely and unconditionally assigns, conveys, transfers and sets over unto Assignee any and all of Assignor's right, title and interest in, under and to the Property Documents and Rights.  Assignee by its execution of this Agreement accepts the assignment of the Property Documents and Rights; provided, however, that Assignee does not assume, directly or indirectly, any liability, obligation, duty or responsibility whatsoever for the payment, discharge or other resolution of any liability, obligation, indebtedness, lien, security interest, encumbrance, claim or other problem, condition or matter, which may exist with respect to the Property Documents and Rights relating to the period prior to the date hereof

2.     **Further Assurances**.  Assignor agrees to execute such additional documents and perform such additional acts as may be necessary to effectuate the assignment of the Property Documents and Rights as contemplated under this Agreement, provided that Assignor shall be at no cost or expense with respect to such matters.

3.     **Successors and Assigns**.  This Assignment shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, heirs and legatees of the respective parties hereto.

**4.      Governing Law**.  This Assignment shall be construed under and enforced in accordance with the laws of the State of California.

**5.      Expenses of Enforcement**.  In the event of the bringing of any action or suit by a party hereto against the other for reason of any breach of any of the covenants, conditions, agreements or provisions on the part of the other party arising out of this Assignment, the prevailing party under such action or suit shall be entitled to have and recover from the other party all costs and expenses incurred therein, including reasonable attorneys' fees.

**6.      Counterparts**.  This Assignment may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

**7.      Severance**.  If any provision of this Assignment is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, such provision will be deemed to be severed and deleted from the Assignment as a whole and neither such provision, nor its severance and deletion shall in any way affect the validity of the remaining provisions of this Assignment.

**8.      Integration**.  This Assignment constitutes the entire, final and integrated agreement between the parties hereto pertaining to the subject matter hereof, fully supersedes any and all prior understandings, representations, warranties and agreements between the parties hereto, or any of them pertaining to the subject matter hereof, except with respect to that certain Agreement for Deed in Lieu of Foreclosure and Escrow Instructions dated _____ by and between Assignor and Assignee, pursuant to which Assignee acquired the Property.  This Assignment may be modified only by written agreement signed by all of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date set forth above.

ASSIGNOR:                                      ASSIGNEE:


By:_____          By:_____
    Susan L. Uecker, Receiver for Central      Name:_____
    Farms, LLC in the case of Securities and    Title:_____
    Exchange Commission vs San Francisco
    Regional Center, LLC, et.al. (Case        By:_____
    No. 3:17-CV-00223-RS in the United        Name:_____
    States District Court, Northern District of   Title:_____
    California)

# EXHIBIT E

## General Provisions

[To Be Attached]

1

# EXHIBIT F

## Approved Exceptions

[To Be Attached]

# EXHIBIT E



# Broker Opinion Of Value

Prepared for:

**Retail Center**

**800-900 Market Street**
**Oakland, CA  94607-3116**

Receiver:
Susan Uecker
Uecker & Associates

May 30, 2017

Prepared by:

**AILEEN DOLBY**
Executive Vice President
DIR  +1 510 433 5815
aileen.dolby@colliers.com
1999 Harrison Street
Suite 1750
Oakland, CA 94612

**REESA TANSEY**
Senior Associate
DIR  +1 510 433 5808
Reesa.tansey@colliers.com
1999 Harrison Street
Suite 1750
Oakland, CA 94612

**EXHIBIT E**

**Broker Opinion of Value**
800 Market Street, Oakland, CA 94607

## EXECUTIVE SUMMARY

**PROPERTY OVERVIEW**

800 - 900 Market Street is a neglected single story 1980's retail center off of a major freeway and at the gateway to Jack London Square and the Port Of Oakland. There is also a separate parcel that has a long term ground lease with McDonalds Corporation and a condominium ownership in an adjacent parcel. The other condominium interest owned by a different entity is a senior housing project. There are several easements for pedestrian and automobile access and utilities.

This project is located in an underserved area abutting low income and senior housing. While it could be rented as low end retail space, its highest and best use would be a mixed use project including senior/ low income housing and amenity oriented retail. There is a deed restriction requiring a grocery store so that would have to be part of any development.

Value Abstract:  The highest value will be obtained by making housing the main component in the redevelopment of this site. As with any development, the entitlement process would take years and the value of a development site that is unentitled is reduced by about 30 percent

The McDonald's drive thru has a lease thru 2030 at a fixed rate.

The condominium is vacant land that can be leased as long as it adheres to the CC&R's as a retail pad, developed as a NNN investment or sold separately.

Overall, the site is a generous 5.16 acres which is rare in an urban area.



