Elizabeth Berke-Dreyfuss (Bar No. 114651)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: edreyfuss@wendel.com

Attorneys for Susan L. Uecker, Receiver

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC,<br><br>Defendants,<br><br>-and-<br><br>CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC,<br><br>Relief Defendants. | Case No. 3:17-CV-00223-RS<br><br>**RECEIVER'S MOTION FOR ORDER AUTHORIZING CLOSING OF CALLSOCKET II, L.P. CALL CENTER**<br><br>Date:    October 26, 2017<br>Time:   1:30 p.m.<br>Place:   450 Golden Gate Ave.<br>            17th Floor, Ctrm. 3<br>            San Francisco, CA 94102<br>Judge:  The Hon. Richard Seeborg |

Susan L. Uecker, the duly appointed receiver (the "Receiver") for Defendants San Francisco Regional Center, LLC; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; Immedia, LLC; Comprehensive Care of California, LLC; Comprehensive Care of Oakland, L.P.; and North America 3PL, LLC; and Relief Defendants CallSocket Holding Company, LLC; CallSocket III Holding Company, LLC; Central California Farms, LLC; JL Gateway, LLC; and Berkeley Healthcare Dynamics, LLC (collectively the "Receivership Entities"), will and does hereby move the above-captioned Court on **October 26, 2017, at 1:30 p.m.** (or as soon thereafter as the Court may hear) for an order with respect to the Receiver's Motion for Order Authorizing Closing of CallSocket II, L.P. ("CallSocket II") Call Center ("Motion").

The Receiver's Motion is brought pursuant to provisions of the Order Appointing Receiver and Monitor ("Appointment Order"), ¶ 38. (Docket No. 100) and the Court's general equitable powers over equity receiverships and the Receiver's business judgment.

The Receiver's Motion is supported by the following Memorandum and the declarations of Susan L. Uecker, and James Yang and the exhibits, and Request for Judicial Notice, and the proposed form of order granting this Motion attached hereto as **Exhibit A**, filed herewith.

## MEMORANDUM IN SUPPORT OF MOTION

### I. INTRODUCTION

The Receiver has been grappling with the future operations of the CallSocket II call center since she was the Receiver in the State Court Action.[1] The call center was losing approximately $122,000 when the State Court placed a hiring freeze on the call center operations. Shortly before the Securities and Exchange Commission ("SEC") commenced this action, the State Court intended to consider alternative proposals for the operation of the call center. In the intervening

---

[1] *Young v. Henderson et al.*, Case No. RG15778891, pending before the Superior Court of the State of California, County of Alameda.

nine months, the Receiver has concluded that rather than pursuing continuing operations, the call center should be closed. Uecker Decl., ¶ 2.

This matter was initially brought before the Court pursuant to a complaint filed on January 17, 2017, by the SEC alleging that the named Defendants had exploited a federal EB-5 visa program by defrauding investors seeking to invest in the job creation program, earn a return on their investments and obtain a permanent U.S. visa as a way towards United States residency. (Docket No. 1).

On January 20, 2017, the SEC filed a motion seeking, among other things, an order appointing a receiver over the entity Defendants and Relief Defendants. (Docket No. 10).

The Court entered the Order Granting Motion for Preliminary Injunction and to Appoint a Receiver on March 23, 2017, pursuant to which the Court, among other things, appointed Susan L. Uecker as Receiver over most of the entities and Monitor over four entities. Thereafter, the Receiver was appointed receiver over the remaining four entities. (Docket Nos. 96, 100, 171).

Pursuant to the provisions of the Appointment Order, on June 26, 2017, the Receiver filed her Recovery Plan. (Appointment Order, ¶ 49, Docket No. 185). That plan addressed crucial issues with respect to the Received Entities and whether investors have a realistic opportunity to secure their immigration benefits through the EB-5 program given that, as alleged in the SEC's complaint, investor funds have been diverted and/or comingled, and the probability that San Francisco Regional Center, LLC ("SFRC") will lose its regional center status from the USCIS. In bringing this Motion, the Receiver has relied on the recommendations made by her special immigration counsel (Robert C. Divine, of Baker Donelson) with respect to the impact of the loss of the regional center status on the investors in CallSocket II as well her business judgment in determining the appropriate actions to be taken with respect to the CallSocket II call center.

