# Exhibit 3

OPERATING AGREEMENT
FOR

BERKELEY HEALTHCARE DYNAMICS, LLC

A CALIFORNIA LIMITED LIABILITY COMPANY


**THIS OPERATING AGREEMENT** (the "Agreement") is entered into effective as of October 17, 2012, by THOMAS M. HENDERSON, CLEMENT CHIN, and KEVIN SHIMAMOTO, doing business in the State of California (hereinafter sometimes collectively referred to as "Members" and "Managers").


R E C I T A L S

WHEREAS, on October 17, 2012, "Berkeley Healthcare Dynamics, LLC" (the "Company") was formed as a limited liability company by the filing of articles of Organization with the California Secretary of State; and

WHEREAS, the Members and Managers wish to adopt and approve an agreement to govern the operations of the Company and document the rights and obligations of each Member and Manager with respect to the Company;

NOW THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, the parties agree as follows:

A G R E E M E N T

ARTICLE I

ORGANIZATIONAL MATTERS

1.1    <u>Formation and Purpose</u>.  The Members have formed a California limited liability company by filing the Articles with the California Secretary of State and have entered into this Agreement to define the rights and liabilities of the Members. The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act or the laws of the State of California.  Unless otherwise defined herein, capitalized terms shall have the meanings set forth in Section 11.1 hereof.  To the extent permitted by the Act, this Agreement shall control the rights or obligations of any Member.

1.2   Name and Term.   The name of the Company shall be "Berkeley Healthcare Dynamics, LLC" The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Members and Managers deem appropriate or advisable.   The terms of this Agreement shall be co-terminous with the existence (including any winding up activities) of the Company.

1.3   Office, Agent, and Addresses of Members and Manager. The Company shall maintain an office and registered agent in California, and may locate its principal office where the Members and Managers may determine.   Other offices may also be established as needed within and without California.   The registered agent shall be as stated in the Articles or as otherwise determined by the Members and Managers.   The addresses of the Members and of the Managers are set forth on Exhibit "A".

## ARTICLE II

### CAPITAL CONTRIBUTIONS

2.1   Capital Contributions.   Each Member shall contribute the amount set forth on Exhibit A as his or her initial Capital Contribution.   No Member shall be required to make any additional Capital Contributions.   Additional Capital Contributions may be made upon the recommendation of the Managers with the written approval of members holding a Majority Interest.   Members shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a pro rata basis in accordance with their Percentage Interests.   All Capital Contributions and Percentage Interests, as set forth on Exhibit A, shall be adjusted by the Managers on a regular basis.   For purposes of this Agreement, the term "Capital Contribution" shall mean the aggregate fair market value of the cash, property (including promissory notes) contributed to the Company by Members and services rendered (excluding, however, the value of any services with respect to which the Member is treated solely as an "employee" and not as the equivalent of a partner for federal employment tax purposes).

2.2   Capital Accounts.   The Company shall establish and maintain in accordance with the Regulation, a "Capital Account" for each Member, which shall carry over to his transferee if transferred in accordance with this Agreement.   No Member shall be entitled to receive any interest on his Capital Contributions.

## ARTICLE III

### MEMBERS

3.1   Limited Liability.   Except as required under Act or this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contact, tort, or otherwise.

3.2   Admission of Additional Members.   Additional Members may be admitted to the Company on terms determined by the Managers and approved by the unanimous approval of the Members; provided, however, that "substitute members" may be admitted only in accordance with Article VI.

3.3   Withdrawals, Resignations, and Termination of Interest.   Any Member may withdraw or resign upon sixty (60) days prior written notice to the Company.   Such Member's Membership Interest shall be subject to purchase and sale as provided in Article VII.   Upon a transfer of a Member's Membership Interest in violation of this Agreement, the occurrence of a Dissolution Event as to that Member which does not result in the dissolution of the Company, or the withdrawal of a Member, the Membership Interest of a Member shall be terminated and may be purchased by the Company or remaining Members as provided for below.   Each Member acknowledges and agrees that such termination and acquisition of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

3.4   Transactions with the Company.   Unless otherwise prohibited herein, a Member may lend money to and transact other business with the Company if the Manager approves after full disclosure of the Member's involvement is made.   Each such Member shall have, in such capacity, the same rights and obligations with respect thereto as a Person who is not a Member.

Notwithstanding the foregoing, no Member shall be entitled to remuneration for acting in the Company business unless; (i) the Member renders services to the Company and the value of those services is not included as part of that Member's Capital contributions under Article II hereof (i.e., the Member is treated solely as an "employee" and not as a partner for federal employment tax purposes); or (ii) the Member acts in connection with the winding up of the Company's affairs pursuant to Article IX.

