JEFFER MANGELS BUTLER & MITCHELL LLP
BENNETT G. YOUNG (Bar No. 106504)
byoung@jmbm.com
JOSEPH N. DEMKO (Bar No. 113104)
jdemko@jmbm.com
Two Embarcadero Center, 5th Floor
San Francisco, California 94111-3813
Telephone:    (415) 398-8080
Facsimile:    (415) 398-5584

Special Counsel for Receiver Susan L. Uecker

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA -SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> SAN FRANCISCO REGIONAL CENTER, LLC; THOMAS M. HENDERSON; CALIFORNIA GOLD MEDAL, L.P.; CALLSOCKET, L.P.; CALLSOCKET II, L.P.; CALLSOCKET III, L.P.; COMPREHENSIVE CARE OF OAKLAND, L.P.; NA3PL, L.P.; WEST OAKLAND PLAZA, L.P.; CALLSOCKET, LLC; CALLSOCKET II, LLC; CALLSOCKET III, LLC; COMPREHENSIVE CARE OF CALIFORNIA, LLC; IMMEDIA, LLC; and NORTH AMERICA 3PL, LLC, <br><br> Defendants, <br><br> -and- <br><br> CALLSOCKET HOLDING COMPANY, LLC; CALLSOCKET III HOLDING COMPANY, LLC; BERKELEY HEALTHCARE DYNAMICS, LLC; CENTRAL CALIFORNIA FARMS, LLC; and JL GATEWAY, LLC, <br><br> Relief Defendants. | Case No. 3:17-CV-00223-RS <br><br> **REPLY MEMORANDUM IN SUPPORT OF RECEIVER'S RENEWED MOTION FOR ORDER AUTHORIZING RECEIVER TO RETAIN REAL ESTATE BROKER TO LIST AND SELL REAL PROPERTY OF BERKELEY HEALTHCARE DYNAMICS, LLC** <br><br> Date:  August 16, 2018 <br> Time:  1:30 p.m. <br> Place: 450 Golden Gate Ave. <br>         17th Floor, Ctrm. 3 <br>         San Francisco, CA 94102 <br> Judge: The Hon. Richard Seeborg |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.  ADDITIONAL FACTS ............................................................................................. 2

    A.   The NA3PL Notes ........................................................................................... 2

    B.   Intervenors' Claim to Sweat Equity ................................................................ 5

    C.   NA3PL, LLC Guarantees the East West Bank Loan ..................................... 6

    D.   Intervenors' Proposed Sale ............................................................................. 6

    E.   Intervenors' Have Not Shown that the Buyer Has the Financial Ability to
         Perform the Proposed Transaction ................................................................. 8

    F.   Intervenors' Proposed Transaction Establishes the Benefits of a Public Sale ........... 9

III. ARGUMENT ........................................................................................................... 10

    A.   Cause Exists to Renew the Motion to List the 20th Street Warehouse on the
         Open Market .................................................................................................. 10

         1.   The Parties Are At An Impasse ........................................................... 11

         2.   Intervenors' Proposed Sale is Unacceptable. ...................................... 12

         3.   The Sale Proceeds Can be Used to Repay Unrelated EB-5 Investors ......... 12

    B.   The 20th Street Warehouse Should Be Sold in an Open Market Transaction ......... 12

    C.   The Statutory Requirements Applicable to a Private Sale Make a Public
         Sale Superior ................................................................................................. 13

IV.  CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Acadia Land Co. v. Horuff*,
 110 F.2d 354 (5th Cir. 1940) ................................................................................................ 14

*SEC v. T-Bar Resources LLC*,
 2008 WL 4790987 (N.D. Tex. 2008) ..................................................................................... 14

*SEC v. Wilson*,
 2013 WL 1283437 (E.D. Mich. 2013) ................................................................................... 14

*United States v. Prime*,
 431 F.3d 1147 (9th Cir. 2005) ................................................................................................. 4

*Western Surety Co. v. La Cumbre Office Partners, LLC*,
 8 Cal.App.5th 125, 132 (2018) ................................................................................................ 5

*Young v. Henderson*.
 Case No. RG15778891 ............................................................................................................ 8

**STATUTES**

28 U.S.C.
 § 2001 .................................................................................................................................... 13
 § 2001(a) ............................................................................................................................... 14
 § 2001(b) .................................................................................................................. 2, 8, 13, 14

California Civil Code
 § 2792 ...................................................................................................................................... 4

