UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 17-cv-00223-RS |
| Plaintiff, | |
| v. | **ORDER AWARDING FEES** |
| SAN FRANCISCO REGIONAL CENTER LLC, et al., | |
| Defendants. | |

## I. INTRODUCTION

The Securities and Exchange Commission filed this civil enforcement action in January of 2017. In some respects, however, its roots go back to a 2015 state court action filed by a private plaintiff, Allan Young, who initially brought claims only in his individual capacity, but later pursued derivative claims on behalf of some of the entities eventually named as defendants in this action. Young's amended state court complaint also asserted adversarial claims against some of the other entities named as defendants or relief defendants here. Young was represented in the state court proceedings by Pritzker Levine LLP.

Pritzker obtained appointment of a receiver in the *Young* action. When the SEC subsequently filed this action and moved for appointment of a receiver and a stay of all other pending litigation, Pritzker opposed the motion, asserting that the SEC sought to "steal away proceeds obtained by [a] separately-appointed state court receiver, and to add those proceeds to its own federal receivership estate." The firm argued against a stay of the state court action, and

United States District Court
Northern District of California

1   suggested that, if a federal receivership were necessary, there be two receiverships, one in federal
2   court, and a continuation of the state court receivership.

3        The motion to appoint a receiver in this case was granted. Young's proposal for a "dual
4   receivership" was rejected. Susan L. Uecker, the state court receiver was named as the federal
5   receiver, all state court litigation was stayed. Approximately $25.2 million was transferred from
6   the state receivership to the federal receivership. The federal receivership also later received
7   approximately $1.55 million from sale of a commercial property that had been initiated during the
8   state court proceedings.

9        Now, nearly six years later, after many complex transactions, extensive contested and
10  uncontested motion practice, settlements, and appeals, the receivership is on the verge of
11  completion. The only substantial issue remaining is the amount of fees to be awarded to Pritzker
12  for its efforts in the *Young* matter. The Ninth Circuit has ruled that Pritzker is entitled to a
13  "reasonable award of attorney fees under the "common fund" doctrine "in light of [its]
14  contributions." The award is to be treated as an administrative claim.

15       Pritzker requests an award of $2,669,449.00, which represents 10% of the amount it
16  contends is the "common fund." Alternatively, Pritzker suggests that applying a multiplier of 1.98
17  to its "lodestar" would be reasonable and would result in the same award.

18       Under all the circumstances present here, the lodestar approach is the best method for
19  ensuring Pritzker receives a reasonable fee award for its contributions to the ultimate recovery by
20  the injured investors. Furthermore, the SEC's proposal to disallow recovery for certain aspects of
21  Pritzker's work is foreclosed by the Ninth Circuit's prior ruling. No multiplier, however, is
22  warranted. As Pritzker has adequately shown that its hourly rates and time expended were
23  reasonable, it will be awarded its full lodestar of $1,346,204.75, together with reimbursement of
24  $30,800.54 in litigation expenses.

25
26
27
28

## II. DISCUSSION

### A. Preferability of lodestar approach

When Pritzker first sought a fee award in 2020, the parties all agreed this was a unique fact situation and that there was no law directly on point. The Ninth Circuit has now held that "Pritzker's efforts in the state court litigation—which included filing the case, obtaining the appointment of a receiver, working closely with the receiver in amassing the receivership fund, and defending the fund against various claims— undeniably caused the creation, discovery, increase, or preservation of a common fund that benefited investors at the conclusion of the federal action" and that it is therefore entitled to recover fees under the common fund doctrine. Nevertheless, this remains a highly unusual fact situation. Pritzker obtained the prejudgment remedy of a receivership in a separate litigation where it was first acting on behalf of a single client. Then, even after it brought derivative claims that would inure to the benefit of some of the investors who shared in the recovery achieved in this action, it had also named as adversarial defendants a number of entities associated with others of the investors.

As the prior order denying fees recognized, and the Ninth Circuit held, the mere fact that Pritzker did not obtain a *judgment* that benefited the investors does mean it failed to "create, discover, increase or preserve a fund to which others also have a claim." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). Quoting *Vincent*, the Ninth Circuit observed, "the common fund doctrine requires that the work of the attorney seeking an extra fee be *a* cause-in-fact of any claimed benefit to the fund, but not the *only* cause-in-fact."

Here, Pritzker's work was only one part of a multi-year and complex effort by numerous parties, including the SEC and its counsel, and the receiver and her counsel, to marshal and preserve the assets and to obtain the settlements and liability determinations necessary to allow the fund to be distributed to the investors. Thus, while Pritzker's efforts were *a* cause-in-fact of the investors' recovery, it would be wholly inappropriate to start the calculation of a reasonable fee from the ordinary 25% of the common fund "benchmark."