**COLLIERS INVESTMENT RATING**
(Outlook for value appreciation)
1: Strong  2: Positive  3: Static  4: Weak  5: Poor

**3.5**
**Static**

**PROPERTY HIGHLIGHTS**

Strengths:
> Good location adjacent to Highway I-880/Bay Bridge
> Ample acres and favorable zoning
> Strong residential market/incentives for senior and low income housing
> Strong city backing for a mixed use project

Challenges:
> Deed restriction requiring a grocery store
> Current building is dated and does not meet code
> Low income neighborhood with crime
> Unforeseen entitlement challenges deterring development

Current Market Rents:
> $0.85 to $1.25 NNN

| PROPERTY CHARACTERISTICS | |
|---|---|
| **Product Type:** | Retail Center |
| **RBA:** | ±58,544 SF |
| **Land Area:** | ±5 /acre |
| **FAR/Parking:** | 26% |
| **Construction:** | Wood frame |
| **Stories:** | 1 |
| **Zoning:** | CC-1 |
| **APN:** | 001-0228-009 |
| **APN: 001-0228-006** | Separate parcel of 7,200 leased to McDonald's drive thru. |
| **APN: 001-0228-010** | A condominium ownership of vacant land on 2.2 acre parcel; other condominium ownership is a senior housing project |

**Broker Opinion of Value**
800 Market Street, Oakland, CA 94607

Page 2 of 7

| VALUE METHODS | Conservative | Probable | Optimistic |
|---|---|---|---|
| Income Approach – Cap Rate on Retail Leases | $6,881,392 | $8,073,183 | $9,662,235 |
| Sale Comparable Approach – Retail Centers | $6,253,615 | $8,065,410 | $12,215,000 |
| Land Value Approached – Retail, Senior/low Income residential development assuming time to get entitlements before closing | $12,400,000 | $13,000,000 | $14,500,000 |
| **OPINION OF VALUE APN: 001-0228-009** Assuming all cash offer | $7,000,000 | | |
| **OPINION OF VALUE APN: 001-0228-006** | $2,100.000 | | |
| **OPINION OF VALUE APN: 001-0228-010** | $1,300,000 | | |
| **Total Value** | $10,400,00 | | |

*(METHODS & OPINION)*

Note: The value of the shopping center has been reduced by $1,000,000 because of the deed restriction requiring a grocery store. The properties should be sold together as it is valuable to have the McDonald's income while stabilizing the retail center and to offset the carrying cost of the vacant condominium land.

**COLLIERS INVESTMENT RATING**

Neighborhood retail center with low occupancy and a poor tenant mix that does not help this underserved community. It also is located in a dense urban environment and does not take advantage of the 5 acres site and 75 foot height allowance.

**LOCATION SUMMARY**

The retail center is located outside of the business district and adjacent to low income and senior housing. There is constant vehicle traffic accessing a major freeway system and the industrial area of the Port of Oakland.

| | | | | |
|---|---|---|---|---|
| 3 | Location Function | | 2 | Transportation (easy access to freeways and public transit) |
| 4 | Amenities (dining, entertainment, cultural, sports) | | 3 | Visibility (quality and identity) |
| 4 | Labor Pool (education, abundance) | | 4 | Housing (availability for workers and customers) |
| 3.3 | Location Rating (average score) | *Location Analysis Rating: 1 (Strong)  2 (Positive)  3 (Static)  4 (Weak)  5 (Poor)* | | |

**SUBMARKET SUMMARY**

Retail in this area caters to commuters with drive through food chains and a convenience store. A gas station would complement what is currently there. Its tenants also provide services such as check cashing, WICK, grocery stables and inexpensive clothing to the low income and senior residents that are within walking distance. A 5 acre site in this urban infill area is unique and if density through a mixed use project could be achieved it would greatly increase the property value and help the neighborhood and its residents.

| | | | | |
|---|---|---|---|---|
| 4 | Size of Submarket (established vs. new or small) | | 4 | Business Environment (supportive, cost effective) |
| 4 | Position in Submarket (quality of building vs. competition) | | 4 | Absorption/Vacancy (vacancy rate vs. norm) |
| 2 | Barriers to Entry (high BTE's support value) | | 3 | Demand Drivers (strength and diversity) |
| 3.5 | Submarket Rating (average score) | *Submarket Dynamics Rating: 1 (Strong)  2 (Positive)  3 (Static)  4 (Weak)  5 (Poor)* | | |