## II.   LEGAL AUTHORITY

### A.   District Court Power To Administer The Receivership.

A district court's power to administer an equity receivership is extremely broad. *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986); *SEC v. Forex Asset Management, LLC*, 242 F.3d 325, 331 (5th Cir. 2001); *SEC v. Basic Energy & Affiliated Resources*, 273 F.3d 657, 668 (6th Cir.

2001); *SEC v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *Hardy*, 803 F.2d at 1038. The Ninth Circuit has explained:

> A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. The district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership. The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions.

*SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (citations omitted); see also, *CFTC v. Tooworth Int'l., Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the court's supervisory role, and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership for the benefit of creditors."). Accordingly, this Court has broad equitable powers and discretion in formulating procedures, schedules and guidelines for administration of the estate, and should authorize the Receiver's actions as proposed in her Motion.

**B.     Deference To The Receiver's Business Judgment.**

In the estate administration context, courts are deferential to the business judgment of bankruptcy trustees, receivers, and similar estate custodians. See, e.g., *Bennett v. Williams*, 892 F.2d 822, 824 (9th Cir. 1989) ("[W]e are deferential to the business management decisions of a bankruptcy trustee."); *Southwestern Media, Inc. v. Rau*, 708 F.2d 419, 425 (9th Cir. 1983) ("The decision concerning the form of [estate administration] rested with the business judgment of the trustee."); *In re Thinking Machines Corp.*, 182 B.R. 365, 368 (D. Mass. 1995) ("The application of the business judgment rule and the high degree of deference usually afforded purely economic decisions of trustees, makes court refusal unlikely.") (rev'd on other grounds, *In re Thinking Machines Corp.*, 67 F.3d 1021 (1st Cir. 1995)).

The Receiver has determined, in her business judgment, as set forth in greater detail below that the CallSocket II call center should be closed for the following reasons:

- In the past eight months, the call center has lost $1.013 million;
- Due to the extensive comingling of funds, it would be inequitable to use the Receivership Funds to continue to operate the call center because in the absence of a completed forensic accounting, it is impossible to determine if the proceeds of the sale of the real estate previously owned by CallSocket II actually belong to the CallSocket II investors;
- The Receiver offered to sell the call center to the CallSocket II investors, or suggested investors recapitalize the call center with an additional investment, and the investors declined;
- The Receiver contacted a third party lender to obtain financing for the call center, and the third party lender declined; and
- The call center can be closed without harming the CallSocket II investors.

Uecker Decl. ¶ 3.

## III.  PROPOSED ACTION

The Receiver bases her proposed action for CallSocket II on the Recovery Plan (Docket No. 185) and the Declaration of Robert C. Divine filed in Support of the Recovery Plan ("Divine Decl., Exhibit 1, Recovery Plan, Docket No. 185), and incorporates both the Recovery Plan and Mr. Divine's declaration.

### A.  The Investors in CallSocket II Should Not Be Harmed From By The Closing Of The Call Center

#### 1.  The Background of CallSocket II and the Call Center

The Call Socket II Business Plan provided for the use of EB-5 funds in the amount of $15 million from 30 investor to develop a the call center that operated twenty-four hours a day, seven days a week, located on four floors of 519 17th Street (Dufwin Building), Oakland, CA. (Recovery Plan, p. 28:9-17, Docket No. 185). In 2016, The Dufwin Building was sold. The State Court ordered a hiring freeze and so employees have not been hired since the move to the Dufwin Building in the fall of 2016 and attrition has left the call center with only a dozen or so employees. (Recovery Plan, p. 29:13-17, Docket No. 185).

2. **Investor Status – I-526 and I-829 Status And Risks For CallSocket II Investors**

Special immigration counsel to the Receiver outlined the immigration status and risks for the CallSocket II investors in the Recovery Plan:

> [C]allSocket II, L.P. ("CS II") was both the Enterprise invested in and the JCE. The original offering documents were quite vague about the business plan and arrangements, but a response to a USCIS "request for evidence" apparently used identically for all investors reflected that SFRC planned to operate CallSocket, LP, CS II, and CS III . . . as one business with commingled accounts and operations. . .