3.5   Members Are Not Agents.   Pursuant to Section 4.1 and the Articles, the management of the Company is vested in the Managers.   No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

3.6  <u>Voting Rights</u>.  Except as expressly provided herein and excluding Members who are the subject of a Dissolution Event and assignors of a Membership Interest, Members holding a Majority Interest shall have the right to formally approve or disapprove matters, as specifically provided for below (hereinafter "approval" by Members), including, but not limited to, the following: (i) a decision to continue the business of the Company after the occurrence of a Dissolution Event; (ii) the transfer of a Membership Interest and admission of the assignee as a Member of the Company; (iii) a decision to compromise an obligation of a Member or return money or property paid or distributed  in violation of the Act; (iv) the election and removal of the Managers; (v) the reorganization or the dissolution of the Company; and (vi) limitation imposed on, or fees paid to, the Managers.  The unanimous consent of all Members shall be required to amend the Articles or this Agreement or to admit new Members.

3.7  <u>Meetings of Members</u>.  Meetings of members may be held at such date, time and place within or without California as the Managers may fix from time to time.  However, no meetings of the Members shall be required.  At any Members' meeting, the Managers shall preside at the meeting and appoint a person to act as secretary, prepare minutes of the meeting, and maintain the minute books of the Company.  Unless prohibited by the Act or the Articles, meetings of the Members may be called by the Managers, or upon written demand of a Member (or group of Members) holding more than then percent (10%) of the Percentage interests for the purpose of addressing any matters on which the Members may vote.

## ARTICLE IV

### MANAGEMENT AND CONTROL OF THE COMPANY

4.1  <u>Management of the Company by Managers</u>.

The business, property, and affairs of the Company shall be managed exclusively by the Managers.  Except for situations in which the approval of the Members is expressly provided for in the Articles of this Agreement, the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters, and to perform any and all the acts customary or incident to the management of the Company's business, property and affairs.

4.2  <u>Election of Managers</u>.

A.  <u>Number; Term; and Qualifications</u>.  The Company shall initially have three (3) Managers. The number of Managers of the Company shall be fixed from time to time by Members holding a Majority Interest, provided that in no instance shall there be

less than one Manager and provided further that if the number of Managers is reduced or increased, the Articles shall be amended as required by the Act.  Unless he resigns or is removed, each Manager shall hold office until a successor is elected and qualified.  The Managers shall be elected by the affirmative vote or written consent of Members holding a Majority Interest.  A Manager need not be a Member, an individual, a resident of California, or a citizen of the United States.

     B.   <u>Resignation; Removal; Vacancies</u>.  A Manager may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.  The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The Manager may be removed at any time, with or without cause, by the affirmative vote or written consent of Members holding a Majority Interest.  The resignation or removal of a Manager shall not effect or prejudice the Manager's rights as a Member or otherwise, and shall not constitute a withdrawal of a Member. Vacancies shall be filled by the affirmative vote or written consent of Members holding a Majority Interest.

    4.3   <u>Powers</u>.  Subject to the terms of this Agreement, the Managers shall manage the business, property and affairs of the Company, and shall have all powers needed to do so, including without limitation, the power to exercise all of the powers described in California Corporations Code Section 17003. Notwithstanding the foregoing, a Manager shall not have the authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest; (i) the Sale, exchange or other disposition of all, substantially all the Company's assets (unless pursuant to the Company's duly authorized dissolution);  (ii) the merger of the Company with another limited liability company, limited partnership, corporation, general partnership or other person; provided, however, no Member shall be required to become personally liable (e.g., a general partner), or shall be subjected to an economic risks of loss in excess of his or her Capital Contribution, in any merger without his express written consent or unless each Member is granted dissenter's rights as described in the Act; (iii) the establishment of different classes of Members; (iv) transactions between the Company and the Manager or an affiliate of the Manager, or transactions in which the Manager has a material financial interest; (v) any act which would make it impossible to carry on the ordinary business of the Company; (vi) the confession of a judgment against the Company; or (vii) any other transaction described herein which requires the approval of the Members.