California Corporations Code
 § 17157(d) ............................................................................................................................... 5
 § 17703.01(b)(2) ..................................................................................................................... 5

**OTHER AUTHORITIES**

Federal Rule of Evidence 702 ........................................................................................................ 3

Susan L. Uecker, the duly appointed receiver (the "Receiver") for Defendants NA3PL, L.P. ("NA3PL, LP"); North America 3PL, LLC (NA3PL LLC"); and Relief Defendant Berkeley Healthcare Dynamics, LLC ("BHD"), as well as the remaining named entity Defendants and Relief Defendants (collectively the "Receivership Entities"), submits her reply memorandum in support of the Receiver's Renewed Motion for Order Authorizing Receiver to Retain Real Estate Broker to List and Sell Real Property of Berkeley Healthcare Dynamics, LLC (the "Renewed Motion") as follows:

## I. INTRODUCTION

The Receiver has amply demonstrated that cause exists to file the Renewed Motion. Intervenors still have not provided to the Receiver evidence that Intervenors' proposed buyer has the financial ability to close. As a result, Intervenors' proposed transaction is unacceptable. The buyer's financial ability to perform is obviously a critical element. Despite months to do so, Intervenors have yet to deliver a commitment letter establishing that their buyer has the ability to fund the transaction. The importance of a commitment letter is magnified by the terms of Intervenors' proposed transaction. Intervenors did not require the buyer make an earnest money deposit. Normally, one would expect a deposit of at least $500,000 to $1 million in a transaction of this magnitude. Instead, the buyer has no "skin in the game" and can walk away without a financial penalty.

The parties are at an impasse regarding the amount of EB-5 funds to which the Receiver is entitled from the sale proceeds. The parties agree that the net amount of $5,465,356.88 of EB-5 investor monies was transferred to BHD and BHD, LP from SFRC and NA3PL, LP. The impasse is over the validity of BHD's guaranties of two of the NA3PL Notes. NA3PL, LP raised over $18 million from EB-5 investors in reliance on a business plan under which NA3PL, LP would lend the funds to NA3PL, LLC. These investors were given the NA3PL Notes by Henderson and SFRC to use in connection with their I-526 petitions. Intervenors' vigorous objection to BHD's guaranty of the NA3PL Notes establishes that the parties are at an impasse.

Additionally, the SEC has demonstrated that the sales proceeds can and should be used to repay EB-5 investors their losses on unrelated projects. (Dkt. no. 422.) This alone supplies cause

for the Renewed Motion.

The 20th Street Warehouse should be sold in an open market transaction. Just the possibility of an open market transaction already has caused Intervenors to increase their price by $18.5 million. The property should be sold on the open market for cash and the net proceeds held pending the adoption of a plan of distribution by the Receiver. Intervenors' real goal is to obtain a distribution of the value of their interests in BHD prior to adoption of a plan of distribution and before any other creditor or investor receives a distribution.

Finally, the private sale proposed by Intervenors is subject to the cumbersome requirements imposed on private sales by federal receivers. *See* 28 U.S.C. § 2001(b). Intervenors completely ignore these mandatory requirements. Compliance with these requirements largely eliminates the benefits claimed by Intervenors for their proposed transaction..

## II.   ADDITIONAL FACTS

### A.   The NA3PL Notes

Intervenors claim to have never seen the two NA3PL Notes that were guaranteed by BHD (Exs. 15 and 16 to the Uecker Decl., dkt no. 414) and further claim that BHD's guaranties of those Notes are forged. According to the attorney for certain EB-5 investors, all three NA3PL Notes were provided to EB-5 investors by SFRC and Henderson to support the investors' I-526 visa petitions. *See* Declaration of Patrick P. Gunn in Support of Expansion of Receivership to Include NA3PL LLC and Berkeley Healthcare Dynamics, LLC, ¶ 12 and Exs. E, F. and G. (Dkt. no. 130.)[1] The notes provided to investors by Henderson and SFRC include the two notes that were guaranteed by BHD. *Id.*, Exs. E and F. Thus, EB-5 investors invested $18 million in NA3PL, LP at least in part based upon the NA3PL Notes and BHD guaranty of the Notes.

Intervenors first argue that the Receiver has not provided a reasonable commercial explanation for why BHD, the owner of the 20th Street Warehouse, would guaranty its tenant's debt. To the extent a commercial explanation is required, Intervenors, who were on the inside, are in a better position to supply one. Indeed, Intervenors speculated that the notes and guaranties

---

[1] Mr. Gunn's testimony is sufficient to authenticate the NA3PL Notes. Furthermore, the notes were attached as Exhibits 14 and 15 to the Monitor's Report. (Dkt. no. 129.)

were used to raise funds from investors in China. Intervenors' Opposition, p. 19, fn. 14.