In recognition of that fact, Pritzker instead proposes it be awarded 10% of the amount that

United States District Court
Northern District of California

1  was transferred from the state court receivership to the federal receivership, inclusive of sales

2  proceeds that came in shortly thereafter. While abundant caselaw has established the 25%

3  benchmark in typical cases, there is no precedent establishing a presumptively reasonable

4  percentage in circumstances like these.

5  "Where a settlement produces a common fund for the benefit of the entire class, courts

6  have discretion to employ either the lodestar method or the percentage-of-recovery method." *In re*

7  *Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). The *Bluetooth* court

8  explained, "[b]ecause the benefit to the class is easily quantified in common-fund settlements, we

9  have allowed courts to award attorneys a percentage of the common fund in lieu of the often more

10 time-consuming task of calculating the lodestar." *Id.*

11 Here, the SEC vigorously disputes that the size of the "common fund" for which Pritzker

12 can take credit is even quantifiable. Although the SEC's points have considerable merit, even

13 assuming Pritzker is responsible for the "creation, discovery, increase, or preservation of a

14 common fund" in the amount it claims, it does not follow that the "benefit to the class" can be

15 easily quantified as that same number. Just as the SEC's efforts to recover for investors might

16 have gone for naught had Henderson and his associates stripped away all of the value in the

17 companies prior to appointment of the state receiver, the mere marshalling of assets by the

18 receiver would have done the investors no good had the SEC not worked to establish liability and

19 obtain the settlements and judgments necessary to distribute the funds to the investors. Without

20 liability determinations against defendants, the assets in the hands of the receiver would have

21 eventually been returned to them, not to the investors.

22 *Bluetooth* cautions that although courts have discretion to choose between a percentage-of-

23 fund calculation or the lodestar method, "their discretion must be exercised so as to achieve a

24 reasonable result." 654 F.3d at 942. As an example, the court suggests that where awarding 25%

25 of a "megafund" settlement "would yield windfall profits for class counsel in light of the hours

26 spent on the case" either the benchmark must be adjusted or the lodestar approach should be

27 applied." *Id.* While the issue here is not a "megafund" settlement, awarding an arbitrary 10% of

28

the amount of the funds in the hands of the receiver at the time of the transfer and the subsequent sales proceeds is not a reasonable result.

Finally, although the receiver now supports an award to Pritzker in the amount it requests, her original position was that it should only receive the lodestar, with no multiplier. See Dkt. No. 758. Pointing to the Ninth Circuit's conclusion that the fee award should be allowed as an administrative claim, the receiver suggests the court "appears to have rejected" her position. The receiver concedes, however, that the Ninth Circuit "did not specifically address this point," and it is unclear why she believes the ruling that fees be allowed as an administrative claim has any bearing on the amount that is appropriate to award. Indeed, the Ninth Circuit expressly remanded "for a determination of a *reasonable* award in light of Pritzker's contributions." (Emphasis added.)

The receiver candidly acknowledges she is supporting the fee claim now in large part because of the value to all involved, especially the investors, of having a final resolution in this case. Even assuming the SEC is less likely to appeal an award in the full amount requested than Pritzker is to appeal a smaller award, the expediency of simply granting the motion in full is not a factor that bears on whether the fee is reasonable.[1]

B. Lodestar calculation

*1. Hours expended*

Pritzker has submitted 109 pages of detailed time entries demonstrating the work its attorneys and paralegals performed in connection with the *Young* case. Pritzker declares that it has excised from its fee request (1) all time spent solely in connection with Young's individual claims,

---

[1] As noted in a prior order, all the relevant actors remaining in this litigation have at least some duty to see this matter brought to a final conclusion as expeditiously and economically as possible and it plainly would not be in the interest of the receivership estate or the individual investors to face the expense and delay of another appeal. For that reason, the parties were ordered to engage in additional meet and confer negotiations. On their own initiative, the parties requested the assistance of a magistrate judge. Although those efforts proved unsuccessful, they were appreciated.

(2) all time monitoring this action after the stay of the state court action was entered, (3) all time preparing the firm's fee claim and negotiating it with the receiver, (4) all time expended on the fee motions, and (5) all time incurred in the appeal of the first fee order.