THIS IS NOT AN APPRAISAL: This Real Estate Broker's Opinion of Value is intended for the sole and exclusive use of **Seller, LLC** ("the Client") and may not be relied upon any person or entity other than the Client for any purpose whatsoever. This Real Estate Broker's Opinion of Value represents only the opinion of Colliers International as to the value of the Subject Property, subject to the assumptions and qualifications set forth herein. Colliers International is not licensed to perform real property appraisals. Accordingly, this Real Estate Broker's Opinion of Value does not constitute an appraisal of the Subject Property and has not been prepared in accordance with the Uniform Standards of Professional Appraisal Practice. The Real Estate Broker's Opinion of Value set forth herein is specifically qualified by, and based solely upon, the relevant facts, circumstances, and market conditions that exist as of the date of this Real Estate Broker's Opinion of Value, and we undertake no obligation to update, modify, or supplement this Real Estate Broker's Opinion of Value to the extent that such facts, circumstances or market conditions subsequently change.

**Broker Opinion of Value**
800 Market Street, Oakland, CA 94607

## INVESTMENT SUMMARY

Can be leased at below market rents but always hovering around 70% leased.  With capital outlay, rents could be pushed by 20% and possibly it could attract a service oriented outlet tenant in the grocery, general merchandise or credit industry.

| | | | | |
|---|---|---|---|---|
| 5 | Current NOI (relative to Market, below is good) | | 4 | Cap Ex Needs (little vs. substantial deferred maintenance) |
| 4 | Stabilized NOI (sustainable vs. unstable) | | 1 | Expenses (relative to benchmarks for similar properties) |
| 4 | Tenant Mix/Profile (minimal roll and strong tenants) | | 5 | Yield Profile (sustainability of future income and returns) |
| 3.8 | Investment Rating (average score) Investment Profile Rating: 1 (Strong)   2 (Positive)   3 (Static)   4 (Weak)   5 (Poor) | | | |

| COLLIERS INVESTMENT RATING (Combined Average Score): | STATIC - |
|---|---|

**Methodology:** The rating system uses the following criteria to evaluate each component of the property: 1 - **Strong**, 2 - **Positive**, 3 - **Static**, 4 - **Weak**, 5 - **Poor**. The BOV ratings are based on the broker's knowledge and understanding of that component as it relates to the competitive product in the market. These ratings are then translated into an average score for each section and an overall score to "grade" the property in terms of the outlook for its investment profile with minimal additional investment.

The grading scale is as follows: 1 - **Strong** (highly likely to increase), 2 - **Positive** (likely to maintain/improve marginally), 3 – **Static** (should maintain value if key components are not compromised), 4 – **Weak** (likely to sustain value deterioration, 5 - **Poor** (continued value deterioration is certain).

**THIS IS NOT AN APPRAISAL:** This Real Estate Broker's Opinion of Value is intended for the sole and exclusive use of **Seller, LLC** ("the Client") and may not be relied upon any person or entity other than the Client for any purpose whatsoever.  This Real Estate Broker's Opinion of Value represents only the opinion of Colliers International as to the value of the Subject Property, subject to the assumptions and qualifications set forth herein.  Colliers International is not licensed to perform real property appraisals.  Accordingly, this Real Estate Broker's Opinion of Value does not constitute an appraisal of the Subject Property and has not been prepared in accordance with the Uniform Standards of Professional Appraisal Practice.  The Real Estate Broker's Opinion of Value set forth herein is specifically qualified by, and based solely upon, the relevant facts, circumstances, and market conditions that exist as of the date of this Real Estate Broker's Opinion of Value, and we undertake no obligation to update, modify, or supplement this Real Estate Broker's Opinion of Value to the extent that such facts, circumstances or market conditions subsequently change.

Broker Opinion of Value
800 Market Street, Oakland, CA 94607

## INCOME APPROACH TO VALUE

The Income Approach to Value is based on the present value of future benefits of ownership.  This is a snapshot of income today if the space were 100 percent leased at market rents with tenant improvement dollars provided and commissions paid.  The cap rate is a reflection of the location and quality of the tenants that would lease space.

The Stabilized Proforma below assumes a full leased center with a rental rate of $12.00 per square foot with $20.00 per square foot spent on the interior spaces, storefront signage and project directories and lighting.

If you capitalize current income from the 80 percent occupied center with no grocery store at a 7 percent cap rate, the center is worth approximately $7,772,229.

Unfortunately, a grocery store actually reduces the stabilized value and the current income value as a grocery store would pay less than $12.00 per square foot, require up to $50.00 per square foot in improvement dollars and trigger code upgrades over the whole project.