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 51, Docket No. 185).

The RFE response's cover memorandum boldly acknowledges that $100,000 of the Dufwin Towers purchase was provided from CallSocket, L.P., and states:

> SFRC has transferred capital from its two CallSocket projects to its own accounts to develop and pay the expenses of all three of its CallSocket projects. CallSocket, LP, CallSocket II, LP, CS II (sic), and CallSocket III, LP are three phases of the same project: the development and operation of customer contact centers in the bay area. They share the same senior management, same business model, same name, same affiliate structure with SFRC, although they are separate limited partnerships located in separate buildings in Oakland.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 51, Docket No. 185).

A declaration of Tom Henderson in the RFE response includes this statement at paragraph 8:

> As the check registers also demonstrate, SFRC has withdrawn capital from CallSocket, LP and CallSocket II, LP for SFRC to purchase the "I. Magnin" building on behalf of CallSocket III, LLC, which owns it in trust for CallSocket III, LP and other owners. The purchase of this building completes the real estate purchases for all three CallSocket projects. Funds are now being raised for CallSocket III, LP. Once acquired these funds will be used to repay the other CallSocket limited partnerships. The CallSocket group will then be fully funded and will complete its business development and hiring.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 51, Docket No. 185).

Apparently USCIS approved the CS II Investors' I-526 petitions after reviewing the RFE Response.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 52, Docket No. 185).

> 29 EB-5 investors subscribed to the offering and obtained I-526 approvals. Some of those approvals were as early as February of 2014, and . . . at least some of the investors have been admitted as conditional residents and maybe even have reached the end of their sustainment period. . . . . A chart provided by James Yang reflects that all but two CS II investors have been admitted as conditional residents, 10 CS II investors have filed I-829, one is due to file I-829 on June 28, and the rest are due to file I-829 in November 2017 or beyond. Therefore, all but two investors are immune to effects of regional center termination and new material changes to the business plan, but most need to sustain their investment for more time, and many for substantially more time.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 53, Docket No. 185).

> [I]n December of 2016 the project papers submitted with an I-829 claimed creation of 63 direct jobs for a total of 100 direct and indirect jobs. USCIS may find a basis to challenge the direct jobs. I do not know how many creditable direct full-time jobs were created in CS II before jobs were lost. I am told by the Receiver that only about a dozen employees remain at CS II.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 54, Docket No. 185).

> The overwhelming majority of CS II investors who already were admitted as conditional residents may claim all direct and indirect jobs even if the regional center becomes terminated. The few who have not been admitted might suffer I-526 revocation based on regional center termination, failure to sustain the investment (particularly in light of commingling and diversion), and material change in the credibility of the plan to reach the necessary level of job creation.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 55, Docket No. 185).

> I am unaware of the extent to which capital of CS II was diverted from CS II. The Receiver could consider above strategies concerning diversion and commingling. This issue could independently give rise to I-526 revocations and prevent I-829 approvals.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 56, Docket No. 185).

> For investors who had been admitted as conditional residents already, the Receiver's closing down of CS II operations might not be independently fatal to the investors' immigration pursuits if the Receiver were able to use proceeds from sale of buildings to re-establish call center operations. Given the purported interdependency of the operations of the three CallSockets, it is not clear whether jobs created already for CallSocket, L.P. and CS II and then lost would be counted or disregarded in USCIS analysis of job creation for CS II in a resurgence of call center operations. USCIS could argue that newly created jobs cannot count again without subtracting the previously created and lost (and credited) call center jobs. Investors could argue the opposite. USCIS could use the liquidation of CallSocket assets (particularly the sale of the Duffwin Building) as a basis for denial of some investors, asserting that the liquidation occurred before the jobs were created that would be credited for those investors.

(Recovery Plan, Exhibit 1, Divine Decl., ¶ 57, Docket No. 185).