Berkeley Healthcare Dynamics, LLC                                                    5
Operating Agreement

4.4   <u>Members have no Managerial Authority</u>. No Member shall have the power to participate in the management of the Company unless expressly authorized or required by this Agreement, the Articles, or Acts.  Unless authorized in writing to do so by the Managers, no Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

4.5   <u>Performance of Duties; Liability of Manager</u>.  A Manager shall perform his managerial duties in good faith, in a manner he reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinary prudent person in like position would use under similar circumstances.  A Manager who so performs shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Managers shall be entitled to rely on information, opinions, reports, or statements, including financial statements and the financial data, from the employees, representatives and agents of the Company, its attorneys and accountants, and the Members, unless he has knowledge that reliance is unwarranted and that reasonable inquiry may be appropriate.

4.6   <u>Devotion of Time; Competing Activities</u>.  A Manager shall not be required to devote all of his time or business efforts to the affairs of the Company, and may devote whatever time, effort, and skill, as he deems appropriate for the operation of the Company.  The Managers and the Members, and their employees, representative and agents, may engage or invest in, independently or with others, any business activities of any type or description, including without limitation those that might be the same as or similar to the Company's business that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have the right in or to such other ventures or activities or to the income or proceeds derived therefrom.  A Manager shall not be obligated to present any investment opportunity to prospective economic advantage to the Company, even if the opportunity is of a the character that, if presented to the Company, could be taken by the Company.  A Manager shall have the right to hold any investment opportunity or prospective economic advantage for his own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Managers and Affiliates of a Manager may own and/or manage the business, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive all rights and claims which they may otherwise have against the Manager and his agents, employees, and affiliates as result of any such activities.

4.7   <u>Transactions between the Company and the Manager</u>. Upon full and complete disclosure to the Members, and the approval by disinterested Members holding a Majority Interest, a Manager and/or his Affiliate may engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and the terms and conditions of such transaction, on an overall basis, are as fair and reasonable to the Company as those that are generally available to parties operating at arm's length.

4.8   <u>Limited Liability</u>.   No person who is a Manager or officer (or both) of the Company shall be personally liable under any judgment of a Court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer (or both) of the Company.

## ARTICLE V

## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1   <u>Allocations of Net Losses and Net Profit</u>.   Net losses shall be allocated to the Members in proportion to their Percentage Interests.   Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such member's share of Company "Minimum Gain" (as defined in the Regulations) that would be realized on a foreclosure of the Company's property.   Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 5.1.   Any loss reallocated under this Section 5.1 shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article V, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article V, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article V if no reallocation of losses had occurred under this section 5.1.   Net profit shall be allocated to a Member in proportion to his Percentage Interest. The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their share of Company income and loss for income tax purposes.

5.2   Special Allocations.  Notwithstanding Section 5.1, if there is a net decrease in Company Minimum Gain during any fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the Regulations), and determined in accordance with Regulations.  Minimum Gain attributable to a Members' "Nonrecourse Debt" (as defined in the Regulations) shall also be charged back and specially allocated in accordance with the Regulations.  This Section 5.2 is intended to comply with the minimum gain chargeback requirement contained in the Regulations and shall be interpreted and applied consistently therewith. Notwithstanding Section 5.1, any "Nonrecourse Deductions" (as defined in the Regulations) for any fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.  Items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Members who bear the economic risk of loss with respect to the Members' Nonrecourse Debt to which such items are attributable as, described in the Regulations.

5.3   Qualified Income Offset.  Notwithstanding Section 5.1, if any event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 5.3 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article V so that he net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article V to the extent possible shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 5.3 if such expected adjustments, allocations, or distributions had not occurred.

5.4   Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes, and shall not effect or in any way be taken into account in computing a Member's Capital Account of share of profits, losses or other items of distributions pursuant to any provisions of this Agreement.

5.5   Allocation of Net Profits and Losses. If any
Membership Interest is transferred, increased or decreased during
any Fiscal year of the Company, each item of income, gain, loss,
deduction, or credit of the Company for such fiscal Year shall be
assigned pro rata to each day in the particular period of such
Fiscal year to which such item is attributable (i.e., the day it
is accrued or incurred) and allocated to each Member based upon
his or her respective Membership Interest at the close of such
day.