That EB-5 investors would require a guaranty from BHD makes perfect sense. EB-5 investors invested in NA3PL, LP, which was supposed to lend the investor funds to NA3PL, LLC to be used in part to develop the 20th Street Warehouse. However, the warehouse was not owned by NA3PL LLC, but instead was owned by BHD. A sophisticated investor would realize that that unless BHD guaranteed the loan, NA3PL, LP would not have recourse to the warehouse in the event NA3PL, LLC failed to pay, greatly increasing NA3PL, LP's, and therefore EB-5 investors', risk.

Intervenors make a series of hyper technical arguments disputing the validity of the NA3PL Notes and the guaranties. This is mere grasping at straws. Intervenors claim that the address for SFRC on two of the Notes is wrong. True, SFRC's headquarters was in the Tribune Tower, but that does not mean that is what SFRC told EB-5 investors. The address on the Notes is 1750 Broadway, Oakland, California. The 1750 Broadway Building was owned by Callsocket II, L.P., another defendant, which acquired the property in October 2012. While owned by Callsocket II, the building had a huge sign on the front that read "San Francisco Regional Center". Supp. Dolby Decl., ¶¶ 3, 5 and Ex. B.

Intervenors next argue that the Notes incorrectly identify Henderson as the CEO of NA3PL, LLC and as managing member of BHD. The two NA3PL business plans in the section headed "Management Team," both describe Henderson as the CEO of NA3PL, LLC. *See* Uecker Decl. Ex. 13, p. 26; Ex. 14, p. 26. Bronson testified that she the author of the business plan. Deposition of Jennifer Bronson, p. 21, ll. 14 – 21, Young Decl. ¶ 2 and Ex. 1. Similarly, one of the two BHD operating agreements lists Henderson as a managing member, and he signed the East West loan documents and account signature cards as a managing member. *See* Uecker Decl. Exs. 3, 4, 5, 7 and 8. Chin and Shimamoto also signed each of these documents, establishing that they knew that Henderson was holding himself out as a managing member of BHD.

Intervenors contend that one of the notes has a photocopied signature. There is no evidentiary basis for this opinion. Handwriting analysis is a matter for expert opinion under Federal Rule of Evidence 702 and Intervenors did not offer any expert opinion testimony. *See*

1   *United States v. Prime*, 431 F.3d 1147 (9th Cir. 2005).

2       Intervenors claim that BHD is not a party and never identified in the two notes. This is not
3   accurate. Both notes state that "If NA3PL, LLC cannot repay the [$10,000,000 or $15,000,000]
4   back to NA3PL, LP, Berkeley Healthcare Dynamics is obligated to repay the [$10,000,000 or
5   $15,000,000]." That the reference is to BHD is made clear by the signature line. Henderson signed
6   as the managing member of Berkeley Healthcare Dynamics. Limited liability companies have
7   managing members; limited partnerships do not. Thus, the reference is to BHD.

8       Intervenors next assert that the notes do not use the word "guaranty" and do not contain a
9   promise to pay. The first does not matter (and Intervenors cite no authority that a guaranty must
10  use the word "guaranty") and the second is incorrect. As quoted above, both notes state that if
11  NA3PL LLC fails to pay, BHD is obligated to repay the amount borrowed. The language "is
12  obligated to repay" is sufficient language to constitute a promise to pay and create a guaranty.
13  Both notes have a signature line for both NA3PL, LLC and Berkeley Healthcare Dynamics. There
14  is no reason for BHD to sign the notes unless it has obligations under them.

15      Intervenors further argue that the notes do not set forth objective criteria under which the
16  guaranties mature and became due. Intervenors neglect to provide any authority for their position
17  that such objective criteria is a requirement. In any event, the quoted language adequately
18  describes when BHD must pay, namely if NA3PL, LLC cannot. This language meets the
19  requirement, to the extent it exists.

20      Intervenors argue that the guaranties lack consideration. Intervenors overlook California
21  Civil Code section 2792 which provides "Where a suretyship obligation is entered into at the same
22  time with the original obligation, or with the acceptance of the latter by the creditor, and forms
23  with that obligation a part of the consideration to him, no other consideration need exist." Cal. Civ.
24  Code § 2792. Thus, there is adequate consideration.