The SEC does not take issue with the reasonableness of the hours Pritzker expended on any of the various tasks reflected in the time entries. Review of those records reveals occasional time entries that might be questioned were it appropriate to nit-pick, but overall the firm has shown it carried out the tasks with reasonable efficiency, and in a manner that was consistent with the complexity of the litigation and what was at stake.[2]

The SEC does argue, however, that certain blocks of time should be excluded completely. First, the SEC would disallow nearly $285,000 in fees incurred during the first year of the *Young* matter on grounds that Pritzker was only representing a single private client (Young) with interests and claims distinct from those of the investors, and there was no receivership. Second, the SEC would eliminate another approximately $56,000 of entries relating to work that was done later to complete tasks begun during the initial period, and which have "no apparent relation to claims that might benefit the receivership." Third, the SEC would exclude approximately $45,000 in time related to an attempt to remove the state court action to federal court. Finally, the SEC argues Pritzker should not recover for its efforts to oppose the appointment of a federal receiver, another approximately $40,000.

The short answer lies in the Ninth Circuit's decision: "Pritzker's efforts in the state court litigation—*which included filing the case*, obtaining the appointment of a receiver, working closely with the receiver in amassing the receivership fund, *and defending the fund against*

---

[2] As an exemplar of potentially questionable entries, a timekeeper billed a half-hour, at the cost of nearly $250, for "Research re: verification for discovery responses." Without more, it is difficult to imagine why it would be necessary to conduct research regarding such a basic and commonplace issue. Courts have discretion, of course, to impose a "haircut" of up to 10% on fee claims without detailed explanation, for the very reason that billings sometimes include a small degree of excess. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). The relatively few suspect time entries here do not warrant a "haircut."

*various claims*— undeniably caused the creation, discovery, increase, or preservation of a common fund . . . ." (Emphasis added.) While Pritzker may have only been representing Young at the outset, all those initial efforts were a compensable prelude to the work that ultimately led to the common fund.[3] Accordingly, Pritzker has adequately shown it reasonably incurred 2056.8 hours of attorney and paralegal time in the matter.

### 2. *Hourly rates*

Pritzker's timekeepers billed at hourly rates ranging from $250 to $695. Additionally, Pritzker attorneys billed at substantially reduced rates when carrying out administrative tasks that otherwise might have been delegated to paralegals. Pritzker has adequately shown that its rates were those it customarily charged, that they were in line with rates prevailing in the community for similar work, and consistent with rates approved in other cases. The SEC does not contest that showing, other than to point out that the state court had indicated it would apply a much lower rate cap. The state court's determination, however, does not compel a conclusion that Pritzker's claimed hourly rates are unreasonable.

### C. <u>Multiplier</u>

As noted, Pritzker's lodestar, calculated by multiplying the hours expended by the hourly rates, is $1,346,204.75. The lodestar figure is "presumptively reasonable." *Cunningham v. Cnty. of Los Angeles,* 879 F.2d 481, 488 (9th Cir. 1988). A court has discretion to adjust the lodestar upward or downward by an appropriate positive or negative multiplier, based on a number of "reasonableness" factors, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Bluetooth,*

---

[3] Pritzker explains that opposing the removal to federal court was intended to defend against possible termination of the receivership. Likewise, although Pritzker's advocacy for a dual receivership and/or the right to continue litigating in state court was not successful, it represented an effort to preserve the fund.

United States District Court
Northern District of California

654 F.3d at 942. The foremost consideration, however, is the benefit obtained for the class. *Id.;* *see also McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff").

Here, Pritzker was highly successful in obtaining appointment of a receiver who then appears to have marshalled as much of the remaining assets for eventual distribution to investors (upon a liability determination) as was reasonably possible. The fact that Pritzker was unable to see the matter through to the end was a result of the SEC's election to bring a civil enforcement action, and no fault of Pritzker.

Nevertheless, for all the reasons discussed above, Pritzker's contribution to the ultimate recovery of the investors, while *a* cause-in-fact, was only one part of a massive, multi-year effort involving the work of many others. To the extent that any of the other factors arguably lean in Pritzker's favor, they do not carry sufficient weight to render an award of the base lodestar amount unreasonable or unfair to Pritzker. As such, while there certainly is no reason to apply a *negative* multiplier, an upward adjustment of the lodestar is not warranted.[4]

Finally, Pritzker has adequately shown it incurred $30,800.54 in litigation expenses. The SEC has not challenged that figure, and it will be awarded.

### III.  CONCLUSION

Pritzker is awarded $1,346,204.75, together with reimbursement of $30,800.54 in litigation expenses. The sums are allowed as an administrative claim.

---

[4]  As noted, Pritzker's proposed multiplier would give it effectively the same recovery as its proposed 10% of the transferred funds. Such an end run is not tenable.

United States District Court
Northern District of California

1    **IT IS SO ORDERED**.

2

3    Dated: October 17, 2022

4                                        _____

5                                        RICHARD SEEBORG
                                         Chief United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California