As stated earlier, the grocery store is a deed restriction and the City of Oakland has shown no flexibility on waiving it. They currently are asking for $500,000.00 in damages because there is not a grocery store in place as per an agreement entered into in December of 2014.

| STABILIZED PROFORMA | | | | | |
|---|---|---|---|---|---|
| | Amount | % | $/SF | SF | |
| Gross Scheduled Income | $702,528.00 | 100% | $12.00 | 58,544 | |
| - Vacancy | $ 35,126.40 | 5% | | | |
| Effective Rental Income | $667,401.00 | | | | |
| Other Income & Concessions | | | | | Free Rent N/C |
| Gross Operating Income | $667,401.00 | | | | |
| Operating Expenses | | | | | Paid for by Tenant |
| Net Operating Income | $667,401.00 | | | | Less Fees |
| Pricing Matrix | | Returns | | | |
| Low Cap | $11,123,360.00 | 6% | $190.00 | | |
| High Cap | $ 8,342,520.00 | 8% | $142.00 | | |
| Average Market Value | $ 9,534,308.00 | 7% | $163.00 | | |
| | | | | | |
| Less TI / Leasing | $1,461,125.00 | | | | $20.00psf over the project |
| Probable Value | $8,073,183.00 | | $138.00 | | $5.00psf Commission |

THIS IS NOT AN APPRAISAL: This Real Estate Broker's Opinion of Value is intended for the sole and exclusive use of **Seller, LLC** ("the Client") and may not be relied upon any person or entity other than the Client for any purpose whatsoever.  This Real Estate Broker's Opinion of Value represents only the opinion of Colliers International as to the value of the Subject Property, subject to the assumptions and qualifications set forth herein.  Colliers International is not licensed to perform real property appraisals.  Accordingly, this Real Estate Broker's Opinion of Value does not constitute an appraisal of the Subject Property and has not been prepared in accordance with the Uniform Standards of Professional Appraisal Practice.  The Real Estate Broker's Opinion of Value set forth herein is specifically qualified by, and based solely upon, the relevant facts, circumstances, and market conditions that exist as of the date of this Real Estate Broker's Opinion of Value, and we undertake no obligation to update, modify, or supplement this Real Estate Broker's Opinion of Value to the extent that such facts, circumstances or market conditions subsequently change.

Broker Opinion of Value
800 Market Street, Oakland, CA 94607

Page 5 of 7

## LEASE COMPARISONS

These lease transactions were used to determine the Income Approach to Value above. These are comparable stripe retail centers in Oakland with same tenant mix that the subject property would like to attract.

| LEASE COMPARABLES ANALYSIS | | | | |
|---|---|---|---|---|
| Comparable | Subject | 1 | 2 | 3 |
| Address | 800 Market Street | 3030 E. 9th Street | 10700 Macarthur Boulevard | 7200 Bancroft Avenue |
| City / State | Oakland, CA | Oakland, CA | Oakland, CA | Oakland, CA |
| Building Type | Masonry | Masonry | Masonry | Masonry |
| Construction Class | B- | B+ | B+ | B+ |
| Condition | Poor | Good | Good | Good |
| Number of Stories | 1 | 1 | 1 | 1 |
| Year Built/remodeled | 1985 | 1997 | 1964/2014 | 1973/2015 |
| Gross Building Area | 58,400 | 165,042 | 107,272 | 114,893 |
| Land | 5 acres | 13.5 acres | 8.75 acres | 4.16 acres |
| Lease Premises | 15,956 | 10,439 | 6,000 | 13,840 |
| Occupancy w Lease | 60% | 100% | 100% | 100% |
| Lease Rate | $9.00 | $10.00 | $15.00 | $19.44 |
| NNN Expenses | $6.00 | $8.35 | $6.00 | $7.92 |
| Start Date | N/A | 6/1/13 | 3/1/16 | 8/1/11 |
| End Date | N/A | 5/31/23 | 2/28/26 | 7/31/31 |

### NOTES

**Subject:** Vacant unit if available today and assumes $5.00 psf in tenant improvement and that little is done to the common areas.

**Lease 1:** Fruitvale station sublease to Sketchers that was done 3 years ago. Today's rents would be 25% higher.

**Lease 2:** Foothill Square lease to Shoe Palace. This retail center has been completely remodeled and the rents reflect it. Good location near the Oakland Zoo and middle class neighborhood of Highway 580.

**Lease 3:** Part of Eastmont Mall but a strip center with CVS and Taco Bell drive through. High rent b/c of drive through. Good tenant mix but in low income high crime neighborhood.