> In summary, CS II presents probably the "closest call" whether the overwhelming majority of investors have a meaningful chance to retain immigration benefits. Some liquidated assets are available to re-deploy in the original business plan for a call center. Given the commingling, it might not be clear which NCEs' investors should have the opportunity to use the assets available to the Receiver. . . . . USCIS could choose many grounds, discussed above, to deny those petitions, and . . . the chances of success are well below 50%. The interest of the investors in pursuing immigration benefits at the risk of losing any liquidation interest and ultimate return should be solicited and considered.

(Recover Report, Exhibit 1, Divine Decl., ¶ 58, Docket No. 185).

The Receiver has also obtained the most current immigration status information for the 29 CallSocket II investors from their immigration counsel, James Yang, of Pegasus Law Group. According to Mr. Yang, he confirms that at least 27 of the 29 EB-5 investors in CallSocket II have received conditional green cards. Of the two remaining EB-5 investors in CallSocket II, one has notified him that she does not wish to continue the EB-5 process and has withdrawn her immigrant visa application. The other EB-5 investor has obtained her immigrant visa and plans to be admitted into the U.S. as a conditional green card holder in the near future. In addition, Mr. Yang, has submitted to USCIS the I-829 Petitions for 14 of the 29 EB-5 investors in CallSocket II who are eligible to file I-829 Petitions. The remaining EB-5 investors are awaiting for the opening of their respective 90-day filing window to file their I-829 Petitions. See, Declaration of James Yang, filed concurrently herewith.

Based on the Receiver's immigration counsel's recommendation, the Receiver believes that the CallSocket II call center can be closed without harming the CallSocket II investors. First, as noted by both the Receiver's and investors' immigration counsel, the overwhelming majority of CallSocket II investors that have already been admitted as conditional residents, and according to the Receiver's immigration counsel, would be immune from the effects of closing the call center. Second, as suggested by the Receiver's immigration counsel, the Receiver undertook two months of communicating with the CallSocket II investors to determine their interest in pursuing the continued operation of the call center and concluded, as described below, the investors are not interested in pursuing the continuing operation of the call center. Uecker Decl. ¶ 4.

**B. The Receiver Should Be Authorized To Close The Call Center Because Investors Are Not Interested In Purchasing or Recapitalizing The Call Center; Conventional Lending Is Not Possible; And The Call Center Is Operating At A Significant Loss, Making A Sale Impossible**

**1. The Receiver Should Be Authorized To Close The Call Center Because The Investors Are Not Interested In Purchasing Or Recapitalizing The Call Center**

Over the past two months, the Receiver has been communicating with the CallSocket II investors to determine whether they would be interested in recapitalizing CallSocket II for the purpose of continuing to operate the call center, and create new jobs for investors to satisfy their I-526/I-829 requirements. During the State Court Action, the Receiver had received a prior proposal from Akila Digita, the present consultant of the call center to operate the call center, create the required number of jobs through 2019, for an investment of $2.15 million. On July 10, and again on July 26, 2017, the Receiver sent letters to all of the investors in CallSocket II asking if they would be interested in committing to a new investment in the call center; 3 or 4 of the 29 investors responded that they would not. Thereafter, the Receiver was contacted by Millstein & Associates and Klasko Immigration Law Partners, L.P., immigration counsel for approximately 21 CallSocket II investors. On August 9, 2017, the Receiver made a proposal to counsel for the investors that the investors provide new capital in a sufficient amount to fund the $2.15 million, or purchase the general partner's interest in CallSocket II and purchase the assets of the call center and continue to operate the call center outside of the receivership. Although counsel for the CallSocket II investors indicated that they would be responding to the Receiver with a proposal, in the five or six weeks following the Receiver's proposal, they did not respond. Uecker Decl., ¶ 5.

Finally, on September 15, 2017, immigration counsel for the CallSocket II investors advised the Receiver that the investors wished the call center to remain open using the existing funds from the sale of the Dufwin Building, but given the opposition of the Receiver to the use of Receivership Funds to operate the call center, and given the investors were unable to raise $2.15 million in additional capital to run the call center, and did not have the ability to run the call center, the investors did not oppose the closing of the call center. Uecker Decl., ¶ 6.