5.6   Distributions.  Subject to applicable law and this
Agreement, a Manager may distribute "Distributable Cash" to the
Members in the following order of priority; (a) to Members in
proportion to their unreturned Capital Contributions until each
Member's Capital Contributions are recovered; and (b) to the
Members in proportion to their Percentage Interests.  All such
distributions shall be made only to the Persons who are the
holders of record of the Economic Interest on the actual date of
distributions.  Neither the Company nor the Managers shall incur
any liability for making distributions in accordance with this
Section 5.6.  A Member, regardless of the nature of the Member's
Capital Contribution, has no right to demand and receive any
distribution from the Company in any form other than money.  No
Member may be compelled to accept from the Company a distribution
of any asset in kind in lieu of a proportionate distribution of
money being made to other Members.  Except upon a dissolution and
the winding up of the Company, no member may be compelled to
accept a distribution of any asset in kind.  Except for
distributions made in violation of the Act or this Agreement, no
Member or owner of an Economic Interest who is not a Member
(hereinafter an "Economic Interest Owner") shall be obligated to
return any distribution to the Company or pay the amount of any
distribution for the account of the Company or to any creditor of
the Company.  The amount of any distribution returned to the
Company by a Member or Economic Interest Owner or paid by a
Member or Economic Interest Owner for the account of the Company
or to a creditor of the Company shall be added to the account or
accounts from which it was subtracted when it was distributed to
the Members or Economic Interest Owner.

5.7   Restrictions on Distributions.  No distribution shall
be made if, after giving effect to the distribution; (a) the
Company would not be able to pay its debts as they become due in
the usual course of business; (b) the Company's total assets
would be less than the sum of its total liabilities plus, unless
this Agreement provides otherwise, the amount that could be
needed, if the Company were to be dissolved at the time of the
distribution, to satisfy the preferential rights of the Members,
if any, upon dissolution that are superior to the rights of the
Members receiving the distribution; or (c) the Act.  A Member or
Manager who votes for a distribution in violation of this
Agreement (or the Act) is personally liable to the Company for

the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act.  Any member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Members received with knowledge of facts indicating that the distribution was made in violation of this agreement or the Act.

## ARTICLE VI

### TRANSFER AND ASSIGNMENT OF INTERESTS

6.1   Transfer or Assignment of Interests.   No Member shall be entitled to transfer, assign, sell, exchange, encumber or in any way alienate all or any part of his or her Membership Interest except with the prior written consent of Members holding a Majority Interest, which consent may be given or withheld as determined by the Members in their sole discretion.  Transfers in violation of this Article VI shall only be effective to the extent set forth in Section 6.4.  Any Membership Interest (or portion thereof) transferred shall continue to be subject to the terms and provisions of this Agreement. Furthermore, and in addition to the restrictions contained herein, no Member shall transfer, assign, sell, exchange, encumber or in any way alienate all or part of his Membership Interest: (i) without first complying with all applicable state and federal securities laws, and (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all the Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Managers.  Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the date immediately following the date upon which the requirements of this Agreement have been met.

6.2   Substitution of Members.   A transferee of a membership Interest shall have the right to become a substitute Member only if (i) the requirements of Section 6.1 are met, (ii) such Person agrees to be bound by the terms of this Agreement, and (iii) such Person pays any reasonable expenses in connection with his or her admission as a new Member.  The admission of a substitute Member shall not result in the release of a Member who assigned the Membership Interest from any liability that such Member may have to the Company.

6.3   Family and Affiliate Transfer.   The Membership Interest of any Member may be transferred, subject to compliance with Section 6.1 (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii) to any Affiliate of the

Members.  Any transferee of a Membership Interest transferred
pursuant to this Section 6.3 shall take such Membership Interest
subject to the transfer restrictions imposed by this Agreement.

6.4  No Effect to Transfers in Violation of Agreement.
Upon any transfer of a Membership Interest in violation of
this Article VI, the transferee shall have no right to vote or
participate in the management of the business, property and
affairs of the Company or to exercise any rights of a Member.
Such transferee shall only be entitled to become an Economic
Interest Owner and thereafter shall only receive the share of one
or more of the Company's Net Profits, Net Losses and
distributions of the Company's assets to which the transferor of
such Economic Interest would otherwise be entitled.
Notwithstanding the immediately preceding sentences, if, in the
determination of the Managers, a transfer in violation of this
Article VI would cause the termination of the Company under the
Code, in the sole discretion of the Managers, the transfer shall
be null and void and the purported transferee shall not become
either a member or an Economic Interest Owner.  Upon any
transfer, assignment, conveyance or sale (whether arising out of
an attempted charge upon that Member's Economic Interest by
judicial process, a foreclosure by a creditor of the Member or
otherwise) of a Member's Economic Interest which does not at the
same time transfer the balance of the rights associated with the
Membership Interest transferred by a Member (including, without
limitation, the rights of the Members to vote or participate in
the management of the business, property and affairs of the
Company), the Company shall purchase from the Member, and the
Member shall sell to the Company for a purchase price of $200,
all remaining rights and interests retained by the Member that
immediately before the transfer, assignment, conveyance or sale
were associated with the transferred Economic Interest.  Such
purchase and sale shall not, however, result in the release of
the Member from any liability to the Company as a Member.  Each
Member acknowledges and agrees that the right of the Company to
purchase such remaining rights and interests from a Member who
transfers a Membership Interest in violation of this Article VI
is not unreasonable under the circumstances existing as of the
date hereof.