25      Finally, Intervenors argue that the guaranties of the NA3PL Notes by BHD, LLC were
26  unauthorized under BHD's operating agreement and therefore are invalid. Intervenors rely solely
27  on the provisions of the operating agreement and do not cite any legal authority to support their
28  position. Intervenors overlook Henderson's apparent authority to sign the guaranties and therefore

overlook the controlling statute, California Corporations Code section 17703.01(b)(2).

Whether or not Henderson had actual authority to bind BHD, he had apparent authority to execute the guaranties. BHD is a California limited liability company governed by the California Corporations Code. Section 17703.01(b)(2) of the Corporations Code provides:

> Every manager is an agent of the limited liability company for the purpose of its business or affairs, and the act of any manager, including, but not limited to, the execution in the name of the limited liability company of any instrument for apparently carrying on in the usual way the business or affairs of the limited liability company of which the person is a manager, binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom the manager is dealing has actual knowledge of the fact that the manager has no such authority.

Cal. Corp. Code § 17703.01(b)(2). Under the statute, a contract signed by a manager of an LLC is valid, even if the manager lacked authority, unless the third party had actual knowledge that the manager lacked authority: "The words of former § 17157(d)[2] are plain and clear: a written contract signed by an LLC's manager is valid even if the manager—without the knowledge of the third party—was without authority." *Western Surety Co. v. La Cumbre Office Partners, LLC*, 8 Cal.App.5th 125, 132 (2018).

Here, Henderson was a manager of BHD. *See* Uecker Decl., Ex. 3. p. 26. The guaranties are consistent with BHD's business and with the NA3PL business plans and were provided by Henderson and SFRC to EB-5 investors in connection with their investments. Furthermore, Intervenors knew that Henderson held himself out as a managing member of BHD. Henderson thus had apparent authority to execute the guaranties unless Intervenors can establish that the EB-5 investors had actual knowledge that he lacked authority. Intervenors have offered no such evidence.

**B.     Intervenors' Claim to Sweat Equity**

Intervenors do not dispute that they did not invest any capital in BHD and that all of the capital to acquire the 20th Street Warehouse and to improve the property was EB-5 investor

---

[2] *Western Surety Co.* addressed the now repealed California Corporations Code section 17157(d). The language of section 17157(d) is identical to the language of section 17703.01(b).

monies. Instead, Intervenors contend that they contributed 'sweat equity' in developing the businesses of BHD and NA3PL, LLC which justifies their claim to ownership of 60% of the equity in BHD.[3]

At most, the evidence supports Intervenors' contention only as to Shimamoto and Chin, not as to Bronson. Both Shimamoto and Chin testified to their efforts to build the businesses of BHD and NA3PL, LLC. (Dkt. Nos. 294-2 and 294-18.) However, as BHD did not operate a business and was only a passive owner of the real estate, the bulk of their efforts benefitted NA3PL, LLC's logistics business. Furthermore, an allocation that gives 60% of the profits to the parties that contributed labor only and just 40% of the profits to the party that contributed the required millions of dollars in capital is inequitable.

There is no corresponding evidence of Bronson's "sweat equity" on behalf of BHD and NA3PL, LLC. Bronson testified that she prepared business plans for submission to the United States Citizenship and Immigration Services. (Dkt. 423-1.) There is no evidence of her involvement in the acquisition of the 20th Street Warehouse or its development.

### C. NA3PL, LLC Guarantees the East West Bank Loan

BHD is indebted to East West Bank pursuant to a noted dated September 17, 2014 in the original principal amount of $6,200,000. This note is secured by a deed of trust encumbering the 20th Street Warehouse and is guaranteed by, among others, Henderson, Chin, Shimamoto, and SFRC. The note is also guaranteed by NA3PL, LLC the tenant of the 20th Street Warehouse. Supp. Uecker Decl. ¶ 2 and Ex. 23. Thus, tenant NA3PL, LP guarantied landlord BHD's debt to East West Bank. This guaranty, and BHD's guaranties of the NA3PL Notes indicate that creditors viewed NA3PL, LP and BHD as one and the same.