THIS IS NOT AN APPRAISAL: This Real Estate Broker's Opinion of Value is intended for the sole and exclusive use of **Seller, LLC** ("the Client") and may not be relied upon any person or entity other than the Client for any purpose whatsoever. This Real Estate Broker's Opinion of Value represents only the opinion of Colliers International as to the value of the Subject Property, subject to the assumptions and qualifications set forth herein. Colliers International is not licensed to perform real property appraisals. Accordingly, this Real Estate Broker's Opinion of Value does not constitute an appraisal of the Subject Property and has not been prepared in accordance with the Uniform Standards of Professional Appraisal Practice. The Real Estate Broker's Opinion of Value set forth herein is specifically qualified by, and based solely upon, the relevant facts, circumstances, and market conditions that exist as of the date of this Real Estate Broker's Opinion of Value, and we undertake no obligation to update, modify, or supplement this Real Estate Broker's Opinion of Value to the extent that such facts, circumstances or market conditions subsequently change.

Broker Opinion of Value
800 Market Street, Oakland, CA 94607

Page 6 of 7

## SALE COMPARISONS

The market value approach to value is determined by comparing the subject property to similar properties which have been sold or offered for sale. Adjustments are made for differences in date of sale, age, condition, size, location, land/building ration, local tax policies, and other physical characteristics and circumstances influencing the sale. The adjusted baled of those sales considered most comparable (based on physical appearance and condition) establish a range of values for the property.

| SALE COMPARABLES ANALYSIS | | | |
|---|---|---|---|
| | 1 | 2 | 3 |
| **Property Address** | 610-640 Hegenberger | 10700 MacArthur | 7200 Bancroft |
| **City, State** | Oakland, CA | Oakland, CA | Oakland, CA |
| **Construction** | Masonry | Masonry | Masonry |
| **Construction Quality** | Good | Good | Good |
| **Number of Stories** | 1 | 1 | multi |
| **Year Built/Renovated** | 1994 | 1964/2015 | 1973/2007 |
| **Square Footage** | 70.8971 | 120,000 | 140,000 |
| **Site Area  Acres** | 6.92 acres | 8.75 Acres | 11 acres |
| **Coverage (GBA / Land)** | 24% | 32% | 29% |
| **Occupancy at Sale** | 100% | 95% | 100% |
| **Cap Rate** | 6.5% | 6% | 8% |
| **Sale Date** | 9/2005 | 11/16 | 10/16 |
| **Sale Price** | $14,650,000 | $25,150,000 | $15,000,000 |
| **Sale Price PSF** | $206.00 | $209.00 | $107.00 |

## NOTES

**Comp 1:** Sold in 2002 for $180psf; 2005 sold for $206psf with PakNSave, McDonalds, Taco Bell; PakNSave went dark and center has been is **40% vacant for years.** This location has many of the same characteristics of subejct property.

**Comp 2:** Remodled and repositoned for sale with long term leases –Food Co., Ross, Wells Fargo Divita Dyalisys. Shows what an exit stratgey for a purchuser could be.

**Comp 3:** Repositoned in 2007 as part of Eastmont Mall with $6 million of capital but sold at a $5,000,000 loss- entire project took a $20,000,000 loss.

THIS IS NOT AN APPRAISAL: This Real Estate Broker's Opinion of Value is intended for the sole and exclusive use of **Seller, LLC** ("the Client") and may not be relied upon any person or entity other than the Client for any purpose whatsoever. This Real Estate Broker's Opinion of Value represents only the opinion of Colliers International as to the value of the Subject Property, subject to the assumptions and qualifications set forth herein. Colliers International is not licensed to perform real property appraisals. Accordingly, this Real Estate Broker's Opinion of Value does not constitute an appraisal of the Subject Property and has not been prepared in accordance with the Uniform Standards of Professional Appraisal Practice. The Real Estate Broker's Opinion of Value set forth herein is specifically qualified by, and based solely upon, the relevant facts, circumstances, and market conditions that exist as of the date of this Real Estate Broker's Opinion of Value, and we undertake no obligation to update, modify, or supplement this Real Estate Broker's Opinion of Value to the extent that such facts, circumstances or market conditions subsequently change.

Broker Opinion of Value
800 Market Street, Oakland, CA 94607

Page 7 of 7

## LAND VALUATION

The land valuation considers the highest and best use of the site taking into account the current zoning. The valuation is based on the utilization of the land to yield the highest return on capital invested. A 5 acre site in a dense urban area is rare and the highest and best use for the site is to build a mixed use residential project. This is further reinforced by the fact that the existing structure is of poor quality and providing a weak economic return.