Immigration counsel for the investors advised the Receiver that the investors wished to recover their capital from the Receivership Estates (rather than invest new money), and then redeploy their capital into a new EB-5 project that would create the necessary number of jobs. Counsel for the investors advised the Receiver that the new project would be a more traditional regional center EB-5 project that relies primarily on job creation from construction, instead of operation of a call center. Ultimately, the investors were not interested in continuing the operation of the call center. Uecker Decl., ¶ 7.

Nor can the Receiver recommend funding the future operations of the CallSocket II call center from existing Receivership Funds. CallSocket II held title to two parcels of real estate, 1750 Broadway and the 519 17th Street (Dufwin Building), Oakland, California, each of which were sold during the State Court Action. As set forth in the in the Recovery Plan, based on the Tate Tracing,[2] it appears that the 1750 Broadway Property (which was held in the name of CallSocket II) was purchased with over $1.6 million in funds belonging to CallSocket, L.P., and over $1.0 million in funds belonging to SFRC. According to the Tate Tracing, Dufwin Building was purchased with funds from CallSocket II. However, according the Declaration of Ellen Chen in Support of the Securities and Exchange Commission's Motion for Preliminary Injunction and Appointment of Receiver (Docket No. 19) ("Chen Decl."), the funds for the purchase of the Dufwin Building came from CallSocket, L.P. (Recovery Report, Docket No. 185, p: 30:3-6; Chen Decl., ¶ 37-40. In the absence of a full forensic accounting[3] there is no assurance that the proceeds of either the 1750 Broadway or the Dufwin Building held in the name of CallSocket II were funds that are actually owned by CallSocket II, attributable to CallSocket II investors or the proceeds of CallSocket II investors. The Receiver believes that using Receivership Funds that are not solely owned by CallSocket II investors to fund the call center operations would be to the detriment of the investors of the other EB-5 entities. Uecker Decl., ¶ 8.

---

[2] Tracing of funds prepared by Marvin Tate CPA in the State Court Action ("Tate Tracing").

[3] On July 21, 2017, the Court entered an order authorizing the Receiver to expend receivership funds on a forensic accounting by the estate's accountant, Bachecki Crom & Co., LLP (Docket No. 198), but that accounting may not be completed for a number of months.

Given the investors lack of support, including financial support, for the CallSocket II call center, the Receiver should be authorized to close the call center.

### 2. The Receiver Should Be Authorized To Close The Call Center Because Conventional Funding Is Not Available To Operate The Call Center

The Receiver contacted Community Bank of the Bay ("CBB"), and enquired whether CBB would provide funding to the call center. The Receiver provided CBB with an income statement, which showed that since the commencement of operations in April of 2016 to June 2017, the call center lost over $1.8 million. CBB's response was whether there was a balance sheet, or given the loss rate, the borrower could demonstrate its ability to meet such a cash burn, or, at the minimum, offer collateral to provide comfort to the lender. The Receiver responded that there was no balance sheet, and limited personal property collateral such as computers, office furniture, which would not have sufficient value to provide comfort to the lender. Given the loss rate of the call center, CBB declined to offer any funding given the lack of collateral. Uecker Decl., ¶ 9.

Because conventional financing is unavailable, the Receiver should be authorized to close the CallSocket II call center.

### 3. The Receiver Should Be Authorized To Close The Call Center Because It Is Not A Salable Business

The Receiver has over 25 years' experience in evaluating businesses for sale. As stated above since the commencement of operations, in April 2016 to June 2017, the call center lost over $1.8 million. From January 2017 to August 2017, the call center lost $1.013 million. The call center has no real asset base to speak of. It has office furniture, and computers, nothing of significant value. The lease has no value because it is a month to month lease at market rate, $25,000 per month. The call center has no ongoing customer contracts since all of its contracts were obtained through the current manager, Akila Digital. Based on the Receiver's business judgment, the call center has insufficient value to sell as a going concern business. In declining to offer financing, CBB suggested that the Receiver offer to sell the call center to a competitor. The Receiver has already explored that option. The call center is operated by potential competitor and the only viable purchaser, the current manager, Akila Digital. The Receiver has on several

occasions offered to sell the call center operations to Akila Digital and each time Akila Digital has refused. Uecker Decl., ¶ 10.