6.5  Right of First Refusal.  Each time a Member proposes
to transfer, assign, convey, sell, encumber or in any way
alienate all or any part of his Membership Interest (or as
required by operation of law or another involuntary transfer to
do so) such Member shall first offer such Membership Interest to
the Company and the non-transferring Members in accordance with
the following provisions:

A.  Such Member shall deliver a written notice to the
Company and the other Members stating such Member's bona fide
intention to transfer such Membership Interest, the name and

Berkeley Healthcare Dynamics, LLC                                    11
Operating Agreement

address of the proposed transferee, the Membership Interest to be transferred, and the purchase price and terms of payment for which the Member proposes to transfer such Membership Interest.

B.    Within thirty (30) days after receipt of the notice described in Section 6.5A, each non-transferring Member shall notify the Managers in writing of his desire to purchase a portion of the Membership Interest being so transferred.  The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest, which may be so transferred.  Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his pro rata share of Membership Interest, then the other Members can successively and proportionality elect, in the same manner as described in Section 7.3 below, to purchase the entire Membership Interest.  If the notice sets forth noncash consideration, the Company and such purchasing Member each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the noncash consideration offered, as determined by the Managers.

C.    If the Company or the other Members do not elect to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the entire Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) all requirements of this Article VI are met.  If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

## ARTICLE VII

### CONSEQUENCES OF DEATH, DISSOLUTION, RETIREMENT OR BANKRUPTCY OF MEMBER

7.1   Dissolution Event.  Upon the occurrence of a Dissolution Event, the Company shall dissolve unless, within ninety (90) days of the Dissolution Event, the Members holding a Majority of the remaining Membership Interests (the "Remaining Members") consent to the continuation of the business of the Company.  Upon the withdrawal of a Member under Section 3.3, or

if the Remaining Members consent to the continuation of the business of the Company, the Company and/or the Remaining Members shall purchase, and the Member whose actions or conduct resulted in the Dissolution Event ("Former Member") shall sell, the Former Member's Membership Interest (hereinafter "Former Member's Interest) as provided in this Article VII to avoid dissolution of the Company.

7.2  <u>Purchase Price</u>. The purchase price for the Former Member's Interest shall be the Capital Account balance of the Former Member as adjusted pursuant to Section 202; provided, however, that if the Former Member of the Company deems the Capital Account balance to vary from the fair market value of the Former Member's Interest by more than ten percent (10%), such party be entitled to require an appraisal by providing notice of the request for an appraisal within fifteen (15) days after the determination by Remaining Members to continue the business of the Company.  In such event, the value of the Former Member's Interest shall be determined by three (3) independent appraisers, one selected by the Former Member (or representative), one selected by the Company, and one selected by the two appraisers so named.  The fair market value of the Former Member's Interest shall be the average of the two appraisals closest in amount to each other.  In the event the fair market value is determined to vary from the Capital Account balance by less than ten percent (10%), the party requesting such appraisal shall pay one-half of such expense and the Remaining Members shall pay the remaining one-half of such expense.  Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

7.3  <u>Notice of Intent to Purchase</u>.  The Managers shall notify the remaining Members of the purchase price of the Former Member's Interest within ten (10) days of its determination, who shall each then notify the managers in writing of his desire to purchase a portion of the Former Member's Interest within twenty (20) days of the date notice is given by the Managers.  The failure of any Remaining Member to submit a notice within the applicable twenty (20) day period shall constitute an election on the part of the Members not to purchase any of the former Member's Interest.  Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.  If any Remaining Member elects to purchase less than all of his pro rata share of the Former Member's Interest, then the Remaining Members shall be entitled to elect to purchase that portion of the Former Member's Interest which has not yet been elected for purchase as is proportionate

to the Percentage Interest held by each elected Remaining member, i.e, which bears the same proportion that the Percentage Interest of the Remaining Members bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.  This proportionate right of first refusal shall be repeated (using the ten and twenty day notice periods noted above) until the Remaining Members: (i) no longer wish to acquire any more of the Former Member's Interest or, if sooner, (ii) have elected to acquire one hundred percent of such Former Member's Interest.  If the Remaining Members fail to purchase the entire interest of the Former Member, the Company shall purchase any remaining share of the Former Member's Interest.