### D. Intervenors' Proposed Sale

Intervenors propose a sale of the 20th Street Warehouse to a joint venture between Lift Real Estate Partners and PCCP for $18.5 million. This is not an all cash transaction. Instead, the buyer will pay a portion of the purchase price in cash and the balance will be paid by Intervenors

---

[3] Because this motion relates to BHD, Intervenors' claimed efforts on behalf of NA3PL, LLC are not relevant.

converting their equity interests in BHD into equity interests in the buyer. The cash portion of the purchase price will be used to retire the East West Bank loan, to repay EB-5 investor monies of $5,465,356.88 plus interest and to satisfy the receivership estate's 40% equity interest in BHD. Murray Decl., ¶ 14. If confirmed, the proposed sale will result in the distribution to Intervenors of the value of their equity interests in BHD in advance of the adoption of a plan of distribution by the Receiver.

There are several notable omissions from Intervenors' proposed transaction that create doubt as to whether the transaction will close on the timeline asserted by Intervenors or at all. The letter of intent attached as Exhibit C to the Murray Declaration (dkt. no. 423-4) references a Schedule 1 which is supposed to set forth the dilution of Intervenors' ownership interests that will occur when Lift or PCCP fund additional money. No Schedule 1 is attached. The dilution to which Intervenors' are subject is an important issue to both Intervenors and to the capital partners, Lift and PCCP. If the potential dilution has not been agreed, the deal could be delayed or fall apart if parties do not agree prior to close. Furthermore, there is no LLC Agreement for the new buying entity attached. The terms of the LLC Agreement are likewise a material deal point and if this has not been agreed, the transaction could be delayed or collapse if the parties are unable to agree.

The form Purchase and Sale Agreement attached as Exhibit A to the Murray Declaration also is problematic. Section 3(b) provides that the buyer can request an ALTA survey of the property. An ALTA survey take six weeks to prepare. Supp. Dolby Decl. ¶ 8. The transaction thus will not close in thirty days, contrary to Intervenors' claim.

Most importantly, Intervenors' form Purchase and Sale Agreement does not provide for an earnest money deposit by the buyer. Thus, the buyer can walk away without any financial penalty, for example if PCCP is unable or unwilling to fund the purchase. The absence of a deposit is particularly important because the property will be off the market. The market could decline while the property is tied up. Furthermore, potential buyers often perceive that cancellation of an escrow indicates a problem with the property. This can impact getting another offer and can affect what price is offered. Supp. Dolby Decl. ¶ 10.

In general, in a transaction such as this, one would expect an earnest money deposit of

between $500,000 to $1,000,000. Supp. Dolby Decl. ¶ 10. Such an amount insures that the buyer is committed to the transaction and compensates the seller for any delay and adverse consequences if the buyer cancels. The deposit usually is refundable for a short period of time, after which the buyer is required to increase the deposit and the entire amount becomes non-refundable. *Id.* For example, the Receiver, in her capacity as the receiver appointed in the action pending in the California Superior Court for the County of Alameda, entitled *Young v. Henderson*. Case No. RG15778891, sold the real property owned by the Receivership Entities known as the Tribune Tower for $20,400,000 with a $1,000,000 earnest money deposit. Supp. Uecker Decl. ¶ 3. Here there is no earnest money deposit whatsoever, giving the buyer a free option to decide whether to close the purchase.

Intervenors' claim that a competing purchase would have to exceed $19.5 million to generate the same net proceeds to the Receivership estate is incorrect.[4] Intervenors claim that they will save the Receivership estate the cost of a broker's commission. That is not correct. As discussed in more detail below, Intervenors' proposed sale must be advertised publicly. *See* 28 U.S.C. § 2001(b). The requirement that the sale be publicly advertised means that the Receiver must make a good faith effort to market the property, implying that the Receiver will need a broker to handle this effort.

Furthermore, the Receiver's legal and other costs likely will be higher in Intervenors' proposed transaction. The form Purchase and Sale Agreement permits the buyer to inspect the property and conduct other due diligence. Normally the due diligence process is handled by the seller's broker and the broker's compensation for doing so is included in the broker's commission. Supp. Dolby Decl. ¶ 11. If there is no broker, then the process would be handled by the Receiver and her counsel, resulting in increased costs. Furthermore, as discussed below Intervenors' proposed transaction will require the Court to appoint three appraisers, at significant cost.

E.   **Intervenors' Have Not Shown that the Buyer Has the Financial Ability to Perform the Proposed Transaction**

---

[4] There is no evidence to support this calculation. The brokerage commission on a sale at $18.5 million would be $555,000. There is no evidence to support the additional $445,000. The figure appears to have simply been invented by Intervenors.