| Mixed Use Land Sale Comparable | | | | | |
|---|---|---|---|---|---|
| Comparable | Subject | 1 | 2 | 3 | 4 |
| Property Address | 800 Market Street | 2338 Filbert Street | 905 72nd Street | 1396 5th Street | 2201 Brush Street |
| City, State | Oakland, CA | Oakland, CA | Oakland, CA | Oakland, CA | Oakland, CA |
| Sq. Ft/Acres | 217,800/5 | 160,301/3.68 | 20,000/.46 | 37,000/.85 | 18,789/.43 |
| Sale Date | N/A | 10/15 | 1/15 | 11/08 | 6/14 |
| Sale Price | 8,000,000 | $6,100,000 | $770,000 | $3,750 | 1,500,000 |
| Zoning | CC-1 | CC-2 | | | |
| # Of Units | 300 Senior or Affordable Units | 126 townhouses | 59 affordable units | 119 senior units | 59 affordable units |
| $ Per Unit | $26,667 | $48,412 | $13,050 | $31,512 | $25,423 |

### NOTES

Subject:  Subject assumes unentitled cash price, private capital
Sale 1.   Townhouses will sell for more but are more expensive to build
Sale 2.   3,000 sq. ft. of community space
Sale 3.   Received financing of $12,265,000 from California Statewide Communities Development
Sale 4.   Childcare center run by YMCA for 130 children will be on site.

General Notes:
Density of 700 units is allowed but without public financing it will be difficult to build to this scale as Community Development Funds and subsidies cap total project costs.

This site has a deed restriction requiring a grocery store and the assumption is the city and neighborhood would look for at least 30,000 square feet of retail plus some community and outdoor space.

While the retail might eventually provide income it will be offset for many years by cost of construction, concessions and turn over- valued as a lost leader.

The McDonald's pad is on its own parcel and has been given a value independent of this land valuation. The KFC pad may or may not remain depending on the value and its locations impact on a development.

The extra parcel that is owned in common and has Jack London Gateway senior housing located on a portion of it, does have room for a $\pm$ 8,000 – 15,000 square foot leased retail pad.

THIS IS NOT AN APPRAISAL: This Real Estate Broker's Opinion of Value is intended for the sole and exclusive use of Seller, LLC ("the Client") and may not be relied upon any person or entity other than the Client for any purpose whatsoever. This Real Estate Broker's Opinion of Value represents only the opinion of Colliers International as to the value of the Subject Property, subject to the assumptions and qualifications set forth herein. Colliers International is not licensed to perform real property appraisals. Accordingly, this Real Estate Broker's Opinion of Value does not constitute an appraisal of the Subject Property and has not been prepared in accordance with the Uniform Standards of Professional Appraisal Practice. The Real Estate Broker's Opinion of Value set forth herein is specifically qualified by, and based solely upon, the relevant facts, circumstances, and market conditions that exist as of the date of this Real Estate Broker's Opinion of Value, and we undertake no obligation to update, modify, or supplement this Real Estate Broker's Opinion of Value to the extent that such facts, circumstances or market conditions subsequently change.

# EXHIBIT F

## 2014-28 - Oakland, CA - Jack London Gateway

**Amounts Owed to Thorofare Capital through July 7, 2017**

| | | |
|---|---|---|
| Outstanding Principal | $ | 6,070,000.00 |
| Interest - July 1, 2017 - July 7, 2017 | $ | 11,993.15 |
| Default Interest | $ | 177,041.65 |
| Exit Fee | $ | 416,700.00 |
| Extension Fees | $ | 140,000.00 |
| Servicing Fees | $ | 650.00 |
| Interest Reserve | $ | (158,526.08) |
| CapEx Holdback Reserve | $ | (250,000.00) |
| Out of Pocket Expenses | $ | 102,351.07 |
| **Total Amount Owed** | **$** | **6,510,209.79** |
| | | |
| Non-Default Per Diem Interest Rate | $ | 1,746.16 |
| Default Per Diem Interest Rate | $ | 1,164.11 |
| **Combined Per Diem Interest Rate** | **$** | **2,910.27** |

**Notes: Please note that interest and expenses amounts will increase**

EXHIBIT F

# EXHIBIT G

009589.0024\4814337.1



# EXCLUSIVE AUTHORIZATION TO SELL

Pursuant to this Exclusive Authorization to Sell ("Agreement"), the undersigned Susan L.Uecker, as Court-appointed Receiver, SEC vs SFRC, Case No. 3:17-cv-00223-RS ("Court") ("Client") hereby irrevocably grants to COLLIERS INTERNATIONAL ("Broker"), and its authorized agents, the exclusive right to negotiate a Sale of that certain real property hereinafter described ("Property"), subject to Court approval. The exclusive agency hereby created ("Agency") shall be for a period commencing on July 15, 2017 ("start date") and ending at midnight on December 31, 2017 ("end date") ("Initial Agency Period").