Because the CallSocket II call center is not a saleable business in the Receiver's business judgment, and the only potential purchaser has refused any purchase opportunities, the Receiver should be authorized to close the call center operations.

## IV. CONCLUSION

All but one of the CallSocket II investors have already immigrated to the United States, received their conditional green cards, and should therefore be immune to the effects of closing the call center operations. The majority of CallSocket II investors do not support either recapitalizing or purchasing the call center, and instead seek to redeploy whatever capital they receive into a different more traditional EB-5 project. The call center has lost over $1.0 million since the beginning of the year, and $1.8 million in the last 18 months. Given the issues of comingling of funds, the Receiver cannot recommend continuing to operate the call center with Receivership Funds. Neither conventional financing nor a sale of the call center is feasible. For all of those, the Receiver should be authorized to close the CallSocket II call center pursuant to her authority under the Appointment Order (Docket No. 100), ¶ 38.

DATED: September 26, 2017          WENDEL, ROSEN, BLACK & DEAN LLP

By:   /s/ Elizabeth Berke-Dreyfuss
      Elizabeth Berke-Dreyfuss
      Attorneys for Susan L. Uecker, Receiver

# EXHIBIT A

009589.0024\4863581.1

1  Elizabeth Berke-Dreyfuss (Bar No. 114651)
   **WENDEL, ROSEN, BLACK & DEAN LLP**
2  1111 Broadway, 24th Floor
   Oakland, California 94607-4036
3  Telephone: (510) 834-6600
   Fax: (510) 834-1928
4  Email: edreyfuss@wendel.com

5  Attorneys for Susan L. Uecker, Receiver

6

7              UNITED STATES DISTRICT COURT

8             NORTHERN DISTRICT OF CALIFORNIA

9                  SAN FRANCISCO DIVISION

10

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC,<br><br>Defendants,<br><br>-and-<br><br>CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC,<br><br>Relief Defendants. | Case No. 3:17-CV-00223-RS<br><br>**[PROPOSED] ORDER GRANTING RECEIVER'S MOTION FOR ORDER AUTHORIZING CLOSING OF CALLSOCKET II, L.P. CALL CENTER**<br><br>Date: October 26, 2017<br>Time: 1:30 p.m.<br>Place: 450 Golden Gate Ave.,<br>         17th Floor, Ctrm. 3<br>         San Francisco, CA 94102<br>Judge: The Hon. Richard Seeborg |

The Motion for Order for Authorizing Closing of CallSocket II, L.P. Call Center ("Motion"), filed by Susan L. Uecker, Receiver for Defendants San Francisco Regional Center, LLC; California Gold Medal, L.P.; CallSocket, L.P.; CallSocket II, L.P.; CallSocket III, L.P.; NA3PL, L.P.; West Oakland Plaza, L.P.; CallSocket, LLC; CallSocket II, LLC; CallSocket III, LLC; Immedia, LLC; and Relief Defendants, CallSocket Holding Company, LLC; CallSocket III Holding Company, LLC; Central California Farms, LLC; JL Gateway, LLC; and Berkeley Healthcare Dynamics, LLC, came on for hearing before the Court pursuant to an order shortening time, on October 5, 2017, at 1:30 p.m. Receiver was represented by counsel, Elizabeth Berke-Dreyfuss, Esq., of Wendel, Rosen, Black & Dean LLP, and such other appearances were made as were noted in the record. The Court has considered the evidence submitted by the Receiver in support of the Motion. Oral argument was heard on the Motion and based thereon, and good cause shown:

**IT IS HEREBY ORDERED**:

1. Any objections to the Motion, if not withdrawn, are overruled;

2. The Receiver is authorized to close the CallSocket II, L.P. call center pursuant to the provisions of Order Appointing Receiver and Monitor, (Docket No. 100), ¶ 38.

3. The Receiver is authorized to take such actions as may be necessary and appropriate to winding down and closing CallSocket II, L.P. call center without further order of the Court.

DATED: _____, 2017

_____
HON. RICHARD SEEBORG
United States District Judge