7.4   <u>Payment of Purchase Price</u>.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the remaining Members: (i) the Company or the Remaining Members shall at the closing pay in cash the total purchase price for the Former Member's Interest; or (ii) the Company or the Remaining Members shall pay at the closing one-fifth (1/5) of the purchase price in cash and shall pay the balance of the purchase price in four equal annual principal installments, plus accrued interest, payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at the applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation to pay the balance due shall be evidenced by a promissory note, and if purchase by a Remaining Member, secured by a pledge of the interest in the Company being purchased.

7.5   <u>Closing Purchase of Former Member's Interest</u>.  The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 a.m. at the principal office of the Company no later than thirty (30) days after the date on which the exercising of the right of first refusal noted above has been completed, except that if the closing date falls on a Saturday, Sunday, or legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest.  The Former Member, the Company and the Remaining Member shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

# ARTICLE VIII

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1    Books and Records.  The books and records of the Company shall reflect all Company transactions and shall be kept in accordance with the accounting methods followed for federal income tax purposes.  The company shall maintain at its principal office in California all of the following: (i) a current list of the full name and last known business or residence address of each Member and Economic Interest Owner, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner; (ii) the full name and business or residence address of the Managers; (iii) a copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed; (iv) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years; (v) a copy of this Agreement and any and all amendments thereto together with executed copes of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed; (vi) copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and (vii) the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

8.2    Delivery to Members and Inspection.    Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interests of the Person as Member, Manager or Economic Interest owner, to (i) inspect and copy during normal business hours any of the Company records described in Section 8.1; and (ii) obtain from the Managers, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

8.3    Annual Statement.  A Manager shall prepare and send an annual report to each of the Members not less than 120 days after the close of each Fiscal Year.  The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year.  Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Managers that the financial statements were prepared without audit from the books and records of the Company.  The Managers shall cause to be prepared at least annually, at the Company's expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns.  The Managers shall send or cause to be sent

to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax information returns.  The Managers, at Company expense, shall cause to be prepared and timely filed with the appropriate authorities, the income tax returns for the Company, any amendments to, restatements of, the Articles, as well as any reports required to be filed by the Company with those entities until the Act or other then current applicable laws, rules, and regulations (including, but not limited to the statement required under California Corporation Code §17060.)

    8.4    Bank Accounts.  The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

    8.5    Accounting and Tax Matters.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers.  The Managers shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Managers, who shall serve as the "Tax Matters Partner," as defined in Code Section 6231, shall represent the Company at the Company's expense in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.  The Tax Matters Partner shall oversee the Company tax affairs in the overall best interest of the Company.  If for any reason the Tax Matters Partner can no longer serve in that capacity or cease to be a Member or Manager, as the case may be, Members holding a Majority interest may designate another to be Tax Matters Partner.

**ARTICLE IX**

**DISSOLUTION AND WINDING UP**

    9.1    Dissolution.  Provided that dissolution of the Company does not affect any EB-5 related processes as specified in Section 9.2, the Company shall be dissolved, its assets shall be disposed of, and it's affairs wound up in the first to occur of the following: (i) upon the happening of any event of dissolution specified in the Articles; (ii) upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the California Corporations Code; (iii) upon the vote of the Members; (iv) upon the occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's

Interest; or (v) the sale of all or substantially all of the assets of the Company.  As soon as possible following the occurrence of any of the foregoing events, the Managers, or if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

9.2   <u>EB-5 Limitation on Dissolution</u>.  The Company shall not be dissolved if dissolution would affect any (a) EB-5 petition for classification as an alien entrepreneur, (b) application for immigration visas or adjustment of status, or (c) application to remove conditions, submitted by any investor or limited partner in any limited partnership of which the Company is a General Partner.

9.3   <u>Winding up</u>.  Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Managers, or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities and assets of the Company, shall either cause its assets to be sold or distributed (and, if sold, as promptly as is consistent with obtaining the fair market value thereof), and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4.  The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.  The Managers or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

9.4   <u>Distribution in Kind</u>.  Any noncash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article V, and the Members' Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distribution asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).  The fair market value of such asset shall be determined by the Managers or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Managers or liquidating trustee and approved by the Members.