The Receiver has not been provided with adequate evidence that the proposed buyer has the financial ability to perform. According to the Declaration of Michael Murray (dkt. no. 423-4) submitted by Intervenors, the buyer will be a joint venture between Lift Real Estate Partners and PCCP. Murray Decl. ¶ 11. PCCP will provide the majority of the cash needed to fund the cash portion of the purchase price. *Id.* Intervenors offer Exhibit B to the Murray Declaration as evidence of PCCP's ability to fund the transaction.

Exhibit B, however, is inadequate. The document (which is not properly authenticated and is hearsay) does not state that PCCP has the cash to fund the transaction nor does it state the amount of liquid assets PCCP has. Instead, the document states that PCCP has "capital commitments from investors" and that PCCP's net worth includes "unfunded capital commitments." No detail is furnished. The implication is that PCCP does not have the cash and instead must get it from its investors. What conditions PCCP's "unfunded capital commitments" are subject to, the mechanics and timing of the process to raise funds from investors, and whether the investors have the ability and willingness to fund are all unknown.

More importantly, Exhibit B does not contain any commitment by PCCP. Exhibit B merely states PCCP's claimed net worth. It does not state that PCCP has agreed to the transaction, does not state that PCCP is committed to fund the transaction and does not state that PCCP has obtained all necessary internal approvals, such as investment committee approval, to fund the purchase. The document is not a commitment letter. There is no evidence that there is a committed source of funds to finance the proposed transaction.[5]

F.   **Intervenors' Proposed Transaction Establishes the Benefits of a Public Sale**

The history of the transaction proposed by Intervenors establishes the benefit to the Receivership Estate of a competitive public sale process. Intervenors' offer to purchase the 20th

---

[5] At approximately 4:40 p.m. on Friday July 6, Intervenors' counsel, Mr. Dunne, provided to the Receiver's counsel a second letter from PCCP. Mr. Dunne stated that the new PCCP letter contained PCCP's proprietary information and he requested that the Receiver maintain the confidentiality of PCCP's information. The new letter contains additional information regarding PCCP. However, the new letter still does not state that PCCP has agreed to the transaction, still does not state that PCCP is committed to fund the transaction and still does not state that PCCP has obtained all necessary internal approvals. Intervenors still have not provided a commitment letter.

Street Warehouse has increased by $1,500,000 since the Receiver first proposed to list the property. The Receiver's original motion to list the 20th Street Warehouse (dkt. no. 281) was supported by a Broker's Opinion of Value of $16,970,000. In response, Intervenors proposed a sale to Lift Real Estate Partners for $17 million. Intervenors' Opposition to Uecker's Motion for Order Authorizing (1) Closing North America 3PK, LLC; and (2) Retaining Broker For Listing and Sale of Berkeley Healthcare Dynamics, LLC Property, p. 24. (Dkt. no. 294). In her Renewed Motion, the Receiver states that she has received unsolicited offers at $18.5 million. Intervenors again propose a sale to Lift, this time coincidentally at $18.5 million.[6] Without any marketing, without any sales effort whatsoever, and without a competitive process, the Lift offer has improved by $1.5 million. In the Receiver's business judgment, a marketing effort and a competitive process is likely further to increase the purchase price.

## III.     ARGUMENT

### A.     Cause Exists to Renew the Motion to List the 20th Street Warehouse on the Open Market

Intervenors spill much ink arguing that there are no grounds for the Receiver to bring the Renewed Motion. In its Order, the Court stated the circumstances under which the Receiver could renew her motion:

> In the event no consensus can be reached on the figures, and/or the Receiver offer other legitimate reasons the intervenors' proposal is unacceptable, she my renew her motion for authority to list and sell the warehouse on the open market. The Receiver may also renew her motion if she and/or the SEC can demonstrate that it would be legal and appropriate to apply funds from the sale of the Warehouse to unrelated losses suffered in connection with other EB-5 projects, despite full repayment of all funds paid into BHD and the Warehouse from these projects or other defendants.

Order Granting Motion For Authorization to Close North America 3PL, LLC and Denying without Prejudice Motion to Retaining [sic] Broker for Listing and Sale of Warehouse. (Dkt. No. 336.) Here, the parties did not reach consensus on the figures, Intervenors' proposal lacks a financing commitment and is unacceptable, and, as the SEC demonstrated in its response to the

---

[6] The implication is that Intervenors attempted to buy the 20th Street Warehouse for less that it was worth, to the detriment of the Receivership Estate.