### A. PROPERTY

The Property is located at 800-900 Market Street, in the City of Oakland, County of Alameda, State of California and further described as approximately a ±58,544 square foot retail center on a ±5 acre parcel with easements, a NNN leased investment McDonalds on a ±7,200 square foot parcel with easements and condominium ownership of +58,935 square feet (Unit 1).
with easements in a 2.2 acre parcel.

### B. PRICE AND TERMS

The price and terms of the Sale of the Property shall be as follows: $10,400,000.00 or as negotiated by Client and the prospective purchaser of the Property with the assistance of Broker.

### C. COMMISSION SCHEDULE AND PAYMENT

1. AMOUNT OF COMMISSION: The parties agree that the commission due to Broker under this Agreement shall be three percent (3%) of the gross sales price of the interest to be transferred.

2. OBLIGATION TO PAY COMMISSION.

   2.1 **During the Agency Period.** During the Agency Period, Broker shall have earned and Client shall pay the commission to Broker if, during the Agency Period either (a) the Property or any interest therein is sold, transferred or conveyed by Client; or (b) any contract for the sale, transfer or conveyance of the Property or any interest therein is made directly or indirectly with Client, pursuant to Court approval and sale closes. For purposes of this Agreement, references to a "Sale" of the Property shall include any transaction involving a transfer of an interest in the Property, excepting a security interest in support of financing.

3. TIME AND MANNER OF PAYMENT: A commission that has been earned by Broker shall be payable in accordance with the following provisions and pursuant to Court approval.

   3.1 For sales or exchanges: (a) if such transaction is closed through an escrow, upon the closing of said escrow; (b) if such transaction is closed without an escrow, upon the earlier of (i) recordation of a deed; or (ii) delivery of a deed or other instrument of conveyance.

   3.2 For a contract or agreement of sale, joint venture agreement, business opportunity or other transaction not involving the delivery of a deed, upon the mutual execution of the agreement evidencing the transaction.

### D. CLIENT COOPERATION

Broker agrees to use all reasonable efforts to find a purchaser for the Property, and Client agrees to cooperate with Broker in causing a Sale of the Property to occur. Client shall immediately refer to Broker all inquiries of any party interested in purchasing the Property, a portion thereof or an interest therein and Broker shall diligently pursue all such referrals. All negotiations regarding the Sale of the Property shall be pursued through Broker or with Broker's knowledge as to the terms and parties. Client hereby authorizes Broker to accept a deposit from any prospective purchaser and to transfer such deposit to an escrow agent for the account of the purchaser for the purpose of consummating a Sale of the Property. All written offers received by Broker for the purchase of the Property shall be promptly reviewed and responded to by Client and Broker.



### E.   COOPERATING BROKERS

Client acknowledges that Broker is entitled and encouraged to solicit the cooperation of other real estate brokers.  However, Broker may not enter into any commission arrangements with other brokers that would be inconsistent with the terms of this Agreement or which would increase the total amount of Client's liability hereunder, and Client's sole liability for commissions shall be as provided in this Agreement.  Broker has no responsibility to pay a fee or commission to a cooperating broker.

### F.   NON-DISCRIMINATION

Both Client and Broker hereby acknowledge their understanding that it is illegal to refuse to present, sell or lease real property to any person because of race, color, religion, national origin, sex, marital status, age or physical disability.

### G.   DISCLOSURES, EXPERT MATTERS AND RESPONSIBILITIES OF CLIENT AND BROKER

1.   **DISCLOSURES:** Owners of real estate must comply with California law for the disclosure of any and all known material facts concerning their property to prospective tenants or buyers as well as any other items required by California law.  To meet this requirement, Broker recommends that Owners of real estate obtain legal advice from a qualified legal professional.  Broker shall have no responsibility for property disclosures beyond the delivery and/or disclosure of information provided by the Owner or known to the Broker.  Parties to a sale or lease transaction should not and will not rely on Broker with regard to matters of disclosure required by Owners, but instead will rely entirely on their own investigation and that of qualified professionals and experts.

   Matters requiring disclosure may include, but are not limited to, the following:  Natural Hazard Disclosures (including whether or not the property is located in a flood hazard area, fire hazard severity zone, forest fire risk area, earthquake fault zone, or a seismic hazard zone), toxic mold disclosures, known material defects, presence or proximity to hazardous materials, compliance with the Americans with Disabilities Act (ADA), compliance with zoning laws, whether or not the property is located in a special tax zone (such as a Mello-Roos Community Facilities District) or a special assessment district, as well as historic energy use and the existence and results of Certified Access Specialist (CASp) inspections.