9.5   <u>Order of Payment of Liabilities Upon Dissolution</u>.
After determining that all known debts and liabilities of the
Company in the process of winding up, including, without
limitation, debts and liabilities to Members who are creditors of
the Company, have been paid or adequately provided for, the
remaining assets shall be distributed to the Members in
accordance with their positive Capital Account balances, after
taking into account income and loss allocations for the Company's
taxable year during which liquidation occurs.   Such liquidating
distributions shall be made by the end of the Company's taxable
year in which the Company is liquidated, or, if later, within
ninety (90) days after the date of such liquidation.   The payment
of a debt or liability, whether the whereabouts of the creditors
is known or unknown, has been adequately provided for either of
the following means: (i) payment thereof has been assumed or
guaranteed in good faith by one or more financially responsible
person or by the United States government or any agency thereof,
and the provision, including the financial responsibility of the
Person, was determined in good faith and with reasonable care by
the Members or the Managers to be adequate at the time of any
distribution of the assets pursuant to this Section; or (ii) the
amount of the debt or liability has been deposited as provided in
Section 2008 of the California Corporations Code.   This Section
9.4 shall not prescribe the exclusive means of making adequate
provisions for debts and liabilities.

9.6   <u>Compliance with Regulations</u>.   All payments to the
Members upon the winding up and dissolution of the Company shall
be strictly in accordance with the positive capital account
balance limitation and other requirements of the Regulations.

9.7   <u>Limitations on Payments Made in Dissolution</u>.   Except
as otherwise specifically provided in this Agreement, each Member
shall only be entitled to look solely at the assets of the
Company for the return of his or her positive Capital Account
balance and shall have no recourse for his or her Capital
Contribution and/or share of Net Profits (upon dissolution or
otherwise) against the Managers or any other Member except as
provided in Article X.

9.8   <u>Certificate of Cancellation</u>.   Any Manager or Member
who filed the Certificate of Dissolution shall cause to be filed
in the office of, and on a form prescribed by, the California
Secretary of State, a certificate of cancellation of the Articles
upon the completion of the winding up of the affairs of the
Company.

9.9   <u>No action for Dissolution</u>.   Except as expressly
permitted in the Agreement, a Member shall not take any voluntary
action that directly causes a Dissolution Event.   The Members
acknowledge that irreparable damage would be done to the goodwill
and reputation of the Company if any Member should bring an

action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1. Except where the Managers have failed to liquidate the Company as required by the Article IX, each Member hereby waives and renounces his right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles of this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights of interests of the complaining Member. Damages for breach of this Section 9.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

### ARTICLE X

### INDEMNIFICATION AND INSURANCE

10.1 _Indemnification of Agents_. The Company shall indemnify any person who was or is a party or is threatened to be made a party of any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee, or agent of the Company or that being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manger, director, officer, employee or their agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being refereed to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Managers shall be authorized, on behalf of the Company, to enter into indemnity agreements with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Managers deem prudent.

10.2 _Insurance_. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

# ARTICLE XI

## DEFINITIONS; MISCELLANEOUS

11.1 _Definitions_.  When used in this Agreement, the following terms shall have the meanings set forth below.  Terms not defined in the Section 11.1 shall have the meanings set forth elsewhere in this Agreement, or, if not so defined, the meanings given to such terms under laws of the State of California.

A.   "_Act_" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 1700 _et seq._, as the same may be amended from time to time.

B.   "_Affiliate_" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member.  The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

C.   "_Bankruptcy_" shall mean: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United State Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of Section 303(f)(1) of the United Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

D.   "_Code_" Shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable the Regulations (as defined below).

E.   "_Dissolution Event_" Shall mean with a respect to any Member one or more of the following: death, insanity, withdrawal, resignation, expulsion, Bankruptcy, dissolution or occurrence of

any other event which terminates the continued membership of any Member unless the other Members consent to continue the business of the Company pursuant to Section 9.1.

F.   "Distributable Cash" shall mean the amount of cash which the Managers deem available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Managers deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

G.   "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of Members, including, without limitation, the right to vote or participate in the management, except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of the Company.

H.   "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

I.   "Majority Interest" shall mean one or more Percentage Interests of members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

J.   "Member" shall mean each Person (said term to include all authorized legal representatives) who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with this Agreement or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

K.   "Net Profits and Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles, consistently applied, employed under the method of accounting used by the Company at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

L.   "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit "A" hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.  Percentage Interests shall be determined annually, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of the Members, effective as of the first day of the Company's

Fiscal Year but with all distributions under this Agreement to be deemed to have occurred on such day immediately prior to determination of the Percentage Interest of a Member.