REPLY MEMO ISO RECEIVER'S RENEWED MTN FOR ORDER AUTHORIZING RECEIVER TO RETAIN ESTATE BROKER TO LIST AND SELL REAL PROPERTY OF BHD, LLC

Renewed Motion (dkt. no. 422), it is "legal and appropriate to apply funds from the sale of the warehouse to unrelated losses suffered in connection with other EB-5 projects…."

### 1. The Parties Are At An Impasse

Contrary to Intervenors' assertions, the parties have not reached consensus on the figures. Intervenors apparently have withdrawn their objection to the recovery of EB-5 investor funds that were transferred to BHD, LP.[7] Thus, the parties agree that the net amount of $5,465,356.88 of EB-5 investor monies was transferred to BHD and BHD, LP from SFRC and NA3PL, LP.

The impasse is over BHD's guaranty of the NA3PL Notes. Intervenors categorically deny the validity of the guaranties. The Notes with the guaranty language were given to EB-5 investors by SFRC and Henderson, apparently to induce them to invest. Gunn Decl., ¶ 12. (Dkt. no. 130.) The Receiver therefore believes that the Notes and guaranties may be valid. Certainly the Receiver cannot just walk away from the guaranties simply because Intervenors, who have a huge financial interest in declaring the guaranties invalid, dispute them. This is an impasse.

The validity of the Notes and guaranties is not before the Court on this motion.[8] Neither is the validity of Bronson's claimed 10% interest in BHD. Further proceedings may be necessary to determine the validity of the guaranties and Bronson's interest. The Receiver recognizes that the fact that there are three NA3PL Notes raises an obvious question. Nonetheless, if one of the guaranties is valid, it will absorb all of the remaining proceeds of a sale. This is the Receiver's point: whatever sale is ultimately approved must allow for the possibility that the NA3PL Notes and the guaranties could be determined to be valid in a subsequent proceeding. The sale proposed by Intervenors, however, locks the Court in to a particular plan of distribution with respect to the proceeds of the sale of the 20th Street Warehouse and therefore forecloses the possibility of collecting the guaranties.

---

[7] Intervenors disputed the Receiver's right to recover the EB-5 funds that were transferred to BHD, LP, conditioned their agreement to the recovery of such funds on the Receiver's acceptance of Intervenor's proposed sale and reserved their rights.

[8] At this time the Receiver seek only authority to retain a broker. Once a buyer is located, the Receiver contemplates a further motion to confirm the sale and further contemplates that the net sale proceeds would be escrowed pending a determination of the rights thereto and the adoption of a plan of distribution.

### 2. Intervenors' Proposed Sale is Unacceptable.

The Receiver had legitimate reasons to reject the transaction proposed by Intervenors. Even now, Intervenors have not provided proof that the buyer has the financial ability to close. Intervenors admit that they did not provide this evidence to the Receiver earlier, despite the obvious need for it. Intervenors blame the Receiver for their failure to do so, claiming that they would do so after the parties agreed upon a sale, but the Receiver never agreed upon the price or terms of a sale.

Intervenors put the cart before the horse. Whether a potential buyer has the ability to perform is a critical factor. Indeed, a seller will often accept a lower price from a more qualified buyer in order to have greater certainty of closing. Qualification is key. One doesn't negotiate the price and terms of a sale and then investigate whether the buyer is able to perform. Instead, one qualifies the buyer and then negotiates. To do otherwise risks wasting time and effort on unqualified buyers. Supp. Dolby Declaration, ¶¶ 6, 7.

More importantly, Intervenors still have not provided evidence of the buyer's ability to perform. There is no earnest money deposit. There is no evidence that the buyer has the funds to close and there is no financing commitment. Exhibit B to the Murray Declaration is not a commitment letter and the document does not establish that PCCP has the liquidity to close. Nor is the new letter from PCCP, provided by Intervenors at the 11th hour, a commitment letter.

### 3. The Sale Proceeds Can be Used to Repay Unrelated EB-5 Investors

The Receiver submits that the SEC has demonstrated that the sales proceeds can and should be used to repay EB-5 investors their losses on unrelated projects. (Dkt. no. 422.) This factor alone is cause for the Receiver to renew her motion to list and sell the 20th Street Warehouse.

### B. The 20th Street Warehouse Should Be Sold in an Open Market Transaction

The Receiver and Intervenors agree that the 20th Street Warehouse should be sold. The dispute is not whether to sell, but whether to sell in an open market transaction or in a private sale transaction in which Intervenors will receive a distribution of the value of their equity interest in BHD before a plan of distribution is adopted and in advance of distributions to any other creditor

or investor.