2.   **DEFENSE, INDEMNITY AND HOLD HARMLESS**

   **2.2 Broker:**  Broker shall defend, indemnify, and hold harmless Client and each of its agents, employees, directors, shareholders, contractors and representatives against all losses, claims, allegations, liabilities, damages, costs and expenses, including, without limitation, reasonable attorneys' and experts' fees, to the extent they arise out of either (i) Broker's representation to a prospective purchaser of information which is false and material regarding the Property, which material information Broker knew or should have known, to be false, or (ii) Broker's failure to provide a prospective purchaser with information known to Broker regarding a material defect concerning the Property, unless such representation or failure arises directly or indirectly from Client's representation or failure to disclose information to Broker.  Notwithstanding this provision, Broker's obligation shall not extend to protect Client against Client's sole negligence or willful misconduct.

3.   **EXPERT MATTERS**

   **3.1**  There are a number of potentially significant matters related to commercial properties, which may be material to a particular transaction, the evaluation of which would require specialized expertise which is beyond the expertise and/or responsibility of the Broker ("Expert Matters").  Broker recommends that parties to a potential lease or sale transaction obtain the advice of qualified professionals and experts prior to the consummation of any transaction.  Parties to a sale or lease transaction should not and will not rely on Broker with regard to Expert Matters, but instead will rely entirely on their own investigation and those of qualified professionals and experts.

---



**3.2** Expert Matters may include, but are not limited to, the following: the use, generation, storage or presence of hazardous or toxic substances and underground storage tanks; natural hazards, such as fire, flood, or earthquake; building safety and structural integrity of roof, walls, and foundations or any improvements located on the Property; operation or condition of mechanical, plumbing, utility or life safety systems; "clean rooms" (including, but not limited to, classification, operation and/or condition); mold, fungus, water damage, or effects of moisture; compliance with Americans with Disabilities Act (ADA); compliance with building, zoning and fire codes; tax, accounting, or legal effects or consequences of the proposed transaction; survey, linear or area measurements of the Property; availability and/or adequacy of utilities and utility connections and panels, adequacy, availability and condition of sewer lines and/or connections, public transportation, or other infrastructure; zoning and permitted land uses; insurance policies and premiums; architectural design or engineering; geotechnical/soil condition; termites or other pests or rodents; statements of income and expense or other financial statements; the financial soundness of a prospective tenant or subtenant; condition of title; or existing taxes, assessments or liens.

**3.3** Broker has no responsibility to, has not made and will not make an independent investigation or determination with respect to any Expert Matters. Any information communicated by Broker regarding any of the Expert Matters arises from third party sources and has not been and will not be independently verified by Broker.

4.    All of the provisions of this Section (I) shall survive the expiration or earlier termination of this Agreement.



H.  **GENERAL PROVISIONS**

1.  **BINDING ON SUCCESSORS:** The parties intend for and agree that, subject to Court approval, their respective successors, assigns, heirs and transferees shall be bound by this Agreement.

2.  **INTEREST:** If there is a failure to make any payment to Broker at the time required herein, the delinquent sum(s) shall bear interest at the rate of twelve percent (12%) per year or the maximum non-usurious interest rate for loans permitted by law, whichever is lower.

3.  **ENTIRE AGREEMENT OF PARTIES:** This Agreement supersedes any and all agreements, either oral or written, between the parties hereto with respect to the Property.  Both parties to this Agreement acknowledge that no representations, inducements, promises, or agreements, oral or otherwise, have been made by any party, or anyone acting on behalf of any party, that are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.

4.  **PARTIAL INVALIDITY:** If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force and effect without being impaired or invalidated in any way.

5.  **GOVERNING LAW:** This Agreement will be governed by and construed in accordance with the laws of the State of California.  In the event of any legal action, jurisdiction and venue shall be in the Superior Court of United States District Court, Northern California.

6.  **NOTICES:** Notices under this Agreement shall be provided to the other party by regular U.S. mail addressed to the last known address of the party.

7.  **TIME:** The parties agree that time is of the essence with regard to the matters provided for in this Agreement.

I.  **OTHER TERMS AND CONDITIONS**
    1) Any Sale is subject to Court approval, and 2) Seller/Client is a court appointed Receiver, Case #3:17-cv-00223-RS, and 3) a sale is on an "as-is" basis.

The undersigned Client has read and understood and hereby agrees to be bound by the foregoing.

**BROKER:  Colliers Parrish International, Inc., dba Colliers International**          **Client:  Susan L. Uecker, Receiver**

By: _____            _____          By: _____        _____
    Aileen Dolby, Senior Vice President         Date              Susan L. Uecker                          Date
Email: aileen.dolby@colliers.com                               Its:  Receiver

By: _____            _____          By: _____        _____
                                           Date              Its: _____        Date

Email: _____

Phone: _____     Fax: _____
Email: _____