M.  "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

11.2  Legends.  Each Member understands and agrees that the certificates (if any) evidencing the Membership Interest may bear the following or a substantially similar legend:

> THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE LAWS OF ANY STATE, AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS ALSO SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS SET FORTH HEREIN.

11.3  Headings; Interpretation.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption of burden or proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his counsel.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

11.4  Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with the Agreement or the transactions contemplated by this Agreement.  Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 11.7 of this Agreement, and that when so made shall be as if served upon him personally within California.

11.5 <u>Severability; Exhibits</u>.  If any provision of the Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

11.6 <u>Additional Documents and Acts</u>.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

11.7 <u>Notices</u>.  Any notice to be given or to be served upon the Company or any party hereto in connection with the Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to the Members or Managers at the address specified in Exhibit "A" hereto.  Any party may, at any time by giving five (5) days' prior written notice to other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

11.8 <u>Reliance on Authority of Person Signing</u>.  If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

11.9 <u>No Interest in Company Property</u>.  No Member or Economic Interest Owner has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

11.10 <u>Attorney's Fees</u>.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without litigation, reasonable attorney's fees and expenses.

11.11  <u>Time is of the Essence; Remedies Cumulative</u>.  All
dates and times in this Agreement are of the essence.  The
remedies under this Agreement are cumulative and shall not
exclude any other remedies to which any person may be lawfully
entitled.

11.12  <u>Special Power of Attorney</u>.  Each Member grants the
Managers a special power of attorney irrevocably making,
constituting, and appointed the Managers as the Member's attorney
in fact, with all power and authority to act in the Member's name
and on the Member's behalf to execute, acknowledge and deliver
and swear to the execution, acknowledgement, delivery and filing
of promissory notes, security agreements, UCC-1 financing
statements, assignments of certificates of membership interest,
or other documents of transfer to be delivered pursuant this
Agreement, as well as any consent to the representation of the
Company by counsel.  The foregoing special power: (i) is
irrevocable, (ii) is coupled with an interest, and (iii) shall
survive a Member's death, incapacity, or dissolution.

11.13  <u>Binding Effect; Parties in Interest</u>.  Subject to the
provisions of this Agreement relating to transferability, this
Agreement will be binding upon and inure to the benefit of the
Members, and their respective successors and assigns.  Except as
expressly provided in the Act, nothing in this Agreement shall
confer any rights or remedies under or by reason of this
Agreement of any Persons other than the Members and Managers and
their respective successors and assigns, nor shall anything in
this Agreement relieve or discharge the obligation or liability
of any third person to any party to this Agreement, nor shall any
provision give any third person any right of subrogation or
action over or against any party to this Agreement.

11.14  <u>Complete Agreement; Amendments</u>.  This Agreement and
the Articles constitute the complete and exclusive statements of
agreement among the Members and Managers with respect to the
subject matter herein and therein and replace and supercede all
prior written and oral agreements or statements by and among the
Members and Managers or any of them.  No representation,
statement, condition or warranty not contained in this Agreement
or the Articles will be binding on the Members or Managers or
have any force or effect whatsoever.  To the extent that any
provision of the Articles conflicts with any provision of this
Agreement, the Articles shall control.  All amendments to this
Agreement must be in writing and signed by all of the Members.
This Agreement may be executed in two or more counterparts, each
of which shall be deemed an original, but all of which shall
constitute one and the same instrument.

IN WITNESS WHEREOF, all of the Members of Berkeley
Healthcare Dynamics, LLC, a California limited liability company,
have executed this Agreement, effective as of October 17, 2012.

_____
THOMAS M. HENDERSON

_____
CLEMENT CHIN

_____
KEVIN SHIMAMOTO

**EXHIBIT "A"**

Berkeley Healthcare Dynamics, LLC
Operating Agreement

**EXHIBIT "A"**

CAPITAL CONTRIBUTION OF MEMBERS AND ADDRESS OF MEMBERS AND

MANAGER OF

Berkeley Healthcare Dynamics, LLC

October 17, 2012

| Members' Names | Members' Capital Contribution | Members' Percentage Interest |
|---|---|---|
| 1.  Thomas M. Henderson | $4,000.00 | 50% |
| 2.  Clement Chin | $5,000.00 | 25% |
| 3.  Kevin Shimamoto | $5,000.00 | 25% |

Managers' Names and Addresses

1.  Thomas M. Henderson, 409 13th Street, 8th Floor, Oakland, CA 94612

2.  Clement Chin, 409 13th Street, 8th Floor, Oakland, CA 94612

3.  Kevin Shimamoto, 409 13th Street, 8th Floor, Oakland, CA 94612