Selling the warehouse in an open market transaction is the superior process. Intervenors seek a no bid process, with no competition. The benefit of an open market transaction can be seen from the history of Intervenors' proposed transaction. Just the possibility of a competitive, open process has caused the offered price to jump by $1,500,000, an almost 10% increase. The Receivership Estate would receive at a minimum 40% of that increase. That Intervenors continue to push for a no bid transaction suggests that Intervenors know that they are getting a below market price.

There is no possible prejudice to Intervenors in an open market transaction. The Receiver is indifferent as to whom she sells the property. The Receiver's criteria is that she sell to the party making the highest and best offer, whomever that might be. Intervenors' money is green just like everyone else's. If Intervenors' offer is the highest and best offer, the Receiver likely will accept it.

Intervenors criticize the three month length of the Receiver's proposed listing agreement. Three months is the maximum length, not the minimum. If an offer is received sooner, which the Receiver believes is likely, the process will proceed more quickly.

### C. The Statutory Requirements Applicable to a Private Sale Make a Public Sale Superior

Intervenors' proposed transaction is a private sale. Indeed, Intervenors' goal is to avoid a public, competitive sales process. A private sale of real property by a federal receiver is subject to strict statutory requirements. *See* 28 U.S.C. § 2001(b). Intervenors did not propose to comply with these requirements. Indeed, Intervenors wholly ignore these requirements and did not cite the controlling statute in their brief, perhaps because compliance with the statute is cumbersome and expensive and undercuts any claimed benefit from the private sale process urged by Intervenors.

The sale of real property by a federal receiver is governed by 28 U.S.C. § 2001. That section provides:

> (a) Any realty or interest therein sold under any order or decree of any court of the United States shall be sold as a whole or in separate parcels at public sale at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein, as the court directs. Such sale shall be upon such terms and conditions as the court directs.

> Property in the possession of a receiver or receivers appointed by one or more district courts shall be sold at public sale in the district wherein any such receiver was first appointed, at the courthouse of the county, parish, or city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such county, parish, or city, as such court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more ancillary districts.
>
> (b) After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest or any part thereof at private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby. Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale.

28 U.S.C. § 2001(a) & (b). Because section 2001(b) uses the word "shall", the provisions relating to private sales are mandatory. *Acadia Land Co. v. Horuff*, 110 F.2d 354, 355 (5th Cir. 1940) ("[A]ll of the requirements are, by the express terms of the statute, made conditions precedent to a valid sale.") The court has no discretion to deviate from these requirements. *SEC v. Wilson*, 2013 WL 1283437, *1 (E.D. Mich. 2013); *SEC v. T-Bar Resources LLC*, 2008 WL 4790987, *3 (N.D. Tex. 2008).

Thus, as directed by section 2001(b), before the Court can confirm Intervenors' proposed transaction, the Court must appoint three disinterested appraisers to appraise the 20th Street Warehouse and the Court must find that the proposed sales price is at least two-thirds of the appraised value. Furthermore, the terms of the sale must be advertised in such newspapers as the Court directs and the sale cannot be confirmed if a bona fide overbid is made that is at least ten percent higher. Because the Court must find that the proposed sale is in the best interests of the estate, the Court appears to have the discretion to decline to confirm the sale if an overbid is received that is less than ten percent greater than the offered price.

These mandatory requirements are cumbersome and likely expensive. The appraisal process will undoubtedly consume several weeks and, since the court must appoint three

appraisers, will be costly. Intervenors' claim that their proposed transaction can close in thirty days is a mirage.

Furthermore, the requirements that the sale be publicly advertised and overbids accepted severely undercut the potential benefit, if there is any, from a private sale. The Receiver likely will require a broker to handle marketing the property. It makes no sense to incur the cost and delay of the appraisal process and then to receive overbids. Far better to run a public sales process, as proposed by the Receiver, and avoid these cumbersome requirements.

## IV.     CONCLUSION

WHEREFORE, the Receiver prays for an order of this Court that:

1.     Authorizing the Receiver pursuant to Paragraph 36 of the Appointment Order to enter into the Listing Agreement with Colliers International for the 20th Street Warehouse as set forth in the Motion; and

2.     For such other and further relief as the court deems proper.

DATED: July 9, 2018

JEFFER MANGELS BUTLER & MITCHELL LLP
BENNETT G. YOUNG
JOSEPH N. DEMKO

By:     */s/ Bennett G. Young*
BENNETT G. YOUNG
Special Counsel for Susan L. Uecker, Receiver